# EXHIBIT 4

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF COLORADO
2    Civil Action No. 15-cv-00765-REB-KMT
     _____
3
     VIDEOTAPE DEPOSITION OF:  EDWARD K. QUICK
4                             July 15, 2016
     _____
5
     EDWARD K. QUICK,
6
     Plaintiff,
7
     v.
8
     FRONTIER AIRLINES INC. and MICHELE ZEIER, an
9    individual,

10   Defendants.
     _____
11

12           PURSUANT TO NOTICE the videotape
     deposition of EDWARD K. QUICK was taken on behalf of
13   the Defendants at 555 17th Street, Suite 3200, Denver,
     Colorado 80202, on July 15, 2016, at 9:16 a.m., before
14   Teresa Coogle, Registered Professional Reporter,
     Certified Realtime Reporter, and Notary Public within
15   Colorado.

16

17

18

19

20

21

22

23   **H+G**

24

25   Hunter + Geist, Inc.

303.832.5966     1900 Grant Street, Suite 1025     ■ www.huntergeist.com
800.525.8490     Denver, CO 80203                  ■ scheduling@huntergeist.com

Your Partner in Making the Record

Court Reporting, Legal Videography, and Videoconferencing

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Civil Action No. 15-cv-00765-REB-KMT

———————————————————————————

VIDEOTAPE DEPOSITION OF:  EDWARD K. QUICK
                July 15, 2016

———————————————————————————

EDWARD K. QUICK,

Plaintiff,

v.

FRONTIER AIRLINES INC. and MICHELE ZEIER, an
individual,
Defendants.

———————————————————————————

          PURSUANT TO NOTICE the videotape
deposition of EDWARD K. QUICK was taken on behalf of
the Defendants at 555 17th Street, Suite 3200, Denver,
Colorado 80202, on July 15, 2016, at 9:16 a.m., before
Teresa Coogle, Registered Professional Reporter,
Certified Realtime Reporter, and Notary Public within
Colorado.

**2**

              A P P E A R A N C E S
     For the Plaintiff:
          JOSEPH A. WHITCOMB, ESQ.
          DAN McAULIFFE, ESQ.
          Whitcomb Law, PC
          1391 Speer Boulevard, Suite 705
          Denver,  Colorado 80204
     For the Defendants:
          WILLIAM R. DABNEY, ESQ.
          Holland & Hart, LLP
          555 17th Street, Suite 3200
          Denver, Colorado 80202

     Also Present:

          Rodney Hudson, Videographer
          Michelle Zeier

**3**

                    I N D E X
EXAMINATION OF EDWARD K. QUICK:              PAGE
July 15, 2016

By Mr. Dabney                              7, 307

By Mr. Whitcomb                               285

                                          INITIAL
DEPOSITION EXHIBITS:                     REFERENCE
Exhibit 1   Resume                               8
Exhibit 2   Employment Application              25
Exhibit 3   USERRA/VP Report Contact,          44
            1/14/15

Exhibit 4   Timeline of Events                  68

Exhibit 5   Letter to Kenyon from Hopkins,      75
            4/24/06

Exhibit 6   Email to Popp from Welt,            85
            6/1/07, Subject:  RE: Ed Quick

Exhibit 7   Email to Quick from Roe, 6/18/07,   89
            Subject: TRB
Exhibit 8   Memorandum For Front Airlines,      90
            Attn: Jim Colburn (Chief Pilot),
            Subject: Military Leave, 6/18/07
Exhibit 9   Statement Of Medical Examination    98
            And Duty Status, July 2011

Exhibit 10  Neuropsychological Evaluation,     102
            6/25/12
Exhibit 11  Memorandum For Medical Evaluation  106
            Board from 460th MDOS/Aerospace
            Medicine, Subject:  Medical History
            CW4 - Edward Quick 20/8255

Exhibit 12  Memorandum For USAPDA              114
            from 460th MDOS/Aerospace
            Medicine, Subject:  Medical History
            CW4 - Edward Quick 20/8255

**4**

Exhibit 13  Social Security Administration,    122
            Function Report

Exhibit 14  Social Security Administration,    131
            Medical Source Statement Of Ability
            To Do Work-Related Activities
            (Mental)
Exhibit 15  Reporter's Transcript Of           134
            Proceedings, Office Of
            Disability Adjudication And
            Review, 8/22/14

Exhibit 16  Reporter's Transcript Of           143
            Proceedings, Office Of
            Disability Adjudication And
            Review, 8/22/14
Exhibit 17  University of Colorado Hospital    155
            Encounter Notes, 11/5/2015

Exhibit 18  Social Security Administration,    168
            Office of Disability and Adjudication
            and Review Decision, 10/1/14

Exhibit 19  Review Post Traumatic Stress       172
            Disorder (PTSD) Disability
            Benefits Questionnaire, 2/23/15

Exhibit 20  Formal Physical Evaluation Board   179
            Proceedings, 12/8/2015
Exhibit 21  Email to Thibodeau from Quick,     184
            9/23/14, Subject:  Return to
            Frontier, with attached emails
Exhibit 22  Handwritten Notes, 10/7/14         190
Exhibit 23  Email to Quick from Zeier,         200
            10/14/14, Subject:  Follow up,
            with attached emails
Exhibit 24  Email to Quick from Zeier,         202
            12/10/14, Subject:  Return
            Process, with attached emails
Exhibit 25  Handwritten Note, 12/12/14         214

Quick v. Frontier Airlines                    EDWARD K. QUICK                            7/15/2016

---

**5**

| Exhibit 26 | Email to Quick from Zeier, 12/23/14, Subject: RE: Frontier Airlines Follow Up, with attached emails | 218 |
| Exhibit 27 | Frontier Policy Acknowledgment Sign-Off, 12/31/13 | 219 |
| Exhibit 28 | Email to Quick from Zeier, 1/13/15, Subject: RE: Reinstatement, with attached emails | 220 |
| Exhibit 29 | Frontier Pay Statement | 252 |
| Exhibit 30 | Frontier Available Jobs and Job Descriptions | 256 |
| Exhibit 31 | Letter to Quick from Zeier, 7/31/15 | 263 |
| Exhibit 32 | Letter to Zeier from Quick, 9/8/15 | 270 |
| Exhibit 33 | Plaintiff's Responses To Defendants' First Set Of Interrogatories And Requests For Production | 272 |
| Exhibit 34 | Letter to Quick from Kupcho, 7/8/15 | 278 |

---

**6**

1    WHEREUPON, the following proceedings were

2  taken pursuant to the Colorado Rules of Civil

3  Procedure.

09:16:06   4    THE VIDEOGRAPHER:  We are on the record.

09:16:08   5  The time is 9:16 a.m. on July 15, 2016.  This is the

09:16:15   6  beginning of Media Unit 1 in the deposition of Edward

09:16:20   7  K. Quick in the matter of Edward K. Quick versus

09:16:25   8  Frontier Airlines, Incorporated, et al., in the United

09:16:28   9  States District Court for the District of Colorado,

09:16:32  10  Case No. 15-CV-00765-REB-KMT.

09:16:40  11    The deposition is being held at 555 17th

09:16:44  12  Street, Denver, Colorado.  The videographer is Rodney

09:16:51  13  Hudson, and the court reporter is Teresa Coogle with

09:16:55  14  Hunter + Geist, Incorporated.

09:16:56  15    Please note that audio and video

09:16:59  16  recording will take place until all parties have

09:17:01  17  agreed to go off the record.  Microphones are

09:17:03  18  sensitive and may pick up whispers, private

09:17:07  19  conversations and cellular interference.

09:17:09  20    Will counsel please state their

09:17:11  21  appearances beginning with plaintiff's counsel.

09:17:16  22    MR. WHITCOMB:  Joseph Whitcomb for Edward

09:17:16  23  Quick.

09:17:16  24    MR. DABNEY:  And William Dabney for the

09:17:16  25  defendants.

---

**7**

09:17:16   1    EDWARD K. QUICK,

09:17:16   2  having been first duly sworn to state the whole truth,

09:17:16   3  testified as follows:

09:17:16   4    EXAMINATION

09:17:28   5  BY MR. DABNEY:

09:17:29   6    Q.  Good morning, Mr. Quick.

09:17:31   7    A.  Good morning, Mr. Dabney.

09:17:33   8    Q.  I know you have had your deposition taken

09:17:35   9  before, so I won't belabor the ground rules or the

09:17:38  10  process too much.  I will just let you know, you know,

09:17:48  11  what I think the purpose here is today and give you a

09:17:53  12  couple of -- of the key points of the process, and

09:17:56  13  then we'll go from there.

09:17:59  14    This is a deposition under oath, and

09:18:03  15  you're sworn to tell the truth.  Do you understand

09:18:05  16  that?

09:18:05  17    A.  I do.

09:18:07  18    Q.  And this is my opportunity to find out

09:18:09  19  about your claims and why you've brought this lawsuit

09:18:13  20  and what evidence that you may have to support it.

09:18:19  21    So I'll ask you to try to be as thorough

09:18:24  22  as possible in your answers, try to be as accurate as

09:18:27  23  possible.

09:18:29  24    If there's something that you can't

09:18:31  25  remember or something that you don't understand, I

---

**8**

09:18:33   1  want you to feel free to stop me and let me know that

09:18:37   2  I need to rephrase the question or let me know that --

09:18:42   3  you know, that you don't recall or that you don't

09:18:44   4  know.  Those are perfectly fine answers in addition to

09:18:50   5  substantive answers.  Do you follow?

09:18:52   6    A.  I do.

09:18:52   7    Q.  Okay.  Is there any reason this morning

09:18:55   8  why you would not be able to answer my questions

09:18:58   9  truthfully and accurately?

09:19:00  10    A.  None.

09:19:03  11    Q.  Well, let's get started.

09:19:16  12    (Deposition Exhibit 1 was marked.)

09:19:23  13    Q.  I have handed you what we've marked as

09:19:26  14  Exhibit 1.  Do you recognize it?

09:19:32  15    A.  I do.

09:19:34  16    Q.  Okay.  And what is it?

09:19:37  17    A.  It's a resume.

09:19:40  18    Q.  Is that your resume?

09:19:41  19    A.  It is my resume.

09:19:43  20    Q.  Okay.  I'll represent to you that this

09:19:45  21  was produced in this litigation by Frontier and was

09:19:49  22  located in the personnel file kept for you by

09:19:54  23  Frontier.

09:19:56  24    It appears to contain some information

09:20:00  25  about your qualifications and your past employers.  I

---

**Quick v. Frontier Airlines**          EDWARD K. QUICK          7/15/2016

---

9

want to ask you about a couple of those.

The flight experience and employer section is toward the middle. And it looks like from 1998 until the point at which you submitted this resume to Frontier, you were working for Dubois County Flight Services in Indiana; is that right?

A. Approximate, yes.

Q. How many years were you working for that company?

A. Approximately three years.

Q. And what type of company was that?

A. It was a corporation.

Q. What was its business?

A. We -- the company itself, Dubois County Flight Services, provided aviation products to multiple companies. Our main one was Jasper Engines and Transmissions, which owned Dubois County Flight Services. They were the parent company.

Q. Was that a manufacturer or a distributor of equipment?

A. Yes.

Q. Both?

A. Yes.

Q. Okay. And what was the nature of your duties?

---

10

A. I was the director of operations and chief pilot for Dubois County Flight Services. Prior to our name change, it was Jasper Flight Services.

Q. So if they were in the business of providing equipment -- aviation equipment to customers, what was the nature of the flight services that the company required?

A. So the company didn't provide flight services. And -- and I'm talking about Jasper Engines and Transmissions. So what they did was remanufacture engines and transmissions, and that's what they produced and sold. So we would go out and -- fly out to their customers and bring in the customers for tours of their facility.

Q. I see. Any other flight aspects of the business besides what you just testified to?

A. Yes. In addition to that, we flew to every NASCAR race during that period. So I was working multiple weekends, going to every NASCAR race across the United States.

Q. This says, "Corporate Flight Department." Is it safe to say that this was a job that entailed, you know, flight services for corporate business purposes?

A. We did that also, yes.

---

11

Q. Okay. Are you familiar with the FAA regulations that designate carriers as passenger carriers or other kinds of carriers?

A. I'm familiar, yes.

Q. Do you know which kind of carrier, if any, this outfit was designated?

A. We operated under Part 91 and Part 131.

Q. And to your knowledge, what's Part 91?

A. That's for general aviation. Part 135 is if we're flying for hire.

Q. Okay. And how does that differ from Part 121, if you know?

A. I do. There's 135, which, in the old days, used to be 19 passengers or less. And now 121 is -- can include anything more than 10 passengers or more, which is a 121 carrier. And they can be large or small.

Q. Okay. So at this time, you were under 135 or 91 for this particular employer?

A. I supervised the 135 pilot that we had because it was a single-pilot operation. I did not conduct 135 operation myself, but I -- I was the overseer as the chief pilot and director of operations.

Q. It says there were ten aircraft and 25

---

12

employees. How many of those employees were pilots?

A. Well, I -- I probably had about 10 to 15 as I recall. Some were full-time and others were part-time.

Q. And it says ten aircraft, and there's some designations here. It looks like Cessna-550, Cessna-650. Is that a jet aircraft?

A. Yes, it is.

Q. And how many passengers?

A. If I'm recalling right, approximately ten.

Q. And it says Beechcraft 58-P, 90 and 200; is that right?

A. That's correct.

Q. And those are what type of aircraft?

A. So that's the Beech Baron. P stands for pressurized. And then you have a Beech 200, King Air 200. We had -- I had at least five King Air 200s. One P Baron, one straight Baron.

Q. Are those reciprocating engines or turboprops?

A. Are you talking about the Baron?

Q. Just let me know which is which.

A. Okay. So the BE-58P is a Beech Baron. And that is a reciprocating turboprop -- or, excuse

---

3 (Pages 9 to 12)

Quick v. Frontier Airlines                          EDWARD K. QUICK                                    7/15/2016

---

**13**

me, not a turboprop but a reciprocating engine. The Beech 90 is a turboprop. And the 200.

Q. Okay. What are the PA-31 and the 31T?

A. So that's -- the PA-31 is a Navajo, and the 31T is the -- is their turboprop.

Q. So these were all passenger planes?

A. All passenger planes, correct.

Q. And which was the largest?

A. I would say the King Air 200.

Q. How many passengers? Do you know?

A. Well, we carried different passenger settings. Let me count. Depending upon the configuration, 9 to 11.

Q. Okay. Looks like in 1997 and '98, you were director of operations at Four Corners Aviation in Farmington, New Mexico?

A. That's correct.

Q. Okay. And what were your duties there?

A. I was the director of operations for their 135 department there and their Part 91 department.

Q. So, again, that would be either flight for hire or general aviation?

A. Correct.

Q. It looks like the same aircraft there,

---

**14**

the King Air 200?

A. Yeah. Beech 90, King Air 200, correct.

Q. A similar plane to what you just testified to?

A. Yes.

Q. Looks like there was air ambulance work; is that right?

A. That was one of the things we did, yes. We did air ambulance out of Farmington, New Mexico, and we used an E-90, which is a Beech turboprop aircraft.

We had a C-90 that we could convert either to air ambulance or passenger. The E-90 was mainly used and was in the colors of the hospital. We had -- I had two King Air 200s over at Albuquerque that I also supervised, and it was for a different hospital.

Q. And it says, "Pipeline, Flight Instruction, and Corporate." Do you see that?

A. Yes. We also did pipeline patrol. And I did that in a smaller aircraft, which I supervised. We gave flight instruction out of there, and we did corporate traffic for Four Corners Aviation, which the parent company was Mesa Airlines.

Q. So you did Mesa Airlines' own internal

---

**15**

corporate travel?

A. I did.

Q. And the flight instruction, what was that?

A. We gave flight instruction in various small aircraft that we had there. We had quite a few straight Barons that they gave multi-engine instruction in. And that was so that -- they work in cooperation with the college down there, San Juan College, if I remember right.

Q. So people trying to get their pilot's license or advance in aviation?

A. Correct. We were training pilots to become airline pilots.

Q. And what kind of aircraft did you use for that?

A. Well, the one that I remember would be the Beech Barons. We had Beach Barons there that we used.

Q. And is that a --

A. Multi-engine recip.

Q. Reciprocating engine?

A. Yes.

Q. How many passengers?

A. You know, we used it for instructions.

---

**16**

It was a pilot and a co-pilot; but if you add passengers, you know, you've got four seats in the back.

Q. How did you come to leave Four Corners Aviation?

A. Oh, I was fired.

Q. Can you tell me the circumstances?

A. What I recall, I brought up safety issues to the -- I can't -- I get them -- Jim Dean was the -- I don't remember what his title was -- president of our company. And we had a disagreement on safety. And he wanted me to skirt the safety regulations, and I said I would have none of it; and so he fired me.

Q. And which regulations in particular?

A. That would have been Part 135.

Q. Do you know what was the issue in particular?

A. I don't recall, no.

Q. Did any litigation arise from your termination?

A. Not that I remember, but -- no, I don't know exactly.

Q. You don't remember if you brought any kind of action against Four Corners or not?

A. No. I could have. I just don't recall

---

scheduling@huntergeist.com                **HUNTER + GEIST, INC.**                303-832-5966/800-525-8490

Quick v. Frontier Airlines                    EDWARD K. QUICK                              7/15/2016

---

**17**

09:33:15  1   this many years later.
09:33:21  2        Q.  It says in 1997, you were director of
09:33:24  3   operations, chief pilot for Leading Edge Aviation in
09:33:28  4   Denver.
09:33:29  5        A.  I was.
09:33:30  6        Q.  It says, "Obtained 135 Certificate."
09:33:31  7   What does that mean?
09:33:35  8        A.  So it was just like having a 135
09:33:39  9   certificate at Dubois County.  It was a single-pilot
09:33:44  10  135 certificate, so we could fly for hire versus doing
09:33:49  11  just corporate work.
09:33:50  12        When the aircraft wasn't being used for
09:33:54  13  either the private use of the owners or corporate work
09:33:58  14  of the owners, then we could use it for hire, and we
09:34:02  15  did.
09:34:05  16        Q.  It says, "Beechcraft 200."
09:34:08  17        A.  Correct.
09:34:12  18        Q.  Is that a --
09:34:13  19        A.  Turboprop.
09:34:14  20        Q.  -- turboprop plane?
09:34:16  21        A.  Yes.
09:34:18  22        Q.  Does it have more than one engine?
09:34:19  23        A.  Yes, it's a multi-engine turboprop.
09:34:23  24        Q.  And how many passengers?
09:34:33  25        A.  Well, in -- for there, it would have been

---

**18**

09:34:38  1   approximately nine depending upon sitting
09:34:41  2   configuration.
09:34:42  3        Q.  Were there any other pilots besides
09:34:45  4   yourself?
09:34:46  5        A.  No, it was just me.
09:34:55  6        Q.  And how did you come to leave that job?
09:34:59  7        A.  I -- I quit.
09:35:03  8        Q.  Was there a reason that you remember?
09:35:09  9        A.  The owners did not want to pay out my
09:35:14  10  contract, which I had with them; and so we separated
09:35:18  11  ways.  I had a contract; they didn't fulfill it; I
09:35:25  12  moved on.
09:35:26  13        Q.  Did any litigation come from that
09:35:28  14  departure?
09:35:30  15        A.  Substantial.
09:35:32  16        Q.  Can you describe it?
09:35:40  17        A.  The owners owed me money.  There was an
09:35:49  18  investigation going on at the time.  And the -- I was
09:35:57  19  aware of things that they were doing that were
09:36:00  20  illegal, and so I had approached the U.S. Attorney
09:36:06  21  here in Denver with the knowledge that I had.  And
09:36:12  22  they conducted an investigation, a trial of both of
09:36:17  23  them, the husband and wife, and sent them both to
09:36:20  24  prison.
09:36:22  25        Q.  So separate from your resignation, you

---

**19**

09:36:26  1   made some sort of complaint to the authorities, and it
09:36:30  2   resulted in some sort of prosecution?
09:36:34  3        A.  I believe that's just what I said, yes.
09:36:37  4        Q.  So there wasn't any litigation about your
09:36:39  5   departure itself?
09:36:54  6        A.  I don't recall --
09:36:56  7        Q.  Okay.
09:36:57  8        A.  -- at this time.
09:37:03  9        Q.  So if you sued Leading Edge, you're
09:37:06  10  saying you don't remember at this point?
09:37:12  11        A.  I -- I don't remember suing them at that
09:37:14  12  time.  I know I -- I had my -- I did have an attorney
09:37:18  13  who went after them for workers' comp.
09:37:24  14        Q.  You were injured while you were working
09:37:25  15  there?
09:37:26  16        A.  Correct.
09:37:28  17        Q.  And --
09:37:29  18        A.  I remember that now, yes.
09:37:31  19        Q.  What was injured?
09:37:32  20        A.  It was an automobile accident that I was
09:37:35  21  in.
09:37:40  22        Q.  Okay.  Any other litigation that you
09:37:42  23  recall while you were there?  And I mean personal
09:37:51  24  related to you.
09:37:59  25        A.  Could you be more clear for me?

---

**20**

09:38:01  1        Q.  Yeah.  Aside from the workers' comp
09:38:04  2   claim, do you recall any other lawsuits you may have
09:38:07  3   brought against Leading Edge or they brought against
09:38:10  4   you for any reason?
09:38:17  5        A.  I don't recall.
09:38:24  6        Q.  Does that mean that you just don't
09:38:26  7   remember one way or the other, or you're saying it
09:38:29  8   could have, but you can't recall the specifics?
09:38:32  9        A.  Well, I'm remembering two.  You're going
09:38:36  10  back quite a few years; so, you know, I don't recall.
09:38:39  11  It could be.  I don't recall.
09:38:41  12        Q.  Okay.  In 1995/'96, it says, "PIC, West
09:38:56  13  Star Aviation, Inc., Timberline Aviation."
09:39:02  14        What were your duties for that employer?
09:39:06  15        A.  I worked as a pilot there for them.
09:39:11  16        Q.  Was that a -- it says Part 135.  So you
09:39:14  17  were flying for hire?
09:39:15  18        A.  I was.
09:39:18  19        Q.  And, again, that's the Beechcraft 100 and
09:39:21  20  200 turboprop plane?
09:39:23  21        A.  It is.
09:39:25  22        Q.  And Cessna 210, what type of plane is
09:39:28  23  that?
09:39:29  24        A.  It's a single-engine aircraft.
09:39:34  25        Q.  In 1994/'95, it says that you were the

---

5 (Pages 17 to 20)

**Quick v. Frontier Airlines**          **EDWARD K. QUICK**          **7/15/2016**

---

### 21

```
09:39:39   1   chief pilot and check airman at Dolphin Express
09:39:41   2   Airlines in Daytona Beach, and you obtained a Part 135
09:39:52   3   airline certificate.  Now, was that a certificate for
09:39:55   4   yourself or for the airline?
09:39:57   5        A.  For the airline.
09:39:59   6        Q.  Okay.  And you flew the Beechcraft 3100?
09:40:10   7        A.  That's British Aerospace actually, BA.
09:40:14   8        Q.  BA?
09:40:14   9        A.  British Aerospace.
09:40:16  10        Q.  Can you describe that plane for me?
09:40:19  11        A.  It's a 19-passenger turboprop.
09:40:24  12        Q.  It says that you were the chief pilot.
09:40:26  13   Were there other pilots that worked for that company?
09:40:29  14        A.  There were.  I was the actually chief
09:40:33  15   pilot.  I was the director of operations, chief pilot,
09:40:36  16   and I was also a check airman.
09:40:38  17        Q.  And how many other pilots were there?
09:40:47  18        A.  Oh, over the period of time, probably had
09:40:50  19   25.
09:40:53  20        Q.  Altogether over the year?
09:40:56  21        A.  Correct.
09:40:59  22        Q.  Some full-time; some part-time?
09:41:01  23        A.  Correct.
09:41:03  24        Q.  Okay.  In terms of being a check airman,
09:41:08  25   how did you come to have that position?
```

### 22

```
09:41:13   1        A.  Well, I was checked out by the FAA as a
09:41:19   2   -- and certified as a line check airman.
09:41:25   3        Q.  Are there particular airframes that was
09:41:27   4   particular to?
09:41:28   5        A.  Well, the aircraft that we were flying at
09:41:31   6   the time, which was the Beech Aerospace 3100
09:41:35   7   Jetstream.
09:41:37   8        Q.  Were you a check airman for any other
09:41:40   9   employer at any time?
09:41:57  10        A.  Well, the definition of check airman, I
09:42:01  11   checked out a lot of pilots as the chief pilot and
09:42:04  12   director of operations for all the corporate flight
09:42:07  13   departments that I had.  So basically as the chief
09:42:11  14   pilot doing the hiring and the firing, I was also the
09:42:14  15   check pilot.
09:42:16  16        Q.  I understand that that would be part of
09:42:18  17   your duties if you were chief pilot for some of these
09:42:23  18   companies.  The check airman designation that I'm
09:42:28  19   referring to is the one that I described here that was
09:42:32  20   bestowed on you by the FAA for this particular
09:42:34  21   airframe.
09:42:36  22        A.  Correct.
09:42:36  23        Q.  Did you have any similar FAA designation
09:42:40  24   for any other employer at any time?
09:42:44  25        A.  Not that I recall, no.
```

### 23

```
09:42:54   1        Q.  And this last one says, "PIC/Instructor."
09:42:59   2   I guess I neglected to ask you what the PIC that's on
09:43:03   3   several of these means?
09:43:04   4        A.  Pilot in command.
09:43:06   5        Q.  It says PIC and instructor at Alpine Air
09:43:10   6   in Denver from 1991 to '93?
09:43:12   7        A.  Correct.
09:43:12   8        Q.  And that was a fly-for-hire job as well?
09:43:30   9        A.  Can you please repeat that question?
09:43:34  10        Q.  That was Part 135 --
09:43:35  11        A.  It was a 135 operation, yes.  Cargo.
09:43:39  12        Q.  Cargo.  And a PA-131 Navajo, that's a
09:43:44  13   Piper turboprop plane or a reciprocating engine plane?
09:43:52  14        A.  That's a reciprocating multi-engine.
09:43:56  15        Q.  Okay.  How did you come to leave your job
09:43:59  16   at Dolphin Express?
09:44:12  17        A.  I left and went on to another job.
09:44:16  18        Q.  So you resigned that position?
09:44:20  19        A.  I did.
09:44:20  20        Q.  How about West Star Aviation?
09:44:22  21        A.  I resigned, moved on to Mountain
09:44:24  22   Aviation.
09:44:26  23        Q.  Any particular reason you quit those
09:44:28  24   jobs?
09:44:32  25        A.  Well, just to move back to Denver.  So I
```

### 24

```
09:44:37   1   was flying at West Star and was flying in Montana.
09:44:41   2   And so I moved back to Denver after them and got on
09:44:45   3   with Mountain Aviation.
09:44:50   4        Q.  Okay.  And this resume that you submitted
09:45:01   5   to Frontier Airlines, do you remember what year that
09:45:06   6   would be approximately?
09:45:16   7        A.  2001.
09:45:23   8        Q.  At that point, it says that in flight
09:45:26   9   experience, you had 10,000-plus hours of -- of flight
09:45:30  10   time; is that right?
09:45:31  11        A.  That's correct, yes.
09:45:33  12        Q.  Okay.  And it says that you had 700-plus
09:45:37  13   hours in a helicopter; is that right?
09:45:43  14        A.  That's correct, yes.
09:45:44  15        Q.  And then some multi-engine is 8,000-plus
09:45:52  16   hours; turboprop engine, turbine engine 7,000-plus
09:45:55  17   hours?
09:45:59  18        A.  Correct.
09:46:00  19        Q.  It says, "Instructor 2500+ Hours."
09:46:06  20        A.  That's correct.
09:46:07  21        Q.  The instructing that you did, that would
09:46:09  22   have been on the airplanes that we talked about for
09:46:13  23   each of these employers; is that generally accurate?
09:46:16  24        A.  Yes.
09:46:21  25        Q.  It says hours in a jet was 500-plus
```

**Quick v. Frontier Airlines**          **EDWARD K. QUICK**          **7/15/2016**

---

25

```
09:46:25  1   hours.
09:46:26  2       A.  Correct.
09:46:27  3       Q.  Would that have chiefly been the Cessna
09:46:31  4   Jet Aircraft we talked about when you were working for
09:46:34  5   Dubois County Flight Services?
09:46:36  6       A.  I had other flight experience in other
09:46:39  7   jet aircraft, but, yes.
09:46:43  8       Q.  The bulk of it, was that at Dubois?
09:46:47  9       A.  No.  You know, I did fly other jet
09:46:51  10  aircraft with pilot services.
09:46:56  11      Q.  Okay.  And the total hours was about
09:46:59  12  500-and-some?
09:47:03  13      A.  If that's what it says.
09:47:04  14      Q.  Okay.  Any reason to believe it's not
09:47:06  15  accurate?
09:47:07  16      A.  No.
09:47:21  17      MR. DABNEY:  You can mark that 2.
09:47:22  18      (Deposition Exhibit 2 was marked.)
09:47:55  19      Q.  (BY MR. DABNEY)  Do you recognize what
09:48:02  20  we've marked as Exhibit 2?  Do you recognize
09:48:49  21  Exhibit 2, Mr. Quick?
09:48:51  22      A.  Yes.
09:48:51  23      Q.  And what is it?
09:48:53  24      A.  It's an employment application.
09:48:56  25      Q.  Is this your employment application to
```

26

```
09:49:05  1   Frontier Airlines?
09:49:06  2       A.  Yes, it appears to be.
09:49:07  3       Q.  Is that your signature on the last page
09:49:09  4   there?
09:49:14  5       A.  Yes, it is.
09:49:16  6       Q.  And then you seem to have dated that
09:49:18  7   February 18, 2004, correct?
09:49:21  8       A.  Correct.
09:49:22  9       Q.  Okay.  When I go through here, I see a
09:49:28  10  listing of previous employers, including the U.S.
09:49:33  11  Army, and then some of the other aircraft companies
09:49:37  12  that we -- or aviation companies that we previously
09:49:43  13  talked about.  If you look at page Bates No. 659, do
09:49:54  14  you see that in the bottom right corner?
09:49:58  15      A.  I do.
09:50:02  16      Q.  Okay.  At the bottom of that page,
09:50:05  17  there's a question that says, "Have you been
09:50:08  18  suspended, discharged, or asked to resign by an
09:50:11  19  employer?  Explain fully."
09:50:13  20      It says you checked yes and wrote, "Four
09:50:19  21  Corners Aviation/Management Style Disagreement."
09:50:22  22      And that's the termination from
09:50:24  23  employment you described earlier where you said you
09:50:26  24  had the disagreement with the boss about safety?
09:50:30  25      A.  Correct.
```

27

```
09:50:30  1       Q.  Okay.  It's true that you were terminated
09:50:36  2   from a few other employers as well, correct?
09:50:40  3       A.  Who are you referring to?
09:50:43  4       Q.  A company called Jetstream International?
09:50:56  5       A.  Prior to this employment record is what
09:50:59  6   you're saying?
09:51:00  7       Q.  I'm just asking isn't it true that you
09:51:06  8   were terminated from Jetstream International when you
09:51:10  9   were employed there?
09:51:11  10      A.  Yes.
09:51:12  11      Q.  And when were you employed there?
09:51:13  12      A.  I don't remember the exact years.
09:51:19  13      Q.  Information that I have seen suggests it
09:51:22  14  was in the late 1980s.  Does that sound right?
09:51:28  15      A.  It sounds right; until around 1990, yes.
09:51:32  16      Q.  Why were you let go?
09:51:34  17      A.  For my union activities.
09:51:35  18      Q.  Is that what they told you the reason
09:51:37  19  was?
09:51:39  20      A.  No.  That's my interpretation of it.
09:51:45  21      Q.  Do you recall what their position was for
09:51:46  22  why you were let go?
09:51:50  23      A.  I do not.
09:51:52  24      Q.  Okay.
09:51:53  25      A.  I try to not remember bad things.
```

28

```
09:51:58  1       Q.  You claim you were let go for your union
09:52:00  2   activities.  I'm sure you're aware that that would not
09:52:02  3   be legal, right?
09:52:03  4       A.  I do know that.  That is correct, yes.
09:52:08  5       Q.  Did you bring any legal action as a
09:52:09  6   result of this termination?
09:52:10  7       A.  Yes, there was a confidential lawsuit
09:52:15  8   that was brought.  And there's a confidential
09:52:18  9   agreement, as we've explained in the previous
09:52:21  10  deposition that I had with you all, that, yes, I was
09:52:26  11  fired.  I believe I was fired for my union activities
09:52:28  12  which was I was a union organizer for the Airline
09:52:32  13  Pilots Association.  I was the primary organizer.
09:52:38  14      The union, APA, Airline Pilots
09:52:43  15  Association, in Washington, D.C., sued the company to
09:52:46  16  get my job back for my union activities.
09:52:50  17      Q.  What was the outcome?
09:52:53  18      A.  A negotiated settlement, and I moved on.
09:53:01  19      Q.  You did not get your job back?
09:53:03  20      A.  I did not.  I didn't -- didn't ask for it
09:53:07  21  to be back.  I just wanted to move on.  I had had
09:53:11  22  enough.
09:53:12  23      Q.  So the position you had at Jetstream was
09:53:16  24  what?
09:53:17  25      A.  I started out as a first officer, moved
```

29

```
09:53:20  1   up to captain there and, for the majority of my time,
09:53:25  2   flew as a captain for them.
09:53:28  3        Q.  What kind of operation was it?
09:53:29  4        A.  It was a Part 135 airline operation with
09:53:33  5   19-passenger Jetstreams.
09:53:42  6        Q.  Is there any reason you didn't list that
09:53:43  7   termination on your application here where it asks for
09:53:47  8   have you ever been suspended or discharged?
09:54:04  9        A.  Yes.
09:54:05 10        Q.  And what's that reason?
09:54:08 11        A.  Up on top of the page, it says employment
09:54:10 12   record for the last ten years.  I was at Jetstream
09:54:13 13   prior to the -- or beyond the ten-year limit.
09:54:18 14        Q.  So you interpret that employment record
09:54:22 15   to extend beyond the listing of different employers
09:54:26 16   and dates of employment below that other black line to
09:54:29 17   the next section?
09:54:33 18        A.  Can you repeat your question for me?
09:54:36 19        Q.  You're interpreting that last ten years
09:54:38 20   notation at the top of the page to extend beyond the
09:54:42 21   sections asking for employer, supervisor, and dates of
09:54:46 22   employment, et cetera, and into the next section that
09:54:51 23   talks about have you ever been suspended or
09:54:53 24   discharged?
09:54:54 25        A.  I read it as the previous -- within the
```

30

```
09:54:57  1   ten years from the time of application.  That was my
09:55:01  2   interpretation of it.
09:55:03  3        Q.  Well, the question doesn't say have you
09:55:04  4   ever been suspended or discharged in the last ten
09:55:07  5   years, does it?
09:55:16  6        A.  Well, the question itself does not; but
09:55:20  7   the -- up on top, it says employment record for the
09:55:23  8   last ten years, and so that's what I gave.
09:55:27  9        Q.  So you combined those two sections?
09:55:30 10        A.  Yes.
09:55:35 11        Q.  There's no direction on this page to do
09:55:36 12   that, is there?
09:55:39 13        A.  Well, we -- we went over this previously
09:55:41 14   in my previous deposition years ago.  And this issue
09:55:46 15   was raised, a person from Frontier called me.  She was
09:55:54 16   in charge of hiring at the time.  I forget her name.
09:55:56 17   And she said, Well, gee, you know, what about
09:56:00 18   Jetstream?  And I said, Well, the thing said ten
09:56:03 19   years.  And she accepted it, and you guys hired me --
09:56:07 20   or Frontier hired me.  Not you, but Frontier did.
09:56:12 21        So that's been raised before, that issue,
09:56:13 22   and Frontier hired me, and they knew full well about
09:56:18 23   it after I explained it, and they hired me.
09:56:21 24        Q.  It's true you were also terminated from
09:56:24 25   American Eagle; isn't that right?
```

31

```
09:56:59  1        A.  I recall resigning from American Eagle.
09:57:02  2        Q.  What was the reason for your resignation?
09:57:13  3        A.  Well, again, I -- I live in Denver.  And
09:57:16  4   the job was outside of Denver, and I decided to come
09:57:21  5   home.
09:57:26  6        Q.  So there wasn't any disagreements or any
09:57:32  7   controversy that led to your termination from American
09:57:35  8   Eagle in Nashville, Tennessee, in 1990?
09:57:38  9        A.  What termination are you referring to?
09:57:40 10        Q.  Well, you say you resigned.  I've seen
09:57:43 11   information suggesting that you were fired, but I want
09:57:46 12   to get your recollection here today.  Were you -- did
09:57:49 13   you resign or were you fired?
09:57:51 14        A.  I resigned.
09:57:52 15        Q.  There wasn't any disagreement about
09:57:55 16   anything related to your job that led to your
09:57:59 17   departure?
09:58:01 18        A.  Well, if you're asking did I submit a
09:58:03 19   letter of resignation, yes, I resigned.  So it was
09:58:07 20   accepted, I resigned, walked away, moved on.
09:58:15 21        Q.  Was there anything that led you to
09:58:17 22   resign?
09:58:21 23        A.  I don't recall.
09:58:23 24        Q.  Was there any litigation as a result of
09:58:25 25   your departure there?
```

32

```
09:58:27  1        A.  I don't recall.
09:58:34  2        Q.  You don't recall if you brought a lawsuit
09:58:36  3   against American Eagle or not?
09:58:39  4        A.  I would have remembered that, I would
09:58:42  5   believe.  So I don't -- no.
09:58:45  6        Q.  Okay.  And what was your position there?
09:58:47  7        A.  Instructor pilot.
09:58:51  8        Q.  And what kind of aircraft?
09:58:53  9        A.  135 Jetstreams.
09:58:55 10        Q.  So flying for hire again?
09:58:59 11        A.  Well, flying for the airline.  I taught
09:59:03 12   airline pilots for that whole period that I was there.
09:59:06 13   I did it at both Flight Safety -- I was a sim --
09:59:09 14   simulator instructor at Flight Safety International
09:59:13 15   for the airline.  And I did ground instruction, sim
09:59:18 16   instruction, and aircraft instruction.  I was a --
09:59:21 17   considered a management pilot no different than the
09:59:23 18   instructors that we have at Frontier Airlines.  I was
09:59:30 19   part of management.
09:59:31 20        Q.  And that was -- all that instruction that
09:59:32 21   you referred to in the simulator work, that was on the
09:59:35 22   aircraft that you just described?
09:59:37 23        A.  Yeah, the BA-3100 Jetstream, correct.
09:59:43 24        Q.  And that was what type of plane?
09:59:44 25        A.  It's a twin-engine turboprop, 19
```

Quick v. Frontier Airlines                          EDWARD K. QUICK                                          7/15/2016

33

| | | |
|---|---|---|
| 09:59:48 | 1 | passenger. |
| 09:59:49 | 2 | Q.  Okay.  Any reason you didn't include that |
| 09:59:54 | 3 | employer on either your resume or your application? |
| 10:00:02 | 4 | A.  Well, if it's outside of that, it was |
| 10:00:04 | 5 | outside of the ten years.  And so it said go back ten |
| 10:00:09 | 6 | years.  That's what I did. |
| 10:00:11 | 7 | And the resume -- I mean, there was |
| 10:00:14 | 8 | plenty of other jobs that I didn't include because it |
| 10:00:16 | 9 | -- you know, I could have gone on and on and on.  I've |
| 10:00:19 | 10 | been doing it since I -- you know, I've flown all my |
| 10:00:24 | 11 | life.  So it's a -- you know, a resume is a snapshot |
| 10:00:32 | 12 | of your background. |
| 10:00:35 | 13 | Q.  You also worked for Aspen Aviation, |
| 10:00:38 | 14 | correct? |
| 10:00:39 | 15 | A.  Aspen Airways, yes. |
| 10:00:43 | 16 | Q.  What was your position there? |
| 10:00:44 | 17 | A.  I was a first officer. |
| 10:00:48 | 18 | Q.  And what kind of operation was that? |
| 10:00:55 | 19 | A.  I was a 121 operator. |
| 10:00:57 | 20 | Q.  So that was a passenger carrier? |
| 10:00:59 | 21 | A.  Yes, it was.  I flew a 50-passenger |
| 10:01:02 | 22 | turboprop Convair 580s. |
| 10:01:11 | 23 | Q.  And I know you just said it, but, I'm |
| 10:01:13 | 24 | sorry, I forgot.  Your position was? |
| 10:01:15 | 25 | A.  A first officer. |

34

| | | |
|---|---|---|
| 10:01:23 | 1 | Q.  And when and for how many years did you |
| 10:01:25 | 2 | work for them? |
| 10:01:27 | 3 | A.  I worked for them approximately six |
| 10:01:29 | 4 | months. |
| 10:01:31 | 5 | Q.  And what year was that? |
| 10:01:34 | 6 | A.  If I remember right, it was '84/'85 or |
| 10:01:40 | 7 | '85/'86; but it was during that winter. |
| 10:01:44 | 8 | Q.  And how did you come to leave there? |
| 10:01:49 | 9 | A.  I resigned from there, I guess, if I |
| 10:01:56 | 10 | remember right.  It's a long time ago. |
| 10:01:59 | 11 | Q.  Do you know why you resigned? |
| 10:02:00 | 12 | A.  Yeah.  There was a disagreement with one |
| 10:02:02 | 13 | of the captains that we had there.  I had a |
| 10:02:04 | 14 | disagreement with one of the captains. |
| 10:02:07 | 15 | Q.  And what was that? |
| 10:02:12 | 16 | A.  I -- you know, I don't recall what it was |
| 10:02:14 | 17 | specifically about, but . . . |
| 10:02:21 | 18 | Q.  Do you recall generally? |
| 10:02:28 | 19 | A.  That's 30 years ago.  I don't. |
| 10:02:32 | 20 | Q.  Did any litigation come from your |
| 10:02:33 | 21 | departure from Aspen Airways? |
| 10:02:36 | 22 | A.  I did have an attorney back then.  And, |
| 10:02:41 | 23 | you know, he did go after Aspen Airways for whatever |
| 10:02:49 | 24 | the litigation was at that point. |
| 10:02:52 | 25 | Q.  You don't know why you had your attorney |

35

| | | |
|---|---|---|
| 10:02:54 | 1 | go after them? |
| 10:02:55 | 2 | A.  Well, obviously, there was a |
| 10:02:57 | 3 | disagreement.  I don't remember the specifics. |
| 10:02:59 | 4 | Q.  What was the outcome of the litigation? |
| 10:03:05 | 5 | A.  They accepted a letter of resignation |
| 10:03:08 | 6 | from me and moved on. |
| 10:03:12 | 7 | Q.  You sued them in order to get them to |
| 10:03:15 | 8 | accept a letter of resignation? |
| 10:03:17 | 9 | A.  Well, if I remember right, it was |
| 10:03:18 | 10 | negotiated; so -- but, you know, again, I'm trying to |
| 10:03:24 | 11 | recall 30 years ago. |
| 10:03:28 | 12 | Q.  Well, you wouldn't need to negotiate. |
| 10:03:29 | 13 | You could just resign, right? |
| 10:03:32 | 14 | A.  No.  I needed to negotiate.  That's why I |
| 10:03:35 | 15 | had an attorney. |
| 10:03:37 | 16 | Q.  Well, what was there to negotiate? |
| 10:03:38 | 17 | A.  Well, as I said, I don't recall the |
| 10:03:41 | 18 | specifics of what the issue was.  I don't recall. |
| 10:03:55 | 19 | Q.  Were you sued by that attorney for not |
| 10:03:57 | 20 | paying his fees? |
| 10:04:03 | 21 | A.  I don't remember that at all, no. |
| 10:04:04 | 22 | Q.  Have you ever been sued by any of your |
| 10:04:06 | 23 | attorneys for that reason? |
| 10:04:24 | 24 | A.  I don't remember being sued by any |
| 10:04:25 | 25 | attorney. |

36

| | | |
|---|---|---|
| 10:04:26 | 1 | Q.  Are you saying you were not or you just |
| 10:04:28 | 2 | don't recall? |
| 10:04:28 | 3 | A.  I don't recall. |
| 10:04:31 | 4 | Q.  Okay.  So it could have happened? |
| 10:04:33 | 5 | A.  I don't recall. |
| 10:04:40 | 6 | Q.  You're familiar with what's referred to |
| 10:04:41 | 7 | in your industry as a checkride? |
| 10:04:44 | 8 | A.  I do. |
| 10:04:45 | 9 | Q.  Can you tell me what that is? |
| 10:04:47 | 10 | A.  So a checkride is a check-out of a pilot |
| 10:04:54 | 11 | where -- whereby you assess the pilot's capabilities |
| 10:04:58 | 12 | to fly the aircraft to whatever standards that you're |
| 10:05:02 | 13 | checking them out for at that particular time. |
| 10:05:06 | 14 | Q.  Now, does a checkride happen in the |
| 10:05:08 | 15 | aircraft itself or in a simulator? |
| 10:05:10 | 16 | A.  Both. |
| 10:05:13 | 17 | Q.  And are you referring to it in a general |
| 10:05:16 | 18 | sense where it could be just the chief pilot does it |
| 10:05:21 | 19 | for the company's own purposes and/or it's done on |
| 10:05:26 | 20 | behalf of the FAA in order to give a pilot a |
| 10:05:30 | 21 | particular rating for a particular airframe? |
| 10:05:33 | 22 | A.  So I think you're asking me a multiple |
| 10:05:37 | 23 | question there.  If you could make it more direct, I |
| 10:05:41 | 24 | could give you a more better answer, I'm sure. |
| 10:05:43 | 25 | Q.  Just as far as your usage of the -- the |

9 (Pages 33 to 36)

---

**37**

word "checkride," you know, is it both run by the company for the company's purposes and also done by someone certified by the FAA for particular airframe ratings?

A. Yes.

Q. Okay. So the checkride could be either/or?

A. Correct.

Q. Okay. Prior to your employment at Frontier Airlines, had you ever flunked a checkride for any employer?

A. Yes.

Q. And tell me about that.

A. It would have been -- I'm trying to recall which one that would have been. It was an ATP checkride that I had.

Q. What is ATP?

A. It's an aircraft. It's a multi-engine turboprop, 64-passenger.

Q. And for which employer was that?

A. United Feeder Service.

Q. Okay. When did you work for them?

A. Again, I don't remember the years. I'd have to look at my records.

Q. I see information to suggest it was about

---

**38**

1993. Does that sound accurate?

A. Approximate, yes.

Q. Okay. What was the upshot of your having failed that checkride?

A. Well, I got -- got offered another job and moved on.

Q. So you never went back and repeated the exercise and passed it?

A. Correct.

Q. Have you ever had any kind of an accident while flying aircraft for any purpose?

A. I have, yes.

Q. Tell me about that.

A. Years ago, I was flying out of Akron, Colorado. And we went off the end of the runway, and the aircraft flipped over.

Q. Was anybody injured?

A. Nobody was injured. There were four of us on board at the time.

Q. Why did that happen?

A. Obviously, I made a mistake.

Q. Was there any repercussions from any authorities?

A. There was an investigation, but no repercussions, no.

---

**39**

Q. Was it an FAA investigation?

A. Yes, it was.

Q. And what was determined?

A. Well, there was -- you know, nothing affected my license or me, so -- I don't remember the exact determination from the FAA, but they didn't take my license, they didn't revoke anything, they -- I -- I went up to the FAA, explained what happened, and they did an investigation, and that was it.

Q. Was that for a particular employer, if you remember?

A. No. I had rented an aircraft. It was a Cessna 172. And I flew from Centennial out to Akron, Colorado, picked up my -- if I remember right, fiance at the time and her sister and brother, so brother-in-law.

Q. What happened to the aircraft?

A. It was totaled.

Q. It sounds like you were lucky.

A. Very fortunate, yes.

Q. If I have my dates right, I know you were initially put into a hiring pool for Frontier somewhere around 2001. And then after that, you served in the Armed Forces for a period of time?

A. Correct.

---

**40**

Q. And then you were actually hired to begin flying work for Frontier Airlines in March of 2004?

A. That's correct.

Q. Now, sometime in 2006, you brought a lawsuit against Frontier that I believe you've referred to now earlier in relation to a dispute about seniority and your contention that USERRA entitled you to additional seniority; is that right?

A. That's correct.

Q. And as part of that lawsuit, you also alleged that Frontier retaliated against you in various ways that violated USERRA?

A. That's correct.

Q. And what was the outcome of that lawsuit?

A. We lost on summary judgment.

Q. In 2007, about the middle of the year, about June or so, you left Frontier for military leave; is that right?

A. That's correct.

Q. Prior to that, had you left Frontier for military leave on other occasions?

A. Yes.

Q. Do you recall how many?

A. I don't.

Q. Do you recall if they were of short

---

41

10:12:00  1    duration or longer?
10:12:03  2        A.  Most of them were short, if I remember
10:12:04  3    right.
10:12:06  4        Q.  So between 2004 and 2007, there were
10:12:12  5    occasions where you had short armed services'
10:12:19  6    requirements, and you fulfilled those, and then you
10:12:24  7    came back to work for Frontier?
10:12:26  8        A.  That's what I recall, yes.
10:12:27  9        Q.  Okay.  Was there any difficulty between
10:12:32  10   you and Frontier as far as your taking that leave time
10:12:38  11   and then returning to service?
10:12:39  12       A.  No.
10:12:49  13       Q.  When you left Frontier in 2007, did you
10:13:00  14   contact the Department of Labor and make any other
10:13:04  15   charges or complaints regarding Frontier and
10:13:08  16   allegations that it violated USERRA in some way?
10:13:18  17       A.  Could you repeat the question for me?
10:13:20  18       Q.  Yeah.  After you left Frontier in 2007
10:13:22  19   and went on the long deployment, during that period of
10:13:27  20   time between 2007 and 2014, when you contacted
10:13:33  21   Frontier about reemployment --
10:13:34  22       A.  Correct.
10:13:35  23       Q.  -- in those seven years, did you bring
10:13:37  24   any other charges or complaints to the Department of
10:13:39  25   Labor about Frontier?

42

10:13:43  1        A.  If I remember correctly, there were a
10:13:47  2    couple different occasions.
10:13:49  3        Q.  And what were they?
10:13:52  4        A.  Well, I made -- made one after I left in
10:13:56  5    2007, but I -- I can't remember the particulars on
10:14:00  6    that one.  But, yes, I did make a -- you know, a
10:14:05  7    complaint to the Department of Labor.  I can't
10:14:08  8    remember the specifics of what it was at this point,
10:14:10  9    but -- and then I made another one when I tried to be
10:14:13  10   reemployed by Frontier when I returned after my
10:14:18  11   military service in 2014.
10:14:21  12       Q.  And what was the outcome of the one that
10:14:23  13   you filed after you -- just after you left in 2007?
10:14:29  14       A.  They said there was nothing that they
10:14:30  15   could do because it wasn't ripe at that time.
10:14:34  16       Q.  Okay.  Did that have to do with your
10:14:38  17   having failed checkrides there in 2006 and 2007?
10:14:45  18       A.  You know, I don't recall what the
10:14:47  19   particular reason was at this point.  I don't remember
10:14:52  20   the specifics.
10:15:00  21       Q.  So you filed a lawsuit in 2006 that you
10:15:03  22   lost on summary judgment.  And you filed a claim of
10:15:06  23   some kind in 2007 after you left on military leave,
10:15:11  24   but you don't remember what the outcome was.  And then
10:15:15  25   you made another complaint to the Department of Labor

43

10:15:18  1    in 2014 when you contacted Frontier for reemployment.
10:15:25  2    Is that all accurate?
10:15:27  3        A.  No.
10:15:28  4        Q.  What's not accurate?
10:15:29  5        A.  So as I recall, in 2007, as I explained
10:15:32  6    earlier in my testimony, I made a complaint.  I don't
10:15:36  7    remember the specifics of the complaint at this point.
10:15:43  8    It can be recalled with help, obviously, with the
10:15:47  9    paperwork, or whatever.  But the conclusion of that
10:15:50  10   was it was not ripe because I was not on property.
10:15:53  11   There was nothing they could do, so they said, Wait
10:15:57  12   until you come back.
10:15:58  13       Q.  Anything else about what I've said that
10:16:00  14   you don't think that you need to correct?
10:16:04  15       A.  Can you please repeat the question?
10:16:06  16       Q.  I said in 2006, you filed a USERRA
10:16:10  17   lawsuit which you lost on summary judgment.  In 2007,
10:16:13  18   you filed a USERRA charge with the Department of Labor
10:16:18  19   where they determined that it wasn't yet ripe,
10:16:22  20   whatever the complaint was.  And in 2014, you made
10:16:26  21   another complaint in relation to your attempts to be
10:16:29  22   reemployed.  Is all of that correct?
10:16:34  23       A.  Sounds correct.
10:16:36  24       Q.  Did you ever file any other USERRA charge
10:16:39  25   or lawsuit against any other airline or air -- or

44

10:16:44  1    aviation employer?
10:16:45  2        A.  Not that I recall, no.
10:16:46  3        Q.  You could have, but you don't remember or
10:16:48  4    you didn't?
10:16:50  5        A.  I did not.  No USERRA claim against
10:16:52  6    anybody else other than Frontier.
10:16:55  7        Q.  Okay.
10:17:10  8        (Deposition Exhibit 3 was marked.)
10:17:34  9        MR. DABNEY:  Is that 3?
10:17:36  10       THE COURT REPORTER:  Yes.
10:17:37  11       Q.  (BY MR. DABNEY)  Do you recognize what
10:17:39  12   we've marked as Exhibit 3?
10:17:44  13       A.  Well, it says it's a Report of Contact to
10:17:46  14   the Department of Labor.
10:17:50  15       Q.  And I'll represent to you that this
10:17:52  16   document was obtained through the Freedom Of
10:17:56  17   Information Act by my office and produced to your
10:17:58  18   counsel in this litigation.  And it came from the
10:18:05  19   Department of Labor.  And it's a record -- or appears
10:18:09  20   to be a record of a contact that you made with a
10:18:14  21   Mr. Palmer at DOL on January 14 of 2015.  Do you
10:18:25  22   recall contacting the DOL and speaking with a
10:18:35  23   Mr. Palmer at that time?
10:18:36  24       A.  I do.
10:18:39  25       Q.  Mr. Palmer has written at the top of the

**45**

10:18:43 1  body of the document there that he received a
10:18:47 2  telephone call from Mr. Ed K. Quick, 9:30 a.m., and he
10:18:53 3  wanted -- and you indicated you wanted technical
10:18:55 4  assistance with an issue with your employer.  And you
10:19:01 5  state that the issue was regarding his retirement
10:19:05 6  payment.  "Mr. Quick stated that he works for Frontier
10:19:08 7  as a pilot and was recently released from the military
10:19:12 8  trying to get reinstated.  Mr. Quick was asked to
10:19:16 9  provide more details into the issue and the problem he
10:19:20 10  is having."
10:19:22 11          And Mr. Palmer wrote, "Response:  Ok
10:19:26 12  there were a lot of things that were going on at that
10:19:29 13  time.  I was in the process of upgrading my airframe
10:19:32 14  rating.  Then I got deployed.  While I was deployed, I
10:19:35 15  was injured.  Now I'm trying to retire from the
10:19:37 16  airline and they demoted my rank to 1st officer while
10:19:42 17  I was on active duty."
10:19:44 18          Do you see that?
10:19:45 19      A.  That I do.
10:19:45 20      Q.  Okay.  Do you recall telling Mr. Palmer
10:19:48 21  that you were trying to retire from the airline?
10:19:50 22      A.  Totally inaccurate.  No, I did not.
10:19:52 23      Q.  Okay.  Do you have any explanation for
10:19:55 24  why Mr. Palmer wrote what he wrote?
10:19:57 25      A.  I have no explanation.

**46**

10:19:58 1      Q.  But you deny saying that?
10:20:01 2      A.  I do.
10:20:02 3      Q.  It says, "They demoted my rank to 1st
10:20:04 4  officer while I was on active duty."
10:20:06 5          Do you see that?
10:20:08 6      A.  Where is that at?
10:20:09 7      Q.  It's at the end of that little indented
10:20:12 8  paragraph that says, "Response."
10:20:15 9      A.  I see his words, yes.
10:20:27 10      Q.  Okay.  What does that refer to, if you
10:20:30 11  know?
10:20:34 12      A.  So he's saying -- he says -- it's not me
10:20:38 13  saying -- "now I trying" -- "now I trying to retire
10:20:43 14  from the air."
10:20:45 15          I did not say that.  He says that.  "And
10:20:49 16  they demoted my rank to 1st officer" -- well, I would
10:20:53 17  have never said demoted -- "while I was on active duty
10:20:58 18  orders."
10:20:58 19          Now, he might have misunderstood my --
10:21:01 20  our conversation, and those are the words that he's
10:21:03 21  using.  But I explained to him, while I was gone on
10:21:09 22  military service, while I was deployed, while I was in
10:21:13 23  Iraq -- what I explained to him was when I left
10:21:18 24  Frontier Airlines in 2007, I was a first officer in
10:21:23 25  training for captain.  And when I left per the

**47**

10:21:27 1  contract at Frontier Airlines, it said that I would be
10:21:32 2  paid as a captain after 70 days.
10:21:35 3          I was in training for longer than 70
10:21:38 4  days, and I was subsequently paid for years by
10:21:42 5  Frontier Airlines as a captain.  And while I was
10:21:46 6  deployed from 2007 and in the military service during
10:21:51 7  that period 2014, if I remember right,
10:21:56 8  approximately 2010, Frontier reverted me from my
10:22:06 9  captain pay status, even though I did not kept --
10:22:11 10  check out as a captain, but the contract called for me
10:22:17 11  to be paid while I left.  And so while I was gone,
10:22:19 12  Frontier reduced my pay from captain's pay to first
10:22:24 13  officer's pay while I was deployed and in country in
10:22:28 14  Iraq.
10:22:28 15      Q.  So when -- Mr. Palmer wrote, "They
10:22:31 16  demoted my rank to 1st officer while I was on active
10:22:34 17  duty orders," that part is apparently accurate?
10:22:39 18      A.  Those are his words, not mine.
10:22:41 19      Q.  Well, are they accurate?
10:22:44 20      A.  Well, they -- you know, they didn't
10:22:46 21  change my rank because I wasn't a captain.  I was a
10:22:49 22  first officer in training to become a captain.  And
10:22:54 23  since I never passed the checkride, I never was a
10:22:57 24  captain; but I was being paid at captain's pay per our
10:23:01 25  contract.

**48**

10:23:04 1          So there was no demotion.  There was a
10:23:06 2  reduction in my pay from captain to first officer pay.
10:23:10 3  That would be the most correct and accurate statement.
10:23:14 4      Q.  Okay.  So he's on the right track; he's
10:23:16 5  just expressed it incorrectly there?
10:23:19 6      A.  Yes.
10:23:20 7      Q.  Okay.  So that's information that he
10:23:21 8  would have gotten from you that he's slightly
10:23:24 9  misquoted?
10:23:25 10      A.  Correct.
10:23:26 11      Q.  Okay.  Paragraph 1 towards the bottom,
10:23:51 12  Mr. Palmer has asked you, "Can you be more specific,
10:23:55 13  when did these events happen?"
10:23:58 14          And then he goes, "Ok, here's what
10:24:00 15  happened and when," from you as a response.  So
10:24:04 16  summarizing what he's got here is what you --
10:24:07 17      A.  Said.
10:24:07 18      Q.  -- what you said.  Do you follow me?
10:24:09 19      A.  Yes.
10:24:09 20      Q.  Okay.  So paragraph 1, "March 2007, he,"
10:24:13 21  Mr. Quick, "stated he was looking to upgrade his pilot
10:24:17 22  rating and receive his qualifications on multiple
10:24:19 23  engine airframes.  At the time the rated position as
10:24:26 24  Captain.  All his paperwork and status, rating, and
10:24:29 25  wages were reported as that of a Captain."

12 (Pages 45 to 48)

**49**

Did you say that?

A. Yes. What I was referring to, as all of the paperwork -- and I want to be specific there -- after I left Frontier in 2007 and after I did not pass my captain's checkride and left for military service, my pay was properly paid out as a captain per the contract and continued for any other subsequent payouts, which there were multiple ones after that fact, even while I was deployed, or even while I was in the military service.

And then in addition to that, Frontier Airlines continued to hold me out on the pilot seniority list as a captain for years.

Q. What pay were you getting while you were on military leave?

A. I'm not sure exactly the payout, but it was -- certainly I got paid for training as I left. And they raised it to the proper amount per the contract, which was captain. So as I left. And then when I -- I cashed in some vacation time that I had. And they paid that to me at captain's pay that I recall. That was after I left.

And then in addition to that, they paid me -- I think it was due to the Frontier Airlines bankruptcy proceedings, and portions of that after the

**50**

bankruptcy was paid out and everybody got a proportion, and I was paid at the captain's rate.

And there were some other times that I was paid. But I received a check. And each time on those paystubs, it was as a captain. I was in the computer as a captain. I was in the seniority list as a captain. And then all of a sudden that all changed while I was in theater in Iraq, and I think it was 2010/'11 somewhere around there.

Q. Did you call the Department of Labor when you learned that had happened in 2010 and make a complaint of some kind?

A. I think I probably did call and -- and asked some questions on it. You know, I knew that there's probably nothing they could do; but I certainly -- I certainly felt that wasn't right.

Q. You felt that was a violation of USERRA, and you contacted the DOL at that time for that reason?

A. I'm pretty sure I did. While I was in theater, I think I actually called them from Iraq.

Q. Okay. Paragraph 3 says, "While I'm training he," Mr. Quick, "stated that he had been unsuccessful and failed twice in attempting to pass his training course."

**51**

That's accurate?

A. Accurate to the fact of an upgrade. And which number are you looking at real quick? Let me review it. Which --

Q. No. 3 at the bottom of the page.

A. No. 3, okay. Let me read it real quick. That's correct. That is accurate.

Q. If you turn the page, then, No. 5, it says, "If there was an issue with a pilot's training progress, the issue would be addressed by the company's Board of Review (TBR)" -- I think he's got that backwards. It should be TRB -- "members," training review board.

A. Correct.

Q. That's accurate, you said that?

A. Let's see. No. 5?

Q. Yes.

A. Oh, I don't remember saying it in that regard, no. I did talk about the training review board that -- what I remember saying was that Frontier was -- you know, at multiple times when you -- when Frontier thought I was coming back, that I would be subject to a training review board. So that's what I was trying to express to him.

Q. Well, it would be a fact that on the

**52**

contract that if there was a pattern of training failures by any pilot that a training review board could be convened; isn't that right?

A. During the -- during the time, yes, that was something that was recently passed by the company, I believe, specifically for Mr. Quick.

Q. Well, it was an agreement between the company and the union, was it not?

A. It was.

Q. Okay. Is there anything that makes you think that the training review board was instituted by both the company and the union specifically for you?

A. Prior to this contract, because I had failed my first-grade attempt for captain, but I reverted and passed my first officer ride subsequent to that failure and returned to the line as a first officer per the contract.

During that period, I had filed a lawsuit against Frontier. And so Frontier wanted to have -- as I look -- view it as an excuse to get rid of somebody like me that they didn't like.

Q. They wanted to have a mechanism to reflect a pattern of training failures is more like it, correct?

A. Well, since they get to control whether

Quick v. Frontier Airlines                EDWARD K. QUICK                          7/15/2016

---

53

10:30:29  1    you pass or fail, yes.
10:30:31  2        Q.   Okay.  And you weren't the only pilot
10:30:38  3    that failed a checkride, right?
10:30:40  4        A.   Correct.
10:30:40  5        Q.   So they would be subject to the same
10:30:42  6    review board proceeding, correct?
10:30:44  7        A.   Correct.  Although I don't believe they
10:30:46  8    have ever executed a training review board to my
10:30:49  9    knowledge to this date.  And certainly not for me.
10:30:58  10       Q.   It was there in case it was necessary,
10:31:02  11   correct?
10:31:02  12       A.   That is correct.
10:31:03  13       Q.   And it would be for any pilot to whom it
10:31:06  14   might apply, correct?
10:31:07  15       A.   I would assume so.
10:31:32  16       Q.   This says -- No. 8 says -- Mr. Palmer
10:31:39  17   wrote that you told him that in "July 2007, Mr. Quick
10:31:43  18   stated that he received a letter from his employer to
10:31:46  19   report before the TBR" or the --
10:31:50  20       A.   Training review board.
10:31:51  21       Q.   -- training review board.  "The training
10:31:53  22   review board was convening to address his
10:31:55  23   qualification training proficiency failures."  He
10:31:59  24   "stated at the time he received his notification," you
10:32:01  25   were already on military orders and deployed.  And

---

54

10:32:04  1    because you were deployed, you were unable to respond.
10:32:09  2    Is that all accurate?
10:32:12  3        A.   Not -- no, it's not all accurate.  And,
10:32:16  4    again, he's repeating what our conversation was.  And
10:32:20  5    so there are inconsistencies with what I said over the
10:32:24  6    phone and what he put down in paper.
10:32:27  7        Q.   What is it that he's -- he's misquoted
10:32:31  8    there?
10:32:31  9        A.   So I did receive a letter after I had
10:32:35  10   left for military service saying that the company was
10:32:40  11   -- wanted to conduct a training review board.  But
10:32:43  12   since I was already gone on military service, it was
10:32:46  13   null and void.
10:32:52  14       Q.   The company said it was null and void, or
10:32:55  15   your opinion was it was null and void?
10:32:58  16       A.   Well, if I remember right, the -- the
10:33:00  17   company went to the union, and the union said, No, you
10:33:03  18   can't have a training review board.  We're not going
10:33:07  19   to conduct a training review board, because he's gone
10:33:09  20   for military service.
10:33:14  21       Q.   This says "because he was deployed he was
10:33:16  22   unable to attend or respond."
10:33:18  23        I mean, that's accurate, isn't it?
10:33:22  24       A.   I wasn't deployed at that particular
10:33:23  25   time, because that was right after -- right after the

---

55

10:33:31  1    notice of leaving for military.  I didn't deploy until
10:33:34  2    months later.
10:33:37  3        Q.   Well, you were on orders at that point.
10:33:40  4    You just --
10:33:41  5        A.   Correct.
10:33:42  6        Q.   When you say you didn't deploy, you mean
10:33:43  7    you hadn't left the country or --
10:33:45  8        A.   Correct.
10:33:45  9        Q.   -- gone to a -- a duty station somewhere
10:33:48  10   else, right?
10:33:49  11       A.   Correct.
10:33:50  12       Q.   Yeah.  But you had left Frontier --
10:33:51  13       A.   Frontier for military service, yes.
10:33:57  14       Q.   So that part is essentially accurate,
10:33:59  15   then, correct?
10:34:05  16       A.   Your interpretation, yes.
10:34:07  17       Q.   Well, in your interpretation, the only --
10:34:11  18   the only issue that you had was the use of the word
10:34:14  19   deployed might not --
10:34:16  20       A.   I wasn't deployed at the time I received
10:34:18  21   the letter.  I wasn't deployed at the time that the
10:34:22  22   union notified Frontier that they would not proceed
10:34:26  23   with the training review board, although management
10:34:30  24   wanted to conduct a training review board.  And it was
10:34:35  25   some bone of contention between the company and the

---

56

10:34:37  1    union.  I was gone.  I didn't participate, but they --
10:34:41  2    they -- the union strongly represented my position.  I
10:34:44  3    was gone on military service, and they cannot conduct
10:34:48  4    a training review board, period.
10:34:51  5        Q.   And so one was not held, correct?
10:34:54  6        A.   There was no training review board.  One
10:34:55  7    was not held, that is correct.
10:35:19  8        Q.   No. 11 and 12, would you read those for
10:35:22  9    me -- just review them for me and let me know when you
10:35:25  10   have done that.
10:35:27  11        (The deponent read the document.)
10:35:34  12       A.   I've read both.
10:35:54  13       Q.   Okay.  Is there anything about either
10:35:57  14   that's inaccurate?
10:36:01  15       A.   Well, in regards to No. 11, you know,
10:36:15  16   that's inaccurate because, you know, he's saying that
10:36:21  17   I received a letter of notification from my employer
10:36:24  18   that my captain status was being removed and being
10:36:29  19   changed to first officer.  That is not true.
10:36:33  20        Actually, as I explained it to him, and
10:36:36  21   he must have misinterpreted what was said over the
10:36:40  22   phone again, was I was explaining that while I was in
10:36:43  23   Iraq in 2011 in theater deployed, I looked at the -- I
10:36:49  24   was following what was going on at Frontier.  And
10:36:52  25   during that period, Frontier had came out of

---

14 (Pages 53 to 56)

Quick v. Frontier Airlines                    EDWARD K. QUICK                              7/15/2016

---

57

10:36:55   1   bankruptcy and were bought by -- oh, the other
10:37:02   2   airline, I can't remember their name, but -- Republic
10:37:06   3   Airways bought Frontier Airlines.  And they changed
10:37:10   4   unions from FAPA, Frontier Pilots Association, to
10:37:17   5   Teamsters.  And also through the master seniority list
10:37:25   6   of all the pilots between Frontier and Republic,
10:37:29   7   Frontier had held out to Republic and to the court, to
10:37:37   8   the arbitrator that was there, that I was a captain on
10:37:40   9   the seniority list.
10:37:42   10          And so on the new list, the master list
10:37:44   11   that was approved by the judge that was taking care of
10:37:48   12   it, Frontier held out to that judge and to the parent
10:37:54   13   company that I was in a captain status on the
10:37:58   14   seniority list.
10:38:00   15          I had called back to the union president,
10:38:03   16   Jeff Thomas, at the time and, you know, thanked them
10:38:08   17   for, you know, continuing to show me as a captain on
10:38:12   18   the seniority list, if nothing more than a captain in
10:38:16   19   training or first officer in training for captain.
10:38:19   20   But needless to say, that's where I was on the list.
10:38:25   21          He said, You know, that isn't right.  And
10:38:28   22   he went back to the company.  And then all of a
10:38:31   23   sudden, a month or so later, the company changed it
10:38:34   24   from captain to first officer.  And that's when I made
10:38:37   25   a complaint by phone while I was in Iraq and said

---

58

10:38:41   1   this -- something isn't right here.  How can I be this
10:38:45   2   for all these years, and now it's -- not only that,
10:38:47   3   it's -- it -- it just doesn't make any sense.
10:38:50   4          Q.  Well, unless it was just an error, right?
10:38:52   5          A.  Well, I -- I suppose, but it's a -- you
10:38:54   6   know, the contract said I'm supposed to be still paid
10:38:59   7   as a captain regardless.
10:39:02   8          Q.  And the company disputed that
10:39:04   9   interpretation of the contract, correct?
10:39:08   10         A.  I assume at that time that's what the --
10:39:10   11   the company did.  In other words, the way I understood
10:39:12   12   it, the union president, you know, said, Oh, this is a
10:39:17   13   mistake.  And he went back to the company and, through
10:39:19   14   Jacquelyn Peters, as far as I understood, and they
10:39:23   15   made a determination that it was a mistake on their
10:39:26   16   part and changed it to first officer.
10:39:31   17         Q.  So the company and the union both were in
10:39:35   18   agreement, as far as you know, that your status should
10:39:38   19   be changed back to first officer?
10:39:40   20         A.  I don't know that.  I wasn't involved in
10:39:42   21   those conversations.  All I'm repeating is what I was
10:39:46   22   told from my conversation to the union president at
10:39:50   23   the time, which was Jeff Thomas.
10:39:53   24          And, in fact, he actually wasn't the
10:39:55   25   union president, because we were covered by Teamster;

---

59

10:39:57   1   but he was the previous union president, and he was
10:40:00   2   still involved with FAPA at the time and also FAPA
10:40:04   3   Invest.
10:40:09   4          Q.  And when you called the Vet's office in
10:40:13   5   Denver, you spoke with a Mr. McDaniel; is that right?
10:40:16   6          A.  And, in fact, I have to correct my
10:40:19   7   statement.  I don't believe that I called Jeff Thomas.
10:40:26   8   I did it on the website, on our union website is when
10:40:30   9   I did it through FAPA.  So it was -- it was actually
10:40:32   10   an email conversation back and forth between the two
10:40:34   11   of us.  It was very short.  But it was -- so it wasn't
10:40:37   12   a phone call to him back on that one.
10:40:41   13         Q.  All right.  And then in regard to that
10:40:43   14   issue, you called the Department of Labor office in
10:40:48   15   Denver, Vets -- Veterans' Employment Training Service?
10:40:51   16         A.  Correct.
10:40:52   17         Q.  You spoke with a Mr. McDaniel?
10:40:55   18         A.  I believe that is correct, yes.
10:40:57   19         Q.  And you informed Mr. Palmer that
10:41:01   20   Mr. McDaniel told you that because you were still on
10:41:04   21   orders, the matter couldn't be pursued until you were
10:41:08   22   through with your military obligation; is that right?
10:41:10   23         A.  Correct.  That's what they told me, it
10:41:12   24   was not ripe.  I think that was his words, wasn't
10:41:16   25   ripe.

---

60

10:41:20   1          Q.  So No. 13 says that in "2012 Mr. Quick
10:41:26   2   stated that after his deployment ended, he was
10:41:29   3   assigned to the Wounded Warrior Battalion as a result
10:41:35   4   of traumatic brain injury, post-traumatic distress
10:41:39   5   disorder and sleep apnea issues.  Where he remained,
10:41:43   6   until December '14, when he was medically retired from
10:41:48   7   the Army."
10:41:49   8          A.  It's incorrect.
10:41:50   9          Q.  Okay.  What is it about that summary of
10:41:52   10   what you told Mr. Palmer that's not correct?
10:42:03   11         A.  Well, so I was originally put into the
10:42:05   12   Wounded Warrior Battalion for mild TBI.  Subsequent to
10:42:13   13   being put into the program, I was subsequently found
10:42:17   14   to have sleep apnea issues after testing.  And then
10:42:21   15   after that -- quite a bit of time after that, I think
10:42:27   16   it was six, seven months, maybe longer, they did a
10:42:32   17   PTSD evaluation, which said I have PTSD.  And so I
10:42:40   18   wasn't put into the Wounded Warrior program for sleep
10:42:44   19   apnea or PTSD.  I was put in for mild TBI upon
10:42:50   20   testing.  And I -- the -- he got 2014.  I -- I retired
10:42:56   21   from the Army in June of 2014.  So that's incorrect.
10:43:04   22         Q.  So what you've stated is -- is actually
10:43:06   23   the correct version of that issue?
10:43:09   24         A.  That's correct.
10:43:09   25         Q.  Okay.  So he got his date wrong?

---

15 (Pages 57 to 60)

Quick v. Frontier Airlines                    EDWARD K. QUICK                              7/15/2016

61

```
10:43:14   1        A.  Yes.
10:43:14   2        Q.  And he misinterpreted why exactly you
10:43:17   3   were assigned to the Wounded Warrior Battalion?
10:43:20   4        A.  Correct.  So, I mean, you know, it was
10:43:23   5   just a general conversation, and I'm sure that's what
10:43:26   6   he recalled.  It's just not completely accurate.
10:43:45   7        Q.  In paragraph 15, Mr. Palmer has written
10:43:49   8   "Mr. Quick stated that he knows as a pilot with a TBI
10:43:53   9   condition he wouldn't be allowed to fly."
10:43:56  10        Did you tell Mr. Palmer that?
10:44:00  11        A.  Well, I explained to him that as a pilot
10:44:03  12   for the military and the fact that I had a mild TBI,
10:44:10  13   that was a grounding item, which it was.
10:44:13  14   Automatically as soon as I was diagnosed, at that
10:44:17  15   particular point in time, I was grounded as a pilot
10:44:20  16   medically from the Army.
10:44:22  17        Q.  "Mr. Quick also stated a position he can
10:44:26  18   no longer perform."
10:44:29  19        Do you know what that sentence means?
10:44:32  20        A.  Are you talking about 15?
10:44:33  21        Q.  Yes.
10:44:34  22        A.  Let me read it again here.
10:44:36  23        (The deponent read the document.)
10:44:55  24        A.  A lot of inconsistencies in -- in this
10:44:57  25   one.  Again --
```

62

```
10:44:58   1        Q.  My question was just --
10:44:59   2        A.  Oh, sorry.
10:45:00   3        Q.  The second sentence says, "Mr. Quick also
10:45:02   4   stated a position he can no longer perform."
10:45:06   5        Do you know what that sentence means?
10:45:08   6        A.  I do not.  I don't know what he was
10:45:09   7   talking about there.
10:45:10   8        Q.  Did you tell Mr. Palmer that your
10:45:14   9   position as first officer with Frontier was a position
10:45:17  10   that you could no longer perform?
10:45:21  11        A.  Well, I'm sure I explained to him I
10:45:23  12   couldn't pass a medical.
10:45:24  13        Q.  Okay.  So that would be correct then?
10:45:32  14        A.  Well, no, it says, "Mr. Quick also stated
10:45:34  15   a position he could no longer perform."
10:45:36  16        Well, what position is he talking about?
10:45:38  17        Q.  And I -- and I asked you, did you tell
10:45:40  18   him that you could not perform your first officer
10:45:43  19   position any longer?
10:45:45  20        A.  You know, it was -- you know, it could
10:45:48  21   have been my Army position as a pilot.  I mean, I
10:45:50  22   don't recall exactly, you know.  But working as a
10:45:54  23   pilot, I was grounded medically.
10:45:57  24        Q.  And that -- was that both for the Army
10:45:59  25   and for a job like your first officer position with
```

63

```
10:46:02   1   Frontier?
10:46:03   2        A.  Yes.  You need a medical for both.
10:46:05   3        Q.  Okay.  So that's something that you did
10:46:09   4   communicate to Mr. Palmer?
10:46:10   5        A.  Yes.
10:46:11   6        Q.  Okay.  And "Mr. Quick stated that what he
10:46:14   7   purpose to the airline."  And I assume that he meant
10:46:21   8   to write "propose to airline and his wishes was to be
10:46:22   9   medically retired and placed on long-term disability
10:46:28  10   until his retirement should kick in."
10:46:30  11        Did you state that to Mr. Palmer?
10:46:33  12        A.  You know, I believe that I, you know,
10:46:38  13   certainly discussed the option, you know, because I
10:46:41  14   had already, at that point, had re-applied to Frontier
10:46:46  15   in September of 2014.
10:46:50  16        So I reported back to work, applied for
10:46:54  17   my work.  And, you know, we're now talking -- he signs
10:47:00  18   this in January.  So I spoke to the chief pilot about
10:47:05  19   my return to work.  I spoke to the human resource
10:47:10  20   person, Michelle Zeier.  And we are now four months,
10:47:17  21   five months past the time that Frontier should have
10:47:21  22   reemployed me.
10:47:24  23        And there had already been discussions
10:47:26  24   with Michelle Zeier about an option, if that was an
10:47:32  25   option to me, because I -- I had asked about all my
```

64

```
10:47:36   1   options, what could be available to me.  And one of
10:47:39   2   those options certainly, you know, that was worth
10:47:41   3   looking at was was I entitled to go out on -- on a
10:47:44   4   medical, and if nothing else, on the short-term.
10:47:50   5        Q.  Now, isn't it true that that was
10:47:51   6   something that you suggested to Ms. Zeier the first
10:47:53   7   time you spoke to her in September or October of 2014?
10:47:57   8        A.  Well, it wasn't the only thing I
10:47:59   9   suggested either.
10:48:01  10        Q.  But was it something you did suggest,
10:48:03  11   correct?
10:48:03  12        A.  It was something that I asked to
10:48:06  13   certainly look at.  Was that an option?  I was trying
10:48:08  14   to find out what my options were upon return, yes.
10:48:12  15        Q.  Isn't it true you stated to her that that
10:48:15  16   was your first option, your first preferred choice?
10:48:19  17        A.  I don't believe that, no.
10:48:20  18        Q.  Do you say you didn't say that, or you
10:48:22  19   don't remember?
10:48:24  20        A.  I certainly don't remember saying that
10:48:25  21   was my first-and-only option.  I remember saying, All
10:48:29  22   my options are on the table.  So, you know, I would
10:48:32  23   not limit myself to certainly one thing.  I was
10:48:36  24   looking to have my job back.  And I made that very
10:48:38  25   clear from the very beginning.
```

16 (Pages 61 to 64)

Quick v. Frontier Airlines     EDWARD K. QUICK     7/15/2016

65

| | | |
|---|---|---|
| 10:48:40 | 1 | Q. My question wasn't whether you limited |
| 10:48:42 | 2 | yourself to only that. My question was did you not |
| 10:48:45 | 3 | state to Ms. Zeier in your first meeting with her that |
| 10:48:48 | 4 | your first choice was to go out on disability and |
| 10:48:52 | 5 | retire? |
| 10:48:52 | 6 | A. I don't recall that, no. |
| 10:48:54 | 7 | Q. Do you deny that you said that? |
| 10:49:00 | 8 | A. We discussed -- certainly discussed the |
| 10:49:04 | 9 | disability portion. I certainly asked her to, you |
| 10:49:07 | 10 | know, please get me a copy of the disability reg -- |
| 10:49:14 | 11 | you know not the reg -- the insurance policy I had |
| 10:49:17 | 12 | asked for at that time so I could review that to see |
| 10:49:20 | 13 | if that was an option for me. |
| 10:49:22 | 14 | So it was discussed. For me to sit there |
| 10:49:24 | 15 | and say that was the only thing that I was looking at |
| 10:49:28 | 16 | doing is totally false. |
| 10:49:29 | 17 | Q. Well, again, that's not what my question |
| 10:49:31 | 18 | stated. |
| 10:49:31 | 19 | A. Oh. Please, restate your question. |
| 10:49:34 | 20 | Q. I'll do it again. Isn't it true that you |
| 10:49:36 | 21 | said to Ms. Zeier in your first meeting with her that |
| 10:49:40 | 22 | your first preferred option -- not necessarily the |
| 10:49:43 | 23 | only one, but your first preferred option was to go |
| 10:49:50 | 24 | out on disability with the company and then medically |
| 10:49:53 | 25 | retire? |

66

| | | |
|---|---|---|
| 10:49:54 | 1 | A. No. |
| 10:49:55 | 2 | Q. Okay. You deny saying that? |
| 10:49:57 | 3 | A. Not in that context, no. |
| 10:50:00 | 4 | Q. What context did you say it in? |
| 10:50:03 | 5 | A. As I previously stated, the discussion |
| 10:50:07 | 6 | that I had with her was an informal discussion at her |
| 10:50:10 | 7 | request. And we discussed a number of options that I |
| 10:50:15 | 8 | had. And I explained to her, in addition to the |
| 10:50:17 | 9 | option of me looking at possibly going out on -- on -- |
| 10:50:23 | 10 | taking advantage of our disability plan, if that was |
| 10:50:27 | 11 | an option to me -- and I didn't know at that time that |
| 10:50:30 | 12 | it was, she made -- didn't help me and didn't make it |
| 10:50:33 | 13 | clear. We didn't receive until months later, after I |
| 10:50:37 | 14 | had to hire an attorney, even after I talked to the |
| 10:50:39 | 15 | Department of Labor, months later, and only after the |
| 10:50:44 | 16 | request of once I hired the attorney, did I ever |
| 10:50:47 | 17 | receive the insurance policy to look it over only to |
| 10:50:49 | 18 | find out that I wasn't qualified under it. So why |
| 10:50:52 | 19 | would I, you know, commit to going out on a disability |
| 10:50:57 | 20 | when there's nothing there? It doesn't make any |
| 10:50:59 | 21 | sense. |
| 10:51:01 | 22 | Q. I've heard your explanation now a couple |
| 10:51:03 | 23 | of different times, but you still haven't answered my |
| 10:51:06 | 24 | question. Do you deny saying that your first |
| 10:51:09 | 25 | preferred option was to go out on disability and |

67

| | | |
|---|---|---|
| 10:51:11 | 1 | medically retire? |
| 10:51:13 | 2 | A. I don't recall that I said it in that way |
| 10:51:15 | 3 | at all, no. |
| 10:51:16 | 4 | Q. Okay. Turn the page to the last page of |
| 10:52:02 | 5 | Exhibit 3. I'd ask you to read over the summary of |
| 10:52:19 | 6 | the contact between you and Mr. Gault on the third |
| 10:52:26 | 7 | page of Exhibit 3. |
| 10:52:28 | 8 | (The deponent read the document.) |
| 10:53:04 | 9 | Q. Do you recall calling the Department of |
| 10:53:07 | 10 | Labor on January 26, 2015, and speaking with |
| 10:53:11 | 11 | Mr. Gault? |
| 10:53:12 | 12 | A. I do. |
| 10:53:13 | 13 | Q. Did Mr. Gault advise you that the |
| 10:53:20 | 14 | things you had discussed with Mr. Palmer were things |
| 10:53:23 | 15 | he believed were already covered by prior cases that |
| 10:53:26 | 16 | you had filed or filed charges that you had filed, |
| 10:53:29 | 17 | prior charges that you had filed? |
| 10:53:31 | 18 | A. Correct. |
| 10:53:32 | 19 | Q. Okay. And that they wouldn't go ahead |
| 10:53:35 | 20 | and investigate these allegations again. Is that what |
| 10:53:37 | 21 | he told you? |
| 10:53:38 | 22 | A. Yes. |
| 10:53:39 | 23 | Q. Okay. "Mr. Quick became agitated and |
| 10:53:44 | 24 | somewhat verbally aggressive toward me and stated it |
| 10:53:48 | 25 | was his right to file a complaint. I advised Mr. |

68

| | | |
|---|---|---|
| 10:53:52 | 1 | Quick that he could file a new USERRA case, but if the |
| 10:53:52 | 2 | issues were the same as those litigated in court, the |
| 10:53:55 | 3 | case would be closed, no further action would take |
| 10:53:57 | 4 | place. Mr. Quick indicated that he would file a |
| 10:54:01 | 5 | complaint against me. I attempted to advise Mr. Quick |
| 10:54:05 | 6 | that he was free to file a complaint against me, but |
| 10:54:08 | 7 | he hung up the phone on me." |
| 10:54:11 | 8 | Did Mr. Gault summarize your interaction |
| 10:54:14 | 9 | accurately? |
| 10:54:15 | 10 | A. Yes. |
| 10:54:24 | 11 | MR. DABNEY: The court reporter has asked |
| 10:54:26 | 12 | for a break. I think it's a good time. |
| 10:54:28 | 13 | THE DEPONENT: Thank you. |
| 10:54:29 | 14 | THE VIDEOGRAPHER: This is the end of |
| 10:54:30 | 15 | Media Unit 1 in the deposition of Edward K. Quick. |
| 10:54:33 | 16 | We're off the record at 10:54 a.m. |
| 10:54:36 | 17 | (Recess taken, 10:54 a.m. to 11:08 a.m.) |
| 11:08:14 | 18 | THE VIDEOGRAPHER: This is the beginning |
| 11:08:19 | 19 | of Media Unit 2 in the deposition of Edward K. Quick. |
| 11:08:19 | 20 | Back on the record at 11:08 a.m. |
| 11:08:23 | 21 | (Deposition Exhibit 4 was marked.) |
| 11:08:24 | 22 | Q. (BY MR. DABNEY) Mr. Quick, I've handed |
| 11:08:27 | 23 | you Exhibit 4. It's a document that was produced in |
| 11:08:29 | 24 | this litigation by Frontier to your counsel. Have you |
| 11:08:33 | 25 | seen No. 4 before? |

17 (Pages 65 to 68)

Quick v. Frontier Airlines     EDWARD K. QUICK     7/15/2016

---

69

```
11:08:36   1        A.  No.
11:08:37   2        Q.  Okay.  I'll represent to you that it is a
11:08:41   3   timeline of events in your training while you were
11:08:44   4   employed at Frontier Airlines.  It concentrates mostly
11:08:49   5   on 2006 and 2007.  This was a period of time when you
11:08:53   6   were trying to upgrade your airframe rating from first
11:08:57   7   officer to captain, right?
11:09:00   8        A.  Correct.
11:09:02   9        Q.  And that activity would involve training
11:09:07  10   and simulator exercises, oral exams; is that right?
11:09:12  11        A.  Correct.
11:09:13  12        Q.  Is there a written exam?
11:09:17  13        A.  Did you ask me is there a written exam?
11:09:19  14        Q.  Yes.
11:09:20  15        A.  There was a written exam that I remember,
11:09:22  16   yes.
11:09:24  17        Q.  Okay.  And are there occasions where
11:09:28  18   representatives of the FAA would observe these upgrade
11:09:34  19   activities?
11:09:35  20        A.  Yes.
11:09:35  21        Q.  Okay.  If you look down toward the
11:09:42  22   bottom, you'll see an April 9, 2005, date.  Do you see
11:09:53  23   that?
11:09:54  24        A.  Correct.
11:09:56  25        Q.  It states there that you passed a first
```

---

70

```
11:09:57   1   officer proficiency check.  Do you recall that?
11:10:02   2        A.  I do.
11:10:03   3        Q.  Okay.  And it says the name Spanos after
11:10:06   4   that.  Do you know who that is?
11:10:07   5        A.  I do.
11:10:08   6        Q.  Who is that?
11:10:10   7        A.  He's the captain and instructor pilot at
11:10:14   8   Frontier who recommended me to be hired.
11:10:19   9        Q.  And then March 30, 2006, it says, "Passed
11:10:23  10   A-320 Type Rating Oral."  And it says Mr. Spanos and
11:10:30  11   then a Mr. McLaughlin from the FAA observed the oral
11:10:34  12   exam.
11:10:39  13        A.  Yes.
11:10:40  14        Q.  Is that accurate?
11:10:41  15        A.  Yes.
11:10:43  16        Q.  And when it says A-320, that's an Airbus
11:10:47  17   A-320 twin-engine jet, correct?
11:10:50  18        A.  Correct.
11:10:51  19        Q.  That's the predominant equipment that
11:10:56  20   Frontier Airlines operates?
11:10:57  21        A.  It is, correct.
11:10:58  22        Q.  Okay.  How many passenger jet is that?
11:11:01  23        A.  If I remember right, our one that I was
11:11:04  24   flying was 150.  There are larger ones now, but the --
11:11:09  25   the ones mainly I was flying was 150 passengers.
```

---

71

```
11:11:14   1        Q.  Okay.  So this aircraft was significantly
11:11:18   2   larger than the aircraft that you flew in your
11:11:23   3   pre-Frontier aviation career, correct?
11:11:27   4        A.  Correct.
11:11:27   5        Q.  Okay.  Was this the first time that you
11:11:29   6   had flown a jet of that size and complexity?
11:11:32   7        A.  Yes.
11:11:37   8        Q.  On April 11, 2006, it states, "Failed an
11:11:44   9   A-320 Type Rating Practical Test."  And it has a
11:11:49  10   Mr. Harke; is that right?
11:11:51  11        A.  Correct.
11:11:52  12        Q.  And from the FAA, a Mr. Hopkins; is that
11:11:55  13   right?
11:11:56  14        A.  Yes.
11:11:58  15        Q.  Okay.  A type rating practical test, is
11:12:01  16   that a simulator exam for attempting to upgrade to
11:12:06  17   captain?
11:12:06  18        A.  It is, yes.
11:12:07  19        Q.  Okay.  So this first attempt at the --
11:12:13  20        A.  Upgrade.
11:12:13  21        Q.  -- simulator practical test for the
11:12:16  22   upgrade, you did not pass; is that right?
11:12:18  23        A.  That's correct.
11:12:21  24        Q.  And it says there in May of 2006, you
11:12:24  25   received additional training?
```

---

72

```
11:12:26   1        A.  Yes.
11:12:28   2        Q.  And the FAA had requested that you take a
11:12:30   3   second oral; is that right?
11:12:31   4        A.  Yes.
11:12:32   5        Q.  Okay.  And then in May 9, you passed the
11:12:37   6   FAA requested second oral exam with a Mr. Linn from
11:12:46   7   Frontier?
11:12:46   8        A.  Yes.
11:12:47   9        Q.  And then in May 10, it says, "Additional
11:12:50  10   FTD Training" with Mr. Popp.
11:12:53  11        A.  Yes.
11:12:54  12        Q.  What is FTD training?
11:12:59  13        A.  Flight training device.
11:13:00  14        Q.  Is that a simulator or something else?
11:13:03  15        A.  It's something else.  It's a stand-alone.
11:13:06  16   It's not actually getting in the simulator itself,
11:13:10  17   it's a mock-up, kind of like the courtroom next door.
11:13:15  18        Q.  I'm sure it's more difficult than that.
11:13:17  19        A.  Right.
11:13:19  20        Q.  Mr. Popp, now, he's the gentleman
11:13:22  21   employed by Airbus; is that right?
11:13:31  22        A.  I thought he worked for us.
11:13:36  23        Q.  He was involved in pilot training for the
11:13:38  24   A-320, correct?
11:13:39  25        A.  Yes.
```

---

18 (Pages 69 to 72)

Quick v. Frontier Airlines | EDWARD K. QUICK | 7/15/2016

---

**73**

11:13:43  1      Q.   And then it says May 15 to 21 of '06, you

11:13:49  2   received a captain simulator course again; is that

11:13:52  3   right?

11:13:55  4      A.   Yes.

11:13:56  5      Q.   Okay.  And then in May 22, you took a

11:14:01  6   recheck for the practical simulator exam for the

11:14:05  7   upgrade --

11:14:08  8      A.   Yes.

11:14:08  9      Q.   -- and you did not pass, correct?

11:14:10  10      A.   That is correct.

11:14:13  11      Q.   Mr. Wallin was the check airman for

11:14:17  12   Frontier?

11:14:18  13      A.   Correct.

11:14:18  14      Q.   And there was a Mr. McLaughlin from the

11:14:21  15   FAA that observed that, correct?

11:14:23  16      A.   Yes.

11:14:25  17      Q.   It says later in June that you had

11:14:31  18   additional training for first officer requalification

11:14:34  19   and passed your requalification for that purpose.

11:14:38  20      A.   That's correct.

11:14:39  21      Q.   Okay.  And it jumps ahead to June of

11:14:44  22   2007.  It says you received an unsatisfactory grade on

11:14:48  23   UFFS 4.  Do you know what that refers to?

11:14:58  24      A.   I'm trying to remember the acronym UFSS.

11:15:01  25   But No. 4 was just a training period.  It was, like,

---

**74**

11:15:06  1   the fourth training period.

11:15:07  2      Q.   Upgrade something?

11:15:09  3      A.   For upgrade, yes.

11:15:10  4      Q.   The U, you think, stands for upgrade?

11:15:14  5      A.   I -- I guess.  You know, there's a lot of

11:15:16  6   acronyms; and I remember most, but not all.

11:15:19  7      Q.   Okay.  And it says June 3, 2007, you took

11:15:26  8   an oral exam for the captain upgrade as you had the

11:15:29  9   previous year.  And you did not pass; is that right?

11:15:32  10      A.   Correct.

11:15:33  11      Q.   Okay.  And then on June 15 of '07, you

11:15:37  12   had additional training for the oral.

11:15:40  13      A.   Yes.

11:15:41  14      Q.   And then on June 18, 2007, you took a

11:15:48  15   recheck for the oral upgrade exam, and you did not

11:15:52  16   pass, correct?

11:15:53  17      A.   Correct.

11:15:53  18      Q.   Okay.

11:16:05  19      A.   It was missing something on here if I can

11:16:08  20   interject.

11:16:08  21      Q.   What is it missing?

11:16:10  22      A.   So you're saying the timeline of events.

11:16:12  23   So I started in -- in 2004.  So I would have passed a

11:16:15  24   proficiency check in 2004 before I passed the second

11:16:20  25   proficiency check in 2005.

---

**75**

11:16:23  1      Q.   For purposes of your first officer

11:16:26  2   position?

11:16:26  3      A.   Correct.  So I passed a first officer

11:16:29  4   checkride three different times with no problems.

11:16:33  5      Q.   Okay.  Anything else missing, at least in

11:16:42  6   terms of the captain upgrade events?

11:16:44  7      A.   The 1 June 2007, I believe it's upgrade

11:16:48  8   flight for flight simulator.  Just guessing.

11:16:56  9      Q.   Okay.

11:16:57  10      A.   I'll throw a stab at it.

11:17:00  11      Q.   Anything else?

11:17:01  12      A.   No, I think everything else is correct.

11:17:03  13         (Deposition Exhibit 5 was marked.)

11:17:47  14      Q.   Mr. Quick, have you seen Exhibit 5

11:17:49  15   before?

11:17:56  16      A.   I believe I have, yes.

11:17:59  17      Q.   This is a letter in April of 2006 after

11:18:04  18   you had failed your upgrade attempt earlier that month

11:18:11  19   from Mr. Hopkins, who was the FAA official who

11:18:15  20   observed your April 11 attempt to pass the simulator

11:18:21  21   test.

11:18:21  22      A.   He did more than observe.

11:18:23  23      Q.   He was present, correct?

11:18:25  24      A.   He interfered.

11:18:26  25      Q.   He was present, right?

---

**76**

11:18:28  1      A.   He was present.

11:18:29  2      Q.   Okay.

11:18:30  3      A.   And interfered.

11:18:31  4      Q.   Okay.  It states here that Mr. Hopkins

11:18:36  5   instructed that you would have to retake the entire

11:18:40  6   checkride as well as retake the oral exam.  And he

11:18:45  7   states that his decision is based on the following:

11:18:47  8   "Mr. Quick demonstrated a very weak knowledge of the

11:18:52  9   aircraft systems, unfamiliarity with the cockpit

11:18:55  10   setup, and unfamiliar later with Frontier procedures

11:18:59  11   and checklist responses.  He used the wrong take off

11:19:02  12   and approach briefing procedures, had weak MCDU

11:19:06  13   entries and showed no leadership in command authority.

11:19:11  14   He had poor CRM, limited situational awareness, and

11:19:15  15   failed to make any FMA calls."

11:19:19  16         And he said, "I have also deemed Mr.

11:19:19  17   Quick unqualified to operate as a First Officer at

11:19:21  18   Frontier Airlines until he demonstrates the proper

11:19:24  19   knowledge and skills of the aircraft by passing an

11:19:27  20   oral and proficiency check."

11:19:36  21         I gather that you disagree with

11:19:37  22   Mr. Hopkins' assessment?

11:19:39  23      A.   I do.

11:19:40  24      Q.   Okay.  Are the things he mentioned here

11:19:44  25   things that did not occur?

---

Quick v. Frontier Airlines                    EDWARD K. QUICK                                    7/15/2016

---

77

11:19:45    1    A.  Well, there's a reason some of the events
11:19:47    2    occurred, and he was the cause of the events.  So had
11:19:53    3    I had a normal checkride without Mr. Hopkins'
11:19:57    4    interference, which is in total violation of the FARs
11:20:01    5    and his job as an inspector -- he's supposed to sit
11:20:05    6    and observe; no more, no less.  He's not allowed to
11:20:08    7    interject, he's not allowed to participate.  All he's
11:20:10    8    supposed to do is observe the check airman giving me a
11:20:15    9    checkride there.
11:20:16   10          What he did was -- prior to us going into
11:20:18   11    the simulator was to demean and belittle me by asking
11:20:23   12    questions, what he was not allowed to do as an FAA
11:20:26   13    inspector, totally outside the scope and bounds of his
11:20:30   14    job, and totally unprofessional on his part.
11:20:34   15          The purpose of it was to get me upset and
11:20:37   16    angry.  It did, and that affected the checkride.  And
11:20:40   17    that's the reason I did poorly and failed.  And I did
11:20:44   18    fail.
11:20:46   19    Q.  Mr. Hopkins asked you questions prior to
11:20:49   20    the beginning of the exercise?
11:20:52   21    A.  Yes.  In the office with -- with Ben
11:20:57   22    Harke.  He was there.  I was there with my instructor
11:21:01   23    from the training period there.  And he did follow-up
11:21:05   24    questions, which is not allowed on my oral.  And he
11:21:10   25    interjected and was literally rude to me by, you know,

---

78

11:21:15    1    getting me upset by asking me questions on systems
11:21:19    2    that I had already previously passed.  And he was
11:21:21    3    trying to belittle me.  And it startled, and it got me
11:21:26    4    off on the wrong foot for the -- for the checkride.
11:21:29    5          I should have stopped it then, took a
11:21:32    6    rest room break with my instructor, who is a retired
11:21:35    7    United Airline pilot and instructor.  And he said he
11:21:39    8    had never seen a checkride ever start in that manner.
11:21:42    9    And he said it was totally inappropriate.
11:21:44   10    Q.  He asked you questions about various
11:21:46   11    technical aspects of the aircraft, correct?
11:21:49   12    A.  He did.
11:21:50   13    Q.  Okay.  And you considered that rude?
11:21:53   14    A.  He wasn't allowed to ask any questions.
11:21:59   15    That's not his purpose.  That's in violation of his
11:22:01   16    job.  That's what I'm saying.  He's supposed to
11:22:03   17    observe, nothing else, nothing more, nothing less.
11:22:07   18    Q.  Now, you said he belittled you?  Did he
11:22:10   19    call you names?  Did he -- did -- was he rude in the
11:22:12   20    way that he --
11:22:13   21    A.  Yes.
11:22:13   22    Q.  -- used language that was off color?  I
11:22:15   23    mean, what did you mean he belittled you?
11:22:18   24    A.  He belittled me by making accusations
11:22:22   25    that any pilot should have known this, would have

---

79

11:22:26    1    known this.  And I was just startled by this man's,
11:22:30    2    you know, treatment toward me when I didn't expect it.
11:22:34    3    I had been around inspectors before, and they never
11:22:38    4    acted in his way.  And he's a previous chief pilot for
11:22:38    5    Frontier Airlines.  I thought there was a serious
11:22:40    6    conflict of interest between his previous position and
11:22:43    7    who he knew at Frontier Airlines and still did.  He
11:22:47    8    should have never been there.
11:22:49    9    Q.  All right.  So you attribute what you
11:22:53   10    considered to be his improper behavior to some sort of
11:22:59   11    relationship with Frontier?
11:23:02   12    A.  Correct.
11:23:03   13    Q.  Based on what?
11:23:06   14    A.  Based upon him being the previous chief
11:23:09   15    pilot.  He knew people at Frontier.  He knew all of
11:23:13   16    the players there.
11:23:14   17          But regardless of that, what he did was
11:23:18   18    improper, was not authorized.  He went outside the
11:23:22   19    scope of his job as an inspector and purposely got me
11:23:27   20    rattled and angry.  That is why I failed my checkride.
11:23:32   21    I was angry.  I was seeing red when I walked in there.
11:23:36   22    I should have stopped it.  I didn't.  Bad on me.
11:23:40   23    Q.  I understand why you believe you failed.
11:23:42   24    I understand your opinion about Mr. Hopkins' behavior.
11:23:45   25    My question is what is it about Mr. Hopkins' conduct

---

80

11:23:53    1    on this day that you blame on Frontier?  Why do you
11:23:57    2    blame it on Frontier?  If you do.
11:24:01    3    A.  Well, I don't believe that Mr. Hopkins
11:24:04    4    should have ever been there.  And Mr. Harke certainly
11:24:07    5    should have stopped him as the instructor.  He knew
11:24:10    6    that he was stepping out of bounds and stepped over
11:24:12    7    the line.
11:24:13    8    Q.  Did he tell you that?
11:24:14    9    A.  And he -- what's that?
11:24:15   10    Q.  Did Mr. Harke tell you that he knew that?
11:24:18   11    A.  No, he didn't say that to me, but --
11:24:24   12    Q.  That's your opinion?
11:24:24   13    A.  Definitely my opinion, yes.
11:24:26   14    Q.  Mr. Harke was the check airman?
11:24:28   15    A.  Correct.
11:24:28   16    Q.  Mr. Harke was the one that failed you?
11:24:30   17    A.  Correct.
11:24:30   18    Q.  Did Mr. Harke belittle you or behave
11:24:33   19    rudely?
11:24:34   20    A.  No.
11:24:34   21    Q.  Okay.  What is it about Mr. Hopkins'
11:24:40   22    behavior that you attribute to Frontier and why?
11:24:45   23    A.  Well, again, it's my opinion that
11:24:49   24    somebody from the pilot group had been talking to him
11:24:51   25    about my increase in seniority.  And there was a lot

---

81

of contention from, not only the company, but the union, and the aggrieved pilot group towards me because pilots there saw that I had moved and advanced in seniority when, in fact, Frontier Airlines should have put out a letter, which we requested well in advance, to let everybody know that Frontier made a mistake, and I should have always been in that position.  I didn't move up in seniority.  It was always my position.  That's the position I should have always held.  So I didn't make the mistake.  Frontier made the mistake.

Q.  What's your evidence that anyone talked to Mr. Hopkins and that he behaved the way he did because of the reasons you just stated?

A.  Well, I was -- I was told by Chris Spanos, who was a check airman there at the time, that the company was out to get me, and there were certain pilots there that were out to get me.  And he was even there that -- that evening just one room over from us.

Q.  Mr. Spanos told you that the company was out to get you or Mr. Hopkins was out to get you?

A.  The -- the company.

Q.  Okay.

A.  Because they weren't happy with my seniority, and they weren't happy because I went back

82

and asked for the delta, the difference in pay, for the advanced seniority that I got.  They felt that I was asking for too much.

And -- and then instead of letting me upgrade with Frank Anders, who I also helped get his seniority increased with mine, because we were both -- had the same violation with USERRA from Frontier.  And I'm the one who advanced the idea that we were both entitled to our seniority because we both left for military service, and we were both equally in the same hiring pool.

And when I was going through the first officer -- I was going through the first officer check, which was in 2000 -- if I remember right, 2005 -- that it was at that time that I explained to Frank Anders that I was going to go to the company, since I was off of probation.  And I was warned in advance don't -- don't do anything until you get off of probation because the company will want to fire you.  They will come after you one way or the other.

The way you guys came -- not you -- the way Frontier came after me was trying to fail me on these rides and by getting me upset and rattled.  And that -- they certainly did that.

Q.  And your evidence for that is what, that

83

Mr. Spanos told you the company was out to get you?

A.  Well, I believed him, yes.

Q.  Okay.  What was Mr. Spanos' source for that information?

A.  You'd have to ask him that.  I don't know.

Q.  Okay.

A.  He never told me.

Q.  Aside from hearsay from Mr. Spanos and the other evidence that Mr. Hopkins was out to get you on behalf of Frontier?

A.  You know, I didn't have any.  I don't -- you know, I don't have any evidence.  We've covered that ground before in the previous testimony.

Q.  Okay.  That's your opinion that Mr. Hopkins behaved towards you the way that he did because there was some agenda to get you, but that's your opinion, and -- and you really don't have any backup for that, correct?

A.  Well, the backup I have is that what he did was highly improper.  And it got me upset.  And, again, Mr. Harke, the check airman, didn't speak up and stop it.  He knew it was improper.  It's in violation.

And he could see that I was upset.  I was

84

angry prior to going into the sim ride.  So, you know, at that point, I wasn't thinking clearly.  Yeah, I didn't pass my checkride.  I was upset.  No -- no -- no ifs, ands, or buts.

Q.  Mr. Hopkins' behavior was part of your retaliation claim in your 2006 lawsuit against Frontier, was it not?

A.  Yes.

Q.  And that's the one you lost on summary judgment?

A.  Well, you know, I -- I really wouldn't characterize it as a loss, no.

Q.  Well, your case was dismissed, correct?

A.  Well, we lost in summary judgment, and I appealed.  But because Frontier was in bankruptcy, we couldn't do anything with it.  So, yeah, I appealed to the public court.  We wanted to go on and say now the summary judgment should not have been put in by the judge at the time, who I believe was Judge Nottingham, who had since left the bench for improper -- improprieties.  And he made the ruling in my case a week before he got in trouble.

Q.  Your case was dismissed, correct?

A.  Well, summary judgment, whatever that means.  You're the attorney.

Quick v. Frontier Airlines                    EDWARD K. QUICK                              7/15/2016

---

85

11:30:05  1      Q.  It means it was dismissed.  Do you
11:30:08  2  disagree?
11:30:08  3      A.  I did disagree and took it to appellate
11:30:09  4  court.
11:30:10  5      Q.  Do you disagree with me that what
11:30:11  6  happened was on summary judgment your case was
11:30:14  7  dismissed?
11:30:15  8      A.  By that judge?
11:30:15  9      Q.  Yes.
11:30:16 10      A.  Yeah, that's -- I think that's what I
11:30:18 11  said, we lost on summary judgment.
11:30:47 12      (Deposition Exhibit 6 was marked.)
11:30:50 13      THE DEPONENT:  Thank you.
11:30:50 14      Q.  (BY MR. DABNEY)  Have you seen Exhibit 6
11:31:26 15  before?
11:31:27 16      A.  No.
11:31:29 17      Q.  I'll represent to you this was part of
11:31:33 18  your training file and was produced in this litigation
11:31:35 19  by Frontier.
11:31:39 20      And the main body of it is a message from
11:31:43 21  Peter Popp.  Peter.Popp.airbus.com.  It's sent to
11:31:52 22  David Welt and to John Roe and Thomas Walby.  Do you
11:31:55 23  see that?
11:31:56 24      A.  I do.
11:31:57 25      Q.  June 1 of 2007?

---

86

11:31:58  1      A.  Yes.
11:32:00  2      Q.  And when you look at the second page, the
11:32:07  3  signature from Mr. Popp says, "Captain Peter Popp,
11:32:11  4  Manager, Airbus Training Center, Airbus North America
11:32:15  5  Customer Services, Inc."  Do you see that?
11:32:17  6      A.  Yes.
11:32:18  7      Q.  Does that refresh your recollection about
11:32:19  8  whether Mr. Popp worked for Airbus?
11:32:22  9      A.  He worked for the training center there,
11:32:23 10  yes.
11:32:24 11      Q.  Okay.  Mr. Popp states in his email that
11:32:29 12  you were not doing well in your training to attempt to
11:32:33 13  upgrade in 2007.
11:32:44 14      The last paragraph on the first page, it
11:32:46 15  says, "He does not seem to be able to adapt well to
11:32:52 16  situations out of the norm.  He does not have a good
11:32:56 17  command presence as Captain in the left seat.  He has
11:32:56 18  a hard time organizing his actions and directing the
11:33:01 19  crew.  His first officer has been required to prompt
11:33:06 20  him on too many items.  He also tries to find excuses
11:33:09 21  when he is critiqued.  I thoroughly debriefed Ed on
11:33:14 22  these items after each session."
11:33:22 23      Is Mr. Popp correct in his assessment of
11:33:24 24  your attempts to go through the training in June of
11:33:27 25  2007?

---

87

11:33:28  1      A.  I can't speak for him.
11:33:30  2      Q.  Well, speak for yourself.  Do you agree
11:33:34  3  with what I just read?
11:33:36  4      A.  You know, I don't recall the particulars
11:33:38  5  of the ride.  All I -- all I know is --
11:33:41  6      Q.  Well, this was just training that
11:33:42  7  Mr. Popp was conducting.  It wasn't a ride at this
11:33:45  8  point, was it?
11:33:46  9      A.  Just training, correct.
11:33:48 10      Q.  Yeah.  And Mr. Popp had those criticisms
11:33:50 11  that I just read.  Do you agree with those criticisms?
11:33:53 12      A.  I don't agree, but he's entitled to his
11:33:56 13  opinion.
11:33:56 14      Q.  Okay.  In the last paragraph on the
11:34:12 15  second page, he says, "Last night during the debrief,
11:34:15 16  I asked if he would like a new instructor, and he
11:34:20 17  stated, 'yes, I've never had problems before, why am I
11:34:24 18  having them now.'  I recommend that Frontier provide a
11:34:27 19  new instructor to continue Ed's training."
11:34:30 20      Did you want to get a different
11:34:31 21  instructor other than Mr. Popp?
11:34:34 22      A.  I did.
11:34:34 23      Q.  Did you think Mr. Popp was unfair?
11:34:36 24      A.  I did.
11:34:39 25      Q.  Did you think Mr. Popp didn't know how to

---

88

11:34:41  1  do his job?
11:34:42  2      A.  I just wanted a new instructor.  It's
11:34:44  3  maybe a personality conflict.  Who knows?  I don't
11:34:46  4  know.  At the time, I was entitled to request one, and
11:34:48  5  I did.  Maybe I wasn't satisfied with his instruction
11:34:55  6  as he wasn't satisfied with my performance.
11:34:58  7      Q.  All right.  Well, do you have any
11:35:01  8  complaints about Mr. Popp being out to get you or
11:35:04  9  Mr. Popp somehow being in cahoots with Frontier
11:35:07 10  because of anything that you had done in relation to
11:35:10 11  your seniority, or what have you?
11:35:12 12      A.  It was very clear to me that the company
11:35:15 13  was never going to let me pass a checkride, plain and
11:35:20 14  simple.  Whether it was poor instruction, poor check
11:35:23 15  airmen, having the FAA there each time, yeah, they
11:35:27 16  were out to get me.  And that's how I feel --
11:35:28 17      Q.  Mr. Popp worked for Airbus, right?
11:35:31 18      A.  Doesn't matter.  He was paid by Frontier.
11:35:33 19      Q.  Well, Frontier was Airbus' customer,
11:35:36 20  right?  Mr. Popp works for Airbus.  He would have no
11:35:38 21  reason to be out to get you, right?
11:35:42 22      A.  Not true.
11:35:43 23      Q.  Well, what's your -- what's your evidence
11:35:45 24  that he would be --
11:35:46 25      A.  So he worked with all of the check airmen

---

Quick v. Frontier Airlines                    EDWARD K. QUICK                                    7/15/2016

---

89

11:35:49 1    and all of the flight instructors there. He heard all
11:35:52 2    the comments about me.
11:35:54 3        Q. What do you know that he heard? Did he
11:35:56 4    tell you he heard comments about you?
11:35:59 5        A. Repeat your question.
11:36:00 6        Q. Did he tell you that he heard comments
11:36:03 7    about you?
11:36:05 8        A. No.
11:36:06 9        Q. So you're assuming that?
11:36:09 10       A. Yes.
11:36:09 11       Q. Okay. Do you have any actual evidence
11:36:12 12   that Mr. Popp harbored any animosity towards you at
11:36:16 13   all for any reason?
11:36:17 14       A. I don't, no.
11:36:18 15       Q. Okay.
11:36:44 16          (Deposition Exhibit 7 was marked.)
11:37:25 17       MR. WHITCOMB: Can you remind me what
11:37:27 18   exhibit -- Exhibit 7. Thank you.
11:37:31 19       Q. (BY MR. DABNEY) Mr. Quick, do you recall
11:37:31 20   receiving Exhibit 7, an email from Mr. Roe?
11:37:36 21       A. I do.
11:37:36 22       Q. This is on June 18 of 2007. Do you see
11:37:38 23   that?
11:37:39 24       A. Yes.
11:37:40 25       Q. Okay. And this is an email where

---

90

11:37:41 1        Mr. Roe, who is a director of flight operations at
11:37:44 2    Frontier, informed you that he wished to convene a
11:37:51 3    training review board to review your pattern of
11:37:54 4    failures.
11:37:55 5        A. Yes.
11:37:57 6        Q. And that that would be in accordance with
11:37:59 7    the CBA, Section 20, paragraph E(1)(3) through --
11:38:07 8    well, strike that. It would be in -- in accordance
11:38:10 9    with the Section 20 of the contract between the pilots
11:38:16 10   union and the company, correct?
11:38:17 11       A. Correct.
11:38:18 12       Q. Okay. And this is the TRB that you
11:38:21 13   testified earlier did not ultimately occur?
11:38:23 14       A. Yes.
11:38:23 15       Q. Okay.
11:38:38 16          (Deposition Exhibit 8 was marked.)
11:38:56 17       Q. Have you seen Exhibit 8 before?
11:38:59 18       A. I have.
11:39:00 19       Q. And what is it?
11:39:02 20       A. What do you mean what is it?
11:39:04 21       Q. Can you describe it for me?
11:39:06 22       A. Oh. It's a letter from my commander at
11:39:08 23   the time out at Buckley Air Force Base to Frontier
11:39:14 24   Airlines requesting military leave dated 18 June.
11:39:18 25       Q. Okay. So on the same day that Mr. Roe

---

91

11:39:21 1    sent you an email telling you that there would be a
11:39:24 2    training review board convened, that's the same day
11:39:28 3    that your commander wrote a letter to Frontier saying
11:39:32 4    that you needed military leave?
11:39:35 5        A. Yes, it is. And it was given to Frontier
11:39:37 6    on the 18th and prior to the email from Mr. Roe,
11:39:41 7    which, if you notice on there, it's at 9:30 at night.
11:39:44 8    And I had already notified Frontier I was leaving for
11:39:47 9    military leave.
11:39:52 10       Q. It seems to me like an interesting
11:39:54 11   coincidence. Did you know prior to June 18 that you
11:39:58 12   were going to be receiving orders to engage in
11:40:02 13   military service and would have to leave Frontier?
11:40:05 14       A. Yes.
11:40:06 15       Q. When did you first know?
11:40:09 16       A. I had known it for some time that they
11:40:11 17   wanted -- they wanted my services.
11:40:14 18       Q. Well, did at some point you tell them
11:40:17 19   that you wished to go ahead and serve?
11:40:20 20       A. Yes, on the 18th of June.
11:40:23 21       Q. And did you tell --
11:40:24 22       A. That afternoon.
11:40:24 23       Q. And did you make that decision to tell
11:40:30 24   the Army that you wished to serve as a result of the
11:40:32 25   fact that you had experienced this pattern of failures

---

92

11:40:36 1    and the training review board was in the offing?
11:40:39 2        A. I didn't look at it as a pattern of
11:40:42 3    failures. I looked at it as I've had enough and I
11:40:45 4    needed to take a break from Frontier. And the
11:40:47 5    military wanted me as a pilot for them, a pilot in
11:40:51 6    command on equivalent aircraft, 121 aircraft in
11:40:55 7    military service, a four-engine aircraft, not a
11:41:00 8    two-engine aircraft. And I continued from 2007 to
11:41:02 9    2012 as a pilot in command and never failed a
11:41:06 10   checkride.
11:41:07 11       Q. So as a result of your experiences
11:41:11 12   failing checkrides for Frontier, you decided to go
11:41:14 13   ahead and accept the Army's offer to serve; is that
11:41:19 14   accurate?
11:41:20 15       A. It would be accurate in the sense of at
11:41:24 16   that time I felt there was probably not much more I
11:41:26 17   could do with Frontier. I didn't feel I was being
11:41:30 18   treated fairly. And that was an option to me, and I
11:41:33 19   executed it.
11:41:35 20       Q. Okay. And you gave Frontier one day's
11:41:35 21   notice?
11:41:39 22       A. I did.
11:41:39 23       Q. Okay. You could have given them a lot
11:41:42 24   more notice, couldn't you?
11:41:43 25       A. Not required.

---

23 (Pages 89 to 92)

Quick v. Frontier Airlines        EDWARD K. QUICK        7/15/2016

---

93

11:41:45  1      Q.  Well, I didn't ask if it was required.  I
11:41:47  2  said you could have given them quite a bit of notice
11:41:51  3  that you were considering doing this, but you chose
11:41:53  4  not to, correct?
11:41:54  5      A.  It is what it is.  It's -- I gave notice
11:41:57  6  that afternoon after -- after I failed a checkride,
11:42:01  7  yes.  I failed in the morning and went -- left there,
11:42:04  8  went to my unit, and they signed me up.
11:42:08  9      Q.  Okay.
11:42:08 10      A.  The letter, that's what it states.
11:42:10 11      Q.  You said you had been considering that
11:42:12 12  for some time, but you never told Frontier that,
11:42:15 13  correct?
11:42:15 14      A.  Not required to.
11:42:16 15      Q.  I didn't ask that.  I said did you tell
11:42:18 16  Frontier prior to the 18th of June that you were
11:42:21 17  considering going on military service?
11:42:23 18      A.  No.
11:42:24 19      Q.  But you knew that you were considering
11:42:26 20  it?
11:42:26 21      A.  Yes.
11:42:27 22      Q.  And you could have told them, but you
11:42:28 23  chose not to?
11:42:30 24      A.  Well, I -- I had options, that's correct.
11:42:38 25      MR. WHITCOMB:  I'm sorry.  I'm having a

94

11:42:39  1  technical issue over here.
11:42:45  2      Q.  (BY MR. DABNEY)  Now, this Exhibit 8 says
11:42:47  3  that your military leave was to be through the 30th of
11:42:51  4  September 2007.  Do you see that?
11:42:53  5      A.  Yes.
11:42:54  6      Q.  At that time, were you aware that it
11:42:56  7  would extend beyond that, or did you believe that you
11:42:58  8  were going to be on a three-month assignment?
11:43:04  9      A.  I wasn't sure.  You're never sure until
11:43:07 10  you get the orders in hand, so one wouldn't know.  And
11:43:13 11  -- and at that time, I wasn't -- wasn't sure that I
11:43:15 12  would be, you know, certainly continuing on through
11:43:20 13  2014 -- or '12, I mean, '12 -- no, '14, because I
11:43:27 14  retired in '14.
11:43:29 15      Q.  At that time, you weren't sure, but you
11:43:31 16  figured it would go longer?
11:43:33 17      A.  Yes.
11:43:38 18      Q.  And ultimately, as you testified, you
11:43:40 19  were serving our country until June of 2014; is that
11:43:46 20  right?
11:43:47 21      A.  I retired the end of the month in
11:43:52 22  June 2014, that is correct.
11:43:54 23      Q.  So for seven years, you were in the
11:43:59 24  service.  And at no time in between did you report
11:44:04 25  back to Frontier?

95

11:44:10  1      A.  I don't remember reporting back, no.
11:44:13  2  Wait.  I think at one point, they thought I was, but I
11:44:19  3  told them, no, I wasn't.  So I think there was some --
11:44:22  4  because I went in for an ID, to update my ID card.  I
11:44:28  5  think the -- the lady at the chief pilot's office,
11:44:31  6  Kim, mistook that for me returning from leave, which
11:44:39  7  wasn't the case.
11:44:41  8      Q.  And I take it that there were several
11:44:43  9  deployments during these seven years which took you to
11:44:47 10  Iraq, correct?
11:44:49 11      A.  Yes.  Multiple times.
11:44:51 12      Q.  And Afghanistan?
11:44:53 13      A.  Correct.
11:44:54 14      Q.  And you stated that you were performing
11:44:58 15  the duties of a pilot, correct?
11:45:03 16      A.  Yes.
11:45:03 17      Q.  And what kind of aircraft were you flying
11:45:04 18  during those years?
11:45:07 19      A.  I flew the de Havilland-7.
11:45:08 20      Q.  And can you describe that for me?
11:45:12 21      A.  Yes.  It's a four-engine aircraft, high
11:45:14 22  wing.  If you're normally carrying passengers, it
11:45:18 23  would be a 50-passenger aircraft for our purposes in
11:45:21 24  the United States.  And it flew -- it was a 121 large
11:45:24 25  aircraft.  It's considered a large aircraft due -- due
11:45:30

96

11:45:32  1  to its size and weight and complexity.
11:45:35  2      And I flew that during -- let's see, I
11:45:42  3  left in 2007.  I was already current and qualified, if
11:45:47  4  I remember right, in the aircraft at that point.  I
11:45:52  5  had kept my currency during my reserve status.  So
11:45:59  6  from 2000 -- I originally got checked out in it in
11:46:03  7  2002.
11:46:07  8      Q.  Okay.  And what type of engines does it
11:46:12  9  have?
11:46:14 10      A.  Pratt Whitney-50s.
11:46:17 11      Q.  Is that a turboprop?
11:46:18 12      A.  It's a turboprop, yes.
11:46:36 13      Q.  Did you ever do any instructing on that
11:46:39 14  aircraft while you were in the service for those
11:46:41 15  years?
11:46:42 16      A.  I did.
11:46:43 17      Q.  Tell me about that.
11:46:46 18      A.  Well, I -- I would instruct on it, as
11:46:50 19  every PIC can in the -- in the Army for any of the
11:46:55 20  other pilots that are coming through the -- the
11:46:58 21  system.  I didn't actually work as an instructor
11:47:01 22  pilot, but as a captain on the aircraft or a captain
11:47:05 23  equivalent absolutely did instruction in it.
11:47:09 24      Q.  So you would do that on an ad hoc basis,
11:47:12 25  but you were never given any sort of assignment to be

---

24 (Pages 93 to 96)

**Quick v. Frontier Airlines**          EDWARD K. QUICK          7/15/2016

---

97

11:47:16 1   a flight instructor, correct?
11:47:18 2      A.  I was never an Army military instructor,
11:47:22 3   no.
11:47:30 4      Q.  Did you have any other military
11:47:33 5   occupational specialty other than what you just
11:47:36 6   described during those years?
11:47:37 7      A.  I worked as a military intelligence
11:47:39 8   officer on classified operations.
11:47:45 9      Q.  Was that in conjunction with flying, or
11:47:47 10  was it separate?
11:47:49 11     A.  In conjunction and separate.
11:47:55 12     Q.  Anything else?
11:47:59 13     A.  Well, I did other various jobs other than
11:48:01 14  that.  So as a -- as an officer in the military, you
11:48:06 15  know, we -- we have additional duties over and above
11:48:10 16  our primary duty.  And my primary duty was as a pilot,
11:48:14 17  a -7 pilot.
11:48:17 18         The fact that I worked for an
11:48:18 19  intelligence battalion, active-duty intelligence
11:48:23 20  battalion, I had additional duties and -- you know
11:48:28 21  over and above.  One of them was working as an
11:48:31 22  intelligence officer as a -- in my case, I was
11:48:35 23  considered a liaison officer to many different
11:48:41 24  organizations within our government.
11:48:55 25     Q.  During this time, you were always a

98

11:48:57 1   member of the Army Reserve, correct?
11:48:59 2      A.  Yes.  I was a member of the -- what they
11:49:01 3   called the Individual Ready Reserve, the IRR.  And I
11:49:07 4   wasn't in a drilling unit, per se.
11:49:12 5      Q.  So not the regular Army, if that's --
11:49:15 6      A.  Well, there's a difference.
11:49:16 7      Q.  -- the way to express it?
11:49:18 8      A.  You have active duty, which I was not.  I
11:49:21 9   was not a drilling reservist.  I was in what we call
11:49:26 10  the Individual Ready Reserve.  And you could
11:49:28 11  participate as much or as little as you liked.
11:49:35 12     Q.  Now, I understand there came a time when
11:49:41 13  you suffered a series of concussions, head injuries;
11:49:50 14  is that generally accurate?
11:49:51 15     A.  Yes.
11:49:52 16         (Deposition Exhibit 9 was marked.)
11:50:13 17         THE DEPONENT:  Thank you.
11:50:25 18     Q.  (BY MR. DABNEY)  Exhibit 9 is two pages
11:50:26 19  of your medical records that were produced in this
11:50:30 20  case.  And these particular ones were received from
11:50:43 21  the -- the Army bureaucracy dealing with your
11:50:51 22  disability evaluations and the like.  But they are a
11:50:58 23  -- both at the top labeled Statement Of Medical
11:51:00 24  Examination And Duty Status dated at the bottom
11:51:06 25  June 18, 2012.  Do you see that?

99

11:51:09 1      A.  Yes, I do.
11:51:11 2      Q.  And there's a paragraph at the bottom,
11:51:16 3   No. 30, or a Section No. 30.  Do you see that?
11:51:23 4      A.  Yes.
11:51:27 5      Q.  And there's sort of a details -- well,
11:51:32 6   let me strike that and go up to No. 15.  That might be
11:51:35 7   helpful.  If you look to Section 15 first --
11:51:39 8      A.  Yes.
11:51:39 9      Q.  -- it says, On or about May 24 of 2012,
11:51:46 10  in Fort Bliss, Texas, a service member evaluated for
11:51:50 11  traumatic brain injury resulting from hitting head
11:51:52 12  upon entering aircraft.  Service member is a pilot.
11:51:56 13  In Iraq in July 2011.  In December 2011 fell and hit
11:52:01 14  head on flight line at Afghanistan.  Do you see that?
11:52:04 15     A.  Yes.
11:52:04 16     Q.  And those events occurred?
11:52:06 17     A.  Yes.
11:52:07 18     Q.  In that way; is that accurate?
11:52:09 19     A.  That's correct.
11:52:09 20     Q.  It says on Section 12, "The following
11:52:12 21  disability may result," and the box check is Permanent
11:52:14 22  Partial.  Do you see that?
11:52:16 23     A.  Yes.
11:52:16 24     Q.  Okay.  And you go further down, and
11:52:22 25  there's some details in Section 30.  It states the

100

11:52:28 1   same thing I just read.  And then it says, "Service
11:52:31 2   member was screened for traumatic brain injury May 24,
11:52:34 3   2012, with complaints of memory lapses and loss,
11:52:39 4   decreased concentrating ability, ringing in the ears,
11:52:42 5   and eye problems.  The service member referred to
11:52:46 6   occupational therapy, speech therapy, issued a
11:52:49 7   temporary profile.  Service member is a pilot and
11:52:53 8   cannot fly at this time due to difficulty with memory
11:52:56 9   and attention with a history of concussion.  Service
11:53:00 10  member has also developed tingling and numbness in
11:53:03 11  both hands."
11:53:04 12         Is all of that accurate?
11:53:06 13     A.  Yes.
11:53:10 14     Q.  And the next page dated the same day, and
11:53:16 15  in Section 15, it notes that "On or about July 2011,
11:53:22 16  Afghanistan service member with severe anxiety and
11:53:27 17  depression causing insomnia.  Service member with
11:53:30 18  multiple deployments as a pilot, profile for
11:53:33 19  depression, stress, and insomnia issued."
11:53:38 20         Is all of that accurate?
11:54:01 21     A.  I don't think so, no.
11:54:01 22     Q.  Which portion is not accurate?
11:54:03 23     A.  Well, the date.  It's saying July of 2011
11:54:10 24  wasn't -- you know, I wasn't diagnosed with anything
11:54:15 25  then.  It wasn't until 2012.  So I think they -- they

Quick v. Frontier Airlines      EDWARD K. QUICK      7/15/2016

---

### 101

11:54:19  1  just got that year wrong.  It should be '12.  Do you
11:54:28  2  see the date?
11:54:29  3      Q.  I do.  Is it -- I mean, is it potentially
11:54:33  4  the case that these issues were first noticed as
11:54:36  5  possible issues for you at that time, but then later
11:54:38  6  diagnosed officially at a later time?
11:54:43  7      A.  No.  No, I was diagnosed afterwards.  It
11:54:48  8  was in 2012 in June, somewhere around May or June,
11:54:54  9  somewhere around there, of -- from the doctor as I did
11:54:56  10  what I call reverse SRP, which is a soldier readiness
11:55:03  11  site or program.
11:55:04  12      And as we go through, you talk to a
11:55:06  13  doctor.  I explained some of the issues that I was
11:55:08  14  having, not knowing at the time what my issues were,
11:55:10  15  and he recommended that I go through a series of
11:55:14  16  tests.  And he diagnosed me that day with having a
11:55:18  17  mild TBI, which automatically grounded me as a
11:55:21  18  military pilot, at least for a period of time, to
11:55:24  19  start with.
11:55:28  20      Q.  Now, both these documents are dated
11:55:30  21  June 18, 2012.
11:55:31  22      A.  Okay.
11:55:32  23      Q.  So would the -- the diagnosis of TBI and
11:55:35  24  the other diagnosis of anxiety and depression all be
11:55:44  25  accurate as far as that date is concerned?

### 102

11:55:55  1      A.  Well, it would have been in June, I know
11:55:56  2  that, because the doctor referred me to the Wounded
11:56:00  3  Warrior program.
11:56:02  4      Q.  June of 2012?
11:56:04  5      A.  In June of 2012.  That's when I entered
11:56:06  6  the program, correct.
11:56:07  7      Q.  Which is the date on these documents,
11:56:09  8  right?
11:56:10  9      A.  Yeah.  And Mr. Weems was the one who
11:56:11  10  fills that out.  And based upon the doctor's report,
11:56:16  11  that's how they come up with that stuff, I guess.
11:56:18  12      Q.  Okay.
11:56:21  13      A.  So . . .
11:56:52  14      (Deposition Exhibit 10 was marked.)
11:56:55  15      THE DEPONENT:  Thank you.
11:57:08  16      Q.  (BY MR. DABNEY)  I assume that you have
11:57:09  17  seen Exhibit 10 before?
11:57:10  18      A.  I have.
11:57:13  19      Q.  You were evaluated by a Dr. Davis --
11:57:15  20      A.  Yes.
11:57:15  21      Q.  -- when you were, I guess, stationed at
11:57:19  22  Fort Bliss, Texas?
11:57:21  23      A.  Correct.
11:57:22  24      Q.  William Beaumont Army Medical Center?
11:57:25  25      A.  Yes.

### 103

11:57:28  1      Q.  To your understanding, what -- what was
11:57:33  2  determined by Dr. Davis in her neuropsychological
11:57:37  3  evaluation of June 25, 2012?
11:57:41  4      A.  That I had some def -- deficiencies.
11:57:46  5      Q.  Do you -- can you be more specific?
11:57:50  6      A.  Well, she said I -- I can read it from
11:57:54  7  here; but in medical terms, she said I had a cognitive
11:57:58  8  disorder, NOS.  Not otherwise specified is what that
11:58:03  9  means, I've learned.  Post-concussional disorder
11:58:06  10  involving impairment-related weakness and auditory
11:58:11  11  memory within the borderline range.  Immediate memory
11:58:16  12  is below average.  My processing speed is below range.
11:58:19  13  And confrontational naming is below average.
11:58:26  14      She said I had a -- a history of head
11:58:28  15  injuries and sleep -- obstructive sleep apnea, which
11:58:34  16  they already knew about.
11:58:36  17      Q.  Could you turn to page 19 on the -- using
11:58:38  18  the Bates numbers at the bottom, the black numbers.
11:58:42  19      A.  You got it.
11:58:55  20      Q.  On page 19, Dr. Davis has a section
11:58:59  21  called Vocational.
11:59:01  22      A.  Yes.
11:59:05  23      Q.  And on the second paragraph, it begins,
11:59:09  24  "His first head injury as an adult occurred in the mid
11:59:13  25  seventies when he hit his head while parachuting.  He

### 104

11:59:18  1  hit the ground" -- "hit the ground very hard but was
11:59:21  2  wearing a helmet."  And you were able to continue with
11:59:23  3  the exercise.
11:59:27  4      It was during the same period you fell
11:59:29  5  from a ledge and went to a hospital, was release --
11:59:35  6  where you were released.  It says 2005, you had a head
11:59:38  7  injury from a motor vehicle accident without loss of
11:59:40  8  consciousness.  The car was semi-totaled and you
11:59:44  9  thought you were okay.
11:59:46  10      The next day, you had a headache and neck
11:59:48  11  pain, felt very ill on the plane going back to Denver.
11:59:52  12  And you had difficulty sleeping, treated with some
11:59:57  13  oxygen, sleep medicine and medicine for anxiety.  And
12:00:00  14  this lasted a couple of months.  Is all of that
12:00:04  15  generally accurate?
12:00:06  16      A.  Well, the -- I don't know about the
12:00:08  17  exactness, but I was having a discussion with her.
12:00:11  18  She asked me, Have you ever had any other injuries?
12:00:14  19  And so, you know, without saying specifically about
12:00:17  20  the dates, but, yeah, it's pretty much accurate.
12:00:21  21      Q.  Okay.  And the next paragraph says, "The
12:00:23  22  next head injury occurred in 2008 in another motor
12:00:26  23  vehicle accident when the vehicle went off into a
12:00:29  24  ditch while" you were driving.
12:00:31  25      A.  Um-hum.

Quick v. Frontier Airlines                    EDWARD K. QUICK                                        7/15/2016

---

105

```
12:00:32   1        Q.  Were you the only person in the vehicle?
12:00:34   2        A.  I was.
12:00:35   3        Q.  Where did this happen?
12:00:38   4        A.  That was in North Carolina.
12:00:43   5        Q.  Okay.  It says you hit the top and
12:00:47   6   frontal area of your head very hard.
12:00:50   7        A.  I did.
12:00:50   8        Q.  And did not sustain loss of
12:00:52   9   consciousness, but you were dazed and confused and
12:00:56  10   became sleepy.
12:00:57  11        A.  I did.
12:00:58  12        Q.  A week later, your symptoms hadn't
12:01:00  13   subsided.  You were getting headaches and depression,
12:01:02  14   and you sought help.  It says this occurred the day
12:01:06  15   before you arrived home.
12:01:08  16        You flew back as a passenger, and you
12:01:11  17   were subsequently checked out in the traumatic brain
12:01:13  18   injury process.  You had a headache, neck pain,
12:01:17  19   tingling in the arms and hands and had some PT and OT.
12:01:24  20   Is all of that accurate?
12:01:25  21        A.  Yes.
12:01:26  22        Q.  Okay.  Next paragraph says you had head
12:01:29  23   injuries that occurred in 2011 when you hit your head
12:01:32  24   several days apart on the door of your aircraft.  So I
12:01:36  25   gather there were two different incidents where you
```

---

106

```
12:01:39   1   struck your head?
12:01:39   2        A.  Yes.
12:01:39   3        Q.  "Second impact was the worst; his
12:01:42   4   sleeping problems got progressively worse, and the
12:01:45   5   other pilots complained that you kept odd hours."  You
12:01:49   6   didn't seek help because you didn't want to be
12:01:52   7   grounded.  Do you see that?
12:01:53   8        A.  Yes.
12:01:55   9        Q.  Is that all accurate?
12:01:56  10        A.  It is.
12:01:56  11        Q.  It says in December, the second time you
12:01:58  12   fell, you hit the back of your head.  However, you got
12:02:01  13   back up, but you continued to have sleep problems and
12:02:05  14   headaches.  Is all of that accurate?
12:02:07  15        A.  Yes.
12:02:09  16        Q.  Is it your understanding that that series
12:02:11  17   of injuries to your head is what led to your being
12:02:17  18   grounded as a pilot and the symptoms that stemmed from
12:02:21  19   that?
12:02:23  20        A.  Well, that's why the doctor diagnosed me
12:02:26  21   with a mild TBI due to multiple smacks on the head.
12:02:33  22        (Deposition Exhibit 11 was marked.)
12:03:10  23        MR. WHITCOMB:  This one is 11?
12:03:12  24        THE DEPONENT:  11.
12:03:14  25        Q.  (BY MR. DABNEY)  Do you recognize
```

---

107

```
12:03:14   1   Exhibit 11, Mr. Quick?
12:03:16   2        A.  I do.
12:03:16   3        Q.  And what is that?
12:03:18   4        A.  This is a memorandum for the MEB board,
12:03:22   5   the Medical Evaluation Board, from my flight doctor at
12:03:28   6   Buckley Air Force Base to the Army Medical Evaluation
12:03:34   7   Board.
12:03:37   8        Q.  It is dated March 22, 2013?
12:03:39   9        A.  It is.
12:03:41  10        Q.  And Captain Groover has signed it?
12:03:47  11        A.  Yes.
12:03:49  12        Q.  And he stated that you were grounded by
12:03:52  13   this Flight Surgeon Office November 15, 2012,
12:03:56  14   secondary to your history of TBI suffered while
12:03:59  15   deployed to Afghanistan.  You have been referred for a
12:04:04  16   neuropsych evaluation, determined that you had certain
12:04:09  17   cognitive deficits resulting from the TBI.  And he
12:04:14  18   concluded that "Chief Quick has a condition that makes
12:04:17  19   him unfit for service in the Army."
12:04:20  20        Is there anything about that that is not
12:04:23  21   accurate?
12:04:24  22        A.  No, it's accurate.
12:04:25  23        Q.  Okay.  Paragraph 2 discusses that a
12:04:34  24   Captain Provov believed that your conditions could be
12:04:38  25   controlled by medication.  And presumably that you
```

---

108

```
12:04:44   1   could be retained in service.  Were you aware of that?
12:04:51   2        A.  Yeah, I was aware that the -- that the
12:04:54   3   captain stated that, that it could be, you know,
12:05:00   4   controlled by medication.  But I really don't know
12:05:04   5   what he was talking about, because he wasn't a doctor,
12:05:06   6   so . . .
12:05:07   7        Q.  Did you have any information to -- that
12:05:09   8   suggested that your issues could be controlled by
12:05:11   9   medication such that you could remain in service?
12:05:14  10        A.  No.  I relied on my flight surgeon and
12:05:17  11   flight doctors and medical doctors that I was seeing
12:05:20  12   at the time.  Captain Provov was not a doctor at all.
12:05:26  13        Q.  Did you have any kind of dispute with him
12:05:28  14   over it?
12:05:31  15        A.  With -- with him?
12:05:32  16        Q.  Yeah.
12:05:34  17        A.  Yeah, he --
12:05:34  18        Q.  He was your commanding officer.  Did this
12:05:37  19   cause a problem between the two of you?
12:05:39  20        A.  Well, you know, his -- his assessment of
12:05:43  21   the situation was totally false and has been proven to
12:05:49  22   be false.
12:05:51  23        Q.  Did anything additional, in terms of
12:05:56  24   investigations, accusations, problems, anything like
12:06:00  25   that, result from the disagreement with Captain
```

---

27 (Pages 105 to 108)

Quick v. Frontier Airlines      EDWARD K. QUICK      7/15/2016

---

**109**

```
12:06:02   1   Provow?
12:06:05   2        A.  I don't know what you're talking about.
12:06:09   3   As in regard to this letter?
12:06:11   4        Q.  Just in regard to his position versus
12:06:12   5   what your doctor was telling you.
12:06:16   6        A.  I don't get the connection.
12:06:18   7        Q.  Well, I don't know that there is one.
12:06:20   8   I'm just asking.  Did you have any sort of
12:06:22   9   disagreement with Captain Provow that led to any --
12:06:26  10   any kind of official actions as a result of this
12:06:29  11   disagreement?
12:06:30  12        A.  Well, all he's saying here in this
12:06:32  13   letter -- if I'm reading it right, it says -- in this
12:06:35  14   letter --
12:06:36  15        Q.  I understand what the letter says.
12:06:37  16        A.  -- Captain Provow states that Chief Quick
12:06:41  17   can be controlled by medicine.  He can determine
12:06:44  18   that as a company commander.  He cannot determine that
12:06:47  19   in his position that he had at the Wounded War program
12:06:51  20   as the company commander there.  He was not a pilot.
12:06:54  21   He wasn't in charge of pilots.
12:06:56  22        So for him to make a determination, you
12:06:58  23   know, on his own that it can be controlled by
12:07:02  24   medication, you know, flies in the face of medical
12:07:03  25   evidence.
```

**110**

```
12:07:05   1        Q.  Did you confront him about that
12:07:06   2   information?
12:07:07   3        A.  I'm sure I told him I disagreed with it,
12:07:10   4   yes.
12:07:11   5        Q.  Did you go up the chain of command with
12:07:13   6   any kind of complaint about what he was saying?
12:07:15   7        A.  Oh, I'm sure I did, yes.
12:07:17   8        Q.  Okay.  And what was the outcome?
12:07:20   9        A.  Well, I guess, what do you mean what was
12:07:22  10   the outcome?
12:07:24  11        Q.  When you went up the chain of command,
12:07:27  12   what happened?
12:07:29  13        A.  In regards to what?  I don't understand
12:07:32  14   the question.  What -- what are you specifically
12:07:34  15   after?  Please -- please explain to me.  Ask the
12:07:37  16   question.  I'll answer it.
12:07:38  17        Q.  When you went up the chain of command to
12:07:40  18   complain about Captain Provow making a decision that
12:07:43  19   you felt was wrong, what happened?
12:07:49  20        A.  Well, I'd have to remember what the
12:07:52  21   original complaint was.  And if it was regarding
12:07:57  22   making a recommendation here that was, you know,
12:08:02  23   proved to be false, then if I remember right, the
12:08:06  24   hospital commander overruled him.
12:08:09  25        Q.  Anything else happen?
```

**111**

```
12:08:12   1        A.  You know, I don't know.  I don't know
12:08:14   2   where you're going with that.
12:08:15   3        Q.  I just -- I wasn't there.  I'm just
12:08:18   4   asking if you recall any other -- any other events
12:08:20   5   surrounding that.
12:08:22   6        A.  Not to this letter, I don't.
12:08:24   7        Q.  Okay.  How about separate from this
12:08:27   8   letter?
12:08:31   9        A.  You know, again, I -- I don't understand
12:08:33  10   your questioning, you know.
12:08:35  11        Q.  Well, maybe I'm not asking a very good
12:08:38  12   question; but I just --
12:08:40  13        A.  Try again.
12:08:40  14        Q.  -- it seems to me that you had a
12:08:42  15   disagreement with Mr. Provow.
12:08:44  16        A.  I've said, yes, we had a disagreement.
12:08:46  17        Q.  And that you went up the chain of
12:08:49  18   command, and he was overruled.
12:08:51  19        A.  Yes, that did happen.
12:08:55  20        Q.  Any more -- were there any more events
12:09:04  21   that followed on that in regard to this matter, or was
12:09:09  22   that the end of it?
12:09:10  23        A.  I don't know what events you're talking
12:09:11  24   about.
12:09:12  25        Q.  Was that the end of it?  Is that the end
```

**112**

```
12:09:14   1   of it, as far as you recall?
12:09:15   2        A.  Of what?
12:09:16   3        Q.  Of --
12:09:17   4        A.  I just don't get your questioning.
12:09:19   5   You're -- you're injecting that there's something
12:09:21   6   there that I don't know what you're talking about.
12:09:24   7        Q.  I'm just asking if anything else
12:09:26   8   happened.  Was there subsequent discipline for the
12:09:29   9   captain?  Was there subsequent complaints that you
12:09:32  10   made elsewhere?  Was there anything else that
12:09:35  11   happened, or as far as you recall that was the end of
12:09:37  12   the matter?
12:09:39  13        A.  In regards to this letter, I -- you know,
12:09:41  14   I -- I just don't get where you're going with this.
12:09:45  15   You know, the captain -- the company commander made a
12:09:49  16   statement in regards to the MEB board.  So this is to
12:09:52  17   the Medical Evaluation Board.  And I had multiple
12:09:56  18   doctors make recommendations to the board.  He, as the
12:09:59  19   commander, was allowed to make a recommendation
12:10:03  20   himself.  I was never included in that.  I can't speak
12:10:05  21   for him other than what he said was totally wrong.  It
12:10:10  22   didn't -- it didn't go along with what the medical
12:10:12  23   doctors were saying.
12:10:13  24        He's not a medical doctor.  So how can he
12:10:16  25   say it can be controlled by medication?  He can't.
```

28 (Pages 109 to 112)

---

### 113

| | |
|---|---|
| 12:10:20 | 1 |
| 12:10:22 | 2 |
| 12:10:25 | 3 |
| 12:10:27 | 4 |
| 12:10:32 | 5 |
| 12:10:36 | 6 |
| 12:10:41 | 7 |
| 12:10:44 | 8 |
| 12:10:47 | 9 |
| 12:10:50 | 10 |
| 12:10:55 | 11 |
| 12:10:57 | 12 |
| 12:11:01 | 13 |
| 12:11:05 | 14 |
| 12:11:14 | 15 |
| 12:11:17 | 16 |
| 12:11:17 | 17 |
| 12:11:26 | 18 |
| 12:11:37 | 19 |
| 12:11:39 | 20 |
| 12:11:42 | 21 |
| 12:11:43 | 22 |
| 12:11:47 | 23 |
| 12:11:48 | 24 |
| 12:11:52 | 25 |

He's not a medical doctor.  And he's not a flight
surgeon.  And he's not even a pilot, so he doesn't
control pilots.  He doesn't know anything about
pilots.  So how can he interject himself and say, Gee,
his -- his conditions can be controlled by medication?
What medication is he talking about?  When, in fact,
my doctors and flight surgeon, multiple ones, were
saying something different from what he put.  I never
read the report until afterwards; and I disagreed with
it, strongly, strenuously, yes.

    Q.  So based on the diagnoses that the
medical people made, Captain Groover has written here
that Chief Quick will never fly again.  As of 22
March 2013, that was the outcome of -- of your
evaluation for the Medical Evaluation Board; is that
right?

    A.  I never flew again, that is correct.  For
the Army, that is.

    Q.  Well, after March 2013, did you ever
pilot an aircraft for any other organization?

    A.  I have.

    Q.  Tell me about that.

    A.  Well, as a certified flight instructor,
I'm still allowed to teach flying.  And so I have been
up in aircraft since that time giving flying

---

### 114

| | |
|---|---|
| 12:11:56 | 1 |
| 12:11:58 | 2 |
| 12:12:03 | 3 |
| 12:12:05 | 4 |
| 12:12:07 | 5 |
| 12:12:09 | 6 |
| 12:12:13 | 7 |
| 12:12:16 | 8 |
| 12:12:19 | 9 |
| 12:12:23 | 10 |
| 12:12:30 | 11 |
| 12:12:32 | 12 |
| 12:12:33 | 13 |
| 12:12:34 | 14 |
| 12:12:36 | 15 |
| 12:12:38 | 16 |
| 12:12:48 | 17 |
| 12:12:51 | 18 |
| 12:12:52 | 19 |
| 12:12:58 | 20 |
| 12:13:01 | 21 |
| 12:13:03 | 22 |
| 12:13:05 | 23 |
| 12:13:10 | 24 |
| 12:13:17 | 25 |

instruction.

    Q.  That's something that the FAA is
comfortable with and there's not any kind of violation
involved?

    A.  No.  I have a certified flight instructor
certificate.  It's on my person as we speak.  And
Frontier has been well aware that I have had one.  I'm
in the process of renewing it.  And, yes, I'm allowed
to teach, I'm allowed to fly, I'm allowed to instruct.
I don't need a medical to do it.

    Q.  I'll probably come back and ask you about
those activities later.

    (Deposition Exhibit 12 was marked.)

    Q.  But this is Exhibit 12.  Have you seen
that before?

    A.  Yes.

    Q.  It says Memorandum for USAPDA.  Do you
know what that means?

    A.  It's the PDA board, yes.  United States
Army PDA board.

    Q.  And what is PDA?

    A.  Physical Disability -- I'm not sure about
the A.  Physical Disability something.  Again, another
-- I can't remember all the acronyms, but I'm trying.
It should say down there.  Physical PDA board,

---

### 115

| | |
|---|---|
| 12:13:20 | 1 |
| 12:13:22 | 2 |
| 12:13:24 | 3 |
| 12:13:25 | 4 |
| 12:13:25 | 5 |
| 12:13:27 | 6 |
| 12:13:28 | 7 |
| 12:13:28 | 8 |
| 12:13:30 | 9 |
| 12:13:33 | 10 |
| 12:13:40 | 11 |
| 12:13:43 | 12 |
| 12:13:46 | 13 |
| 12:13:50 | 14 |
| 12:13:52 | 15 |
| 12:14:04 | 16 |
| 12:14:07 | 17 |
| 12:14:10 | 18 |
| 12:14:15 | 19 |
| 12:14:18 | 20 |
| 12:14:22 | 21 |
| 12:14:25 | 22 |
| 12:14:25 | 23 |
| 12:14:26 | 24 |
| 12:14:29 | 25 |

Physical Disability.

    Q.  That says it's written by Major Pepper.
Do you see that?

    A.  Yes.

    Q.  Do you know who he is?

    A.  I do.

    Q.  Who is he?

    A.  He was one of the flight surgeons or the
flight commander plus a flight surgeon.  And he
oversaw Dr. -- or my -- the other flight surgeon,
which was Zackery Groover, Captain Groover.

    Q.  So Major Pepper wrote this memorandum on
April 14, 2014, according to his signature?

    A.  Yes.

    Q.  And if you look further down the
paragraph there in the middle, there's a sentence that
starts, "Having discussed this case with our staff,
who has all Treated Chief Warrant Officer 4 Quick, we
believe that his symptoms definitely interfere with
the performance of his duties as a pilot but also
interfere with his ability to perform a staff job."

    Do you see that?

    A.  I do.

    Q.  Okay.  "Either way we believe he does not
meet retention standards."

---

### 116

| | |
|---|---|
| 12:14:34 | 1 |
| 12:14:35 | 2 |
| 12:14:39 | 3 |
| 12:14:42 | 4 |
| 12:14:48 | 5 |
| 12:14:52 | 6 |
| 12:14:55 | 7 |
| 12:14:57 | 8 |
| 12:14:59 | 9 |
| 12:15:01 | 10 |
| 12:15:03 | 11 |
| 12:15:06 | 12 |
| 12:15:08 | 13 |
| 12:15:09 | 14 |
| 12:15:09 | 15 |
| 12:15:11 | 16 |
| 12:15:13 | 17 |
| 12:15:17 | 18 |
| 12:15:22 | 19 |
| 12:15:26 | 20 |
| 12:15:30 | 21 |
| 12:15:32 | 22 |
| 12:15:38 | 23 |
| 12:15:39 | 24 |
| 12:15:41 | 25 |

    Is there anything about what I just read
that you think is not accurate?

    A.  Well, what he was saying in this letter
was that I wasn't going to return as a military pilot
to -- you know, to fly anymore for the military, you
know, due to their evaluation.

    Q.  The portion that I just read, is that
accurate, as far as you're aware?

    A.  Can you re -- read it again?  I might
have missed something there.

    Q.  "We believe that his symptoms definitely
interfere with the performance of his duties as a
pilot."

    A.  Um-hum.

    Q.  "But also interfere with his ability to
perform a staff job."

    A.  Well, yeah, I think it's taken a little
out of context when you're talking about a staff job.  So,
you know, once we go to a -- you know, an area like
Iraq or Afghanistan, that's what he was referring to
as a -- as a staff job in the field, not saying that I
couldn't do or wasn't doing a job at Buckley Air Force
Base at the time, which I was.

    Q.  Isn't it true that the work that you did
at Buckley in the Wounded Warrior Battalion was work

---

Quick v. Frontier Airlines                    EDWARD K. QUICK                                7/15/2016

---

117

that was not really staff work in the way that you're
describing?

A. Well, I was -- a liaison officer was my
title, and I worked as a staff officer within the unit
out there. And I performed staff duties, yes.

Q. Was it a full-on job, or was it something
that was consistent with your attempting to heal from
your injuries?

A. Well, being in the Wounded Warrior
program, you know, I was assigned to basically two
different units. So I had one unit down at
Fort Carson, which was the WTU. And then we were
allowed to be assigned -- in my case, I was assigned
to my house. And -- and then I had additional duties
and responsibilities to my unit in Denver, which was
my deployed unit that I deployed from.

So they were very familiar with my
capabilities and work ethic. And I was only required
to put in four hours a day of actual work; but many
days, I put in more than that.

Q. Were you ever accused of any kind of
misconduct while you were assigned to the Wounded
Warrior Battalion?

A. Can you expand on that?

Q. Were you ever accused of any misconduct?

---

118

A. Not that I know of. Not while I was in
it, no.

Q. Okay. It seems to me that I read some
information to suggest that there was an investigation
performed regarding some activities of yours and that
you defended yourself in that investigation. Is that
true?

A. Well, it was true that I requested a 15-6
investigation; but that wasn't done until after I left
the Army.

Q. Now, what is a 15-6 investigation?

A. Well, it's a -- it's an investigation
where if you feel like you've been wronged and weren't
treated properly, then you can request one, which I
did. And it was an investigation that was processed.

Q. And what was the outcome?

A. You know, I disagreed with the
investigation and subsequently nothing to me. No
outcome.

Q. What was the subject of the
investigation?

A. Well, I was complaining about not being
treated properly, fairly. And also, I was due a large
amount of money from the Army that the program, the
Warrior Transition program, was supposed to be helping

---

119

me with.

So as an example, during the time as I
was retiring from the Army, I was trying to get -- I
was trying to get my storage pay for while I was in
Iraq. I had stuff in storage, and I was entitled to
be paid for that.

And the Wounded Warrior program was
supposed to help me with that, the program there, the
WTU. They had people specifically hired to help folks
like us who were in the program. And that wasn't
being done. And that's because I had made a complaint
against the company commander, the battalion
commander, multiple times went over their head. And I
always was proven right. And they didn't like it.

So, you know, a person with 40 years of
military experience learned something somewhere along
the way. And I'm used to being able to stand my
ground, as I'm doing today.

Q. So when you went over the heads of your
immediate superiors to the commanding authority at the
Warrior Transition Unit, your feeling now is that
there were people that were out to get you?

A. Yes, that's a true statement.

Q. I'll ask you one more time about any sort
of accusations of dishonesty on your part that

---

120

occurred while you were assigned to the WTU. Did that
or did that not occur?

A. Of somebody accusing me of it?

Q. Exactly.

A. Oh, yes, okay. Yes. The battalion
commander accused me of -- I've got to remember his
words -- yes. His exact words were, Mr. Quick, you
are a liar, you're a cheat, you're a gamer of the
system. Those were his exact words.

Q. What was his name?

A. I don't remember right offhand. He was
the battalion commander.

Q. Did he attempt to investigate or prove
these allegations?

A. No, he was stopped, actually.

Q. He attempted to, but he didn't get to go
forward?

A. Correct.

Q. Do you know what he was referring to when
he said you were a liar and a gamer of the system?

A. Well, of course, that is his opinion.
And I would say the same of him.

Q. My question is do you know what he was
referring to?

A. No, I don't. I can't speak for what he

---

Quick v. Frontier Airlines                    EDWARD K. QUICK                              7/15/2016

---

121

```
12:21:20   1   was -- you know, those were the words he used. And,
12:21:24   2   you know, it's like you said, well, if that's how you
12:21:27   3   feel, you have recourse against me there. But he
12:21:30   4   never took that recourse.
12:21:32   5          If you really feel that strongly and if I
12:21:36   6   really did something wrong, then he was able to take
12:21:39   7   disciplinary action. I never had any disciplinary
12:21:42   8   action. None, zero. And I retired with an honorable
12:21:45   9   discharge.
12:21:46  10   Q.   So there was no attempt to -- by him to
12:21:48  11   prove that, that failed or that was derailed, or he
12:21:52  12   just never started it?
12:21:54  13   A.   Never started what?
12:21:55  14   Q.   Any kind of attempt to prove that.
12:22:00  15   A.   To prove what?
12:22:03  16   Q.   What he just said about you.
12:22:05  17   A.   Well, I told him in his office, when he
12:22:08  18   brought that up, that -- that his allegations were
12:22:10  19   totally false. And I went up to the -- the -- what we
12:22:17  20   consider the brigade commander, the hospital
12:22:20  21   commander, and he was proven wrong. And I proved him
12:22:23  22   wrong in that office.
12:22:24  23          So that's -- and that's where it was
12:22:26  24   left. And that's how we do it in the military. If
12:22:29  25   you feel like you're being wronged by anybody in your
```

---

122

```
12:22:33   1   command, whether it's your company commander or
12:22:36   2   battalion commander, you have a right to go to the
12:22:39   3   person above them and their boss, which is what I did.
12:22:42   4   And they corrected the little colonel, as I called
12:22:45   5   him.
12:22:46   6   Q.   So --
12:22:47   7   A.   He stood corrected.
12:22:48   8   Q.   That was the -- that was the end of that
12:22:50   9   issue then?
12:22:51  10   A.   As far as I was concerned. Nothing ever
12:22:55  11   came of it. I retired with an honorable discharge and
12:22:59  12   retired with a legion of merit. That's my retirement
12:23:05  13   award.
12:23:16  14          (Deposition Exhibit 13 was marked.)
12:23:20  15          THE COURT REPORTER: 13.
12:23:40  16   Q.   (BY MR. DABNEY) Do you recognize
12:23:41  17   Exhibit 13, Mr. Quick?
12:23:44  18   A.   I do.
12:23:47  19   Q.   And this is a portion of some documents
12:23:51  20   that you filled out in 2013 in application to the
12:23:56  21   Social Security Administration for Social Security
12:23:59  22   Disability benefits; is that right?
12:24:01  23   A.   Yes.
12:24:04  24   Q.   And this is while you were still in the
12:24:07  25   Warrior Transition Unit?
```

---

123

```
12:24:15   1   A.   I don't think so. Let me see the date on
12:24:17   2   it.
12:24:20   3   Q.   The date is February 12, 2013, on the
12:24:23   4   last page.
12:24:32   5   A.   February 20 -- I was still in the Wounded
12:24:34   6   Warrior program, yes.
12:24:36   7   Q.   And the second-to-last page is also dated
12:24:37   8   the same day. Do you see that?
12:24:39   9   A.   Yes.
12:24:39  10   Q.   Are those your signatures there on that
12:24:42  11   page?
12:24:42  12   A.   It is.
12:24:42  13   Q.   And this is your handwriting on the
12:24:44  14   document?
12:24:44  15   A.   Yes.
12:24:45  16   Q.   Okay. Why did you apply for Social
12:24:48  17   Security Disability in February 2013?
12:24:54  18   A.   Well, because as part of the Wounded
12:24:56  19   Warrior program, they encourage you to apply for it.
12:25:00  20   Q.   Did you apply for it because you believed
12:25:03  21   you were entitled to the benefits?
12:25:05  22   A.   Well, I must have been because I receive
12:25:07  23   them.
12:25:08  24   Q.   Well, did you believe at the time you
12:25:11  25   were entitled to them is my question?
```

---

124

```
12:25:13   1   A.   Well, I wouldn't have applied if I didn't
12:25:14   2   think I was entitled. Yes.
12:25:16   3   Q.   Okay. So -- you were working at the
12:25:19   4   time, were you not?
12:25:21   5   A.   Correct. I was working full-time as a
12:25:27   6   pilot -- well, I was a military officer at the time in
12:25:30   7   the Wounded Warrior program doing my staff job at
12:25:35   8   Buckley.
12:25:36   9   Q.   But you felt like that occupation was
12:25:42  10   somehow insufficient to disqualify you from Social
12:25:46  11   Security Disability benefits?
12:25:50  12   A.   Disqualify -- I don't understand that
12:25:53  13   question.
12:25:54  14   Q.   Well, if you were working, then you
12:25:55  15   wouldn't need disability benefits, right?
12:25:59  16   A.   Well, no, that's not true. So when
12:26:02  17   you're in the Wounded Warrior program, they tell all
12:26:09  18   the soldiers there, to include this one, that you can
12:26:11  19   apply for Social Security Disability.
12:26:15  20          Now, I waited a few months trying to
12:26:17  21   figure out what direction I was going in before I
12:26:19  22   applied because I went in in June, and I was actually
12:26:22  23   told back then, when I first started, that I was
12:26:26  24   eligible for it. And I waited until February to find
12:26:30  25   out what the outcome was going to be. I wasn't sure
```

---

Quick v. Frontier Airlines                **EDWARD K. QUICK**                          7/15/2016

---

### 125

```
12:26:34  1   which -- what was going on.  Remember, I was treating
12:26:38  2   my wounds, my injuries, my illness.  So . . .
12:26:46  3        Q.  The first page of Exhibit 13, Section B
12:26:51  4   at the bottom, it says, "How do your illnesses,
12:26:55  5   injuries, or conditions limit your ability to work?"
12:26:57  6   And you've written --
12:26:58  7        A.  Page 13?
12:27:00  8        Q.  Exhibit 13.  Sorry.  It's -- it's the
12:27:02  9   first page.
12:27:03  10       A.  Oh, first -- there we go.  Thank you.
12:27:06  11       Q.  Section 5 there at the bottom.
12:27:08  12       A.  Um-hum.
12:27:08  13       Q.  It says, "How do your illnesses,
12:27:10  14  injuries, or conditions limit your ability to work?"
12:27:12  15  "Mine is real simple.  I'm required to maintain a
12:27:15  16  medical certificate both for the Army and my civilian
12:27:20  17  job as a pilot.  Because I had a TBI injury, it has
12:27:24  18  grounded me from doing my job as a pilot."
12:27:30  19       Is it true as of February 2013 that you
12:27:32  20  needed an FAA medical certificate for the Army in
12:27:36  21  order to fly?
12:27:39  22       A.  What was the question again, please?
12:27:41  23       Q.  Is it true that as of the date of this
12:27:43  24  document, February 2013, that you needed an FAA
12:27:47  25  medical certificate for the Army in order to perform a
```

### 126

```
12:27:51  1   flying job?
12:27:52  2        A.  No, that's not true.  I don't need an FAA
12:27:56  3   medical to fly a military aircraft.
12:27:59  4        Q.  So when you wrote you're "required to
12:28:01  5   maintain a medical certificate for both the Army and
12:28:04  6   my civilian job as a pilot," that's not exactly
12:28:08  7   accurate then?
12:28:08  8        A.  No, it isn't.  It would be a medical -- I
12:28:11  9   mean, you know, we get a medical for the military.
12:28:14  10  You have to pass your medical, and you get a medical
12:28:17  11  for -- a certificate from the -- you know, the FAA
12:28:23  12  portion to use it for civilian flying.
12:28:29  13       Q.  It says, "Because I had a TBI injury, it
12:28:31  14  has grounded me from doing my job as a pilot."  Do you
12:28:35  15  see that?
12:28:36  16       A.  That's true.  That's all correct.
12:28:40  17       Q.  The next page Section 11, it says, "Do
12:28:46  18  the injuries, conditions, or illnesses affect your
12:28:49  19  sleep?"  And you have written, "All the time!  I have
12:28:51  20  insomnia and sleep apnea."  And "I feel tired during
12:28:55  21  the day."  That's accurate, correct?
12:28:57  22       A.  It was accurate at the time, yes.
12:28:58  23       Q.  Okay.  If you look at page 219, Bates No.
12:29:25  24  219, the bottom black numbers, Section 18(c) says,
12:29:37  25  "Describe any changes in your hobbies and interests
```

### 127

```
12:29:41  1   since the illnesses, injuries, or conditions began."
12:29:46  2        And you wrote you "cannot fly anymore and
12:29:48  3   that causes depression.  I am withdrawn and do not
12:29:50  4   like being around other people."  Is that accurate?
12:29:53  5        A.  Definitely accurate at the time.
12:30:26  6        Q.  If you would turn the page to 221.  I'm
12:30:30  7   sorry.  220.  There is a section at the top that says,
12:30:40  8   "Do you have any problems getting along with family,
12:30:42  9   friends, neighbors, or others?"
12:30:44  10       And you check, Yes, "I feel withdrawn and
12:30:46  11  depressed and have to be on guard around others so not
12:30:50  12  to get upset."
12:30:52  13       And then "Describe any changes in social
12:30:53  14  activities since the injuries began."  You said that
12:30:56  15  "I find it hard to be around family, friends, and
12:30:59  16  coworkers."  Do you see that?
12:31:00  17       A.  Yes.
12:31:01  18       Q.  Is that accurate?
12:31:02  19       A.  It is.
12:31:04  20       Q.  And Section (d) says, "Check any of the
12:31:07  21  following items as your illnesses, injuries, or
12:31:10  22  conditions affect."  And you've checked hearing,
12:31:14  23  memory, completing tasks, concentration,
12:31:18  24  understanding, and getting along with others.
12:31:25  25       And then it says, "Please explain how
```

### 128

```
12:31:27  1   your illnesses, injuries, or conditions affect each of
12:31:30  2   the items that you checked."
12:31:31  3        And you said, "I have memory issues due
12:31:33  4   to my TBI that affect my concentration, understanding,
12:31:37  5   and completing tasks.  Ringing in my ears causes me to
12:31:41  6   be irritable around others."  Do you see that?
12:31:43  7        A.  I do.
12:31:44  8        Q.  All of that was true?
12:31:46  9        A.  Yes, at the time.
12:31:49  10       Q.  And you go down further, it says, "For
12:31:53  11  how long can you pay attention?"  And you wrote, "This
12:31:55  12  is a problem for me."  Do you see that?
12:31:57  13       A.  Um-hum.
12:31:58  14       Q.  Yes?
12:31:59  15       A.  Yes, I -- yes.
12:32:01  16       Q.  And then in Section (f) there, it says,
12:32:04  17  "How well do you follow written instructions?  (For
12:32:08  18  example, a recipe.)"  "I have difficulty with my
12:32:14  19  attention and concentration."
12:32:16  20       The next one says, "How well do you
12:32:19  21  follow instructions?"  And you say, "My attention is a
12:32:22  22  problem.  Sometimes I don't hear a word."
12:32:25  23       Do you see that?
12:32:26  24       A.  I do.
12:32:28  25       Q.  Is that accurate?
```

Quick v. Frontier Airlines      EDWARD K. QUICK      7/15/2016

---

129

1   A. At the time it was, yes.

2   Q. Next page, 221, says, "How well do you

3 get along with authority figures?" And it says, "I

4 find myself easily irritated and angered now."

5     Is that true?

6   A. Definitely true.

7   Q. Section (j) says, "How well do you handle

8 stress?" "I used to be good with this, but now I feel

9 tired all the time and withdrawn."

10    And "How well do you handle changes in

11 routine?" "I do not like changes now to where before

12 I didn't care."

13    And lastly, Section (i) says, "Have

14 you noticed any unusual behavior or fears?" You

15 checked, "Yes." "I'm having problems making decisions

16 and solving problems."

17     Is all of that accurate?

18   A. Yes.

19   Q. The next page, 222, notes that you were

20 taking a drug called Trazodone for depression. Do you

21 see that?

22   A. Yes.

23   Q. And then if you didn't take it, your

24 depression would become worse. Is that true?

25   A. Yes.

---

130

1   Q. Do you still take that drug?

2   A. I do.

3   Q. Okay. Now, you testified several times

4 that the items that we just went through were accurate

5 at the time, February 2013?

6   A. That's correct.

7   Q. Are there any of those items that are no

8 longer accurate?

9   A. Well, I've been under treatment for

10 years. And, you know, I go weekly to my psychiatrist

11 for my PTSD and depression and coping with the medical

12 issues that I have. So I feel like I've certainly

13 improved.

14   Q. Okay. Do you still receive Social

15 Security benefits on the basis of this application?

16   A. Yes, I do.

17   Q. So have you indicated to the Social

18 Security Administration that you have improved enough

19 to where you no longer are entitled to the benefits?

20   A. They said until I return to work, there

21 is nothing to prove, nothing to say.

22   Q. Who said that?

23   A. The Social Security Administration.

24 Because I called them and told them -- I said, I'm

25 trying to go back to work. And they said, Until you

---

131

1 do, just report to us when you start getting paid from

2 Frontier, and we'll take it from there.

3   Q. So the answer to my question is that you

4 continue to receive Social Security benefits on the

5 basis of the information you put in this application,

6 correct?

7   A. Yes, that is correct.

8    (Deposition Exhibit 14 was marked.)

9    THE DEPONENT: Thank you.

10   Q. (BY MR. DABNEY) Exhibit 14 is another

11 document from your Social Security proceedings. It

12 was obtained from your attorney in this litigation.

13 And it -- it appears to be a three-page document

14 signed by Dr. Wendy Clyne, Psy.D. Do you see that?

15   A. Yes.

16   Q. Dr. Clyne is your therapist?

17   A. Yes.

18   Q. She submitted this document in support of

19 your Social Security application?

20   A. Yes, she did.

21   Q. And she did so in October of 2013?

22   A. Yes.

23   Q. And at that time, under Section I, she

24 was asked, "Is ability to understand and remember and

25 carry out instructions affected by the impairment?"

---

132

1 She checked "Yes."

2    Then there's a series of issues that are

3 asked about below that. And she was asked to check

4 the appropriate block to describe your restrictions

5 for the following work-related mental activities.

6 Understand and remember simple instructions, she

7 checked mild impairment -- or mild restriction, sorry.

8 Carry out simple instructions, she checked mild

9 restriction. Ability to make judgments on simple

10 work-related decisions, she checked moderate

11 restriction. Understand and remember complex

12 instructions, she checked marked restriction. Carry

13 out complex instructions, she checked marked

14 restriction. The ability to make judgments on complex

15 work-related decisions, she checked marked

16 restriction.

17    If you turn the page, paragraph 2 says,

18 "Is ability to interact appropriately with supervisors

19 coworkers and the public, as well as respond to

20 changes in a routine work setting, affected by the

21 impairment?" She checked, "Yes."

22    And then she was asked to check the block

23 to describe the degree of restriction for the

24 following work-related mental activities. Interact

25 appropriate with the public -- appropriately with the

---

Quick v. Frontier Airlines                EDWARD K. QUICK                7/15/2016

---

133

```
12:38:28   1   public, she checked mild restriction. Interact
12:38:31   2   appropriately with supervisors, again, mild
12:38:34   3   restriction. Interact appropriately with co-workers,
12:38:39   4   mild restriction. And respond appropriately to usual
12:38:42   5   work situations to changes in a routine work setting,
12:38:46   6   she checked moderate restrictions.
12:38:49   7         Is all that information information that
12:38:51   8   you agreed with when Dr. Clyne submitted this to
12:38:58   9   Social Security?
12:38:58  10      A. Yes.
12:39:27  11      Q. In respect to the restrictions that
12:39:29  12   Dr. Clyne discussed in this document, are any of them
12:39:33  13   restrictions that she has indicated to you are no
12:39:37  14   longer accurate?
12:39:40  15      A. You'd have to ask her that.
12:39:43  16      Q. Okay. Have you asked her to re-evaluate
12:39:47  17   you with respect to these restrictions?
12:39:49  18      A. I have not.
12:39:50  19      Q. Do you believe that you are in any way
12:39:54  20   improved from October of 2013 in respect to these
12:39:58  21   restrictions?
12:39:59  22      A. I hope I'm improving.
12:40:01  23      Q. Has any physician evaluated you to that
12:40:05  24   effect?
12:40:05  25      A. No.
```

134

```
12:40:05   1         MR. DABNEY: We'll do one more, and then
12:40:30   2   we'll take a lunch. How is that?
12:40:33   3         MR. WHITCOMB: That sounds great.
12:40:36   4         THE DEPONENT: Perfect.
12:40:41   5         MR. WHITCOMB: I'm going to fill this up.
12:40:44   6         THE DEPONENT: Yeah, don't forget that.
12:40:58   7         (Deposition Exhibit 15 was marked.)
12:41:00   8         THE DEPONENT: Thank you. That was done
12:41:14   9   by you guys.
12:41:22  10      Q. (BY MR. DABNEY) Do you recognize
12:41:23  11   Exhibit 15, Mr. Quick?
12:41:24  12      A. I do.
12:41:26  13      Q. And what is it?
12:41:28  14      A. It's a Reporter's Transcript Of
12:41:30  15   Proceedings For Disability Adjudication And Review,
12:41:35  16   August 22, 2014.
12:41:39  17      Q. Now, this is a transcript of a hearing
12:41:44  18   that you testified in for your Social Security
12:41:46  19   benefits in August of 2014, correct?
12:41:51  20      A. Yes.
12:41:51  21      Q. Okay. So this is just about one month
12:41:54  22   before you contacted Frontier for reemployment after
12:41:59  23   your military leave was over, correct?
12:42:02  24      A. Yes.
12:42:10  25      Q. If you would turn to page 16, you'll
```

135

```
12:42:13   1   notice it's a four-to-a-page transcript. If you would
12:42:17   2   turn to page 16.
12:42:21   3      A. Um-hum.
12:42:23   4      Q. And do you see at line 4, the judge in
12:42:29   5   this case asks you, "Okay. What do you think is your
12:42:33   6   biggest problem in working?"
12:42:36   7         Answer, "Well, clearly, as a pilot --"
12:42:44   8         Question, "Okay. Let's not talk about
12:42:47   9   pilot."
12:42:48  10      A. I need the page. Oh, there we go. Thank
12:42:51  11   you.
12:42:51  12      Q. Sorry about that. We're at page 16
12:42:53  13   there, line 4.
12:42:54  14      A. Okay.
12:42:55  15      Q. And the judge asks, "Okay. What is your
12:42:58  16   biggest problem in working?"
12:43:00  17         Answer, "Well, clearly, as a pilot --"
12:43:05  18         Question, "Okay. Let's not talk about
12:43:07  19   pilot. Let's say a simple job like a cashier at
12:43:07  20   7-Eleven. What would stop you from doing something
12:43:11  21   like that?"
12:43:12  22         Answer, "Well, I would certainly think
12:43:15  23   that my memory issues."
12:43:16  24         Question, "Okay. Tell me about those."
12:43:18  25         Answer, "I'm -- you know, I have become
```

136

```
12:43:22   1   quite forgetful. I have a problem with remembering
12:43:24   2   names and faces. As an example, coming here to the
12:43:26   3   hearing today, instead of coming right here, I was
12:43:28   4   going up 6th Avenue for a while where I used to live
12:43:32   5   up in the mountains, just spaced it out. That's
12:43:37   6   pretty common for me."
12:43:38   7         Question, "Okay."
12:43:42   8         So it was your view in August of 2014
12:43:48   9   that a job as simple as a cashier at 7-Eleven would be
12:43:52  10   something that your memory issues would cause you not
12:43:55  11   to be able to do; is that right?
12:43:57  12      A. Yes.
12:43:58  13      Q. And that was something that you testified
12:44:00  14   to under oath, correct?
12:44:01  15      A. It was, yes.
12:44:03  16      Q. Okay. And then further down on 16, at
12:44:13  17   line 22, you say, "And I -- in the afternoon I become
12:44:17  18   very lethargic and sleepy from my sleep patterns and
12:44:23  19   sleep problems that I have from having sleep issues.
12:44:25  20   And so that's pretty common."
12:44:27  21         Question, "When you say 'common,' do you
12:44:29  22   mean every day you have to take a nap?"
12:44:32  23         "Not every day, but I would say two to
12:44:34  24   three times a week --"
12:44:35  25         "Okay. And for how long do you have to
```

34 (Pages 133 to 136)

137

12:44:38  1   nap?"

12:44:38  2          "It can very.  Two days I was totally

12:44:41  3   exhausted.  Part of the problem is my tinnitus that I

12:44:48  4   have which is very severe for me -- I have ringing in

12:44:52  5   the ears as we talk right now -- and it gets so bad it

12:44:56  6   causes a headache, causes me to have to go home.  And

12:44:56  7   I just have to lie down and sleep for -- like, two

12:45:01  8   days ago, I slept for probably two or three hours,

12:45:04  9   just totally exhausted."

12:45:06  10          So that was something that occurred on a

12:45:08  11   two-to-three-times-a-week basis in August of 2014?

12:45:12  12          A.  Yes.

12:45:16  13          Q.  And then on page 18, the judge said,

12:45:20  14   "Anything else" -- starting at line 2, "Anything else

12:45:24  15   that you think might affect your ability to do the

12:45:27  16   kind of work I suggested," meaning the 7-Eleven

12:45:31  17   cashier job.

12:45:33  18          Answer, "Well, you know -- if you want a

12:45:34  19   -- you know, a person that doesn't have explosive

12:45:38  20   interactions with people, I do.  I have become very

12:45:41  21   irritable.  I have a short fuse, and I don't think

12:45:44  22   that's necessary for working with the public at a

12:45:48  23   7-Eleven."

12:45:53  24          Further down, at line 15, you answered,

12:45:56  25   "Well, I've been severely withdrawn.  I keep to

138

12:46:00  1   myself.  I don't trust people.  And, you know, I have

12:46:03  2   periods of explosive outbursts.  Luckily for me at the

12:46:07  3   time I've had, you know, friends around me that were

12:46:10  4   able to help me out and help me through it."

12:46:14  5          "How often do you have these explosive

12:46:16  6   episodes?"

12:46:17  7          Answer, "Well, in the degree of -- from

12:46:19  8   totally bad, where you're threatening somebody --"

12:46:22  9          Question, "Yes."

12:46:23  10          "-- I would say that's about once a

12:46:24  11   month."

12:46:26  12          Was that all accurate in August of 2014?

12:46:29  13          A.  Yes.

12:46:45  14          Q.  Further down on page 19 at line 17, you

12:46:50  15   answered a question about asking for an example where

12:46:53  16   you said, "Well, I was at a bar, I had a guy saying

12:46:58  17   something to me while I was sitting there, and

12:47:00  18   whatever it was, I can't remember the issue, but I got

12:47:02  19   up and I threatened to kill the guy."

12:47:07  20          Is all of that something that was a

12:47:12  21   problem for you in August of 2014?

12:47:15  22          A.  Well, that's what I -- that's what I

12:47:16  23   said.  That's what happened.

12:47:29  24          Q.  If you'd turn to page 27.  At page 27,

12:47:43  25   you began to be examined by your attorney,

139

12:47:46  1   Mr. Whitcomb.  At line 5, he asks, "Mr. Quick, you

12:47:51  2   mentioned that you read" -- "you review your iPad for

12:47:54  3   the news, TV, that sort of thing.  Do you ever find

12:47:58  4   yourself forgetting what you've read?"

12:48:00  5          Answer, "All the time."

12:48:04  6          And further down, line 22, he's talking

12:48:06  7   about your therapist, Dr. Clyne.  And he asks, "She

12:48:12  8   talks to you about you repeating yourself during your

12:48:14  9   -- during your therapy sessions?"

12:48:16  10          Answer, "I do that regularly."

12:48:23  11          Further down on page 28, at line 8, you

12:48:27  12   answered, "All the time," to a question about whether

12:48:31  13   your close friends comment to you that, Hey, Ed, you

12:48:35  14   just told me that.

12:48:35  15          So August of 2014, did you have a problem

12:48:37  16   repeating yourself or remembering what you had said

12:48:39  17   earlier?

12:48:45  18          A.  Are you asking me a question?  I'm sorry.

12:48:48  19          Q.  Yeah.

12:48:49  20          MR. DABNEY:  Could you repeat it for me?

12:49:02  21          THE COURT REPORTER:  The whole thing?

12:49:04  22          MR. DABNEY:  Just the last question.

12:49:07  23          (The last question was read back as

12:49:07  24   follows:  "So August of 2014, did you have a problem

12:49:07  25   repeating yourself or remembering what you had said

140

12:49:07  1   earlier?")

12:49:08  2          A.  Yes.

12:49:17  3          Q.  (BY MR. DABNEY)  If you would turn over

12:49:18  4   to page 31.  Mr. Whitcomb is examining you about the

12:49:27  5   cash register position.  And at line 19, he asks, "If

12:49:33  6   it was your job to run the cash register and you had

12:49:35  7   to handle money and coin throughout the day, could

12:49:37  8   you -- would you anticipate" -- "would you anticipate

12:49:39  9   any difficulties with that kind of fingering and

12:49:42  10   handling throughout most of the day?"

12:49:44  11          Answer, "I would assume so, with my

12:49:45  12   carpal tunnel and with the numbness that I get in my

12:49:49  13   hands."

12:49:50  14          Question, "Have you tried anything on

12:49:51  15   your own, like maybe typing or writing anything

12:49:55  16   lengthy that's caused you any sort of hand pain?"

12:49:59  17          Answer, "No.  But you know, I don't do

12:50:02  18   that on a regular basis, so I wouldn't -- I wouldn't

12:50:04  19   know."

12:50:08  20          And then he asked, "Did you experience

12:50:11  21   any pain in your hands when you were flying as a

12:50:13  22   pilot?"

12:50:14  23          And at line 14 of page 32, you answered,

12:50:17  24   "Yes, that's been going on for a number of years."

12:50:20  25          So were these issues with carpal tunnel

Quick v. Frontier Airlines        EDWARD K. QUICK        7/15/2016

---

141

```
12:50:24   1  and numbness something that you were experiencing in
12:50:25   2  August of 2014?
12:50:26   3       A.  Yes.
12:51:06   4       MR. DABNEY:  All right.  I say we take a
12:51:08   5  lunch break.
12:51:10   6       THE VIDEOGRAPHER:  This is the end of
12:51:11   7  Media Unit 2 in the deposition of Edward K. Quick.
12:51:15   8  We're off the record at 12:51 p.m.
13:34:16   9       (Recess taken, 12:51 p.m. to 1:38 p.m.)
13:38:26  10       This is the beginning of media unit 3 in
13:38:29  11  the deposition of Edward K. Quick.  We're back on the
13:38:32  12  record at 1:38 p.m.
13:38:35  13       Q.  (BY MR. DABNEY)  Good afternoon,
13:38:36  14  Mr. Quick.  You understand that you're still under
13:38:40  15  oath?
13:38:41  16       A.  I do.
13:38:46  17       Q.  We were looking at Exhibit 15, which was
13:38:53  18  a transcript of your Social Security Disability
13:38:58  19  hearing.  And I'd like to direct your attention to
13:39:02  20  page 34.  Actually, it's 33 just above.  There's an
13:39:15  21  examination there by the administrative law judge of a
13:39:22  22  gentleman named Martin Rauer who testified as a
13:39:26  23  vocational expert.
13:39:29  24       Do you recall Mr. Rauer testifying in
13:39:31  25  your Social Security hearing?
```

---

142

```
13:39:34   1       A.  I do.
13:39:35   2       Q.  Okay.  On page 34, starting at line 1,
13:39:41   3  the judge asks "If someone needs to lie down for a
13:39:45   4  couple hours four times a month during work hours, is
13:39:49   5  there any occupation that such a person could
13:39:52   6  perform?"
13:39:53   7       Answer, "Your Honor, nothing typical.
13:39:55   8  The only thing I've ever run into is surveillance
13:40:00   9  system monitor, which the individuals can work from
13:40:03  10  virtually any position."
13:40:07  11       Question, "Can they go to sleep?"
13:40:11  12       Answer, "No."
13:40:13  13       Were you present for that testimony?
13:40:15  14       A.  I was.
13:40:15  15       Q.  Okay.  Did you understand that Mr. Rauer
13:40:17  16  was indicating that someone who needed to lay down and
13:40:21  17  sleep several times a month during working hours would
13:40:27  18  be severely limited in their vocational options?
13:40:32  19       A.  That's what he testified to.
13:40:34  20       Q.  Okay.  Did you agree with that testimony?
13:40:40  21       A.  I agreed with his testimony, yes, sure.
13:40:44  22       Q.  Further down at page 10 -- I'm sorry, on
13:40:53  23  line 10, the question from the judge to Mr. Rauer was,
13:40:56  24  "If someone becomes involved with a supervisor in a
13:40:59  25  confrontational manner, how frequently can that happen
```

---

143

```
13:41:02   1  and the person can still remain employed?"
13:41:05   2       Answer, "Your Honor, not surprisingly, it
13:41:10   3  depends somewhat on the level of confrontation and
13:41:12   4  whether it becomes hostile, even verbally, but even
13:41:15   5  simply confrontational, even at the least
13:41:18   6  confrontational action, it's only tolerated before the
13:41:21   7  individual is counseled on each occasion and then
13:41:24   8  terminated."
13:41:26   9       Were you present for that testimony?
13:41:28  10       A.  Yes.
13:41:29  11       Q.  Okay.  Anything about it that you
13:41:32  12  disagree with?
13:41:33  13       A.  No.
13:41:33  14       Q.  Okay.  I've got my pile of papers here.
13:42:23  15       (Deposition Exhibit 16 was marked.)
13:42:48  16       Q.  Mr. Quick, No. 16 is a transcript of a
13:42:50  17  similar-type hearing before the Social Security
13:42:53  18  Administration.  It took place November 13, 2013.
13:43:03  19       Do you recall a hearing on that date
13:43:05  20  regarding your application for Social Security
13:43:09  21  disability benefits?
13:43:10  22       A.  Yes.
13:43:11  23       Q.  And do you remember testifying under oath
13:43:13  24  in that hearing?
13:43:14  25       A.  Yes.
```

---

144

```
13:43:28   1       Q.  On page 5 of the four-to-a-page
13:43:34   2  transcript here, the administrative law judge in that
13:43:38   3  instance, starting at line 4, questioned you, "But if
13:43:44   4  I have an individual who is capable of a relatively
13:43:47   5  full range of medium work, even if it has to be low
13:43:51   6  stressed and unskilled, generally speaking, at your
13:43:54   7  age I would expect that there will still be jobs that
13:43:58   8  would be suitable for you.  Why do you think you can't
13:44:01   9  do that?"
13:44:02  10       Answer, "Well, I believe it's my current
13:44:04  11  medical issues that I've been facing for the last year
13:44:07  12  and a half."
13:44:07  13       Question, "And what's that, sir?"
13:44:09  14       Answer, "Well, I have" traumatic brain
13:44:11  15  injury, "mild TBI, and posttraumatic stress syndrome."
13:44:18  16       Do you recall giving that testimony?
13:44:18  17       A.  I do.
13:44:21  18       Q.  And it was true and accurate when you
13:44:23  19  gave it?
13:44:23  20       A.  It was.
13:44:35  21       Q.  If you look at page 6, starting at line
13:44:41  22  20, the judge states another question along the same
13:44:47  23  lines.  He says, "I don't see evidence in the file
13:44:51  24  that tends to tell me that if I had simple unskilled
13:44:54  25  tasks at a medium level, had accounted for minimal or
```

---

Quick v. Frontier Airlines                   EDWARD K. QUICK                                    7/15/2016

---

145

13:44:56   1   moderate interaction with supervisors, coworkers,
13:44:58   2   general public and no requirement for use of the
13:45:02   3   phone, for example, to accommodate your hearing issue,
13:45:06   4   I don't see why I wouldn't reasonably expect to find
13:45:10   5   jobs for such an individual.  Am I missing something?"
13:45:14   6          Answer, "I believe you are, Your Honor.
13:45:16   7   I expect my VA rating to be 90 to a hundred percent.
13:45:20   8   I'm not sure what you're looking at, because I haven't
13:45:23   9   received --"
13:45:24   10         Do you see that testimony?
13:45:25   11      A.  Yes.
13:45:27   12      Q.  Okay.  And it was true and accurate when
13:45:29   13   you gave it?
13:45:30   14      A.  Correct.
13:45:34   15      Q.  So you were telling the judge that you
13:45:36   16   felt like you were going to have a disability rating
13:45:40   17   from -- from the Veterans Administration that would be
13:45:44   18   close to 100 percent disabled, correct?
13:45:47   19      A.  That is correct.
13:45:47   20      Q.  Okay.  And you felt that because of that
13:45:52   21   there wouldn't be any medium-level, unskilled tasks
13:45:57   22   that you could do even if there were some
13:46:01   23   accommodations made for dealing with supervisors and
13:46:05   24   coworkers and the general public, correct?
13:46:12   25      A.  In regards to applying for the Social

---

146

13:46:15   1   Security Disability application, that is correct.
13:46:18   2      Q.  Okay.  Now, going back to Exhibit 15,
13:46:29   3   that was a Social Security Disability hearing that
13:46:35   4   took place in August of 2014, right?
13:46:47   5      A.  Yes.
13:46:49   6      Q.  Okay.  And that was one month before you
13:46:51   7   contacted Frontier about reemployment, correct?
13:46:57   8      A.  Yes.
13:46:58   9      Q.  And you knew at the time of the Social
13:47:00   10   Security hearing in August of 2014 that you were going
13:47:05   11   to contact Frontier about reemployment, right?
13:47:10   12      A.  Repeat the question.
13:47:12   13      Q.  You knew in August of 2014 that within
13:47:15   14   the next month you'd be contacting Frontier about
13:47:18   15   reemployment?
13:47:20   16      A.  I hadn't made a decision one way or the
13:47:22   17   other at that point.
13:47:24   18      Q.  And had you considered it?
13:47:25   19      A.  Yes.
13:47:26   20      Q.  Okay.  Were you leaning one way or the
13:47:29   21   other?
13:47:33   22      A.  Not really.  Not at that point.
13:47:35   23      Q.  Okay.  What were the reasons why you
13:47:37   24   would not have done it?
13:47:41   25      A.  Exactly what I'm going through right now.

---

147

13:47:44   1   So I was hoping for the best and got the worst.
13:47:49   2      Q.  Any other reasons why you didn't have a
13:47:52   3   decision made in August whether you were going to
13:47:55   4   contact Frontier about reemployment?
13:47:57   5      A.  I didn't need to make a decision at that
13:47:59   6   point, a final decision.
13:48:01   7      Q.  Okay.  It was something you were just
13:48:04   8   considering then?
13:48:06   9      A.  It was a possibility.
13:48:07   10      Q.  Well, I read through the whole
13:48:12   11   transcript of your August 2014 hearing, and I didn't
13:48:15   12   see anywhere where you indicated to the administrative
13:48:18   13   law judge that you were considering reemployment with
13:48:22   14   your previous employer Frontier Airlines.
13:48:27   15      A.  I wasn't required to.
13:48:28   16      Q.  Is there a reason why you did not
13:48:30   17   indicate that information to the Social Security
13:48:32   18   Administration?
13:48:33   19      A.  Nobody asked.
13:48:36   20      Q.  Aside from that?
13:48:39   21      A.  No.  No.
13:48:41   22      Q.  Okay.  Because it seems to me kind of
13:48:46   23   incongruous that if you're having difficulty with a
13:48:52   24   7-Eleven cashier job that the idea that you might be
13:48:56   25   considering trying to go back to work for an airline

---

148

13:48:59   1   in some capacity related to your skills as a pilot
13:49:02   2   would be relevant, would it not?
13:49:05   3      A.  No.
13:49:06   4      Q.  You don't think so?
13:49:08   5      A.  No, I don't think so.
13:49:31   6      Q.  Is it true that you didn't offer that
13:49:32   7   testimony because you knew that it would hurt your
13:49:36   8   chances of getting Social Security Disability
13:49:39   9   benefits?
13:49:40   10      A.  Not at all.
13:49:43   11      Q.  You would agree it would have, wouldn't
13:49:44   12   it?
13:49:45   13      A.  Well, I wouldn't speculate on that, no.
13:49:47   14      Q.  Okay.  You're asking for benefits that
13:49:50   15   are awarded to people who are unable to engage in
13:49:53   16   gainful employment.  You're considering going back to
13:49:59   17   Frontier and using your USERRA rights to try to
13:50:04   18   continue your career in some fashion.  You don't think
13:50:11   19   it would have hurt your case to let that information
13:50:13   20   out?
13:50:14   21      A.  I don't know why it would.  I wasn't
13:50:16   22   asked, so I didn't say anything.  I don't think
13:50:18   23   it's in the transcript.  You know, I'm not -- it
13:50:22   24   wasn't brought up.  I didn't volunteer it, if that's
13:50:25   25   what you're asking --

---

scheduling@huntergeist.com              HUNTER + GEIST, INC.              303-832-5966/800-525-8490

149

13:50:26  1    Q.  Right.
13:50:26  2    A.  -- what my thoughts were at that time.
13:50:28  3    Q.  And I'm asking you had you volunteered
13:50:30  4  it, it would have hurt your case, would it not?
13:50:32  5    A.  I --
13:50:33  6        MR. WHITCOMB:  Objection, calls for a
13:50:34  7  legal conclusion.
13:50:36  8    Q.  (BY MR. DABNEY)  You can answer.
13:50:39  9    A.  I -- I don't know why I would even think
13:50:41 10  that.  You know, I was on active duty being paid by
13:50:45 11  the military for the previous two years.  And, you
13:50:48 12  know, I was doing a -- a position with a staff job
13:50:55 13  while I was in the Wounded Warrior program and while I
13:51:00 14  was recovering from my injuries.
13:51:01 15        So why would I -- you know, if I qualify
13:51:04 16  under that program, why would it be any different with
13:51:09 17  Frontier?  It makes no sense to me.  You know, the law
13:51:12 18  says you are supposed to reemploy me.  That has not
13:51:17 19  been taken place.
13:51:18 20    Q.  Do you believe that you would still be
13:51:20 21  able to collect Social Security Disability even if you
13:51:20 22  were working at Frontier?
13:51:25 23    A.  Absolutely.  Yes -- yes, I can and would
13:51:27 24  and shall.
13:51:28 25    Q.  Do you understand that if you work a

150

13:51:30  1  certain number of hours at any job, you lose your
13:51:33  2  benefits?
13:51:34  3    A.  Well, as explained to me from Social
13:51:36  4  Security, because I did ask the question, was that I
13:51:40  5  can work up to nine months during that trial period to
13:51:43  6  see if I can return to work.  And that hasn't taken
13:51:48  7  place.
13:51:49  8        So, you know, I've asked them, you know,
13:51:52  9  What do I need to do?  They said, Well, once Frontier
13:51:55 10  starts paying you, you let us know, and your
13:51:58 11  nine-month clock starts.  If it works out, fine.
13:52:02 12  Otherwise, you stay on Social Security.
13:52:05 13        So if you found I could do a job, any
13:52:09 14  job, I would still have my Social Security benefits.
13:52:11 15  Or even after nine months -- for a period after, I'm
13:52:13 16  not sure what that is, my understanding is I would
13:52:15 17  automatically go back on my Social Security.  But I
13:52:20 18  would be -- I'm given a trial period by the Social
13:52:22 19  Security Administration.
13:52:31 20    Q.  At any point after contacting Frontier
13:52:34 21  about reemployment, did you inform them that you were
13:52:36 22  collecting Social Security Disability benefits?
13:52:40 23    A.  I didn't -- what was the question again?
13:52:52 24        MR. DABNEY:  Could you read it back?
13:52:55 25        (The last question was read back as

151

13:52:55  1  follows:  "At any point after contacting Frontier
13:52:55  2  about reemployment, did you infor them" -- "inform
13:52:55  3  them that you were collecting Social Security
13:52:55  4  disability benefits?")
13:52:56  5    A.  At some point you found out.  I mean, I
13:52:58  6  had no obligation to tell you.
13:53:00  7    Q.  (BY MR. DABNEY)  The question was did you
13:53:00  8  ever inform Frontier at any time?
13:53:04  9    A.  No.
13:53:20 10    Q.  Now, you had testified in your Social
13:53:22 11  Security hearing about difficulty with your memory,
13:53:28 12  difficulty with explosive temper incidents with
13:53:34 13  coworkers and members of the public, and a variety of
13:53:39 14  other restrictions.  And your physicians had submitted
13:53:44 15  documentation in support of a number of vocational
13:53:47 16  restrictions, as we discussed earlier.
13:53:55 17        Didn't you feel like that information
13:53:56 18  would be helpful to Frontier in dealing with the issue
13:54:00 19  of your reemployment?
13:54:02 20    A.  Absolutely not.
13:54:03 21    Q.  And why not?
13:54:05 22    A.  I had no duty or obligation to say that I
13:54:07 23  was drawing Social Security Disability.  My only duty
13:54:10 24  and obligation was to Social Security --
13:54:12 25    Q.  That wasn't my question.

152

13:54:13  1    A.  -- to let them know --
13:54:15  2    Q.  That wasn't my question.
13:54:16  3    A.  -- that I had been reemployed and being
13:54:18  4  paid.  That hasn't happened for over -- coming up on
13:54:20  5  two years.
13:54:21  6    Q.  That was nothing close to my question.
13:54:24  7    A.  I'm sorry.  I misunderstood it.  Can you
13:54:26  8  repeat it, please.
13:54:27  9    Q.  You testified in your Social Security
13:54:29 10  hearing just before you contacted Frontier for
13:54:31 11  reemployment that you had a number of occupational,
13:54:33 12  vocational-type restrictions.
13:54:37 13    A.  True.
13:54:37 14    Q.  And so did your physicians submit
13:54:39 15  information to that effect, correct?
13:54:41 16    A.  Correct.
13:54:41 17    Q.  Okay.  Don't you believe that that
13:54:44 18  information would have been helpful to Frontier in
13:54:47 19  dealing with the issue of your reemployment?
13:54:49 20    A.  Absolutely not.  Under the law, I'm not
13:54:52 21  required.  There is nothing that requires me to return
13:54:55 22  to work.
13:54:56 23    Q.  I asked if you felt it would be helpful.
13:54:58 24    A.  No.
13:54:58 25    Q.  I didn't ask if it was required or what

38 (Pages 149 to 152)

Quick v. Frontier Airlines                     EDWARD K. QUICK                                7/15/2016

153

13:55:00  1    the law says.
13:55:01  2         A.  If Frontier asked me -- asked me what I
13:55:04  3    could do to identify any positions, which I did, what
13:55:11  4    positions I felt I was qualified for at the time.  And
13:55:14  5    I did that.
13:55:15  6         Q.  Okay.  My question again --
13:55:17  7         A.  Separate from being a pilot.
13:55:19  8         Q.  My question was you'll agree with those
13:55:23  9    restrictions that were the subject of your Social
13:55:25  10   Security Disability hearing, your testimony about
13:55:28  11   them, physicians' testimony about them in the form of
13:55:33  12   written submissions, you agree with me that that
13:55:36  13   information would have been helpful to Frontier had
13:55:38  14   you revealed it to them, correct?
13:55:43  15        A.  So let me put it this way --
13:55:46  16        Q.  Yes or no?
13:55:46  17        A.  No employer --
13:55:47  18        Q.  Yes or no?
13:55:48  19        A.  No.
13:55:49  20        Q.  Yes or no?
13:55:50  21        A.  No.
13:55:50  22        Q.  Okay.  You don't feel like it would have
13:55:52  23   been helpful?
13:55:53  24        A.  No, I don't.
13:55:54  25        Q.  Okay.  And why not?

154

13:55:55  1         A.  Because you're not entitled to that
13:55:57  2    information.
13:55:59  3         Q.  That's why it wouldn't be helpful?
13:56:00  4         A.  When a person applies for a job, I don't
13:56:03  5    have to show up with my medical record.  When I --
13:56:04  6    definitely, when I reapply for a job, there is no
13:56:08  7    requirement that I show up and say, Gee, here's my
13:56:11  8    medical record.  Decide what job you can get for me.
13:56:14  9         Really?  I don't think so.
13:56:15  10        Q.  Again, you have not really been
13:56:17  11   responsive to my question.  I didn't say you had to
13:56:20  12   show up with your medical record, and I didn't ask you
13:56:23  13   whether it would be helpful to bring your medical
13:56:25  14   record.
13:56:25  15        I asked, the information about your
13:56:27  16   vocational restrictions that was the subject of your
13:56:30  17   hearing took place one month before.  You testified,
13:56:34  18   no, you thought that would not be helpful to Frontier
13:56:37  19   in dealing with reemployment.  And my question is why
13:56:39  20   not?
13:56:40  21        A.  Because you didn't reemploy me.  The
13:56:42  22   airline didn't reemploy me.  That's the starting
13:56:44  23   point.
13:56:45  24        Q.  Well, the question is wouldn't it have
13:56:46  25   been helpful to the issue of reemploying you had you

155

13:56:49  1    given that information up?
13:56:50  2         A.  Once -- once I was reemployed, yes, it
13:56:52  3    might have been helpful at that point.  I still have
13:56:55  4    not been reemployed to this day.  That's my argument.
13:56:58  5         Q.  So it's correct to say, then, that that
13:57:01  6    information was never given to Frontier by you?
13:57:04  7         A.  It was never asked of me.
13:57:06  8         Q.  It was never given, correct?
13:57:07  9         A.  Well, if it wasn't asked, I didn't give,
13:57:10  10   so . . .
13:57:10  11        Q.  Well, it sounds to me like even if you
13:57:12  12   had been asked, you would have refused, correct?
13:57:15  13        A.  No, that's not true.
13:57:16  14        Q.  Well, you said unless you were
13:57:18  15   reemployed, it wasn't relevant, right?
13:57:21  16        A.  It isn't relevant until I'm reemployed,
13:57:24  17   correct.
13:57:24  18        Q.  So if it was asked of you before you were
13:57:26  19   so-called reemployed, you would not have given it up,
13:57:29  20   right?
13:57:29  21        A.  Repeat the question again.
13:57:31  22        Q.  If you weren't reemployed, in your view,
13:57:35  23   then if you were asked for information about your
13:57:37  24   vocational restrictions, you still wouldn't have given
13:57:40  25   it, right?

156

13:57:41  1         A.  I had no duty to, no obligation to.
13:57:43  2         (Deposition Exhibit 17 was marked.)
13:58:34  3         THE DEPONENT:  Thank you.
13:58:34  4         Q.  (BY MR. DABNEY)  Mr. Quick, 17 is a
13:59:02  5    portion of Dr. Clyne's notes from her sessions with
13:59:10  6    you.  And I want to direct your attention to the
13:59:16  7    second paragraph there at the bottom of the page.
13:59:23  8    Dr. Clyne has written this note November 19, 2015.
13:59:30  9    And she recounts, "Ed talked regarding recent events
13:59:35  10   related to his lawsuit against Frontier and was
13:59:39  11   ordered to turn over all of his medical records to
13:59:41  12   opposing counsel and was angry with his own attorney
13:59:45  13   that he did not appeal that ruling.  Ed was
13:59:48  14   disappointed his lawyers did not understand how upset
13:59:51  15   he was.  Also feels violated that his medical record
13:59:54  16   will be shared even though he doesn't really know
13:59:57  17   what's in the record."
14:00:02  18        Later, it says, "He fired his attorneys
14:00:04  19   and does not feel he could even look at what's in his
14:00:06  20   medical records."
14:00:08  21        So that refers to an incident in this
14:00:17  22   litigation where Frontier had served discovery
14:00:20  23   requests upon you and your attorney for medical
14:00:22  24   records related to your disabilities as they were
14:00:26  25   stated in your complaint.  And you and your attorneys

39 (Pages 153 to 156)

---

157

14:00:32  1    resisted that discovery, and it went to a hearing
14:00:37  2    before a magistrate judge who ruled in favor of
14:00:43  3    Frontier; is that all correct?
14:00:45  4        A.  Correct.
14:00:45  5        Q.  And you were very unhappy because you
14:00:48  6    really did not want to turn over the information in
14:00:50  7    your medical records about the disabilities that were
14:00:53  8    alleged in your complaint, correct?
14:00:58  9        A.  Correct.
14:00:58 10        Q.  And I understand everybody has a desire
14:01:02 11    for privacy.  As you found out, sometimes the law
14:01:08 12    overrides that for reasons peculiar to the law.  But
14:01:15 13    aside from just a general desire for privacy, why did
14:01:20 14    you not want Frontier to know what kind of disabling
14:01:23 15    conditions you were dealing with?
14:01:25 16        A.  Well, until I'm being reemployed, which I
14:01:27 17    haven't been, over the past coming up on two years,
14:01:32 18    that's the first hurdle.  I need to be reemployed.
14:01:35 19    And then Frontier can decide what job I can or cannot
14:01:39 20    do.  But I have even then no obligation to turn over
14:01:43 21    my medical records to them.
14:01:45 22        Q.  And you didn't want Frontier to have any
14:01:47 23    information about whatever conditions that were the
14:01:50 24    subject of your disability hearings and the subject of
14:01:55 25    your complaint for failure to reemploy you, correct?

158

14:01:58  1        A.  Correct.
14:02:01  2        Q.  Now, I'm just trying to understand,
14:02:03  3    wouldn't it have made sense for you to volunteer to
14:02:09  4    Frontier, Hey, I'm suffering from the effects of mild
14:02:16  5    traumatic brain injury.  I'm diagnosed with PTSD.  It
14:02:21  6    causes me some difficulties of various kinds.  Here's
14:02:26  7    the ways it might be relevant to employment.  What
14:02:32  8    kind of jobs do you think make sense for me given
14:02:36  9    those issues?
14:02:38 10        Why wouldn't you have just come to
14:02:40 11    Frontier and presented something along those lines in
14:02:42 12    order to try to assist the reemployment process?
14:02:46 13        A.  I absolutely did that.
14:02:49 14        Q.  I'm not aware of anytime where you gave
14:02:51 15    any information along those lines, and you just
14:02:53 16    testified that you did not.
14:02:54 17        A.  Well, I certainly, one, asked for my job
14:02:57 18    back.  Two, I explained that I was open to any and all
14:03:03 19    options with Frontier.  I was working without an
14:03:06 20    attorney, without the Department of Labor.  I was
14:03:09 21    trying to be fair and equitable in my return without
14:03:12 22    causing any grief to them or to me.
14:03:16 23        And during that process, I named a number
14:03:18 24    of jobs that I felt I was capable of doing.  I
14:03:22 25    explained that I cannot get a medical and that I had

159

14:03:26  1    disabilities when I left the service.
14:03:28  2        So nothing was asked of me at that time,
14:03:30  3    What are your disabilities?  What do we need to do to
14:03:34  4    find a position for you?  That wasn't forthcoming at
14:03:38  5    all.
14:03:39  6        Q.  Mr. Quick, I'm not aware of anytime
14:03:41  7    during -- between September of 2014 and the time you
14:03:46  8    filed this lawsuit or after or until your expert filed
14:03:53  9    a report -- I'm not aware of anytime where you named a
14:03:56 10    single job that you thought you could do.
14:03:59 11        A.  That's totally false.  We named a number
14:04:01 12    of jobs, absolutely.
14:04:02 13        Q.  Tell me those circumstances.
14:04:04 14        A.  So when I first met with Michelle in the
14:04:06 15    office when we had our informal discussion, I
14:04:09 16    explained during that position that -- or during that
14:04:11 17    interview that I was certainly capable of being an
14:04:15 18    instructor, since I still have a certified flight
14:04:18 19    instructor certificate.  I could be an assistant chief
14:04:21 20    pilot.  I could work in training, as other people
14:04:24 21    have.  I realize other pilots that were there at
14:04:28 22    Frontier have been accommodated after they didn't --
14:04:31 23    couldn't maintain their medical.  They didn't force
14:04:34 24    them to go out on leave.  They put them in the
14:04:36 25    training department.

160

14:04:37  1        Other people have been accommodated even
14:04:39  2    after they retired.  They get to have a training
14:04:42  3    position, instructor positions.  And yet, Frontier
14:04:44  4    doesn't want to accommodate me.  In fact, Frontier
14:04:48  5    doesn't want to rehire me, period, even though I'm
14:04:52  6    disabled.
14:04:52  7        Q.  So your testimony is that you stated to
14:04:55  8    Ms. Zeier in a face-to-face meeting --
14:05:00  9        A.  It was in our first meeting, yes.
14:05:01 10        Q.  -- that you felt like you were capable of
14:05:05 11    being an instructor?
14:05:06 12        A.  I did.
14:05:07 13        Q.  Capable of being an assistant chief
14:05:09 14    pilot?
14:05:10 15        A.  I did.  In training -- or in the training
14:05:13 16    department.  Platform instructor.  I listed a number
14:05:16 17    of items.
14:05:17 18        Q.  Did you list them on any piece of paper?
14:05:19 19        A.  I did not.
14:05:20 20        Q.  Did you write an email that detailed
14:05:25 21    those at any point?
14:05:26 22        A.  You know, I don't -- I don't recall.
14:05:29 23        Q.  Well, I read through all of the email
14:05:31 24    correspondence a number of times between you and
14:05:33 25    Ms. Zeier, Frontier, and yourself since the time that

Quick v. Frontier Airlines                 EDWARD K. QUICK                                 7/15/2016

---

161

14:05:36   1   you asked for reemployment or contacted Frontier about
14:05:39   2   reemployment.  And I never saw where you made any
14:05:43   3   reference to any of the positions that you just named.
14:05:50   4   Am I correct?
14:05:52   5        A.  Well, I don't know what you've read.  All
14:05:54   6   I -- all I know is what I said and what I did.
14:05:58   7        Q.  I'm asking, did you put it in any email
14:06:01   8   at any time?
14:06:02   9        A.  I know that at some point, yes, there was
14:06:04   10  an email saying, Here's the jobs that should be
14:06:06   11  considered.  I mean, I don't remember the time frame
14:06:10   12  of when that was.
14:06:11   13       Q.  Okay.  Who wrote that email?
14:06:13   14       A.  I did.
14:06:14   15       Q.  Okay.  And you don't remember when you
14:06:15   16  did?
14:06:16   17       A.  I -- I don't.  I just don't.  There's
14:06:20   18  been a lot of back and forth.
14:06:24   19       Q.  Did you write more than one that
14:06:26   20  contained that information?
14:06:28   21       A.  Well, you know, I don't think I'm
14:06:29   22  required to do that when I apply for reemployment --
14:06:33   23       Q.  I didn't ask you -- I didn't ask you what
14:06:34   24  you think you're required to do.  I asked did you
14:06:37   25  write more than one?

---

162

14:06:38   1        A.  I think I did, but I don't recall
14:06:40   2   exactly.
14:06:40   3        Q.  Okay.
14:06:41   4        A.  And I'm sure Frontier was notified in
14:06:43   5   more ways than one of the jobs that I felt that I was
14:06:46   6   capable of doing.
14:06:47   7        Q.  Well, aside from your testimony so far,
14:06:50   8   are there any other ways that you can tell me you
14:06:51   9   think that happened?
14:06:56   10       A.  I can't think right offhand, no.
14:06:59   11       Q.  Okay.  Let me ask you this:  You stated
14:07:35   12  that you think you could be -- you could have been
14:07:38   13  employed as an assistant chief pilot; is that correct?
14:07:41   14       A.  Correct.
14:07:42   15       Q.  Okay.  And you think that your -- excuse
14:07:52   16  me -- you think that your occupational restrictions,
14:07:56   17  as detailed in your Social Security hearing, your
14:07:58   18  application, and your physicians' submissions, are
14:08:03   19  consistent with a high-level, complex job like
14:08:08   20  assistant chief pilot?
14:08:10   21       A.  Absolutely.
14:08:11   22       Q.  Okay.  Based on what?
14:08:12   23       A.  Based upon my experience.
14:08:15   24       Q.  You think your experience would help you
14:08:17   25  overcome the fact that you would need to take a nap

---

163

14:08:19   1   three or four times a month during the workday?
14:08:24   2        A.  Maybe I would do it during lunchtime.
14:08:26   3        Q.  Do you think your experience is enough to
14:08:27   4   allow you to be able to overcome your difficulties
14:08:31   5   processing complex information in a timely fashion?
14:08:38   6        A.  Well, I'm very familiar with being in a
14:08:41   7   management position, both as a chief pilot and
14:08:44   8   director of operations, hiring and firing people and
14:08:47   9   interviewing people.  And certainly feel I'm capable
14:08:50   10  of doing that.
14:08:51   11       Q.  My question was do you feel like your
14:08:55   12  cognitive restrictions that you have testified to
14:08:58   13  earlier were consistent with the demands of a job like
14:09:05   14  assistant chief pilot?
14:09:06   15       A.  Yes, I believe I can do it.
14:09:07   16       Q.  Okay.  And aside from your belief, do you
14:09:10   17  have any other basis for saying so?
14:09:13   18       A.  My background and experience.
14:09:21   19       Q.  Your background and experience that we
14:09:23   20  went over earlier this morning, the jobs that you have
14:09:27   21  held prior to Frontier, is that what you're referring
14:09:29   22  to?
14:09:30   23       A.  Yeah, those jobs and my jobs in the
14:09:32   24  military, yes, over a 40-year span.
14:09:35   25       Q.  Okay.  What job was similar to assistant

---

164

14:09:38   1   chief pilot at a Part 121 passenger airline the size
14:09:42   2   of Frontier?
14:09:44   3        A.  Well, you know, I'm -- I'm sure that
14:09:47   4   other people that you have chosen for those people
14:09:50   5   come from various backgrounds, whether it be corporate
14:09:53   6   backgrounds or the small 135 carriers or airlines to
14:09:57   7   include the current director of operation.  He came
14:09:59   8   from a 135 operation.
14:10:02   9        Q.  And did he have the kinds of occupational
14:10:04   10  restrictions that you are dealing with?
14:10:08   11       A.  Well, I don't know what his restrictions
14:10:09   12  are.
14:10:10   13       Q.  Do you know of anybody who has held the
14:10:13   14  position of assistant chief pilot instructor, platform
14:10:17   15  instructor, or other positions in training who did
14:10:25   16  those jobs while dealing with the kinds of
14:10:27   17  occupational restrictions that you have testified to?
14:10:31   18       A.  I believe -- you know, I don't know
14:10:32   19  exactly the -- what their -- other people's
14:10:35   20  restrictions would be.  I can't speak to that.  But I
14:10:38   21  know of other people who, for whatever reason, lost
14:10:41   22  their medical or couldn't fly; and Frontier was
14:10:45   23  accommodating to them.  So why can't they accommodate
14:10:48   24  me?
14:10:48   25       Q.  You don't know what their particular

---

Quick v. Frontier Airlines                    EDWARD K. QUICK                                    7/15/2016

---

165

| | |
|---|---|
| 14:10:50 | 1 |
| 14:10:52 | 2 |
| 14:10:55 | 3 |
| 14:10:56 | 4 |
| 14:11:05 | 5 |
| 14:11:07 | 6 |
| 14:11:09 | 7 |
| 14:11:14 | 8 |
| 14:11:17 | 9 |
| 14:11:21 | 10 |
| 14:11:24 | 11 |
| 14:11:29 | 12 |
| 14:11:34 | 13 |
| 14:11:36 | 14 |
| 14:11:38 | 15 |
| 14:11:42 | 16 |
| 14:11:46 | 17 |
| 14:11:49 | 18 |
| 14:11:52 | 19 |
| 14:11:55 | 20 |
| 14:11:56 | 21 |
| 14:11:59 | 22 |
| 14:12:01 | 23 |
| 14:12:05 | 24 |
| 14:12:07 | 25 |

issues were, correct?

A. Well, it's their medical issues. Why would I have a need to know?

Q. Okay. Other than what you've testified to, do you have any other basis for saying that you feel like you could have done one of those jobs that we just discussed?

A. Well, you know, the -- the FAA certifies that I am qualified to be a flight instructor. So if they find me qualified, why would not Frontier give me the opportunity or the chance to prove myself and to work with me to -- to be an instructor? That doesn't make any sense to me.

I've taught -- for the majority of my flying career, I've taught a lot of pilots. And I have experience in -- at Flight Safety International. I've taught in simulators, I've taught in the aircraft, I've taught on the ground. And I've never had a student flail -- fail a checkride that I recommended. Not one.

Q. Have you ever done any kind of instruction on an A-320?

A. No, I haven't done it on the A-320.

Q. In fact, when you tried to qualify as a captain, you failed two years running, correct?

---

166

| | |
|---|---|
| 14:12:13 | 1 |
| 14:12:17 | 2 |
| 14:12:21 | 3 |
| 14:12:22 | 4 |
| 14:12:25 | 5 |
| 14:12:32 | 6 |
| 14:12:33 | 7 |
| 14:12:36 | 8 |
| 14:12:39 | 9 |
| 14:12:42 | 10 |
| 14:12:46 | 11 |
| 14:12:46 | 12 |
| 14:12:50 | 13 |
| 14:12:53 | 14 |
| 14:12:57 | 15 |
| 14:13:06 | 16 |
| 14:13:08 | 17 |
| 14:13:11 | 18 |
| 14:13:13 | 19 |
| 14:13:19 | 20 |
| 14:13:21 | 21 |
| 14:13:26 | 22 |
| 14:13:31 | 23 |
| 14:13:35 | 24 |
| 14:13:38 | 25 |

A. Give me a second. I'll go back to the paperwork here. So I'll give you an example.

Q. No, I mean, my question is what I need an answer to. I don't need an example. Have you ever done an instruction on an Airbus A-320?

A. No.

Q. Okay. And, in fact, when you tried to qualify as a captain, you made two attempts at it in two successive years. And both times, you didn't pass, correct?

A. Correct.

Q. Okay. Do you know of anybody who was made an instructor pilot because of a lack of an FAA medical who had in their past a history of failed checkrides similar to yours?

A. Well, I know other people have failed checkrides. And I know other people have been given opportunities to either revert back to first officer and then again try or the captain's position, pass, and move on in their career, yes.

Q. Okay. Who has failed a successive number of captain upgrades and then later become an instructor for Frontier on the A-320?

A. Well, I can't speak to the human resource department of Frontier; but I'll leave that to

---

167

| | |
|---|---|
| 14:13:41 | 1 |
| 14:13:42 | 2 |
| 14:13:44 | 3 |
| 14:14:02 | 4 |
| 14:14:03 | 5 |
| 14:14:06 | 6 |
| 14:14:10 | 7 |
| 14:14:21 | 8 |
| 14:14:27 | 9 |
| 14:14:35 | 10 |
| 14:14:38 | 11 |
| 14:14:42 | 12 |
| 14:14:43 | 13 |
| 14:14:45 | 14 |
| 14:14:46 | 15 |
| 14:14:47 | 16 |
| 14:14:50 | 17 |
| 14:14:51 | 18 |
| 14:14:53 | 19 |
| 14:14:56 | 20 |
| 14:14:58 | 21 |
| 14:15:03 | 22 |
| 14:15:05 | 23 |
| 14:15:07 | 24 |
| | 25 |

Ms. Zeier.

Q. So the answer is you don't know?

A. I don't know.

Q. Aside from the positions that we've discussed here just in this last few minutes, assistant chief pilot, instructor, platform instructor, training position, did you ever -- did you ever suggest or point out to Frontier any other positions after you contacted them for reemployment which you felt you were capable of doing?

A. Yes. Through -- through my attorney, we sent a list of job descriptions that we felt qualified for.

Q. Okay. So that was after you filed a lawsuit?

A. That was.

Q. That was not prior to then?

A. I don't think so, no.

Q. It wasn't in September or October or November of 2014, was it?

A. You know, I don't recall.

Q. Okay. It wasn't in January of 2015, February 2015?

A. All I remember is that in my initial meeting, I made it very clear that I was open to any

---

168

| | |
|---|---|
| 14:15:10 | 1 |
| 14:15:15 | 2 |
| 14:15:19 | 3 |
| 14:15:23 | 4 |
| 14:15:26 | 5 |
| 14:15:29 | 6 |
| 14:15:30 | 7 |
| 14:15:32 | 8 |
| 14:15:38 | 9 |
| 14:16:31 | 10 |
| 14:16:32 | 11 |
| 14:16:33 | 12 |
| 14:16:33 | 13 |
| 14:16:36 | 14 |
| 14:16:41 | 15 |
| 14:16:45 | 16 |
| 14:16:51 | 17 |
| 14:17:08 | 18 |
| 14:17:19 | 19 |
| 14:17:20 | 20 |
| 14:17:22 | 21 |
| 14:17:27 | 22 |
| 14:17:36 | 23 |
| 14:17:40 | 24 |
| 14:17:45 | 25 |

and all options that were available to me. And I mentioned to Michelle the jobs -- examples of jobs that I felt I could possibly do. So --

Q. And that -- we've already -- you've already testified to what --

A. Okay.

Q. -- you recall about that, correct?

A. Well, I did, yes.

(Deposition Exhibit 18 was marked.)

Q. Mr. Quick, are you familiar with Exhibit 18?

A. No.

Q. I'll represent to you that this is a decision in your Social Security case. I know there were an appeal and a few other proceedings, but then this decision awarding you benefits came down October 1 of 2014.

If you look at page 1840 --

A. Yes.

Q. -- there's a paragraph No. 3 there towards the bottom. And the judge has written in his Findings Of Fact And Conclusions Of Law -- I'm sorry -- paragraph 2 -- "The claimant has not engaged in substantial gainful activity since May 24, 2012, the alleged onset date" of the disabilities that

---

42 (Pages 165 to 168)

Quick v. Frontier Airlines                EDWARD K. QUICK                7/15/2016

169

14:17:51  1    underlie your claim.
14:17:55  2          And then he states, "The claimant worked
14:17:57  3    after the established disability onset date," of
14:18:00  4    May 2012, "but this work activity did not rise to the
14:18:04  5    level of substantial gainful activity.  It is noted
14:18:07  6    that the claimant was paid under the 'wounded warrior
14:18:09  7    program.' He was being paid but not for full-time
14:18:13  8    work."
14:18:13  9          Is that accurate?
14:18:14  10         A.  That's true.
14:18:15  11         Q.  Paragraph 3 says, "The claimant has the
14:18:17  12   following severe impairments:  sleep apnea, hearing
14:18:20  13   loss, tinnitus, binocular vision disorder, carpal
14:18:25  14   tunnel syndrome, traumatic brain injury, a cognitive
14:18:30  15   disorder not otherwise specified, post-traumatic
14:18:37  16   stress disorder," and a variety of other issues more
14:18:42  17   related to physical rather than mental or brain-type
14:18:55  18   disabilities.
14:18:56  19         Do you see that?
14:18:57  20         A.  I do.
14:18:58  21         Q.  Okay.  Are anything that's written in
14:19:04  22   paragraph 3 inaccurate?
14:19:06  23         A.  It's all true.
14:19:12  24         Q.  If you would turn over to page 1841,
14:19:18  25   Bates No. 1841, paragraph 5, it states that "The

170

14:19:24  1    claimant has the residual functional capacity to
14:19:28  2    perform medium work as defined in the CFRs, except
14:19:32  3    that he can lift and carry 50 pounds occasionally,
14:19:35  4    25 pounds frequently, stand and/or walk for 6 hours in
14:19:39  5    an 8 hour day, sit for 6 hours in an 8 hour day,
14:19:42  6    occasionally use hearing in the work day, must avoid
14:19:47  7    even moderate exposure to noise, can understand,
14:19:51  8    remember and carry out simple instructions and would
14:19:55  9    need to nap at least 1 hour during the workday at
14:19:58  10   least 2-3 times a week."
14:20:01  11         And that was a determination that the
14:20:03  12   judge made about your functional capacity to perform
14:20:09  13   medium work.  Have you seen that paragraph before?
14:20:12  14         A.  I believe I actually read it before, yes.
14:20:14  15         Q.  Okay.  Is there anything about it that
14:20:16  16   you disagree with?
14:20:25  17         A.  No, it looks appropriate.
14:20:37  18         Q.  If you look at paragraph 6 on Bates No.
14:20:39  19   1844, on paragraph 6, he's written that "The claimant
14:20:58  20   is unable to perform any past relevant work," and it
14:21:03  21   gives a citation to the federal regulations.
14:21:05  22         He's made a conclusion there that work
14:21:07  23   that you had done in the past in terms of aviation,
14:21:11  24   you were no longer able to perform that as of the date
14:21:15  25   of this decision, October 2014.  Have you read that

171

14:21:21  1    before?
14:21:21  2          A.  Yes.
14:21:23  3          Q.  Anything about this you disagree with?
14:21:26  4          A.  No.
14:21:29  5          Q.  Paragraph 9 states that the -- your
14:21:35  6    acquired job skills don't transfer to other
14:21:38  7    occupations within that residual functional capacity
14:21:42  8    that I read earlier.
14:21:47  9          And paragraph 10 indicates that
14:21:49  10   considering your age, your education, your work
14:21:52  11   experience, and what your residual functional capacity
14:21:59  12   or ability to work is that the judge believed there
14:22:01  13   are no jobs that exist in significant numbers in the
14:22:10  14   national economy that you could perform.  Had you read
14:22:14  15   that before?
14:22:14  16         A.  Yes.
14:22:14  17         Q.  Okay.  And did you disagree with that
14:22:17  18   conclusion?
14:22:17  19         A.  No.
14:22:22  20         Q.  If you look at the last page, 1845.  The
14:22:30  21   judge indicates that "The vocational expert,"
14:22:33  22   referring to Mr. Rauer, "testified that given all of
14:22:37  23   these factors, there are no jobs in the national
14:22:39  24   economy that" you could perform.
14:22:41  25         And specifically, the expert testified

172

14:22:43  1    "that the only occupation that would allow you to lie
14:22:45  2    down during the workday was that of a surveillance
14:22:49  3    systems monitor," which is a sedentary occupation.
14:22:58  4    Had you read that before?
14:22:59  5          A.  Yes.
14:23:00  6          Q.  Okay.  And was there anything about the
14:23:01  7    judge citing that testimony that you felt was
14:23:03  8    inappropriate?
14:23:03  9          A.  No.
14:23:04  10         (Deposition Exhibit 19 was marked.)
14:23:52  11         Q.  Have you seen Exhibit 19 before?
14:24:20  12         A.  I don't think I've seen it before, but --
14:24:23  13         Q.  Okay.  Do you remember undergoing what's
14:24:26  14   known as a compensation and pension examination for
14:24:28  15   the VA by a Cynthia Johnsrud?
14:24:34  16         A.  Yes.
14:24:34  17         Q.  And a Golden -- at a clinic in Golden,
14:24:37  18   Colorado?
14:24:38  19         A.  Yes.
14:24:38  20         Q.  Okay.  This record indicates that that
14:24:41  21   exam took place on -- or at least it indicates that
14:24:48  22   the note was written February 23, 2015.  Do you see
14:24:51  23   that?
14:24:51  24         A.  Yes.
14:24:58  25         Q.  And my read of the document indicates

Quick v. Frontier Airlines                    EDWARD K. QUICK                              7/15/2016

---

173

```
14:24:59  1    that it's intended to be a screen for depression and
14:25:05  2    disorders like that that's often given to military
14:25:08  3    veterans such as yourself.
14:25:51  4            There is a paragraph 2 on the first page
14:25:54  5    that says, Current Diagnoses. And (a) says mental
14:26:03  6    Diagnosis No. 1 is PTSD and comments, "The veteran was
14:26:07  7    previously diagnosed with PTSD as likely as not caused
14:26:11  8    by or a result of his military experiences and he
14:26:14  9    continues to have this PTSD."
14:26:17 10        Do you see that?
14:26:17 11        A. Yes.
14:26:18 12        Q. Is there anything about that statement of
14:26:20 13    diagnosis that you think is not accurate?
14:26:22 14        A. No.
14:26:23 15        Q. Okay. And then mental disorder diagnosis
14:26:29 16    No. 2, major depressive order. The comment says that
14:26:33 17    "Veteran is diagnosed with MDD," or major depressive
14:26:38 18    disorder, "recurrent, at least as likely as not caused
14:26:41 19    by or result of his service connected PTSD."
14:26:46 20        Do you disagree with that statement of
14:26:47 21    diagnosis?
14:26:48 22        A. No.
14:26:59 23        Q. Down at the bottom of that first page,
14:27:01 24    paragraph 4, there's a reference to occupational and
14:27:05 25    social impairment. And the question on the form is,
```

174

```
14:27:09  1    "Which of the following best summarizes the Veteran's
14:27:12  2    level of occupation on social impairment in regard to
14:27:16  3    all mental diagnoses?"
14:27:19  4            And the checked box is "Occupational and
14:27:23  5    social impairment with a reduced liability in
14:27:27  6    productivity."
14:27:27  7        Do you see that?
14:27:28  8        A. Yes.
14:27:28  9        Q. Okay. And then for that indicated level
14:27:37 10    of occupational and social impairment under Item (b),
14:27:42 11    "Is it possible to differentiate what portion of this
14:27:45 12    occupational and social impairment is caused by each
14:27:48 13    mental disorder?" And the answer is, "Yes." And the
14:27:55 14    comment is made, "All occupational and social
14:27:58 15    impairment is due directly or secondarily to PTSD."
14:28:06 16        A. Yes.
14:28:07 17        Q. That's the information that you don't
14:28:12 18    quarrel with?
14:28:13 19        A. I don't quarrel with it.
14:28:26 20        Q. On Bates No. 494 of Exhibit 19, there is
14:28:32 21    a relevant mental health history narrated under Item
14:28:40 22    (c). Second-to-last paragraph on the bottom states
14:28:52 23    that you experiences -- "He experiences irritability
14:28:57 24    daily, and will get into verbal arguments but not
14:29:01 25    physical altercations with others. The veteran stated
```

175

```
14:29:04  1    that he does not tend to avoid dealing with people.
14:29:07  2    He does avoid talking about his military experience
14:29:09  3    because work he did was classified."
14:29:13  4            And then it says, "Regarding depression,
14:29:15  5    the veteran reported feelings of sadness, low energy
14:29:19  6    and low motivation."
14:29:23  7            Further on the page, it states that you
14:29:27  8    reported depression about 60 percent of the time and
14:29:29  9    you rated it as 6 out of 10 with medication.
14:29:33 10        Is there anything about that recitation
14:29:35 11    of your history that you feel is not accurate?
14:29:39 12        A. No.
14:29:44 13        Q. And then under Item (e) "Relevant
14:29:48 14    substance abuse history" on page 495, it says, "The
14:29:52 15    vet" -- "the veteran reported that he drinks Scotch
14:29:56 16    'sometimes more than he should.'"
14:29:58 17        Is that something you recall reporting to
14:30:00 18    this examiner?
14:30:01 19        A. Yes.
14:30:02 20        Q. Okay. At this point in your
14:30:09 21    post-military life, had you struggled at all with
14:30:12 22    excessive alcohol use?
14:30:14 23        A. On occasion, I've drank probably more
14:30:17 24    than I should have.
14:30:18 25        Q. Okay. Is that something that you have
```

176

```
14:30:20  1    tried to limit as a result of problems it may have
14:30:22  2    caused?
14:30:25  3        A. I'm just trying to limit because it's not
14:30:27  4    good for your health.
14:30:31  5        Q. Did you ever have a low point where you
14:30:33  6    got into an altercation and ended up in a detox unit?
14:30:44  7        A. I don't know what you're referring to.
14:30:47  8        Q. It seems to me that I read some
14:30:49  9    information indicating that you had had too much to
14:30:52 10    drink, got into some kind of an altercation, and the
14:30:56 11    police took you to a detox unit for the night.
14:30:59 12        A. Oh, yes.
14:31:00 13        Q. Okay. What happened then?
14:31:05 14        A. I got out the next day and went home.
14:31:07 15        Q. Okay. Do you recall what led to your
14:31:11 16    being brought to the detox unit?
14:31:14 17        A. A disagreement with the hotel desk clerk.
14:31:20 18        Q. Had incidents like that happened to you
14:31:22 19    more than once?
14:31:24 20        A. That's the only time I remember it.
14:31:32 21        Q. Were you counseled to limit your drinking
14:31:35 22    by Dr. Clyne or one of your other providers?
14:31:38 23        A. Oh, I'm sure she always -- always
14:31:41 24    encourages me to get more exercise, drink less, and
14:31:46 25    get more sleep. You know, eat right, all those
```

Quick v. Frontier Airlines        EDWARD K. QUICK        7/15/2016

---

177

14:31:48   1   things.  She encourages that regularly.

14:31:51   2      Q.  Okay.  Did she ever single out the use of

14:31:53   3   alcohol as something for you to avoid in particular?

14:31:57   4      A.  I don't recall that, no.

14:32:24   5      Q.  On page 496, Bates No. 496, there's an

14:32:31   6   Item 4 that is headed Symptoms.  And the form asks

14:32:36   7   that "For VA rating purposes, check all symptoms that

14:32:39   8   actively apply to the Veteran's diagnoses."

14:32:42   9      The examiner has checked all of the

14:32:44   10   boxes, including depressed mood; anxiety; chronic

14:32:47   11   sleep impairment; mild memory loss, such as forgetting

14:32:53   12   names, directions or recent effects; flattened affect;

14:32:56   13   disturbances of motivation and mood; difficulty in

14:32:59   14   establishing and maintaining effective work and social

14:33:03   15   relationships; and inability to establish and maintain

14:33:06   16   effective relationships.

14:33:09   17      Is there anything about that list of

14:33:10   18   symptoms for VA rating purposes that you felt was not

14:33:13   19   correct?

14:33:13   20      A.  No.

14:33:34   21      Q.  It's true that during the period of time

14:33:36   22   after you contacted Frontier about reemployment that

14:33:39   23   you were pursuing disability ratings through the

14:33:47   24   physical evaluation board process with the U.S. Army

14:33:51   25   physical disability agency, correct?

---

178

14:33:53   1      A.  Correct.

14:33:56   2      Q.  And it's true that in January of 2014,

14:34:15   3   they had originally given you a disability rating of

14:34:17   4   50 percent based more or less exclusively on your

14:34:24   5   diagnosis of PTSD?

14:34:27   6      A.  Correct.

14:34:29   7      Q.  And that was a disability rating that you

14:34:32   8   felt was too low, right?

14:34:35   9      A.  Well, I felt that they should have

14:34:38   10   included my TBI rating, mild TBI.

14:34:43   11      Q.  So you appealed that decision and --

14:34:49   12      A.  I did.

14:34:50   13      Q.  -- asked that you have your disability

14:34:53   14   rating increased from 50 percent to 70 percent, right?

14:34:56   15      A.  Correct.

14:34:58   16      Q.  And you were successful in that appeal,

14:34:59   17   correct?

14:35:01   18      A.  I was.

14:35:02   19      Q.  And part of the reason you were

14:35:04   20   successful is because the board, on appeal -- or on

14:35:11   21   remand also determined that your traumatic brain

14:35:16   22   injury merited its own disability rating, and that if

14:35:20   23   you combine the amount attributable there to the

14:35:26   24   amount attributable to your PTSD, the total would be

14:35:29   25   70 percent?

---

179

14:35:32   1      A.  As I understand it, they left my PTSD at

14:35:35   2   50 percent, and then they gave me an increase of

14:35:39   3   30 percent for -- I believe it was for headaches, but

14:35:43   4   it was -- but related to my TBI, mild TBI.

14:35:48   5      (Deposition Exhibit 20 was marked.)

14:36:37   6      Q.  Mr. Quick, do you recognize Exhibit 20?

14:36:40   7      A.  I do.

14:36:40   8      Q.  And that is the Formal Physical

14:36:44   9   Evaluation Board decision awarding you that 70 percent

14:36:48   10   you just testified about?

14:36:49   11      A.  Correct.

14:36:51   12      Q.  And giving you a disposition of permanent

14:36:53   13   disability retirement?

14:36:54   14      A.  Correct.

14:36:58   15      Q.  And this decision was rendered December 8

14:37:00   16   of 2015, correct?

14:37:02   17      A.  That is correct.

14:37:05   18      Q.  Or at least, it was -- the hearing was

14:37:07   19   convened on that date, and it looks like --

14:37:19   20      A.  I think it was approved on that date,

14:37:21   21   too.

14:37:22   22      Q.  It looks like you -- you signed your

14:37:24   23   concurrence on the second-to-last page, December 15 --

14:37:28   24   or December 21, 2015?

14:37:30   25      A.  Yes.

---

180

14:37:31   1      Q.  That's your signature at the end where it

14:37:34   2   says, "I concur"?

14:37:35   3      A.  Let me check.  Yes.  Yeah, 21

14:37:38   4   December 2015, correct.

14:37:44   5      Q.  If you look down on the first page under

14:37:52   6   Disability, No. 1 in the middle of the page, that's a

14:37:57   7   reference to your diagnosis of post-traumatic stress

14:38:01   8   disorder and major depressive disorder, correct?

14:38:05   9      A.  Um-hum.

14:38:06   10      Q.  Yes?

14:38:06   11      A.  Yes.  I'm sorry.

14:38:08   12      Q.  And "The board found that the Soldier's

14:38:13   13   current PTSD symptoms are best rated at 50 percent for

14:38:17   14   occupational and social impairment with a reduced

14:38:19   15   liability and productivity due to systems" -- "due to

14:38:23   16   symptoms such as disturbances of motivation and mood

14:38:26   17   and difficulty establishing and maintaining effective

14:38:29   18   work and social relationships."

14:38:32   19      That was a finding made December of 2015.

14:38:38   20   Did you have any disagreement with that finding at

14:38:40   21   that time?

14:38:40   22      A.  No.

14:38:44   23      Q.  And then under the second disability

14:38:46   24   there at the bottom of the page, referring to your

14:38:49   25   diagnosis of traumatic brain injury, there's a

---

45 (Pages 177 to 180)

181

```
14:39:03   1   sentence that starts in the middle of the paragraph,
14:39:06   2   "The board noted that the Soldier's brain MRI done in
14:39:10   3   2012 showed changes consistent with multiple head
14:39:15   4   trauma."
14:39:16   5        A.  I'm lost on which page you are on,
14:39:18   6   so . . .
14:39:19   7        Q.  It's the first page of Exhibit 20.
14:39:21   8        A.  This is 20.
14:39:22   9        Q.  And then you look down at the third --
14:39:24  10   the bottom section.
14:39:25  11        A.  Oh, right.  Okay.  Where are we at now?
14:39:28  12        Q.  And then there's a sentence that begins,
14:39:30  13   "The board noted."  It's about halfway down.
14:39:33  14        A.  Oh, I got it.  Okay.  Thank you.
14:39:35  15        Q.  No problem.  "The board noted that the
14:39:37  16   Soldier's brain MRI done in 2012 showed changes
14:39:40  17   consistent with multiple head trauma."
14:39:44  18        Were you aware that you had an MRI that
14:39:47  19   showed that in 2012?
14:39:48  20        A.  Yes.
14:39:49  21        Q.  The "Neuropsychological testing in 2012
14:39:51  22   showed cognitive deficits that were not clearly
14:39:54  23   attributed to his behavioral health condition versus
14:39:57  24   repeated head traumas.  The board noted the soldier
14:40:02  25   was indeed permanently grounded from flying in 2012
```

182

```
14:40:05   1   not due to behavioral health issues but specifically
14:40:09   2   due to his TBI symptoms."
14:40:15   3        Those findings are all correct as far as
14:40:17   4   you're concerned?
14:40:17   5        A.  Yes.
14:40:23   6        Q.  The sentence that begins, "Finally, the
14:40:26   7   board determined that it is unlikely that the Army
14:40:31   8   could have found an appropriate staff position for
14:40:34   9   this Soldier given his rank and military occupational
14:40:37  10   specialty and cognitive limitations.  The Soldier was
14:40:41  11   in fact placed in the Warrior Transition Unit due to
14:40:45  12   his combined cognitive and behavioral health
14:40:49  13   problems."  That's all true, correct?
14:40:52  14        A.  It's true, because I was given a
14:40:53  15   permanent profile as such.
14:41:27  16        Q.  At any point during your discussions with
14:41:30  17   Frontier after September of 2014, did you ever refer
14:41:35  18   to the disability findings and ratings that you had
14:41:44  19   been given as a result of these physical evaluation
14:41:47  20   board proceedings?
14:41:51  21        A.  I don't understand the question.
14:42:05  22        MR. DABNEY:  Can you read it back?
14:42:07  23        (The last question was read back as
14:42:07  24   follows:  "At any point during your discussions with
14:42:07  25   Frontier after September of 2014, did you ever refer
```

183

```
14:42:07   1   to the disability findings and ratings that you had
14:42:07   2   been given as a result of these physical evaluation
14:42:07   3   board proceedings?")
14:42:08   4        A.  No.
14:42:37   5        MR. WHITCOMB:  I was afraid you were out
14:42:38   6   of notebooks.
14:42:41   7        MR. DABNEY:  No.
14:42:55   8        Q.  (BY MR. DABNEY)  And the reasons why you
14:42:56   9   never did refer to any of this information during your
14:42:59  10   discussions with Frontier are the same reasons why you
14:43:01  11   never referred to any of the information that was
14:43:04  12   contained in your Social Security hearing documents?
14:43:10  13        A.  I didn't feel I had any obligation to
14:43:12  14   give you the information -- or give Frontier the
14:43:14  15   information.
14:43:35  16        Q.  When you first decided to make the
14:43:36  17   decision in September 2014 to contact Frontier about
14:43:40  18   reemployment, the person you initially contacted was
14:43:43  19   the chief pilot, Mr. Thibodeau, correct?
14:43:45  20        A.  Correct.
14:43:46  21        Q.  Okay.  And why did you contact him?
14:43:49  22        A.  Because that's the -- he was my first
14:43:53  23   chain of command on reporting back to work at
14:43:56  24   Frontier.
14:43:57  25        Q.  And he was the chief pilot, and you had
```

184

```
14:43:59   1   been a first officer, correct?
14:44:03   2        A.  Say that again.
14:44:04   3        Q.  He was the chief pilot.  And when you
14:44:06   4   last actively worked at Frontier, he -- you were a
14:44:10   5   first officer and pilot yourself, right?
14:44:12   6        A.  First officer in training for captain,
14:44:14   7   yes.
14:44:15   8        Q.  And you reported directly to
14:44:16   9   Mr. Thibodeau?
14:44:19  10        A.  Well, the chief pilot, whoever was chief
14:44:21  11   pilot at the time.  I don't believe he was chief pilot
14:44:24  12   at the time, but he was when I returned.
14:44:26  13        Q.  And you knew that at that point you did
14:44:28  14   not have the ability to get an FAA medical
14:44:31  15   certification to resume flying, right?
14:44:34  16        A.  Correct.
14:44:35  17        (Deposition Exhibit 21 was marked.)
14:45:05  18        Q.  We're going to look at a series of emails
14:45:07  19   that went between you and various folks at Frontier.
14:45:11  20   You'll notice on all of them that at the very top
14:45:15  21   left, my name appears or another one, my -- name of my
14:45:22  22   assistant appears, Elizabeth Marsiglia.  That is a
14:45:24  23   result of how the documents were printed and produced,
14:45:27  24   not -- those names are not on the original emails.  Do
14:45:31  25   you understand what I'm saying?
```

185

14:45:32  1        A.  Yes.
14:45:33  2        Q.  Okay.
14:45:33  3        MR. DABNEY:  Do you understand, Counsel?
14:45:34  4        MR. WHITCOMB:  I do.
14:45:35  5        MR. DABNEY:  Do you have any objection?
14:45:36  6        MR. WHITCOMB:  No, I have no objections.
14:45:38  7    These were a function of discovery materials, correct?
14:45:41  8        MR. DABNEY:  Yeah, these were all
14:45:43  9    produced by Frontier.
14:45:44 10        MR. WHITCOMB:  Okay.
14:45:44 11        MR. DABNEY:  So if they were produced in
14:45:45 12    that fashion, I don't want to create any confusion.
14:45:50 13        Q.  (BY MR. DABNEY)  This first page of
14:45:51 14    Exhibit 21, it looks like an email from yourself --
14:45:54 15    that's your email address, ekquick@yahoo.com?
14:46:00 16        A.  It is.
14:46:00 17        Q.  Okay.  And it was to Joseph Thibodeau at
14:46:05 18    Frontier.  "JP, Thanks for your call this morning.  I
14:46:08 19    have concluded my military service and will be
14:46:11 20    reporting back to Frontier on Thursday, the 25th," two
14:46:15 21    days from the date of the email.
14:46:18 22        "I understand you have some stuff to send
14:46:19 23    to me via email for my return.  Please let me know
14:46:26 24    when and where you would like me to report on
14:46:28 25    Thursday.  I'll follow up with a phone call today."

186

14:46:32  1        Was this your first contact with
14:46:33  2    Mr. Thibodeau, or had you called him before this?
14:46:37  3        A.  I believe I called him because he
14:46:40  4    obviously says, "Thanks for your phone call this
14:46:43  5    morning."  So I must have called him earlier in the
14:46:47  6    day.  And then he called back, if I remember right,
14:46:48  7    but not for certain.
14:46:50  8        Q.  Were they voice mails or conversations
14:46:52  9    directly?
14:46:54 10        A.  "Thanks for your phone call this
14:46:56 11    morning."  Well, I might have left him a voice mail,
14:46:58 12    as far as I know.
14:46:59 13        Q.  And do you recall?
14:47:00 14        A.  I don't recall.
14:47:01 15        Q.  Okay.
14:47:03 16        A.  The -- yeah, I don't.  I was making
14:47:09 17    contact, one way or the other.
14:47:11 18        Q.  Right.  On the next page of the exhibit,
14:47:15 19    your response -- a response to your email says, "On
14:47:24 20    September 24, the next day, the afternoon, at 1:53
14:47:27 21    p.m., I'm In response to your voice mail that you
14:47:31 22    intend to return to work at Frontier, I am providing
14:47:32 23    you with the following information."
14:47:35 24        In the first paragraph, he asks you for
14:47:38 25    military orders, documentation to document your leave

187

14:47:42  1    of absence as called for by USERRA.
14:47:46  2        And in the next paragraph, he asked you
14:47:53  3    for proof that you hold a current first-class FAA
14:47:56  4    medical certificate, and then refers to taking a drug
14:48:00  5    test and a new-hire orientation.  Do you see that?
14:48:03  6        A.  I do.
14:48:04  7        Q.  Do you recall receiving that email?
14:48:05  8        A.  Yes.
14:48:06  9        Q.  Okay.  The next page at the bottom,
14:48:19 10    there's an email on the 25th, the next day in the
14:48:23 11    morning from you, that says, "JP, Please find attached
14:48:31 12    my temporary disability retirement orders and DD214."
14:48:38 13        What's your DD214?
14:48:41 14        A.  It's a statement of service.
14:48:44 15        Q.  It's a document that the military gives
14:48:46 16    you upon discharge?
14:48:47 17        A.  It does.
14:48:48 18        Q.  Explains where you've been and what
14:48:49 19    you've been up to?
14:48:50 20        A.  Correct.
14:48:53 21        Q.  The next paragraph states, "Due to my
14:48:57 22    medical condition I cannot obtain a first class FAA
14:49:00 23    medical.  I will follow up today with a phone call to
14:49:04 24    discuss our options.  Thanks, Ed."
14:49:08 25        So is there a reason why you did not

188

14:49:10  1    inform Mr. Thibodeau of your lack of a first-class FAA
14:49:14  2    medical in your first contact or two?
14:49:20  3        A.  No.
14:49:24  4        Q.  Mr. Thibodeau obviously thought you were
14:49:27  5    intending to return to work as a first officer,
14:49:30  6    correct?
14:49:38  7        A.  Okay.  What was your -- please repeat
14:49:41  8    that.
14:49:42  9        Q.  Yeah.  I mean, based on your initial
14:49:44 10    contact and his response, it's safe to assume that he
14:49:49 11    believed you were wanting to return to work at your
14:49:52 12    previous position of pilot, correct?
14:49:54 13        A.  Yes.
14:49:55 14        Q.  But you knew at that point that that
14:49:57 15    wasn't going to be possible.  I just wonder why was it
14:50:01 16    that you didn't tell him that to begin with, rather
14:50:03 17    than two or three emails and two or three days into
14:50:07 18    the process.
14:50:11 19        A.  I -- you know, I don't know.
14:50:21 20        Q.  Okay.  If you turn to the next page,
14:50:29 21    there's an email several days later on October 1,
14:50:34 22    2014, from Ms. Zeier.  Do you see that?
14:50:37 23        A.  Yes.
14:50:38 24        Q.  And that's to you.  And it says, "Chief
14:50:42 25    Pilot Thibodeau informed me that you have contacted

47 (Pages 185 to 188)

Quick v. Frontier Airlines      EDWARD K. QUICK      7/15/2016

---

189

| | |
|---|---|
| 14:50:46 | 1 | him about reemployment at Frontier Airlines."  And "I |
| 14:50:49 | 2 | further understand that you've informed him that you |
| 14:50:51 | 3 | cannot hold a first class medical and that you would |
| 14:50:55 | 4 | therefore be unable to resume any duties as a Frontier |
| 14:50:59 | 5 | first officer.  Chief Pilot Thibodeau stated you had |
| 14:51:04 | 6 | some questions that he was unable to answer.  Can we |
| 14:51:06 | 7 | schedule a call so that we can review those questions? |
| 14:51:10 | 8 | In addition, Chief Pilot Thibodeau provided me the |
| 14:51:14 | 9 | paperwork that you sent to him at his request and I |
| 14:51:16 | 10 | please let me know when it would be convenient to discuss." |
| 14:51:20 | 11 | |
| 14:51:26 | 12 | Do you remember what the questions were |
| 14:51:27 | 13 | that you had that Mr. Thibodeau couldn't answer? |
| 14:51:30 | 14 | A.  I don't. |
| 14:51:31 | 15 | Q.  Okay.  At this point, it's fair to say |
| 14:51:35 | 16 | that Frontier has responded to your inquiry and is |
| 14:51:43 | 17 | taking steps to implement the process? |
| 14:51:48 | 18 | A.  Well, you know, you're -- I was never |
| 14:51:52 | 19 | reemployed, so I -- we were communicating, if you want |
| 14:51:55 | 20 | to ask it that way. |
| 14:51:58 | 21 | Q.  Well, they didn't tell you that we're not |
| 14:52:00 | 22 | going to rehire you, correct? |
| 14:52:02 | 23 | A.  No, they didn't say that for sure. |
| 14:52:04 | 24 | Q.  No.  They said they had -- they wanted |
| 14:52:06 | 25 | some information from you, and you wanted information |

---

190

| | |
|---|---|
| 14:52:11 | 1 | from them, and a dialogue began, correct? |
| 14:52:15 | 2 | A.  Correct. |
| 14:52:27 | 3 | Q.  If you look at the last page of the |
| 14:52:29 | 4 | exhibit, there's an email from you on October 1 |
| 14:52:37 | 5 | responding to the previous email. |
| 14:52:40 | 6 | "Michelle, thanks for reaching out to me. |
| 14:52:43 | 7 | Anytime is fine with me for a phone call or I can come |
| 14:52:46 | 8 | by the office to meet with you in person." |
| 14:52:49 | 9 | She responds above that on October 3, "I |
| 14:52:52 | 10 | have between 1 and 5 p.m. on Tuesday next week |
| 14:52:55 | 11 | available.  Will that work for you to come for an |
| 14:52:57 | 12 | in-person meeting?" |
| 14:53:01 | 13 | And you both agree on 1 p.m. for an |
| 14:53:05 | 14 | in-person meeting on the 7th of October.  Is that a |
| 14:53:09 | 15 | fair statement? |
| 14:53:09 | 16 | A.  Yes. |
| 14:54:00 | 17 | (Deposition Exhibit 22 was marked.) |
| 14:54:23 | 18 | Q.  Have you seen Exhibit 22 before? |
| 14:54:31 | 19 | A.  I don't think so. |
| 14:54:34 | 20 | Q.  Okay.  I'll represent to you that these |
| 14:54:35 | 21 | are notes Ms. Zeier at Frontier Airlines produced in |
| 14:54:40 | 22 | this litigation regarding an October 7, 2014, |
| 14:54:46 | 23 | face-to-face meeting with you.  Do you recall that |
| 14:54:50 | 24 | meeting? |
| 14:54:51 | 25 | A.  I do. |

---

191

| | |
|---|---|
| 14:54:52 | 1 | Q.  Okay.  Did you take any notes at that |
| 14:54:53 | 2 | meeting? |
| 14:54:54 | 3 | A.  I did not. |
| 14:54:56 | 4 | Q.  Did you record the meeting in any way? |
| 14:54:59 | 5 | A.  No.  She asked me to keep recording |
| 14:55:01 | 6 | devices outside the room, which I did. |
| 14:55:08 | 7 | Q.  There is a -- a notation at the top.  It |
| 14:55:11 | 8 | says, "Temporary disability - retired list (could |
| 14:55:17 | 9 | change) - military status can't hold 1st or 2nd class |
| 14:55:24 | 10 | medical.  Would like to do short-term disability, |
| 14:55:27 | 11 | long-term disability program with Frontier -- with F9 |
| 14:55:31 | 12 | Frontier.  'Out of sight, out of mind' put the claim |
| 14:55:37 | 13 | in motion," it says. |
| 14:55:38 | 14 | Okay.  Do you recognize those notes as |
| 14:55:40 | 15 | topics that you discussed with Ms. Zeier on that day? |
| 14:55:43 | 16 | A.  I do. |
| 14:55:46 | 17 | Q.  So you stated to her you would like to do |
| 14:55:48 | 18 | a short-term or long-term disability program with |
| 14:55:52 | 19 | Frontier, correct? |
| 14:55:53 | 20 | A.  Oh, the way I believe I was expressing |
| 14:55:57 | 21 | myself during that conversation that I wanted to |
| 14:56:00 | 22 | research all options available to me not knowing |
| 14:56:04 | 23 | exactly what those options were upon returning to |
| 14:56:09 | 24 | Frontier. |
| 14:56:10 | 25 | So one of those options would have been |

---

192

| | |
|---|---|
| 14:56:13 | 1 | possibly applying for the short-term or long-term |
| 14:56:15 | 2 | disability if that was available to me.  So, yes, that |
| 14:56:20 | 3 | was said in the -- in the meeting. |
| 14:56:28 | 4 | Q.  Another topic was -- was retroactive |
| 14:56:32 | 5 | contributions to your various retirement plans.  Do |
| 14:56:35 | 6 | you see that? |
| 14:56:35 | 7 | A.  Yes.  We discussed that. |
| 14:56:37 | 8 | Q.  Okay.  Was that something that Ms. Zeier |
| 14:56:43 | 9 | expressed any resistance to? |
| 14:56:47 | 10 | A.  No.  She said that -- that she would look |
| 14:56:53 | 11 | into it.  It would take some time, and I was open to |
| 14:56:55 | 12 | that. |
| 14:56:57 | 13 | Q.  Then the third paragraph talks about pay |
| 14:57:00 | 14 | rates.  "Still believes it should have been at |
| 14:57:03 | 15 | captain.  Flew as captain when he went back to the |
| 14:57:07 | 16 | military.  Feels he left Frontier as a captain in |
| 14:57:10 | 17 | training, paid as a captain." |
| 14:57:12 | 18 | This is an issue that you talked about |
| 14:57:14 | 19 | quite a bit with Frontier and Ms. Zeier, your belief |
| 14:57:18 | 20 | that your reemployment should somehow include being |
| 14:57:23 | 21 | paid as a captain even though you were unable to |
| 14:57:30 | 22 | perform the pilot position anymore, correct? |
| 14:57:34 | 23 | A.  Well, we -- we had the discussion, that |
| 14:57:36 | 24 | is -- that is correct. |
| 14:57:41 | 25 | Q.  And that's something that you emphasized |

---

193

```
14:57:48  1    throughout the period between September and March of
14:57:52  2    2015, correct?
14:57:54  3        A.   Yes.  On -- on numerous occasions, I
14:57:57  4    felt, still feel, that my rate of pay, which was
14:58:02  5    captain's pay when I left, should be my rate of pay
14:58:06  6    when I return.
14:58:11  7        Q.   Well, why should it be your rate of pay
14:58:13  8    if you can't perform the captain position anymore?
14:58:16  9        A.   Well, because it was my rate of pay when
14:58:18  10   I left.  And during my military service, I served as
14:58:23  11   the equivalent of a captain for a military aircraft
14:58:26  12   for those, you know, 2007 to 2012 in a 121 aircraft,
14:58:35  13   large aircraft equivalent.
14:58:39  14       Q.   Is there any --
14:58:40  15       A.   They didn't find anything wrong with my
14:58:42  16   abilities.
14:58:43  17       Q.   Is there anything that make -- that makes
14:58:46  18   you think that the law requires that you be paid to
14:58:56  19   perform a position that you are admittedly unable to
14:59:00  20   perform?
14:59:00  21       A.   Well, you're not saying that I'm unable
14:59:03  22   to perform it.  I've -- I've stated I was able to
14:59:06  23   perform it after I left Frontier right up until my
14:59:09  24   return.
14:59:09  25            If you look at my experience and what I
```

194

```
14:59:11  1    did while I was flying as a command pilot for the
14:59:15  2    Army, it's the same thing as flying as a captain for
14:59:18  3    an airline, even Frontier's airline.
14:59:24  4        Q.   Well, why would Frontier pay you for that
14:59:27  5    position when starting in 2012 you couldn't do it
14:59:29  6    anymore?
14:59:30  7        A.   Well, I believe that the law USERRA
14:59:34  8    allows a returning service member to return at an
14:59:39  9    equivalent rate at what they left or -- or at least
14:59:43  10   try to find a position of an equivalent pay rate based
14:59:47  11   upon the pay that you would have had when you left
14:59:51  12   and/or the likelihood upon return under normal
14:59:56  13   circumstances that I would have been given another
14:59:58  14   opportunity to check out as a captain and pass that
15:00:02  15   checkride since I had passed multiple military
15:00:06  16   checkrides in the interim.
15:00:08  17       Q.   Again, I don't understand why any of that
15:00:09  18   is relevant to your situation at this time in
15:00:12  19   September 2014 or October 2014.
15:00:16  20       A.   Because USERRA, the law, allows for it.
15:00:20  21       Q.   You believe that the law allows for you
15:00:22  22   to be paid for a position that you can no longer
15:00:27  23   perform and haven't been able to perform for at least
15:00:29  24   three years?
15:00:31  25       A.   Three years?  What do you mean?
```

195

```
15:00:34  1        Q.   Well, you were grounded in November of
15:00:36  2    2012.  So two years.
15:00:37  3        A.   Okay.  Yeah, I see your point there.
15:00:41  4        Q.   Yeah.
15:00:41  5        A.   Yes.  Yes, I absolutely do.  So --
15:00:44  6        Q.   But how -- how -- the law -- the law
15:00:48  7    somehow says that if I come back from my military
15:00:51  8    service, and I used to be a cop, and now, you know, I
15:00:54  9    have lost my sight and my hearing, and I cannot pass
15:01:00  10   any required exams or health criteria to be a cop, but
15:01:09  11   I come back to my old employer, and I say, you know, I
15:01:13  12   would like to be reemployed, and you need to start
15:01:16  13   paying me to be a policeman even though we both
15:01:20  14   understand that I'll never actually perform that job
15:01:23  15   again, that's a scenario that you feel the law is
15:01:28  16   consistent with?
15:01:31  17       A.   Yes.  You know, I've read the law
15:01:34  18   extensively.  Obviously, since we had a previous
15:01:38  19   experience with this before.  And I -- I think the law
15:01:42  20   is very clear.  When a returning service member
15:01:46  21   returns and cannot do the job or position that they
15:01:48  22   had before, that service member, even with their
15:01:54  23   disabilities, are supposed to be given an opportunity
15:01:56  24   of a comparable job that that individual can do or be
15:02:01  25   trained to do with assistance.
```

196

```
15:02:05  1            And I believe there was plenty of jobs
15:02:07  2    that Frontier could have at least tried to let me do.
15:02:10  3    And I tried to point out a number of those jobs.
15:02:18  4            Flight instructor.  I have a certificate
15:02:20  5    from the FAA, and nobody even wanted to talk to me
15:02:22  6    about that one.
15:02:23  7            Assistant chief pilot.  You make that job
15:02:26  8    out to be something that it really isn't.  You know,
15:02:28  9    I'm familiar with the job.  I'm familiar with the
15:02:31  10   responsibilities, and I feel it's something that I can
15:02:34  11   do with reasonable accommodations, whether it be that
15:02:38  12   or the flight instructor.  Those are just two
15:02:41  13   examples.
15:02:42  14           Another example I would give would be a
15:02:44  15   manager of flight training.  Dave Welt had that.  And
15:02:47  16   he was a first officer.  He was never a captain, but
15:02:51  17   he was paid a captain's salary when he took that job.
15:02:54  18   He's below me in seniority.  And, you know, he was
15:02:57  19   there the night I flunked.
15:02:59  20           So he was given the opportunity to work
15:03:01  21   as manager of training in the training department
15:03:05  22   whenever -- without being a captain.  And so why would
15:03:09  23   you not make that accommodation for somebody like me?
15:03:11  24   Unless you're just out to get me and out to fire me.
15:03:15  25   That's the way I feel.  That's what I feel like
```

Quick v. Frontier Airlines                EDWARD K. QUICK                          7/15/2016

---

197

15:03:18  1    Frontier just doesn't want to do anything to
15:03:23  2    accommodate Mr. Quick.
15:03:24  3        Q.   If you look at this document, Exhibit 22,
15:03:26  4    there's no reference in these notes of your first
15:03:34  5    meeting with Ms. Zeier that refers to your desire to
15:03:38  6    be assistant chief pilot or your desire for a flight
15:03:43  7    instructor job or your desire for any of the other
15:03:46  8    positions that you just mentioned, correct?
15:03:49  9        A.   No.  It's not in her notes, no.
15:03:51  10       Q.   Okay.  And you took no notes either?
15:03:53  11       A.   I did not.
15:03:53  12       Q.   Okay.  Do you have any other evidence
15:03:57  13   that in this meeting you made reference to the jobs
15:04:02  14   that you just discussed?
15:04:04  15       A.   Well, certainly had I known that I would
15:04:06  16   be sitting here today, I would have brought in a tape
15:04:09  17   recorder, you bet.  But I didn't feel it was
15:04:12  18   necessary.  I was trying to be cooperative upon
15:04:15  19   returning to work.  I was trying to offer --
15:04:17  20       Q.   So the answer is, no, you don't have any
15:04:19  21   other evidence?
15:04:20  22       A.   Yes, you're right, no, I don't have any
15:04:23  23   evidence, other than my word.
15:04:35  24       Q.   At the very bottom of the set of notes
15:04:38  25   there, it says, "Two-week window to reinstate.

---

198

15:04:45  1    Realize we may need more time."
15:04:48  2        Is that a statement that you made to
15:04:49  3    Ms. Zeier in that meeting, if you recall?
15:04:55  4        A.   Yes.  I had pointed out, as I -- we
15:05:00  5    discussed more than what she just put in her notes
15:05:04  6    there.  The meeting went on for quite -- quite a
15:05:06  7    period.
15:05:07  8        So I remember the meeting lasting 30, 40
15:05:10  9    minutes, something like that.  And, you know, this is
15:05:12  10   a single-page note for a lot of -- a lot that went
15:05:17  11   back and forth that I remember.
15:05:19  12       Q.   My question was that last two lines,
15:05:21  13   "Two-week window to reinstate, realize we may need
15:05:26  14   more time," is that a statement you remember making in
15:05:28  15   the meeting?
15:05:30  16       A.   Well, I didn't make the -- I don't
15:05:32  17   remember that I made the statement.  I think we talked
15:05:35  18   about, you know, normally that -- that an employer
15:05:42  19   would reemploy a returning service member normally --
15:05:45  20   it's normally by law within two weeks.
15:05:48  21       So, you know, if -- if we discussed that
15:05:52  22   she might need some more time, I think I was
15:05:55  23   accommodating and was agreeable to that.  So I wasn't
15:05:58  24   putting any demands on Frontier whatsoever.  I was
15:06:01  25   trying to work it out with them.

---

199

15:06:03  1        Q.   So your testimony earlier that with
15:06:07  2    reasonable accommodations, you felt like you could
15:06:09  3    have performed a number of the jobs that you say that
15:06:13  4    you brought up in this meeting?
15:06:15  5        A.   Yes.
15:06:16  6        Q.   Okay.  Did you ever refer to any specific
15:06:20  7    accommodations that you felt were necessary or could
15:06:22  8    be workable for those jobs?
15:06:24  9        A.   None was ever asked of me.
15:06:28  10       Q.   No, I said did you ever --
15:06:29  11       A.   No, I never --
15:06:30  12       Q.   -- discuss any of the accommodations that
15:06:32  13   you now refer to as possibly being workable?
15:06:35  14       A.   I did not.  Nothing was ever offered.
15:06:39  15       Q.   Okay.  How would Frontier know what
15:06:44  16   accommodations to offer if it didn't know what the
15:06:47  17   nature of your disability was?
15:06:49  18       A.   By asking me.
15:06:51  19       Q.   Okay.  Did you ever inform Frontier of
15:06:54  20   the nature of your disability?
15:06:57  21       A.   Again, I did not feel I had any
15:06:59  22   obligation, other than saying that I was disabled at
15:07:03  23   that point, to give any other information until asked
15:07:07  24   and until, first of all, being reemployed, which I
15:07:10  25   haven't been.

---

200

15:07:16  1        Q.   Any other reason?
15:07:17  2        A.   No.
15:07:17  3        (Deposition Exhibit 23 was marked.)
15:07:48  4        MR. DABNEY:  Why don't we take a sec -- a
15:07:50  5    short break.
15:07:52  6        MR. WHITCOMB:  I think that would be a
15:07:52  7    good idea.
15:07:53  8        THE DEPONENT:  Great idea.
15:07:54  9        THE VIDEOGRAPHER:  This is the end of
15:07:55  10   Media 3 in the deposition of Edward K. Quick.  We're
15:07:58  11   off the record at 3:07 p.m.
15:08:03  12       (Recess taken, 3:07 p.m. to 3:25 p.m.)
15:25:36  13       THE VIDEOGRAPHER:  This is the beginning
15:25:37  14   of Media Unit 4 in the deposition of Edward K. Quick.
15:25:41  15   We're back on the record at 3:25 p.m.
15:25:47  16       Q.   (BY MR. DABNEY)  Mr. Quick, we're looking
15:25:48  17   at Exhibit 23 now.  And it's another set of emails
15:25:54  18   between yourself and Ms. Zeier.
15:25:58  19       After your meeting on October 7, there's
15:26:09  20   an email to you from Ms. Zeier October 14, "Ed, Thanks
15:26:15  21   for meeting with me last week.  Pursuant to our
15:26:17  22   discussion, we are further researching your questions
15:26:19  23   and hope to respond by the end of the week."  And
15:26:22  24   then, "It's my understanding you'll be sending me a
15:26:25  25   copy of the orders that we discussed.  Let me know if

---

50 (Pages 197 to 200)

Quick v. Frontier Airlines                  EDWARD K. QUICK                          7/15/2016

---

### 201

```
15:26:28   1   there's anything else that we need to address at this
15:26:30   2   time."
15:26:32   3          And then the next day, October 15, you
15:26:37   4   replied, "Michelle, Here is my previous DD214 and
15:26:42   5   orders. Let me know if you need anything more. As I
15:26:47   6   said during our meeting, I am open to more time if
15:26:51   7   needed by you to research our options."
15:26:59   8          At that point, was there anything that
15:27:01   9   you were concerned about with respect to this
15:27:03  10   dialogue?
15:27:04  11       A.  No.
15:27:16  12       Q.  And then on October 22, Ms. Zeier emailed
15:27:22  13   you, "Hi Ed," thanks "for providing additional
15:27:25  14   information related to your exception status."
15:27:28  15          She had a follow-up question about a
15:27:30  16   particular time period and asked for additional
15:27:33  17   paperwork for that time.
15:27:35  18          Do you see that?
15:27:35  19       A.  I do.
15:27:37  20       Q.  And then -- on the 30th on the next page,
15:27:41  21   October 30, you sent an email saying here are the
15:27:47  22   orders you requested. And she responded, "Thank you,
15:27:51  23   I will be in touch about next steps." Do you see
15:27:54  24   that?
15:27:54  25       A.  I do.
```

### 202

```
15:27:58   1       Q.  And if you turn to the last page, there's
15:28:04   2   an email at the top of the page, Bates No. 00952 where
15:28:16   3   Ms. Zeier sent you a message on November 12, "Hi Ed,
15:28:20   4   You will be getting a phone call from Cassie Micklich,
15:28:22   5   HR Specialist, on Monday to begin your paperwork
15:28:26   6   processing for return to active status. I will follow
15:28:29   7   up with you about other return detail."
15:28:32   8          And you responded the same day,
15:28:34   9   November 12, "Thanks. Got your email. Will look
15:28:39  10   forward to a call from Cassie next week and a follow
15:28:42  11   up with you."
15:28:43  12          Did you have any concerns about the
15:28:44  13   process at that point?
15:28:46  14       A.  No.
15:28:53  15          (Deposition Exhibit 24 was marked.)
15:29:11  16       Q.  Exhibit 24 is a similar batch of emails.
15:29:36  17   This is Wednesday, December 10. Ms. Zeier writes to
15:29:41  18   you, "Hello Ed, I understand from Cassie that your
15:29:44  19   re-entry drug alcohol test is clear."
15:29:47  20          So sometime before this email, you did
15:29:51  21   receive a call from Cassie Micklich; is that right?
15:29:54  22       A.  Yes.
15:29:55  23       Q.  And she arranged for you to take a drug
15:29:59  24   alcohol test?
15:30:00  25       A.  Correct.
```

### 203

```
15:30:01   1       Q.  And you passed that without any issues,
15:30:03   2   correct?
15:30:04   3       A.  Yes.
15:30:09   4       Q.  Did you have any other discussions with
15:30:11   5   Ms. Micklich?
15:30:18   6       A.  I'm trying to remember which -- who she
15:30:20   7   was. Was she just the drug and alcohol lady?
15:30:28   8       Q.  I'm just asking if you remember if you
15:30:29   9   had any other discussions with her or not.
15:30:34  10       A.  No, I don't remember. But it doesn't
15:30:37  11   mean there weren't any. I know she called me. I
15:30:40  12   talked to her on the phone.
15:30:42  13       Q.  So on the 10th of December, Ms. Zeier
15:30:47  14   sent you this email saying, "I understand your drug
15:30:50  15   test is clear. When we met" -- "When we last met, you
15:30:55  16   explained that you would like to apply for LTD. I've
15:30:59  17   attached claim filing instructions through Unum if you
15:31:03  18   would like to initiate this process as the next step."
15:31:06  19          And then you see attached to this email
15:31:08  20   is a brochure regarding how to file a short-term
15:31:14  21   disability claim by telephone or on the Unum website.
15:31:24  22   Do you see that?
15:31:25  23       A.  Yes.
15:31:25  24       Q.  And it has the long-term disability
15:31:28  25   pilot's policy number on there as well.
```

### 204

```
15:31:32   1       A.  Yes.
15:31:33   2       Q.  Do you see that? It has a telephone
15:31:34   3   number for Unum. Do you see that?
15:31:37   4       A.  Correct.
15:31:38   5       Q.  Okay.
15:31:43   6       A.  Um-hum.
15:31:44   7       Q.  The second page talks about information
15:31:47   8   needed to submit a short-term disability claim. Do
15:31:51   9   you see that?
15:31:51  10       A.  Yes.
15:31:55  11       Q.  Healthcare provider's name, description
15:31:58  12   of medical condition, cause of condition, dates of
15:32:03  13   visits with healthcare providers, work restrictions
15:32:04  14   and limitations. Do you see all that?
15:32:08  15       A.  I do.
15:32:09  16       Q.  Okay. And when you received this email
15:32:13  17   from Ms. Zeier, did you ever make a phone call or go
15:32:16  18   onto the website for Unum to file one of these
15:32:20  19   short-term disability claims?
15:32:21  20       A.  Yes, I did call them. I was trying to
15:32:24  21   find out what the policy actually was and how it --
15:32:27  22   how it worked. They said I couldn't get the policy.
15:32:30  23   I'd have to get it from Frontier.
15:32:32  24          I went back to Frontier in person, made
15:32:36  25   my request in person for the policy and didn't get it
```

205

15:32:39    1    until some months later.
15:32:42    2         Q.   To whom did you make your request?
15:32:46    3         A.   You know, I can't remember the exact
15:32:49    4    people that were there when I talked to them, but I
15:32:54    5    was -- the lady who takes care of the 401(k) policy,
15:33:00    6    because I spoke to her.  And this was separate from
15:33:02    7    the meeting when I met Michelle.  And I -- oh, I
15:33:05    8    remember that now.
15:33:06    9         So I walked in and even saw Jacquelyn
15:33:08   10    Peters.  And I said hi to her that day because she was
15:33:12   11    at the front desk.  One of the ladies at the front
15:33:14   12    there, said, Oh, there's trouble.  And, of course, we
15:33:19   13    all laughed.
15:33:21   14         And I went back to the back because, at
15:33:25   15    the same time, I was trying to follow up on my 401 and
15:33:31   16    my contributions to my direct contribution plan to see
15:33:35   17    when and if Frontier was going to do anything.  And
15:33:38   18    nobody really had any answers at that point.
15:33:41   19         Michelle was at a meeting, and she came
15:33:44   20    out later, if I remember right, and said hi briefly
15:33:46   21    before I left.
15:33:49   22         Q.   Okay.
15:33:51   23         A.   That's as I remember it.
15:33:53   24         Q.   You had indicated, when you first met
15:33:55   25    with Ms. Zeier, that filing for short-term and

206

15:33:58    1    long-term disability was one of the options that you
15:34:05    2    would be considering as you went through a
15:34:12    3    reemployment process.
15:34:14    4         A.   Correct.  That is true.
15:34:20    5         Q.   And is it true that you said something
15:34:27    6    along the lines of, We can make this easy for
15:34:31    7    everybody.  I would be out of sight, out of mind if I
15:34:35    8    would be able to exercise that option?
15:34:39    9         A.   Yeah, I believed I remember saying that
15:34:42   10    for sure, out of sight, out of mind.  If that -- if
15:34:46   11    that was an option that was available to me and would
15:34:49   12    work, sure, it was good for Frontier, good for me, and
15:34:53   13    off we went.
15:34:54   14         Q.   So when you received this email on
15:34:57   15    December 10, with the claim filing instructions
15:35:05   16    through Unum for short-term disability benefits, why
15:35:12   17    didn't you go ahead and file a claim?
15:35:15   18         A.   Well, I didn't -- at that time, I didn't
15:35:17   19    know what the policy said.  I was advised to make sure
15:35:23   20    I got a copy of the policy and read it thoroughly
15:35:28   21    before, you know, I made any decision on whether I'd
15:35:32   22    go out on a -- a short-term or long-term disability if
15:35:36   23    that was an option to me.
15:35:38   24         Subsequently later when we finally got a
15:35:40   25    copy and I read the -- the policy there, I didn't

207

15:35:43    1    qualify for it.
15:35:46    2         Q.   Why didn't you qualify?
15:35:47    3         A.   Because there was a war clause.
15:35:53    4         Q.   It says that if you sustained the
15:35:55    5    disabilities that would entitle you to benefits as a
15:35:59    6    result of wartime activities, then it was excluded?
15:36:07    7         A.   That's the way I read it, yes.
15:36:09    8         Q.   Okay.  Prior to knowing that information,
15:36:16    9    that was something that you were -- it's fair to say
15:36:20   10    you were quite interested in exploring?
15:36:23   11         A.   It was one of the options, absolutely,
15:36:26   12    sure.
15:36:33   13         Q.   I mean, you could have just filed a claim
15:36:35   14    and figured out -- let them decide whether you
15:36:38   15    qualified or not, correct?
15:36:40   16         A.   No, because once you qualify, you know,
15:36:46   17    who knows where that would go.  If I get denied, you
15:36:49   18    know, then I'm out of a job regardless; so I wanted to
15:36:52   19    leave all my options open.
15:36:55   20         Q.   Is it your understanding that if you were
15:36:57   21    denied disability that you wouldn't have a job?
15:37:00   22         A.   Well, I wouldn't have had one yet anyway,
15:37:04   23    regardless.
15:37:05   24         Q.   Well, what made you say that?  Or what
15:37:08   25    made you believe that?

208

15:37:09    1         A.   I've read something somewhere in there.
15:37:12    2    I'm not sure what the deal was on that, but that was
15:37:15    3    my understanding, yes.  So . . .
15:37:16    4         Q.   You don't know where you got that
15:37:17    5    understanding?
15:37:19    6         A.   What's that?
15:37:20    7         Q.   You don't know where you got that
15:37:21    8    understanding?
15:37:22    9         A.   No, I'm not sure.  In my mind, that's
15:37:24   10    what I was thinking.
15:37:31   11         Q.   So Ms. Zeier sends you this email on
15:37:35   12    December 10 attaching claim filing instructions for
15:37:43   13    Unum.  And you indicated you came into the office and
15:37:49   14    asked someone, whose name you don't recall, for a copy
15:37:53   15    of the policy, right?
15:37:54   16         A.   I did.  And it would be the lady who was
15:37:57   17    the -- there was two ladies at the back office.  And I
15:38:00   18    believe Michelle was in the office next to it, but it
15:38:04   19    was like a conference room.  And there was one office
15:38:06   20    there for a supervisor, and then there was the lady
15:38:09   21    who was taking care of the -- but I just don't
15:38:12   22    remember their names.
15:38:13   23         And they took care of the defined
15:38:18   24    contribution plan and the 401.  They really couldn't
15:38:20   25    answer my questions that I had for them that day.  And

Quick v. Frontier Airlines                    EDWARD K. QUICK                          7/15/2016

---

209

15:38:24  1   I -- you know, I asked at that time for a -- for a
15:38:28  2   copy of the policy because I didn't have one. I
15:38:34  3   didn't know what the policy said. So I'm not going to
15:38:38  4   apply for something until I have a chance to read it.
15:38:43  5       Q.   Then you responded at 8:51 p.m. that same
15:38:47  6   day on December 10, page 960 of this Exhibit 24,
15:38:55  7   "Michelle, Thanks for your email. Please let me know
15:38:59  8   my report date to return to work."
15:39:01  9           Do you see that?
15:39:01 10       A.   Yes. Yes, I do. That was in December.
15:39:08 11       Q.   Okay. And you turn the page, the next
15:39:17 12   day, December 11, page 00962, Ms. Zeier writes, "Ed, I
15:39:25 13   guess I'm a little confused by your response given our
15:39:28 14   prior meeting. Do you want to have a meeting or a
15:39:31 15   call to discuss what you would like to do regarding
15:39:33 16   position/LTD in leave of absence?"
15:39:37 17           Do you see that?
15:39:37 18       A.   Um-hum.
15:39:38 19       Q.   Yes?
15:39:39 20       A.   Yes.
15:39:40 21       Q.   Okay. Did you understand why Ms. Zeier
15:39:43 22   was confused by your response?
15:39:47 23       A.   No.
15:39:50 24       Q.   You had indicated that you would like to
15:39:54 25   receive the information to apply for disability, and

---

210

15:39:59  1   then the next few hours later, you indicate that
15:40:05  2   What's my report date to return to work?
15:40:12  3       A.   Correct.
15:40:13  4       Q.   Do you not see why that is a bit
15:40:17  5   incongruous? Do you want to go on disability or do
15:40:20  6   you want to go back to work, which is it, type of
15:40:23  7   thing?
15:40:23  8       A.   Well, you have to be reemployed before
15:40:25  9   you apply for disability, and I was never reemployed.
15:40:27 10   I mean, that's pretty simple.
15:40:30 11       Q.   Well, then, what is the option of going
15:40:35 12   on a leave of absence and, therefore, having
15:40:40 13   reemployment status handled that way, correct?
15:40:44 14       A.   I don't understand your question.
15:40:47 15       Q.   Her email says, "Do you want to have a
15:40:50 16   meeting or a call to discuss what you would like to do
15:40:52 17   regarding position/LTD and leave of absence."
15:40:56 18           Do you see that?
15:40:56 19       A.   Oh, yes, yes.
15:40:57 20       Q.   Do you know what Ms. Zeier meant by
15:41:00 21   "leave of absence"?
15:41:02 22       A.   Well, yes. Her -- I assumed her
15:41:05 23   viewpoint there was that she was wondering if I still
15:41:09 24   wanted to explore one of my options, which was to look
15:41:14 25   at the leave of absence. And regardless of that, I

---

211

15:41:18  1   had to be reemployed before I could apply for it. I
15:41:25  2   was never reemployed. That's the point.
15:41:27  3       Q.   Well, you were, on several occasions,
15:41:28  4   asked to contact a particular individual, Ms. Aragon,
15:41:35  5   to execute leave-of-absence paperwork, correct?
15:41:40  6       A.   Yes. That was offered to me. I didn't
15:41:42  7   -- I decided not to go that route.
15:41:45  8       Q.   Why not?
15:41:46  9       A.   Well, I decided, you know, at that point,
15:41:50 10   I needed to be returned to work, and then I'd make a
15:41:59 11   decision.
15:41:59 12       Q.   When did you make that decision?
15:42:00 13       A.   Well, really, basically from the
15:42:01 14   beginning. I was waiting on Frontier to fulfill their
15:42:05 15   obligations to me as a returning disabled military
15:42:08 16   veteran.
15:42:08 17       Q.   Well, it's true, isn't it, that initially
15:42:11 18   you were inquiring about disability and then, at some
15:42:15 19   point in December 10th, 11th time frame, when you
15:42:24 20   asked about what is your return date to work, the
15:42:28 21   response was we're confused; which of the options do
15:42:31 22   you want to take, correct?
15:42:33 23       A.   Yeah. Frontier was confused. I wasn't.
15:42:36 24   I was still waiting to return to work.
15:42:37 25       Q.   Well, at that point, you just told me

---

212

15:42:39  1   that you decided to reject the leave-of-absence option
15:42:44  2   and you wanted to exercise the option to return to an
15:42:52  3   actual position, correct?
15:42:54  4       A.   Well, you know, again, I was trying to,
15:42:57  5   you know, make my position clear. I should have been
15:43:01  6   returned to work and proceed from there.
15:43:05  7           Until I was back on the property getting
15:43:07  8   a full-time paycheck, whatever that was going to be,
15:43:11  9   that was Frontier's first obligation to me. I had no
15:43:13 10   obligation to Frontier to go out on disability unless
15:43:18 11   that's something I decided.
15:43:21 12       Q.   Right. And you had that option, and you
15:43:22 13   had the option to go on a medical leave of absence,
15:43:25 14   correct?
15:43:26 15       A.   Correct.
15:43:27 16       Q.   And you discussed those with Ms. Zeier
15:43:29 17   between September and December, correct?
15:43:33 18       A.   A medical leave of absence?
15:43:37 19       Q.   Yes.
15:43:38 20       A.   Yes.
15:43:38 21       Q.   Okay. And then your testimony today is
15:43:40 22   that at some point, you rejected those and wanted to
15:43:44 23   move forward with the third option of returning to an
15:43:48 24   actual position, correct?
15:43:50 25       A.   Correct.

---

53 (Pages 209 to 212)

Quick v. Frontier Airlines                   EDWARD K. QUICK                                7/15/2016

213

15:43:50  1    Q.  Okay.  If you'd turn to page 00965 of
15:44:04  2  Exhibit 24.  Do you see there's an email there
15:44:31  3  responding to Ms. Zeier's email about being confused?
15:44:34  4        On December 12, you wrote, "Hi Michelle,
15:44:38  5  Please give me your earliest report date as I eagerly
15:44:42  6  wait my return to Frontier.  We can discuss my pay
15:44:46  7  rate upon my return.  I am available as this Monday
15:44:50  8  the 15th."
15:44:51  9        Do you see that?
15:44:52  10       A.  Yes.
15:44:52  11       Q.  So in response to her email about wanting
15:44:54  12  to have a call to discuss what she'd like to do
15:44:58  13  regarding the three options that we just discussed,
15:45:01  14  you sent this email saying you wanted to return to
15:45:04  15  work, correct?
15:45:07  16       A.  Yeah.  I wanted to make it very clear I
15:45:09  17  had been waiting, and make it very clear again that
15:45:12  18  I'm requesting to return to work.  I still hadn't been
15:45:15  19  reemployed.  Any and all decisions are made after
15:45:18  20  you're reemployed and getting paid.
15:45:25  21       Q.  Okay.  So turn the page to 00968.
15:45:33  22       A.  Yes.
15:45:34  23       Q.  On December 12, you see an email from you
15:45:38  24  to Ms. Zeier that says, "Michelle, Thanks for your
15:45:42  25  call."

214

15:45:42  1        Did Ms. Zeier call you after that other
15:45:46  2  exchange of emails that we just discussed?
15:45:50  3        A.  Yes.
15:45:51  4        Q.  Okay.  Did you take any notes of that
15:45:54  5  call?
15:45:54  6        A.  No, not that I know of.
15:45:56  7        Q.  Did you have any --
15:45:57  8        A.  Other than whatever it said in an email.
15:46:00  9        Q.  Okay.  Do you have any recording or other
15:46:02  10  information about what occurred during the call?
15:46:05  11       A.  I don't.
15:46:05  12       Q.  Okay.  Okay.  So you wrote, "Thanks for
15:46:10  13  your call.  I am willing to wait if needed for
15:46:13  14  Frontier to give me a start date due to the logistics
15:46:16  15  of my return and the Holidays if needed."
15:46:22  16       That was a statement that you intended
15:46:24  17  Frontier to take as true, correct?
15:46:26  18       A.  Yes.
15:46:26  19       (Deposition Exhibit 25 was marked.)
15:46:57  20       Q.  Okay.  Here is Exhibit 25.  Have you seen
15:47:29  21  it before, Mr. Quick?
15:47:30  22       A.  I have not.
15:47:31  23       Q.  Okay.  I'll represent to you that this
15:47:33  24  was a page of Ms. Zeier's notes of your call on
15:47:40  25  December 12 produced in this litigation by Frontier to

215

15:47:46  1  your counsel.
15:47:52  2        It says, "Ed Quick, 12/12/14.  Doesn't
15:47:56  3  matter if he has a medical or not.  Must bring me back
15:48:02  4  in like position."
15:48:03  5        Do you see that?
15:48:04  6        A.  Yes.
15:48:04  7        Q.  Did you discuss any positions during that
15:48:06  8  call?
15:48:07  9        A.  I don't remember whether any exact
15:48:11  10  positions were discussed.  I did say that Frontier had
15:48:13  11  an obligation under the law to reemploy me.  It wasn't
15:48:20  12  my job to find a job.
15:48:22  13       Q.  Was it your job to assist?
15:48:27  14       A.  Well, if they were going to offer me one,
15:48:30  15  I'm sure I would have.
15:48:31  16       Q.  Okay.  How would they know what to offer
15:48:34  17  you if you didn't assist?
15:48:38  18       A.  Well, it's a hypothetical situation,
15:48:40  19  isn't it?
15:48:41  20       Q.  Well, I think it's actually pretty close
15:48:44  21  to what happened, isn't it?
15:48:46  22       A.  Yeah.  What happened is they didn't
15:48:48  23  reemploy me into any position.  You know, I mean
15:48:51  24  normally when you bring a person back on, you're -- and
15:48:55  25  they say, All right.  Go do this for now.  We're going

216

15:48:58  1  to give you an administrative job until we can figure
15:49:01  2  out what position we can find for you.
15:49:03  3        You do something for the employee at that
15:49:05  4  point.  That something never has happened for me.
15:49:08  5  That is what I expected to take place, something,
15:49:13  6  anything.  Nothing took place for me.  And I was
15:49:18  7  waiting to be reemployed.  I was being polite.  I was
15:49:22  8  being nice.  I was trying to work with Frontier.  And
15:49:24  9  it went from weeks to months to years, and I still
15:49:29  10  haven't been reemployed.  So --
15:49:32  11       Q.  Well, when you say you wanted --
15:49:34  12       A.  -- I think my position has been pretty
15:49:36  13  clear from the very beginning.  Reemploy me.  I'm open
15:49:43  14  to all options to include the medical, to include
15:49:44  15  disability, to include everything, anything and
15:49:47  16  everything.  We never really sat down and had a -- a
15:49:50  17  good, open, solid discussion after I was reemployed.
15:49:55  18       Q.  My question for you is you kept asking
15:49:59  19  for a return date to work.  And you made it very clear
15:50:03  20  that you believe that you were supposed to come back
15:50:05  21  to work in some capacity and start getting paid like a
15:50:10  22  captain.  That's true, isn't it?
15:50:13  23       A.  That's what I was requesting, absolutely.
15:50:15  24       Q.  Yeah.  But unless you assisted Frontier
15:50:21  25  in determining what accommodations could be made or

54 (Pages 213 to 216)

Quick v. Frontier Airlines                    EDWARD K. QUICK                        7/15/2016

217

15:50:25  1    what positions might fit the reasons you could no
15:50:29  2    longer be a pilot, how would Frontier be able to put
15:50:33  3    you into any particular position if you did not assist
15:50:38  4    in that matter?
15:50:40  5         A.  Well, I was ready, willing, and able to
15:50:42  6    assist once reemployed.  Once asked the questions,
15:50:46  7    Gee, Ed, would you like to be -- can we try to make
15:50:49  8    you a sim instructor?  Can we try to make you a
15:50:53  9    manager of training?  Would you like to try out maybe
15:50:56  10   assistant chief pilot?  You know, let us know what
15:51:00  11   your limitations are.
15:51:01  12        The question was never asked of me.
15:51:03  13   There was never an open discussion on it.  My open
15:51:07  14   discussion was, Please reemploy me.  And then let's go
15:51:12  15   from there.
15:51:32  16        Q.  In the open discussion that you're
15:51:34  17   referring to, doesn't it make sense, from a logical
15:51:42  18   perspective, from the perspective of the most
15:51:49  19   efficient process, that you would tell Frontier what
15:51:55  20   your abilities and disabilities were and what
15:51:59  21   positions you felt were at least possibilities to
15:52:04  22   explore to start with, and then Frontier could take
15:52:07  23   that information and look at the positions that were
15:52:10  24   available or look at the positions in the
15:52:12  25   organization, consider accommodations, and then tell

218

15:52:17  1    you, Hey, here's -- here's what we've got?  Doesn't
15:52:21  2    that make sense?
15:52:22  3         A.  Well, I made it very clear from the
15:52:25  4    beginning that there were.
15:52:27  5         Q.  Does what I just described make sense?
15:52:29  6         A.  Sure.  Why not?
15:52:30  7         Q.  Okay.  And the information that pertained
15:52:41  8    to your abilities and disabilities, you were the only
15:52:44  9    one who had that information, correct?
15:52:52  10        A.  Well, obviously, the military had them
15:52:55  11   and Social Security did and my doctors did.
15:52:58  12        Q.  Frontier did not, correct?
15:52:59  13        A.  Well, Frontier did not, no.
15:53:01  14        Q.  Okay.
15:53:40  15        (Deposition Exhibit 26 was marked.)
15:53:55  16        Q.  Do you see Exhibit 26 is a -- an email
15:54:02  17   from Ms. Zeier on the 23rd of December, 2014.  There
15:54:09  18   at the bottom of the page, 00976.  It says, "Hello Ed,
15:54:13  19   Please plan to attend New/Return from extended leave
15:54:17  20   of absence employ orientation on Monday, January 5 at
15:54:20  21   8:30 at the general offices.  Let me know if you have
15:54:24  22   any questions.  I requested a read receipt on this
15:54:28  23   email just to verify you got the information."
15:54:33  24        And you responded the same day, "Hi
15:54:36  25   Michelle, I'll plan on being there.  Thanks for the

219

15:54:39  1    update.  Merry Christmas, Ed."
15:54:41  2         Do you see that?
15:54:42  3         A.  Yes.
15:54:43  4         Q.  So at that point, you were attending
15:54:50  5    employee orientation for your return to employment,
15:54:55  6    correct?
15:54:57  7         A.  Yeah, about three or four months after I
15:54:59  8    originally applied.
15:55:01  9         Q.  Well, that was three or four months where
15:55:03  10   you indicated that you were willing to wait for the
15:55:05  11   logistics to be worked out and the holidays to pass,
15:55:10  12   correct?
15:55:10  13        A.  I was certainly willing to work with
15:55:12  14   Frontier, that's for sure.
15:55:13  15        Q.  Okay.  And you understand that if you're
15:55:20  16   not going to be reemployed, then you're certainly not
15:55:25  17   going to be sent to employee orientation, right?
15:55:29  18        A.  That's kind of what I thought.  I thought
15:55:32  19   we got some movement.
15:55:33  20        (Deposition Exhibit 27 was marked.)
15:55:55  21        Q.  Okay.  Exhibit 27 is a couple of
15:55:58  22   documents that bear your signature on January 5 of
15:56:02  23   2015; is that right?
15:56:04  24        A.  That's correct.
15:56:05  25        Q.  Policy Acknowledgments.  Are these

220

15:56:07  1    documents that you signed at the orientation?
15:56:09  2         A.  I did.
15:56:10  3         (Deposition Exhibit 28 was marked.)
15:56:41  4         Q.  Exhibit 28 is another set of emails.
15:56:50  5    There's an email on the first page, Bates No. 00982,
15:56:55  6    from the 13th of January, 2015, "Hello Ed.  Per our
15:57:02  7    discussions there is a process to apply for leave of
15:57:04  8    absence, short-term disability.  I've attached the
15:57:08  9    brochure for Unum regarding the application process.
15:57:11  10   I will ask our leave of absence coordinator, Brandi
15:57:13  11   Aragon, to send the paperwork.  I understand you had a
15:57:17  12   conversation with our benefits department and they are
15:57:19  13   working on your 401(k) request."
15:57:22  14        Do you see that?
15:57:23  15        A.  Yes.
15:57:25  16        Q.  So did you have a conversation with the
15:57:27  17   benefits department?
15:57:29  18        A.  That was the one I was referring to, if I
15:57:31  19   remember right.
15:57:32  20        Q.  Okay.  And it's accurate to say they were
15:57:41  21   working on your 401(k) request?
15:57:45  22        A.  I would assume so.  They said so.
15:57:49  23        Q.  And then the second paragraph refers to
15:57:52  24   the ongoing disagreement about interpretation of the
15:57:57  25   CBA with respect to whether or not you could be

55 (Pages 217 to 220)

**Quick v. Frontier Airlines**              **EDWARD K. QUICK**                        **7/15/2016**

---

221

15:58:02  1    eligible for captain's pay under any circumstances.
15:58:06  2        A.  Correct.
15:58:06  3        Q.  Upon reemployment, right?
15:58:08  4        A.  Yes.
15:58:08  5        Q.  So you were still focused on that issue,
15:58:11  6    right?
15:58:12  7        A.  Yes.
15:58:13  8        Q.  Okay.  And you responded later on the
15:58:25  9    13th, "Hi Michelle, Do you want me to stop by to
15:58:31 10    discuss this or call you?  This is a problem.  I am
15:58:32 11    over at University Hospital, if this afternoon works."
15:58:35 12    And she responded that she couldn't do it today.  Do
15:58:39 13    you see that?
15:58:39 14        A.  Yes.
15:58:39 15        Q.  The problem that you're referring to,
15:58:41 16    that's the captain's pay issue?
15:58:47 17        A.  Probably -- probably the reemployment
15:58:50 18    question completely.  I don't know.  I can't remember
15:58:52 19    now exactly, but there is a problem.  I sent an email,
15:58:57 20    it looks like, after that.
15:59:00 21        Q.  Yeah.  Well, on the same day on the 13th,
15:59:05 22    it looks like you sent an email at 7:56 p.m. saying
15:59:10 23    "To follow up on your position regarding my pay
15:59:13 24    status, I'd like to point out some information about
15:59:16 25    the CBA," and your position that it entitled you to be

---

222

15:59:26  1    paid as a captain under some circumstances.
15:59:31  2        And you indicated, "Please let me know
15:59:39  3    when you would like to meet or discuss our way
15:59:42  4    forward."  Do you see that?
15:59:43  5        A.  Yes.
15:59:43  6        Q.  So the problem you were referring to was
15:59:45  7    the captain's pay issue, correct?
15:59:47  8        A.  Yes.  In that email, um-hum.
15:59:50  9        Q.  And then three days later on the 16th of
15:59:53 10    January, you indicated, "Hi Michelle, To follow up on
15:59:56 11    my pay -- rate of pay issue, I spoke with David Palmer
16:00:01 12    at vets DOL" regarding "my understanding of USERRA."
16:00:08 13        And you state that Mr. Palmer said that
16:00:11 14    your understanding as to your pay rate was correct.
16:00:16 15    Do you see that?
16:00:16 16        A.  Yes.
16:00:17 17        Q.  Is that what Mr. Palmer told you?
16:00:22 18        A.  Yes.
16:00:30 19        Q.  And that was on the 16th?
16:00:33 20        A.  Correct.
16:00:33 21        Q.  And then on the -- January 26, which is
16:00:42 22    Bates No. 996 on Exhibit 28, you say, "Michelle, I
16:00:47 23    haven't heard back from you?  I need to know what my
16:00:49 24    status is?  I tried using my medical provision and
16:00:52 25    dental and was told by my doctors office I'm not on

---

223

16:00:56  1    the Frontier insurance plan."
16:00:59  2        Is it accurate that sometime in early
16:01:01  3    January, you went to vision and dental providers to
16:01:05  4    take advantage of your Frontier employee benefits?
16:01:09  5        A.  Correct.
16:01:10  6        Q.  Okay.  And at some point, were those
16:01:19  7    benefits made available to you?
16:01:22  8        A.  Sometime later, yes, they were turned on.
16:01:26  9        Q.  Sometime within the next month or two?
16:01:28 10        A.  Yes, that would be correct.
16:01:29 11        Q.  Okay.  And did you take advantage of
16:01:31 12    those benefits?
16:01:37 13        A.  I'm pretty sure I did the eyes.  Dental
16:01:42 14    only recently.
16:01:45 15        Q.  And when did you do the dental?
16:01:49 16        A.  Sometime this year.  A few months ago,
16:01:52 17    two months ago, say.
16:02:04 18        Q.  Any other employee benefits that you have
16:02:07 19    taken advantage of with respect to Frontier's plans?
16:02:11 20        A.  Medical?
16:02:13 21        Q.  Any other benefits aside from --
16:02:16 22        A.  Travel benefits, I've certainly used.
16:02:18 23        Q.  And you've been using them since when?
16:02:21 24        A.  I never lost them.
16:02:23 25        Q.  So you had them while you were on

---

224

16:02:24  1    military leave?
16:02:25  2        A.  I did.
16:02:26  3        Q.  And you've used them continually until
16:02:28  4    the present?
16:02:29  5        A.  Correct.
16:02:31  6        Q.  Okay.  And then in terms of medical
16:02:35  7    insurance as distinct from vision and dental, have you
16:02:37  8    taken advantage of that?
16:02:39  9        A.  I'm not on Frontier's medical.
16:02:42 10        Q.  What's the reason for that?
16:02:44 11        A.  I'm covered.  I don't need the Frontier's
16:02:47 12    medical.
16:02:48 13        Q.  You're covered by Medicare?
16:02:51 14        A.  I am.  Medicare and Tricare and VA.
16:02:55 15        Q.  Are you covered by Medicare because of
16:02:56 16    the fact that you receive Social Security disability?
16:03:03 17        A.  That's correct.
16:03:06 18        Q.  Further down in the email on the 26th of
16:03:12 19    January 2015, you talk about your -- an issue with
16:03:15 20    your ID badge and ask, Have you mailed or reached out
16:03:19 21    to the Department of Labor regarding my pay rate. "I
16:03:22 22    am ready to meet with you in regard to my return but
16:03:25 23    not hearing back is troubling.  Please respond."
16:03:28 24        Do you see that?
16:03:33 25        A.  Yep.  I got it.  I was looking at the

---

56 (Pages 221 to 224)

Quick v. Frontier Airlines                EDWARD K. QUICK                7/15/2016

225

16:03:36   1   wrong one.  Yes.
16:03:38   2        Q.  Now, on the next page, 01000, Ms. Zeier
16:03:42   3   responds the same day, the 26th, "Hi Ed, I'll check
16:03:47   4   on your benefits and seniority issue.  I thought we
16:03:50   5   had the date on your badge corrected.  This is the
16:03:53   6   first I've heard about the benefit issue.  I will talk
16:03:57   7   to Jackie about the pay rate, but as we've explained
16:04:00   8   before our position is that the correct rate is as
16:04:03   9   First Officer."
16:04:04  10        Do you see that?
16:04:05  11        A.  Yes.
16:04:05  12        Q.  Okay.  "Brandi told me she hasn't heard
16:04:07  13   from you regarding paperwork for leave of absence.  Do
16:04:10  14   you have an update on that?"
16:04:12  15        Do you see that?
16:04:12  16        A.  Yes.
16:04:13  17        Q.  Okay.  And you responded the same day at
16:04:21  18   1:12 p.m. on page 1004, correct?
16:04:24  19        A.  Yes.
16:04:26  20        Q.  I looked through that email, and I don't
16:04:28  21   see where you provide an update on the
16:04:30  22   leave-of-absence paperwork.  Is there a reason you did
16:04:33  23   not do that?
16:04:35  24        A.  Well, I hadn't been reemployed there.
16:04:37  25   You can't turn in an application until you're

226

16:04:41   1   reemployed.
16:04:42   2        Q.  Well, Ms. Zeier told you on a number of
16:04:44   3   occasions that you should turn in that paperwork,
16:04:46   4   right?
16:04:46   5        A.  One, that's my option.  And, two, I
16:04:49   6   hadn't been reemployed.
16:04:50   7        Q.  Well, I understand that it would be your
16:04:52   8   option if you wanted to do it or not; but if she's
16:04:55   9   telling you that you're able to do it, then there's no
16:04:57  10   issue with respect to whether you think you've been
16:05:00  11   reemployed or not, right?
16:05:02  12        I mean, if the HR person tells you to
16:05:05  13   fill them out, if you want to fill them out, you
16:05:07  14   should do it, right?
16:05:08  15        A.  No.
16:05:09  16        Q.  Why not?
16:05:10  17        A.  Because it's my choice.
16:05:11  18        Q.  So you chose not to, correct?
16:05:13  19        A.  Correct.
16:05:14  20        Q.  And you chose not to say anything about
16:05:16  21   it in this response email, correct?
16:05:18  22        A.  Correct.
16:05:24  23        Q.  How was Ms. Zeier supposed to know that
16:05:28  24   you were going to reject that option?
16:05:30  25        A.  Well, I think I had made it abundantly

227

16:05:33   1   clear throughout the emails throughout the months that
16:05:35   2   I wanted to be reemployed first.
16:05:39   3        Q.  Okay.  Well, that's not what you said in
16:05:41   4   this email, right?  You didn't say anything about it
16:05:44   5   at all.  You just ignored the issue, correct?
16:05:47   6        A.  It doesn't say anything about it, that's
16:05:49   7   correct.
16:05:57   8        Q.  Now, the next couple of emails are
16:06:00   9   devoted to this issue of the proper pay rate.  And at
16:06:12  10   some point that same afternoon you stated, "Michelle,
16:06:15  11   Are you willing to talk with the DOL informally or do
16:06:18  12   you want me to go ahead and file a formal DOL
16:06:21  13   complaint?  If the company is going to stick to the
16:06:23  14   $89 an hour," which is the first officer rate, "then
16:06:26  15   we're at an impasse."
16:06:28  16        Do you see that?
16:06:28  17        A.  Yes.
16:06:30  18        Q.  Did you go ahead and file a complaint
16:06:31  19   like that?
16:06:32  20        A.  No.
16:06:33  21        Q.  Why not?
16:06:38  22        A.  You're talking about the DOL complaint,
16:06:41  23   correct?  Well, because I -- I spoke to the supervisor
16:06:44  24   after I got a phone call from Mr. Palmer.  And he told
16:06:49  25   me that there was nothing that he could do.  He was

228

16:06:52   1   told by his superior to drop it.  And then I called
16:06:57   2   his superior.  And his superior said what he said, and
16:07:02   3   that was that.  I was done with the DOL.
16:07:09   4        Q.  Did you ever file a complaint against the
16:07:11   5   DOL for not handling that the way you wanted them to
16:07:16   6   do?
16:07:17   7        A.  I did call back to Washington, D.C. and
16:07:19   8   made a informal complaint at the time to the
16:07:25   9   supervisors back there, but never -- I never filed a
16:07:30  10   formal -- I just dropped it and moved on.  I figured
16:07:33  11   it was a waste of time at that point.  I had had
16:07:37  12   previous experience with them, and, you know, I was
16:07:39  13   trying to do everything reasonable and, you know, the
16:07:45  14   least amount of litigation keeping us from where we're
16:07:52  15   at today.  But obviously that was not to come to be.
16:07:55  16        Q.  Okay.  On January 27, Ms. Zeier got back
16:08:04  17   to you on the benefits issue that you had raised
16:08:07  18   regarding your vision and dental not working and says
16:08:11  19   she spoke to the benefits manager and determined that
16:08:15  20   you are eligible to enroll.  There's a 30-day waiting
16:08:19  21   after your return before it will become effective, and
16:08:20  22   she'll be reaching out to assist with enrollment.
16:08:23  23        And it turns out that the 30-day waiting
16:08:25  24   period was actually not correct, is that -- is that
16:08:29  25   your recollection?

57 (Pages 225 to 228)

Quick v. Frontier Airlines                    EDWARD K. QUICK                    7/15/2016

229

```
16:08:29   1        A.  That's true.
16:08:30   2        Q.  Okay.  And that there was no -- you
16:08:32   3   weren't -- you weren't required to wait the 30 days,
16:08:35   4   right?
16:08:35   5        A.  Correct.
16:08:38   6        Q.  Her next paragraph says, "With regard to
16:08:39   7   your need for leave of absence, I have asked you on
16:08:43   8   several occasions to contact the department for leave
16:08:45   9   of" -- "or contact our leave-of-absence department and
16:08:49  10   it is my understanding that you have not done so.  We
16:08:52  11   will require documentation as soon as possible - but
16:08:54  12   no later than February 2.  If you are unable to
16:08:59  13   provide" it -- "unable to provide the documentation by
16:09:01  14   then, please let me know."
16:09:05  15        Do you see that?
16:09:06  16        A.  Yes.
16:09:09  17        Q.  Okay.  If you turn the page to 1024,
16:09:13  18   there's a response email from you on that same day,
16:09:17  19   January 27.  And you say a number of things, but you
16:09:24  20   don't respond to the request for leave-of-absence
16:09:26  21   paperwork; is that correct?
16:09:28  22        A.  That is correct.
16:09:31  23        Q.  And the reasons are the same reasons you
16:09:33  24   testified about earlier?
16:09:34  25        A.  Correct.
```

230

```
16:09:46   1        Q.  It says there's an item No. 4 in your
16:09:48   2   mail that says, "USERRA trumps any and all contracts
16:09:51   3   because it's the floor not the ceiling as set out by
16:09:55   4   Federal Law not State Law or the CBA."
16:09:57   5        Do you see that?
16:09:58   6        A.  I do.
16:09:58   7        Q.  And that was in reference to your pay
16:10:00   8   rate?
16:10:05   9        A.  Well, it's in reference to anything
16:10:07  10   regarding USERRA.
16:10:10  11        Q.  Well, Item 3 says in your email, "The
16:10:13  12   returning service member will be returned at the same
16:10:16  13   rate of pay and escalator will be applied for the
16:10:20  14   returning veteran."
16:10:20  15        Do you see that?
16:10:21  16        A.  Yes.
16:10:21  17        Q.  Ask No. 4 says, "USERRA trumps any and
16:10:25  18   all contracts," correct?
16:10:26  19        A.  Correct.
16:10:27  20        Q.  Well, what was that addressing exactly?
16:10:28  21   I mean, your whole point was based on your
16:10:31  22   interpretation of the contract, right?
16:10:33  23        A.  That is correct.
16:10:35  24        Q.  So it wasn't -- nothing about USERRA says
16:10:38  25   what you're supposed to be paid.  USERRA says you look
```

231

```
16:10:42   1   at the contract, right, and then you act accordingly
16:10:47   2   with regard to the escalator principle, correct?
16:10:50   3        A.  Well, we -- USERRA says that the rate of
16:10:55   4   pay that you left at is going to be the rate of pay
16:10:59   5   that you return at.  An escalator can be applied for
16:11:04   6   the amount of time or period that you are gone.  It
16:11:06   7   can go either way, up or down.
16:11:08   8        Q.  And the dispute was at what rate of pay
16:11:12   9   was appropriate under the contract, correct?
16:11:14  10        A.  Correct.
16:11:16  11        Q.  And you cited the contract on a number of
16:11:18  12   occasions, right?
16:11:19  13        A.  I did.  Is it incorrect?
16:11:25  14        Q.  There was a dispute about it, is my
16:11:27  15   point.
16:11:28  16        A.  It was a dispute, yes.
16:11:37  17        Q.  So if you turn over to the January 28
16:11:38  18   email on page 1029 of Exhibit 29, you see, "Hi Ed, I
16:11:47  19   mistakenly said there was a waiting period.  Krista is
16:11:50  20   aware there is no waiting period and will be
16:11:52  21   contacting to reinstate.  We have been discussing
16:11:56  22   these issues for some time now.  We followed all of
16:11:59  23   the employment requirements under USERRA to complete
16:12:02  24   the return.  You have not, however, provided the
16:12:06  25   paperwork that we have repeatedly asked you to
```

232

```
16:12:08   1   provide."
16:12:09   2        She's, again, referring to the
16:12:10   3   leave-of-absence paperwork, correct?
16:12:13   4        A.  Yes.
16:12:19   5        Q.  "If you need more time, please let me
16:12:22   6   know."  Do you see that?
16:12:24   7        A.  I think I said yes.
16:12:25   8        Q.  Okay.  And, again, you did not respond
16:12:30   9   with that paperwork?
16:12:33  10        A.  No.
16:12:37  11        Q.  And now there's an email on Friday,
16:12:40  12   January 30.  Do you see that?
16:12:41  13        A.  Yes.
16:12:45  14        Q.  It says, "Hi Michelle, I would like to
16:12:47  15   get a copy of the Short and Long Disability Plan for
16:12:49  16   my review.  In the meantime I am ready to return to
16:12:52  17   work with my Disability and would like to know what
16:12:56  18   position you have for me?  I'll call Krista back on my
16:13:00  19   benefits today."  And "I look forward to getting back
16:13:02  20   to work."
16:13:03  21        Do you see that?
16:13:04  22        A.  Yes.
16:13:05  23        Q.  So we've been through a whole set of
16:13:08  24   emails since the month of September 2014 through
16:13:17  25   January 30, 2015.  This is the first email where I see
```

58 (Pages 229 to 232)

Quick v. Frontier Airlines        EDWARD K. QUICK        7/15/2016

### 233

```
16:13:21  1   you request a copy of the short and long disability
16:13:25  2   plan.  Do you disagree or do you agree?
16:13:30  3        A.  No, I -- I agree with that, for sure.
16:13:33  4        Q.  Okay.  Then you stated, "I am ready to
16:13:41  5   return to work with my disability and would like to
16:13:43  6   know what position you have for me," correct?
16:13:46  7        A.  Correct.
16:13:47  8        Q.  Okay.  And you didn't say anything in
16:13:53  9   this email about what that disability might have been,
16:13:55 10   correct?
16:13:55 11        A.  Correct.
16:14:14 12        Q.  On February 6, page 1046 of Exhibit 28,
16:14:22 13   you wrote an email to Ms. Zeier saying, Hi Michelle,
16:14:25 14   Thanks for taking my pass information from yesterday
16:14:29 15   with my change from my Dad to Oliver Bever as a
16:14:33 16   Companion."
16:14:34 17        Do you see that?
16:14:34 18        A.  I do.
16:14:35 19        Q.  Did you speak with Ms. Zeier on the
16:14:36 20   telephone?
16:14:37 21        A.  I thought it was in person.
16:14:39 22        Q.  You spoke with her in person?
16:14:40 23        A.  I believe so.  "Thanks for" -- oh, well,
16:14:53 24   I don't know, maybe it was on the phone.
16:14:56 25        Q.  And you -- do you remember one way or the
```

### 234

```
16:14:58  1   other?
16:14:58  2        A.  I don't.
16:14:59  3        Q.  Okay.  But did you apparently have a
16:15:01  4   conversation with Ms. Zeier about your travel
16:15:05  5   benefits?
16:15:06  6        A.  I did.
16:15:07  7        Q.  And she fixed that for you?
16:15:09  8        A.  She did.
16:15:10  9        Q.  Okay.  And you still were asking for
16:15:15 10   assistance with your ID and the seniority date listed
16:15:19 11   on there?
16:15:20 12        A.  I -- that's correct.
16:15:21 13        Q.  Okay.  The last paragraph of your email
16:15:30 14   says, "I don't consider myself returned to work until
16:15:34 15   I get paid and I've missed the past two pay periods if
16:15:37 16   my return date was January 5?  Do we need to move it
16:15:40 17   forward?"
16:15:41 18        Do you see that?
16:15:42 19        A.  Yes.
16:15:44 20        Q.  Had Ms. Zeier and you spoken about
16:15:46 21   January 5 being the date that you were -- that you had
16:15:51 22   been actively reemployed?
16:15:53 23        A.  Well, that's what I thought she was going
16:15:55 24   to let me do; but, you know, I don't consider not
16:15:58 25   being paid being reemployed.  Usually a paycheck comes
```

### 235

```
16:16:04  1   with reemployment.
16:16:08  2        Q.  When you said, "Do we need to move it
16:16:11  3   forward," meaning you were asking whether or not the
16:16:14  4   date for your reemployment should be moved up to a
16:16:17  5   future date?
16:16:25  6        A.  Yeah.  I was asking the question when am
16:16:27  7   I going to be reemployed?  I'm not being paid, so -- I
16:16:31  8   mean, I think any person in their right mind would
16:16:34  9   consider they are reemployed when they are being paid.
16:16:41 10   Isn't that what employment is?  Employment?  You get a
16:16:45 11   paycheck.
16:16:46 12        Q.  A paycheck usually implies that you are
16:16:50 13   in a position and working, correct?
16:16:52 14        A.  Correct.
16:16:55 15        Q.  So without that prerequisite, there's no
16:17:00 16   usual way that you would get paid, right?  I mean,
16:17:03 17   it's not consistent with the concept of employment to
16:17:06 18   be paid when you're not doing a job, right?
16:17:10 19        A.  Well, it's, you know, Frontier's
16:17:13 20   obligation to give me a job.
16:17:16 21        Q.  Okay.
16:17:17 22        A.  Whatever that would be.  Whatever they
16:17:19 23   decided they wanted to try and give me the tryout.
16:17:22 24   Gee, here, hand out towels here, Mr. Quick.  We think
16:17:26 25   that's all you're capable of.  But something,
```

### 236

```
16:17:31  1   anything.
16:17:31  2        Q.  Well, this is a discussion we've already
16:17:33  3   had, right?  I mean, what, were they supposed to guess
16:17:34  4   at what might be appropriate without knowing what you
16:17:37  5   could do and not do?
16:17:38  6        A.  I believe the obligation falls upon
16:17:41  7   Frontier to reemploy me and find a reasonable job due
16:17:46  8   to my disabilities that I have.
16:17:48  9        Q.  And you have no obligation to make any
16:17:50 10   information available at all about what those
16:17:52 11   disabilities are?
16:17:55 12        A.  I would have been more than accommodating
16:17:57 13   had Frontier worked with me, called me in, got me on
16:18:01 14   the payroll, worked with me to say, Hey, gee, let's --
16:18:04 15   you know, let's see what jobs that we feel you're
16:18:08 16   qualified for here.
16:18:09 17        But I shouldn't have to go into my -- you
16:18:13 18   know, hand over my medical records, say, Here, take
16:18:15 19   this, and you decide what I can do.  That's
16:18:18 20   ridiculous.
16:18:19 21        Q.  Until you got paid, you weren't going to
16:18:21 22   say anything about what your issues were in terms of
16:18:23 23   disability?
16:18:24 24        A.  Until I was reemployed, that's correct.
16:18:29 25        Q.  There's an email on page 1052 of
```

59 (Pages 233 to 236)

---

237

Exhibit 28 where Ms. Zeier wrote to you on February 9.

A. Oh, yeah, I remember those.

Q. It refers to you having stopped by the general office last Thursday on February 5. Do you see that?

A. Yes.

Q. And then she goes on to provide a brief summary of where things stand. The first two paragraphs have to do with your lack of an FAA medical certificate and your inability to work as a first officer or a captain because of that. And that's not controversial, right?

A. No.

Q. Okay. And then the second -- the next paragraph says -- the next paragraph refers to your inability to become reemployed as a pilot in either the left-hand or right-hand seat, but states that "If you believe you could qualify for reemployment as a First Officer or upgrade to Captain with reasonable efforts by Frontier (and notwithstanding your inability to hold an FAA Medical), please notify us."

Do you see that?

A. Yes.

Q. But you never notified them of anything along those lines, correct?

---

238

A. I have not.

Q. It says, "Currently, you have indicated no interest in becoming reemployed into a different position at Frontier (i.e., other than First Officer or Captain). Frontier has provisional reemployed you with First Officer with all of your accrued seniority. You are currently eligible to participate and use your employee benefits. However," because you don't have an FAA medical certificate, "you are currently unable to work, and thus unable to receive First Officer's pay."

Do you see that?

A. Yes.

Q. So with respect to your seniority accruing all through your time on military leave, that was something that had been restored to you, correct?

A. What was restored to me?

Q. Your seniority.

A. Previously you're talking about?

Q. I mean, in respect to your status in February 2015, your seniority in terms of the date on your badge and the date that the company had for you being first employed --

A. Oh, yes.

Q. -- that was all as it should be, correct?

---

239

A. No, not really. It -- it -- it -- on my ID card, it says -- has my correct date, but on -- in the system on the computer system, it doesn't have the correct seniority reflection.

So I'll give you an example. If I go up and I'm traveling and somebody with higher seniority than me but has a date of hire below me, because it isn't effected on the date-of-hire date, then they travel before me.

So in that regard, they would be traveling ahead of me when my seniority is ahead of them. And that's never been corrected.

Q. Okay. And is the date the correct date in 2001, or is it a date that -- sometime in advance of that?

A. So for travel purposes, my seniority should be 2002, which would have been the hire date. But I believe it's -- March of 2002 is the corrected -- or the advanced seniority.

When, in fact, it really wasn't advanced. It should have always really been there to begin with. That was the purpose for asking for it.

Q. And what's the date it actually shows instead of that date?

A. It shows 2004.

---

240

Q. Okay. Have you made any effort to fix that issue?

A. Yes. I've asked repeatedly to, you know, have it corrected. And that's the one issue outstanding, so I've asked --

Q. Who did you ask?

A. Well, I've asked the -- I guess it's the lady who is in charge of travel. I can't think of her name right offhand. And, of course, that's what I was mentioning to Michelle in this email that my -- my ID and my travel benefits were not, you know, correct.

Q. So further down in this email, there's the discussion about the indication that you had made about long-term disability. And Ms. Zeier says, "I've told you a number of times, if you want to apply, you've got to complete the paperwork and submit it. And it's ultimately up to the carrier to decide."

Do you see that?

A. Correct.

Q. Then turn the page over to 1053. And she writes, "If you don't wish to apply for LTD, but want to return to work to Frontier in a capacity other than as a pilot, you may also pursue open positions for which you are qualified, or for which you could become qualified through reasonable efforts by Frontier.

---

**Quick v. Frontier Airlines**     **EDWARD K. QUICK**     **7/15/2016**

---

241

```
16:24:39   1   Because the position of pilot in the airline industry
16:24:41   2   is unique, there are no jobs that are closely
16:24:45   3   comparable.  Without more information from you about
16:24:47   4   your interests and abilities, it is impossible for us
16:24:50   5   to know what open positions you are either interested
16:24:53   6   in or qualified -- with reasonable training -- to
16:24:55   7   hold.  If you are sincere about pursuing other
16:25:00   8   positions, please go to flyfrontier.com/careers and
16:25:04   9   review if there are openings that you would like to
16:25:07  10   discuss.  We're available to discuss open
16:25:10  11   positions with you; please let me know if you would
16:25:12  12   like to do that."
16:25:14  13           Do you see that?
16:25:15  14       A.  I do.
16:25:16  15       Q.  Okay.  Did you ever go to the website and
16:25:19  16   look at positions and then get back to Ms. Zeier about
16:25:22  17   ones you felt were appropriate?
16:25:23  18       A.  I have no duty or obligation under USERRA
16:25:26  19   to do that.  It's Frontier's duty and obligation to
16:25:29  20   find a job for me.
16:25:31  21       Q.  Well, the answer is, no, you never did
16:25:33  22   that, right?
16:25:34  23       A.  No, I never -- not up to that point, no.
16:25:36  24       Q.  "Without more information from you about
16:25:41  25   your interests and abilities, it's impossible for us
```

---

242

```
16:25:44   1   to know what open positions you're either interested
16:25:46   2   in or qualified -- with reasonable training -- to
16:25:49   3   hold."
16:25:50   4           That is a true statement, correct?
16:25:51   5       A.  It is not.
16:25:52   6       Q.  Why not?
16:25:53   7       A.  Well, they weren't reasonable in rehiring
16:25:56   8   me in any way, shape, or form.  If I'm brought back on
16:25:59   9   the property, and I'm getting paid, and they bring you
16:26:02  10   in and say, Okay, we're all done with your
16:26:04  11   orientation.  Now let's try to decide what kind of
16:26:07  12   position.  You know, it's a -- it's a two-way street.
16:26:12  13   And in the meantime, I'm being paid while I'm -- while
16:26:14  14   they are trying to accommodate me and accommodate any
16:26:17  15   disability I may have.
16:26:18  16           But in the meantime, I'm being paid, and
16:26:20  17   I'm doing something.  I mean, surely there's a job
16:26:23  18   there that they could assign me like they have for
16:26:26  19   other people who have come up with medical issues.
16:26:28  20   And they have accommodated many other pilots there.
16:26:31  21       Q.  The ones --
16:26:31  22       A.  They accommodated retirees there --
16:26:33  23       Q.  The ones that they --
16:26:34  24       A.  -- but they won't accommodate me.
16:26:36  25       Q.  The ones that they have accommodated have
```

---

243

```
16:26:38   1   shared the information about their disabilities, have
16:26:40   2   they not?
16:26:41   3       A.  Well, they were working at the time.  I
16:26:42   4   wasn't.
16:26:44   5       Q.  Right.
16:26:44   6       A.  Whether they did or not, I'm privy to
16:26:46   7   that.
16:26:47   8       Q.  Exactly.  So whether they did something
16:26:49   9   for other people that you claim was not done for you,
16:26:51  10   the fact is you don't know whether or not the
16:26:54  11   situations are the same because Frontier would have
16:26:56  12   had information about their capabilities, but didn't
16:26:58  13   have information about yours.  So that's the
16:27:01  14   difference, right?
16:27:03  15           MR. WHITCOMB:  I'm sorry.  How would he
16:27:04  16   know that?
16:27:07  17           MR. DABNEY:  Do you have an objection?
16:27:08  18           MR. WHITCOMB:  Objection.  Sorry.  Yeah,
16:27:09  19   it's lack of foundation.  Sorry.
16:27:12  20           MR. DABNEY:  Can you repeat the question?
16:27:34  21           (The last question was read back as
16:27:34  22   follows:  "So whether they did something for other
16:27:34  23   people that you claim was not done for you, the fact
16:27:34  24   is you don't know whether or not the situations are
16:27:34  25   the same because Frontier would have had information
```

---

244

```
16:27:34   1   about their capabilities, but didn't have information
16:27:34   2   about yours.  So that's the difference, right?")
16:27:35   3       A.  No, I wouldn't know one way or the other.
16:27:48   4       Q.  (BY MR. DABNEY)  And if you -- if your
16:27:56   5   sole criterion for sharing information about your
16:27:58   6   disability was that you should be on the payroll
16:28:02   7   first, as you testified, why wouldn't you just decide,
16:28:09   8   Hey, it appears that in order to get on the payroll, I
16:28:13   9   need to have a job?  In order to be assigned to a job,
16:28:15  10   I need to share my capabilities and lack thereof.
16:28:20  11           And so just go ahead and say, Here's my
16:28:26  12   issue in general terms.  Here's the jobs that I think
16:28:29  13   I might be qualified for with or without
16:28:31  14   accommodation, and then see what happened.  Why were
16:28:33  15   you unwilling to do that?
16:28:37  16       A.  It wasn't that I was unwilling to help
16:28:39  17   and assist.  What I was waiting for was to be
16:28:42  18   reemployed, fully reemployed.  That has never taken
16:28:47  19   place.
16:28:49  20           Once I am reemployed and an employee of
16:28:51  21   the company, Frontier, and being paid and on their
16:28:54  22   payroll, if they want to ask me about the capabilities
16:28:58  23   of my job or look for something, then that's
16:29:00  24   reasonable part -- on the part of the employer.  And I
16:29:03  25   would have been reasonable to work with them as I had
```

---

scheduling@huntergeist.com     **HUNTER + GEIST, INC.**     303-832-5966/800-525-8490

Quick v. Frontier Airlines                    EDWARD K. QUICK                                    7/15/2016

---

**245**

up until to that point waiting weeks, months, now
years to get reemployed. So I think I've been
extremely reasonable --

Q.   The fact is that at that point in time,
you were taking advantage of your full complement of
company benefits, correct? Travel benefits,
vision/dental benefits, without any kind of issue or
problem, correct?

A.   Well, there were issues and there were
problems. And we -- I brought them up during that --
during the period because I didn't get -- if
supposedly I was reemployed and I go to use -- they
say, Well, you're reemployed. Okay. So I go to see
if my eyes -- my vision medical portion, which is what
I had been signed up for, was available to me, it
wasn't. And so I had to go back. So -- you know, and
nobody turned on everything. And when they do that,
it's supposed to come with a paycheck.

Q.   Well, when they -- when you made an issue
out of the fact that your -- your benefits weren't yet
turned on, that was remedied, correct?

A.   They corrected it after the fact, yes.

Q.   They corrected it, and that was something
that you were taking advantage of? I mean, the same
goes for your travel benefits. I mean, you said a

---

**246**

hundred times here today that you were never
reemployed, yet you're flying around the country on
Frontier for free. Do you think they would do that
for people who are not reemployed?

A.   Well, that brings up a good point.
That's a very good, logical point.

On the employee -- or on the
company-controlled seniority list, Frontier still
shows me as being out on military leave. When I've
cost -- called the union, they said, You're still on a
military leave. When I get ahold of the new union,
ALPA, they say, We show you on military leave. The
seniority list is controlled by the company. And
so --

Q.   What's that got to do with my question?
My question was you were flying around the country for
free on Frontier benefits, right?

A.   Because while I'm on military leave, I
have those benefits. They never changed. So why
would I think any different?

Q.   That -- oh, so that's what the
explanation is that there's some sort of paperwork
that you're privy to that shows you on military leave.

Are you aware that Frontier's UltiPro
system employee roster shows you as an active employee

---

**247**

and with a provisional status of first officer?

A.   What is this hypothetical provisional job
that you're talking about?

Q.   I asked you whether or not you're aware
that Frontier's internal employee organization system
shows you as an active employee with first officer
status?

A.   I show an inconsistency there that's
shown on that website. I have -- I have to agree with
you, yes, it does show me as actively employed. But
if I'm actively employed, where is my paycheck?
What's my job? What is this fictional, provisional
job that I've been given with no pay? It makes no
sense.

It's -- it's -- nobody in the industry
has heard of this provisional job. They allay say, What
is that? I've asked the union that. They said, Well,
we've never heard of that.

Q.   I think what it's intended to be is a
placeholder restoring your benefits, restoring your
seniority, restoring your ability to access the
property. You're restoring every indicator of
employment other than we haven't figured out a job for
you because we don't know what you can do. Doesn't
that make sense as a provisional status given the

---

**248**

circumstances?

A.   No, it doesn't. It doesn't -- it
doesn't, you know, even come close to complying with
the law, USERRA, absolutely not.

Q.   So your basic quarrel with that scenario
is you believe it's not consistent with the law?

A.   Clearly it's not consistent with USERRA,
and you're in violation and willful violation, in my
opinion.

Q.   All right.

A.   I'm not talking about you, I'm talking
about Frontier.

Q.   If you would turn to page 1077 of
Exhibit 28.

A.   Last one? Is it the last page?

Q.   Second-to-last page.

A.   Second-to-last page. Got it.

Q.   There's a paragraph in the middle that
begins, "Your claim that you have not been reemployed
in any position whatsoever since you informed Frontier
of your interest to return to work in September 2014
is also untrue. You have been provisionally
reemployed as a First Officer. You are already
receiving employee benefits -- including travel
benefits -- based on your reemployment. However,

---

scheduling@huntergeist.com                    HUNTER + GEIST, INC.                    303-832-5966/800-525-8490

Quick v. Frontier Airlines                EDWARD K. QUICK                        7/15/2016

249

16:34:33   1   since you've repeatedly told Frontier that you are
16:34:36   2   disabled and unable to fly, you have not performed any
16:34:39   3   actual work as a First Officer, and accordingly have
16:34:42   4   received no wages. We will, however, pay you for the
16:34:46   5   time that you spent in the new hire orientation after
16:34:48   6   your request to return to work as a pilot. We have
16:34:51   7   not reemployed you in any other position because, as
16:34:54   8   discussed below, you have frustrated our efforts to
16:34:56   9   identify an alternative reemployment position."
16:35:02  10       Now, if you'll turn the page, then, to
16:35:17  11   No. 1078, it says, halfway down the first paragraph,
16:35:22  12   "Fourth -- and perhaps most importantly -- you suggest
16:35:25  13   in your February 11, 2015, email that you may now be
16:35:28  14   seriously interested in non-pilot positions. However,
16:35:31  15   other than suggesting you should be reemployed into a
16:35:33  16   position at or around a Captain's rate of pay, you
16:35:37  17   have not previously assisted our efforts to identify
16:35:39  18   any such appropriate reemployment position. Indeed,
16:35:42  19   you have not even identified your claimed disability,
16:35:44  20   which makes it impossible for us to do determine what
16:35:47  21   positions you might be physically capable of
16:35:50  22   performing, with or without a reasonable accommodation
16:35:54  23   and (even apart from the question of qualification).
16:35:58  24       "I have previously asked you for
16:36:00  25   information regarding your disability and leave of

250

16:36:02   1   absence information, yet you have failed to provide
16:36:05   2   it. We are available to discuss open positions with
16:36:07   3   you. Your claim that we have asked you to 'apply' for
16:36:10   4   these, like any other condition, is not true.
16:36:12   5   Instead, positions listed on our website
16:36:15   6   flyfrontier.com/careers are the currently open
16:36:19   7   positions at Frontier (and we can't guarantee how long
16:36:24   8   any posted position will be available and the openings
16:36:27   9   change frequently) and this list provides us a basis
16:36:30  10   on which we may begin a dialogue regarding any
16:36:32  11   non-pilot jobs in which you're interested."
16:36:37  12       When you received this email, did you say
16:36:40  13   to yourself, Okay, let me look at the website, let me
16:36:43  14   see what positions are there that I believe are
16:36:46  15   appropriate, and supply that to Frontier?
16:36:49  16       A. I had no duty or obligation to do so
16:36:51  17   under the law.
16:36:52  18       Q. Well, the answer is you did not do it,
16:36:54  19   correct?
16:36:54  20       A. Correct.
16:36:59  21       Q. When you received this email that says,
16:37:00  22   "I have previously asked you for information regarding
16:37:02  23   your disability and leave of absence information, yet
16:37:04  24   you have failed to provide it," did you decide to
16:37:09  25   yourself, Let me give them some information about

251

16:37:11   1   these issues and see if the discussion about returning
16:37:17   2   to work in a non-pilot goes anywhere?
16:37:21   3       A. No.
16:37:24   4       Q. Okay. If you would turn back a page.
16:37:34   5   The bottom, it says, "As to your long-term disability
16:37:36   6   benefits, I have previously given you a description of
16:37:39   7   available benefits and forms for applying for the
16:37:42   8   same. You have now requested to see the actual plan
16:37:45   9   documents."
16:37:46  10       And if you look at the attachments at the
16:37:49  11   top of the page there, it says, "UNUM Pilot LTD
16:37:54  12   Certificate 2.pdf."
16:37:56  13       So this email attached quite a large
16:37:58  14   document containing the entire LTD plan; isn't that
16:38:02  15   right?
16:38:03  16       A. Well, that's true, yes.
16:38:29  17       Q. This last email that was dated March 6,
16:38:37  18   2015, did you ever respond to it at all?
16:39:10  19       A. I think I responded by filing the
16:39:12  20   lawsuit.
16:39:12  21       Q. That's my understanding, too. Okay.
16:39:16  22       MR. DABNEY: Let's take a break.
16:39:18  23       THE VIDEOGRAPHER: This is the end of
16:39:19  24   Media Unit 4 in the deposition of Edward K. Quick.
16:39:22  25   We're off the record at 4:39 p.m.

252

16:55:40   1       (Recess taken, 4:39 p.m. to 4:55 p.m.)
16:55:49   2       THE VIDEOGRAPHER: This is the beginning
16:55:49   3   of Media Unit 5 in the deposition of Edward K. Quick.
16:55:53   4   We're back on the record at 4:55 p.m.
16:56:09   5       (Deposition Exhibit 29 was marked.)
16:56:21   6       THE COURT REPORTER: 29.
16:56:22   7       THE DEPONENT: 29.
16:56:24   8       Q. (BY MR. DABNEY) Mr. Quick, do you
16:56:25   9   recognize Exhibit 29?
16:56:26  10       A. I do.
16:56:27  11       Q. And what do you recognize it as?
16:56:28  12       A. A pay statement.
16:56:29  13       Q. And that's a pay statement from Frontier
16:56:31  14   to you, correct?
16:56:32  15       A. Correct.
16:56:33  16       Q. And it's got a pay period of March 1 to
16:56:36  17   March 15, 2015. Do you see that?
16:56:39  18       A. Yes.
16:56:40  19       Q. Down under Earnings, it says, "Regular
16:56:44  20   Pay, 3.5 hours." And the total of $312 in wages or
16:56:59  21   salary-type pay plus a parking pass and a long-term
16:57:02  22   disability impeded income as part of compensation to
16:57:10  23   you for that pay period. Do you see that?
16:57:13  24       A. Yes.
16:57:13  25       Q. Is it your understanding that that was

63 (Pages 249 to 252)

253

part of you being paid for attending the orientation?

A.  Yeah.  I believe in March, I was paid for my orientation in January, I guess, after the fact, three months after the fact.

Q.  Okay.  And you have received this -- you received this compensation through the normal channels?

A.  Direct deposit.

Q.  Okay.  Part of your -- part of the discussion today we have had is a period where you had -- made inquiries about your direct -- direct contribution retirement plan and your 401(k) retirement plan.  You made inquiries of Frontier about that during the reemployment discussions?

A.  Yes.

Q.  And it's true that a deposit was made to retroactively catch you up for those retirement contributions for the period of time you were on military leave?

A.  Frontier did make a direct contribution to the DC plan.  I've never seen the numbers as to what I'm allowed to contribute to the 401 plan.  And since I've never been -- other than, say, this small amount here -- paid, then, obviously, I can't do my catch-ups in the 401 plan.  And I also still have

254

never been given the -- the solid numbers for what that would be based upon Frontier's calculations for the seven years that I was gone on military service.

Q.  Okay.  So as far as the direct contribution plan, you received a catch-up contribution in 2015.  And do you have any disagreement with that amount?

A.  Well, yes, that would be, obviously, on -- you gave me -- you gave me the lower rate of pay, which is as first officer, versus the higher rate of pay as captain, you know, at least captain's salary because that's the salary I was at when I left.

Q.  Any other disagreement about the amount that was contributed to your DC plan as a catch-up for your military leave time?

A.  It was close.  And so, you know, I'm not going to argue -- argue about the closeness if it's -- if it's decided that I was supposed to be at first officer pay versus captain's pay.  So I'm not going to argue about the small difference there.

It's what our expert came up with.  It was very close, very similar.  Except you paid me at the first officer pay versus captain, Frontier did.

Q.  Do you know how much the difference is if you do it one way versus the other?

255

A.  You mean for captain?

Q.  What your expert says the delta is.

A.  Yeah, I don't have it in front of me; so I would be guessing, but I can make a stab at it, if you want.

Q.  If you don't know, that's fine.

A.  I don't know right off.  We would have to figure what it would be.  Just look at the report.

Q.  And as far as your 401(k) plan, during the time you were on military leave, you would not be making contributions, correct?

A.  Correct.  You have to make them up upon return.

Q.  So in terms of any damages that you're claiming with respect to the 401(k) plan, it stems from the idea that you would have been making contributions yourself and getting matching contributions once you began earning money in a position in Frontier, which you contend should have been some time ago?

A.  Once I was reemployed, correct.

Q.  Okay.  Any other damage allegations or complaints that you have regarding the 401(k) situation?

A.  No.  It's -- it's all very clear in the

256

expert's -- in our expert's report as to what the amount should be and, you know, the reasonableness between the -- what's decided upon is -- I'm not going to argue about, you know, small amounts of money, whether it's in my favor or not.

Q.  Well, what I just described as the scenario for what you should be paid in your view as far as your 401(k), that's accurate?

A.  Yes.  I haven't been able to contribute because I haven't received any pay, that is correct, or make catch-up contributions.

MR. DABNEY:  I'm missing --

THE DEPONENT:  It's in there somewhere.

MR. DABNEY:  I think it was.  I trust the assistant who made one error in copying all day.  I'll give her a pass on that.

THE COURT REPORTER:  30.

(Deposition Exhibit 30 was marked.)

Q.  (BY MR. DABNEY)  Do you recognize what we've marked as Exhibit 30, Mr. Quick?

A.  I do.

Q.  And what do you recognize it as?

A.  These are job descriptions that come from online at Frontier.

Q.  Okay.  I'll represent to you that these

Quick v. Frontier Airlines        EDWARD K. QUICK        7/15/2016

257

```
17:04:25   1   job descriptions from the web -- from the Frontier's
17:04:30   2   career website were produced by you and your counsel
17:04:34   3   in this litigation. Do you see where it says Quick
17:04:36   4   0000647 at the bottom left?
17:04:45   5       A. Yes, you're correct.
17:04:46   6       Q. So these are documents that you produced.
17:04:49   7   I look at the very top on the right-hand side, there's
17:04:51   8   a date, July 7, 2015, 2:28 p.m. Do you see that?
17:04:56   9       A. Yes.
17:04:56  10       Q. And all of the job descriptions in this
17:04:58  11   exhibit, they all bear dates either in July, 2015, a
17:05:09  12   few in October 2015 as far as when they were
17:05:16  13   apparently downloaded and printed. Do you see that?
17:05:19  14       A. Yes.
17:05:21  15       Q. Where did these come from?
17:05:24  16       A. Frontier website.
17:05:25  17       Q. And who obtained them from that source?
17:05:30  18       A. I did.
17:05:31  19       Q. And you obtained all of these?
17:05:34  20       A. I did.
17:05:34  21       Q. Okay. And you obtained them on the dates
17:05:36  22   that they are shown in the top right corner?
17:05:38  23       A. I believe so, yes.
17:05:39  24       Q. Okay. So if you look at pages Bates No.
17:05:59  25   647 through 655, all of those appear to have been
```

258

```
17:06:10   1   downloaded and printed during the afternoon of July 7,
17:06:14   2   2015, correct?
17:06:15   3       A. Correct.
17:06:18   4       Q. And this was after you had filed your
17:06:20   5   lawsuit, correct?
17:06:21   6       A. Correct.
17:06:22   7       Q. Several months, in fact?
17:06:24   8       A. That's correct.
17:06:24   9       Q. Okay. So you were able to go to the
17:06:29  10   website and obtain job descriptions and produce them
17:06:33  11   to Frontier's lawyers in this lawsuit.
17:06:39  12       Why weren't you able to do the same thing
17:06:44  13   sometime during the months that you were discussing
17:06:47  14   reemployment and provide these same job descriptions
17:06:50  15   to Frontier and say, Hey, these are the ones I'm
17:06:53  16   interested in?
17:06:54  17       A. Because I had already indicated the jobs
17:06:57  18   that I was interested in and felt qualified for, those
17:07:02  19   being as a flight instructor, platform instructor, sim
17:07:07  20   instructor, and then also assistant chief pilot. You
17:07:13  21   know, those were just examples of jobs I felt I could
17:07:16  22   do. But there was no discussion at that time or later
17:07:20  23   as to any abilities I might have to work in those
17:07:26  24   positions one way or the other.
17:07:28  25       Q. So you were -- you knew exactly where to
```

259

```
17:07:29   1   find the job descriptions?
17:07:31   2       A. Oh, sure, yeah. It's on the website.
17:07:33   3   Yeah, but I don't have to apply like the normal
17:07:36   4   person. I'm not applying for a job. I get
17:07:38   5   reemployed, and the obligation is on Frontier to find
17:07:43   6   a position for me. And I can assist in that, but it's
17:07:47   7   -- it's -- the obligation is on Frontier, it's not on
17:07:49   8   me.
17:07:52   9       Q. And when Frontier invited you in the last
17:07:55  10   couple of emails in February and March of 2015 to look
17:07:59  11   at the website and get back to them with some
17:08:05  12   positions, you knew where to go find those job
17:08:09  13   descriptions, but you didn't do it until after you
17:08:11  14   filed a lawsuit; is that accurate?
17:08:13  15       A. No, that -- yes, that is accurate.
17:08:21  16       Q. And these first set that I just
17:08:24  17   mentioned, 647 through 655, the first couple say
17:08:31  18   pricing analyst, publications specialist, supervisor
17:08:39  19   material services, social media intern, maintenance
17:08:48  20   planner, load planning coordinator, dispatcher, ASAP
17:08:58  21   manager, Aviation Safety Action Program Manager.
17:09:08  22   These were not jobs that you had mentioned to Frontier
17:09:11  23   until after you filed your lawsuit, correct?
17:09:15  24       A. Correct, yeah. We gave you copies of all
17:09:18  25   these.
```

260

```
17:09:19   1       Q. Why did you --
17:09:20   2       A. There's some more examples.
17:09:22   3       Q. Why did you pick those jobs?
17:09:23   4       A. Well, after looking at them, I felt, you
17:09:26   5   know, with reasonable accommodations, I could and
17:09:29   6   should be able to do at least one of them.
17:09:31   7       Q. Okay. Was there any particular
17:09:35   8   accommodations that you identified in relation to any
17:09:37   9   particular job?
17:09:38  10       A. I didn't, you know, dwell down that deep
17:09:41  11   in it, no. I just looked and -- I over -- I just, you
17:09:46  12   know, looked on the website and said, Hey, I think I
17:09:48  13   can do that one. And looked at the qualifications,
17:09:50  14   looked at the knowledge, skills, and abilities and
17:09:53  15   felt, you know, that I possibly could be put into one
17:09:56  16   of these positions, you know. Maybe on closer look
17:10:00  17   that that wouldn't be possible, but, you know, in the
17:10:02  18   cursory look, I felt that any one of these would be
17:10:07  19   something worth looking at.
17:10:10  20       Q. Okay. Since that time, have you made any
17:10:13  21   further analysis as to these particular jobs beyond
17:10:16  22   the cursory one you just testified to?
17:10:19  23       A. I -- I have not.
17:10:39  24       Q. There's another set of job descriptions
17:10:42  25   that begins on page 656. Do you see that?
```

Quick v. Frontier Airlines                EDWARD K. QUICK                           7/15/2016

---

261

17:10:50  1        A.  Let me get to it.  656.  Got it.  Quality
17:10:53  2   assurance auditor.
17:10:58  3        Q.  These jobs -- job descriptions, rather,
17:11:01  4   appear to have been obtained from the Frontier website
17:11:03  5   on October 2 of 2015.  Do you see those dates up in
17:11:09  6   the right-hand corner?
17:11:10  7        A.  I do.
17:11:10  8        Q.  Do you know why you went to obtain these
17:11:12  9   additional ones in October of 2015?
17:11:18  10       A.  Just to look to see what else was
17:11:19  11  available, I guess.
17:11:22  12       Q.  Do you know why they were produced in the
17:11:24  13  lawsuit?
17:11:26  14       A.  Just to give you more examples.
17:11:30  15       Q.  Of what?
17:11:31  16       A.  Of possible jobs I felt qualified for.
17:11:49  17       Q.  Take a look at page 662.
17:12:04  18       A.  AOG Buyer.
17:12:07  19       Q.  Yeah.  Do you see that?
17:12:08  20       A.  I do.
17:12:10  21       Q.  Okay.  That's one of the jobs that you
17:12:12  22  felt was possibly one that you would be able to
17:12:15  23  perform?
17:12:17  24       A.  Yes.
17:12:17  25       Q.  Potentially with accommodations or not?

---

262

17:12:21  1        A.  Correct.
17:12:22  2        Q.  If it was one that was offered to you,
17:12:26  3   would you have accepted it?
17:12:33  4        A.  Probably not.
17:12:34  5        Q.  Why not?
17:12:35  6        A.  It's not comparable in pay for what I was
17:12:39  7   supposed to come back at.
17:12:41  8        Q.  Why did you select it as a possible job
17:12:43  9   that you could have performed if it was not one you
17:12:45  10  were going to accept?
17:12:46  11       A.  Well, just to show that there was any
17:12:48  12  job.  You know, you're -- you know, you're saying that
17:12:51  13  there's no job that I can perform at Frontier.  And
17:12:53  14  you've got thousands of employees and hundreds of
17:12:57  15  jobs, and Frontier is saying there's not one position
17:13:00  16  for -- for Mr. Quick.  And that just doesn't make any
17:13:03  17  sense.  It's -- it flies in the face of
17:13:08  18  reasonableness.
17:13:09  19       Q.  Does it make any sense to say, Here's
17:13:11  20  some job I can do; but if you offer them to me, I'm
17:13:14  21  not going to take them?
17:13:16  22       A.  Well, if they were going to give me the
17:13:18  23  comparable pay, then maybe I could.
17:13:21  24       Q.  Well, do you know if any of the jobs that
17:13:23  25  you selected in this entire exhibit had a pay level

---

263

17:13:30  1   that was commensurate with either a captain or a first
17:13:34  2   officer's pay?
17:13:36  3        A.  Well, I don't believe -- I'm pretty sure
17:13:40  4   none of them do.  None of them are even close to a
17:13:46  5   first officer or a captain's pay.  Maybe -- maybe
17:13:50  6   touch up on the first officer on some of them, but
17:13:53  7   probably even less than -- less than that, I'm almost
17:13:58  8   sure.  But it was just to give you an example.  These
17:14:00  9   were --
17:14:01  10       Q.  And, again, an example of what?  Jobs
17:14:04  11  that you could do but that you wouldn't accept if
17:14:06  12  offered?
17:14:06  13       A.  Well, you know, I -- I didn't -- I wasn't
17:14:10  14  offered anything.
17:14:28  15       Q.  I'll look back at page 662.
17:14:58  16           (Deposition Exhibit 31 was marked.)
17:15:23  17       Q.  If you could keep Exhibit 30.  Open to
17:15:25  18  page 662.  And then please have a look at Exhibit 31.
17:15:46  19  Exhibit 31, do you recognize it?
17:15:48  20       A.  I do.
17:15:49  21       Q.  Okay.  That's a letter from Ms. Zeier
17:15:52  22  that was sent to you in care of your attorney,
17:15:54  23  July 31, 2015?
17:15:56  24       A.  Correct.
17:15:58  25       Q.  And in that -- in that letter, Ms. Zeier

---

264

17:16:01  1   expressed the difficulty in trying to figure out what
17:16:04  2   kind of a job to offer you without any information
17:16:07  3   about what your capabilities were.  Nevertheless, the
17:16:14  4   letter offered you the position of AOG Buyer and
17:16:18  5   attached that job description; isn't that right?
17:16:20  6        A.  Yes.
17:16:26  7        Q.  And that AOG Buyer position, Aircraft On
17:16:30  8   Ground Buyer, is the same position that's in
17:16:31  9   Exhibit 30 at page 662, correct?
17:16:35  10       A.  It is, yes.
17:16:37  11       Q.  So you were offered the position in July
17:16:39  12  of AOG Buyer, but you rejected it, correct?
17:16:44  13       A.  That is correct.
17:16:44  14       Q.  And why did you reject it?
17:16:46  15       A.  Because it wasn't even close to the
17:16:47  16  salary I was making when I left.
17:16:49  17       Q.  And then --
17:16:53  18       A.  There are plenty of other positions -- I
17:16:55  19  want to clarify that -- plenty other positions and
17:16:58  20  jobs at Frontier that under USERRA -- you're actually
17:17:03  21  required under USERRA -- if there's another position
17:17:06  22  that I can return to, you take the person in that
17:17:09  23  position out and give them another job or back on the
17:17:13  24  line as a pilot.  As an example, assistant chief
17:17:18  25  pilot.

---

scheduling@huntergeist.com          HUNTER + GEIST, INC.          303-832-5966/800-525-8490

Quick v. Frontier Airlines                    **EDWARD K. QUICK**                  7/15/2016

---

265

So you have assistant chief pilots throughout the system, whether it be Front -- in Denver or otherwise who are paid at least first officer rate and/or captain rate. And that's the same thing if you look at the -- as the one I gave you an example, Dave Welt. If they put me back into the position he had -- remember, I said earlier and testified earlier that he was a first officer and was given a position manager of training. And he was paid at a substantial rate and was working in the training department. And that certainly is something I would have been capable of doing and am capable of doing. And while he was in the training department, he upgraded and got his type rating, and then continued to work, and he got a higher salary during that period.

So they accommodated him for whatever reason. And -- and Frontier is not even trying to be the least bit reasonable in accommodating me.

Q. Do you know why Mr. Welt was in the position that he was in?

A. Because he applied for that position.

Q. Do you know that Mr. Welt had a serious health condition that prevented him from flying, correct?

---

266

A. I don't believe so, no. He's a young man.

Q. Okay. So you don't know what his situation was, correct?

A. No. I'm just -- I'm pointing out that he was a first officer lower in seniority than I was, was not a captain, didn't have his type rating. And I'm sure he had less experience than I am because I'm considerably older than he is. And they put him into that position, so --

Q. Which position?

A. Into the manager of flight training.

Q. Okay. Now, do you know whether Mr. Welt had ever failed a checkride?

A. Well, up until the point that he got the job, I hadn't either at Frontier.

Q. That's what I'm asking, do you know whether he failed a checkride?

A. Oh, I don't know that.

Q. Okay.

A. But that has nothing to do with it.

Q. And do you know what his experience was prior to coming to Frontier?

A. No, I don't.

Q. Okay. For all you know, he was far more

---

267

qualified than you, correct?

A. I don't know that.

Q. Well, you don't know what his qualifications were is my point. All you know is that he was younger, and you assumed you were going to be better at it, but you don't have any actual facts, right?

A. Well, the fact is I feel very qualified for the job.

Q. Aside from feeling you were qualified for the job, you have no idea how you would stack up against Mr. Welt because you don't know his circumstances?

A. I'm just giving you an option there.

Q. Well, yes or no?

A. Yes or no to Mr. Welt?

Q. You don't -- you don't know anything about his background or why he got the position he did?

A. Well, actually, I do.

Q. What do you know?

A. Yeah. So I -- I was told that, you know, he's part of the -- the good ol' boy system that they got out there, just like all of the people in the training department that they have.

---

268

Q. Oh, okay. So you were told, meaning you had hearsay information from who?

A. Chris Spanos.

Q. Okay. Mr. Spanos told you --

A. He worked in the training department.

Q. Mr. Spanos told you that Mr. Welt got the position as director of training because he was part of a good ol' boy network?

A. It's there -- it's the process out there, that's true.

Q. And that's what Mr. Spanos told you?

A. Something to that effect, yes.

Q. Okay. And do you know what his basis for that information was?

A. Because he worked in the training department for years. And he was a senior instructor there at the time. He knew the politics of the place.

Q. Okay. Aside from Mr. Spanos, his opinion about Mr. Welt, and how he came to have that position, do you have any other evidence or information to suggest that you would have been better qualified than him for that position?

A. Well, I'm saying I would be just as qualified or should have been --

Q. Again, how --

---

269

A.  -- or can be.

Q.  How do you know?  Do you know what his background was?

A.  Well, I don't know what his background is.  How would I know that?

Q.  So how would you know that you would be comparable to him in terms of being a candidate for director of training?

A.  Because I have extensive background, both military, corporate, and air background, and working with the FAA and working in training and training pilots my whole career.  So I'm sure I would be just as fine in that position that -- that he had or did.

Q.  And you're sure based on the fact that you know your own experience, but you don't know anything about his, right?

A.  Okay.  So let me go back.  Under the law --

Q.  You don't have to go back.  I'm just asking you whether you know anything about his experience or background.

A.  No.

Q.  Okay.  Now, to go back to my original question, which was when you were offered the position of AOG Buyer on July 31, 2015, you turned it down

270

because you felt the pay was not sufficient to what you were entitled to, correct?

A.  I figured it was a ridiculous offer, yes.

Q.  Okay.  And yet you put that same job description and you produced it to Frontier in this lawsuit as an example of what type of job you could have done, am I right?

A.  Well, yes, it's an example of any job.  I mean, you're saying I can't do any job, but you're not trying to accommodate by the law.  The law says you will try to find the most closest and comparable job to my salary that I was making when I left --

Q.  That you --

A.  -- whether --

Q.  That you could perform with or without accommodation, right?

A.  Correct.

Q.  Except Frontier didn't know what accommodations you needed, so they --

A.  Never asked.

Q.  -- picked a couple of jobs and offered them to you and said, What do you think?  And your response was, No.  But not a counteroffer, not a different job, just, No.  Am I right?

A.  I answered through my attorney.  Upon the

271

advise of my attorney, we gave an answer, whatever that was at the time.

(Deposition Exhibit 32 was marked.)

Q.  Mr. Quick, Exhibit 32 is the response that your attorney sent back to Ms. Zeier in care of me.

A.  Um-hum.

Q.  As I review that letter again, it states that you're not going to accept either the AOG Buyer position or the crew scheduler position that was offered because they are not commensurate with the pay that you felt you were entitled to; is that accurate?

A.  That's what I testified to also, yes.

Q.  Yeah.  And it says, "One approach, in keeping with USERRA, would be to look at my seniority, other non-flying pilots who are lower in seniority, and potentially reemploying and training me to one of those positions.  I am familiar with some of those positions, but before reemployment, it would make little sense discussing then or any training or accommodation (if any) that I might need to work in one of those jobs."

Do you see that?

A.  Yes.

Q.  So there were -- the answer to Frontier's

272

offer of two positions to you in July of 2015 was I am familiar with positions that I think might work and that I think might comply with USERRA, but I'm not going to discuss them with you, and I'm not going to discuss any training or accommodations with you until I'm on the payroll; is that accurate?

A.  That is accurate, yes.

(Deposition Exhibit 33 was marked.)

Q.  Mr. Quick, do you recognize Exhibit 33?

A.  I do.

Q.  Those are your answers to interrogatories and requests for production from Frontier in this case.

A.  They are.

Q.  And that's your signature attesting to their truth and accuracy on page 25?

A.  Yes.

Q.  Okay.  On page 6, there's an interrogatory that says, "Describe all efforts you've made to mitigate the damages identified in response to Interrogatory No. 1 above, including but not limited to each employer with whom you have applied for work and the date of same, the date, terms and compensation of any job offered declined, and the duration of employment for any and all job offers accepted."

68 (Pages 269 to 272)

Quick v. Frontier Airlines                EDWARD K. QUICK                        7/15/2016

---

273

17:28:13   1    And the answer, "Following military" --
17:28:15   2    "Following leaving military duty, Mr. Quick sought
17:28:20   3    reemployment from Frontier from July of 2014 to
17:28:23   4    April 2015 as alleged in the complaint.  Mr. Quick
17:28:26   5    does not recall the other entities with whom he
17:28:28   6    applied for work during that timeframe."
17:28:33   7    Did you apply for work with any other
17:28:37   8    employer during the period July 2014 through
17:28:39   9    April 2015?
17:28:40  10    A.  Multiple, yes.
17:28:42  11    Q.  And what were their names?
17:28:45  12    A.  You know, I contacted all of the ones at
17:28:49  13    the different airlines.  I made phone calls.  I went
17:28:52  14    in person.  Sent resumes.  Nothing.
17:28:56  15    Q.  Do you have any proof of those efforts?
17:28:58  16    A.  I don't.
17:29:00  17    Q.  You didn't keep any of the cover letters
17:29:02  18    and resumes you say you sent?
17:29:04  19    A.  I don't -- I didn't, no.
17:29:06  20    Q.  Do you have a list of the people that you
17:29:09  21    visited?
17:29:09  22    A.  No.
17:29:10  23    Q.  A list of the contacts that you made?
17:29:12  24    A.  No.  I wasn't required to do that, was I?
17:29:18  25    Q.  Well, if you want to prove you made an

---

274

17:29:21   1    effort to mitigate, it would have been a good idea.
17:29:24   2    It sounds like you don't have any such proof.
17:29:28   3    A.  Oh, well --
17:29:36   4    Q.  After April 2015, did you make any other
17:29:40   5    attempts to become employed with any other employer?
17:29:43   6    A.  After what date?
17:29:45   7    Q.  After April 2015.
17:29:48   8    A.  Yes.
17:29:50   9    Q.  Do you remember who else you applied for
17:29:52  10    work at during that time frame?
17:29:58  11    A.  Different companies that I would ask, go
17:30:01  12    around the different airports and ask if there's any
17:30:05  13    positions, any jobs.
17:30:08  14    Q.  Do you recall --
17:30:10  15    A.  Make phone calls.
17:30:10  16    Q.  -- any -- any names of contacts or
17:30:12  17    employers you visited?
17:30:13  18    A.  You know, I don't remember.  I don't
17:30:14  19    recall.  I didn't -- we didn't keep track of it.  You
17:30:16  20    know, if they said, Hey, we -- you know, we have a
17:30:17  21    position, you know, that was open, then -- then I'd
17:30:21  22    follow through on it.  Most everybody is not hiring.
17:30:23  23    You know how bad the economy is.
17:30:26  24    Q.  Actually, at this point, unemployment is
17:30:32  25    scraping the bottom in Colorado.  Is it your testimony

---

275

17:30:36   1    that of all the efforts you say you made, you were not
17:30:39   2    offered any positions?
17:30:40   3    A.  Correct.
17:30:43   4    Q.  Despite all your experience, none of
17:30:45   5    these efforts bore any fruit?
17:30:47   6    A.  That's correct.
17:30:48   7    Q.  Okay.  As you sit here today, can you
17:30:54   8    recall the name of even one of those prospects that
17:31:01   9    you say you contacted?
17:31:02  10    A.  Not off the top of my head, no.  I would
17:31:05  11    have to sit down and think about it.
17:31:07  12    Q.  If you think about it before the end of
17:31:09  13    today, would you let me know?
17:31:11  14    A.  Sure.
17:31:13  15    Q.  And then it says, "In June and July of
17:31:16  16    2015, Mr. Quick made efforts to prepare for, and
17:31:18  17    eventually enrolled as a student at Metropolitan State
17:31:21  18    University in Denver in order to finish his college
17:31:25  19    degree and improve his process of present and future
17:31:31  20    employment."
17:31:32  21    Do you see that?
17:31:35  22    A.  Yes.
17:31:36  23    Q.  Did you enroll at Metro?
17:31:38  24    A.  I went over and applied, yes.
17:31:40  25    Q.  Were you accepted?

---

276

17:31:41   1    A.  I was.
17:31:41   2    Q.  Did you begin any classes?
17:31:43   3    A.  I did not.
17:31:43   4    Q.  Why not?
17:31:45   5    A.  I'm trying to remember what the issue was
17:31:48   6    at that time.  I think it was my father.  He's
17:31:52   7    elderly, he's 98.  And there were some medical issues
17:31:55   8    going on with my dad, so I was taking care of my
17:31:58   9    father.
17:32:00  10    Q.  Is that still the case?
17:32:04  11    A.  I'm still helping my father, yes,
17:32:06  12    absolutely.
17:32:07  13    Q.  Is there any reason why you could not
17:32:10  14    have applied -- excuse me.  Strike that.  Is there any
17:32:13  15    reason why you could not have commenced classes at
17:32:16  16    some time since you first applied?
17:32:19  17    A.  I'm looking at possibly taking them this
17:32:21  18    next semester dependent upon everything that's going
17:32:26  19    on, but, yes.  I've been accepted.  I can start
17:32:29  20    classes.  I researched my options both at the
17:32:34  21    school -- so I've been -- have an acceptance letter
17:32:38  22    there.  I can start anytime I want.  It's just the
17:32:39  23    timing hasn't worked out for me.
17:32:44  24    Q.  So between April 2015 and July 2016, you
17:32:52  25    have not sought to commence any classes at Metro?

---

Quick v. Frontier Airlines     EDWARD K. QUICK     7/15/2016

---

277

17:32:57 1     A. Probably the -- the hardest part there of

17:33:00 2 really trying to start a class is knowing what would

17:33:02 3 be most beneficial for me, for one, and also using my

17:33:07 4 VA veteran's benefits.

17:33:10 5     I did apply to -- through the Veterans

17:33:11 6 Administration for voc rehab. And they said until

17:33:17 7 Frontier had come up and decided which job they are

17:33:19 8 going to offer, they didn't know how to help with voc

17:33:22 9 rehab, which I'm entitled to, which is vocational

17:33:25 10 rehab.

17:33:26 11     So, you know, just to spend my benefits

17:33:31 12 when we don't know what job I'm going into and what

17:33:34 13 assistance that Frontier needed, they are ready,

17:33:37 14 willing, and able to -- to assist me at that point.

17:34:01 15     Q. Well --

17:34:03 16     A. I believe you were given a letter to that

17:34:05 17 effect from the VA.

17:34:06 18     Q. -- my question was between April 2015 and

17:34:09 19 July 2016, you have not commenced any classes at Metro

17:34:12 20 State, correct?

17:34:14 21     A. That is correct.

17:34:14 22     Q. Okay. And one of the reasons is you're

17:34:23 23 not sure which classes you should take?

17:34:24 24     A. That's a reason, yes, sure.

17:34:26 25     Q. Any other reasons besides the issue with

---

278

17:34:28 1 your father?

17:34:30 2     A. Well, as I said, you know, the vocational

17:34:33 3 rehab experts said it would be better to wait to find

17:34:37 4 out what position we decided on at Frontier before I

17:34:42 5 spent any of their money, because I didn't know at the

17:34:46 6 time when I talked to them as to what position I'd be

17:34:50 7 going to and what assistance I would need at that

17:34:52 8 point with Frontier.

17:34:54 9     (Deposition Exhibit 34 was marked.)

17:35:02 10     Q. Exhibit 34 is a letter to you from the

17:35:04 11 Veterans Affairs VA regional office in Lakewood. Do

17:35:08 12 you see that?

17:35:08 13     A. I do.

17:35:09 14     Q. That's the letter you're referring to

17:35:11 15 saying --

17:35:12 16     A. It is.

17:35:12 17     Q. -- that your vocational rehabilitation

17:35:16 18 benefits would not be pursued at this time?

17:35:20 19     A. Correct.

17:35:25 20     Q. The bullet points there in the middle, do

17:35:28 21 you see that?

17:35:28 22     A. Where? Are you talking about right on

17:35:31 23 the first page?

17:35:33 24     Q. Yeah.

17:35:33 25     A. Yes.

---

279

17:35:34 1     Q. The first one says, "Why we stopped

17:35:36 2 action to your claim."

17:35:37 3     A. Um-hum.

17:35:38 4     Q. Do you see that?

17:35:38 5     A. I do.

17:35:38 6     Q. And below the set of bullets is a

17:35:39 7 paragraph that's headed, "Why did we stop action to

17:35:43 8 your claim?"

17:35:44 9     A. Correct.

17:35:44 10     Q. "We stopped action on your claim because

17:35:47 11 you cannot proceed with further evaluation and

17:35:47 12 planning services within a foreseeable time frame."

17:35:50 13     Do you see that?

17:35:51 14     A. Um-hum.

17:35:52 15     Q. Yes.

17:35:53 16     A. I do, yes.

17:35:54 17     Q. It doesn't say anything about waiting for

17:35:56 18 Frontier to make a decision, does it?

17:36:07 19     A. Oh, I'm sorry, it -- you're right, it

17:36:09 20 said, "Thank you for talking with me. I wish a swift

17:36:12 21 response by your employer," my employer being Frontier

17:36:17 22 Airlines, "and that they find a position for you."

17:36:22 23 That would be me.

17:36:23 24     Q. Right. So it sounds to me --

17:36:23 25     A. It says, "As we discussed, since you

---

280

17:36:26 1 cannot proceed with further evaluation and planning

17:36:28 2 with voc rehab, your file will be discontinued at this

17:36:33 3 time," because at that point, I had no offer.

17:36:36 4     Q. Well, it doesn't look to me like VA was

17:36:39 5 saying you had to have an offer before they could help

17:36:42 6 you. What it looks to me like is you were waiting for

17:36:43 7 an offer and, therefore, didn't want to proceed until

17:36:45 8 you got one. Isn't that more accurate?

17:36:49 9     A. So I suppose we're talking semantics at

17:36:51 10 this point.

17:36:52 11     Q. But what I just said is accurate, right?

17:36:55 12     A. Yes.

17:36:55 13     MR. WHITCOMB: Asks for a conclusion of

17:36:56 14 law, objection.

17:36:57 15     Q. (BY MR. DABNEY) I mean, you could have

17:36:58 16 proceeded with your vocational rehabilitation

17:37:00 17 benefits, but you decided not to --

17:37:03 18     A. No.

17:37:03 19     Q. -- as I read this letter.

17:37:05 20     A. Not true. That isn't true. The -- this

17:37:07 21 lady here told me to wait, this Denise -- and I can't

17:37:12 22 pronounce her last name -- Kupcho -- told me to wait

17:37:18 23 until we found out what direction Frontier was going

17:37:21 24 to go in. And I followed her advice.

17:37:25 25     And so I have substantial vocational

---

70 (Pages 277 to 280)

Quick v. Frontier Airlines        EDWARD K. QUICK        7/15/2016

281

| | |
|---|---|
| 17:37:28 | 1 |
| 17:37:32 | 2 |
| 17:37:34 | 3 |
| 17:37:41 | 4 |
| 17:37:48 | 5 |
| 17:37:51 | 6 |
| 17:37:54 | 7 |
| 17:37:55 | 8 |
| 17:37:57 | 9 |
| 17:38:00 | 10 |
| 17:38:05 | 11 |
| 17:38:06 | 12 |
| 17:38:10 | 13 |
| 17:38:11 | 14 |
| 17:38:13 | 15 |
| 17:38:15 | 16 |
| 17:38:16 | 17 |
| 17:38:19 | 18 |
| 17:38:21 | 19 |
| 17:38:24 | 20 |
| 17:38:26 | 21 |
| 17:38:27 | 22 |
| 17:38:29 | 23 |
| 17:38:34 | 24 |
| 17:38:36 | 25 |

rehabilitation through the VA. Being a 100 percent disabled veteran, they will certainly work with me and work with Frontier for any position that was eventually decided upon. If I needed additional training, additional help, whatever that might be, they would work with Frontier. That's what vocational rehab is all about.

Q. So your testimony is that the person at the VA who was dealing with you on your voc rehab benefits told you to wait to pursue them?

A. Correct.

Q. Okay. Where in this letter does it say that?

A. She told me that in our meeting when I met with her face to face.

Q. Okay.

A. And then she sent this letter afterwards.

Q. Which doesn't say anything about what you claim you discussed in the meeting, correct?

A. Not what I just talked about, no.

Q. Okay.

A. I'm testifying as that's what my recall is of the conversation.

Q. Did you want to pursue the benefits, but felt that somehow they weren't going to do it for you?

282

rehabilitation through the VA. Being a 100 percent

A. I would not have applied for them if I didn't feel that I could possibly use them. And, you know, I discussed with her in detail what was going on at Frontier.

And she said, Well, the best thing to do is just to wait. So I followed her advice. And so she closed the case out because you all hadn't put me back to work, had not offered me a job.

Q. And, again, that's -- what you just testified to is nowhere in this letter, correct?

A. Repeat the question, please.

Q. What you just testified to about Frontier not offering you a position and, therefore, somehow that prevented vocational rehabilitation benefits from proceeding on your behalf, that's not here in this letter?

A. It's not in this letter, no.

Q. No. In fact, it says on the second page, if you disagree with our decision not to go forward with the benefits, you have one year from the date of this letter to request an administrative review or file a formal appeal. Did you do any of those things?

A. I did not.

Q. And generally, if you feel you're entitled to benefits, you're not shy about pursuing

283

them, right?

A. I'm not shy.

Q. So you could have proceeded to these, but chose not to?

A. I was waiting for a job offer from Frontier that was reasonable.

Q. That's what I surmised to begin with.

A. Thank you.

Q. When was the most recent occasion where you sought employment with a different employer?

A. It would have been a few months ago.

Q. Can you tell me more about that?

A. What's to tell?

Q. What makes you say that it was a few months ago? Do you recall doing it?

A. I do.

Q. And did you call somebody? Send them an email? What did you do?

A. I did. I did call.

Q. Whom did you call?

A. Well, it was -- I've got to think of my friend's name up there. I can't think of his name right offhand.

Q. And do you know where this person was employed or where this person --

284

A. Yeah, he -- he lives in Seattle. And it was, like, two months ago. And I talked to him about flying jobs that were available. And that was that.

Q. So you called a friend in Seattle to see if he knew about any work?

A. I did. It's called networking.

Q. And did he have any suggestions?

A. No. He said nobody was really hiring.

Q. Did you investigate any websites or employment resources up there to see for yourself?

A. No, I don't recall.

Q. Do you have a current resume?

A. No, probably not current.

Q. Have you done your taxes for the tax year 2015?

A. Yes.

MR. DABNEY: Counsel, would we be able to get a copy of that, since we've got all of the ones up to 2014, but '15 is lacking and was requested?

MR. WHITCOMB: I'm making a note. A copy of W -- 1040s and W2s.

MR. DABNEY: That's something that you're willing to produce?

MR. WHITCOMB: I don't want to speak to whether I'm willing to produce or not. I'm making a

71 (Pages 281 to 284)

Quick v. Frontier Airlines      EDWARD K. QUICK      7/15/2016

---

285

17:44:23  1  note of it.  And let me get back to my office, and

17:44:26  2  I'll let you know.

17:44:28  3  MR. DABNEY:  Okay.

17:44:28  4  MR. WHITCOMB:  Okay?

17:44:28  5  MR. DABNEY:  Those are all my questions

17:44:29  6  at this time.

17:44:30  7  THE DEPONENT:  Thank you.

17:44:31  8  MR. DABNEY:  Thank you, Mr. Quick.

17:44:34  9  THE DEPONENT:  Thank you, Mr. Dabney.

17:44:36  10  THE VIDEOGRAPHER:  This is the end of

17:44:36  11  Media Unit 5 -- oh, sorry.  Did you -- do you have

17:44:39  12  some questions?

17:44:40  13  MR. WHITCOMB:  Yeah --

17:44:40  14  THE VIDEOGRAPHER:  I'm sorry.

17:44:40  15  MR. WHITCOMB:  -- I have some questions.

17:44:45  16  MR. DABNEY:  Do you need to change the

17:44:46  17  tape?

17:44:47  18  THE VIDEOGRAPHER:  No.

17:44:48  19  MR. DABNEY:  Okay.

17:44:48  20  THE VIDEOGRAPHER:  We're still good.

17:44:49  21  MR. WHITCOMB:  I promise to -- I made

17:44:51  22  questions along the way.  I'm going to do these in

17:44:55  23  reverse chronological order, pretty much how they went

17:44:58  24  down the pipe.

17:44:59  25  EXAMINATION

---

286

17:44:59  1  BY MR. WHITCOMB:

17:45:00  2  Q.  So, Mr. Quick, earlier a moment ago you

17:45:02  3  testified about vocational rehabilitation, correct?

17:45:05  4  A.  Yes.

17:45:07  5  Q.  Are you aware on -- are you aware of

17:45:10  6  limitations on the rehabilitation program once it

17:45:14  7  begins?

17:45:15  8  A.  No.

17:45:17  9  Q.  I'll represent to you that the

17:45:18  10  limitations would be 48 months.  Does that sound out

17:45:21  11  of bounds?

17:45:25  12  MR. DABNEY:  Object to the form

17:45:26  13  rehabilitation.

17:45:27  14  Q.  (BY MR. WHITCOMB)  Would it -- I'm sorry.

17:45:28  15  Would it surprise you to find out that rehabilitation

17:45:30  16  time frame is 48 months from when it begins?

17:45:35  17  A.  Yes, they did tell me it was that long.

17:45:38  18  Q.  So beginning -- so beginning vocational

17:45:39  19  rehabilitation prematurely could theoretically burn up

17:45:45  20  your benefits before you got through with the program?

17:45:48  21  A.  That's how she was explaining it to me.

17:45:52  22  Q.  Okay.  There were some questions about

17:45:53  23  mitigating your damages and questions about applying

17:45:57  24  for -- for jobs.  Were you aware of any other airlines

17:46:01  25  besides Frontier that owed you a position upon

---

287

17:46:04  1  returning from military service?

17:46:06  2  MR. DABNEY:  Objection.

17:46:07  3  A.  None.

17:46:08  4  MR. WHITCOMB:  I'm sorry?

17:46:12  5  MR. DABNEY:  Object to form.

17:46:12  6  MR. WHITCOMB:  Oh, thank you.

17:46:14  7  Q.  (BY MR. WHITCOMB)  If you had been -- to

17:46:17  8  your knowledge, if you had been placed with another

17:46:20  9  airlines, would you have maintained your seniority

17:46:22  10  that you had at Frontier?

17:46:23  11  A.  No.

17:46:24  12  Q.  To your knowledge, if you had taken

17:46:25  13  another position with another airline, would your pay

17:46:29  14  have been comparable to the pay you were receiving at

17:46:31  15  Frontier?

17:46:32  16  A.  No.

17:46:35  17  Q.  Mr. Dabney referred to a job that you

17:46:39  18  rejected in July of 2015.  If the same job had been

17:46:44  19  offered to you at the same rate of pay that you had

17:46:47  20  received as a first officer or potentially a captain

17:46:50  21  in July of 2015, assuming all things being equal,

17:46:54  22  would you have taken that position?

17:46:55  23  A.  Yes.

17:46:58  24  Q.  Was the position of -- I'm sorry.  I'm

17:47:00  25  going to -- I didn't -- my exhibits weren't labeled,

---

288

17:47:04  1  so I'm at a little bit of a disadvantage as far as

17:47:09  2  numbers.

17:47:11  3  Mr. Dabney referred earlier to an exhibit

17:47:14  4  where there were a list of jobs that you pulled off

17:47:17  5  the website in July and a list of jobs that you pulled

17:47:20  6  off the website in October.  Do you remember that?

17:47:22  7  A.  Yes.

17:47:23  8  Q.  All right.  Were -- were the jobs of

17:47:25  9  instructor -- was the job of airline instructor or

17:47:28  10  pilot instructor on that list of jobs?

17:47:31  11  A.  I believe so, but it wasn't included in

17:47:33  12  that.  It's in this one right here.

17:47:35  13  Q.  "This one right here" refers to what?

17:47:38  14  A.  This was the one on voc rehab.  On the

17:47:40  15  back of it, it's attached.  So why is it there and

17:47:43  16  not with the other ones, I don't know.

17:47:47  17  Q.  Okay.  But in the July list of jobs --

17:47:52  18  A.  That's July.

17:47:52  19  Q.  -- in 2015 that was there and in the

17:47:56  20  October -- in the October list of jobs that you pulled

17:47:57  21  down, was the job of flight instructor there?

17:47:59  22  A.  Yes.

17:48:00  23  Q.  Okay.  Was it your impression, based on

17:48:05  24  your correspondence with Ms. Zeier -- I hope I'm

17:48:09  25  pronouncing your name correctly -- that the only jobs

---

Quick v. Frontier Airlines                 EDWARD K. QUICK                                7/15/2016

---

289

17:48:14  1   you want to seek out were those that were available at
17:48:18  2   the time at Frontier?
17:48:20  3        A.  No.  What was the question?
17:48:26  4        Q.  Okay.  So I'm going to point your
17:48:29  5   attention back to -- and, again, I'm lost -- it's the
17:48:32  6   email that Mr. Dabney referred to that began -- it was
17:48:36  7   Friday, March 6, 2015.
17:48:38  8        A.  Yes.
17:48:39  9        Q.  Do you have that email available?
17:48:40  10       A.  I don't.  But I can look at yours, if
17:48:42  11  that's all right.  I don't.  They're all over here.
17:48:47  12       Q.  Okay.  Do you remember Ms. Zeier
17:49:05  13  informing you that you should apply for positions that
17:49:09  14  were available --
17:49:10  15       A.  Yes.
17:49:10  16       Q.  -- at Frontier at the time?
17:49:14  17       A.  Yes, I do.  Yes, absolutely.
17:49:16  18       Q.  Is it your impression now that was
17:49:18  19  correctly stating your rights under USERRA?
17:49:22  20            MR. DABNEY:  Objection.  Calls for a
17:49:23  21  legal conclusion.
17:49:27  22       Q.  (BY MR. WHITCOMB)  As your rights have
17:49:28  23  been explained to you by counsel, did you believe at
17:49:30  24  the time that you were eligible for jobs, even those
17:49:34  25  not currently listed on Frontier's website?

---

290

17:49:38  1        A.  Absolutely.
17:49:40  2            MR. DABNEY:  Same objection.
17:49:44  3        Q.  (BY MR. WHITCOMB)  When you presented to
17:49:45  4   Frontier in September of 2014, would you have had any
17:49:51  5   way of knowing all of the jobs that were currently
17:49:54  6   available at Frontier or what accommodations you might
17:49:56  7   have needed?
17:49:57  8        A.  No.
17:50:01  9        Q.  Would you have had access to a catalog of
17:50:02  10  all of the jobs at Frontier and all of their
17:50:04  11  requirements?
17:50:05  12       A.  No.
17:50:07  13       Q.  Are you in any way qualified as a
17:50:09  14  vocational expert?
17:50:11  15       A.  No.
17:50:11  16       Q.  Are you in any way qualified as a
17:50:13  17  rehabilitation expert?
17:50:14  18       A.  No.
17:50:18  19       Q.  Have you required special accommodations
17:50:20  20  in any other job in your -- in your employ?
17:50:24  21       A.  No.
17:50:32  22       Q.  Let me back up.  You just stated you were
17:50:36  23  never offered special accommodations in any other
17:50:39  24  employment, correct?  Would that include the WTU or
17:50:44  25  the transition unit?  Did it --

---

291

17:50:47  1        A.  Well --
17:50:47  2        Q.  -- offer you special accommodations?
17:50:49  3        A.  Well, they did, yes.
17:50:50  4        Q.  Okay.  What kind of special
17:50:51  5   accommodations did they offer you?
17:50:53  6        A.  They offered me a position at my unit in
17:50:56  7   Denver, and I worked for the unit in Denver while
17:50:59  8   being in the WTU with my primary job as -- was to go
17:51:04  9   to all of my medical appointments and then to work at
17:51:09  10  my job at Buckley Air Force Base.
17:51:11  11       Q.  Did they offer you abbreviated hours?
17:51:14  12       A.  They did.
17:51:15  13       Q.  Did they offer you accommodated
17:51:16  14  workplace?
17:51:17  15       A.  They did.
17:51:18  16       Q.  Did they offer you remote working?
17:51:20  17       A.  They did.
17:51:40  18       Q.  There were some questions regarding the
17:51:42  19  disability policy.  Do you recall the first time you
17:51:46  20  actually saw a copy of the policy?
17:51:50  21       A.  It wasn't until after my attorney asked
17:51:52  22  for it and it was sent.  So it's some -- it was quite
17:51:56  23  some time after I had asked for it that it was ever
17:52:00  24  produced to me.  And it was even after I had called
17:52:03  25  the insurance company.

---

292

17:52:04  1        Q.  Were -- are you aware now of any offsets
17:52:09  2   that you would have suffered as a result -- if you had
17:52:12  3   applied for and been awarded?
17:52:14  4        A.  There's a war clause there, so I wouldn't
17:52:17  5   -- I'm not entitled to anything.
17:52:19  6        Q.  Assuming they had awarded you the
17:52:21  7   benefits --
17:52:21  8        A.  Oh, yes.
17:52:22  9        Q.  -- are you aware of any offsets?
17:52:25  10           MR. DABNEY:  Objection.
17:52:25  11       A.  Yes.
17:52:26  12           MR. DABNEY:  Improper.
17:52:28  13           MR. WHITCOMB:  I'm sorry?
17:52:29  14           MR. DABNEY:  Objection, it's an improper
17:52:31  15  hypothetical.
17:52:35  16       Q.  (BY MR. WHITCOMB)  Are you aware that the
17:52:37  17  union policy would have reduced your benefits by the
17:52:40  18  amount of Social Security payment?
17:52:41  19       A.  Yes, I am aware of that.
17:52:43  20       Q.  Are you aware that the union policy would
17:52:44  21  have reduced your benefits by the amount of the VA
17:52:47  22  benefits that you were getting?
17:52:49  23       A.  Yes, I am aware of that.
17:52:50  24       Q.  Are you aware that the union policy would
17:52:50  25  have reduced your benefits by the amount of retirement

---

73 (Pages 289 to 292)

Quick v. Frontier Airlines               EDWARD K. QUICK                              7/15/2016

293

17:52:50  1   pay that you got?
17:52:54  2        A.  Yes.
17:52:55  3        Q.  Are you aware that the union policy would
17:52:56  4   have reduced your benefits by any other type of
17:52:59  5   retirement pay?
17:53:00  6        A.  It would, yes.
17:53:01  7        Q.  You're aware of that?
17:53:02  8        A.  I am aware of that.
17:53:04  9        Q.  You're aware of that now?
17:53:05 10        A.  Yes.
17:53:05 11        Q.  Were you aware of that prior to March 6,
17:53:07 12   2015, when you got a copy of --
17:53:10 13        A.  I was not aware of it.
17:53:11 14        Q.  Were you aware prior to March 6, 2015,
17:53:13 15   that the union policy contained a war clause?
17:53:16 16        A.  I was not aware until then.
17:53:17 17        Q.  Were you aware, before March 6, 2015, the
17:53:20 18   implications of a war clause?
17:53:22 19        A.  No, I was not aware until afterwards.
17:53:25 20        Q.  So is it fair to say that had you
17:53:31 21   followed Ms. Zeier's guidance and applied for
17:53:36 22   long-term disability that it would have meant a
17:53:40 23   significantly less money -- it would have meant
17:53:44 24   significantly less money than being employed at
17:53:47 25   Frontier?

294

17:53:48  1        MR. DABNEY:  Object to form.  Misstates
17:53:49  2   the record.
17:53:51  3        A.  Yes.
17:53:57  4        Q.  (BY MR. WHITCOMB)  Did you know that at
17:53:57  5   the time that you presented yourself for reemployment
17:54:00  6   in September of 2014?
17:54:02  7        A.  I did not know that.
17:54:02  8        Q.  You did not know that you would -- you
17:54:04  9   would receive less pay if you went on disability as
17:54:06 10   opposed to being employed by --
17:54:09 11        A.  I had no idea.
17:54:10 12        Q.  Okay.  But as to your attempt to mitigate
17:54:21 13   your damages, you did apply for Social Security
17:54:23 14   benefits?
17:54:23 15        A.  I did.
17:54:24 16        Q.  You did apply for VA benefits?
17:54:27 17        A.  I did.
17:54:28 18        Q.  You did reapply for VA benefits?
17:54:30 19        A.  I did.
17:54:31 20        Q.  You -- you applied for an increase in VA
17:54:34 21   benefits?
17:54:35 22        A.  I did.
17:54:35 23        Q.  All in an attempt to make yourself as
17:54:38 24   close to whole as possible?
17:54:39 25        A.  Yes.

295

17:54:40  1        MR. DABNEY:  Objection.  That misstates
17:54:41  2   the record.
17:54:45  3        MR. WHITCOMB:  I'm sorry.  What part?
17:54:47  4   Well, I --
17:54:48  5        MR. DABNEY:  Would you like to know?
17:54:49  6        MR. WHITCOMB:  Yes, I would like to know
17:54:51  7   what part misstates the record.
17:54:54  8        MR. DABNEY:  You characterized Social
17:54:55  9   Security as an effort for mitigation for his failure
17:54:58 10   to be rehired at Frontier, when actually he applied
17:55:01 11   for Social Security in 2013 before he ever even
17:55:05 12   re-approached Frontier for reemployment.  So I don't
17:55:09 13   know how he could be mitigating his damages a full
17:55:12 14   year before his claim even arose.
17:55:15 15        MR. WHITCOMB:  Okay.  We'll get to that.
17:55:16 16        Q.  (BY MR. WHITCOMB)  You testified earlier
17:55:17 17   as to a trial work period.
17:55:19 18        A.  Yes.
17:55:19 19        Q.  Are you familiar with what Social
17:55:19 20   Security means as regarding the trial work period?
17:55:25 21        A.  I do.
17:55:25 22        Q.  So you testified earlier that it's nine
17:55:27 23   months of eligibility to continue working and drawing
17:55:29 24   Social Security benefits?
17:55:30 25        A.  I testified to that.  That's as I was

296

17:55:32  1   told by the Social Security Administration.
17:55:34  2        Q.  You were also represented by -- for your
17:55:36  3   Social Security claim, correct?
17:55:37  4        A.  By counsel, yes.
17:55:39  5        Q.  So your attorney may have actually told
17:55:40  6   you what your benefits were under --
17:55:43  7        A.  That's true, too.
17:55:44  8        Q.  Okay.  So -- and you also spoke about an
17:55:48  9   extended period of eligibility after your nine-month
17:55:51 10   trial work period.
17:55:52 11        A.  Correct.  That it goes beyond that.
17:55:54 12        Q.  So even if you had been employed by
17:55:56 13   Frontier and began drawing a paycheck and lost
17:56:00 14   your benefits from Social Security from a payment
17:56:00 15   perspective --
17:56:01 16        A.  Correct.
17:56:02 17        Q.  -- if you were unable to continue working
17:56:05 18   thereafter, you would have been able to be reinstated
17:56:07 19   on Social Security.  Is that your understanding?
17:56:10 20        A.  That's my understanding.
17:56:10 21        Q.  Of your rights then?
17:56:12 22        A.  Yes.
17:56:12 23        Q.  Okay.  All right.  And you also testified
17:56:14 24   earlier that you applied for Social Security benefits
17:56:17 25   while on the Warrior Transition Unit, correct?

74 (Pages 293 to 296)

Quick v. Frontier Airlines                    EDWARD K. QUICK                                7/15/2016

297

17:56:23  1      A.  I did.
17:56:23  2      Q.  And that was under instruction of the
17:56:24  3  commander of the Warrior Transition Unit?
17:56:27  4      A.  Yes.  It was under -- it's a program that
17:56:28  5  they have for all Wounded Warriors, and they encourage
17:56:31  6  all of us to apply for our Social Security benefits.
17:56:32  7      Q.  That's an important point.  The first
17:56:32  8  time you applied for Social Security benefits, were
17:56:34  9  you awarded?
17:56:35  10     A.  No.
17:56:38  11     Q.  The -- when you raised it upon appeal,
17:56:40  12  were you awarded Social Security benefits?  The first
17:56:43  13  time you had a hearing, did that result in an award of
17:56:46  14  benefits?
17:56:46  15     A.  No.
17:56:47  16     Q.  In fact, the record demonstrates that
17:56:53  17  your initial appeal was dismissed, correct?
17:56:57  18     A.  Correct, I believe so.
17:56:59  19     Q.  Judge Maddigan dismissed your appeal?
17:57:01  20     A.  Oh, yes.
17:57:02  21     Q.  Right?
17:57:02  22     A.  Yes.
17:57:02  23     Q.  And that's when you visited our office?
17:57:07  24     A.  Well, it was on appeal at that point, and
17:57:09  25  that's when I came to your office.

298

17:57:11  1      Q.  And we were able to get your Social
17:57:13  2  Security case re-opened?
17:57:14  3      A.  That's correct.
17:57:15  4      Q.  And that resulted in the hearing before
17:57:17  5  Mr. -- before ALJ Lawritson, correct?
17:57:20  6      A.  That's correct.
17:57:21  7      Q.  All right.  So the first time you applied
17:57:24  8  for benefits, you were denied?
17:57:26  9      A.  Yes.
17:57:26  10     Q.  On appeal, you were denied?
17:57:29  11     A.  It was remanded.
17:57:30  12     Q.  Well, actually, you were -- I'm sorry.
17:57:32  13  The ALJ Maddigan, did he dismiss your claim?
17:57:36  14     A.  He did.
17:57:36  15     Q.  All right.  You appealed to the appeals
17:57:38  16  council?
17:57:39  17     A.  I did.
17:57:40  18     Q.  They remanded?
17:57:41  19     A.  They remanded, yes.
17:57:42  20     Q.  Went down to ALJ Lawritson again for a
17:57:45  21  second look?
17:57:46  22     A.  That's correct.
17:57:47  23     Q.  So finally 18 months after your
17:57:49  24  application for benefits, you were finally awarded
17:57:51  25  benefits.

299

17:57:52  1      Did you have any assurance before
17:57:53  2  October 1 of 2014, when you got the notice of award
17:57:58  3  from Judge Lawritson that you were definitely going to
17:58:01  4  get Social Security benefits?
17:58:04  5      A.  I had no idea that I would get them.
17:58:06  6      Q.  How about before the VA awarded you
17:58:08  7  benefits the most recent time?  I think a month ago
17:58:12  8  when you were raised to 100 percent, were you aware
17:58:15  9  before those two months ago that you were going to get
17:58:17  10  100 percent service disability?
17:58:20  11     A.  Not until they give it to you.
17:58:22  12     Q.  Right.  When you sat with a vocational
17:58:26  13  expert, a vocational rehabilitation expert at the VA,
17:58:29  14  did she outline for you your exact monetary damages of
17:58:32  15  the vocational rehab program?
17:58:35  16     A.  Yes.
17:58:35  17     Q.  What did you expect to receive from that
17:58:36  18  program?
17:58:37  19     A.  Substantial.
17:58:38  20     Q.  Do you remember exactly what it was?
17:58:40  21     A.  Well, I'm qualified for the -- the new GI
17:58:44  22  bill benefit, so they would pay for my housing at E5
17:58:51  23  rate.  And they would pay for all of my expenses in
17:58:54  24  relation to college and everything else.  Everything
17:58:56  25  was paid --

300

17:58:57  1      Q.  What --
17:58:57  2      A.  -- 100 percent.
17:58:58  3      Q.  What about if Frontier had engaged you in
17:59:01  4  a training program, would Frontier have received money
17:59:03  5  pursuant to your conversation with the voc rehab?
17:59:07  6      A.  They would.  They would assist, yes.
17:59:10  7      Q.  All right.  So these efforts were in an
17:59:12  8  attempt to get you back to reemployment?
17:59:13  9      A.  That's correct.
17:59:14  10     Q.  Okay.  Is it fair to say that your
17:59:18  11  relationship with Frontier before you left for active
17:59:21  12  duty in 2007 was adversarial?
17:59:26  13     A.  Yes, that's correct.
17:59:34  14     Q.  Did you have reason to believe -- or I'm
17:59:37  15  sorry.  Let me rephrase.  Strike that.  At any -- when
17:59:44  16  you approached Ms. Zeier in September of 2014, did she
17:59:48  17  at any time ask you for your medical records?
17:59:50  18     A.  No.
17:59:51  19     Q.  Did she at any time request or did
17:59:54  20  Frontier or any representative of Frontier request
17:59:57  21  that you be seen by one of their psychiatrists for --
18:00:01  22  or psychologist for an assessment of your abilities?
18:00:05  23     A.  No.
18:00:05  24     Q.  Did they request a physical examination
18:00:06  25  -- did they request that you go to a physical

75 (Pages 297 to 300)

Quick v. Frontier Airlines                    EDWARD K. QUICK                              7/15/2016

---

### 301

18:00:09   1   examination?
18:00:10   2       A.  No.
18:00:11   3       Q.  Did they request that you go out for
18:00:14   4   another flight physical?
18:00:15   5       A.  No.
18:00:17   6       Q.  When you presented to Frontier, you
18:00:19   7   expressed it -- you expressed in several emails and in
18:00:22   8   your testimony today that it was your belief at the
18:00:24   9   time that you were permanently grounded because of
18:00:27  10   your mild TBI?
18:00:29  11       A.  Correct.
18:00:30  12       Q.  Had you researched the law on that point?
18:00:34  13       A.  I have.
18:00:35  14       Q.  Had you then at that time?
18:00:36  15       A.  Oh.  Not then, no.
18:00:37  16       Q.  All right.  Are you aware now as to how
18:00:41  17   long would have been grounded mandatorily as -- as
18:00:44  18   a result of a mild TBI?
18:00:46  19       A.  Yes.
18:00:46  20       Q.  How long would that period have been?
18:00:48  21       A.  Six months.
18:00:49  22          MR. DABNEY:  Objection, calls for a legal
18:00:50  23   conclusion.
18:00:58  24       Q.  (BY MR. WHITCOMB)  Who makes
18:00:58  25   recommendations for how long someone is to be grounded

---

### 302

18:01:00   1   when they have a -- any kind of injury?
18:01:05   2          MR. DABNEY:  Lacks foundation.
18:01:09   3       Q.  (BY MR. WHITCOMB)  Do you know who makes
18:01:11   4   recommendations or who -- who sets policy for how long
18:01:14   5   a pilot is grounded if they experience limitations?
18:01:18   6       A.  The FAA.
18:01:20   7       Q.  Any particular individual within the FAA
18:01:22   8   that you're aware of?
18:01:23   9       A.  Well, the aeromedical folks make
18:01:27  10   recommendations.
18:01:28  11       Q.  Are you aware of the recommendations for
18:01:30  12   grounding a pilot if they suffer a mild TBI?
18:01:34  13       A.  I do.  It's six months.
18:01:36  14       Q.  Okay.  Does the FAA go to the trouble of
18:01:43  15   defining a mild TBI?
18:01:47  16       A.  They do.
18:01:49  17       Q.  Do you know or can you recall how the FAA
18:01:54  18   describes a mild TBI juxtaposed to other types of TBI?
18:01:59  19       A.  Well, it -- if you don't have, like, a
18:02:06  20   seizure within a, you know, that period, then you're
18:02:12  21   supposed to be able to recover after a six-month
18:02:14  22   period.  And there's a listing of a number of items.
18:02:17  23   One of them is like a seizure.  And I'm not sure what
18:02:22  24   the other ones are.  I can't recall.
18:02:24  25       Q.  What about loss of consciousness?

---

### 303

18:02:26   1       A.  Oh, yeah, well, loss of consciousness for
18:02:30   2   sure.
18:02:30   3       Q.  Did any of your head injuries result in a
18:02:33   4   loss of consciousness?
18:02:34   5       A.  No.
18:02:35   6       Q.  Did you ever experience a seizure?
18:02:36   7       A.  No.
18:02:39   8       Q.  So as you understand it now, would there
18:02:43   9   have been anything to have permanently precluded your
18:02:46  10   ability to fly?
18:02:46  11       A.  No.
18:02:48  12       Q.  As a matter of fact, are you licensed to
18:02:49  13   fly now?
18:02:50  14       A.  As a flight instructor, yes.
18:02:52  15       Q.  Okay.  Were you aware of any other pilots
18:02:56  16   who were grounded for any other -- for any period of
18:02:59  17   time, short or long, in your work -- in your career
18:03:04  18   with Frontier?
18:03:05  19       A.  I'm sorry?
18:03:05  20       Q.  That was a terrible way of posing that
18:03:07  21   question.  Were any of your fellow pilots, while you
18:03:12  22   worked at Frontier -- to your knowledge, were they
18:03:14  23   ever medically grounded for any period of time?
18:03:16  24       A.  Yes.
18:03:16  25       Q.  Did you witness what those other pilots

---

### 304

18:03:19   1   were allowed to do for short-term --
18:03:22   2       A.  Yes.
18:03:22   3       Q.  -- grounding?  Can you give me some
18:03:25   4   examples?
18:03:25   5       A.  Well, one of my instructors, he was
18:03:27   6   having some very serious medical issues, and he was
18:03:31   7   one of the instructors there for me.
18:03:35   8       Q.  And he was allowed to instruct?
18:03:38   9       A.  Yes.
18:03:38  10       Q.  You testified earlier that sometimes
18:03:41  11   retired pilots were allowed to instruct.
18:03:43  12       A.  Oh, absolutely, yes.  A number of them
18:03:44  13   still work for the company.
18:03:46  14       Q.  Were they, for other reasons, precluded
18:03:49  15   from flying passenger planes?
18:03:51  16          MR. DABNEY:  Objection, lacks foundation.
18:03:53  17       Q.  (BY MR. WHITCOMB)  Are you aware if they
18:03:55  18   were precluded for any other reasons from flying
18:03:59  19   passenger planes?
18:04:00  20       A.  Well, they can't fly at that point
18:04:03  21   because they're over the age limit.
18:04:05  22       Q.  So you're aware of an age limit for
18:04:05  23   flying?
18:04:07  24       A.  65.
18:04:08  25       Q.  So are you aware of retired pilots over

---

76 (Pages 301 to 304)

Quick v. Frontier Airlines      EDWARD K. QUICK      7/15/2016

---

305

18:04:11  1    the age of 65 that were teaching at Frontier?
18:04:14  2         A.  Yes.
18:04:14  3         Q.  Were they being paid at captain or first
18:04:16  4    officer pay to your knowledge?
18:04:18  5         MR. DABNEY:  Again, lacks foundation.
18:04:20  6         Q.  (BY MR. WHITCOMB)  Do you know how much
18:04:21  7    they were paid?
18:04:22  8         A.  No, I do not.
18:04:23  9         Q.  Okay.  I'll skip it.  You testified
18:04:29  10   earlier that your relationship with Frontier was
18:04:32  11   adversarial before you left for military duty,
18:04:34  12   correct?
18:04:35  13        A.  Yes.
18:04:37  14        Q.  Did that cause you a sense of distrust
18:04:39  15   with Frontier?
18:04:40  16        A.  Absolutely.
18:04:40  17        Q.  Did you have any personal reasons to
18:04:42  18   believe that if you had surrendered your medical
18:04:44  19   records to Frontier upon your return, they would have
18:04:48  20   acted in good faith?
18:04:50  21        A.  I didn't believe so, no.
18:04:54  22        Q.  You testified earlier and the record
18:04:58  23   demonstrates that you were in counseling with -- and
18:05:01  24   I'm going to say her name wrong -- Cynthia -- Cynthia
18:05:03  25   -- you had a personal counselor here in Denver?

---

306

18:05:06  1         A.  In Denver, yeah, Wendy.
18:05:09  2         Q.  Wendy?
18:05:10  3         A.  Dr. Clyne.
18:05:11  4         Q.  Did you discuss personal issues with
18:05:13  5    Wendy?
18:05:13  6         A.  I did.
18:05:15  7         Q.  Did you discuss feelings of inadequacy
18:05:17  8    upon returning from service?
18:05:19  9         A.  Absolutely.
18:05:20  10        Q.  Did you express feelings of isolation?
18:05:25  11        A.  Yes.
18:05:28  12        Q.  Did you express -- did you describe
18:05:31  13   episodes that were embarrassing to you?
18:05:34  14        A.  Yes.
18:05:35  15        Q.  Things that you would have only expressed
18:05:37  16   to your psychologist?  I can't hear you.  I'm sorry.
18:05:44  17        A.  Yes.
18:05:45  18        Q.  Is it possible that for those reasons,
18:05:49  19   you were hesitant to surrender your medical records to
18:05:53  20   Frontier?
18:05:54  21        A.  Absolutely.
18:06:06  22        Q.  And you testified earlier that you did
18:06:07  23   not have a good faith belief that if you would have
18:06:11  24   given those records that they would have used them as
18:06:15  25   a mechanism for reemployment?

---

307

18:06:17  1         A.  That is correct.
18:06:17  2         Q.  And that is based on your experience with
18:06:20  3    them in 2007 before leaving?
18:06:21  4         A.  Very negative experience, yes.
18:06:25  5         MR. WHITCOMB:  Okay.  I don't have any
18:06:27  6    further questions right now.
18:06:30  7              EXAMINATION
18:06:30  8    BY MR. DABNEY:
18:06:32  9         Q.  So you believe that Frontier had a motive
18:06:39  10   to obtain your medical records that was not related to
18:06:43  11   any issues in the lawsuit, but was instead somehow
18:06:50  12   designed to embarrass you?
18:06:52  13        A.  Absolutely.
18:06:54  14        Q.  And what do you base that on?
18:06:56  15        A.  Distrust, mistrust.
18:07:00  16        Q.  Your feelings of distrust or mistrust; is
18:07:02  17   that right?
18:07:02  18        A.  Were founded in my opinion.
18:07:04  19        Q.  Yeah.  What's it founded on?
18:07:07  20        A.  Previous experience with everything I've
18:07:10  21   gone through in my employment with Frontier.  It's not
18:07:13  22   been positive.
18:07:15  23        Q.  Things like when you failed your training
18:07:17  24   exercises, blamed that on Frontier, that type of
18:07:21  25   thing?

---

308

18:07:22  1         A.  Yes, I blame it on -- on the process.  I
18:07:26  2    sure do.
18:07:28  3         Q.  Anything in particular that would
18:07:29  4    actually indicate with any specificity that someone at
18:07:34  5    Frontier meant to harm you or embarrass you?
18:07:44  6         A.  The whole process has been embarrassing,
18:07:46  7    and it certainly has harmed me.  It's harmed me and my
18:07:50  8    -- my position, for sure, and my standing amongst the
18:07:54  9    pilot group.
18:07:56  10        Q.  What process are you referring to?
18:07:57  11        A.  Oh, the process of not informing the
18:07:59  12   pilot group that I was entitled to my seniority
18:08:02  13   benefits, it had nothing to do with being advanced
18:08:06  14   seniority benefits where other pilots felt like they
18:08:10  15   were -- I got something that -- you know, it was a
18:08:13  16   gray area.  And, oh, by the way, I used the system in
18:08:17  17   order to get my benefits, which is totally ridiculous.
18:08:21  18   It's the law.
18:08:22  19        Q.  So people -- people had that opinion
18:08:24  20   about you, is that what you're saying?
18:08:25  21        A.  Oh, absolutely.  I was called the
18:08:27  22   aggrieved pilot --
18:08:27  23        Q.  So you blame Frontier for not going out
18:08:30  24   and trying to fix people's opinions of you for what
18:08:34  25   you chose to do?

---

77 (Pages 305 to 308)

---

309

18:08:35  1         A.  I warned Frontier at the beginning that
18:08:37  2    they needed to put out a letter --
18:08:38  3         Q.  You blame Frontier for --
18:08:41  4         A.  -- and to accept responsibility --
18:08:41  5         Q.  People feel the way they feel, and you
18:08:43  6    blame Frontier for not fixing it, correct?
18:08:45  7         A.  Well, correct, yes.
18:08:46  8         Q.  And that's the issue -- that's the basis
18:08:48  9    for you saying that somehow the discovery issue with
18:08:53  10   your medical records was meant as a gratuitous effort
18:08:58  11   to embarrass you?
18:09:02  12        A.  I found it outrageous, literally
18:09:06  13   outrageous that I had to produce my medical records
18:09:09  14   for this lawsuit.
18:09:10  15        Q.  I know you --
18:09:10  16        A.  And it's not required.  I don't -- you
18:09:11  17   don't show up to a job and produce your medical
18:09:14  18   records to get a job.  So why would I do it for
18:09:17  19   reemployment?  It's one thing to ask.  It's another to
18:09:21  20   go and get all of my personal and private information.
18:09:24  21   I find it -- because I'm disabled?  I find it
18:09:28  22   outrageous.
18:09:29  23        Q.  Okay.
18:09:29  24        A.  I'm just saying.
18:09:30  25        Q.  I'm asking you for any proof at all that

---

310

18:09:34  1    Frontier's motive in doing so was unrelated to
18:09:36  2    litigation and did not have a good-faith basis in the
18:09:39  3    litigation, but, instead, was a gratuitous effort to
18:09:44  4    embarrass you.
18:09:46  5         All you've pointed to is your general
18:09:49  6    view that Frontier doesn't like you.  Do you have any
18:09:50  7    other actual, specific evidence?
18:09:52  8         MR. WHITCOMB:  Objection, misstates the
18:09:53  9    record.
18:09:57  10        A.  No.
18:10:00  11        Q.  (BY MR. DABNEY)  Do I hear correctly that
18:10:11  12   at some point since last December 2015, your
18:10:20  13   disability rating from the physical evaluation board
18:10:23  14   has increased from 70 to 100 percent disabled?
18:10:29  15        MR. WHITCOMB:  Objection.
18:10:29  16        A.  No.
18:10:30  17        MR. WHITCOMB:  Misstates the record.
18:10:32  18        Q.  (BY MR. DABNEY)  There were several
18:10:33  19   references, one when I was examining you and one when
18:10:36  20   Mr. Whitcomb was examining you, to a disability rating
18:10:40  21   of some kind that amounts now to 100 percent --
18:10:44  22        A.  Oh.
18:10:45  23        Q.  -- incurred here in the last month or
18:10:47  24   two.  Is that accurate?
18:10:48  25        A.  That is correct.  That's my VA rating.

---

311

18:10:53  1         Q.  Can you explain what happened and what
18:10:54  2    that is?
18:10:54  3         A.  So they went back upon asking for an
18:10:59  4    increase in my rating because I was at 90 percent with
18:11:02  5    the VA.  And since I went through what we call the IDS
18:11:08  6    process and the Wounded Warrior program, once I
18:11:11  7    finished my appeals with the Army -- and the last one
18:11:15  8    being in December.  I even notified Frontier I was
18:11:17  9    going to that.  And I traveled to Fort Lewis,
18:11:20  10   Washington, that hearing that was brought out in this
18:11:27  11   deposition.  And they said that there was an error in
18:11:31  12   the original one, which came out at 50 percent.  And
18:11:35  13   it was increased to an overall 70 percent rating from
18:11:39  14   the Army medical board based upon that new evidence
18:11:43  15   and new finding.
18:11:46  16         Then we go back to the VA.  And because
18:11:49  17   they are supposed to work together on their ratings,
18:11:52  18   you can't do one without the other, and the VA had to
18:11:56  19   take a second look at the TBI rating because I asked
18:11:59  20   for an increase.  They said that there was -- they
18:12:03  21   also made an error.  And they increased my rating to
18:12:06  22   100 percent.  So Army 70, VA is 100.
18:12:12  23        Q.  Okay.  So with respect to --
18:12:14  24        A.  Disability.
18:12:15  25        Q.  -- veteran's benefits that you're

---

312

18:12:17  1    entitled to from the VA, those include disability
18:12:21  2    payments?
18:12:22  3         A.  Correct.
18:12:23  4         Q.  Okay.  And your rating in respect to the
18:12:26  5    severity of your disability according to the VA and
18:12:30  6    their benefits scheme is 100 percent?
18:12:32  7         A.  That is correct.
18:12:33  8         Q.  Do you know what particular disabilities
18:12:35  9    that 100 percent is based on?
18:12:37  10        A.  Oh, sure.  Based upon my disabilities
18:12:41  11   that they found me disabled for.  And the big ones
18:12:44  12   would be my PTSD, my TBI related -- related to
18:12:53  13   headaches, as they called it.  And -- well, there's
18:13:01  14   others; but they all add up to 100 percent.  I can't
18:13:05  15   remember the -- the particular ones.
18:13:08  16        Q.  Okay.
18:13:09  17        A.  Those are the big ones.
18:13:11  18        Q.  So as it stands, you receive now
18:13:16  19   disability benefit payments from the VA, and you
18:13:21  20   receive disability retirement benefits from the Army?
18:13:27  21        A.  Correct.
18:13:28  22        Q.  And you receive Social Security
18:13:32  23   Disability benefits from the Social Security
18:13:35  24   Administration, correct?
18:13:37  25        A.  Correct.

Quick v. Frontier Airlines | EDWARD K. QUICK | 7/15/2016

---

313

```
18:13:43   1        Q.   The effort to determine that there had
18:13:45   2   been an error in your VA rating should actually be
18:13:48   3   100 percent, was that something that you appealed or
18:13:51   4   started, or was that something they notified you
18:13:56   5   they discovered in error?
18:13:58   6        A.   So the Army said it was in error, and
18:13:59   7   they notified the VA saying it's an error.  In order
18:14:03   8   for the process to work at the VA, I had to ask for an
18:14:07   9   increase.  They do that in a short period of time, 90
18:14:11  10   days.  After asking for the increase, they looked at
18:14:14  11   it.  And they said, yes, this -- there was an error.
18:14:18  12   You should have always been at the 100 percent based
18:14:20  13   upon the Army board rating.
18:14:28  14        Q.   Clear as mud, but thank you.  At any
18:14:35  15   point since you applied for reemployment -- or strike
18:14:42  16   that.  Since you notified Frontier of your desire for
18:14:45  17   reemployment in September 2014, have you sought to get
18:14:49  18   your FAA medical certification renewed or reinstated?
18:14:54  19        A.   I have not.
18:15:06  20        Q.   What's the reason for that?
18:15:09  21        A.   Only recently did I find out that I was
18:15:12  22   able to possibly go back and get a medical back.  I
18:15:17  23   had no knowledge that I was even entitled to it based
18:15:21  24   upon my military --
18:15:25  25        Q.   As you sit here --
```

314

```
18:15:26   1        A.   -- flight doctors.
18:15:27   2        Q.   As you sit here today, do you intend to
18:15:30   3   go and try and get it renewed?
18:15:34   4        A.   Why not?
18:15:35   5        Q.   I don't know.  I'm asking you.  Do you
18:15:36   6   intend to do it?
18:15:38   7        A.   Sure.  Why not?
18:15:39   8        Q.   Okay.  Do you have any specific plan?
18:15:41   9        A.   Not as we speak, no.
18:15:49  10        Q.   Mr. Whitcomb asked you whether Frontier
18:15:52  11   had sought to have you examined by a physician or
18:15:56  12   psychiatrist or psychologist during the time that you
18:16:00  13   were discussing reemployment with Frontier.  Do you
18:16:02  14   recall that testimony?
18:16:03  15        A.   Yes.
18:16:06  16        Q.   If Frontier had asked you to go and see
18:16:10  17   any particular medical doctor or mental health
18:16:15  18   provider, all other things being equal, would you have
18:16:21  19   consented and gone?
18:16:22  20        MR. WHITCOMB:  Objection as to form.
18:16:25  21        A.   Oh, I don't know whether I would have or
18:16:27  22   wouldn't have.  It was never offered.
18:16:31  23        Q.   (BY MR. DABNEY)  Well, you were pretty
18:16:32  24   reluctant to share any information at all about your
18:16:34  25   disability without being, as you put it, reemployed.
```

315

```
18:16:38   1   So it stands to reason that you wouldn't have gone to
18:16:42   2   see any practitioner that Frontier would have wanted
18:16:45   3   you to go see either, correct?
18:16:48   4        MR. WHITCOMB:  Objection to form.
18:16:50   5        THE DEPONENT:  So I still answer?
18:16:52   6        MR. WHITCOMB:  Yes.
18:16:52   7        A.   So I think that once upon reemploying, I
18:16:56   8   believe that any employer is allowed, if they have an
18:16:59   9   employee, to be referred to a doctor.
18:17:02  10        Now, whatever that process is at the time
18:17:04  11   and whatever protection I might have from the union, I
18:17:07  12   would certainly follow.  So I mean, I can't say as to
18:17:14  13   I would have or wouldn't have until offered, but was
18:17:17  14   never asked.
18:17:18  15        Q.   (BY MR. DABNEY)  You testified in
18:17:22  16   response to Mr. Whitcomb's questions that if you had
18:17:29  17   gone to take a job with another airline at any point
18:17:34  18   after September 2014 that your pay would have been
18:17:38  19   less than the pay that you thought you were entitled
18:17:42  20   to at Frontier, is that right?
18:17:44  21        A.   Correct.
18:17:45  22        Q.   Have you done any survey of what the
18:17:46  23   other airlines would be paying compared to what you
18:17:49  24   would have been working for Frontier if you had been
18:17:53  25   able to be paid as a pilot or first officer?
```

316

```
18:17:56   1        A.   Oh, yeah.  I get a magazine with all of
18:17:58   2   the breakdown of all of the different starting
18:18:01   3   salaries at other airlines.
18:18:03   4        Q.   And what are those?
18:18:04   5        A.   They vary anywhere from -- depend -- you
18:18:07   6   know, I'm talking about basically the major airlines,
18:18:10   7   anywhere from probably, on the low side, the low 30s
18:18:13   8   to 50,000.
18:18:15   9        Q.   Your testimony is that starting pay for a
18:18:18  10   pilot at a major airline is $30,000?
18:18:23  11        A.   I believe some of them, yes.  Probably
18:18:25  12   Frontier.  I don't know.  You guys don't pay much.
18:18:29  13        Q.   Well, my question is do you know what the
18:18:31  14   starting pay is at United Airlines?
18:18:36  15        A.   I don't know today without referring to
18:18:38  16   my magazine, but I have certainly reviewed the
18:18:40  17   magazine that I get.  And in it, it's -- every year,
18:18:43  18   it has the job description of the different pilots,
18:18:48  19   corporate pilots, all that.  And it says how much
18:18:51  20   managers make, how much the pilots make, chief pilot,
18:18:54  21   all that.  I get it once a year.
18:18:56  22        Q.   Okay.
18:18:57  23        A.   So I can't remember off the top of my
18:18:59  24   head what exactly the numbers were, but they weren't
18:19:03  25   -- weren't a lot.
```

scheduling@huntergeist.com | HUNTER + GEIST, INC. | 303-832-5966/800-525-8490

Quick v. Frontier Airlines                    EDWARD K. QUICK                              7/15/2016

---

317

18:19:04  1     Q.  So as you sit here today, can you tell me
18:19:07  2  how much the starting pay would be at any major
18:19:09  3  airline for a first officer or captain?
18:19:15  4     A.  Any particular airline?
18:19:17  5     Q.  Any major airline.
18:19:18  6     A.  Well, I -- you know, I recall
18:19:20  7  30-some-thousand range as a reasonable starting for a
18:19:24  8  first officer.
18:19:26  9     Q.  For a major airline like United or
18:19:29  10  American?
18:19:29  11     A.  What's that?
18:19:30  12     Q.  Like United or American or Southwest,
18:19:32  13  you're saying they pay 30,000 to start?
18:19:35  14     A.  As far as I remember, yeah.  You know,
18:19:37  15  it's not all of them.  At least one.  It varies.  The
18:19:40  16  salary ranges vary.
18:19:49  17     Q.  Do you know what the difference in pay
18:19:51  18  would be between a new first officer at Southwest and
18:19:59  19  what the first officer pay for you would have been at
18:20:03  20  Frontier?
18:20:07  21     A.  Considerably less than what I make at --
18:20:09  22  at Frontier.
18:20:10  23     Q.  Do you know the specific numbers?
18:20:11  24     A.  I don't.  I know approximate what I make
18:20:15  25  or should make.

---

318

18:20:16  1     Q.  But do you know how much Southwest would
18:20:19  2  pay a new employee?
18:20:20  3     A.  Well, it's anywhere in those numbers.  I
18:20:22  4  believe it's --
18:20:24  5     Q.  I don't want to know what you believe or
18:20:29  6  surmise or estimate.  I want to know if you know.
18:20:32  7     A.  How about, no, I would have to refer to
18:20:34  8  the magazine to give you an exact number.
18:20:36  9     Q.  But you believe it's low?
18:20:37  10     A.  Oh, yes, definitely low.
18:20:39  11     Q.  You believe it's in the $30,000 range?
18:20:41  12     A.  At least one of them that I recall.  Are
18:20:49  13  you saying that they start at my salary after ten
18:20:52  14  years at Frontier, as -- even at the first officer
18:20:55  15  rate?  Is that your question?
18:20:57  16     Q.  I'm just trying to find out if you know
18:20:59  17  what the difference in pay would be, since you
18:21:01  18  testified earlier that you believe it would be
18:21:04  19  significantly lower.  I want to know what your basis
18:21:06  20  for that is.  And as best I can tell, it's because you
18:21:09  21  read a magazine once a year, but you don't know what
18:21:12  22  the actual numbers are in the magazine.  Is that
18:21:13  23  right?
18:21:14  24     A.  We can look -- we can look at our own
18:21:15  25  salary at Frontier.  You can tell me what my starting

---

319

18:21:18  1  salary is now.  I mean, I'm not a, you know, starting
18:21:20  2  pilot at Frontier.  So I know it's something less than
18:21:23  3  my current rate that you claim as a first officer is
18:21:27  4  $92 an hour.
18:21:30  5        So, you know, starting salary at Frontier
18:21:31  6  is, what, 30-some an hour.  But I don't know the exact
18:21:37  7  number.  But I know it's considerably less because I'm
18:21:39  8  at the top of the scale, not the bottom.
18:21:42  9     Q.  Okay.
18:21:42  10     A.  I think that's a reasonable calculation.
18:21:49  11     Q.  You testified earlier that if you had --
18:22:00  12  well, strike that.  At any time after September 2014,
18:22:22  13  did you go to any additional counselors or additional
18:22:26  14  mental health providers other than Ms. Clyne?
18:22:31  15     A.  After 2014?
18:22:33  16     Q.  Yes.
18:22:35  17     A.  The only ones I could remember would be
18:22:36  18  the VA people.
18:22:38  19     Q.  Were the VA people for purposes of
18:22:41  20  therapy, or were they for purposes of your various
18:22:44  21  claims for benefits?
18:22:46  22     A.  Well, they were only there for the
18:22:47  23  claims.
18:22:48  24     Q.  Okay.
18:22:48  25     A.  For determining claims.

---

320

18:22:50  1     Q.  As far as therapy or actual mental
18:22:52  2  healthcare, Dr. Clyne is the only person you've seen
18:22:55  3  since --
18:22:56  4     A.  Yes.
18:22:56  5     Q.  -- September 2014?
18:22:58  6     A.  Yes.
18:23:01  7     Q.  And you were seeing her prior to then,
18:23:03  8  correct?
18:23:05  9     A.  I started with her while I was in the WTU
18:23:08  10  program, yes.
18:23:09  11     Q.  Okay.  Regardless of what did or didn't
18:23:30  12  happen with your attempts at reemployment with
18:23:33  13  Frontier, you would have -- you would have continued
18:23:37  14  to see Dr. Clyne anyway, right?
18:23:39  15     A.  Yes.  I still go to her.
18:23:46  16     Q.  Mr. Whitcomb asked you some questions
18:23:48  17  about accommodations that you were given or offered
18:23:50  18  for your -- whatever job it was that you were doing
18:23:53  19  with the WTU.  Do you recall that?
18:23:55  20     A.  Yes.
18:23:57  21     Q.  And isn't it true that the Warrior
18:23:58  22  Transition Unit exists to provide accommodations to
18:24:03  23  wounded or disabled soldiers?
18:24:06  24     A.  Absolutely.
18:24:07  25     Q.  Okay.  Frontier Airlines exists for other

---

80 (Pages 317 to 320)

Quick v. Frontier Airlines                    EDWARD K. QUICK                              7/15/2016

---

321

| | | |
|---|---|---|
| 18:24:11 | 1 | purposes, correct? |
| 18:24:13 | 2 | A.  It's an airline. |
| 18:24:15 | 3 | Q.  It's a private enterprise, right? |
| 18:24:17 | 4 | A.  It is. |
| 18:24:19 | 5 | Q.  So it's got nothing in common with the |
| 18:24:21 | 6 | Warrior Transition Unit in terms of whether or not |
| 18:24:25 | 7 | accommodations are part of their efforts at working |
| 18:24:30 | 8 | with their employees, right?  I mean -- |
| 18:24:32 | 9 | MR. WHITCOMB:  Objection as to form. |
| 18:24:33 | 10 | Q.  (BY MR. DABNEY) -- the WTU is |
| 18:24:35 | 11 | 100 percent different from any private company, such |
| 18:24:38 | 12 | as Frontier, in that respect, true? |
| 18:24:43 | 13 | MR. WHITCOMB:  Calls for a legal |
| 18:24:44 | 14 | conclusion. |
| 18:24:45 | 15 | A.  So the Warrior Transition Unit was |
| 18:24:51 | 16 | accommodating to me, and Frontier has not been. |
| 18:24:54 | 17 | Q.  (BY MR. DABNEY)  The WTU exists for |
| 18:24:56 | 18 | purposes of working with individuals who have |
| 18:24:59 | 19 | disabilities, injuries, other physical mental |
| 18:25:03 | 20 | problems, correct? |
| 18:25:04 | 21 | A.  Specifically, yes. |
| 18:25:06 | 22 | MR. DABNEY:  Those are all my questions |
| 18:25:07 | 23 | at this time. |
| 18:25:15 | 24 | MR. WHITCOMB:  Call it a day. |
| 18:25:17 | 25 | THE VIDEOGRAPHER:  This is the end of |

---

322

| | | |
|---|---|---|
| 18:25:20 | 1 | Media Unit 5, and this concludes the deposition of |
| 18:25:23 | 2 | Edward K. Quick.  The total number of media units is |
| 18:25:26 | 3 | five.  Going off the record at 6:25 p.m. |
| | 4 | WHEREUPON, the within proceedings were |
| | 5 | concluded at the approximate hour of 6:25 p.m. on the |
| | 6 | 15th day of July, 2016. |
| | 7 | *   *   *   *   * |
| | 8 | |
| | 9 | |
| | 10 | |
| | 11 | |
| | 12 | |
| | 13 | |
| | 14 | |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

---

323

I, EDWARD K. QUICK, do hereby certify that I have read the above and foregoing deposition and that the same is a true and accurate transcription of my testimony, except for attached amendments, if any.

Amendments attached   (  ) Yes  (  ) No

_____

EDWARD K. QUICK

The signature above of EDWARD K. QUICK was subscribed and sworn to before me in the county of _____, state of _____ , this _____ day of _____, 2016.

_____

Notary Public
My commission expires

Edward K. Quick 7/15/16 (tc)

---

324

REPORTER'S CERTIFICATE

STATE OF COLORADO      )
                       ) ss.
CITY AND COUNTY OF DENVER  )

I, TERESA COOGLE, Registered Professional Reporter, Certified Realtime Reporter, and Notary Public ID 19994013288, State of Colorado, do hereby certify that previous to the commencement of the examination, the said EDWARD K. QUICK was duly sworn by me to testify to the truth in relation to the matters in controversy between the parties hereto; that the said deposition was taken in machine shorthand by me at the time and place aforesaid and was thereafter reduced to typewritten form; that the foregoing is a true transcript of the questions asked, testimony given, and proceedings had.

I further certify that I am not employed by, related to, nor counsel for any of the parties herein, nor otherwise interested in the outcome of this litigation.

IN WITNESS WHEREOF, I have affixed my signature this 18th day of July, 2016.

My commission expires May 24, 2019.

__X__ Reading and Signing was requested.

_____ Reading and Signing was waived.

_____ Reading and Signing was not required.

---

81 (Pages 321 to 324)

EDWARD K. QUICK

324

REPORTER'S CERTIFICATE

STATE OF COLORADO        )
                         ) ss.
CITY AND COUNTY OF DENVER  )

      I, TERESA COOGLE, Registered Professional
Reporter, Certified Realtime Reporter, and Notary
Public ID 19994013288, State of Colorado, do hereby
certify that previous to the commencement of the
examination, the said EDWARD K. QUICK was duly sworn
by me to testify to the truth in relation to the
matters in controversy between the parties hereto;
that the said deposition was taken in machine
shorthand by me at the time and place aforesaid and
was thereafter reduced to typewritten form; that the
foregoing is a true transcript of the questions asked,
testimony given, and proceedings had.

      I further certify that I am not employed by,
related to, nor counsel for any of the parties herein,
nor otherwise interested in the outcome of this
litigation.

      IN WITNESS WHEREOF, I have affixed my
signature this 18th day of July, 2016.

      My commission expires May 24, 2019.


__X__ Reading and Signing was requested.

_____ Reading and Signing was waived.

_____ Reading and Signing was not required.


_____
Teresa Coogle
Certified Realtime Reporter
Registered Professional Reporter