# EXHIBIT 5

# 30 (b)(6) Deposition of :
## Frontier Airlines through Zeier, Thibodeau and Sabia (Videotaped)

### Date: **August 5, 2016**

Edward Quick v. Frontier Airlines and Michele (sic) Zeier

Civil No. 15-cv-00765-REB-KMT



14143 Denver West Parkway, Suite 100 • Golden, Colorado 80401
(303) 202-0210 • contact@milehighreporting.com
www.milehighreporting.com

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 15-cv-00765-REB-KMT

_____

VIDEOTAPED DEPOSITIONS OF 30(b)(6)
FRONTIER AIRLINES DESIGNEES:   MICHELLE ZEIER
                               JOSEPH THIBODEAU
                               ANTHONY SABIA

August 5, 2016

_____

EDWARD K. QUICK,

Plaintiff,

vs.

FRONTIER AIRLINES, INC. and MICHELE (sic) ZEIER,

an individual,


Defendants.

_____


          PURSUANT TO NOTICE, the videotaped

depositions of 30(b)(6) FRONTIER AIRLINES designees,

MICHELLE ZEIER, JOSEPH THIBODEAU, and ANTHONY SABIA,

called for an examination by the Plaintiff herein was

taken at Holland & Hart, LLP, 555 17th Street, Suite 3200,

Denver, Colorado 80202, commencing at 9:45 a.m. on August

5, 2016, before Shauna T. Dietel, a Registered

Professional Reporter and Notary Public within Colorado.

30(b)(6) Deposition of Frontier Airlines through Zeier, Thibodeau and Sabia (Videotaped)
Edward Quick v. Frontier Airlines and Michele (sic) Zeier  -  August 5, 2016

2

```
 1    APPEARANCES:

 2            PETER ROMER-FRIEDMAN, ESQ.
              Washington Lawyers' Committee for
 3            Civil Rights and URBAN AFFAIRS
              11 Dupont Circle, NW
 4            Suite 400
              Washington, DC  20036
 5            202-644-7080
              peter_romerfriedman@washlaw.org
 6            and
              JOSEPH A. WHITCOMB, ESQ.
 7            Whitcomb, Selinsky, McAuliffe, PC
              1391 Speer Boulevard
 8            Suite 705
              Denver, Colorado  80204
 9            303-534-1958
              joe@whitcomblawpc.com
10
                        For the Plaintiff
11

12            WILLIAM R. DABNEY, ESQ.
              Holland & Hart, LLP
13            555 17th Street
              Suite 3200
14            Denver, Colorado  80202
              303-295-8000
15            wrdabney@hollandhart.com

16                      For the Defendants

17

18
              Also Present:  Edward K. Quick
19                           Kathy Myers, Videographer

20

21

22

23

24

25
```

30(b)(6) Deposition of Frontier Airlines through Zeier, Thibodeau and Sabia (Videotaped)
Edward Quick v. Frontier Airlines and Michele (sic) Zeier  -  August 5, 2016

3

1                          I N D E X

2  EXAMINATION OF MICHELLE ZEIER:                    PAGE

3  By Mr. Romer-Friedman                            6, 106

4  By Mr. Dabney                                     104

5

   EXAMINATION OF ANTHONY SABIA:
6
   By Mr. Romer-Friedman                             109
7
   By Mr. Dabney                                      --
8

9
   EXAMINATION OF JOSEPH THIBODEAU:
10
   By Mr. Romer-Friedman                           158, 209
11
   By Mr. Dabney                                     207
12

13
   EXHIBITS: (MICHELLE ZEIER)                       MARKED
14
      49   Employment offer                          15
15
      50   Amended Plaintiff's Notice of Deposition  17
16         Pursuant to rule 30(b)(6)

17    51   Mr. Quick's personnel file                18

18    52   Letter dated June 29, 2007,               27
           Re:  Training Review Board
19
      53   Document used for New-employee orientation 55
20
      54   E-mail from Schwab Payroll Processing to  104
21         Anthony J. Sabia dated Monday August 3, 2015

22

23

24

25

4

| | | EXHIBITS:  (JOSEPH THIBODEAU) | MARKED |
|---|---|---|---|
| 1 | | | |
| 2 | 55 | FAR 121 Subpart Q - Flight time limitations | 160 |
| 3 | | | |
| | 56 | Portion of the Collective Bargaining Agreement | 170 |
| 4 | | | |
| 5 | 57 | E-mail from John Roe to ekquick@yahoo.com dated Monday, June 18, 2007 | 172 |
| 6 | | | |
| | 58 | E-mail from Edward Quick to Jim Colburn and John Roe dated Wednesday June 13, 2007 | 181 |
| 7 | | | |
| 8 | 59 | E-mail from John Roe to Robert C. Dixon and Carl M. Miller dated Thursday, June 14, 2007 | 183 |
| 9 | | | |
| | 60 | Letter from Captain John Roe to Edward Quick dated June 14, 2007 | 184 |
| 10 | | | |
| 11 | | | |
| | | EXHIBITS PREVIOUSLY MARKED | |
| 12 | | | |
| | 7 | Frontier Airlines position description | 63 |
| 13 | | | |
| | 13 | E-mail from Edward K. Quick to Jim Colburn dated Monday, June 18, 2007 with attachment | 175 |
| 14 | | | |
| 15 | 40 | Response to Interrogatory No. 6 to FA | 84 |
| 16 | 45 | E-mail chain Bates labeled FA01487 | 136 |
| 17 | 46 | E-mail from Krista M. Shaff to Anthony J. Sabia dated Friday, March 6, 2015 with attachment | 139 |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

**5**

1              P R O C E E D I N G S
2         (Mr. Quick was not present at the commencement
3     of the deposition.)
4         THE VIDEOGRAPHER:  We are now on the record at
5     9:45 a.m. on August 5th, 2016, with Media Number 1 in the
6     deposition of 30(b)(6) designee Michelle Zeier in the case
7     of Edward K. Quick versus Frontier Airlines, Inc., et al.,
8     to be heard in the U.S. District Court, District of
9     Colorado, Case Number 15-cv-00765-REB-KMT.
10         This deposition is being taken at 555 17th
11     Street, Suite 3200, Denver, Colorado at the request of
12     counsel for plaintiff.
13         The videographer is Kathy Myers.  The court
14     reporter is Shauna Dietel for Mile High Court Reporting &
15     Video.
16         Will counsel please state their appearances
17     beginning with plaintiff's counsel.
18         MR. ROMER-FRIEDMAN:  Peter Romer-Friedman for
19     the plaintiff, Edward Quick.
20         MR. DABNEY:  William Dabney, Holland & Hart for
21     the defendants.
22              MICHELLE ZEIER,
23     having been first duly sworn, was examined and testified
24     as follows:
25     //

**6**

1              EXAMINATION
2     BY MR. ROMER-FRIEDMAN:
3         Q   Good morning, Ms. Zeier.
4         A   Good morning.
5         Q   Thanks for being here today.  I know we had a
6     long individual deposition yesterday, and I appreciate
7     your being here early in the morning.
8          Today you understand that you're here in a
9     different capacity than you were yesterday?
10         A   Yes.
11         Q   Okay.  Do you understand what that different
12     capacity is?
13         A   As a company representative.
14         Q   Okay.  So in this 30(b)(6) deposition, you are
15     testifying on behalf of the company; is that correct?
16         A   Yes.
17         Q   Not in your individual capacity?
18         A   Correct.
19         Q   I'll quickly go over some of the ground rules
20     that we went over yesterday just so that we have it for
21     the record and this transcript.
22          Okay?
23         A   Okay.
24         Q   But other than the fact that you're testifying
25     for the company, the ground rules are the same as

**7**

1     yesterday.
2          Okay?
3         A   Okay.
4         Q   All right.  And that's that if I ask a poorly
5     worded question, feel free to clar -- ask me to clarify.
6         A   Right.
7         Q   Verbal answers as opposed to head nods,
8     correct?
9         A   Correct.
10         Q   If your attorney objects, you can answer unless
11     he specifically advises you not to.
12         A   Understood.
13         Q   We'll take breaks, hopefully more often than
14     yesterday.
15         A   Thanks.
16         Q   Okay.  And please don't hesitate to let me know
17     if you need a break.
18          If you don't feel your answer's complete, you
19     can always come back and clarify.
20         A   Understood.
21         Q   Okay.  You understand you're under oath?
22         A   Yes.
23         Q   And you're testifying on behalf of the company?
24         A   Yes.
25         Q   Okay.  Do you think that you are the best

**8**

1     person to testify on behalf of the company regarding the
2     topics that you've been designated for?
3         A   For the most part.
4         Q   Other than the -- the -- the -- the instances
5     which someone else has been designated; is that right?
6         A   Right.
7         Q   Okay.  So before we proceed, Ms. Zeier,
8     Mr. Dabney and I are going to do a stipulation.
9          Okay?
10         A   Understood.
11         MR. ROMER-FRIEDMAN:  Okay.  So, Mr. Dabney,
12     we've spoke between yesterday evening after the conclusion
13     of Mr. Thibodeau and Ms. Zeier's individual depositions
14     about two -- two matters.
15          One is the stipulation that we plan to do now
16     regarding how to treat the answers that were given
17     yesterday in the individual depositions for the purpose of
18     the 30(b)(6), and to a stipulation regarding the
19     authenticity of business records, nature of the documents
20     that have been produced.
21          Perhaps we can take them in reverse order.  So
22     do we -- I understand that the parties agree and stipulate
23     that all of the documents that have been produced in this
24     litigation to date by the defendants and the plaintiff are
25     business records and are authentic copies of the original

30(b)(6) Deposition of Frontier Airlines through Zeier, Thibodeau and Sabia (Videotaped)
Edward Quick v. Frontier Airlines and Michele (sic) Zeier  -  August 5, 2016

9

1    records; is that correct?
2        MR. DABNEY:  That's correct.  Yes, so
3    stipulated, with the caveat that, you know, we're not
4    making any stipulation to admissibility in evidence of any
5    documents on any other grounds.  We are simply stating
6    that the -- the business records are authentic.  That the
7    business records produced in this litigation by -- by both
8    parties are authentic, and there's no question as to the
9    providence of any of those documents.
10       MR. ROMER-FRIEDMAN:  Okay.  And so, in part, we
11   have done that so that we can get through this 30(b)(6)
12   faster and -- and not have to go through all of the
13   documents, including the documents that are merely
14   correspondence between Frontier Airlines' employees as
15   opposed to correspondence between my client and Frontier
16   Airlines' employees.
17       MR. DABNEY:  So stipulated.
18       MR. ROMER-FRIEDMAN:  Okay.  Now, with respect
19   to the -- the -- yesterday's depositions, we have agreed
20   and so stipulate that to the extent that Mr. Thibodeau or
21   Ms. Zeier yesterday, in their individual capacity,
22   answered questions in an affirmative way, that those
23   answers will be deemed to be the answers of the company
24   for the purposes of this 30(b)(6) deposition under Rule
25   30(b)(6), with the caveat that if Ms. Zeier or

10

1    Mr. Thibodeau stated that they don't know or don't know
2    the information in response to a question, that that will
3    not be deemed to constitute an admission by the company
4    that it does not know that information.
5        Is that right, Mr. Dabney?
6        MR. DABNEY:  That is correct.  Any -- the
7    substance of all the answers given by the witnesses in
8    their individual depositions can be deemed the same as the
9    answers they would have given in a 30(b)(6) capacity.
10       MR. ROMER-FRIEDMAN:  Okay.  And as -- as part
11   of that agreement, I will do my best today to ensure that
12   we try not to re-ask the questions that are -- for which
13   there were substantive answers.
14       We did receive a rough draft about an hour ago
15   of the deposition transcripts from yesterday, and if there
16   is -- you know, if there becomes a dispute over this
17   issue, I think we can look at those.  But we'll -- I'll do
18   my best, based on my recollection of yesterday, about what
19   we got answers that were substantive.
20       Okay.
21       MR. DABNEY:  Fair enough.
22       MR. ROMER-FRIEDMAN:  Okay.  Thank you,
23   Mr. Dabney.
24       MR. DABNEY:  Okay.
25       (Mr. Quick entered the room.)

11

1        Q    (By Mr. Romer-Friedman)  So, Ms. Zeier, how did
2    you prepare for today's 30(b)(6) deposition?
3        A    I met with counsel.
4        Q    When did you meet with your counsel?
5        A    Day before yesterday.
6        Q    Was this the same preparation that you
7    undertook to do your personal individual deposition?
8        A    Yes.
9        Q    So you didn't separately meet with Mr. Dabney
10   or anyone else to prepare for the 30(b)(6)?
11       A    No.
12       Q    Okay.  Did you speak with any other person
13   besides Mr. Dabney prior to that meeting with him about
14   the case or Mr. Quick or anything related to this dispute
15   to prepare for this deposition?
16       A    As I stated yesterday, in preparation for
17   personal with regard to the company, my direct supervisor,
18   Jackie Peter.
19       Q    Did you do that for the purposes of gaining
20   more information about what the company knows?
21       A    Just reviewing the items that were in the
22   company interrogatory.
23       Q    Okay.  So you --
24       Or in the -- what's this called?
25       Q    The deposition notice?

12

1        A    Right.
2        Q    So you reviewed with Ms. Peter the -- the --
3    the topics that are identified in the 30(b)(6) notice?
4        A    Right.  Just to review my own knowledge of
5    those things.
6        Q    Did -- did you -- did you speak with her in --
7    in her capacity as a -- as a legal counsel for Frontier or
8    to learn information about what the company knows so that
9    you can be prepared to -- to describe that information
10   today?
11       A    Legal counsel.
12       Q    Okay.  Did you speak with anyone else besides
13   Ms. Peter to prepare for this deposition?
14       A    No.
15       Q    Okay.  You didn't speak with Mr. Thibodeau or
16   anyone else about the litigation or the issues to prepare
17   yourself to know what -- what you're able to say on behalf
18   of the company?
19       A    As I stated yesterday, in preparation for my
20   personal deposition, I -- I spoke with JP.  There may be
21   some overlap on those items.
22       Q    No one else besides Mr. Dabney, Ms. Peter, or
23   Mr. Thibodeau?
24       A    Not that I can recall.
25       Q    Okay.  And you didn't look at any other

30(b)(6) Deposition of Frontier Airlines through Zeier, Thibodeau and Sabia (Videotaped)
Edward Quick v. Frontier Airlines and Michele (sic) Zeier  -  August 5, 2016

13

1  documents besides the ones that you mentioned
2  yesterday that you know --
3      A  That I've already -- that I've already
4  reviewed, correct.
5      Q  Okay.  I think yesterday you said you didn't --
6  you've never fully reviewed Mr. Quick's personnel file; is
7  that right?
8      A  Yes.
9      Q  Okay.  So you wouldn't be familiar with his
10 personnel history in a -- in a -- in a detailed way?
11     A  Probably not in a detailed way.
12         MR. DABNEY:  That's one of the issues that I
13 mentioned earlier.  We can grab it.  She can have it
14 handy.  And you can ask questions.  And if she needs to
15 look at some information in the file to answer a question,
16 I think that would be an acceptable way to handle anything
17 that she doesn't --
18         MR. ROMER-FRIEDMAN:  Okay.
19         MR. DABNEY:  -- otherwise have at her
20 fingertips.
21         MR. ROMER-FRIEDMAN:  Okay.  And, perhaps,
22 Mr. Thibodeau will be able to fill in some gaps if there
23 are gaps in knowledge.
24         MR. DABNEY:  To the extent that he's designated
25 for certain topics, I agree.

14

1          MR. ROMER-FRIEDMAN:  Right.  As far as I know,
2  he's designated for Topic 1 on training and upgrades.
3          MR. DABNEY:  Correct.
4          MR. ROMER-FRIEDMAN:  Okay.
5      Q  (By Mr. Romer-Friedman)  Okay.  Well, let's --
6  let's start with the personnel history issue.
7      Okay?
8      A  Yes.
9      Q  All right.  Yesterday we talked about how
10 Mr. Quick has significantly more flight hours than is
11 required to be hired when he was originally hired in 2004;
12 is that correct?
13     A  I remember that, yes.
14     Q  Okay.  He had more than 11,000 hours of flight
15 time versus the 2500 that are required to become a first
16 officer at -- at Frontier?
17     A  It was 11,000.  I don't know the exact number,
18 but that's what I recall.
19     Q  Okay.  And that he had considerably more
20 experience than the -- the average pilot who is hired; is
21 that right?
22     A  More from an hours' perspective, yes.
23     Q  Okay.  From a years' perspective, too, in terms
24 of the decades of experience that he had, is that right,
25 that he had more experience than the average Frontier

15

1  Airlines pilot who's hired?
2      A  Yeah.  The -- the hours would take time to
3  accumulate for sure.
4      Q  Okay.  And in general, having more flight time
5  and more years of experience, is that a positive thing
6  that Frontier Airlines values highly?
7      A  Hours are -- are certainly one of the things
8  that we look at.  The type of experience, as discussed
9  previously, are also of importance.
10     Q  Okay.  And the number of years is something
11 that is highly valued in terms of experience?
12     A  Yes.
13     Q  Okay.  I'm going to hand you what will be
14 marked Exhibit 49.
15         (Deposition Exhibit 49 was marked.)
16         MR. ROMER-FRIEDMAN:  We're continuing from the
17 exhibit numbers from yesterday.
18         MR. DABNEY:  Hold on just a second.
19         THE VIDEOGRAPHER:  Do you want to go off the
20 record?
21         MR. ROMER-FRIEDMAN:  Yes, please.
22         THE VIDEOGRAPHER:  Off the record.  The time is
23 9:57.
24         (A recess was taken from 9:57 a.m. until
25 10:10 a.m.)

16

1          THE VIDEOGRAPHER:  Back on the record.  The
2  time is 10:10.
3      Q  (By Mr. Romer-Friedman)  Okay.  All right.
4      Good morning, Ms. Zeier.
5      A  Good morning.
6      Q  We're still -- the same ground rules, still
7  under oath?
8      A  Yes.
9      Q  Okay.  Great.
10     So before you is Exhibit 49.  This is from
11 Mr. Quick's personnel file, or I'll present to you that
12 it's -- we're going to look at -- we're going to
13 authenticate -- look at the whole personnel file in a
14 second.
15     But is this -- is this an offer letter of --
16 offer of employment from Frontier to Mr. Quick on March
17 11, 2004?
18     A  It is.
19     Q  Okay.  And Frontier wrote, This letter confirms
20 our verbal offer to you to join Frontier Airlines.  We
21 feel that you can make a significant contribution to our
22 efforts, correct?
23     A  Yes.
24     Q  Okay.  Was that true at the time, that that's
25 what Frontier Airlines believed --

30(b)(6) Deposition of Frontier Airlines through Zeier, Thibodeau and Sabia (Videotaped)
Edward Quick v. Frontier Airlines and Michele (sic) Zeier  -  August 5, 2016

17

1    A  I would imagine, yes.
2    Q  Okay.  There wouldn't be any reason for
3  Frontier to -- to lie or misrepresent their belief that
4  Mr. Quick would make a significant contribution to
5  Frontier Airlines?
6    A  Correct.
7       (Deposition Exhibit 50 was marked.)
8    Q  (By Mr. Romer-Friedman)  Okay.  And just for
9  the record, I'm going to hand you Exhibit 50 and ask you
10  to verify that this is a copy of the 30(b) -- amended
11  30(b)(6) notice that your counsel provided to you that you
12  previously said you -- you reviewed with Ms. Peter?
13    A  Yes.
14    Q  Okay.  And the company has no objection today
15  to sitting for this 30(b)(6) --
16    A  No.
17    Q  -- deposition?
18       Okay.
19       MR. DABNEY:  Well, we do have the objection to
20  this notice that were provided to counsel?
21       MR. ROMER-FRIEDMAN:  Right.  Agreed on that.
22  There -- for the record, there are -- I don't have it in
23  front of me, but there were objections that have been so
24  noted, since -- they are not conceded by plaintiff, but we
25  will try to work through them, to the extent we can.

18

1    Q  (By Mr. Romer-Friedman)  If I can switch with
2  you this big, black covered document.  This will be
3  Exhibit 51, correct?
4       (Deposition Exhibit 51 was marked.)
5    A  Okay.  Yes.
6    Q  (By Mr. Romer-Friedman)  This is a copy of
7  Mr. Quick's personnel file, correct?
8    A  Yes.
9    Q  Okay.  Mr. Dabney just had this copied for us,
10  correct?
11    A  Yes.
12    Q  Okay.  This is -- this is -- this is the full
13  personnel file?
14    A  I believe that's been stipulated to.
15    Q  Okay.  We may get into some of this information
16  as we go ahead.  I'm going to put this aside for one
17  moment.
18       Actually, let's turn to Page 690 of this
19  personnel file.  FAA 690 is the Bates number.
20       Have you -- have you seen this type of a
21  document before, which extends, I believe, from 690 to
22  691?
23    A  Honestly, I don't think I have.
24    Q  Okay.  This is an officer evaluation report,
25  correct --

19

1    A  Yes.
2    Q  -- at the top?
3    A  Yes.
4    Q  This is a document from the military; is that
5  correct?
6    A  I believe it is, yes.
7    Q  Okay.  And this includes a number of
8  descriptions of Mr. Quick and his service, correct?
9    A  It does.
10    Q  Okay.  And it -- there are -- there are a
11  number of these -- several of these officer evaluation
12  reports going through Page 6 -- from 690 to 695, correct?
13    A  Yes.
14    Q  And these say some very, very positive things
15  about Mr. Quick, correct?
16    A  I haven't read it.
17    Q  Okay.  Well, I'm going to go through a couple
18  of these with you.  On Page 690 -- actually, let me look.
19  Look at 69 -- 691.  Excuse me.
20       It says, Quick's performance was outstanding
21  during this rating period.  His initiative and active
22  involvement opened the door to greater recognition and
23  problem-solving of interoperability issues, intelligence
24  discrimination -- intelligence dissemination, problems in
25  the Air Force and Army intelligence assets.  Ed always

20

1  looks for issues needing improvement and takes
2  responsibility to fix them.
3       At the bottom it says, CW-4 Quick demonstrates
4  unlimited potential.  Promote to CW-5.
5       Do you see that?
6    A  Yes, I see all of that.
7    Q  And then below, under comment on performance,
8  it says, CW-4 Quick is an excellent officer, in the top 5
9  percent of all warrant officers with whom I have served.
10  He's reliable and trusted officer that understands his
11  mission and is ready and able to execute his duties at any
12  time.
13       The company didn't have any reason at the time
14  that this was issued, this officer evaluation report, to
15  discount this very high recommendation and description of
16  Mr. Quick's service in the military, did it?
17    A  The -- the dates on these are -- let's see --
18  I'm seeing on 690 at the bottom is 2003, right?  Is that
19  the time frame?  They vary.
20    Q  Looks like on Page 690 the -- the date is
21  3/1/12; is that correct?
22    A  On 690?
23    Q  Yep.  At the very top, kind of about an inch
24  down from the top on Page 690.
25    A  Yes, I see it.  Okay.

30(b)(6) Deposition of Frontier Airlines through Zeier, Thibodeau and Sabia (Videotaped)
Edward Quick v. Frontier Airlines and Michele (sic) Zeier  -  August 5, 2016

**21**

1    Q   All right.  But at that time, the company had
2  no reason to doubt that the military's description of
3  Mr. Quick's service was -- was outstanding, correct?
4    A   This indicates at that time that his --
5    Q   Oh, I'm sorry.  This -- this -- this is the
6  year -- the -- the year is under -- under -- you period
7  covered here it says -- the year is 2003 --
8      MR. DABNEY:  Correct.
9    Q   (By Mr. Romer-Friedman) -- November.  Sorry.
10     Is that correct?  There was no reason to doubt
11  that?
12    A   No reason to doubt the military's evaluation of
13  Mr. Quick?
14    Q   Correct.  The company doesn't dispute that --
15  that this is an accurate portrayal of Mr. Quick's military
16  service, right?
17    A   Correct.
18    Q   Okay.  The same for the 692 to 693 officer
19  evaluation report that's dated -- that covers the period
20  '02 -- 2 -- 2/11/02 through 2/10/03?
21    A   Right.
22    Q   Okay.  And, again, the second page of this
23  officer report on 693, it says, CW-4 Ed Quick is a
24  topnotch officer and exceptional pilot.  His dedication to
25  his mission accomplishments in and out of the cockpit is

**22**

1  exemplified by the safe and successful exhibition of over
2  700 hours of SRO sorties in his support of the commander
3  of the United States forces, Korea.
4      Below it says, CW-4 Quick is a go-getter and
5  that doesn't settle -- and doesn't settle for status quo,
6  but instead looks for every opportunity to improve the
7  effectiveness of the organization.  CW-4 Quick has proven
8  to be a tremendous asset to the company.  He has unlimited
9  potential.  Promote to CW-5.
10     Correct?
11    A   I would say these are descriptions in the
12  military documents, evaluations that . . .
13    Q   But these -- these do include descriptions of
14  his flying, correct, because he was working as a pilot?
15  Is that right?
16    A   His flying and his performance in general, as I
17  understand it.
18    Q   Okay.  And with respect to the last officer
19  report, 694 to 695 of Frontier's production, says similar,
20  very supportive things of Mr. Quick, including that he
21  successfully completed 100 percent of the sensitive
22  recognizance missions he was assigned, and his performance
23  was outstanding during this rating period.  This is on the
24  second -- on Page 695.
25    A   I --

**23**

1    Q   Again -- again, the company has no reason to
2  question this is an accurate portrayal of Mr. Quick's
3  performance in the military, including as a pilot; is that
4  correct?
5    A   This is their evaluation of his performance --
6    Q   Okay.
7    A   -- of his military service, yes.
8    Q   Are these kinds of highly positive and
9  laudatory descriptions of Mr. Quick's service things that
10  the company would value in their -- in their pilots?
11     MR. DABNEY:  Object to form.
12    A   These seem to represent positive performance
13  evaluations by the military.
14    Q   (By Mr. Romer-Friedman) Okay.  And so I guess
15  what I'm asking is, does the company value the military
16  service of its service memb -- of its -- of its pilots and
17  the -- the -- the high recommendations from the military
18  regarding their service?
19    A   Yes.
20     MR. DABNEY:  Same objection.
21    A   Yes.
22    Q   (By Mr. Romer-Friedman) It values it?
23    A   Yes.
24    Q   Significantly, would you say?
25    A   I would say of course we value that experience

**24**

1  and -- and their performance evaluations.  I wouldn't
2  represent that this, you know, correlates to -- or I don't
3  know what the evaluations were at -- at these times,
4  before or after, with regard to his flying at Frontier.
5    Q   Okay.  Does Frontier actively recruit members
6  of the military to become pilots at Frontier Airlines?
7    A   Yes.
8    Q   Why does it do that?
9    A   We -- we value the military experience as far
10  as flying, as well as other types of flying.  We try to
11  recruit from multiple avenues for our pilot workforce.
12    Q   Would -- would the company say that it benefits
13  significantly from the training that the -- their pilots
14  have received in the military before they become Frontier
15  Airlines pilots?
16    A   Yes.  It's experience that's valued.
17    Q   And what portion of the -- the pilots at this
18  time at Frontier Airlines have ongoing military
19  obligations?
20    A   I can't give you an exact amount.  I know that
21  we do have quite a number of -- of military personnel in
22  the pilot ranks.
23    Q   Okay.  Let's go back to Mr. Quick's personnel
24  experience a little bit.  The -- we -- we talked yesterday
25  about the training review board, correct?

30(b)(6) Deposition of Frontier Airlines through Zeier, Thibodeau and Sabia (Videotaped)
Edward Quick v. Frontier Airlines and Michele (sic) Zeier  -  August 5, 2016

25

1    A   Yes.
2    Q   Okay.  What is the training review board?
3    A   It's a board made up of representatives from
4  the company and the pilots union to review personnel with
5  training issues.  I believe there's language about
6  patterns of failure.  And they review individuals who
7  experience those things.
8    Q   Okay.  They make personnel recommendations or
9  decisions?
10    A   They make recommendations with regard to next
11  steps as far as training, et cetera.
12    Q   Okay.  When was the -- when was the TRB
13  created?
14    A   At least was in the current pilot CBA,
15  collective bargaining agreement, and it may have been in
16  the prior.  But I can't be sure.
17    Q   Okay.
18    And I believe that collective bargaining
19  agreement, the last one or the existing one was 2007, was
20  when it was amendable and in place.
21    Q   So the -- the 2007 CBA would have been the
22  earliest CBA that includes the training review board?
23    A   It may have been in the prior.
24    Q   Okay.  But you're -- but you're not -- you're
25  not aware that it was in the prior CBA earlier than 2007?

26

1    A   I can't recall.  I'd have to look at that CBA.
2    Q   Okay.  Do you know if anyone else besides
3  Mr. Quick has ever been asked to be part of the training
4  review board?  Does the company know?
5    A   I would have to check.  I don't believe a
6  training review board.  The union and the company had some
7  difficulty identifying pattern of failure.  But I -- I
8  can't recall if -- if there's been another training review
9  board called for someone.
10    Q   Okay.  So the company is not familiar with
11  whether there's ever been a training review board?
12    MR. DABNEY:  Object to form.  I mean, that's
13  not -- that's not the answer she gave.  That's not
14  something that was in the topics.  She doesn't know, and
15  there's no representation by the company one way or the
16  other.
17    Q   (By Mr. Romer-Friedman)  Okay.
18    A   As I said, I don't know if there's been another
19  training review board called.
20    Q   The training review board was pretty
21  controversial, correct, between the company and the union?
22    A   I don't know that it was controversial, but
23  there were discussions about the language in the contract
24  with regard to the -- the TRB.
25    Q   Okay.  Is it -- is it correct that the first

27

1  time the training review board was ever attempted to be
2  convened was in the case of Mr. Quick?
3    A   As I said, I'm not sure.
4    Q   I -- I'm going to hand you what will be Exhibit
5  52.
6    (Deposition Exhibit 52 was marked.)
7    MR. ROMER-FRIEDMAN:  Mr. Dabney, if is this an
8  issue that is better to -- to bring up with Mr. Thibodeau,
9  we can certainly do that, if you feel that that's relevant
10  to the portion of the . . .
11    MR. DABNEY:  He's designated for training
12  issues.  I mean, you make the decision if you want to ask
13  her or him.
14    MR. ROMER-FRIEDMAN:  I mean, I guess we may
15  have to go over this with him, but . . .
16    This looks to be cut off.
17    Q   (By Mr. Romer-Friedman)  I apologize.  This
18  appears to be cut off, the last page of -- of -- of
19  Exhibit 52.
20    But I will represent to you that this is a
21  letter from the vice president for flight operations of
22  Frontier Airlines to the FAPA president on June 29, 2007.
23    A   Do you have a name?
24    Q   I don't have it in my notes.  We -- you know
25  what, let's come back to this.

28

1    A   Okay.
2    Q   Thanks.
3    Okay.  And just to -- to quickly go over a
4  couple things, Mr. Quick failed a check ride when he was
5  upgraded to captain in 2007, correct?
6    A   That's my understanding.
7    Q   Okay.  He wasn't terminated or disciplined at
8  the time, correct?
9    A   He was still in the process of review.  A
10  determination had not been made.
11    Q   Okay.  There had been no determination about
12  whether he would be disciplined or terminated, right?
13    A   Right.  That was under review.
14    Q   Okay.  And when he -- when he went -- when he
15  gave his notice that he was going on military leave,
16  Mr. Quick was eligible for all of the other same benefits
17  as -- as pilots of Frontier Airlines, correct?
18    A   Yes.
19    Q   Okay.  Okay.  All right.  Let's talk a little
20  bit about Mr. Quick's military leave and his service.
21  Okay?
22    A   Okay.
23    Q   Okay.  So I think we established yesterday he
24  gave written notice on June 18th, 2007, of his military
25  leave, correct?

30(b)(6) Deposition of Frontier Airlines through Zeier, Thibodeau and Sabia (Videotaped)
Edward Quick v. Frontier Airlines and Michele (sic) Zeier  -  August 5, 2016

29

1    A  I believe that was the e-mail to Jim Colburn.
2    Q  Right.  And he -- he served through the summer
3  of 2014, correct?
4    A  Yes.
5    Q  Okay.  Do you know the date that his service
6  ended?
7    A  I do not, but as we said yesterday, he did
8  contact the chief pilot, JP Thibodeau, I believe on
9  September 14th --
10    Q  Okay.
11    A  -- or sometime before that.
12    Q  When Mr. -- Mr. Quick contacted Mr. Thibodeau
13  on September 23rd, 2014, about seeking reemployment, that
14  was done within 90 days of when he ended his
15  military leave --
16    A  I don't believe there's a dispute about that.
17    Q  So that's correct --
18    A  Correct --
19    Q  -- he -- he -- he contacted him within 90 days
20  of his military leave ending?
21    A  I believe so, yes.
22    Q  Okay.  And just to -- to touch a quick base, we
23  agreed yesterday that Mr. Quick satisfied all of the five
24  requirements to be reemployed under USERRA, correct?
25    A  Yes.  Yes.

30

1    Q  Okay.  I know you individually didn't know
2  exactly what the date was, but I'm going to ask you as the
3  company.  When did the company determine that Mr. Quick
4  had satisfied all of the five requirements for being
5  reemployed under USERRA, what date?
6    MR. DABNEY:  This is the same objections as
7  when you asked this half a dozen times yesterday.
8    MR. ROMER-FRIEDMAN:  Okay.
9    Q  (By Mr. Romer-Friedman) I'm asking in -- in
10  the -- when did the company determine?
11    A  I have to give the same answer I did yesterday.
12  I don't know.
13    Q  Okay.  And the company doesn't know the
14  particular date in which it determined that Mr. Quick
15  satisfied the five requirements of USERRA?
16    A  Correct.
17    Q  Okay.  But from the company's perspective, it
18  was at least sometime before his January 5th, 2015,
19  new-employee orientation, correct?
20    A  Correct.
21    Q  Does the company know whether there's any form
22  or checklist for determining whether someone has satisfied
23  the five requirements of USERRA?
24    MR. DABNEY:  Again, this is something outside
25  the scope of the topics.  So she can answer if she knows,

31

1  but it's not on behalf of the company.
2    MR. ROMER-FRIEDMAN:  This is -- I think this
3  goes to their -- a couple things.  It goes to their
4  resource -- human resource decision-making, training
5  procedures, including training regarding USERRA.
6    MR. DABNEY:  Which topic are you looking at?
7    MR. ROMER-FRIEDMAN:  Number 6. It also goes
8  to -- Topic Number 6.  It also goes -- it's relevant to
9  Mr. Quick's reemployment as to whether the company has
10  procedures that would relate to his reemployment.
11    MR. DABNEY:  I withdraw my objection.
12    MR. ROMER-FRIEDMAN:  Okay.  Thank you.
13    Q  (By Mr. Romer-Friedman) The question is, does
14  the company know whether there are any forms or specific
15  procedures for determining whether the returning service
16  member has satisfied the five requirements of USERRA?
17    A  We have procedures to review that and
18  determine.  There isn't a form that I'm aware of.
19    Q  Okay.  Is there --
20    A  A document.
21    Q  What is the specific procedure for determining
22  the five requirements have been satisfied?
23    A  We review the length of service against five
24  years, any exemptions, the notice, or exceptions, rather,
25  the notice of them going out on leave, the timing on the

32

1  notice of returning from leave, et cetera.
2    Q  Okay.  Does the company know whether there's
3  a -- a timeline or a goal for establishing those five
4  requirements have been satisfied?
5    A  Upon notice of the returning service member,
6  there's a two-week time frame or as soon as practicable.
7    Q  So -- so the company is supposed to determine
8  within two weeks of receiving notice of an intent to be
9  reemployed that the five requirements should be
10  determined?
11    A  I believe that's the guideline for -- the
12  timeline for determining that and returning the service
13  member.
14    Q  Where is that guideline set out?  Is that in a
15  document or a company policy?
16    A  I believe it's just in regard to USERRA
17  requirements.
18    Q  Okay.  So the -- it's just a -- more of a
19  practice that the company uses to follow USERRA?
20    MR. DABNEY:  Objection.  That's not what she
21  said.
22    A  I -- I said, our -- our procedures are to
23  review, as I just discussed, and make those
24  determinations.
25    Q  (By Mr. Romer-Friedman) Okay.  Has the company

30(b)(6) Deposition of Frontier Airlines through Zeier, Thibodeau and Sabia (Videotaped)
Edward Quick v. Frontier Airlines and Michele (sic) Zeier  -  August 5, 2016

33

1  ever had a service member employee return with a
2  disability and seek reemployment besides Mr. Quick?
3      A   As I stated yesterday, I don't -- I can't
4  recall any other particular individual.  I couldn't come
5  up with another name.
6      Q   So now speaking for the company, the company is
7  not aware of any other service member who has returned
8  with a disability?
9      A   I would have to find out.
10     Q   But at this time, speaking for the company, the
11 company doesn't know?
12     A   I'm not aware of any others.
13     Q   Okay.  Does the company have a specific
14 procedure for disabled veterans who need -- who are
15 returning from military leave?
16     A   In that we comply with the process to reemploy
17 the individual to their former position based on the
18 escalator rule or prior job or a similar job in paying
19 status through an interactive process with the employee to
20 determine best placement.
21     Q   Is that a written procedure with respect to
22 disabled veterans who need to be accommodated?
23     A   No.  Our policies that are written indicate
24 that we comply with the requirements of -- of USERRA.
25     Q   Okay.  There are written procedures that -- in

34

1  the employee handbook that we looked at yesterday of
2  Frontier Airlines that specify basic information about
3  military leave, correct?
4      A   Are you talking about the employee handbook --
5      Q   Correct.
6      A   -- policy?
7      Yes.
8      Q   So I think it was 8.06 or 8.15.  But in any
9  event, the handbook sets forth a time that a service
10 member needs to be reemployed, correct?
11     A   I believe there were timelines included.
12     Q   But it doesn't specify the -- any of its
13 information you just conveyed to me about the company's
14 policy to deal with a disabled veteran who needs to be
15 accommodated, right?
16     A   It's an overarching policy.  It doesn't contain
17 every detail with regard to the various facets of
18 compliance with USERRA.
19     Q   Who is responsible for setting that policy
20 about how a disabled veteran should be treated when they
21 return from military leave?
22     A   The company establishes policies as set forth
23 in the employee handbook that are compliant with USERRA.
24     Q   But if it's -- if it's not specifically in the
25 employee handbook, who is responsible at the company for

35

1  determining what the policy specifically will be?
2      A   The policy is the policy --
3      Q   Well, where --
4      A   -- contained in the employee handbook.
5      Q   Right.  I think we just established a second
6  ago, though, that the specific way in which a service
7  member who is disabled will be reemployed is not in the
8  handbook, right?
9      A   Right.
10     Q   So -- but there, nevertheless, is a policy that
11 you just described that the company has about how to deal
12 with a disabled veteran, right?
13     A   There are procedures.
14     Q   Okay.
15     A   As I indicated, there aren't forms or a
16 checklist, but there are unwritten processes, procedures
17 that the human resources department applies in these
18 instances.
19     Q   So these unwritten rules, who creates them?
20 How do people in HR know what they are?  How are they
21 communicated to people in HR?
22     MR. DABNEY:  Objection.  Compound.
23     Q   (By Mr. Romer-Friedman)  You can answer.
24     A   The human resources department would, over
25 time, on a case-by-case basis, if that situation occurred,

36

1  comply with USERRA and -- and apply the -- the proper
2  process.
3      Q   Okay.  Who is responsible for changing the
4  rules or making the rules that are unwritten?
5      MR. DABNEY:  Asked and answered.
6      Q   (By Mr. Romer-Friedman)  You can answer.
7      A   The human resources department leadership would
8  establish how that's accomplished.
9      Q   So that would be the VP for human resources?
10     MR. DABNEY:  Objection.  That's not what she
11 said.
12     Q   (By Mr. Romer-Friedman)  Who -- who would --
13 who would it be specifically?
14     A   I don't know that it's any one person.  It
15 would be leadership in -- in the human resources
16 department to include the vice president, directors, et
17 cetera.
18     Q   Okay.  So when Mr. Quick was being -- when
19 Mr. Quick was seeking reemployment in the fall of 2014
20 going into 2015, who determined what the unwritten rules
21 were going to be at the company for handling Mr. Quick's
22 reemployment?  Was that you?
23     A   It was a collective human resources effort.
24     Q   So when you say "collective," does that mean
25 you and other people?

30(b)(6) Deposition of Frontier Airlines through Zeier, Thibodeau and Sabia (Videotaped)
Edward Quick v. Frontier Airlines and Michele (sic) Zeier  -  August 5, 2016

37

1     A  Yes.
2     Q   Who are those other people who helped determine
3  those unwritten rules to determine how to deal with
4  Mr. Quick's reemployment?
5     A  Myself, Jaclyn Peter, the vice president at the
6  time, and, as I stated yesterday, with guidance from
7  counsel.
8     Q   Okay.  Anyone else who worked collectively to
9  determine those unwritten rules?
10     A  No.
11     Q   Okay.  Have those unwritten rules been
12  subsequently written down anywhere or communicated to the
13  pilots or the Frontier Airlines employee workforce?
14     A  The particulars of how the policies are
15  applied, no.
16     Q   Okay.  Does -- does Frontier Airlines have
17  policies about how to -- how to comply or how to deal with
18  the ADA or disabilities that need to be accommodated under
19  the ADA?
20     A  It's similar.  We have overarching policies
21  that give employees information that they need to comply
22  with requests for accommodations, et cetera.
23     Q   Okay.
24     A  And it's up to the human resources department
25  to administer those policies.

38

1     Q   I guess what I'm asking is, in the employee
2  handbook or anywhere else, does the employee actually --
3  does the -- does Frontier Airlines write down the rules
4  that -- and the procedures that govern accommodating a
5  disability under the ADA?
6     A  The employee handbook is a -- is a policy
7  handbook.  It doesn't have -- you know, it's not a thick
8  procedures manual on every particular detail of how to
9  administer those policies.
10     Q   I'm not asking if every aspect or facet of the
11  ADA issues are in the handbook.  I'm asking, is there any
12  place in the handbook or another written policy or, you
13  know, written document where Frontier Airlines tells the
14  employees in general or even in some specific way how the
15  company will work with them to accommodate a disability
16  under the ADA?
17     MR. DABNEY:  I'll reiterate my objections from
18  yesterday regarding the ADA and lack of relevance.
19     Q   (By Mr. Romer-Friedman)  You can answer.
20     A  The policies contained in the employee handbook
21  with regard to military leave are the policies.  There's
22  also a section in the collective bargaining agreement for
23  pilots.
24     Beyond that, the policies are administered by
25  the HR department.  As I've stated before, there isn't a

39

1  checklist or a document.
2     Q   So you're saying there's no place in the
3  employee handbook where it describes the Americans with
4  Disabilities Act or how to deal with those issues?
5  There's no place in the employee handbook?
6     A  There's a section on ADA, and -- and it
7  provides guidance to the employee with regard to
8  requesting accommodation.
9     Q   Okay.  But there is not a similar section with
10  respect to how a disabled veteran will be treated under
11  USERRA, right?
12     A  I believe the policy on USERRA in the employee
13  handbook states that the company will comply with the
14  requirements thereof.
15     Q   But it doesn't specifically describe anything
16  about a disabled veteran needing an accommodation, right?
17  We can look at -- we looked at it -- we looked at it
18  yesterday.  I'm happy to put it in front of you again.
19     A  I don't believe so.  I think it -- it -- it is
20  an overarching policy that we would comply with in that
21  facet, as well as all others.
22     Q   Okay.  How common is it for service members
23  to -- for employees to take military leave for more than a
24  year?
25     A  I believe with, you know, recent environments,

40

1  that that probably has happened on many occasions.
2     Q   Okay.  So the idea of -- of a service -- of an
3  employee or a pilot taking military leave for an extended
4  period is not -- is not a foreign or an infrequent thing
5  for --
6     A  It's not uncommon.
7     Q   Okay.  But it does sound like it is pretty
8  uncommon for a service member to come back with a
9  disability that needs to be accommodated; is that right?
10     A  Fortunately for them and for Frontier, that
11  hasn't happened very often.
12     Q   Okay.  And with respect to -- how many people
13  work in the HR department at Frontier Airlines?
14     A  Approximately 20.  I -- I'm not in that
15  department currently, so there may have been some -- some
16  changes in personnel, head count.
17     Q   Okay.  What kind of training does Frontier
18  Airlines provide to its HR department and its labor
19  relations department about USERRA and dealing with service
20  members who come back from military leave?
21     A  There are, as I said yesterday, often
22  employment law seminars that -- that people attend, of
23  which USERRA is a topic.
24     Q   Okay.
25     A  And -- and various people have backgrounds as

30(b)(6) Deposition of Frontier Airlines through Zeier, Thibodeau and Sabia (Videotaped)
Edward Quick v. Frontier Airlines and Michele (sic) Zeier - August 5, 2016

41

1    far as their -- their personal education with regard to HR
2    experience.
3         Q   How many of those 20 people in the -- in the HR
4    department have been trained specifically about USERRA?
5         A   I couldn't tell you.
6         Q   Do you -- does the company know whether it's 1
7    or 5 or 20?
8         A   Not all of the people in the department would
9    have a reason for dealing with USERRA, so it would be a
10   smaller number of people who -- I can't give you a number.
11        Q   Okay.  Do you know if there's been any specific
12   training for HR employees at Frontier Airlines about
13   handling the case of a disabled veteran who needs an
14   accommodation?
15        A   I don't know.
16        Q   Do you know if -- does the company know of
17   anyone besides Ms. Zeier, you, has received any of that
18   training specifically?
19        A   I don't know.
20        Q   Okay.  And I think yesterday we -- we covered
21   that you -- you didn't recall whether you -- whether you
22   specifically had received training about how to handle a
23   disabled veteran's accommodation or reemployment, right?
24        A   Right.  My testimony was what it was yesterday
25   with regard to that.

42

1         Q   Okay.  So if a service member comes back and
2    has a disability, how would anyone in HR know how to deal
3    with that issue?
4         A   We generally have experience with
5    accommodations.  There are quite frequently -- there is
6    quite frequently a need to assess an individual's
7    disability, abilities, and go through a placement process.
8         Q   Okay.  And that experience is based on working
9    on accommodating disabilities under the ADA, right?
10        A   Most of it.
11        Q   Well --
12        A   That's -- that's typically --
13        Q   Okay.
14        A   -- the reason why we would --
15        Q   Okay.
16        A   -- use that procedure with our employees.
17        Q   But as far as you know, there's no experience,
18   besides Mr. Quick, in trying to reemploy or accommodate a
19   disability of a service member who has a disability,
20   right?
21        A   I think I described yesterday that we
22   understand there are some differences, but overall, the
23   same concepts apply.
24        Q   Okay.  Has -- has Frontier Airlines ever had to
25   deal with a situation -- well, actually, let me back up.

43

1         Q   Is there a procedure for addressing a situation
2    where a pilot can't fly either due to a medical condition
3    or any other condition?
4         A   Yeah.  Is there a procedure?
5         Q   Yep.
6         A   It's, as I just described, similar, you know,
7    evaluation with multiple points of information to -- to
8    evaluate to determine accommodations and placement.
9         Q   Is that procedure written down anywhere about
10   how to deal with a pilot who can't fly because of a
11   medical issue or another reason that prevents him from
12   flying?
13        A   Not that I'm aware of.
14        Q   So, again, it's an unwritten rule that would be
15   applied?
16        A   It is a matter of course of administration and
17   by the human resources department.
18        Q   Okay.  Are there any individuals, let's say, in
19   the last five years, who were pilots, who were not able to
20   fly for a medical or another reason, but Frontier Airlines
21   found the person a position with the company?
22        A   I know there are instances of pilots without a
23   medical who are in a position.  I'm not sure about the
24   details of whether currently those were, you know,
25   something that they went through an interview process to

44

1    be placed or whether it was done because of the loss of
2    medical.
3         Q   Do you know how many people -- how many pilots
4    in the last five years were able to be temporarily or
5    permanently transferred to a different position when they
6    couldn't fly because of medical or another reason?
7         A   I don't know the number.
8         Q   Does the company know -- have a ballpark sense
9    of the number of pilots in the last five years?
10        A   We can try to find out.
11        Q   At this time, do you have any -- any sense?
12   Are we talking about 10 people or 100 people?
13        A   I don't know.
14        Q   Okay.  But finding a position -- a nonflying
15   position is something that is certainly feasible for
16   Frontier Airlines to do, correct?
17            MR. DABNEY:  Object to the form.
18        A   Yes.
19        Q   (By Mr. Romer-Friedman)  I mean, it's not --
20   it's not onerous or difficult for Frontier Airlines to
21   identify a nonflying position for a pilot who can no
22   longer fly temporarily or permanently, correct?
23            MR. DABNEY:  Object to form.
24        A   We would go through the same process to
25   determine what the disability was, what the capabilities

45

1  were, and whether they could perform that -- that job
2  safely.
3      Q   (By Mr. Romer-Friedman) I asked you if that's
4  an onerous or a difficult process as opposed to a standard
5  or usual thing that can be -- can be accomplished?
6      A   The process to determine that is -- is not
7  onerous.
8      Q   Okay.  And the -- the actual placement of a
9  pilot in a nonflying position, that's not onerous either,
10  right?
11     A   It would --
12         MR. DABNEY:  Object to form.
13     A   -- depend on the disability and the conditions.
14     Q   (By Mr. Romer-Friedman) We talked yesterday
15  about how there are more than a 1,000 pilots at --
16  currently at Frontier Airlines, correct?
17     A   Correct.
18     Q   Do you know how many -- do you know how many of
19  those pilots are employed in -- in nonflying positions?
20     A   So some of them, as JP mentioned yesterday, are
21  pilot positions that management.  There may be some
22  others that that -- that's not required.
23     Q   I guess my question was how many.  Do you know
24  how many pilots are not required to fly or have active
25  certifications?

46

1      A   I do not.
2      Q   Is it -- is it 100?  Is it 5?  Is it 50?
3          MR. DABNEY:  Objection.  Lacks foundation.
4      A   I don't know.
5      Q   (By Mr. Romer-Friedman) Okay.  But it's
6  possible it could be 50 or 100?
7          MR. DABNEY:  It's not what she said.  It's
8  not --
9      A   I don't know.
10         MR. DABNEY:  -- objection.
11     Q   (By Mr. Romer-Friedman) So the company
12  doesn't -- so the company doesn't know how many pilots are
13  employed in nonflying positions?
14         MR. DABNEY:  Mr. Thibodeau has been designated
15  on this topic.
16         MR. ROMER-FRIEDMAN:  Okay.  We'll take that up
17  with him.
18     Q   (By Mr. Romer-Friedman) Are there instances in
19  which the human resource department is not involved in
20  verifying that an individual is qualified for
21  reemployment?
22     A   Generally, if anybody is qualified for
23  reemployment with regard to USERRA?
24     Q   Right.
25     A   HR would be involved typically.

47

1      Q   Are -- are there instances in which the -- the
2  department, like the -- like the chief pilot, for example,
3  would determine that someone can be reemployed without
4  interfacing with HR?
5      A   My understanding is that they would -- they
6  would typically interface with HR.
7      Q   What would be the -- if it's a simple case,
8  what would be the extent of that interfacing or
9  communication between the chief pilot and his staff and
10  HR?
11         MR. DABNEY:  Object to form.
12     A   There's a collaboration to determine
13  reemployability, and then the HR department would
14  administer the -- the return with regard to leave of
15  absence, status, active status, et cetera.
16     Q   (By Mr. Romer-Friedman) Okay.  Okay.  And
17  going back to the issue -- the issue yesterday, we talked
18  about a service member who's provisionally reemployed.
19         I know that you in your individual capacity
20  didn't recall whether there was any other person besides
21  Mr. Quick who had ever been provisionally employed.
22         Does the company know if -- if anyone else
23  besides Mr. Quick has ever been provisionally employed?
24     A   There may be other instances of administrative
25  placeholders for people in a -- a variety of instances, as

48

1  I described yesterday, but I'm not aware of a specific
2  example that I can give you.
3      Q   But in the -- in the -- in the context of a
4  service member returning from military leave, the
5  company's not aware of any other specific person who was
6  provisionally reemployed, correct?
7      A   As I said yesterday, the word "provisional"
8  simply had to do with a -- a placeholder in our system in
9  the process of reemploying Ed Quick.
10     Q   You, Michelle Zeier, in communicating with
11  Mr. Quick a number of times in 2015, did refer to him as
12  being provisionally reemployed, correct?
13     A   And with the clarification that was with regard
14  to what I just said, our human resources information
15  system and the placeholder as we continued through the
16  process with him in determining either the long-term
17  disability route or placement route.
18     Q   So the answer is, yes, in the communications
19  with Mr. Quick, you referred to him as being provisionally
20  reemployed from January 5th, 2015, going forward, correct?
21         MR. DABNEY:  Asked and answered.  The
22  communications speak for themselves.
23     Q   (By Mr. Romer-Friedman) Is that correct?
24     A   I would -- the documents that we looked at
25  yesterday, I believe that that -- that's what was written.

30(b)(6) Deposition of Frontier Airlines through Zeier, Thibodeau and Sabia (Videotaped)
Edward Quick v. Frontier Airlines and Michele (sic) Zeier  -  August 5, 2016

49

1     Q   Okay. That he was provisionally reemployed?
2        MR. DABNEY: Same objections.
3     Q   (By Mr. Romer-Friedman) You can answer.
4     A   That's what the document said. I just gave you
5  clarification as to what that meant.
6     Q   Okay. Has Frontier Airlines ever told a
7  returning service member that he or she is provisionally
8  reemployed?
9        MR. DABNEY: Objection. Asked and answered.
10    A   I don't know.
11    Q   (By Mr. Romer-Friedman) The company is not
12  aware of any instance in which a service member has been
13  classified or been told that he or she is provisionally
14  reemployed, right?
15    A   In Frontier's history, which is long, I don't
16  know.
17    Q   Okay. Is the company aware of any other
18  instance in which it's taken more than three months to
19  determine that a service member meets the five
20  requirements of USERRA?
21    A   I don't know specific timelines of reemployment
22  cases.
23    Q   So the company is not aware of it taking more
24  than three months in any other -- in any -- in any other
25  situation beside Mr. Quick to -- to verify the five

50

1  requirements were satisfied?
2     A   I can't tell you that another instances it
3  hasn't taken that long.
4     Q   And from the -- does the company have a
5  specific policy about whether a service member needs to be
6  put on payroll when they're reemployed or receive
7  compensation, or is that an unwritten rule?
8     A   Upon return, if they return to their prior
9  position, they receive pay when they attend new-employee
10  orientation and/or begin training.
11    Q   Let me -- let me clarify.
12       So when -- does the company have a specific
13  policy about whether a returning service member needs to
14  be paid after the time in which the company has determined
15  that the person meets the five requirements of USERRA to
16  be reemployed?
17    A   When they're reemployed and they're working,
18  they would receive pay.
19    Q   So -- okay. So in other words, once they've
20  met the five requirements and then are actually working a
21  regular shift, that's when they get paid?
22    A   Working in some capacity, whether it be
23  training, a job, attending new employee orientation, et
24  cetera.
25    Q   Okay. And is there a specific written policy

51

1  about how to determine what job is appropriate for a
2  service member who has a disability, a written policy?
3     A   I think I covered that a few minutes ago, that
4  it's a matter of course of human resources administering
5  those --
6     Q   Okay.
7     A   -- those procedures.
8     Q   And in -- under these unwritten policies for
9  determining the reemployment of a disabled service member,
10  what is the goal in -- of Frontier Airlines in attempting
11  to find the right position for the service member?
12    A   As I've stated before, we evaluate whether they
13  can do their prior job with reasonable efforts, training,
14  et cetera, or an old job or a most similar job in pay and
15  status, again, with reasonable efforts by the company.
16    Q   Okay. In terms of being sim -- similar pay and
17  status, do you -- does the company have any goal in terms
18  of what that -- or policy about what the salary should be
19  in relation to the person's old position salary?
20    A   I think we covered that yesterday. And I
21  believe we talked about how it could be, you know,
22  parallel, like, similar, above, below. The object is to
23  make it as most similar as we can.
24    Q   Okay. The two positions that Mr. Quick was
25  offered on July 31st, 2015, the AOG buyer and the crew

52

1  scheduler position, those were -- that -- that was the
2  time and those were the positions he was offered by
3  Frontier Airlines, correct?
4     A   I think we covered that yesterday as well.
5  That was in a document.
6     Q   Okay. The answer is yes?
7     A   Yes.
8     Q   Okay. The -- the letter that was sent to
9  Mr. Quick said that the crew scheduler position would --
10  would top out at $18 per hour. Is that 18 -- is $18 per
11  hour a fraction of what Mr. Quick would have made as a
12  first officer?
13    A   I think this was covered yesterday as well in
14  that I indicated those were -- that was done in an effort
15  to engage Ed Quick with regard to placement because we had
16  not had his cooperation prior to that in doing so.
17    Q   The other positions that Mr. Quick expressed
18  interest in qualifying for, the -- the nonflying pilot
19  positions, would those have paid significantly more than
20  the AOG buyer and crew scheduler positions?
21    A   Yes.
22    Q   All right. And does the company know the
23  specific time frame in which Mr. Quick identified to -- to
24  you, Ms. Zeier, that he was interested in nonflying pilot
25  positions?

30(b)(6) Deposition of Frontier Airlines through Zeier, Thibodeau and Sabia (Videotaped)
Edward Quick v. Frontier Airlines and Michele (sic) Zeier  -  August 5, 2016

53

1       A   We covered that yesterday.  He mentioned those
2   other positions in passing.
3       Q   I'm asking the date.  Does the company know the
4   date in which that was first raised?
5       A   No.
6       Q   But it was before he was provisionally
7   reemployed by the company, correct?
8       A   Yes.
9       Q   Okay.  Who were the -- who would you say the
10  decision-makers were with respect to Mr. Quick's
11  reemployment?
12      A   Myself and Jaclyn Peter, my direct supervisor.
13      Q   So Ms. Peter wasn't just providing counsel; she
14  was a decision maker about whether Mr. Quick would be
15  reemployed?
16      A   Yes.
17      Q   Were there meetings to -- to determine
18  Mr. Quick's eligibility for reemployment?
19      A   Meetings, discussions, yes.
20      Q   Do you know how many meetings or discussions
21  there were with Ms. Peter?
22      A   No.
23      Q   Okay.  There wasn't anyone else who was a
24  decision maker with respect to Mr. Quick's reemployment?
25      A   I can't recall.

54

1       Q   Okay.  Mr. Thibodeau was not a decision maker,
2   correct, with respect to Mr. Quick's reemployment?
3       A   It was mainly administered by the HR department
4   and myself as the point person.
5       Q   Okay.  So from the time in late September,
6   early October in which Mr. Thibodeau had transferred the
7   -- being the point person on Mr. Quick's reemployment from
8   him to you, Mr. Thibodeau was no longer a decision maker
9   with respect to Mr. Quick's reemployment?
10      A   He would have been involved at some point had
11  we been able to continue the process with regard to his
12  reemployment as it may pertain to possible placement.
13      Q   But as it turned out, he wasn't involved later
14  on, right?
15      A   No, because we're here today and the process
16  was suspended.
17      Q   Okay.  So after that early -- late September,
18  early October 2014 period, you and Ms. Peter remained the
19  decision-makers with respect to Mr. Quick's reemployment,
20  correct?
21      A   Yes.
22      Q   Okay.
23          (Deposition Exhibit 53 was marked.)
24      Q   (By Mr. Romer-Friedman)  I'm going to ask you
25  about a document that I meant to ask about yesterday.  It

55

1   will be labeled Exhibit 53.
2       A   Okay.
3       Q   Here you go.
4          Do you recognize this document?
5       A   I believe this is a human resources document
6   that they use for new-employee orientation.
7       Q   Okay.  Mr. Quick is shown here, correct?  I
8   think he's the second person listed --
9       A   Yes.
10      Q   -- under Mr. Todd Grun --
11      A   Yes.
12      Q   Okay.  And Mr. Quick is listed as a first
13  officer?
14      A   Yes.
15      Q   Okay.  What is -- what -- so what are these --
16  on the left -- left field here, what do these descriptions
17  mean?  Rehire is the first.  Return from LOA.  Return from
18  FA to inflight instructor.  Transfer from RFC.  Transfer
19  from captain flight ops instructor.
20      A   Right.  That's the new hire/rehire comments
21  with regard to where the person's coming from, what the --
22  what the situation is.
23      Q   Okay.  And these are all the people who
24  attended the January 5th, 2015, new-employee orientation?
25      A   Based on what I'm seeing on this document, I

56

1   would assume so, yes.
2       Q   Okay.  All right.  Thanks.
3          Yeah.  Looking at this Exhibit Number 53, the
4   last person listed here, Christopher Fair, F-A-I-R?
5       A   Yes.
6       Q   It says he's transferred from captain to flight
7   ops instructor, correct?
8       A   Yes.
9       Q   What does that mean?
10      A   That he is transferred from captain to flight
11  ops instructor.
12      Q   Okay.  And in transferring from captain -- I
13  mean, do you -- do you know why Mr. Fair was transferred?
14      A   I do not.  He may have retired.
15      Q   Well, retired from flying?
16      A   Possibly.  I'm not sure.
17      Q   What does it mean to retire from flying?
18      A   That there's an age limit for pilots, which is
19  65.
20      Q   That's a requirement set by the federal
21  government, correct?
22      A   It is.
23      Q   That used to be 60?
24      A   Correct.
25      Q   Okay.  So is it pretty common for pilots who

57

1    retire at 65 from flying to take -- to -- to transfer to
2    jobs that don't require them to fly, like flight ops
3    instructor?
4        A  I don't know how common it is, but I do know
5    that it's -- it's happened, as it did in this case, I
6    believe.  I would have to verify what his -- if that was
7    due to retirement.
8        Q  How about the -- the -- the -- the person two
9    -- two above Christopher Fair, Michelle Knudsen,
10   K-N-U-D-S-E-N?
11       A  Yes.
12       Q  It says transfer from FA to inflight
13   instructor/SH.  What does that mean?
14       A  I can't tell what the circumstances were, but
15   it looks like she transferred from the flight attendant to
16   an instructor position.  I'm not sure what SH means.
17       Q  So this happens at the company even beyond
18   pilots, that individuals transfer from positions where
19   they're actually working in a -- in a commercial flying
20   capacity to instructing others?
21       A  Yes.  We have flight attendants also who were
22   flight attendants and then instruct.
23       Q  What is this in between Michelle Knudsen and
24   Christopher Fair?  It says Christopher Socey, S-O-C-E-Y,
25   transfer from RSC/MS?  What does that mean?

58

1        A  I believe ramp service coordinator to material
2    specialist.
3        Q  Okay.
4        A  Maybe not ramp service coordinator if this is
5    1/5 of '15.  RSC may -- may stand for something else.
6        Q  Okay.  Is this new-employee orientation class
7    representative of -- of similar classes of people who are
8    being put through the new-employee orientation in the
9    sense that there are a number of people who are retiring
10   or transferring from a flying position to an instructor
11   position?
12       A  Usually these lists --
13       MR. DABNEY: Object to form.
14       A  Usually these lists have people who are new to
15   the company who wouldn't be necessarily transferring.
16       Q  (By Mr. Romer-Friedman)  But this isn't an
17   anomaly that -- that you have a bunch of people who are
18   transferring from a flying position to a -- to a nonflying
19   position, right?
20       MR. DABNEY: Object to form.  Mischaracterizes
21   the exhibit.
22       A  The new-employee orientation form would include
23   new employees, transfers, et cetera, for various reasons.
24       Q  (By Mr. Romer-Friedman)  Okay.  Rehires too?
25       A  Rehires.

59

1        Q  Okay.  I guess what I'm asking is, it's --
2    it's -- it's not rare to see individuals on a new-employee
3    orientation list who are transferring from a flying
4    position to an instructor or a nonflying position, right?
5        A  It is somewhat rare.  That doesn't happen all
6    that often in the context of the number of people that we
7    hire, transfer, rehire.
8        Q  Do you know the number of times a year that a
9    person transfers from a flying to a nonflying position?
10       A  I do not.
11       Q  So it could be hundreds of people?
12       MR. DABNEY: Object to form.  Foundation.
13       A  It's fairly rare.
14       Q  (By Mr. Romer-Friedman)  In the case of
15   Mr. Fair listed here as the bottom --
16       A  Yes.
17       Q  -- employee, do you know if he was transferring
18   after a leave of absence?
19       A  As I stated before, it may be due to
20   retirement.  I'm not sure.
21       Q  Okay.  In -- in the context of a -- of a
22   service member who needs to be reemployed versus a
23   nonservice member who retires, if both want to go into an
24   instructor position and not -- or any other nonflying
25   position, who would have priority under the company's

60

1    policies if the service -- if -- if both workers could be
2    qualified with or without a reasonable accommodation for
3    the position?
4        A  We would certainly have an obligation to try to
5    place in the most similar position a pilot who was
6    returning from military leave.
7        Q  So the pilot returning from military leave
8    would be entitled to priority over the 65-year-old
9    retiring pilot, right?
10       A  They would have to be evaluated for their
11   disability and ability to do the job, but -- but, yes.
12       Q  Likewise, under -- the company -- does the
13   company agree that a service member who can be qualified
14   with or without a reasonable accommodation for a nonflying
15   position could be put into a nonflying position that
16   would, if necessary, displace a current nonservice member?
17       A  We would try not to displace people, but --
18   but, yes, we would have an obligation to make that
19   evaluation and -- and try to place that person.
20       Q  Okay.  And prior to the time that Mr. Quick was
21   offered those two positions for the buyer job and the crew
22   service job, neither Ms. Zeier nor anyone else at the
23   company had evaluated whether Mr. Quick could be employed
24   in a nonflying pilot position, correct?
25       A  We didn't have the information necessary to

30(b)(6) Deposition of Frontier Airlines through Zeier, Thibodeau and Sabia (Videotaped)
Edward Quick v. Frontier Airlines and Michele (sic) Zeier  -  August 5, 2016

61

1  evaluate at that point and were, as stated yesterday,
2  making efforts to reemploy Ed with -- in line with his
3  stated priority of receiving long-term disability benefits
4  and -- and being on a leave of absence.
5       Q  So I'm just trying to -- I know -- you
6  testified yesterday that you didn't undertake any effort
7  to -- before that July 31st letter to determine if
8  Mr. Quick could be qualified for these nonflying pilot
9  positions that he expressed interest in, correct?
10      A  We didn't get that far in the process at that
11  time.
12      Q  Okay.  You didn't -- you didn't -- I think
13  yesterday you -- you said that you, Michelle Zeier, didn't
14  do anything to determine whether he could be qualified for
15  those positions, correct?
16          MR. DABNEY:  Object to form.  Mischaracterizes
17  the testimony.
18      Q  (By Mr. Romer-Friedman)  I guess what I'm
19  asking is, not just you, but you as an individual didn't
20  recall.  Does the company know whether you or anyone else
21  undertook any effort to determine prior to July 31st,
22  2015, whether Mr. Quick could satisfy the basic
23  qualifications of the nonflying pilot positions?
24          MR. DABNEY:  Asked and answered yesterday --
25      Q  (By Mr. Romer-Friedman)  You can answer.

62

1          MR. DABNEY:  -- in reference to our agreement
2  that we wouldn't recover the issues we covered --
3          MR. ROMER-FRIEDMAN:  I think --
4          MR. DABNEY:  -- yesterday.  She's already
5  spoken for the company on this multiple times.
6       Q  (By Mr. Romer-Friedman)  You can answer.
7       A  I'll refer to my testimony yesterday.
8       Q  Okay.  From the time that Mr. Quick sought
9  reemployment in September of 2014 to the present, are you
10  aware of any nonflying jobs that there are for pilots at
11  Frontier Airlines?
12      A  Of their existence?  If there are any
13  currently?
14      Q  Not just openings, but jobs --
15      A  Right.
16      Q  -- that exist.
17      A  Jobs that exist.  I believe there are.  I would
18  need to look at the -- the job descriptions or the -- the
19  FAR requirements for each of those to determine whether
20  that's a requirement or not.
21      Q  Okay.  Do you know -- do you know how many jobs
22  there are?
23      A  I do not.
24      Q  We will take a look at an exhibit yesterday --
25  from yesterday that we looked at with Mr. Thibodeau.  This

63

1  is Exhibit 7.
2       A  Thanks.
3       Q  And I'll represent to you that Exhibit 7 is
4  what was produced in response to plaintiff's request for
5  production number 1 to Frontier's -- Frontier Airlines
6  regarding the pilot positions that do not require all
7  certifications of a pilot to be maintained.
8       A  That these were represented yesterday as -- as
9  the positions that did not require?
10      Q  That's correct.  That did not require all --
11  all certifications be maintained.
12          Do you recognize what -- what these documents
13  are in Exhibit Number 7?
14      A  These are position descriptions.
15      Q  Okay.  Are these -- do you know of any other
16  positions beside the ones in Exhibit 6 that employed
17  pilots who are not required to fly are not required to
18  maintain all medical or other certifications?
19      A  I can't think of others at the moment.
20      Q  Okay.  If you do, please let us know.
21      A  Yes, sir.
22      Q  All right.  And these -- these specific
23  positions on -- in Exhibit 7 were not among the positions
24  that you were eval -- were -- were looked at in determining
25  the positions that Mr. Quick would be offered, correct, in

64

1  January -- in -- in July of 2014 -- 2015?
2       A  In July of 2015.
3       Q  I think you -- I think yesterday you testified
4  that you individual -- you personally did not consider
5  nonflying pilot positions for Mr. Quick, right?
6          MR. DABNEY:  Objection.  Mischaracterizes the
7  testimony.
8       A  I would refer to the context of my testimony
9  yesterday --
10      Q  (By Mr. Romer-Friedman)  Okay.
11      A  -- with regard to --
12      Q  Okay.
13      A  -- the concerns.
14      Q  Okay.  The company doesn't -- does the company
15  know if anyone else besides you would have looked at these
16  nonflying pilot positions to determine whether Mr. Quick
17  was qualified them prior to the time that he was
18  offered those two --
19      A  Not that I'm aware of.
20      Q  -- two positions?
21          Not that you're -- you're not aware of any --
22  the company's not aware of anyone else besides Michelle
23  Zeier looking at nonflying positions?
24      A  Correct.
25      Q  Okay.  And we would have to look back at your

30(b)(6) Deposition of Frontier Airlines through Zeier, Thibodeau and Sabia (Videotaped)
Edward Quick v. Frontier Airlines and Michele (sic) Zeier   -   August 5, 2016

65

1    testimony yesterday as to whether you looked at those --
2    Michelle Zeier looked at those positions?
3        A   Yes.
4            MR. ROMER-FRIEDMAN:  Okay.  Let's take a
5    five-minute break.
6        Okay?
7        THE WITNESS:  Okay.
8        THE VIDEOGRAPHER:  Going off the record at
9    11:20 with the end of Media Unit Number 1.
10           (A recess was taken from 11:20 a.m. until
11   11:36 a.m.)
12       THE VIDEOGRAPHER:  Back on the record.  The
13   time is 11:36.
14       Q   (By Mr. Romer-Friedman)  Okay.  Ms. Zeier, same
15   ground rules.  Still under oath, correct?
16       A   Yes.
17       Q   Okay.  Great.
18           Has anyone at Frontier Airlines ever complained
19   about their USERRA rights not being followed by Frontier
20   Airlines?
21       A   I can think of two, Ed's Quick prior seniority
22   complaint and a flight attendant by the name of -- I
23   believe it's Shaveen Cole (phonetic).
24       Q   Let's talk about Mr. Quick's prior seniority
25   complaint.  That's the complaint that was resolved with

66

1    Frontier Airlines agreeing voluntarily to change his
2    seniority to start in 2002 rather than 2004, right?
3        A   Correct.
4        Q   We're not talking about any other disputes?
5        A   Correct.
6            MR. DABNEY:  Object to form.
7        Q   (By Mr. Romer-Friedman)  All right.  And
8    Ms. Cole, the fight attendant, could you describe what
9    happened with her?
10       A   She had missed some work, and we have an
11   attendance policy.  She was assessed points for that time.
12   After the fact, she indicated that she had military duty.
13           When we reached out to investigate, her
14   military representative indicated that that was not the
15   case.  She had filed a -- a complaint with the Department
16   of Labor initially, but after it was investigated, she
17   withdrew the complaint.
18       Q   So, in essence, she -- in -- in Frontier
19   Airline's view, Ms. Cole misrepresented that she was on
20   military duty when -- when she was not, in fact, on duty?
21       A   Yes.
22       Q   Okay.  Has that situation ever arisen before?
23       A   No.
24       Q   Okay.  And Mr. Quick never misrepresented his
25   military duty, right?

67

1        A   Not to my knowledge.
2        Q   Okay.  Mr. Quick did everything -- he was asked
3    to provide military order documentation, correct?
4        A   Yeah.  I believe we covered that yesterday.
5        Q   Okay.  Both before his 2007 to 2014 leave and
6    after it?
7        A   I believe so.
8        Q   Okay.  So besides Mr. Quick's prior seniority
9    complaint and Ms. Cole's complaint that was withdrawn,
10   there have been no other informal or formal complaints
11   about USERRA compliance?
12       A   Not that I'm aware of.
13       Q   Okay.  All right.  Going back to this Exhibit
14   53; this is the spreadsheet of the new employees --
15       A   Yes.
16       Q   -- that were being oriented or they're
17   returning on -- on January 5th, 2015?
18       A   Yes.
19       Q   Do you know what process Mr. Christopher Fair
20   went through to transition from captain to flight ops
21   instructor, how that -- how that went down?
22       A   I don't know the detail.
23       Q   Okay.  If a -- if a captain is retiring after
24   turning 65, and is going to seek a nonflying position,
25   would that be a similar process as qualifying a disabled

68

1    veteran who has -- who has a disability, or is it a
2    different process?
3        A   There may have been -- there may have been an
4    interview.  I'm not sure.  Certainly there would be an
5    evaluation of his experience and abilities to do the job.
6        Q   Would there be a medical evaluation?
7        A   I don't know if there was one or not with him.
8        Q   Do you know, is it the company's policy to do a
9    medical evaluation or a physical for a pilot who can no
10   longer fly and is transi -- trying to transition and
11   transfer to a nonflying position?
12       A   If there -- if there is reason to believe that
13   we needed to do one, we would.  If there wasn't, we
14   wouldn't.
15       Q   Okay.  What would be the other reasons to -- to
16   do that review, a medical review of him?
17       A   A retirement due to age is pretty
18   straightforward.  If there were other medical issues with
19   that person, then we would evaluate that.
20       Q   Okay.  All right.  Let's talk a little bit
21   about the -- the make-up benefits.
22       Okay?
23       A   Okay.
24           MR. ROMER-FRIEDMAN:  And I understand Mr. Sabia
25   is going to be talking about pension contribution

30(b)(6) Deposition of Frontier Airlines through Zeier, Thibodeau and Sabia (Videotaped)
Edward Quick v. Frontier Airlines and Michele (sic) Zeier  -  August 5, 2016

---

69

1   calculations.  Is that the -- the defined contribution and
2   the 401(k), Mr. Dabney?
3       MR. DABNEY:  Defined contribution is the only
4   one where calculations were made and -- and payments
5   caught up.  But he can talk generally about the 401(k)
6   plan, as can Ms. Zeier.
7       MR. ROMER-FRIEDMAN:  Okay.  All right.
8       Q   (By Mr. Romer-Friedman)  So for the 401(k) plan
9   with respect to pilots, how -- what is -- what is
10  Frontier's policy in terms of providing a make-up
11  contribution to pilots for their period of military leave
12  after reemployment?
13      A   My understanding is that the pilot would have
14  the ability to make up those contributions according to
15  the matches described in their collective bargaining
16  agreement and that they would coordinate with our benefits
17  department to accomplish that.
18      Q   How soon after returning from military
19  leave or seeking reemployment would a pilot ordinarily
20  receive information from the benefits department about
21  their potential match?
22      A   I don't know.
23      Q   Is there not a policy for a standard amount of
24  time to provide that information?
25      A   I don't know.

---

70

1       Q   The company's not aware of a policy?
2       A   You may be able to find that out through other
3   means.
4       Q   You didn't -- you didn't -- you didn't reach
5   out -- you personally didn't reach out to talk to the
6   benefits department or anyone else about what -- what the
7   timeline is for making 401 -- for -- for determining the
8   401(k) match for the make-up contribution, correct?
9       A   When we were in the process of reemploying
10  Mr. Quick, I personally put him in touch with the benefits
11  subject matter experts to accomplish reinstatement of
12  benefits.
13      Q   Okay.  But the -- the company is not aware of
14  any specific communication to Mr. Quick informing him of
15  the amount of his 401(k) contribution that he could make
16  and have Frontier Airlines match from that 2007 to 2014
17  period, correct?
18      A   I don't know that I can speak to what
19  communication went out to Ed or was had via e-mail, et
20  cetera, with regard to that timing.
21      Q   Okay.  Does the company agreed that it -- that
22  communication hasn't happened, that Mr. Quick still is
23  entitled to make a contribution and have the company match
24  it for that 2007-2014 period?
25      A   My understanding is that he has a right to make

---

71

1   up those contributions.
2       Q   But he hasn't received any match or been given
3   the opportunity to do -- to make that match, correct?
4       MR. DABNEY:  Object to form.
5       A   I just said I don't know if there was
6   communication, verbal or otherwise, between Mr. Quick with
7   regard to detail on the match and make-up.
8       Q   (By Mr. Romer-Friedman-Friedman)  Okay.  But
9   just as a matter of fact, the company has not yet made a
10  matching contribution for the 401(k), correct?
11      A   I believe that's the case.
12      Q   Okay.  And how is it determined what
13  percentage -- how is it determined what compensation he
14  would have received during the period of military leave in
15  order to figure out what percentage he would pay and what
16  percentage the company would match?  Follow what I'm
17  saying?
18      A   I don't know how it would be determined what he
19  would contribute.  But as I said, the company match is
20  described in the collective bargaining agreement.
21      Q   So under the 401(k), the company match and what
22  he can put into the 401(k) from his salary, right, is a
23  percentage of his compensation, correct?
24      A   I believe so.
25      Q   Do you know the -- the percentage currently

---

72

1   that a pilot -- in 2014 or 2015 a pilot could make in the
2   401(k) and get matched?
3       A   I would have to refer to the collective
4   bargaining agreement --
5       Q   But the CBA says the percent?
6       A   I believe so.
7       Q   Okay.  How does -- how does -- when a -- when a
8   service member's on military leave, how does -- for the
9   purpose of a make-up contribution by the pilot and the
10  company, how does the company determine what his
11  compensation would have been each month during that
12  military leave?
13      A   I believe they would have looked at earnings
14  previously or what would have been through that period.
15      Q   Specifically, though, how -- is it they look at
16  the 12-month period before the leave, or do they look at
17  the wages that he would have earned under the CBA during
18  the leave?  Is there a formula or rule that's written down
19  for doing that?
20      A   I don't know.
21      Q   Who -- who would know at the company?
22      MR. DABNEY:  The person we designated on these
23  issues would know.
24      MR. ROMER-FRIEDMAN:  Okay.  Well you -- I think
25  you just said, Mr. Dabney, that she could speak to the

---

73

1   401(k) issues.
2        MR. DABNEY: I said generally.
3        MR. ROMER-FRIEDMAN: Okay. Generally. We'll
4   -- we'll talk specifics to Mr. Sabia.
5        Q   (By Mr. Romer-Friedman) Okay. That's not
6   something that you've handled before personally --
7        A   Correct.
8        Q   -- in your individual capacity?
9        A   Correct.
10       Q   Okay. That is, the 401(k) pension contribution
11  for a service member?
12       A   Correct.
13       Q   Okay. Are you familiar with the profit-sharing
14  plan for pilots?
15       A   I'm aware of the equity program for the pilot
16  group.
17       Q   This is the FAPA Invest?
18       A   Okay.
19       Q   Could you describe how that works?
20       A   To my understanding, there are criteria. FAPA
21  Invest obtains earnings information from the company.
22  They determine distribution amongst the pilots. They tell
23  us what the distribution is, and we administer it.
24       Q   So a certain percentage of the profit of the
25  company is distributed to the pilots?

74

1        A   I believe that's the case.
2        Q   Does that happen every year?
3        A   It depends on the criteria.
4        Q   So the -- and the the -- the FAPA Invest documents
5   states the terms?
6        A   I believe so.
7        Q   Okay. Do you know what per -- you don't know
8   what percentage of the -- what percentage of the company's
9   profit goes to the -- the pilots every year?
10       A   I do not.
11       Q   Do you know if -- during the years in which
12  Mr. Quick was on military leave, whether there were any
13  distributions to the pilots under the -- the FAPA Invest?
14       A   I do not.
15       MR. ROMER-FRIEDMAN: Will Mr. Sabia be able to
16  testify to that?
17       MR. DABNEY: I believe he will have information
18  only on the defined contribution and 401(k) plan. I don't
19  believe he's involved in the FAPA Invest.
20       If there's specific questions you have that
21  Ms. Zeier can't answer, we're willing to provide the
22  answers to those questions in writing if she can't answer
23  today.
24       MR. ROMER-FRIEDMAN: Okay. I mean, I -- it
25  doesn't seem like she knows very much about what was

75

1   either given to the pilots generally or given to
2   Mr. Quick, which is basically what we want to know.
3        Q   (By Mr. Romer-Friedman) Under the FAPA Invest,
4   were there -- do you know if there were any -- were there
5   any distributions from '07 to present?
6        A   I know that there have been distributions, but
7   I can't tell you which years between that period.
8        Q   But you know those some of those were years in
9   which Mr. Quick was on -- on military leave, or no?
10       A   I don't know if it was towards the end or
11  thereafter.
12       Q   And you -- do you know whether Mr. Quick was
13  ever given a FAPA Invest profit-sharing distribution?
14       A   I don't know.
15       Q   Even whether -- during his military leave or
16  otherwise?
17       A   I don't know.
18       Q   Okay. In the company's perspective, would he
19  be entitled to receive -- while he was on military leave,
20  would he be entitled to receive the same FAPA Invest
21  profit-sharing distribution as other pilots?
22       MR. DABNEY: Objection. Calls for speculation,
23  and it calls for a legal conclusion.
24       A   FAPA Invest is a separate entity from Frontier.
25  I don't know exactly.

76

1        Q   (By Mr. Romer-Friedman) Well, I'm asking you,
2   do you -- does the company know whether a service member
3   -- a pilot on military leave would receive under the
4   company's ordinary procedures the same FAPA Invest
5   distribution as other pilots?
6        A   They're rights to benefits --
7        MR. DABNEY: Same objections as yesterday.
8        A   Their rights to benefits as provided to other
9   pilots are -- are -- should be provided to the service
10  member on military leave as well.
11       Q   (By Mr. Romer-Friedman) So the answer to my
12  question is, yes, that they would be -- a pilot who's on
13  military leave would receive the same profit sharing
14  distributions as other pilots?
15       MR. DABNEY: Calls for a legal conclusion.
16       A   I don't know.
17       Q   (By Mr. Romer-Friedman) But the company
18  doesn't know whether it has a policy about providing the
19  same profit sharing distributions to military pilots when
20  they're on military leave as other pilots?
21       MR. DABNEY: Objective to the form, and
22  mischaracterizes the record. It's not profit sharing.
23       MR. ROMER-FRIEDMAN: Sorry. The FAPA Invest.
24       MR. DABNEY: FAPA Invest is separate from
25  Frontier. So it's not Frontier providing anything to the

77

1    pilots.
2        Q   (By Mr. Romer-Friedman) Could you describe the
3    difference between FAPA Invest and profit sharing?
4        A   FAPA Invest is a -- is an equity program.
5    That's the extent of my knowledge.
6        Q   Could you describe what you mean by "it's an
7    equity program"?
8        A   If you have the document, it describes what it
9    is.
10       Q   I'm -- I'm asking what -- how the company
11   understands the FAPA Invest program.
12       A   I can't speak to it.
13       Q   How -- how is FAPA Invest different than profit
14   sharing?
15       A   I don't know the ways in which it's different
16   from profit sharing.
17       Q   How does the profit-sharing plan work for
18   pilots?
19       A   As I just described.
20       Q   That --
21       A   That --
22       Q   -- a certain portion of the company's profit
23   every year is distributed to pilots?
24           MR. DABNEY:  Object to form.
25       Q   (By Mr. Romer-Friedman)  Is that right?

78

1        A   Yes.
2        Q   Okay.  Who determines what portion of the
3    pilot's distributions go to particular pilots?
4        A   FAPA Invest.
5        Q   FAPA Invest determines that amount?
6        A   Yes.
7        Q   Okay.
8        A   As -- as described in the document.
9        Q   Okay.
10           MR. ROMER-FRIEDMAN:  So I don't know what
11   Mr. Sabia is going to be able to testify about, but if
12   he's not going to be able to testify about FAPA Invest or
13   the profit sharing, I'd like a stipulation that the
14   company is going to respond to all of our interrogatories
15   about -- in detail with specific information with respect
16   to Interrogatory Number 12 about FAPA Invest, 13 about
17   FAPA Invest, and extent and equity, investment agreement,
18   Interrogatory Number 14 with regard to FAPA Invest, as
19   well as the request for production that relate to his
20   interrogatories.
21           MR. DABNEY:  The documents that are relevant to
22   the request for production have been produced.  It doesn't
23   sound like you've read them or -- but -- but they have
24   been.
25           MR. ROMER-FRIEDMAN:  They have been produced?

79

1            MR. DABNEY:  Yes.
2            MR. WHITCOMB:  There were no objections.
3            MR. ROMER-FRIEDMAN:  As well as Interrogatory
4    Number 15.
5            MR. DABNEY:  Pull up the document.
6            MR. ROMER-FRIEDMAN:  Yeah.  16, 17.
7        So if you can -- if you can provide -- I mean,
8    if she or Mr. Sabia is not prepared to testify about FAPA
9    Invest or profit sharing specifically, we'd appreciate
10   your stipulation now that there will be detailed answers
11   to Interrogatories Number 12 through 17 with -- with
12   answers as opposed to just objections.  And your agreement
13   that if that's not provided, that we'll be able to move to
14   compel.
15           MR. DABNEY:  These interrogatories were
16   responded to in the way that they were responded to almost
17   a year ago.  But we are willing to discuss the provisions
18   under the protective order and give you the information
19   you're speaking of.  You never got back to me about a
20   protective order.  You never sought any more information
21   until today and, you know . . .
22           MR. ROMER-FRIEDMAN:  Could you give me the
23   Bates range of the production that you're -- you're
24   referring to?
25           MR. DABNEY:  Do you have it?  It's the

80

1    confidential production that was done.
2            MR. WHITCOMB:  We said Interrogatory Number 12,
3    correct?
4            MR. ROMER-FRIEDMAN:  It's 12 through 17 in the
5    relevant productions.
6            MR. WHITCOMB:  All right.  So that's where --
7    Bill, you're referring to defendant states willingness to
8    discuss the provisions under the appropriate protective
9    order saying there was a subsequent --
10           MR. DABNEY:  Yes.
11           MR. WHITCOMB:  -- hang on --
12           MR. ROMER-FRIEDMAN:  I'm just asking where --
13   what the Bates range is of the --
14           MR. DABNEY:  Let's see.  1538 -- begins at 1538
15   and going -- goes to 1607.
16           MR. ROMER-FRIEDMAN:  1538 to 1607?
17           MR. DABNEY:  Correct.
18           MR. ROMER-FRIEDMAN:  Bill, can I ask you, is
19   this something we can talk to Mr. Sabia about, the --
20           MR. DABNEY:  I don't know if he has information
21   on this at all.
22           MR. ROMER-FRIEDMAN:  Okay.  If we put these
23   documents in front of Ms. Zeier, will she be able to
24   testify about these?
25           MR. DABNEY:  You can put them in front of her

30(b)(6) Deposition of Frontier Airlines through Zeier, Thibodeau and Sabia (Videotaped)
Edward Quick v. Frontier Airlines and Michele (sic) Zeier  -  August 5, 2016

81

1    and ask her. If she doesn't know the answers, then we can
2    talk about getting the answers that are fairly called for.
3        I mean, we've asked -- there's several things
4    with this. We produced the documents to you, and,
5    presumably, a lot of your questions could be answered by
6    reading them. But if there are additional questions, we
7    -- we can talk about giving you responses to them if
8    Ms. Zeier can't provide them today.
9        One of things you should know, however, is that
10   FAPA Invest is separate from Frontier. FAPA Invest
11   possesses the information about who gets what. Frontier
12   does not and we can't stipulate to answering stuff that it
13   doesn't have possession of.
14       MR. ROMER-FRIEDMAN: Okay. Okay.
15       Q   (By Mr. Romer-Friedman) So is it -- is it your
16   understanding that once the -- under FAPA -- under the
17   profit-sharing plan, once the distribution is made, FAPA
18   Invest determines what the pilot receives and controls
19   that?
20       A   FAPA Invest determines distribution.
21       Q   Okay. So the -- the -- to your knowledge, the
22   company doesn't -- doesn't possess the information of --
23   of -- of how that distribution would have been made to
24   Mr. Quick?
25       A   I don't believe we know what the -- what the

82

1    calculations are for their distribution process.
2        Q   Okay.
3        A   It may be contained in those -- in the FAPA
4    Invest documents.
5        Q   Okay. Well, let's talk about something we
6    talked about a little bit earlier in more detail.
7        Other than those four or five nonflying pilot
8    positions that we -- looked at in Exhibit, I think,
9    7 -- are -- in your -- in the company's experience, are
10   there other pilots that are -- that are often a good fit
11   for pilots who can't fly even if they're -- they're
12   nonpilot positions?
13       Are you following me?
14       A   I think you're asking, would their experience
15   of a pilot be beneficial in a --
16       Q   In a -- in --
17       A   -- nonflying pilot-related role?
18       Q   Even not -- even not a pilot related, right.
19   Even beyond the 7 -- or the -- the Exhibit 7, you know,
20   positions we looked at.
21       A   Uh-huh.
22       Q   If you were to try to find a position for a
23   pilot in another department other than what pilots
24   ordinarily do, what are -- what are the kinds of positions
25   that pilots would ordinarily be qualified to do?

83

1        MR. DABNEY: Object to form.
2        A   A pilot position is unique in their abilities
3    and experience. I imagine there are other jobs that the
4    skill sets would -- would translate to one day degree or
5    another.
6        Q   (By Mr. Romer-Friedman) What kind of other
7    positions would the skill sets potentially transfer?
8        A   As I testified yesterday, one example was the
9    crew scheduling position, for the reasons I described.
10       Q   The buyer position as well?
11       A   At the time I reviewed that, I believe I
12   thought that could be a possibility.
13       Q   Are there any others besides crew scheduler or
14   buyer that a pilot's experience and knowledge might
15   transfer well?
16       A   I'd have to take some time, as I would in the
17   process, to review qualifications for -- for various jobs.
18       Q   Are there any that come to mind that are common
19   positions that -- where the skills might be transferable?
20       A   Without having things in front of me, I can't
21   say.
22       MR. WHITCOMB: Here.
23       Q   (By Mr. Romer-Friedman) I believe yesterday we
24   looked at response to Interrogatory Number 6 to FA. This
25   is the blue document. For some reason, I'm not finding in

84

1    my stack of documents -- it's Exhibit Number 40. This is
2    a list of the documents that defendants identified in
3    response to Interrogatory Number 6 that had been open at
4    Frontier Airlines since September of 2014.
5        Could you go down this list of the titles and
6    -- and identify any that might be the types of jobs that a
7    pilot might have skills that would be transferable and
8    qualifications to do?
9        MR. DABNEY: Object to form. Foundation.
10       Q   (By Mr. Romer-Friedman) For example --
11       A   Skills that are transferable that could -- they
12   could then also been trained -- reasonable efforts to be
13   trained for --
14       Q   Sure.
15       A   -- at the time --
16       Q   Yeah. Absolutely. So, for example, the third
17   one down on Page 741 is crew scheduler, right?
18       A   Right.
19       Q   That's one that you -- you think the skills and
20   knowledge would often transfer, right?
21       A   Right. The first one, lead material
22   specialist, poss --
23       Q   That would --
24       A   -- possibly.
25       Q   Okay. Any other on this first page here?

30(b)(6) Deposition of Frontier Airlines through Zeier, Thibodeau and Sabia (Videotaped)
Edward Quick v. Frontier Airlines and Michele (sic) Zeier  -  August 5, 2016

85

1    A   Just going down the list in order, aircraft
2  appearance --
3         THE REPORTER: I'm sorry. I can't hear you.
4    A   Aircraft appearance agent, possibility. With
5  training, supervisor customer service. We've already
6  talked about the instructor.
7    **Q   (By Mr. Romer-Friedman) The instructor is a**
8  **possible position for somebody who no longer flies but is**
9  **a -- has experience as a pilot, right?**
10   A   Yeah. Again, based on the evaluation of any
11 restrictions, disabilities, et cetera. Reservations
12 agent. Possibly that's -- that and the customer service
13 position would take a lot of training on the software
14 systems.
15   **Q   Okay. Customer service agent?**
16   A   Right.
17   **Q   Okay.**
18   A   We talked about the assistant chief pilot.
19 Same applies with regard to evaluating abilities.
20   **Q   Okay. But it's a possible position for a**
21 **nonflying pilot?**
22   A   Yes. I won't go through each one. I'll try to
23 pick out a few on the page.
24   **Q   Actually, if you could -- if you can go**
25 **through, I'd appreciate it.**

86

1    A   Auditor internal eval programs, I'm not sure.
2  I'm not as familiar with that position. Crew planner,
3  probably similar to crew scheduler. Inflight
4  policies/procedures man -- manager, I'm not sure. General
5  -- general tech writer, I'm not sure.
6         Instructor ground school, again, depending on
7  abilities. I'm not sure about the coordinator training
8  and development. Maintenance planner, I'm not sure. Ramp
9  service agent, probably. Customer service coordinator,
10 again, customer service, all of these could possibly be
11 trained.
12   **Q   That's -- the three customer service**
13 **coordinator, Denver --**
14   A   And then the agent --
15   **Q   -- customer service agent --**
16   A   So in part is the only difference between
17 those.
18   **Q   Okay.**
19   A   Station operations trainer, I'm not sure.
20 Supervisor warranty and repair, I'm not sure. I'd have to
21 look at the job description.
22   **Q   Okay.**
23   A   Quality assurance call evaluator, I think
24 that's a reservations-related position. So with training
25 on software, et cetera, possibly. AOG buyer, that was one

87

1  of the positions offered.
2    **Q   Offered to Mr. Quick?**
3    A   Yes.
4    **Q   Okay.**
5    A   Facilities engineer, I'm not sure. Flight
6  attendant, I imagine.
7    **Q   That's something that a former pilot could do?**
8    A   Possibly.
9    **Q   With training?**
10   A   Right.
11   **Q   Okay.**
12   A   Executive assistant, I don't know. Possibly a
13 corporate recruiter.
14   **Q   You're not sure about a corporate recruiter?**
15   A   Possibly. Manager staffing and compliance, I'm
16 not sure. Early returns loyalties, that's
17 reservations-related as well as the one below it, help
18 desk agent, so same as the other reservations related --
19   **Q   Like the customer services job those are jobs**
20 **that they could likely do?**
21   A   -- training --
22         MR. DABNEY: Object to form.
23   **Q   (By Mr. Romer-Friedman) Is that right?**
24         MR. DABNEY: That's not what she said. None of
25 those -- none these responses are what you just

88

1  characterized them as.
2    **Q   (By Mr. Romer-Friedman) The -- the -- the**
3  **early returns loyalty agent and reservations help desk,**
4  **these are -- these have like customer service jobs that**
5  **were jobs that you -- you thought a former pilot could**
6  **probably do; is that right?**
7         MR. DABNEY: Object to form. That's not what
8  she said.
9    A   I'm talking about at first glance without
10 reviewing the job -- the qualifications for each of these
11 jobs, trying to give you some sense of, with reasonable
12 efforts, if -- if they're skill sets that could translate
13 that they could possibly do.
14   **Q   (By Mr. Romer-Friedman) Okay. So the ones**
15 **you're saying you're not -- the ones that you said you're**
16 **not sure, you would need to look a lot more specifically**
17 **at that job, whereas the ones that you said are probable**
18 **or possible are the ones that, based on your knowledge,**
19 **are jobs that you think could potentially be a good fit,**
20 **right?**
21   A   It's a possibility. It would have to be
22 further evaluated. I'm just looking at a list right now.
23   **Q   How about an engineer of senior IT**
24 **telecommunications?**
25   A   I'm not sure about that one.

89

1   **Q   Intern IT --**
2       A   Intern, they're in training, so possibly.
3   Check compliance, possible.  I'm not sure.  Specialist HR
4   support, it's possible.  Customer service instructor, you
5   know, those are similar to a customer -- other customer
6   service positions.
7           Manager aircraft field maintenance admin, I'm
8   not sure.  Instructor inflight, probably have to be a
9   flight attendant first.
10      **Q   To be an instructor inflight?  So that wouldn't**
11  **something initially they could do?**
12      A   I'd have to look at it.
13      **Q   Okay.  So you're not sure about that one?**
14      A   Right.
15      **Q   Okay.**
16      A   Specialist system policies and procedures, I
17  can't even tell what department that is.
18      **Q   Okay.**
19      A   I'm not sure.  Supervisor material services,
20  possibility.  Specialist HR support, possibility.
21  Frontier Airlines flight attendant, possibility.
22          I don't know about the next one, manager IT
23  network.  Instructor inflight, that's a duplication.
24  Intern finance, that's an intern.  Crew scheduler, we
25  already talked about.

90

1       **Q   Okay.  So I'm not going to make you go through**
2   **this five-pages of job openings.  But is it fair to say**
3   **that in looking at -- I tried to circle the ones that you**
4   **said could be a likely fit or a possible fit -- that a**
5   **majority of these positions were -- are potential**
6   **positions that a former pilot who can't fly could be**
7   **qualified and trained to do; is that --**
8       A   Yeah.  I mean, I don't want you to misrepresent
9   what I said.  I -- I -- at first glance, without looking
10  at the job descriptions related to these positions, based
11  on my general knowledge of what they are, with further
12  evaluation, those -- those that I identified could be
13  potential possibilities.
14      **Q   Okay.  Thanks.**
15          **Okay.  Did Frontier Airlines ever enter into**
16  **any sort of contract with Mr. Quick to waive his rights**
17  **under USERRA in any respect?**
18          MR. DABNEY:  Objection.  Calls for a legal
19  conclusion.
20      A   I don't know.
21      **Q   (By Mr. Romer-Friedman)  Okay.  The -- the**
22  **company's not aware of any agreement with Mr. Quick that**
23  **he agreed to waive or delay his rights under USERRA?**
24      A   Not that I'm aware of.
25          MR. DABNEY:  Same objection.

91

1       **Q   (By Mr. Romer-Friedman)  Did he --**
2           MR. DABNEY:  You know, with respect to those
3   questions, that was also covered yesterday.
4           MR. ROMER-FRIEDMAN:  Okay.
5       **Q   (By Mr. Romer-Friedman)  All right.  Is the --**
6   **the company aware that it has asserted that it would be**
7   **impossible or unreasonable to employ Mr. Quick?**
8           MR. DABNEY:  Object to form.
9       A   In what context?
10      **Q   (By Mr. Romer-Friedman)  Are you aware that in**
11  **the context of this case, that the company has asserted**
12  **that it would be impossible or unreasonable to employ --**
13  **to reemploy Mr. Quick in a position where he'd actually**
14  **receive compensation, full reemployment?**
15      A   I believe the context of that has to do with
16  not having the information or not getting far enough along
17  in the process to have comfort or reasonably place him in
18  just any position, given the nature of our business and
19  passenger safety.
20      **Q   Okay.  So the -- the company's assertion of**
21  **this impossibility or unreasonableness, it doesn't have**
22  **anything to do with Frontier's financial capacity or**
23  **circumstances, right?**
24          MR. DABNEY:  Object to form.  Calls for a legal
25  conclusion.

92

1       **Q   (By Mr. Romer-Friedman)  You can answer.**
2       A   Certainly that would relate to what I just said
3   about the type of business we are and our being heavily
4   regulated and responsible for passenger safety.
5       **Q   Let me frame this differently.  It sounds like**
6   **what you're saying is the -- the company's belief that it**
7   **would be impossible or unreasonable to reemploy Mr. Quick**
8   **had to do with his circumstances of either his disability**
9   **or the difficulty that there was, apparently, between the**
10  **company and Mr. Quick in identifying what his capabilities**
11  **were, right?**
12          MR. DABNEY:  Object to form.
13      A   That at the time that we were going through the
14  process to reemploy him, we did not have sufficient
15  information to place him.
16      **Q   (By Mr. Romer-Friedman)  Okay.  In other words,**
17  **my point is that your -- the company's assertion of this**
18  **defense isn't at all about whether Frontier Airlines was**
19  **profitable or not profitable or had sufficient numbers of**
20  **positions to reemploy a person, right?**
21          MR. DABNEY:  Object to form.  It calls for a
22  legal conclusion.  The witness can testify about facts
23  relevant to the defense.  The witness can't argue with you
24  or present the defense as if she's counsel for the
25  company --

30(b)(6) Deposition of Frontier Airlines through Zeier, Thibodeau and Sabia (Videotaped)
Edward Quick v. Frontier Airlines and Michele (sic) Zeier  -  August 5, 2016

93

 1    Q   (By Mr. Romer-Friedman)  If you can answer it,
 2  please answer.
 3    A   Restate the question.
 4    Q   In asserting that it was impossible or
 5  unreasonable for the company to reemploy Mr. Quick, is the
 6  company concerned about Mr. Quick's interaction with the
 7  company, or is it broader than that, that the company
 8  lacked the financial resources or something about the
 9  company changed?
10    A   I don't know.
11    Q   Okay.  In the time that Mr. Quick sought
12  reemployment, did anything about the company's financial
13  outlook or the number of employees get worse?
14    A   Did the company's profitability or --
15    Q   Let's take -- let's take this one by one.  From
16  -- from 20 -- September 2014 going forward, was there
17  anything in that time period about the profitability of
18  the company that would cause it to not be able to reemploy
19  a single pilot in -- some position?
20    A   We did employ pilots.  I can answer that.
21    Q   Or to -- was there something about the
22  profitability that -- or the revenues of the company that
23  would make it difficult or onerous to reemploy a pilot in
24  a -- in a nonpilot position?
25    A   I don't know.  I'm not sure what you're getting

94

 1  at.
 2    Q   In the 2014, 2015 time period, the company was
 3  profitable, right?
 4    A   I don't know the overall profitability or
 5  revenue picture for Frontier during that time.
 6    Q   It earned profit during that period, correct?
 7    A   I believe so.
 8    Q   Okay.  The number of pilots was growing
 9  significantly or steadily during that period, correct?
10    A   We have been hiring pilots, as JP testified to
11  yesterday --
12    Q   But as --
13    A   -- during that period.
14    Q   As Mr. --
15    A   I don't know what the numbers are.
16    Q   As Mr. Thibodeau noted yesterday, over the last
17  five years, hundreds of additional pilots in terms of net
18  growth have been brought on at Frontier Airlines, right?
19    A   I don't know if the number was hundreds but,
20  yes, we have been hiring.
21    Q   Okay.  So bringing one pilot back into a
22  nonpilot flying -- a nonflying pilot job or another job at
23  the company, that wouldn't be a financial hardship on the
24  company, right?
25    MR. DABNEY:  Object to form.

95

 1    A   If the context is what it is with regard to
 2  placing somebody in a nonpilot role, it would depend on
 3  that individual with regard to their suitability for -- if
 4  it were a critical position related to the operation or
 5  safety of the airline.
 6    Q   Okay.  At the time that the company was
 7  considering reemploying Mr. Quick in the fall of 2014, was
 8  it aware that he was a flight instructor certified by the
 9  FAA?
10    A   I don't know that.
11    Q   Does anyone in the company know that?
12    A   I don't know.
13    Q   Did -- at the time, did the company know that
14  he had any other certifications from the FAA?
15    A   I don't know.
16    Q   So the company didn't know that he had an FA --
17  a certificate from the FAA as an airline transport pilot?
18    A   He may have -- it may be a document in his
19  training or personnel file.
20    Q   Okay.  Would that make a difference in terms of
21  those nonpilot flying job -- nonflying pilot jobs, that
22  Mr. Quick had a license to be a flight instructor?
23    A   That, along with everything else, would be
24  taken into consideration through that evaluation process.
25    Q   Okay.  So it would be helpful towards

96

 1  qualifying him, for example, as a flight instructor,
 2  that -- that he had a certificate from the FAA and
 3  experience as a flight -- as an instructor of other
 4  pilots?
 5    MR. DABNEY:  Object to form.  Foundation.
 6    Q   (By Mr. Romer-Friedman)  You can answer.
 7    A   I don't know if that certification had to do
 8  with military instruction or otherwise.  That would have
 9  to be --
10    Q   So the company --
11    A   -- taken into consideration.
12    Q   So the -- the company is unaware that he --
13  that Mr. Quick had experience as a commercial -- outside
14  of the military in doing flight instruction?
15    MR. DABNEY:  Object to form.  That's not what
16  she said.
17    A   You're asking me if I know that he had
18  instructor experience.  I think I answered that, that --
19  that I -- I don't know if he had.
20    Q   (By Mr. Romer-Friedman)  Okay.  That the
21  company doesn't know?
22    MR. DABNEY:  Object to form.  I don't see where
23  that's on the topic list either.  Ms. Zeier said she
24  doesn't know.
25    MR. ROMER-FRIEDMAN:  Well, I think it goes to

97

1   his personnel experience, his reemployment or reemployment
2   efforts.
3       MR. DABNEY:  You're asking if they knew -- what
4   he knew -- what was the situation with Mr. Quick's
5   qualifications in 2014.  That's not his personnel history.
6       MR. ROMER-FRIEDMAN:  That relates to his
7   reemployment or non-reemployment.
8       MR. DABNEY:  Well, that's related to my
9   objection and how overly broad that is.  I mean,
10  that's a specific about his -- about -- among many
11  thousands of facts that could be encompassed by that
12  description.
13      Q   (By Mr. Romer-Friedman)  Do you know in -- in
14  the context of Mr. Quick stating back in the fall of 2014
15  that he was qualified for nonflying pilot positions,
16  whether anyone asked him whether he had an updated flight
17  instructor certificate from the FAA?
18      A   I'm not aware of anybody asking him that or
19  not.
20      Q   Is the company aware of any situation where it
21  took longer than three months to reemploy or provisionally
22  reemploy a service member coming back from military leave?
23      MR. DABNEY:  Asked and answered.
24      A   I'd refer to my testimony yesterday and today.
25      Q   (By Mr. Romer-Friedman)  All right.  So it's

98

1   the same for the company?
2       MR. DABNEY:  It's the same answer that she gave
3   to your question yesterday and today.
4       MR. ROMER-FRIEDMAN:  Well, she said she didn't
5   know.
6       MR. DABNEY:  You've asked that question how
7   many times.  I don't understand why you keep going back to
8   things you've covered.
9       MR. ROMER-FRIEDMAN:  Well, I think pursuant --
10  okay.
11      Q   (By Mr. Romer-Friedman)  So the company is not
12  aware -- in your capacity testifying for the company, your
13  testimony is the same, you're not aware of any situation
14  where it took three months or longer to reemploy a service
15  member after their military service?
16      A   I'm not aware of specific timelines of other
17  cases.
18      Q   And we talked earlier about Mr. Jaclyn Peter,
19  and you said she was the other decision-maker --
20      MR. DABNEY:  Object to form.  That's not what
21  she said.
22      Q   (By Mr. Romer-Friedman)  -- is that correct,
23  with respect to Mr. Quick's reemployment?
24      A   As I said, she serves in -- and I talked about
25  this yesterday, too.  She has -- she wears two hats.  She

99

1   serves as counsel or -- or in that capacity for the
2   company as well.  I'm not sure in Ed's situation or any
3   other, you know, at any particular time when I talked to
4   her what capacity she's in.
5       Q   Okay.  So if she talked to you about Mr. Quick,
6   you're not sure or -- if she talks or e-mails with you,
7   you're not sure if she's giving you legal advice or if
8   she's your boss telling you what to do with respect to --
9       A   Correct.
10      Q   Okay.  Who makes that decision, the lawyers?
11      MR. DABNEY:  Who makes what decision?
12      Q   (By Mr. Romer-Friedman)  Who makes the -- I
13  mean, how -- how -- how do we know whether Ms. Peter was
14  giving you legal advice or not in talking about the --
15      A   If I don't know, you wouldn't know.
16      Q   Okay.  But it's fair to say that any e-mail
17  that she sent, any communication about Mr. Quick, it might
18  have been her hat as a decision-maker; it might have been
19  her hat as a -- as a counsel?
20      A   I don't know.
21      Q   Okay.  How about the outside counsel?  Are they
22  decision-makers like Ms. Peter?
23      A   They're counsel.
24      Q   They give advice?
25      A   Correct.

100

1       Q   They don't make the decision?
2       A   Correct.
3       Q   Okay.  So Ms. Peter's a little bit different
4   than outside counsel.  Sometimes she makes decisions;
5   sometimes she's advising?
6       MR. DABNEY:  Object to form.  Foundation.
7       Q   (By Mr. Romer-Friedman)  You can answer.
8       MR. DABNEY:  That's not part of the topics.
9   Ms. -- Ms. Zeier can't answer with respect to how the
10  company obtains legal advice or what it does with it.
11      MR. ROMER-FRIEDMAN:  I think she testified that
12  Ms. -- Ms. Peter was a decision-maker with respect to
13  Mr. Quick's reemployment.  I'm asking about her role
14  relative to other people.
15      Q   (By Mr. Romer-Friedman)  So what --
16      MR. DABNEY:  I think you're mischaracterizing
17  her testimony.
18      Q   (By Mr. Romer-Friedman)  What decisions did
19  Ms. Peter make about Mr. Quick's reemployment?
20      A   I don't know through the course of it.  Like I
21  said, we -- we have conversations, and because of her dual
22  -- dual role, I'm not sure at what capacity at any given
23  time she's functioning.
24      Q   What role did Mr. Jim Colburn have with respect
25  to Mr. Quick's reemployment?

30(b)(6) Deposition of Frontier Airlines through Zeier, Thibodeau and Sabia (Videotaped)
Edward Quick v. Frontier Airlines and Michele (sic) Zeier  -  August 5, 2016

### 101

1    A  None other than he may have been consulted with
2  regard to Ed's training status.
3    Q  Okay.  So it was a very minor tangential role?
4    MR. DABNEY:  Asked and answered.
5    A  He was consulted, as I just said --
6    Q  (By Mr. Romer-Friedman)  Okay.
7    A  -- with regard to training.
8    Q  With respect to the long-term disability leave,
9  who was the person responsible at the company for
10  determining when an individual is entitled to long-term
11  disability leave?
12    A  The individual applies for long-term
13  disability.
14    Q  Okay.
15    A  And through that application process, the
16  eligibility is determined by the insurance company.
17    Q  Okay.  Who runs -- who's responsible for
18  administering the long-term disability leave?
19    A  The insurance company.  And we have benefits
20  specialists in the HR department who are a liaison or
21  provide information in order to help a person apply.
22    Q  Is it -- is the -- is the long-term disability
23  plan an ERISA plan?
24    A  I don't know.
25    Q  Is -- is there anyone who's an official at the

### 102

1  company at Frontier Airlines who is responsible for
2  wearing a different hat to administer the long-term
3  disability plan?
4    A  Mr. Sabia could probably answer that question
5  for you.
6    Q  Okay.  Does the company know when Mr. Quick
7  received his make-up -- his defined contribution make-up
8  contribution under USERRA?
9    A  I don't know the date off the top of my head,
10  but I'm sure the company has that information and could be
11  provided as to the timing.
12    Q  Okay.
13    MR. DABNEY:  It's been produced.
14    Q  (By Mr. Romer-Friedman)  It was in the spring
15  of 2014 -- 2015?  Excuse me.  Does that sound right?
16    MR. DABNEY:  The date is on the document that
17  was produced.  She's testified she doesn't know the date.
18    A  Do you want to show it to me, and I can testify
19  to it?
20    Q  (By Mr. Romer-Friedman)  That's okay.
21    Is the company aware of any pension
22  contribution that took five to six months to be made up
23  for a service member's military service?
24    A  Are you asking me about other timelines?
25    Q  Yeah.  Whether there --

### 103

1    A  I'd refer to my prior testimony about that.
2    Q  Okay.  So the company is not aware of any
3  instance in which it's taken five to six months or
4  anything in that ballpark?
5    A  I don't know that that was the testimony.
6    Q  I'm asking, what -- what is the company's
7  testimony as to how --
8    A  I said I'm -- I believe I said I'm not aware of
9  specific timelines in other cases.
10    Q  Okay.  So the company is not aware of any other
11  instance in which a make-up contribution has taken five to
12  six --
13    A  That's a mischaracterization.  I said what I
14  said.
15    Q  Is -- I'm asking, is the company aware of any
16  other instances?
17    A  I'm not aware of specific timelines in other
18  cases, so, therefore, I cannot answer that question.
19    Q  Okay.  So it's possible, then, that there's
20  never been an instance in which it took this long, five to
21  six months, for a pension contribution or make-up
22  contribution to be made; is that right?
23    A  I don't know.
24    Q  Okay.  I'm going to hand you what will be
25  Exhibit 54, and I believe this will be our last exhibit

### 104

1  with you, Ms. Zeier.
2    (Deposition Exhibit 54 was marked.)
3    A  Thank you.
4    MR. ROMER-FRIEDMAN:  You're welcome.
5    Q  (By Mr. Romer-Friedman)  Does Exhibit 54
6  refresh your memory about --
7    A  That appears to be an e-mail from Schwab
8  Payroll Processing to Anthony Sabia on August 3rd, 2015.
9    Q  Okay.  Does this refresh your memory about when
10  the defined contribution was made in the amount of
11  $32,046.21 for Mr. Quick's military service between '07
12  and 2014?
13    A  No, because I have no memory of when that
14  actually was accomplished.  The document says what it says
15  as far as the timing.
16    Q  Okay.  All right.
17    MR. ROMER-FRIEDMAN:  Okay.  I think that's all,
18  Ms. Zeier.  Thank you.
19    EXAMINATION
20  BY MR. DABNEY:
21    Q  Michelle, I just have one or two questions.
22    A  Yes, sir.
23    Q  You were asked about whether anyone at the
24  company had inquired of Mr. Quick about whether he held
25  a -- any kind of instructor certification or whether he

30(b)(6) Deposition of Frontier Airlines through Zeier, Thibodeau and Sabia (Videotaped)
Edward Quick v. Frontier Airlines and Michele (sic) Zeier  -  August 5, 2016

---

105

1 held his air transport pilot's license. True, isn't it,
2 that the company was aware that Mr. Quick held an air
3 transport pilot's license, right?
4     A   The ATP would be something in his training
5 qualifications file. It pertains to his position as a
6 pilot at Frontier.
7     Q   Okay. And then in terms of the process that
8 you described any number of times in the last two days for
9 evaluating and placing Mr. Quick in a job pursuant to the
10 reemployment regime under USERRA, would asking him about
11 qualifications about, such as an instructor, have been
12 part of that process?
13     A   Yes, it would have been part of the dialogue we
14 would have with Ed or anybody else about their
15 qualifications and placement.
16     Q   And is the dialogue that you asked Mr. Quick to
17 engage in with the company in your e-mails in February and
18 March of 2015, the same dialogue that would have produced
19 information from Mr. Quick about his instructor
20 qualifications had Mr. Quick engaged in that dialogue?
21     A   Likely, yes.
22     Q   In undergoing that process and looking at
23 qualifications and abilities and disabilities, et cetera,
24 in order to place Mr. Quick in the appropriate position,
25 you testified earlier that information, such as his

---

106

1 military performance reports, would be considered along
2 with everything else?
3     A   Yes.
4     Q   Would there be any difference between
5 information that was 10 or 15 years old versus information
6 that was more recent?
7     A   Yes.
8     Q   What would that difference be?
9     A   And I -- I think I testified earlier that
10 certainly we value all pilot-related experience, military
11 experience, you know, hours, et cetera, but those are all
12 qualifying things depending on the type of hours flown on
13 what aircraft, et cetera, and, yes, the timing of
14 performance evaluations, et cetera.
15         And that while they're valued and would be part
16 of any evaluation process, they would have to be taken for
17 what they were and not always a direct correlation to a
18 passenger transport airline 121.
19         MR. DABNEY: Those are all my questions.
20         EXAMINATION
21 BY MR. ROMER-FRIEDMAN:
22     Q   One last question then, just responding.
23         As you testified yesterday -- yesterday in your
24 individual capacity and today, Mr. Quick did tell you in
25 the fall of 2014 he was interested in nonflying pilot

---

107

1 positions, right?
2         MR. DABNEY: Object to form.
3     A   I'll refer to my prior testimony.
4     Q   (By Mr. Romer-Friedman) Okay. And not
5 withstanding what you just said to -- to Mr. Dabney, isn't
6 it true that, as you testified yesterday, between
7 Mr. Quick telling you he wanted to qualify for a nonflying
8 pilot position, that between that time and the July 31,
9 2015 offer letter, you made no effort to look into his
10 qualifications for those particular positions, right?
11         MR. DABNEY: Object to form. It
12 mischaracterizes her testimony.
13     Q   (By Mr. Romer-Friedman) You can answer.
14     A   I'll refer to my prior testimony.
15     Q   Okay. And, again, as yesterday, in addition to
16 you, no one else in your department reached out to
17 Mr. Thibodeau or anyone else in the relevant departments
18 during this fall 2014 to 2015 time period to determine if
19 there were job positions that were appropriate for
20 Mr. Quick, correct?
21         MR. DABNEY: Object to form. It
22 mischaracterizes the testimony.
23     A   I believe that was asked and answered, and I'd
24 refer you to my prior testimony.
25     Q   (By Mr. Romer-Friedman) Okay.

---

108

1         Yeah. Last question: Is there -- is there a
2 way in which Frontier Airlines and HR or the pilots
3 division can obtain information about Mr. Quick's
4 certifications under the FAA or other qualifications under
5 the -- through the FAA without asking him directly for it?
6         Like is there an electronic database or a -- or
7 a way to reach out to the FAA to get the relevant
8 certifications or anything --
9     A   There may be. I'm not sure.
10     Q   So it -- it -- okay.
11         MR. ROMER-FRIEDMAN: All right. We're done.
12 Thanks.
13         Can we take 30 minutes?
14         THE VIDEOGRAPHER: This is -- this is the
15 30(b)(6) deposition Media Unit Number 2 --
16         MR. ROMER-FRIEDMAN: Oh, actually, we're not --
17 we're not ending the --
18         THE VIDEOGRAPHER: Right. This ends the
19 30(b)(6) deposition Media Unit 2 --
20         MR. ROMER-FRIEDMAN: Okay.
21         THE VIDEOGRAPHER: -- with the testimony of
22 designee Michelle Zeier.
23         It will be followed by other media units,
24 counsel.
25         MR. ROMER-FRIEDMAN: Great.

---

109

1    THE VIDEOGRAPHER:  But we are going off the
2 record with the end -- with the end of Media Unit Number
3 2.  The time is 12:40.
4    (A recess was taken between 30(b)(6) designees
5 from 12:40 p.m. until 1:39 p.m.)
6    THE VIDEOGRAPHER:  Back on the record with
7 Media Unit 3 at 1:39 with 30(b)(6) designee Anthony Sabia.
8    Please swear the witness.
9    ANTHONY SABIA,
10 having been first duly sworn, was examined and testified
11 as follows:
12    EXAMINATION
13 BY MR. ROMER-FRIEDMAN:
14    Q  Good afternoon, Mr. Sabia.
15    A  Hi.
16    Q  Is that correct pronunciation?
17    A  Yep, Sabia.
18    Q  My name is Peter Romer-Friedman.  I represent
19 Mr. Quick, the plaintiff, in this case.  I understand
20 you're here to be a -- what's called a 30(b)(6) designee
21 on behalf of Frontier Airlines on several topics.
22    Is that your understanding?
23    A  My understanding is I'm here to -- to talk
24 about the calculations with -- with regard to the DC plan.
25    Q  Okay.  And we may ask you some other things if

110

1 you -- if you -- if you know and can help us related to
2 401(k) or the profit-sharing plan.
3    Okay?
4    A  Okay.
5    Q  Okay.  I'm going to go through some basic
6 ground rules on depositions.
7    Have you been deposed before?
8    A  A long time ago, yes.
9    Q  How long ago?
10    A  I would expect maybe at least 10 years ago.
11    Q  Okay.  What kind of a case was that?
12    A  It was a bankruptcy.
13    Q  Any other cases?
14    A  No.
15    Q  Okay.  Okay.  For the record, could you state
16 your name, address and current employer.
17    A  I'm Anthony Sabia, Frontier Airlines.  We're at
18 7001 Tower Road in Denver.
19    Q  And what's your position?
20    A  Direct of HR services.
21    Q  Okay.  And -- okay.  So you understand you're
22 here testifying on behalf of the company as opposed to you
23 as an individual?
24    A  That's my expectation.
25    Q  Okay.  Did you do anything to prepare for

111

1 today's deposition?
2    A  I talked to counsel.  I looked over some --
3 some of the worksheets that I prepared and calculations,
4 and I reviewed a couple e-mails that -- that, you know,
5 may have come to me over the last year.
6    Q  Okay.  Do you have a copy of that worksheet
7 with you today?
8    A  I do not.
9    Q  Okay.
10    MR. ROMBER-FRIDEMAN:  Has that been produced to
11 counsel?
12    MR. DABNEY:  Yes.
13    MR. ROMER-FRIEDMAN:  Okay.  And is that -- is
14 that in the Bates range that you mentioned, Mr. Dabney,
15 earlier?
16    MR. DABNEY:  The FAPA Invest Bates ranges?
17    MR. ROMER-FRIEDMAN:  No.  The Bates range that
18 you mentioned.
19    MR. WHITCOMB:  The Bates --
20    MR. ROMER-FRIEDMAN:  I'm sorry.  The -- the --
21 the -- the calculation you mentioned.
22    MR. DABNEY:  Yes.  He -- he -- the -- the sheet
23 he's talking about was produced.
24    MR. ROMER-FRIEDMAN:  Okay.  Do you know what
25 the Bates number is of that?

112

1    MR. DABNEY:  He wouldn't, and I don't.
2    MR. ROMER-FRIEDMAN:  Okay.  Okay.
3    Q  (By Mr. Romer-Friedman)  So we have a
4 stenographer as well as a videographer.  Please give
5 verbal answers as opposed to nodding your heading.
6    Okay?
7    A  Okay.  Great.
8    Q  If I ask a poorly worded question, feel free to
9 ask for clarification.  If I don't hear from you, I'll
10 assume you understand the question.
11    A  Okay.
12    Q  Okay.  Your attorney may ask -- make
13 objections.  If he does, you can still answer -- you're
14 still supposed to answer the question unless he instructs
15 you specifically not to.
16    Okay?
17    A  Okay.
18    Q  All right.  We can take -- we may take a short
19 break, depending on how long we go, but if you need a
20 break for any reason, just let me know.
21    A  Okay.
22    Q  Okay.  If your answer isn't incomplete and you
23 want to complete it later, just let me know, and we can do
24 that.
25    A  Okay.

30(b)(6) Deposition of Frontier Airlines through Zeier, Thibodeau and Sabia (Videotaped)
Edward Quick v. Frontier Airlines and Michele (sic) Zeier  -  August 5, 2016

---

113

1     Q   You understand you're under oath just as if you
2  were in a court before a judge?
3     A   Yes.
4     Q   Okay.  You're not a party to this lawsuit,
5  correct?
6     A   Correct.
7     Q   Okay.  Frontier Airlines and Ms. Zeier are the
8  parties, correct?
9     A   That's my understanding.
10    Q   Okay.  Is there any reason why you can't tell
11 the truth today?
12    A   No.
13    Q   Okay.  You're not -- you're not taking any
14 drugs or medications that prevent that --
15    A   No.
16    Q   Okay.  That's one of the things we're supposed
17 to ask.  I'm not picking on you.
18    A   No.  I -- that's fine.
19    Q   Okay.  And when I say "Frontier," I'll refer --
20 be referring to Frontier Airlines.
21        Okay?
22    A   Okay.
23    Q   All right.  So besides those calculations you
24 reference, what else did you look at in anci -- to prepare
25 for this deposition?

---

114

1     A   I looked at -- there were just maybe two or
2  three e-mails just to familiarize myself with what was
3  asked at the time.
4     Q   Okay.  Did you look at any of the expert
5  reports that have been prepared in this litigation?
6     A   No.
7     Q   Are you aware of any expert reports being
8  prepared or created?
9     A   I -- I'm really not sure what an expert report
10 is.
11    Q   Like a report about Mr. -- a report by an
12 outside entity besides Frontier Airlines reporting about
13 Mr. --
14    A   No.
15    Q   -- Quick's benefits?
16    A   No.
17    Q   Okay.  So you haven't reviewed any of those?
18    A   No.  No.  No.
19    Q   Okay.  What are the types of retirement
20 benefits that pilots receive at Frontier Airlines?
21    A   Pilots have a defined contribution plan or DC
22 plan.
23    Q   Okay.
24    A   That is one benefit that they receive
25 automatically.  There are also -- there's also a 401(k)

---

115

1  plan, and that would be provided that -- if an employee
2  would sign up for contributions.
3     Q   So the -- the employee voluntarily donates --
4  puts a portion of their compensation, and the company
5  matches it?
6     A   Right.  So they would -- they would work with
7  Charles Schwab to get that set up, so that percentage, and
8  then the file would come to Frontier Airlines, and we
9  would set it up in the system.
10    Q   Do you -- do you know what portion of the
11 defined contribution -- in the -- under the defined
12 contribution plan, do you know what portion over the last
13 10 years has been going into pilot's DC?
14    A   I would have to refer to either the contract or
15 -- or my worksheet, because depending on the years and
16 depending on -- on the time, there was a specific
17 contribution amount.
18    Q   Okay.  Do you have a ballpark idea what it is?
19    A   I believe it's 6 percent.
20    Q   Okay.  How about the 401(k)?  What -- up to
21 what percentage for pilots will the company match?
22    A   Currently?
23    Q   Sure.
24    A   So currently it's 50 percent up to 10 percent
25 of their salary provided that the employee contributes at

---

116

1  least 10 percent.
2     Q   So if the employee puts 10 percent of their
3  salary into the 401(k), Frontier would put 5 --
4  essentially 5 percent of their salary in?
5     A   Right.  Or half of that contribution.  So 50
6  percent up to 10 percent.  If the employee --
7     Q   If he puts in 5 --
8     A   -- put in 6 percent, we would match 50 percent
9  of that 6 percent, which would be 3 percent.
10    Q   Okay.  All right.  Are there any other
11 retirement or profit sharing plans that are -- that are
12 available to pilots?
13    A   There is a profit-sharing plan that's really
14 administered through FAPA Invest, which is a separate
15 entity.  You know, so that's not anything that -- that I
16 would say Frontier administers or calculates.
17        But I do know that the -- the pilots do get a
18 profit sharing check or they have -- at least in the last
19 two years they have.
20    Q   Okay.  So under the FAPA Invest, when Frontier
21 earns a profit, a portion of that profit goes to the
22 pilots and is distributed in turn to the pilots?  Is that
23 how it works?
24        MR. DABNEY:  Object to form.  That is not what
25 he said.

---

30(b)(6) Deposition of Frontier Airlines through Zeier, Thibodeau and Sabia (Videotaped)
Edward Quick v. Frontier Airlines and Michele (sic) Zeier  -  August 5, 2016

---

**117**

1   Q   (By Mr. Romer-Friedman)  Could you describe how
2   that works?
3       A   I can tell you that it's really -- I don't have
4   the detail behind what the Frontier amount would be that
5   they've agreed to with FAPA Invest.  That's really between
6   FAPA Invest and -- and, you know, Frontier leadership, I
7   guess.  What I do is, I would provide information, and
8   they really do the calculations.  And I -- I pay a number
9   that they give back to me.
10      Q   Okay.  What kind of information would you be
11  given?
12      A   It would be earnings information.
13      Q   Okay.  So FAPA Invest takes the earnings
14  information of what the pilot earned and uses that to
15  determine a share the pilot would get of the -- of -- of
16  the overall amount?
17      A   I know that that's what I provide to them.
18  What they do from there and if there's any other
19  information they consider, that, I don't know.
20      Q   Okay.  Do you know how these programs, the --
21  the defined contribution plan, the 401(k), the -- the
22  profit sharing FAPA Invest plan, do you know how those
23  work for service members who go on military leave?
24      A   I -- I do not.
25          MR. DABNEY:  Ask him a noncompound question.

---

**118**

1   Try again.
2          MR. ROMER-FRIEDMAN:  Thanks, counsel.
3       Q   (By Mr. Romer-Friedman)  So when -- when a
4   service member goes on military leave and returns to
5   work --
6       A   Okay.
7       Q   -- what does the company do with respect to the
8   defined contribution plan?  Let's start with that.
9       A   All right.  So you're talking about leave.  My
10  understanding is when someone goes on a military leave and
11  they come back to the company, the company should make --
12  like in the -- in the DC plan, should make that employee
13  whole as far as they should be at -- for an example, with
14  pilots, they should -- they should step on their
15  anniversaries, get the -- the contractual rate of pay
16  increases as well, as if they were still, you know, active
17  or -- or at the company.
18      Q   Okay.
19      A   And then the same with the DC plans.  So if --
20  if they were gone for a certain period of time, I would
21  expect that, you know, a calculation should be made for
22  that period of time the person was gone once they came
23  back to -- to the company.
24      Q   Okay.  So let's -- let's take, like, a simple
25  example.  Let's say if someone one goes on leave for one

---

**119**

1   year --
2       A   Okay.
3       Q   -- okay, like all of 2014, and they come back
4   on January 1 of 2015.  How -- what -- what is the process
5   look like to go at -- at Frontier to go about making that
6   employee whole --
7       A   So --
8       Q   -- on the defined contribution?
9       A   Right.  So let me tell you.  Leaves are not
10  handled in my department.  Leaves is actually a -- a
11  different department.
12          What I would expect is that we would be
13  notified that the employee would go to an active status.
14  And at that point, we would activate them in the system
15  or, you know, bring them off of a leave.
16          And then I would expect that the -- the -- the
17  labor side of the department would have discussions, you
18  know, with me or with my team to say, okay, we need to,
19  you know, make this person whole or, you know, we need to
20  make sure it's as if they did not leave the company as far
21  as -- in my case, it would be as far as the rate of pay is
22  concerned.  And with the DC plan, it would be as far as
23  that DC calculation would be concerned.
24      Q   Okay.  How soon would the company start making
25  that calculation for the make-up plan -- the make-up

---

**120**

1   contribution to the defined contribution plan after the
2   employee returns to active status?
3       A   Can -- can you ask that again.
4       Q   Yes.  So once the employee is returned to an
5   active status --
6       A   Right.
7       Q   Actually, so is that -- is your understanding
8   when the employee has an active status, that that employee
9   is reemployed for the purposes of the company's
10  personnel --
11      A   In -- in my -- you know, I guess in my
12  discipline, yes, they're -- they're employed.  They're
13  active.  They're working.
14      Q   Okay.  So once they're in active status, the --
15  how soon after does the benefits department start to
16  calculate the -- the defined contribution make-up for the
17  period of leave?
18      A   I think, you know, it's really -- it's as soon
19  as practicable.  The -- if you're gone for one year, there
20  probably is a lot of information that we have immediate
21  access to.  And this is the case that you're asking about.
22      Q   Right.
23      A   When -- in this particular case, when -- when
24  there's a number of years that -- that have gone by, there
25  are also a number of system changes that had been made,

---

121

1   and so some systems had been sunsetted. So, you know, I
2   would say as soon as practicable, I mean, really.
3       Q   So actually, I'm just talking about how -- when
4   does the process start, right?
5       A   Yeah.
6       Q   So I assume in an easy case, like one year, or
7   a harder case, like five years.
8       A   Right.
9       Q   You're saying -- I understand you're saying it
10  may take longer to make the calculation for the longer
11  period.
12      A   Right.
13      Q   But when does -- does the process start usually
14  at -- right away when the person becomes active?
15      A   You know, I have not -- I have not had a
16  situation where I've had to -- where I could answer to --
17  or refer to on this --
18      Q   Okay.
19      A   -- before.
20      Q   Have there been other pilots or -- who went on
21  military leave for a longer period of time?
22      A   Again, I -- that, I don't know.
23      Q   Okay.
24      A   That -- that's -- that's in the leave
25  department, which is not the department --

122

1       Q   Okay.
2       A   -- that -- that I am --
3       Q   All right. And I -- I'm just trying to get a
4   ballpark sense of when -- when after the active status
5   resumes --
6       A   Right.
7       Q   -- do you start to go about doing the
8   calculation? I mean, are we talking about, like, a couple
9   weeks, or are we talking about six months?
10          Is there some kind of basic time frame in which
11  you would expect the company in the benefits department to
12  start that process of collecting information and making
13  the calculation?
14      MR. DABNEY:  Asked and answered.
15      Q   (By Mr. Romer-Friedman)  You can answer, if you
16  know.
17      A   I think as soon as practicable -- I mean,
18  practicable.
19      Q   Okay. And how -- how long, in your experience,
20  does it take to do this calculation and make -- actually
21  make the contribution for the defined contribution
22  make-up?
23      A   Again, from my experience, this is the first
24  time that I've -- I've had this experience.  I -- I have
25  not seen any others prior to this.

123

1       Q   By "experience," do you mean you have not seen
2   any other situation where a pilot returned and needed to a
3   make-up contribution to be made?
4       A   Yes. I mean, that's -- I think that's what I'm
5   saying. I have nothing to -- to compare it to.
6       Q   Okay. How long have you been in the benefits
7   department?
8       A   We -- we at Frontier took benefits over in
9   December of 2013.
10      Q   When you say "we" --
11      A   Front -- as -- as you know, Frontier was owned
12  by Republic Airways. They administered all benefits
13  through the end of 2013.
14      Q   Okay. But prior to that, though, when -- so
15  how long have you been at -- at Frontier?
16      A   I've been at Frontier since April of 2012.
17      Q   Okay. All right. Is there a written policy
18  for -- for how to do these make-up contributions for a
19  service member?
20      A   I -- in my area, there's -- there's no written
21  policy. I think that's really a question for the other
22  side of HR because that -- that has to do with leaves.
23      Q   Okay. I guess what I'm asking is, is there a
24  written policy that tells you or anyone else how to
25  calculate what the make-up contribution should be, or is

124

1   it an unwritten rule?
2       A   I have not seen a policy that tells me exactly
3   how to calculate the DC contribution based on someone that
4   was out on military leave.
5       Q   Okay. And when you -- and when you or whoever
6   did the pol -- the calculation for Mr. Quick, they weren't
7   following a particular policy --
8       MR. DABNEY:  Object to form --
9       Q   (By Mr. Romer-Friedman)  -- in making that
10  calculation --
11      MR. DABNEY:  Object --
12      Q   (By Mr. Romer-Friedman)  -- is that right?
13      MR. DABNEY:  That's not what he said.
14      Q   (By Mr. Romer-Friedman)  I'm asking you. I'm
15  char -- I'm not trying to characterize. I'm saying, when
16  Mr. Calc -- when Mr. Quick's pension calculation was done
17  for the defined contribution -- the make-up contribution,
18  was that the case, that there was no written policy being
19  applied to make that calculation?
20      A   I -- I --
21      MR. DABNEY:  Objection.
22      A   -- did not refer --
23      Q   (By Mr. Romer-Friedman)  Go ahead.
24      A   Okay. I did not refer to a written policy --
25      Q   Okay.

125

1    A -- to determine how to make that -- that
2  calculation.
3    Q  Well, how -- how -- how did you know what --
4  how to do the calculation?  You can answer.
5    A  The way I approached the calculation, because
6  there were no earnings pri -- that I could -- I could find
7  prior to the -- the date that Mr. Quick went out on leave,
8  what I did was I based the calculation on the base salary
9  of a first officer and the step and rate and the time that
10  -- that the employee would be in that step and rate and
11  calculated against the current percentage -- deferral
12  percentage, and that was -- that was the way that I
13  calculated it.
14    Q  Okay.  So let me make sure I -- I have this
15  straight.  That's helpful.
16    So you took the base salary.  Is that the line
17  guarantee?
18    A  Yes.  At the end of the day, it's -- it's the
19  guarantee.
20    Q  So the base salary would be the minimum number
21  of hours that a pilot would be --
22    A  That would be 75 hours.
23    Q  -- compensated in a month?
24    A  Correct.
25    Q  75 hours, okay, is a minimum they would be

126

1  compensated in a month.
2    So you take 75 hours, and you multiply it for
3  each -- in each month by the first officer rate that would
4  be in effect at the time based on Mr. Quick's seniority
5  and the -- the pay tables, right?
6    A  Correct.
7    Q  Am I missing anything?
8    And then you multiply that by the percentage,
9  whether it's 6 percent or otherwise, for the relevant year
10  of the defined contribution of -- supposed to be made of
11  the overall compensation?
12    A  Correct.
13    Q  Okay.  Have you ever been trained on -- on
14  USERRA as it relates to pension issues?
15    A  You know, I have not been trained on USERRA as
16  it relates to pension issues.
17    Q  Do you know if anyone else in the company has
18  been, in HR?
19    A  I -- you know, I don't -- I don't know what the
20  -- what training -- specific training people have had.
21    Q  Okay.  Do you know if the USERRA -- do you know
22  what the USERRA law is?
23    A  I -- I -- I am more familiar with it now
24  than -- than I was in January of 2015.
25    Q  Okay.  Do you -- do you know whether the USERRA

127

1  law has different rules for workers based on whether their
2  earnings are variable or fixed?
3    A  I understand that when there are calculations
4  that need to be made, there -- there is a -- an approach
5  where you would -- you -- you may look back at the prior
6  -- you know, the prior months of earnings.
7    I do know, for example, with salespeople, you
8  know, you have to determine what the potential commission
9  could be in order to, you know, get to -- to a number.
10    Q  Okay.
11    A  That -- that's -- that is what I know about --
12  about that piece of it.
13    Q  So with the salesperson, you might look at what
14  they had earned before the period of military leave to
15  estimate what they might have earned during the period?
16    A  I expect they could.
17    Q  Okay.  But that -- that's not how you did it
18  here, right, in Mr. Quick's case?  You said you looked
19  at -- you didn't -- you didn't look at what he earned
20  before the period of leave, right?
21    A  So based on some of the research that needed to
22  be done and what I referred to earlier as far as there
23  were at least three system changes, you know, I did try to
24  go back to get a point of reference --
25    Q  Right.

128

1    A  -- before that to say, okay, what were the
2  earnings -- you know, what can I refer to.  And I -- I was
3  unsuccessful in getting that information.  So what I did
4  was I calculated the -- the best I could without that
5  information.
6    Q  Okay.  Did you -- were you able to -- to
7  ascertain how many hours on average Mr. Quick worked
8  before he went on military leave?
9    A  I don't remember looking at that.
10    Q  Okay.  Do you know if he generally worked more
11  than the line guarantee?
12    A  Again, I -- I don't --
13    Q  Okay.
14    A  I don't know that information.
15    Q  Is it common for pilots at Frontier to work
16  more than the line guarantee?
17    A  Again, it's -- that's not something I can
18  answer, whether that's common or not.
19    Q  It happens?
20    A  Some do, and some don't.
21    Q  Okay.  All right.  Why did you use the first
22  officer rate for Mr. Quick in doing the calculation?
23    A  I'd have to refer back to when I was putting
24  the data together, but I expect that in the system, that
25  had to be the -- the title or the rate or something that I

129

1    referred to at that time. I mean, that -- that would be
2    the reason why.
3         Q   Okay. I'm going to hand you -- actually, I
4    think you have here in front of you what is Exhibit 54 in
5    this stack of papers. Hang on. It's at the very bottom.
6         Do you recognize this document, sir?
7         A   Not specifically, but I know what the document
8    is.
9         Q   Okay. This is an e-mail from Schwab Payroll
10   Processing to you on August 3rd; is that right?
11        A   Right.
12        Q   August 3rd, 2015?
13        A   That's what it looks like.
14        Q   And the subject is ACH debit notification,
15   Frontier Airlines, Inc. 401(k) retirement plan
16   semi-monthly payroll contribution file defined
17   contribution plan, correct?
18        A   Correct.
19        Q   Okay. And they write to you, Anthony Sabia,
20   Schwab Retirement Services -- I'm sorry -- Schwab
21   Retirement Plan Services, Inc. has reconciled the
22   7/31/2015 manual contribution data for Frontier Airlines,
23   Inc. 401(k) retirement plan funds in the amount of
24   $32,046.21 will be debited from account ending in
25   XXXXX0397. Is that Mr. Quick's account?

130

1         A   I -- I couldn't tell you whether that's his
2    account or not.
3         Q   And it says here, the defined contribution plan
4    contribution was $32,046.21; is that right?
5         A   That's correct.
6         Q   Is this the amount that was donated -- that was
7    contributed by Frontier Airlines to Mr. Quick's defined
8    contribution plan to make up for his seven years of
9    military leave?
10        A   I believe that was the amount that -- that I
11   calculated.
12        Q   Okay. So you calculated this number?
13        A   I did.
14        Q   Okay. Do you know when the contribution was
15   made to Mr. Quick's retirement -- or defined contribution
16   plan?
17        A   I would expect if this is dated August 3rd, it
18   was either August 2nd or August 3rd.
19        Q   Okay. Or maybe even July 31st --
20        A   Very possible -- it -- I would have to look at
21   a calendar to see how days fell and what the processing
22   time of --
23        Q   Okay. But it -- it wouldn't have been a month
24   before this? It would have been in this time frame?
25        A   I don't expect it would have been a month

131

1    before.
2         Q   Okay. Do you know when the benefits program
3    began calculating Mr. Quick's defined contribution plan,
4    make-up contribution?
5         A   I don't believe the benefits department did
6    that. Like I said, I --
7         Q   When you -- when you --
8         A   -- I started the calculation, I -- I would say,
9    you know, sometime in the early spring, you know, maybe
10   March time frame, somewhere in there.
11        Q   Okay.
12        A   Again, that's a guess. I -- I don't have a
13   date when I started that.
14        Q   Okay.
15        A   But I started it, you know --
16        Q   Not later than -- not later than March?
17        A   No. No --
18        Q   Okay.
19        A   -- not later than March.
20        Q   Okay. And it seems like, from what you're
21   saying, you had to pull information from several different
22   systems, and that's why it took from March until July to
23   -- to get this calculation done; is that right?
24        A   Well, I think that's one component --
25        Q   Sure.

132

1         A   -- of some of the timing there.
2         Q   What -- what else was -- what else were the
3    components that --
4         A   I mean, other components would be, for example,
5    they -- being able to understanding exactly what needed to
6    be done, and because of USERRA, like I said, that that
7    was -- that was a new -- that's something new that I was
8    working with at the time. I wanted to make sure that
9    everything was correct, right, and I wanted to make sure I
10   had really any and all data points I could refer to.
11        So starting that -- getting that process
12   started, I referred, you know, to Schwab, which is one of
13   our resources. I referred to our benefits broker,
14   Lockton, which is -- that's why the -- those companies are
15   there. They're a resource for us.
16        And then getting -- trying to get through the
17   systems does take a while. We started with ADP in the --
18   somewhere in the 2000s, went to an Oracle system, went to
19   an UltiPro system and was -- and was purchased at same
20   time, which means that data was -- that some integrity was
21   not there or easily available. So that -- that were --
22   those were some of the components that -- that I had to
23   work with.
24        Q   Okay. Was dealing with USERRA a new concept
25   for other people in -- in the time frame in which

133

1    Mr. Quick was -- was trying to get reemployed?
2        A   You know, that, I don't know.
3        Q   Okay.
4        A   I don't know.
5        Q   Who did you talk to or work with in -- in going
6    about calculating Mr. Quick's pension contributions?
7        A   Can you be more specific? I mean --
8        Q   Did you talk with anyone in the HR department
9    or -- or at Frontier Airlines in -- in deciding how or
10   what you were going to do to define -- to determine his
11   defined contribution make-up?
12       A   So I would work with Michelle Zeier, who was
13   another director in -- in HR.
14       Q   Okay.
15       A   I would -- I would have discussions with my
16   benefits manager, who is Krista Shaff, and, you know,
17   along with Lockton, we referred -- used Lockton as a
18   resource as well.
19           And, you know, some of the discussions is,
20   here's -- here's how I'm going to approach this because of
21   the information I have or the lack of information I have.
22   So I made the -- the best approach that I thought was
23   available at the time.
24           So those are -- you know, if you talk about who
25   did we have discussions with, that's -- those are the

134

1    discussions I had.
2           (A cell phone rang.)
3        Q   (By Mr. Romer-Friedman) And did you -- all
4    right.
5           My apologies.
6           Did you -- in -- in initially learning -- well,
7    when did you learn, actually, that you -- you were going
8    to calculate Mr. Quick's defined contribution make-up?
9        A   Again, about -- I don't know the -- the
10   specific date, but if I was working on that in the March
11   time frame, that would be about the time that I would have
12   been aware that we needed to do that or, you know, anytime
13   March or before. I mean, that -- I -- I just can't point
14   to a specific time.
15       Q   Okay. Did you come to learn about how under
16   USERRA benefits are supposed to be handled once a service
17   member is returned and reemployed?
18       A   Yes. There's a specific example -- which I'm
19   not in the day-to-day of all the benefits transactions,
20   let's say.
21           But when Ed Quick was brought back and made
22   into an active status, I think there was confusion that
23   what it -- really should have happened is all benefits
24   should have been active immediately or effective
25   immediately. And I think there was either a

135

1    misunderstanding or someone didn't know, so they -- they
2    treated Mr. Quick as a -- what you would consider like a
3    new hire where you would have a waiting period of 31 days
4    before it would become effective.
5           And that was toward the end of January. That's
6    when I -- I found out about, you know, what had happened.
7    And so that's why, you know, my -- my quick understanding
8    of USERRA and what really needed to happen, we went -- we
9    went back and made those corrections immediately.
10          So, yes, I mean, that's -- I do understand it
11   was not handled correctly at that point. I mean, that's
12   what happened, but I believe we made it -- you know, as
13   soon as -- as I was able to know what should be done, we
14   made those changes.
15       Q   Okay. How -- in terms of reinstating someone's
16   pension benefits and their health benefits, all the
17   benefits that they have as a regular employee, how quickly
18   can that be done in -- in the Frontier Airlines system?
19          Is that something that can be done like in a
20   week or two when someone comes back from work?
21       A   If you're talking about the -- the benefits
22   side, you know, the -- the medical, dental, vision are
23   really what I would focus on -- that would be -- we could
24   make that effective, you know, or call it effective
25   immediately, though, we don't have control over the

136

1    systems of our vendors, which in some cases could take a
2    week; some cases could take two weeks, just depending on
3    how it -- how the work would flow throw their systems.
4    But it doesn't mean that somebody would not be covered
5    should anything -- you know, should they have a claim
6    during that time.
7        Q   Okay. And it's not -- and it's not a hard
8    thing to do or costly to turn someone's benefits on,
9    right?
10           MR. DABNEY: Object to form.
11           Go ahead.
12       A   Say that again. I'm sorry.
13           MR. DABNEY: Objection to form.
14       A   Okay.
15       Q   (By Mr. Romer-Friedman) Yeah. It -- It's not
16   hard or difficult to turn on someone's benefits, right?
17           MR. DABNEY: Objection to form. Vague.
18   Ambiguous.
19       Q   (By Mr. Romer-Friedman) You can answer.
20       A   We have a process to -- to go through when we
21   need to turn --
22       Q   Okay.
23       A   -- a person's benefits on.
24       Q   Okay. And let me direct you to Exhibit 45,
25   which is in the pile in front of you. It has the -- I

### 137

1  think those are in chronological numbers.
2      A   Okay.
3      Q   Do you recognize this document?
4      A   I -- I'm, you know, vaguely familiar that --
5  that we had a discussion like this at that time.
6      Q   Okay.  This is an e-mail exchange between you
7  and Michelle Zeier on January 27th regarding Ed Quick, the
8  rest of the story, is that correct, is the subject line?
9      A   That's the subject line.
10      Q   Okay.  But as I described the document, that's
11  what this appears to be?
12      A   Yes.
13      Q   Okay.  And you wrote on January 27th, Krista
14  will call Ed Quick to get him enrolled tomorrow.  Thank
15  you, Krista.  What I learned from the conversation with
16  Jackie just now is that he had the government noted
17  exception in his orders that has to do with serving in
18  wartime.  That exception waives the five-year limit period
19  for reemployment protection below.  Must not have exceeded
20  the five-year cumulative limit on periods of service.
21          Because of these orders and the time/reason he
22  served, his benefits will be effective immediately.  I
23  hope this clears up any confusion that the exception from
24  the government and in his orders overrules any waiting
25  limit.

### 138

1          You wrote that right?
2      A   It looks like it came from my e-mail.
3      Q   Okay.  And this is an accurate reflection of
4  what was happening at the time?
5      A   I -- I expect that my response to learning
6  that -- that Mr. Quick's benefits were not effective,
7  based on any conversations I may have had with Lockton,
8  whenever -- this is -- this is probably what drove
9  reinstating.
10      Q   Okay.  Can I ask -- so -- so it seems like --
11  so does this refresh your memory in terms of the timing of
12  when you would have started to go about the -- the --
13  pursuing the pension cal -- the defined contribution
14  calculation?
15      A   So this -- this was very much benefits related
16  or medical benefits related.  I would expect shortly
17  thereafter would be, you know, what else do we need to do
18  in order to make sure that -- that, you know, we get our
19  employee taken care of.
20      Q   Okay.  So this was really -- this exchange was
21  really just about making sure his benefits were turned
22  back on?
23      A   Right.  At -- at this point, I -- I was able to
24  get the questions answered that I needed in order to say,
25  let -- you know, we need to get these benefits effective

### 139

1  right away.
2      Q   Okay.  Like his health, his dental, his vision,
3  right?
4      A   Correct.
5      Q   Okay.  And then that happened shortly
6  thereafter, right?
7      A   It should have happened, yeah, after this
8  e-mail went out.
9      Q   Okay.  Could you take a look at Exhibit 46,
10  please, in the pile?
11      A   This one?
12      Q   The next one.  And tell me if you recognize
13  this exhibit.
14      A   Okay.
15      Q   This is an e-mail from Krista Shaff to you,
16  Anthony Sabia, on March 6, 2015; is that right?
17      A   Yes.
18      Q   Okay.  And Ms. Shaff is talking about starting
19  a spreadsheet for Ed Quick.  She's looked through the CBA
20  to find -- to try and find the match amounts and the
21  deferred comp amounts.  What I cannot determine is what
22  his 401(k) contribution was prior to his leave, as Oracle
23  only goes back to 12/07, and it was already at zero
24  dollars and then what he should have been paid hourly rate
25  wise.  But I think you were going to have Hillary do that

### 140

1  piece.  Let me what -- know what changes need to be made
2  or if this was correct.
3          She wrote that to you?
4      A   Yes.
5      Q   Okay.  Does this refresh your memory about kind
6  of who was helping you or --
7      A   Yes.  This -- this helps the -- the timing
8  piece.
9      Q   Okay.
10      A   Yes.
11      Q   So you were -- you were -- as you talked about
12  before, in the March time -- in the early March time
13  frame, you and your -- your staff were working on doing
14  the -- the defined contribution and the 401(k)
15  calculation?
16      A   Right.  We were pulling information together --
17  I mean, specifically with the defined contribution, and at
18  the same time, you know, we wanted to understand what the
19  401(k) contribution was or was not or could have been.
20      Q   Okay.  And these tables in the second and third
21  pages of these exhibits -- of this exhibit --
22      A   Yeah.
23      Q   -- these are the -- are these the -- are these
24  identifying for different time periods the percentage
25  that -- for the 401(k) Frontier would match of a pilot's

141

1   contribution to the 401(k)?
2       A   This looks like what would have been the very
3   first step when we were trying to access those systems
4   that I talked about to try to make -- try to see what
5   historical information we had.
6       Q   Okay.
7       A   That's -- that's what I expect this was.
8       Q   Okay.  But -- and that's for the 401(k), not
9   for the defined contribution, right?
10      A   I -- I think the -- the -- the third page says
11  deferred comp percentage.
12      Q   Okay.  The third -- okay.  The third page is I
13  guess, the -- the e-mail is too wide for the paper?
14      A   Yeah.
15      Q   So those deferred comp percentages on Page 3
16  match up for the dates for -- for the seniority date field
17  on Page 2 of this exhibit?
18      A   That -- that's -- that's what it looks like.
19      Q   Okay.  All right.  So with respect to the
20  401(k), do you know if Mr. Quick has ever received a
21  make-up contribution, matching one, from Frontier
22  Airlines?
23      A   I -- I don't know that he has.  I don't know
24  that -- that I've ever seen an amount.
25      Q   Okay.  Was it -- was it -- was the amount ever

143

1       Q   Okay.  And as a result, there hasn't been a
2   401(k) contribution?
3       A   Not to my knowledge.
4       Q   Okay.  All right.  Did anyone else -- so could
5   you describe what Ms. Shaff and what Hillary, who's
6   referred to in this e-mail in Exhibit 46, what -- what
7   their role was in putting together the calculation for the
8   defined contribution make-up?
9       A   So Krista is the benefits manager.  Hillary is
10  our compen -- or I'm sorry -- our HRS analyst, so she
11  would pull reports for us.
12          In the initial stages of -- of data gathering,
13  they would go through some of the systems to pull initial
14  data for me.  You know, so they weren't really -- they
15  weren't doing any calculations, but they were -- they were
16  pulling information for me so I could refer to something
17  and then review and, you know, confirm that -- that the
18  rates are -- are what they should be you, know, they're --
19  the deferred comp rates are what were in the contract, et
20  cetera.
21      Q   Okay.
22      A   So they didn't do the calculation, but it was
23  sort of the initial data pull or the attempt at trying to
24  access data.
25      Q   Okay.  So you confirmed the information that

142

1   calculated that he could contribute and that the company
2   could match?
3       A   Along with -- with this worksheet that you're
4   looking at here, I believe there could have been a
5   calculation depending on what a contribution may have
6   been.
7           But it -- I don't believe it was anything that
8   was ever formalized or requested.  You know, the deferred
9   comp definitely was requested.  The 401(k) is really me
10  and my team getting information together because of these
11  systems we have to go in.
12      Q   Okay.  So I know we -- we -- we know from
13  talking earlier that the -- the $32,000 contribution was
14  made in mid-2015 for Mr. Quick's defined contribution
15  plan, right?
16      A   Right.  That's what that was, right.
17      Q   But it was never -- for the 401(k) make-up
18  contribution, it was never -- a number or a calculation
19  was never formalized, right?
20      A   I have never -- I have never been requested to
21  or have seen a number that -- that was formalized for a
22  401(k) contribution --
23      Q   Okay.
24      A   -- either on the employee or on the employer's
25  side.

144

1   they provided to you?
2       A   Right.  That -- I mean, part of the process is
3   to make sure that any calculations that I did were based
4   on correct information.
5       Q   Okay.  Have you -- have you done any
6   contributions for other pilots since Mr. Quick has
7   returned from -- since Mr. Quick's contribution was
8   determined, or is he the only you have ever done --
9       A   Are you saying --
10      Q   Other pilots who have returned from military
11  leave or other employees --
12      A   Again, no.  No.  I --
13      Q   He's the only one you've done?
14      A   Really, Mr. Quick is the only pilot that --
15  that I've worked with that, you know, has returned where
16  I've had to do any calculations.
17      Q   Are there -- so are there other pilots when
18  they've returned where their -- it's more, I guess,
19  electronically done as opposed to the manual type --
20      A   Again, that -- that's handled through our leave
21  department, so until -- you know, I would not know people
22  who returned from leave, you know.
23          In this particular case, the -- because of
24  USERRA and because of the -- the benefits piece is -- is,
25  you know, definitely a reason why I got involved there.

30(b)(6) Deposition of Frontier Airlines through Zeier, Thibodeau and Sabia (Videotaped)
Edward Quick v. Frontier Airlines and Michele (sic) Zeier  -  August 5, 2016

145

1    So to ask me whether there were others that
2  returned from military, I -- I don't have an answer for
3  you there. I don't know how many people or whether we
4  have other people on military leave or not. So I can't
5  answer that question for you. But I can tell you that --
6  that, yes, in this case, this -- this is the only one that
7  I've done.
8    Q   Okay. So -- so it may be that the -- the --
9  the leave of absence department may be doing their own
10 separate calculations of returning service members'
11 pension --
12    MR. DABNEY:  Objection.
13    Q   (By Mr. Romer-Friedman)  -- make-up
14 contribution?
15    MR. DABNEY:  Lacks foundation.
16    Go ahead.
17    Q   (By Mr. Romer-Friedman)  You can answer.
18    A   I don't expect the leave department to be doing
19 any calculations for a DC plan and put -- putting them
20 through to Schwab.
21    Q   Okay. Because that's something that's in your
22 personal purview?
23    A   That's in my professional purview.
24    Q   Okay.
25    A   That's -- that's my discipline and what I

146

1  handle.
2    Q   Okay. Are you an actuary by trade?
3    A   No.
4    Q   What's your -- what's your professional
5  background in?
6    A   As far as?
7    Q   Education, professional experience.
8    A   I -- I have a lot of headhunting background, so
9  recruiting, staffing, human resources, compensation.
10 That's sort of -- that's my area, benefits, payroll, HRS.
11    Q   Where did you work at before Frontier Airlines?
12    A   I worked for a company called Temporary
13 Accounting Personnel where I was a headhunter for a number
14 of years.
15    I came to Frontier in the HR department as a
16 recruiter and then moved to compensation. And then I
17 moved on to Xcel Energy, which -- where I was a manager of
18 compensation there. And then my job was eliminated, moved
19 to Minnesota, and I happened to come back to Frontier in
20 2012.
21    Q   Okay. And when -- what had you been at
22 Frontier before from, what years?
23    A   2003 to 2008 --
24    Q   Okay.
25    A   -- in that time frame.

147

1    Q   Do you have a -- where did you graduate from
2  college?
3    A   I graduated from University of Colorado --
4  Colorado at Denver. I did two and a half years at Rutgers
5  in New Jersey.
6    Q   What did you study? What was your major?
7    A   I -- my degree is a degree in English writing
8  and communications.
9    Q   Okay. Do you have any graduate degree or
10 experience?
11    A   I don't.
12    Q   Did you go to graduate school?
13    A   No.
14    Q   Do you have professional training in -- in
15 employee -- in -- in -- in pension or retirement?
16    A   Not specifically pension or retirement. I do
17 have my PHR, which is your professional human resources
18 certification.
19    Q   Where did you receive that from?
20    A   There's a Human Resources Institute.
21    Q   Was part of that learning about retirement
22 benefits?
23    A   Yes.
24    Q   Okay. Did you ever have training about -- in
25 that context or any other context about veterans'

148

1  employment benefits?
2    A   There -- I mean, there was an overview about
3  that. But just like any kind of training, I think, you
4  know, until you actually experience it, you get a broad
5  view of a number of different areas, and then you really
6  need to do a deep dive once -- once, you know, experience
7  comes before you.
8    Q   Okay. Did -- did Charles Schwab or Lockton or
9  any other entity tell you how Mr. Quick's benefits,
10 defined contribution, should be calculated --
11    A   No.
12    Q   -- for the make-up? No?
13    A   No. I mean, the -- the -- the most that --
14 that they did was say, under USERRA, here are sort of the
15 -- the guidelines or, you know, the -- the law. And
16 that's -- you know, I -- I read that and made my
17 decisions based on that.
18    Q   Okay. You didn't consult with any lawyers or
19 anything like that?
20    A   No.
21    Q   Okay. Did -- does -- did Ms. Peter have any
22 involvement in -- in determining what Mr. Quick's benefits
23 should be?
24    MR. DABNEY:  Don't answer if you know that
25 she's given any legal advice to you in her capacity as

149

1    counsel for the company.
2        A   Yeah.  I -- can you ask that again?
3        Q   (By Mr. Romer-Friedman)  Who is Jaclyn Peter?
4        A   She was my manager at the time.
5        Q   Okay.  If you were unsure what to do, would you
6    check with her about what the decision should be?
7            MR. DABNEY:  Object to form.  Vague.
8        A   Yeah.
9        Q   (By Mr. Romer-Friedman)  You can answer.
10       A   Yeah.  Like -- like any employee, you're going
11   to ask your, you know, supervisor for guidance, you know,
12   or have some discussion.  Absolutely.
13       Q   Did you check with her on this -- on any of
14   Mr. Quick's benefit issues?
15           MR. DABNEY:  Again, don't reveal any content of
16   any legal advice that she may have given or any legal
17   compliance advice that she may have given.
18       A   I mean, I -- I don't know how to answer that
19   question.
20       Q   (By Mr. Romer-Friedman)  Did you ever speak
21   with her about Ed Quick?
22       A   From the -- when this came up, you know, the --
23   the USERRA, the medical benefits --
24       Q   Yes.
25       A   -- in -- in January?

150

1            I mean, she was -- she was involved.  You know,
2    did I speak specifically, you know, to the -- to the
3    circumstance, not necessarily to Ed Quick.
4        Q   It seems like actually you were giving advice,
5    right, as opposed to her?  Because you're the one who
6    figured out that there were exceptions to this five-year
7    limit.
8            Is that fair to say?  You were -- you were --
9    you were advising your colleagues about how the law should
10   be complied with, right?
11       A   I believe that -- I don't know that I would say
12   I was advising, but, you know, when you -- when you get
13   information, right, and -- and you want to share that
14   information and say, you know, based -- here's how we go
15   forward, and here's how the decision is based.
16           Now, whether somebody would agree with that or
17   not is something different.
18       Q   Right.  And going back to that January 27th
19   e-mail, Exhibit 45, was there -- was there confusion among
20   the people involved in this conversation about whether
21   Mr. Quick had satisfied this five-year limit?
22           Was that an open question at the time?
23       A   I don't know who it would have been an open
24   question for other than me because, again, the situation
25   was new to me.  Right?  I needed to understand exactly

151

1    what we were working with.  And so based on what I -- you
2    know, what I researched the -- the advised -- you know,
3    the advisement we got from Lockton, who's our benefits
4    broker and the information that -- you know, that I
5    reviewed, I think it was more, here's how we go forward.
6    You know, this is -- this is what I'm -- why we should
7    base our decision going forward.
8            But at any time, anybody could tell me no and
9    not -- not to go forward that way.  So I don't know that I
10   was advising anyone.
11       Q   Well, I guess my question is, what -- I mean,
12   you said, I hope this clears up any confusion about the
13   government -- about the exception, right?
14       A   Right.
15       Q   I mean, was what you were saying is that in
16   this group of people who are trying to deal with Ed
17   Quick's reemployment and his benefits, that there was --
18   it was unclear within this group whether he actually
19   satisfied the requirements to get these benefits?
20           MR. DABNEY:  Object to form.  Foundation.
21       Q   (By Mr. Romer-Friedman)  Is that what was
22   happening?
23           MR. DABNEY:  He doesn't know what other people
24   were thinking.
25       Q   (By Mr. Romer-Friedman)  You can answer.

152

1        A   You know, I -- I think that the reason why this
2    situation rose to me was to try and figure out what's
3    going on.  Right?
4            My benefits manager for sure I -- I believe
5    made a wrong decision, you know.  She had -- she had
6    reviewed some of the same type of information, but I think
7    that -- that she specifically came to the wrong decision,
8    which is why the benefits were set up when Mr. Quick came
9    back the way that they were.
10           And I think my -- you know, my e-mail there is
11   really saying, okay, guys, you know, I've heard what has
12   happened, why it happened, and now here's how it's
13   going -- you know, how we're going to go forward.
14       Q   Okay.  All right.  So -- hold on one second.
15           The person who made the -- the incorrect
16   decision to create this 30-day waiting limit for
17   Mr. Quick, had she ever been trained on the USERRA issues
18   before?
19       A   You know, I don't -- I don't know what training
20   she had.
21       Q   Okay.  While you were at Frontier, was -- in
22   the HR department, was there ever a training about USERRA
23   or how to comply with it?
24       A   I -- again, I didn't -- you know, I did not
25   have any specific USERRA training at Frontier.  I'm not

30(b)(6) Deposition of Frontier Airlines through Zeier, Thibodeau and Sabia (Videotaped)
Edward Quick v. Frontier Airlines and Michele (sic) Zeier  -  August 5, 2016

---

153

1   sure whether or not anyone else did, but not to my
2   knowledge.
3       Q   Okay.  Is there a -- are you aware of any time
4   period that the law specifies for Frontier to make the
5   contributions to a defined contribution plan?
6       A   Not a specific time period.  You know, as soon
7   as -- you know, I -- I would approach it as -- as soon as
8   would be, you know -- I used the word practicable before,
9   but, you know, reasonable to be able to do -- make the
10  right contribution and make something accurate.
11      Q   In general, in dealing with pension benefits,
12  does the company believe it needs to comply with the law
13  or federal regulations that they specify time periods?
14          MR. DABNEY:  Object to form.  It's not one of
15  the topics he's designated on.  Is has no foundation.
16      Q   (By Mr. Romer-Friedman) You -- you can answer.
17          MR. DABNEY:  Calls for a legal conclusion.
18      Q   (By Mr. Romer-Friedman) You can answer.
19          Generally speaking, does the company try to
20  comply with federal law and regulations about time periods
21  to do things related to pensions?
22      A   I would expect that to be the case.
23      Q   Would you be surprised if Frontier Airlines was
24  making pension contributions months after federal
25  regulations said that they had to be made?

---

154

1           MR. DABNEY:  Objection.  Assumes facts.  No
2   foundation.
3       Q   (By Mr. Romer-Friedman) You can answer.
4       A   Ask the question again.
5       Q   You wouldn't -- you -- you wouldn't -- the
6   company -- well, I'll withdraw.
7           Is the -- is -- is Charles Schwab is the
8   administrator of the defined contribution plan --
9       A   Right.
10      Q   -- is that correct?
11      A   Right.
12      Q   It -- it's an ERISA plan?
13      A   Yes.
14      Q   Okay.  Is there a person who is responsible,
15  charged -- as the plan administrator at Charles Schwab,
16  like a human being?
17      A   We have two contacts at Schwab.  One we work
18  on, you know, a daily basis if -- if you want to say that.
19  They also have a call center that employees might --
20      Q   Okay.
21      A   -- make calls to.
22      Q   Is there any official from Frontier Airlines
23  who has any role at Charles Schwab with respect to the
24  defined contribution plan, wearing two hats?
25      A   Can you clarify that?

---

155

1       Q   Is there an official who works for Frontier who
2   also works at Schwab on -- related to the pilots' defined
3   contribution?
4       A   Not to my knowledge.
5       Q   Did Charles Schwab play any role in calculating
6   or checking the -- the calculation you made about
7   Mr. Quick's pension contributions?
8       A   No.
9       Q   You had no conversations with them about the
10  appropriate amount?
11      A   Not the appropriate amount.  I think, you know,
12  when I was -- I was going forward with my approach, just
13  like I said before, you know, I referred to Lockton.  I
14  referred -- you know, to ask questions of -- of Charles
15  Schwab, just, you know, have you -- have you been -- you
16  know, worked with this situation before.
17          But at the end of it, you know, it was my
18  approach.  No -- they had nothing to do with the
19  calculations.
20      Q   Okay.  Last questions.  Do you -- do you know
21  what it means for a worker to be reemployed at the
22  company?
23          MR. DABNEY:  Object.  It's not something he's
24  been designated on and it's got no foundation.
25      Q   (By Mr. Romer-Friedman) You can answer.

---

156

1       A   I expect reemployment is either employing in
2   the capacity in which an employee left or in any other
3   capacity within the company.  And capacity, I mean,
4   position.
5       Q   Okay.  Does a worker have to be reemployed in
6   order to get a USERRA make-up contribution under the rules
7   that Frontier follows?
8       A   Can you be more specific?
9       Q   So before a returning service mem -- before a
10  service member -- sorry.
11          Before an employee of Frontier can receive a
12  USERRA make-up contribution for a period of military
13  leave, does that service member have to actually return to
14  work and be reemployed?
15          MR. DABNEY:  Object to form.  Also, it calls
16  for a legal conclusion.
17      Q   (By Mr. Romer-Friedman) You can answer.
18          MR. DABNEY:  Foundation.
19      A   You know, I don't know the answer to that.
20      Q   (By Mr. Romer-Friedman) Okay.  So if Mr. Quick
21  had gone and worked for a different airline after his
22  seven years of military leave, would you have made a
23  similar calculation to -- to give him $32,046 in his
24  defined contribution plan?
25      A   Again, I -- I don't know the answer to that.  I

---

30(b)(6) Deposition of Frontier Airlines through Zeier, Thibodeau and Sabia (Videotaped)
Edward Quick v. Frontier Airlines and Michele (sic) Zeier  -  August 5, 2016

157

1  would -- I would need to depend on, you know, the -- the
2  other director in the area, you know, to kind of bring it
3  to light --
4      Q  Okay.
5      A  -- to see that.
6      Q  Okay.  Do you know when Mr. Quick was
7  reemployed by the company?
8      A  I believe it was January of 2015.
9      Q  Okay.  And he -- he never actually returned to
10  a position at Frontier Airlines, correct?
11      A  I don't know the answer to that.
12      Q  Okay.  Do you -- do you know what --
13      MR. DABNEY:  Also, you're just fishing around
14  with this witness who's not been designated on this topic.
15  You know darn well he didn't return to a position.  I
16  mean, is -- is there a point to these questions --
17      MR. ROMER-FRIEDMAN:  Well --
18      MR. DABNEY:  -- other than fishing?
19      MR. ROMER-FRIEDMAN:  -- it relates to whether
20  he's entitled to pension benefits.
21      MR. DABNEY:  Whether he got back to another
22  position or not, you're asking this witness after all this
23  time?
24      MR. ROMER-FRIEDMAN:  I think we're done, but we
25  can -- we can take a break, and I think we're pretty much

158

1  finished.
2      (There was a brief pause.)
3      MR. ROMER-FRIEDMAN:  Okay.  We're done.  We're
4  going to take a quick break.
5      THE VIDEOGRAPHER:  Going off the record --
6  we're done with this witness?
7      MR. ROMER-FRIEDMAN:  We are done with this
8  witness.
9      THE VIDEOGRAPHER:  This is the end of Media
10  Unit 3 with designee Anthony Sabia.
11      Going off the record.  The time is 2:39.
12      (A recess was taken between 30(b)(6) designees
13  from 2:39 p.m. until 3:09 p.m.)
14      THE VIDEOGRAPHER:  Back on the record at 3:09
15  with Media Unit 4 of 30(b)(6) designee Joseph Thibodeau.
16      Please swear the witness.
17      JOSEPH THIBODEAU,
18  having been first duly sworn, was examined and testified
19  as follows:
20      EXAMINATION
21  BY MR. ROMER-FRIEDMAN:
22      Q  Good afternoon, Mr. Thibodeau.
23      A  Good afternoon.
24      Q  Good to see you again.
25      A  Thank you.

159

1      Q  Thanks for coming back today.
2      And -- and I understand you're testifying in a
3  different capacity; is that correct?
4      A  Correct.
5      Q  Okay.  This is as a 30(b)(6) witness for
6  designated topics on behalf of the company; is that
7  correct?
8      A  Correct.
9      Q  Okay.  So you understand you're testifying not
10  in your personal capacity, but as a representative of the
11  company?
12      A  Correct.
13      Q  Okay.  And earlier today, Mr. Dabney and I
14  stipulated, agreed on behalf of the parties that the
15  substantive answers that you gave yesterday in your
16  individual capacity would be deemed and considered the
17  same answers for the company for this 30(b)(6) deposition
18  so that we don't have to go back on all the same turf that
19  we talked about yesterday.
20      Do you understand that?
21      A  I do.
22      MR. ROMER-FRIEDMAN:  Okay.  Any objection to
23  that representation, Mr. Dabney?
24      MR. DABNEY:  No.
25      MR. ROMER-FRIEDMAN:  Okay.  Thank you.

160

1      Q  (By Mr. Romer-Friedman)  So hopefully this will
2  not take any -- anywhere as close as long as yesterday.
3  Okay.
4      Okay.  I'm going to hand you what is going to
5  be marked Exhibit 55.  I think we only got to 6 or 7 with
6  you yesterday.
7      (Deposition Exhibit 55 was marked.)
8      A  Right.
9      Q  (By Mr. Romer-Friedman)  There you go.  And
10  this is Bates marked 563 to 565.
11      Do you recognize this exhibit?
12      A  Yes.
13      Q  What is it?
14      A  It looks -- appears to be -- the first page is
15  a statement provided by Ed Quick with regard to FAR 121,
16  regulations limiting 1,000 hours of commercial flying in
17  any one calendar year.  Pages 2 and 3 are a portion
18  thereof of his training record.
19      Q  Of his what?
20      A  Training record.
21      Q  Okay.  Does the time period here, which extends
22  from the first date of March 15, 2004, to June 18, 2007,
23  does that cover the entire time in which Mr. Quick would
24  have been training at Frontier Airlines?
25      A  I believe it does.

30(b)(6) Deposition of Frontier Airlines through Zeier, Thibodeau and Sabia (Videotaped)
Edward Quick v. Frontier Airlines and Michele (sic) Zeier  -  August 5, 2016

161

1    Q   Okay.  That's the -- that's the time -- and he
2  -- as we talked about yesterday, he was -- began his
3  employment in '04?
4    A   Correct.
5    Q   Okay.  All right.  What are -- what are the
6  fields at the top of this document on Page 564 of
7  Frontier's production, the second page of this exhibit?
8    A   Correct.  FFT is a designator for our airline.
9    Q   Okay.
10   A   The top line is the date that it was printed.
11   Q   Okay.  How about below -- above the dot -- the
12  kind of dashes there?  It says ACPOS code, description.
13  Could you kind of walk me through what these fields are?
14   A   AC would be aircraft type.
15   Q   Okay.
16   A   Position would be referring to the pilot
17  position, captain or first officer.  Code would be the
18  codification of the type of training.  Description would
19  further define what the code meant.  S or U would indicate
20  satisfactory or unsatisfactory performance.
21      TRG date would be the date of training.  Base
22  month is a month that training occurred.  Instructor
23  number is an employee number of a Frontier employee
24  providing the instruction.  Hours and minutes would be the
25  duration of the training.  LNDGS is landings.  CLS is, I

162

1  believe, a class.  I'm not certain.  And FAA would stand
2  for the Federal Aviation Administration.
3    Q   Okay.  I'd like to direct you to the top two
4  rows in -- on the second page -- on the -- on the second
5  page of the exhibit at the first page of this training
6  schedule.
7    A   Okay.
8    Q   Still 564.
9    A   564.
10   Q   564.  Okay.  So under code, what does comp DEQ
11  mean?
12   A   Company dequal.
13   Q   And what does that mean?
14   A   That the pilot is dequalified.
15   Q   Dequalified for what?
16   A   In this capacity, as a pilot.
17   Q   As a pilot or -- or as a captain?
18   A   In this capacity, it would be as an -- as a
19  pilot, as a captain and first officer by FAR.  In that an
20  upgrade attempt was unsatisfactory by FAR, we need to
21  requalify an applicant as a first officer.
22   Q   Okay.  So under position, the -- the third row,
23  it says CA.  That's captain?
24   A   Correct.
25   Q   Does that mean everything above that is with

163

1  regard to a captain?
2    A   No.
3    Q   No.  UGS, upgrade ground school, that's for him
4  to upgrade -- going to school to upgrade for captain?
5    A   Correct.  The ground school portion thereof.
6    Q   Okay.  And he did that on May 24th, 2007?
7    A   That would have been the completion of that
8  ground school.
9    Q   Okay.  So he's -- so because there's not a U
10  next to that, that means he completed the ground school to
11  become a captain?
12   A   Correct.
13   Q   Okay.  And then the -- on June 3rd and June
14  18th, the top two rows, is that -- those are the dates
15  that he took and failed the check ride?
16   A   Correct.
17   Q   Okay.  And he had two different instructors for
18  that; is that right?
19   A   Correct.
20   Q   Okay.  3595 and 178 are the two -- two
21  instructors?
22   A   Correct.
23   Q   Okay.  So the -- the company -- explain again
24  what "company dequal" means.
25   A   That -- can we read it again?  Can we read my

164

1  answer?
2    Q   It says -- it says company dequal.
3    A   And could we reread my previous answer?
4      MR. ROMER-FRIEDMAN:  Oh.  Can you read that
5  back?
6      (The reporter read the answer on Page 161,
7  Line 14.)
8    Q   (By Mr. Romer-Friedman)  Okay.  And could you
9  explain what -- what company dequal means?
10   A   It's that the pilot is not qualified to act in
11  the capacity as a pilot for Frontier Airlines.
12   Q   Okay.  So as we talked about yesterday, that
13  could mean that under those circumstances, a pilot could
14  be retrained and could then become a first officer
15  again --
16   A   Correct.
17   Q   -- or even a captain later on, right?
18   A   Correct.
19   Q   Okay.  And this is all in the time frame we
20  talked about yesterday where the TRB was in the process of
21  being convened on June 8th -- around June 18th, right?
22   A   It would have been after that.
23   Q   After the second failed check ride?
24   A   Correct.
25   Q   Okay.  And those check rides were both for

30(b)(6) Deposition of Frontier Airlines through Zeier, Thibodeau and Sabia (Videotaped)
Edward Quick v. Frontier Airlines and Michele (sic) Zeier  -  August 5, 2016

165

1    captain, right?  Those were not first officer check rides?
2        A   That's correct.
3        Q   Okay.  Did Mr. Quick ever fail a first officer
4    check ride?
5        A   Not that I am aware of and not that is
6    indicated here.
7        Q   Okay.
8        A   We should ask Mr. Quick that, as well, though.
9        Q   Okay.  Right.
10         Sorry.  What did you say?
11        A   We should also ask Mr. Quick that question.
12        Q   So in this -- in the context of the second
13    failed check ride for -- for captain -- captain check
14    ride, Mr. Quick was informed that a TRB might be convened,
15    correct?
16        A   Correct.
17        Q   Okay.  We're going to talk a little bit about
18    that.
19         Just as background before we talk specifically
20    about the TRB and Mr. Quick, do you know when the TRB was
21    created in terms of the -- this process?
22        A   I do not -- I cannot recall.  I know that it's
23    in our collective bargaining agreement -- our current
24    collective bargaining agreement.
25        Q   Was it in the prior one that was signed in 2 --

166

1    in early 2007?
2        A   I -- I don't recall.
3        Q   Okay.  It had to have been, right, if in June
4    2007 you were to convene a TRB, right?
5        A   Yes.  It -- it would have had to have been in
6    that collective bargaining agreement or in the one prior.
7        Q   Okay.  Do you know how many times the TRB has
8    actually been convened by Frontier Airlines?
9        A   I do not.
10        Q   Does the -- does anyone at the company know
11    that?
12        A   I'm not sure if we would have -- I could -- I
13    could ask that and -- and find out, but I don't know.
14        Q   You've been with -- with Frontier since 2000,
15    right?
16        A   2001.
17        Q   2001?
18        A   Yes, sir.
19        Q   As a first officer, a captain, assistant chief
20    pilot, a chief pilot?
21        A   That's correct.
22        Q   Okay.  And in all that time, have you ever
23    heard of anyone else being subject to a TRB?
24        A   No, sir.
25        Q   Okay.  As -- either as a rank and file pilot or

167

1    manager, right?
2        A   That is correct.
3        Q   Okay.  Was it fairly controversial for
4    Mr. Quick to be called to the TRB back in 2007?
5         MR. DABNEY:  Object to form and foundation.
6        A   I would be speculating in answering.
7        Q   (By Mr. Romer-Friedman)  Was -- was the union
8    concerned about Mr. Quick being asked to be part of a TRB?
9         MR. DABNEY:  Foundation.
10        Q   (By Mr. Romer-Friedman)  I'm going to direct
11    you to take a look at Exhibit 52, which I will hand to
12    you.
13         Okay.
14        Q   Please take a little bit of time to review
15    that, and let me know if you can identify this exhibit.
16         Okay.
17        A   I have reviewed it.
18        Q   Do you recognize this Exhibit --
19        A   Yes, sir.
20        Q   -- 52?
21        A   Yes, sir.
22        Q   What is it?
23        A   This is a letter from Frontier Airlines --
24        Q   Okay.
25        A   -- to Captain Jeff Thomas.

168

1        Q   And who is Captain Jeff Thomas?
2        A   At that time, he was the president of the
3    Frontier Airlines Pilots Association.
4        Q   Okay.  And that -- that's the union that
5    represented Mr. Quick?
6        A   Correct.
7        Q   Okay.  And actually you at the time, right?
8        A   That is correct.
9        Q   Okay.  Is it -- is it fair to say that Mr. --
10    Mr. -- Mr. Kenyan, the VP of flight operations, is
11    responding to Mr. Thomas' concerns about the calling, the
12    process of a TRB, as well as whether Mr. Quick's --
13    calling a TRB related to Mr. Quick might implicate USERRA?
14        A   I wouldn't say concerns, only in that this has
15    two separate issues, not concerns.
16        Q   Okay.  So those were issues that the union has
17    raised?
18        A   Apparently.
19        Q   Okay.  Does this refresh your memory at all
20    about what was -- any dispute between the union and the
21    company about the TRB process at the time?
22        A   The union had a position, apparently, and the
23    company had a position.  They did not necessarily align.
24        Q   Okay.  What was the union's position?
25         MR. DABNEY:  Object to foundation.

30(b)(6) Deposition of Frontier Airlines through Zeier, Thibodeau and Sabia (Videotaped)
Edward Quick v. Frontier Airlines and Michele (sic) Zeier  -  August 5, 2016

169

1    A  I don't have -- I don't -- I don't have the
2  information in front of me that would indicate.
3    Q  Okay.  What -- what is the basis for calling a
4  TRB?  Why would a TRB be called?
5    A  By contract, a TRB would be called if there had
6  been a pattern of failures.
7    Q  Okay.  How do you determine at Frontier that
8  there's been a pattern of failures?
9    A  Well, by definition, a pattern would be a
10  repeatable or a recurring occurrence.
11    Q  So more than -- more than once?
12    A  Correct.
13    Q  Okay.  Or several times?
14    A  Something that repeats.
15    Q  Okay.  Would -- in determining whether there
16  was a pattern of failures, in your experience, would --
17  would that be made if there was a failed check ride for an
18  upgrade as opposed to a failed check ride for your
19  current position like first officer?
20    A  A -- a -- a training review board can be
21  convened for either.
22    Q  Is that right?
23    Okay.  I'm going to hand you what will be
24  Exhibit 56, which is -- I'll represent to you it's a
25  portion of the collective bargaining agreement between --

170

1  this is the current collective bargaining agreement.
2    (Deposition Exhibit 56 was marked.)
3    MR. DABNEY:  This doesn't have a Bates number.
4  So is this something that's not been produced, counsel?
5    MR. ROMER-FRIEDMAN:  Yeah.  I'll represent this
6  is a publicly available copy of the CBA.
7    MR. DABNEY:  My question was, you guys didn't
8  produce this up until now, correct?
9    MR. ROMER-FRIEDMAN:  This was, I think, pulled
10  this morning.
11    MR. WHITCOMB:  Yes, from Frontier's website.
12    MR. ROMER-FRIEDMAN:  From Frontier Airline's
13  website.
14    THE WITNESS:  Which website?
15    MR. WHITCOMB:  From the FAPA website.
16    MR. ROMER-FRIEDMAN:  From the -- from the --
17  from the union's website.
18    THE WITNESS:  Then it's not publicly available.
19    MR. WHITCOMB:  I just Googled -- I literally
20  Googled 2007 FAPA agreement, and it came up.
21    MR. DABNEY:  I'm just trying to clarify for my
22  own purposes what it is and where it came from.
23    So you found it on the internet this morning.
24  And now we're looking at one page from it, correct?
25    MR. WHITCOMB:  Okay.  I didn't have access to

171

1  the printer.
2    MR. DABNEY:  Well, I'm sure that there may be
3  aspects of this document, entire contents might be
4  relevant to questions as we go forward, but . . .
5    MR. ROMER-FRIEDMAN:  Okay.  Do we need to take
6  a break and --
7    MR. WHITCOMB:  If we need to take a break and
8  print it, that's no problem.
9    MR. ROMER-FRIEDMAN:  Okay.
10    Q  (By Mr. Romer-Friedman) So here -- if you look
11  under Section E here, it says performance standards?
12    A  Correct.
13    Q  Okay.  Or -- does this language look familiar
14  to you where it says, general performance standards, oral
15  -- and then failure documentation, oral examination
16  failures?
17    A  Look, I'll be honest.  I -- I wouldn't be
18  comfortable with this.  I'd want to see my own copy of the
19  CBA or one that we -- we know.
20    Q  Okay.  Let me ask you a question.  In terms of
21  the -- your -- your knowledge of the CBA and the rules
22  that govern determining whether a pilot's flying and
23  skills are unsatisfactory, is it the standard operating
24  procedure that a failed check ride for a wrong position,
25  you know, an upgrade position that's not their normal

172

1  position, would be part of determining whether someone had
2  an unsatisfactory rating?
3    A  I think we should rephrase that question.
4    Q  Sure.
5    How would you -- how would you describe the
6  standards?
7    A  If -- when you're talking about wrong seat and
8  talking about upgrade, can you reclarify that?
9    Q  What does it mean to be a wrong seat?
10    A  It would mean that if you are occupying a
11  position in the aircraft that you have not yet been
12  trained.
13    Q  Okay.  So if -- if you were upgrading from
14  first officer to pilot -- to captain, would that be a
15  wrong seat?
16    A  No, sir.  You've been trained, and now you are
17  taking a checking event as a captain.
18    Q  Okay.  All right.  All right.  I'm going to
19  hand you what will be Exhibit 57 and ask you to identify
20  the document.
21    (Deposition Exhibit 57 was marked.)
22    A  This is an e-mail from John "Skid" Row to
23  ekquick@yahoo.com.
24    Q  Okay.  And what is he informing Mr. Quick of?
25    A  As stated in letter 06, June '07, you are

173

1    advised that you may be subject to review by the training
2    review board in the event of another failure.  Based upon
3    your failure of the captain oral qualification event of
4    18, June '07, I am here convening the TRB to review your
5    pattern of failures.  The board will convene at 10:00 a.m.
6    on Wednesday the 20th of June.  The board's composition of
7    board will be in accordance with the CBA Section 20,
8    paragraph E(1)(e)(3)(6).
9        Q   And at this time, on the 18th, had it been
10   determined who would be on the review board?
11       A   No, sir.  I -- it couldn't have been.
12       Q   Why is that?
13       A   Because as we saw in Exhibit 55,
14   dequalification occurred 18th of June, the same day that
15   this e-mail was sent.  This e-mail was sent at 9:33 p.m.
16       Q   Okay.  Would it have been possible to convene
17   the TRB within, I guess, a one -- one business day between
18   the 18 -- the --
19       A   That would assume that I would know what the
20   union would be able to do.
21       Q   And why is it -- take a step back.
22           Is it right that the union would appoint two
23   people and the company would appoint two people to the
24   TRB?
25       A   That's correct.

174

1        Q   Okay.  And a majority vote would govern what
2    the recommendation of the TRB is?
3        A   Not necessarily.  It can deadlock, and then
4    it's the decision of the vice president of the flight
5    operations.
6        Q   Okay.  So the company kind of gets to break the
7    tie?
8        A   They can.
9        Q   Okay.  Have you ever seen that happen?
10       A   No, sir.
11       Q   Okay.  All right.  So do you know if -- does
12   the company know if the union ever appointed their two
13   representatives to the TRB for Mr. Quick's TRB?
14       A   The company's understanding and my
15   understanding of the company's position that based on
16   Exhibit 52, all of the timelines contained herein on Page
17   4 of Exhibit 52 says, to be very clear, it's Frontier's
18   position that any and all such time limits influenced by
19   first Officer Quick's presence must be stayed during his
20   military leave, including but not limited to all company
21   deadlines under Section 13, Section 20 and all related
22   sections of the CBA.
23       Q   Okay.  So because Mr. Quick was on military
24   leave at the time -- actually, he went on military leave
25   the day that the TRB was -- that they informed him of the

175

1    TRB, right?
2        A   I don't have that -- I don't have his DD-214 in
3    front of me.
4        Q   Okay.  Maybe we can look back.  I think -- I'm
5    not sure if we looked at it with you yesterday or with
6    Ms. Zeier.  But take a quick look.
7            I believe that Mr. Quick gave notice before
8    this 9:00 p.m. e-mail occurred.  Okay.  I'd ask you to
9    look through that pile for Exhibit 13, please.
10       A   Okay.
11       Q   Okay.  And this is an e-mail -- Exhibit 13 is
12   an e-mail from Mr. Quick to Mr. Colburn on June 18th at
13   6:14 p.m. where he says, Please find attached my request
14   for military leave.
15           Do you see that?
16       A   Uh-huh.
17       Q   Okay.
18       A   I do.
19       Q   Attached on the second and third pages are his
20   military orders and a USERRA reemployment rights
21   notification sheet.
22           Do you see that?
23       A   I do.
24       Q   Okay.  So you agree, if you compare Exhibit 13
25   and Exhibit 57, that Mr. Quick gave notice of his military

176

1    leave before he was informed by Mr. Roe that he was -- was
2    going to be subject to a TRB?
3        A   He gave notice to Captain Colburn.
4        Q   I'm sorry.
5            That he gave -- that Mr. -- Mr. Quick gave
6    notice to the company --
7        A   Correct.
8        Q   -- several hours before he found out that a TRB
9    was going to be convened, correct?
10       A   I would agree.
11           MR. DABNEY:  Based on the record or --
12       Q   (By Mr. Romer-Friedman)  You don't -- you don't
13   have --
14           MR. DABNEY:  I'll just object to foundation.
15       Q   (By Mr. Romer-Friedman)  You don't -- you don't
16   have any reason to believe that the timing of -- that
17   actually happened in reality is different than what these
18   documents show?
19       A   Nor do I have any reason to believe that
20   Mr. Roe knew from Mr. Colburn that Mr. Quick had provided
21   notice that he was requesting military leave.
22       Q   Sure.  Okay.  Fair enough.
23           So going back to the letter that you point --
24   Page 4 of Exhibit 52, that you pointed out that the
25   company maintained the position that it would have to stay

177

1  any time limits for the TRB, right, while Mr. Quick was on
2  military leave?
3      A  That's on Page 4, yes.
4      Q  Yeah.  Why would they do that?
5      A  To allow Mr. Quick to serve in the military
6  as -- as requested.
7      Q  Okay.  And so if -- if Mr. -- Mr. Quick didn't
8  end up coming back to be in a flying position at -- at
9  Frontier Airlines, would it be necessary to reconvene the
10  TRB if he never was going to fly again?
11      A  We would have to conclude and somehow otherwise
12  close out that was provided in Exhibit 57.
13      Q  Okay.  So if -- if, for example, let's say if
14  after -- after -- we talked yesterday how you were the
15  point person initially with Mr. Quick on his reemployment
16  and then it turned over to Ms. Zeier, right --
17      A  Correct.
18      Q  -- in early October, late September 2014?
19      A  Correct.
20      Q  Let's say in the fall of 2014 it had been
21  determined that Mr. Quick had come back full-time in a
22  position that didn't require him to fly an aircraft.
23  Would the TRB still have been convened, or would -- is
24  that right?
25          MR. DABNEY:  Object to form.  Foundation.

178

1      A  It's speculative.  We would have -- we never
2  got there.
3      Q  (By Mr. Romer-Friedman)  Okay.  I mean, if --
4  let -- well.  You said a second ago it would have to be
5  dealt with, right?
6      A  Correct.
7      Q  So what does that mean?
8      A  We'd have an open notice of TRB.  We would have
9  to go through a step or a process to conclude this notice.
10      Q  Okay.  Could a -- could that be as simple as
11  the person who gave the notice finds out that Mr. Quick is
12  no longer going to be flying for Frontier and says, now
13  the -- the failed check rides are a moot issue, and I will
14  now close out this TRB?
15          Or is that -- would the TRB have to be kind of
16  formally convened and then determined that it's moot, or
17  how would -- how would that work?
18      A  Having not gone through the process, I would
19  be -- I would be guessing.  We would go through a series
20  or a process of steps within the flight operations
21  department in concert with the union as to how we would
22  convene and close this out.
23          In that the union is a party to the training
24  review board, we would have to consult with the union on
25  what the next steps would be.  I simply can't answer for

179

1  them.
2      Q  Okay.  So it -- you -- you -- you can't say
3  today that, you know -- that it def -- the TRB definitely
4  would have been reconvened formally and a decision would
5  have been issued?
6      A  I can't speak for -- for FAPA or ALPA.  I can't
7  speak on behalf of the associations.  In that they are
8  parties to the TRB, we would need their input.
9      Q  Okay.  If FAPA refused to attend the -- the TRB
10  or appoint people, what would happen?
11      A  As is in Exhibit 52, our vice president of
12  flight operations had -- has said -- let me find the
13  paragraph, please.
14      Q  Sure.
15      A  Page 3, second paragraph, last sentence.  Our
16  view is that any refusal by FAPA to participate in a TRB
17  convened by the company is, in essence, a deadlock that
18  under the CBA gives the vice president of flight -- flight
19  operations the final decision-making authority.
20      Q  Okay.  So -- so if FAPA didn't want to
21  participate any more with this process and protest it --
22  you were the chief pilot, right, when Mr. Quick came back?
23      A  Correct.
24      Q  Or tried to come back to work, correct?
25      A  Correct.

180

1      Q  So what -- what would you have done?
2      A  I would referred that to the vice president of
3  flight operations as indicated in the CBA.  Excuse me.
4      Q  Okay.  Okay.  Is it standard practice to have
5  check rides so close in time, in this case, June 3rd and
6  June 18?
7      A  Yes, sir.
8      Q  Does -- does that happen on a regular basis?
9      A  Yes, sir.
10      Q  When's the last time you saw that happen?
11      A  This week.
12      Q  This week?
13      A  Correct.
14      Q  Where someone failed a check ride and then did
15  a subsequent check ride within 14, 15 days?
16      A  I believe it was in six.  It may have been
17  within seven days.
18      Q  Does training happen between the two?
19      A  Yes.
20      Q  Okay.  What kind of training is done?
21      A  It would depend on the area deficient on the
22  original check ride.
23      Q  Okay.  Is it the pilot's choice as to how much
24  time they want between the check rides, or is that
25  something that the company dictates?

181

1    A   The company would set the training, but there
2  are limits defined by CBA as to how quickly that can be
3  reassigned -- or be assigned.
4    Q   The CBA limits how quickly the -- the -- the --
5  the company can require a new check ride?
6    A   Correct.  That -- let me rephrase.
7        The CBA defines how quickly after an
8  unsatisfactory performance the company may reschedule
9  training and the rest -- or intervening rest periods
10  between check ride and retraining.
11    Q   Okay.  I'm going to hand you what will be
12  Exhibit 59 and ask whether you recognize this exhibit.
13        Oh, I'm sorry.  That should be 58.  Here.  I
14  can just . . .
15        (Deposition Exhibit 58 was marked.)
16    Q   (By Mr. Romer-Friedman)  There you go.  Oh,
17  sorry.  The document did not slide properly.
18    Q   Is this an e-mail from Mr. Quick to Mr. Colburn
19  and Mr. John Row?
20    A   Yes, sir.
21    Q   On June 13th, 2007?
22    A   That is correct.
23    Q   Okay.  This is between the first failed check
24  ride upgrade to captain and the second one, right,
25  between --

182

1    A   Correct.
2    Q   -- June 3rd and June 18th?
3    A   Correct.
4    Q   Okay.  And Mr. Quick says, Thank you for your
5  phone call today regarding my next oral.  I was in a
6  meeting with Captain Kenyon and some other people, so I
7  was unable to call you back until after the meeting ended.
8        I followed up by returning your call and
9  leaving a message, but then by stopping by your office
10  today to discuss with you the setting of the oral.  I
11  would request the following.  And he says, one, identify
12  my weak areas from my last oral with Captain Tim Cavender,
13  be retrained to those areas.  Three, he allowed a preoral
14  before taking another type oral.  And he says, four, wait
15  to see how I do on the preoral before scheduling my next
16  oral.  Please let me know if this plan works for you.
17        He wrote that, correct?
18    A   Correct.  That's what's on this page.
19    Q   So in this situation, is it -- was Mr. Quick
20  trying to work with the airline to address his
21  deficiencies?
22        MR. DABNEY:  Object to form.  Foundation.
23    A   I can't get into Ed's head.
24    Q   (By Mr. Romer-Friedman)  Well, from the
25  company's perspective at this point where he's saying he

183

1  wants to identify his weak areas, be retrained on them, is
2  that -- did the company -- did the company understand him
3  as, you know, trying to --
4    A   The company would -- the company would have --
5  the company does take these steps with anybody.
6    Q   Okay.  So he was essentially saying he wanted
7  to take the steps the company would -- would ordinarily
8  take to --
9    A   To --
10    Q   -- requalify him to move forward?
11    A   These are steps that the company provides.
12    Q   Okay.
13        (Deposition Exhibit 59 was marked.)
14    Q   (By Mr. Romer-Friedman)  Okay.  I'm going to
15  hand you Exhibit 59.
16        Do your recognize this exhibit?
17    A   Yes.
18    Q   This is an e-mail from John "Skid" Roe, the
19  director of flight operations at Frontier, right?
20    A   Correct.
21    Q   To two FFA employees?
22    A   Correct.
23    Q   Robert Dixon and Carl Miller?
24    A   Correct.
25    Q   And cc'ing Cameron Kenyon?

184

1    A   Correct.
2    Q   Who's Cameron Kenyon?
3    A   At the time, he was vice president of flight
4  operations.
5    Q   Okay.  And he writes, Gentlemen, Ed Quick's
6  retake of his oral is scheduled on Monday the 18th at 9 --
7  0900.  Location will be in my office at CAE building,
8  correct?
9    A   Correct.
10    Q   Okay.  So is it fair to say that Mr. Quick was
11  trying to get a little bit more time to -- before he had
12  to take his next oral when the company was proceeding
13  notwithstanding that?
14        MR. DABNEY:  Same objection.
15    A   I can't answer why Ed wrote his e-mail.
16    Q   (By Mr. Romer-Friedman)  How about Mr. Roe?
17    A   With regard to Exhibit 59?
18    Q   Yep.
19    A   Exhibit 59 is an e-mail to two FAA employees.
20    Q   Okay.  I'm going to hand you one more exhibit
21  just for you to identify.  It will be Exhibit 60 --
22  Exhibit 60.
23        (Deposition Exhibit 60 was marked.)
24    Q   (By Mr. Romer-Friedman)  This appears to be a
25  letter from Captain John Roe, director of flight

185

1    operations, training and standards, to Mr. Quick on June
2    17th -- June 14th, 2007; is that correct?
3        A   I would agree.
4        Q   Okay.  And in this letter, he is scheduling his
5    second oral at -- on the 18th at 9:00 a.m., right?
6        A   Please ask that again.
7        Q   In this letter, Mr. Roe is rescheduling the
8    oral examination of Mr. Quick on the morning of June 18th,
9    correct?
10       A   Yeah.  I -- I'm reading in Exhibit 60, if I'm
11   understanding you correctly -- I'm sorry -- that --
12   Exhibit 60, Captain Roe is advising Ed that his second
13   oral is scheduled Monday the 18th at 9:00 a.m.
14       Q   Okay.  All right.  I'm going to ask you to take
15   a look at an exhibit that you haven't seen yet but is in
16   your pile, Exhibit 53.  It looks like this.
17           And I will represent to you that Ms. Zeier
18   earlier today identified this as a document related to the
19   new-employee orientation that occurred on January 5th,
20   2015, which -- that included Mr. Quick.
21           Do you recognize this type of document?
22       A   It -- it appears to be an Excel spread -- Excel
23   spreadsheet.
24       Q   Okay.  And there are -- there are -- we talked
25   to Ms. Zeier earlier today about several individuals in

186

1    this kind of -- in this -- this area here who are
2    transferred.
3        A   Okay.
4        Q   One says transferred from FAA to inflight
5    instructor, transfer from RSC/MS, and then the last one
6    says, transfer from captain/flight ops instructor?
7        A   Correct.
8        Q   So -- and -- and the person the -- that last
9    person is Christopher Fair?
10       A   Correct.
11       Q   Do you know Mr. Fair?
12       A   I do.
13       Q   Okay.  How do you know Mr. Fair?
14       A   He was a pilot for Frontier Airlines.
15       Q   Okay.  Do you know for how long?
16       A   Not definitively, no.
17       Q   Five years, 10 years, 20 years?
18           MR. DABNEY:  Objection, foundation.
19       A   At least 15.  He was senior to me.
20       Q   (By Mr. Romer-Friedman)  Okay.  Is this -- is
21   this indicating, this exhibit, that he was transferring
22   from being a captain to being a flight operations
23   instructor?
24       A   That's what this indicates.
25       Q   Okay.  Is that what happened in and around

187

1    January 2015 with Mr. Fair?
2        A   He was never in a position of a flight ops
3    instructor.
4        Q   Never?
5        A   Never.
6        Q   Is he retired now?
7        A   Yes.
8        Q   Do you know when he retired?
9        A   I believe his -- he was man -- mandatory
10   retirement was within five days of the new year.  I cannot
11   recall if it was the 2nd, 3rd, or 4th of 2000 -- of
12   January of 2015.
13       Q   And that's because of the 65 rule?
14       A   Correct.
15       Q   Both the FAA and federal law requirements him
16   to --
17       A   Correct.
18       Q   The FAA requires him to -- pilots not to fly
19   commercially after age 65?
20       A   Commercially with -- in regard to FAR 121.
21       Q   Okay.  The -- at least what is flown by the
22   commercial jets that are flown by Frontier Airlines, those
23   can't be flown by someone who is 65 or older?
24       A   Not in revenue service.
25       Q   What does that mean?

188

1        A   When we operate under FAR Part 121, we have
2    to -- you asked the question, jets flown by Frontier.
3        Q   Right.
4        A   There are Frontier -- there are airplanes that
5    may be in Frontier Airlines' operations specification that
6    are being repositioned for maintenance.  An individual
7    aged greater than 65 can operate.  They are not in revenue
8    service.
9        Q   Okay.  So if you're -- if you're transporting
10   passengers, you can't be 65 or older?
11       A   Correct.  With -- at Frontier, that is correct.
12       Q   Okay.  And if -- but if you're just
13   transporting from maintenance purposes, there aren't
14   passengers?
15       A   Operating under FAR Part 91, that is correct.
16       Q   You can be more than -- over -- 65 or over?
17       A   Correct.
18       Q   Okay.  So you said Mr. Fair never became a
19   flight operations instructor?
20       A   That is correct.
21       Q   Why would this document say that he was
22   transferring from captain to flight operations instructor?
23       A   I believe it was either a clerical error by
24   designating an instructor, or that was the only
25   position -- the only placeholder we had to indicate that

189

1   Mr. Fair was going to continue in a capacity of flying for
2   Frontier Airlines as a repositioned pilot.
3       Q   Oh, is that what he ultimately did?
4       A   No.
5       Q   What -- what did he do after January 5th, 2012?
6       A   He stayed retired and never came back to
7   Frontier.
8       Q   Okay.  So he took permanent retirement?
9       A   Yes, sir.
10      Q   Okay.  How common is it -- how common is it for
11  pilots, when they hit the -- 65 age limit, to transfer
12  to a non -- to a position where they don't have to fly
13  passengers?
14      A   Not very.
15      Q   How often would you say it happens?
16      A   A handful.
17      Q   A year, a handful?
18      A   Not even in -- not even per year.  Only a
19  handful have elected to -- to continue in any -- any
20  capacity.  And to give you a more finite answer -- I would
21  have to go review again -- I apologize, but I can only
22  think of two.
23      Q   Two over what period?
24      A   Over the last -- during my tenure.
25      Q   The last three and a half years?

190

1       A   Correct.
2       Q   As chief pilot?
3       A   Correct.
4       Q   Okay.  Do you know how many pilot positions
5   there are for individuals who are not flying planes or who
6   are not required to fly planes?
7       A   A pilot position that does not require you to
8   fly an airplane?
9       Q   I think we looked over some of them yesterday
10  that don't require you to hold an FAA medical
11  certification.
12      A   But they aren't necessarily pilot positions.
13      Q   What -- what positions that are -- that are --
14  that pilots -- that someone who has been a pilot -- sorry.
15          If we -- if we take a look at the exhibit that
16  you and I looked at yesterday, that showed -- this is
17  Exhibit 7?
18      A   Yes, sir.
19      Q   It looks like this with the blue strip --
20      A   Yep.
21      Q   -- at the top.
22          These were the -- the jobs that were identified
23  as pilot positions by Frontier Airlines that did not
24  require all -- all certifications to be maintained?
25      A   Correct.

191

1       Q   Okay.  Do you have -- I think we went through
2   yesterday, through a number of these positions?
3       A   Correct.
4       Q   Are there other positions that a -- someone who
5   could do something related to a pilot's work where they're
6   not flying besides these positions?
7       A   Without any additional certification?
8       Q   Yeah.
9       A   Not that I'm aware of and not that have not
10  been discussed.
11      Q   All right.  What I meant to ask you yesterday,
12  when -- when Mr. Quick was returning from reemployment --
13      A   Correct.
14      Q   -- the -- the basic thing that you knew that he
15  didn't have was a -- was a first-class medical
16  certification, right?
17      A   Correct.
18      Q   Okay.  Did you know at the time that he had an
19  instructor -- an FAA instructor certification?
20      A   Not at the time.
21      Q   When did you learn that?
22      A   In review of his deposition transcript.
23      Q   Okay.
24      A   The flight instructor certificate is a unique
25  FAA certificate in that it expires every 24 months.  So to

192

1   merely say that he had represented at the time he was
2   hired that he had one, did not necessarily mean that he
3   still held one in 2014.
4       Q   Okay.  Do you -- do you know if Mr. Quick has
5   had any lapse of his instructor --
6       A   I do not know.
7       Q   Okay.  All right.  Is there any sort of
8   electronic or other database for -- that would allow
9   Frontier to determine what certifications a person has
10  from the FAA, like, for example, to find out if Mr. Quick
11  had -- has certification as an instructor?
12      A   Can you ask that again or -- did you say a
13  database other than the FAA?
14      Q   I'm saying, is there any database --
15      A   Only the FAA that I'm aware of --
16      Q   -- the FAA or any other database that allows
17  Frontier, without asking the pilot, to determine what
18  certifications the pilot has?
19      A   Only the FAA's.
20      Q   But the FAA has such a database?
21      A   They maintain a website.
22      Q   Okay.
23      A   I -- I would have no idea if it's current or
24  not.
25      Q   Okay.

193

1    A   The only way to ask would be to -- the only way
2  to verify would be to ask the pilot.
3    Q   But if -- but if you went to the website today,
4  you -- you might be able to see what certifications
5  Mr. Quick or other pilots who work for you have, right?
6    A   Again, I would -- I would be cautious with the
7  validity or accuracy of that based on any number of
8  things, based on the timing, the updating on the FAA.  I
9  can tell you with regard to aircraft certification, they
10 are frequently wrong.
11   Q   Okay.  With respect to aircraft certification,
12 were you aware that there had been any lapse in
13 Mr. Quick's aircraft certification?
14   A   No, I was not aware.
15   Q   Okay.  And you're not aware now?
16   A   No.
17   Q   Okay.  I know you said it was just a handful
18 of -- of -- of individuals who have transferred from
19 flying to non -- after the rule of 65 to nonflying
20 positions.
21       Is there a procedure that you have at Frontier
22 for figuring out how to transition a pilot who hits 65
23 years old or for some other reason, can't fly commercial
24 aircrafts with passengers, to figure out how to employ
25 them in another position?

194

1    A   Again, it -- to clarify, when I said a handful,
2  in thinking through it, I can only recall two, Mr. Fair
3  and one other.  And in both of those cases, the pilot
4  indicated to flight operations management that they had
5  wanted to continue employment in a capacity other than
6  that as a pilot --
7    Q   Okay.
8    A   -- a commercial pilot.
9    Q   Was Mr. Roe the other?
10   A   Mr. Roe was not the other I was thinking of.
11   Q   Who was the other you were thinking of?
12   A   Captain Constaine.
13   Q   He hit 65 and --
14   A   Correct.
15   Q   -- became an -- an instructor?
16   A   A repositioned pilot?
17   Q   A repositioned pilot, okay.
18   A   Correct.
19   Q   So -- so they kind of -- those two individuals
20 came to your management and said they'd like a different
21 position when they turned 65?
22   A   They came to us and said they'd like to
23 continue flying.
24   Q   Okay.  And you worked with them to find an
25 appropriate position?

195

1    A   The only position we had that they could fly
2  was -- was that of an aircraft repositioned pilot.
3    Q   Okay.  Did they have to take any sort of
4  medical test or exam to --
5    A   They had to provide the same certification as
6  any of our other pilots.  And that's defined by FAR in
7  order to act as pilot in command of the aircraft.
8    Q   Okay.  Did you involve the HR department in
9  that procedure?
10   A   Yes.  And that would have been through -- I did
11 not personally.  The company did through Skid Roe --
12 Captain John Roe, who is now the manager of aircraft
13 repositioning.
14   Q   Okay.  What kind of USERRA-related training has
15 been provided to the management within your department?
16   A   A basic understanding.
17   Q   So you're -- you -- okay.  So the management
18 from you, as a chief pilot, and the other managers, you're
19 saying you have a basic understanding of USERRA?
20   A   Very limited.  And I don't even want to qualify
21 that as very limited or very basic.  It's too subjective
22 for me to tell you what my understanding of it is.
23 Compared to legal counsel, my knowledge is miniscule, but
24 compared to a layperson on the 16th Street Mall, I may be
25 a little more familiar with it.

196

1    Q   Okay.  Maybe not.
2    A   Yeah.  Fair.
3    Q   So how did you and other members of your
4  management team acquire knowledge about USERRA?
5    A   We would ask HR.
6    Q   Kind of on an ad hoc basis, or was there some
7  sort of formal training provided?
8    A   No formal training.
9    Q   Do you recall you or any -- anyone else in
10 management receiving retraining -- receiving training
11 about what to do with a disabled veteran who needs an
12 accommodation?
13   A   Again, that would be a collective -- a
14 collaborative effort where we would go to HR.
15   Q   Right.  And I understand that that's what you
16 testified about yesterday, that you would refer those
17 issues to HR.
18       What I -- I guess what I'm asking is, does the
19 company provide -- has the company provided any specific
20 training to the -- to the flight operations team, you and
21 your other managers, about how -- what to do when a
22 service member is returning with an injury or any sort of
23 disability?
24   A   I think we answered that yesterday.
25   Q   But there's no -- there hasn't been formal

197

1    training?
2        A    Again, with inflight operations, when faced
3    with a situation as you have described, we would go work
4    with our HR department on how to accommodate, how to --
5    whatever process or steps needed to be taken.  They are
6    the experts.  They are specifically trained with state and
7    federal statute.  We are not.
8        Q    Okay.  Other than the situation where a pilot
9    is turning 65 and is no longer able to fly passengers,
10   have -- do you recall any situations where a pilot has not
11   been able to fly passengers and has been repositioned to a
12   different job within your command?
13       A    Can you read that again?  Can you read that
14   question, please?
15           MR. ROMER-FRIEDMAN:  Go ahead.
16           (The reporter read the last question.)
17       A    As a result of the inability to fly passengers?
18       Q    (By Mr. Romer-Friedman)  Sure.
19       A    Then, no.
20       Q    No.  How about for other reasons?  Have there
21   been other reasons other than not being able to fly
22   passengers that someone's been repositioned from flying
23   commercially to a different position?
24       A    Yes.
25       Q    What is that circumstance or situation?

198

1        A    We have one individual reporting to me who at
2    this time does not possess a medical -- a valid medical.
3        Q    Who is that?
4        A    Charles Aaron Rex.
5        Q    And what is that pilot doing with respect to
6    his job and you?
7        A    He's an assistant chief pilot.
8        Q    Okay.  How long has he held that position for?
9        A    20 months.
10       Q    And is the -- is the expectation he will be
11   able to hold that job for the foreseeable future?
12       A    Yes.
13       Q    Okay.  Do you know what he's paid?
14       A    His hour -- his first officer wage, 85 hours
15   per month with a $1,000 a month override.
16       Q    Okay.  So that's 10 hours above the line
17   guarantee?
18       A    Correct.  And I believe it's in Exhibit 7.
19       Q    Could you show me where that is?
20       A    Page 3 of Exhibit 7, numbered 749 at the
21   bottom.  In the blue shaded section at the top, the fourth
22   row in the second column.  Structure or grade, 85 credit
23   hours, plus 1,000 per month.
24       Q    Okay.  So is -- if you turn -- if you look at
25   the rest of these positions in Exhibit 7, could you walk

199

1    me through what the salaries for those would be?
2        A    Page 751, director of flight operations
3    training, structure or Grade 15.
4        Q    And what is that salary or pay?
5        A    We would have to defer to the payroll expert.
6    I don't know the bracket for a Grade 15.
7        Q    Is that under the CBA, Grade 15?
8        A    No, sir.
9        Q    Where -- roughly, do you have a --
10       A    I do not.
11       Q    You do not.  Is that --
12       A    They report to the VP of flight operations, and
13   I don't -- I don't know what they are paid.  I don't know
14   what that position pays.
15       Q    Okay.  How about the next one on 753?
16       A    That is a Grade 10 for an instructor ground
17   school.
18       Q    Do you know what that's paid?
19       A    I do not.
20       Q    Okay.  How about the first page where it says
21   structure or Grade 99 on Page 747?
22       A    Same answer.  I don't know what -- a grade
23   99 --
24       Q    Okay.
25       A    -- I don't know what that -- what that grade

200

1    pay is.
2        Q    In general, these -- and these instruct -- all
3    these instructor positions and chief pilot in Exhibit 7,
4    are these all considered management?
5        A    By what definition?
6        Q    Do you consider these people to be in
7    management?
8        A    The CBA recognizes the assistant chief pilot as
9    the only management position --
10       Q    What about the chief --
11       A    -- within this -- within this -- this group of
12   four positions.
13       Q    Okay.  Are -- are these grades set by the CBA?
14       A    No, sir.
15       Q    No.  Okay.  So what's -- the company has
16   discretion as to what these -- what these positions will
17   be paid?
18       A    We would have to defer that to HR and our
19   payroll specialists.  That's not within my purview.
20       Q    Okay.  Okay.  So the assistant chief pilot,
21   then, will ordinarily be paid more than a pilot who is
22   doing the same work and earning the line guarantee; is
23   that right?
24       A    I want to be very clear with my answer.  The
25   question was, will that ordinarily be more than you'd

30(b)(6) Deposition of Frontier Airlines through Zeier, Thibodeau and Sabia (Videotaped)
Edward Quick v. Frontier Airlines and Michele (sic) Zeier  -  August 5, 2016

---

201

1  make on -- as a line pilot, but you also qualified as a
2  line guarantee.  Those are two separate questions.
3      Q   Okay.  So -- but at least in terms of the pay
4  that would be guaranteed, this -- here on Page 749, this
5  assistant chief pilot would be guaranteed 85 hours of pay
6  up there.
7          Is that a first officer rate or a captain rate?
8      A   Depending on the position, the pilot entered
9  the assistant chief pilot role in.  And to answer your
10 question, yes, 85 credit hours at a 1,000 per month is
11 greater than our guarantee.
12     Q   Okay.  Do you have a sense of what these other
13 positions, flight instructor, director of flight
14 operations training, instructor ground school, whether
15 these pay more or less than the standard line guarantee?
16         MR. DABNEY:  Objection.  Lacks foundation.
17 He's already said he didn't know what they're paid.
18     A   I don't know what they're paid, so I can't have
19 a sense.
20     Q   (By Mr. Romer-Friedman)  Okay.
21         MR. ROMER-FRIEDMAN:  All right.  Let's take a
22 five-minute break, and I think we may be close to being
23 done.
24         THE VIDEOGRAPHER:  Going off the record.  The
25 time is 4:10.

---

202

1          (A recess was taken from 4:10 p.m. until
2  4:24 p.m.)
3          THE VIDEOGRAPHER:  We're back on the record.
4  The time is 4:24.
5      Q   (By Mr. Romer-Friedman)  Okay.  Good afternoon,
6  Mr. Thibodeau.
7      A   Good afternoon.
8      Q   You understand we're working under the same
9  ground rules?
10     A   Yes, sir.
11     Q   Still under oath?
12     A   Yes, sir.
13     Q   Great.
14         This gentleman we looked -- we saw some
15 correspondence from earlier, John "Skid" Roe --
16     A   Yes, sir.
17     Q   -- he was previously the director of flight
18 operations, correct?
19     A   Flight operations training.
20     Q   Training, okay.
21         And when he turned 65, was he repositioned to a
22 different job?
23     A   No, sir.  He -- I don't remember his birth
24 date, but it -- he did not -- he turned -- previous to our
25 age 65 requirement and regulation, retirements were age

---

203

1  60.
2      Q   Right.
3      A   He reached age 60 before the age 65 rule was in
4  place.
5      Q   Okay.  So when he reached 60, did he reposition
6  to a different job?
7      A   I can't recall specifically when he left the
8  line to become the director of flight operations training.
9  That may have occurred before his 60th birthday.
10     Q   Okay.  What does he do now?
11     A   He's our manager of aircraft reposition.
12     Q   Okay.  So he went from this position, director
13 of flight operations training to --
14     A   Manager of aircraft reposition.
15     Q   Okay.  How did that happen, that transition?
16     A   Through any other process or step, it was a
17 position that Skid had indicated that he was ready to no
18 longer be the director of flight operations training.  At
19 the time, he had been repositioning aircraft.  He was
20 wearing two hats at the time.  He stopped wearing one, and
21 he continued wearing the other.
22     Q   Okay.  And so he went from a position where he
23 was repositioning aircraft to no longer flying --
24     A   No, sir.
25     Q   -- at all?

---

204

1      A   He -- he -- no, sir.  That's not correct.
2      Q   What -- what was the difference between this
3  position of director of flight operations training and the
4  manager position that he had after that?
5      A   The director of flight operations training is
6  responsible for the curriculum, what's involved with
7  flight operations training.  Aircraft repositioning is
8  moving aircraft.  He continues to this day to reposition
9  aircraft.
10     Q   Okay.  I think we might have talked about this
11 a little bit yesterday, the FAPA Invest benefit.  Have you
12 received any distributions as a pilot under FAPA Invest?
13     A   I believe I have.
14     Q   Do you know when you received those?
15     A   I would have to review my own pay stubs.  There
16 was a very small portion.  I believe it was 2013.  But I'd
17 have to review to give you an -- an answer.
18     Q   Okay.  Do you know how many distributions there
19 have been in the last three or four years?
20     A   No.  I'm not -- that's not within the purview
21 of Frontier.  That's an investment group.
22     Q   Okay.  And -- and other pilots besides you
23 received distributions at the same time?
24     A   Others who were a part of FAPA Invest.
25     Q   Okay.  And those were pilots who would have

---

205

1    been at the airline at the time that FAPA Invest was
2    created?
3        A   Others that were pilots at the time FAPA Invest
4    was created, yes, sir.
5        Q   Okay.
6        A   I don't know if there were others, but I
7    believe they were all pilots.
8        Q   Do you know if Mr. Quick has received any
9    distributions under FAPA Invest?
10       A   I don't know.
11       Q   Do you know if he should in terms of someone
12   who was a pilot at the time that FAPA Invest was created?
13       A   I don't know.
14           MR. DABNEY: Lacks foundation.
15       Q   (By Mr. Romer-Friedman)  Okay.  You said you
16   received a small amount?
17       A   Yes, sir.
18       Q   Do you recall how much that was, even ballpark?
19       A   Ballpark would be a $1,000.
20       Q   Okay.  And your --
21       A   I'm specifically excluded from FAPA Invest.
22       Q   Now?
23       A   Yes, sir.
24       Q   When you became chief pilot?
25       A   When I became the assistant chief pilot.

206

1        Q   Okay.  So how did you receive a distribution
2    recently?
3        A   It was based on my earnings prior to my time as
4    assistant chief pilot.
5        Q   Okay.  So it was when you were a rank and file
6    pilot?
7        A   Correct.
8        Q   All right.  Earlier we were talking about the
9    wrong seat issue?
10       A   Correct.
11       Q   And I just want to see if we can clean up some
12   of the language so I can understand this.
13           If -- if an individual is being -- has been
14   trained, like in the training school, but they haven't yet
15   been qualified to be a captain and while they're doing the
16   upgrade, would you say that the person is trained but not
17   qualified, or would you -- would you say that because they
18   went to the training school, they're qualified to be
19   captain?
20       A   The CBA defines it otherwise.  There are
21   training events and qualifying events.
22       Q   Could you describe what that means?
23       A   A training event is one wherein you are
24   completing a module within the flight operations training
25   manual.  A qualifying event would be a checking event.

207

1        Q   Okay.  So if you have pass the checking event,
2    like the check for captain, if you pass that, then you are
3    qualified?
4        A   No, sir.  There are additional requirements.
5        Q   Okay.  So if you have passed the check ride and
6    all the other requirements, then you're qualified, but not
7    beforehand?
8        A   Correct.
9            MR. ROMER-FRIEDMAN: Okay.  I think that's all.
10           Do you have anything, Mr. Dabney?
11           MR. DABNEY: Yes.
12                    EXAMINATION
13   BY MR. DABNEY:
14       Q   I'm going to direct you back to Exhibit 58.
15   Earlier when Mr. Romer-Friedman asked you about this
16   document, which is an e-mail from Mr. Quick to Mr. Colburn
17   and Mr. Roe at Frontier, June 13th, 2007, he asked you
18   about the various numbered items there on Mr. Quick's
19   e-mail.
20           And I want to ask you, are there any items in
21   that list which are not typical for a person in the
22   circumstance that Mr. Quick was who had failed his initial
23   oral exam for captain upgrade?
24       A   Let me review.
25           There are two items that are not typical.

208

1        Q   Which ones are those?
2        A   Item Number 3, be allowed a preoral before
3    taking another type oral.
4        Q   Is that a step that would typically be afforded
5    to a pilot in his position?
6        A   No, sir.
7        Q   Any others?
8        A   Yeah.  I want to go on further with Number 3.
9    Have the instructor sign a new 8710 verifying that they
10   personally instructed me and consider me ready to take a
11   test.  That's not typical either.
12       Q   What is that even referring to?
13       A   8710 seems to be slang or jargon or vernacular
14   for a form that the FAA uses for applicants when they are
15   receiving airman certificates or ratings.
16           We don't -- we don't typically fill out a new
17   8710 when an applicant does not successfully or
18   satisfactorily pass an oral exam.  That's not typical.
19           You asked anything else.  Number 4, wait to see
20   how I do on the preoral before scheduling my next oral.
21   We -- we typically have everything scheduled where we
22   would have the retraining described and the rechecking
23   scheduled.  We don't wait for completion of retraining
24   before we schedule a rechecking.
25       Q   Anything else about that document that

30(b)(6) Deposition of Frontier Airlines through Zeier, Thibodeau and Sabia (Videotaped)
Edward Quick v. Frontier Airlines and Michele (sic) Zeier  -  August 5, 2016

---

### 209

1   indicates steps out of the ordinary?
2       A   No, sir.
3       Q   Okay.
4           MR. DABNEY:  Those are all my questions.
5           MR. ROMER-FRIEDMAN:  I have one -- one last
6   question that I'm permitted to have.
7           EXAMINATION
8   By Mr. Romer-Friedman:
9       Q   Is it -- in order to -- to move from a flying
10  position to a nonflying pilot-related position, like an
11  instructor or an air -- airbus training manager, do you --
12  do you have to be a captain, or can you also be a first
13  officer?
14      A   It -- it depends on the position.
15      Q   So it could be that someone who's a
16  first officer could transition into one of these kind of
17  nonstandard pilot-related positions?
18      A   Again, it would -- it would be case by case on
19  the position being transferred into.
20      Q   Do you know who David Welt is?
21      A   I do.
22      Q   What does he do?
23      A   He is a captain and an air crew program
24  designee.
25      Q   Okay.  Was he -- he was the airbus training

---

### 210

1   manager at some point?
2       A   He -- he has been the director of flight
3   operations training.
4       Q   Before that, was he the airbus training
5   manager?
6       A   I would have to review the official title.
7       Q   Okay.  Do you know if he was a first officer
8   before he became a training manager?
9       A   I would have to review the -- the exact dates.
10      Q   Okay.
11      A   But, yes, Dave Welt has been a first officer
12  for Frontier and is currently a captain.
13      Q   Okay.  Do you know if he's more or less senior
14  than Mr. Quick?
15      A   I -- I want to qualify.  I do not know.
16  Mr. Welt had a seniority number at Frontier.  He flew for
17  another airline, resigning his original seniority number
18  and was rehired at Frontier with a new seniority number.
19  I don't know where that new seniority falls with relation
20  to Mr. Quick's seniority number.
21      Q   Okay.  I think we talked about this yesterday,
22  whether someone was less senior or more senior, if they're
23  moving into a position in management or an instructor
24  position, the seniority wouldn't necessarily affect
25  whether the person can get hired, right?

---

### 211

1       A   Seniority's irrelevant.
2           MR. ROMER-FRIEDMAN:  All right.  I think that
3   concludes the 30(b)(6), unless Mr. Dabney has anything
4   further.
5           MR. DABNEY:  Nothing further.
6           MR. ROMER-FRIEDMAN:  Okay.  Thank you,
7   Mr. Thibodeau.
8           THE WITNESS:  Thank you, Mr. Romer-Friedman.
9           THE VIDEOGRAPHER:  This is the end of the
10  30(b)(6) deposition with Media Unit 4 of 4 and designee
11  Joseph Thibodeau.
12          Going off the record at 4:35.
13          (The 30(b)(6) depositions concluded at
14  4:35 p.m. on the 5th day of August 2016.)

---

### 212

1           AFFIDAVIT
2       I have read my deposition and it is true and
3   accurate, except for changes or corrections now indicated
4   by me on the Amendment sheet.
5
6       Amendment sheet attached   (  )
7       No changes to testimony   (  )
8
9       _____
10      MICHELLE ZEIER as 30(b)(6)
        witness for Frontier Airlines
11
12      Subscribed and sworn to before me this
13  date, _____ 2016.
14      _____
15      My Commission expires:
        _____
16      NOTARY PUBLIC
17      _____
18      STREET ADDRESS
        _____
19      CITY, STATE, ZIP
20
21  Return to:  MILE HIGH COURT REPORTING & VIDEO, INC.
            14143 Denver West Parkway
22          Suite 100
            Golden, Colorado  80401
23
24
25

---

213

```
 1              AFFIDAVIT
 2       I have read my deposition and it is true and
 3  accurate, except for changes or corrections now indicated
 4  by me on the Amendment sheet.
 5
 6       Amendment sheet attached   ( )
 7       No changes to testimony    ( )
 8
 9       _____
         ANTHONY SABIA as 30(b)(6)
10       witness for Frontier Airlines
11
12       Subscribed and sworn to before me this
    date, _____ 2016.
13
14       _____
         My Commission expires:
15       _____
         NOTARY PUBLIC
16       _____
17       STREET ADDRESS
18       _____
         CITY, STATE, ZIP
19
20
21    Return to:  MILE HIGH COURT REPORTING & VIDEO, INC.
         14143 Denver West Parkway
         Suite 100
22       Golden, Colorado  80401
23
24
25
```

215

```
 1              CERTIFICATE
 2
    STATE OF COLORADO        )
 3                           ) ss.
    COUNTY OF ADAMS          )
 4
 5       I, SHAUNA T. DIETEL, Registered
    Professional Reporter, and Notary Public of the State of
 6  Colorado, certify that before the deposition the witness
    sworn by me to testify to the truth, and that the
 7  foregoing is a true transcript of the questions asked,
    testimony given, and proceedings had.
 8
 9       I further certify that I am not related to,
    any party herein, nor their counsel, and have no interest
10  in the result of this litigation.
11
12
13       _____
         Shauna T. Dietel, RPR
14       My commission expires 8/6/2017
15
16
17
18
19
20
21
22
23
24
25
```

214

```
 1              AFFIDAVIT
 2       I have read my deposition and it is true and
 3  accurate, except for changes or corrections now indicated
 4  by me on the Amendment sheet.
 5
 6       Amendment sheet attached   ( )
 7       No changes to testimony    ( )
 8
 9       _____
         JOSEPH THIBODEAU as 30(b)(6)
10       witness for Frontier Airlines
11
12       Subscribed and sworn to before me this
    date, _____ 2016.
13
14       _____
         My Commission expires:
15       _____
         NOTARY PUBLIC
16       _____
17       STREET ADDRESS
18       _____
         CITY, STATE, ZIP
19
20
21    Return to:  MILE HIGH COURT REPORTING & VIDEO, INC.
         14143 Denver West Parkway
         Suite 100
22       Golden, Colorado  80401
23
24
25
```

August 17, 2016


WILLIAM R. DABNEY, ESQ.
Holland & Hart, LLP
555 17th Street
Suite 3200
Denver, Colorado  80202


RE:  Quick v. Frontier Airlines, et al.
     Civil Action No. 15-cv-00765-REB-KMT
     30(b)(6) deposition of:  MICHELLE ZEIER, ANTHONY
                              SABIN and JOSEPH THIBODEAU
     Taken:  August 5, 2016


Dear Mr. Dabney:

Enclosed with your copy of the above-referenced
deposition is the signature page from the Court's
Original transcript.

In accordance with the Rule, please have the witness
read and sign his or her testimony, then return the
executed signature page and any amendment sheets used
to us within 35 days of the date of this letter.


Sincerely,


MILE HIGH COURT REPORTING & VIDEO, INC.


Encl.


cc: Original transcript

    Peter Romer-Friedman, Esq.

    Joseph A. Whitcomb, Esq.

PETER ROMER-FRIEDMAN, ESQ.
Washington Lawyers' Committee for
Civil Rights and URBAN AFFAIRS
11 Dupont Circle, NW
Suite 400
Washington, DC  20036


Re:  Quick v. Frontier Airlines, et al.
     Civil Action No. 15-cv-00765-REB-KMT
     30(b)(6) Deposition of:  MICHELLE ZEIER, ANTHONY
                              SABIA and JOSEPH THIBODEAU
     Taken:  August 5, 2016

Dear Mr. Romer-Friedman:
The above-referenced original deposition is being filed
with you on this date:_____.

Pursuant to the governing Rules of Civil Procedure, the
above-mentioned deposition is being filed:

_____ signed, with no changes

_____ signed, with changes, a copy of which is attached

_____ unsigned, no changes

_____ unsigned, with changes, a copy of which is
      attached

_____ unsigned, pursuant to agreement of counsel that
      the deposition may be reviewed and signed at or
      before the time of trial

_____ unsigned, our office having received notice that
      the case has settled

_____ signature waived at the time of deposition

_____ signature not required

MILE HIGH COURT REPORTING & VIDEO, INC.
cc: Original transcript
    William R. Dabney, Esq.