# EXHIBIT 7

# Transcript of the Testimony of:
# **Michelle Zeier (Videotaped)**

**Date:** August 4, 2016

Edward Quick v. Frontier Airlines and Michele (sic) Zeier

Civil No. 15-cv-00765-REB-KMT



**Mile High**
**Court Reporting & Video, Inc.**

14143 Denver West Parkway, Suite 100 • Golden, Colorado 80401
(303) 202-0210 • contact@milehighreporting.com
www.milehighreporting.com

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 15-cv-00765-REB-KMT

─────────────────────────────────────────────────

VIDEOTAPED DEPOSITION OF MICHELLE ZEIER

August 4, 2016

─────────────────────────────────────────────────

EDWARD K. QUICK,

Plaintiff,

vs.

FRONTIER AIRLINES, INC., and MICHELE (sic) ZEIER,
an individual,

Defendants.

─────────────────────────────────────────────────

PURSUANT TO NOTICE, the videotaped
deposition of MICHELLE ZEIER, called for an examination by
the Plaintiff herein, was taken at Holland & Hart, LLP,
555 17th Street, Suite 3200, Denver, Colorado 80202,
commencing at 2:42 p.m. on August 4, 2016, before
Shauna T. Dietel, a Registered Professional Reporter and
Notary Public within Colorado.

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

2

```
 1   APPEARANCES:

 2           PETER ROMER-FRIEDMAN, ESQ.
             Washington Lawyers' Committee for
 3           Civil Rights and Urban Affairs
             11 Dupont Circle, NW
 4           Suite 400
             Washington, DC  20036
 5           202-644-7080
             Peter_RomerFriedman@washlaw.org
 6           and
             JOSEPH A. WHITCOMB, ESQ.
 7           Whitcomb, Selinsky, McAuliffe, PC
             1391 Speer Boulevard
 8           Suite 705
             Denver, Colorado  80204
 9           303-534-1958
             joe@whitcomblawpc.com
10
                     For the Plaintiff
11

12           WILLIAM R. DABNEY, ESQ.
             Holland & Hart, LLP
13           555 17th Street
             Suite 3200
14           Denver, Colorado  80202
             303-295-8000
15           wrdabney@hollandhart.com

16                   For the Defendants

17

18
             Also Present:  Edward K. Quick
19                           Kathy Myers, Videographer

20

21

22

23

24

25
```

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

3

1                     I N D E X

2     EXAMINATION:                                    PAGE

3     By Mr. Romer-Friedman                        7, 269

4     By Mr. Dabney                                   266

5

6     EXHIBITS:                                      MARKED

7      8   Notice of Deposition                        11

8      9   Section 8.05 of the employee handbook       33

9     10   Section 805.6 of the employee handbook      35

10    11   Emergency Medical Information Personal       88
           and Confidential

11

12    12   Frontier Airlines Personnel action form    101

13    13   E-mail from Edward K. Quick to Jim Colburn  104
           dated Monday, June 18, 2007 with attachment

14    14   E-mail from Jim Colburn to Edward Quick     108
           dated Wednesday, April 30, 2008

15

16    15   Handwritten notes                          122

17    16   E-mail from Michelle Zeier to              129
           ekquick@yahoo.com dated Tuesday,
           October 14, 2014

18

19    17   E-mail from ekquick@yahoo.com to Michelle  131
           Zeier dated Wednesday, October 15, 2014
           with attachment

20

21    18   E-mail from ekquick@yahoo.com to Michelle  134
           Zeier dated Wednesday, October 15, 2014
           with attachment

22

23    19   Complaint and Jury Demand                  140

24    20   E-mail chain Bates labeled QUICK 000092    144
           and QUICK 000093

25

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

4

| 1 | EXHIBITS: | | MARKED |
|---|---|---|---|
| 2 | 21 | E-mail from Michelle Zeier to ekquick@yahoo.com dated Wednesday, December 10, 2014 with attachment | 148 |
| 4 | 22 | E-mail chain Bates labeled QUICK 0000103 and QUICK 0000104 | 152 |
| 5 | 23 | E-mail chain Bates labeled QUICK 0000116 | 155 |
| 6 | 24 | Notes of meeting on 12/12/14 | 157 |
| 7 | 25 | E-mail chain Bates labeled FA00976 | 162 |
| 8 | 26 | E-mail chain Bates labeled FA01469 | 167 |
| 9 | 27 | Frontier Policy Acknowledgment Sign-Off | 168 |
| 10 | 28 | E-mail chain Bates labeled FA00987 | 171 |
| 11 | 29 | E-mail chain Bates labeled QUICK 0000122 and QUICK 0000123 | 175 |
| 13 | 30 | E-mail chain Bates labeled QUICK 0000120 | 178 |
| 14 | 31 | E-mail chain Bates labeled FA01484 through FA01486 | 180 |
| 15 | 32 | E-mail chain Bates labeled QUICK 0000146 through QUICK 0000150 | 185 |
| 17 | 33 | E-mail chain Bates labeled QUICK 0000162 | 190 |
| 18 | 34 | E-mail from ekquick@yahoo.com to Michelle L. Zeier dated Wednesday, February 11, 2015 | 195 |
| 19 | 35 | E-mail from Michelle Zeier to ekquick dated Monday, February 9, 2015 | 200 |
| 21 | 36 | E-mail chain Bates labeled QUICK 0000108 | 216 |
| 22 | 37 | E-mail from Michelle Zeier to ekquick dated Friday, March 6, 2015 | 219 |
| 23 | 38 | Copy of pay stubs | 222 |
| 24 | 39 | Edward Kevin Quick - 408824 - Frontier Airlines - Compensation as of 04/01/2015 | 223 |

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

5

| 1 | EXHIBITS: | | MARKED |
|---|---|---|---|
| 2 | 40 | Response to Interrogatory No. 6 to FA | 230 |
| 3 | 41 | E-mail chain Bates labeled FA01455 and FA01456 | 234 |
| 4 | | | |
| | 42 | E-mail chain Bates labeled FA01548 | 236 |
| 5 | | | |
| | 43 | (Document clawed back.) | 238 |
| 6 | | | |
| | 44 | E-mail chain Bates labeled FA01467 | 242 |
| 7 | | | |
| | 45 | E-mail chain Bates labeled FA01487 | 245 |
| 8 | | | |
| | 46 | E-mail from Krista M. Shaff to Anthony J. Sabia dated Friday, March 6, 2015 with attachment | 248 |
| 9 | | | |
| 10 | | | |
| | 47 | (Exhibit number skipped.) | -- |
| 11 | | | |
| | 48 | Defendant Michelle Zeier's Responses to Plaintiff's First Set of Interrogatories and Requests for Production | 261 |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | EXHIBITS PREVIOUSLY MARKED | | |
| 17 | 6 | E-mail chain Bates labeled FA00921 and FA00922 | 110 |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

---

**6**

1          PROCEEDINGS
2          THE VIDEOGRAPHER:  We are now on the record at
3   2:42 p.m. on August 4th, 2016, with Media Number 1 in the
4   deposition of Michelle Zeier in the case of Edward K.
5   Quick versus Frontier Airlines, Inc., et al., to be heard
6   in the U.S. District Court, District of Colorado, Case
7   Number 15-cv-00765-REB-KMT.
8          This deposition is being taken at 555 17th
9   Street, Suite 3200, in Denver, Colorado, at the request of
10  counsel for plaintiff.
11         The videographer is Kathy Myers.  The court
12  reporter is Shauna Dietel for Mile High Court Reporting &
13  Video.
14         Will counsel please state their appearances,
15  beginning with plaintiff's counsel.
16         MR. ROMER-FRIEDMAN:  Peter Romer-Friedman for
17  the plaintiff, Edward Quick.
18         MR. WHITCOMB:  Joseph Whitcomb for the
19  plaintiff Edward Quick.
20         MR. DABNEY:  William Dabney, Holland & Hart,
21  for the defendants.
22         THE VIDEOGRAPHER:  And also present, Counsel?
23         MR. ROMER-FRIEDMAN:  Also present is plaintiff
24  Edward Quick.
25         THE VIDEOGRAPHER:  Please swear in the witness.

---

**7**

1                MICHELLE ZEIER,
2   having been first duly sworn, was examined and testified
3   as follows:
4                EXAMINATION
5   BY MR. ROMER-FRIEDMAN:
6   **Q   Great.**
7   **Good afternoon.**
8   A   Good afternoon.
9   **Q   My name is Peter Romer-Friedman.  I represent**
10  **Mr. Quick in this litigation.  And I realize that you were**
11  **here for the morning's proceedings, so some of this may**
12  **all sound redundant to start.  But for the record, I**
13  **will probably go through some of the ground rules that I**
14  **went through with Mr. Thibodeau.**
15  **Okay?**
16  A   Sure.
17  **Q   Okay.  For the record, could you please state**
18  **your name, address, and current employer.**
19  A   Excuse me.
20         Michelle Zeier, and it's 15752 East 107th
21  Avenue, Commerce City, Colorado 80022.  I work for
22  Frontier Airlines.
23  **Q   Okay.  And what's your position?**
24  A   Currently I'm the director of labor relations.
25  **Q   Okay.  Have you ever been deposed before?**

---

**8**

1   A   No.
2   **Q   Have you ever testified at trial before?**
3   A   No.
4   **Q   How about in -- testified in a hearing?**
5   A   Hearings.
6   **Q   Arbitration?**
7   A   Arbitrations.
8   **Q   How many arbitrations?**
9   A   I couldn't tell you exactly.  A handful.
10  **Q   Handful.**
11  **Were those all in your capacity as a labor**
12  **relations or human resource person at Frontier Airlines?**
13  A   Correct.
14  **Q   Okay.  Were those arbitrations between the**
15  **pilots union and the -- and the company?**
16  A   Various unions representing various work
17  groups, to include the pilots.
18  **Q   Okay.  The unions representing the different**
19  **crafts at -- at Frontier?**
20  A   Yes.
21  **Q   Okay.  Do you recall any of the specific issues**
22  **that were arbitrated in those arbitrations?**
23  A   There have been termination cases, contract
24  interpretation cases, both.
25  **Q   Okay.  Did any of those prior cases involve**

---

**9**

1   veterans' or service members' rights or USERRA?
2   A   No.
3   **Q   How about the ADA or disability rights?**
4   A   Not that I recall.
5   **Q   Okay.  If you recall any more --**
6   A   Sure.
7   **Q   -- today, let me know, please.  Thank you.**
8   **Okay.  As I said before, I'm going to ask**
9   **questions to you.  We need verbal answers, even though**
10  **we're videotaping today, so the stenographer --**
11  **stenographer can take everything down.**
12  **Okay?**
13  A   Understood.
14  **Q   Okay.  On occasion I may ask a poorly worded**
15  **question.  If you don't understand or you need**
16  **clarification, let me know.  I'd be happy to clarify or**
17  **re-ask the question.**
18  **Okay?**
19  A   Okay.
20  **Q   Otherwise, I'll assume you understand the**
21  **question.**
22  A   Understood.
23  **Q   Okay.  Your attorney, Mr. Dabney, may object to**
24  **some of my questions.  If he does so, you can answer,**
25  **except in the case in which he tells you specifically not**

---

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

---

10

```
 1    to answer the question.
 2         Okay?
 3      A   Okay.
 4      Q   We'll hopefully try to get done as quickly as
 5    possible today, but we'll take breaks when necessary.  The
 6    only time that we won't take a break is if we're in the
 7    middle of a question.  But after -- after a particular
 8    question, if you need a break, just let us know, and we
 9    can -- we can do that.
10         Okay?
11      A   Okay.
12      Q   If you recall additional information subsequent
13    to me asking you a question, you're welcome to clarify or
14    to come back and let us know later in the deposition if
15    you have further explanation or recall.
16         Okay?
17      A   Okay.
18      Q   All right.  And you understand you're under
19    oath, just as if you were in a court of law?
20      A   I do.
21      Q   Okay.  And you understand that you're a party
22    in this lawsuit?
23      A   I do.
24      Q   Okay.  And that you're testifying for yourself
25    in this deposition today?
```

11

```
 1      A   Correct.
 2      Q   Okay.  Okay.  Is there any reason why you can't
 3    tell the truth today?
 4      A   No.
 5      Q   Okay.  You're not on any drugs or medications
 6    that would prevent you from testifying truthfully and
 7    accurately?
 8      A   No.
 9      Q   Okay.  And as I said earlier, when I refer to
10    Frontier, I'll be referring to Frontier Airlines.  If
11    there are any acronyms that you don't understand, just let
12    me know.  I can ask you -- or I can clarify; or likewise,
13    I may ask you to clarify what they are.
14      A   Sure.
15      Q   Okay.  Great.
16         All right.  I'm handing you what will be
17    Exhibit 8.
18         And it's Zeier, right?
19      A   Zeier.
20      Q   Zeier.
21         I have -- I have a tough last name, so I --
22      A   I appreciate that.
23      Q   -- I feel -- I feel for you.
24         (Deposition Exhibit 8 was marked.)
25      Q   (By Mr. Romer-Friedman)  There you go.
```

12

```
 1      A   Thanks.
 2      Q   Do you recognize this document?
 3      A   I believe I've seen this through the course of
 4    documentation notifying me of the lawsuit.
 5      Q   Exhibit 8 is a notice of deposition for you?
 6      A   Correct.
 7      Q   Okay.  And do you have any objection to sitting
 8    for this deposition and testifying?
 9      A   No.
10      Q   Okay.  All right.  Okay.  How did you prepare
11    for today's deposition?
12      A   I met with Bill Dabney, counsel, in
13    preparation.
14      Q   When did you meet with him?
15      A   Yesterday.
16      Q   Was that before or after he met with
17    Mr. Thibodeau?  Do you know?
18      A   Let's see.  I think I met with him before, in
19    the morning.
20      Q   Okay.  For how long did you meet with
21    Mr. Dabney?
22      A   Most of the day.
23      Q   How many hours would you say?
24      A   Five, six.
25      Q   Okay.  Did you review any documents with
```

13

```
 1    Mr. Dabney?
 2      A   Some prior e-mails between myself and
 3    Mr. Quick.
 4      Q   How about e-mails with other Frontier employees
 5    or agents?
 6      A   There may have been, although I think the
 7    majority of them were correspondence with Mr. Quick.
 8      Q   Okay.  And those were all documents that were
 9    produced as part of this litigation?
10      A   Yes.
11      Q   Okay.  Did you look at anything that wasn't
12    produced?
13      A   No.
14      Q   Okay.  And you said earlier you haven't been
15    deposed before?
16      A   Correct.
17      Q   Okay.  To prepare for this deposition, did you
18    speak with anyone besides Mr. Dabney?
19      A   No.
20      Q   Okay.  Did you look at any documents besides
21    those e-mails?
22      A   Early on, when we were providing information,
23    there may have been documents that I reviewed, but what I
24    -- what I recall is what I reviewed recently --
25      Q   Okay.
```

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

14

1  A  -- in preparation for today.
2  Q  So you're talking about when you were producing
3  documents as part of the discovery in the lawsuit?
4  A  Right.  The things that were produced as far
5  as --
6  Q  Okay.
7  A  -- the suit goes.
8  Q  Have you done that before in the context of
9  litigation, to help produce information, documents for --
10  as part of discovery?
11  A  Not very often, but yes.
12  Q  Okay.  And who -- who were the people you've
13  spoken to about this lawsuit besides Mr. Dabney?
14  A  Jacalyn Peter, who I report to.  She's
15  currently the vice president of labor relation --
16  relations.
17  Q  Okay.  Anyone else?
18  A  That's the extent of what I can recall right
19  now.
20  Q  So since -- let -- let's -- time frame, let's
21  talk about since the lawsuit was filed last year.
22  A  Also Mr. Thibodeau.
23  Q  Okay.  Okay.  What did you discuss with
24  Ms. Peter?
25  MR. DABNEY:  Careful.  Ms. Peter's counsel for

15

1  Frontier Airlines as well as vice president of labor
2  relations, and so I'd caution the witness not to reveal
3  any conversations with Ms. Peter that would invade the
4  attorney-client privilege.
5  A  It's my understanding she served as legal
6  counsel during the period.
7  Q  (By Mr. Romer-Friedman)  When did she serve as
8  legal counsel -- as general counsel or legal counsel?
9  A  I don't know the time frames.
10  Q  So in her role as VP of labor relations,
11  currently she's also general counsel?
12  MR. DABNEY:  She wears two hats.  She's not got
13  the title general counsel, and she's not in the general
14  counsel's office, but her advice of counsel to the company
15  is in a legal capacity as an executive.
16  Q  (By Mr. Romer-Friedman)  Is it fair to say that
17  she does things in a nonlegal capacity, as well as VP of
18  labor relations?
19  A  I know she wears two hats.
20  Q  Okay.  How do you know what -- in -- in her
21  interactions with you regarding Mr. Quick, for example,
22  how do you know what's -- her wearing her legal hat versus
23  her nonlawyer hat?
24  A  As it pertains to Mr. Quick, my understanding
25  is she's serving as legal counsel.

16

1  MR. ROMER-FRIEDMAN:  All right.  Let -- let's
2  take this up in a --
3  MR. DABNEY:  Sure.
4  MR. ROMER-FRIEDMAN:  -- at a break.
5  Q  (By Mr. Romer-Friedman)  How about
6  Mr. Thibodeau?  What did you discuss with Mr. Thibodeau
7  about the lawsuit?
8  A  Not necessarily about the lawsuit, just that
9  there eventually was one filed.  I had discussions with
10  him about Mr. Quick, because he first contacted -- Ed
11  first contacted JP, and then JP got in touch with me
12  thereafter.
13  Q  Okay.
14  A  So we had conversations about Ed's return to
15  work.
16  Q  Back in September of 2014?
17  A  Right.
18  Q  And sometime thereafter?
19  A  Right.
20  Q  Okay.  But since the lawsuit was filed, have
21  you talked with Mr. Thibodeau about Mr. Quick or the
22  lawsuit?
23  A  No.  Just housekeeping, that we were both
24  deposed and that we would be here today to provide a depo.
25  Q  Why did you attend the deposition of

17

1  Mr. Thibodeau?
2  MR. DABNEY:  And, again, I would caution you
3  not to reveal any communications with counsel that might
4  be relevant to this question.
5  Q  (By Mr. Romer-Friedman)  I'm not asking what
6  your counsel told you.  I'm asking why you -- why you sat
7  for the deposition this morning.
8  MR. DABNEY:  Again, same question -- same --
9  same objection and same caution to the witness, that to
10  the extent any answer to the question would reveal
11  discussions with counsel, she's not to answer.
12  A  I'm participating in the process.  I sat in on
13  Ed's portion; I sat in on JP's portion.  Just part of
14  participating.
15  Q  (By Mr. Romer-Friedman)  Do you disagree -- do
16  you agree with -- do you disagree with anything that
17  Mr. Thibodeau said this morning?
18  A  No, not that I -- unless you want to ask me
19  specifically.  In general, no.
20  Q  Okay.  All right.  Any -- did you speak with
21  anyone else besides Ms. Peter or Mr. Thibodeau about this
22  lawsuit --
23  A  No.
24  Q  -- other -- other than your counsel?
25  A  No.

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

18

1      Q   And Mr. Dabney, has he been your counsel
2   throughout this entire litigation?
3      A   Yes.
4      Q   Okay.  You've chosen not to have separate
5   counsel from Frontier Airlines?
6      A   Correct.
7      Q   Okay.  Okay.  All right.  Let's -- let's talk a
8   little bit about your -- your background.
9      A   Sure.
10      Q   Could you tell me where you went to college
11   and -- to start.
12      A   Sure.
13         I originally attended college at Mountain State
14   -- excuse me, Montana State University.  I was employed
15   with Frontier Airlines during that time.  Did not finish
16   school at that time, but later finished an undergraduate
17   degree at Regis University in Denver while employed at
18   Frontier.
19      Q   When did you graduate from Regis?
20      A   I can't remember the exact year.  I'm guessing
21   about 2000.
22      Q   Okay.  Have you done any additional higher
23   education?
24      A   No.
25      Q   Where did you attend high school?

19

1      A   Ryegate High School.  It's a town in Montana.
2      Q   Okay.  That's where you grew up, Montana?
3      A   Correct.
4      Q   Okay.  When did you graduate from high school?
5      A   1990.
6      Q   Have you attended any other universities or
7   schools?
8      A   I attended CUM Boulder for some classes between
9   about 2009 and 2012.
10      Q   What were those classes?
11      A   Archaeology and anthropology.
12      Q   Are you doing a master's degree?
13      A   No.  I decided not to.
14      Q   Is that what you were pursuing with those
15   classes?
16      A   At the time, yeah.
17      Q   Okay.  All right.  Let's -- I guess, let's work
18   backwards from current time until earlier in time with
19   respect to your employment.
20         You're currently the director of labor
21   relations?
22      A   Correct.
23      Q   Okay.  And when did you start that position?
24      A   I was promoted to director, I believe, sometime
25   in 2013.

20

1      Q   Okay.  What was your position before director
2   of labor relations at Frontier?
3      A   Let me correct that.
4         I -- I was more recently promoted -- or not
5   promoted, but transferred to director of labor relations
6   and moved to the legal department.  That was about six
7   months ago.
8         Prior to that, I was the director of labor
9   relations and human resources, and that position was
10   starting sometime in 2013.
11      Q   Okay.  So when were you transferred to -- you
12   said director --
13      A   The legal -- the legal --
14      Q   -- director of labor relations in the legal
15   department?
16      A   Correct.
17      Q   Is that different than the regular labor
18   relations department?
19      A   I basically no longer had responsibility for
20   human resources, but only labor relations with that
21   change, if that makes sense.
22      Q   So your -- the scope of your work is -- is
23   limited to labor as opposed to --
24      A   Previously, human resources and labor
25   relations, correct.

21

1      Q   Okay.  And is -- what's the difference between
2   labor relations and human resources?
3      A   When I had responsibility for human resources
4   as well, the areas I oversaw were staffing, workers'
5   compensation, compliance, leave of absence, employee
6   relations.  And then I also had the labor relations title,
7   so grievance resolution and contract negotiations.
8      Q   Okay.  So labor, essentially, is -- as in,
9   like, labor law, dealing with the union?
10      A   Right.
11      Q   That's why it's grievances and arbitrations?
12      A   Correct.
13      Q   Okay.  And human relations is more focused on
14   the employment laws, that kind of thing, workers' comp,
15   compliance --
16      A   Right, those other disciplines in HR.
17      Q   Okay.  And I realize there may be some overlap
18   because some of the union workers may be involved with
19   workers' comp, these other issues; right?
20      A   Right.
21      Q   Okay.  So why -- it was -- it was a promotion
22   from director of labor relations to become just the
23   director of labor relations?
24      A   That's more of a lateral transfer.
25      Q   Okay.

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

---

22

1      A   The 2013, approximate, director of labor
2  relations and HR was a promotion from -- my title was
3  senior manager of the same, labor relations and HR.
4      **Q   Okay.  So do you -- do you run a staff in --in**
5  **your capacity of director of labor relations?**
6      A   Not currently.
7      **Q   You're the only person in the labor relations**
8  **role?**
9      A   I -- I do not have any direct reports.
10      **Q   Okay.  And you're not a supervisor of anyone?**
11      A   Correct.
12      **Q   Okay.  How about when you were the director of**
13  **labor relations and HR?**
14      A   Yes, I had direct reports.
15      **Q   How many individuals did you supervise?**
16      A   Approximately eight, nine.
17      **Q   Okay.**
18      A   It varied over time.
19      **Q   What -- what kind of positions were those that**
20  **you supervised?**
21      A   The leave of absence employees -- I won't give
22  you all their titles -- the compliance employees, the
23  employee relations managers, staffing managers, and
24  recruiters.
25      **Q   Who is the head of HR now, the director of HR?**

---

23

1      A   Her name is -- they did not replace my
2  position.  There is another director of HR who oversees
3  other disciplines.  His name is Anthony Sabia.  Cindy Ruff
4  is the new vice president of human resources.
5      **Q   Okay.  So is Cindy Ruff the supervisor -- she's**
6  **above Mr. Sabia?**
7      A   Correct.
8      **Q   Okay.  So Mr. Sabia, among his other**
9  **responsibilities, handles the the - director of -- the**
10  **director of HR supervisory capacity that you had before?**
11      A   No.
12      **Q   No.**
13      A   As I said, they didn't replace my position.  He
14  has other HR disciplines that report to him.
15      **Q   Okay.**
16      A   So Cindy Ruff would be the closest, I suppose,
17  to oversight for areas of responsibility that I used to
18  have.
19      **Q   Okay.  Who -- who -- who made the decision to**
20  **do this reorganization?**
21      A   It was a group decision between HR and the
22  legal department --
23      **Q   Okay.**
24      A   -- executives.
25      **Q   And why was the decision made to reorganize the**

---

24

1  **HR and labor relations in this way?**
2      A   With growth, and also the fact that we had all
3  of our labor groups up for contract negotiations,
4  contracts were amendable.
5      **Q   Okay.  So because they were amendable under the**
6  **ROA, they had to be negotiated --**
7      A   Right --
8      **Q   -- to the extent that you worked --**
9      A   The workload on -- the workload on that front
10  increased.
11      **Q   Okay.  All right.  Okay.  When did -- so in**
12  **2013, you moved from the senior manager of labor relations**
13  **and HR to the director of labor relations and HR, right?**
14      A   Yeah.
15      **Q   When did you start the position of**
16  **senior manager of labor relations and HR?**
17      A   I -- let me just tell you that I've been with
18  Frontier for about 20 years.  Most of that's been in HR in
19  various roles.  I was not with the company between the
20  period of 2009 to 2012.  I came back to Frontier in
21  January of 2012.  That was during the time that Frontier
22  merged with Republic Airways; and then once they
23  separated, I came back.
24      **Q   Okay.  Okay.  So from that time -- and '09 to**
25  **'12 is when you were --**

---

25

1      A   Away.
2      **Q   -- away doing school?**
3      A   Right.
4      **Q   Did you have a job during that period?**
5      A   No.
6      **Q   Okay.  So you were doing school full-time?**
7      A   Correct.
8      **Q   In that master's program of archaeology?**
9      A   Right.  They were undergraduate classes.
10      **Q   Okay.  All right.  So from 2012 to 2014, you**
11  **were -- you were the senior manager of labor relations and**
12  **HR?**
13      A   (The witness nodded.)
14      **Q   Okay.  So until you -- you took that brief**
15  **period of leave between '09 and '12, before that, what**
16  **were your positions?  What was your position before 2009?**
17      A   Senior manager, labor relations.  I didn't have
18  the other HR functions; however, I was -- I was an
19  employee relations manager with emphasis on labor
20  relations.
21      Prior to that, I was a recruiter.  That's
22  actually how I started in the HR department after I moved
23  or transferred from the operation to the HR department.
24      **Q   Okay.  Could we -- could we talk about the**
25  **years?  So until -- from when until 2009 were you the**

---

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

---

26

1   senior manager of labor relations?
2       A   I can't -- I can't recall those --
3       Q   Okay.
4       A   -- those dates.  Prior to that, it gets a
5   little foggy, as far as there was a lot of movement of
6   positions.
7       Q   Do you remember when you were -- you started as
8   a recruiter?
9       A   Correct, in the HR department, when I
10  transferred.
11      Q   Okay.  When was that that you started as a
12  recruiter?  Do you have a ballpark memory?
13      A   1998.
14      Q   Okay.  And before that, what did you do at
15  Frontier?
16      A   I was a supervisor of customer service at DIA.
17      Q   DIA?
18      A   Denver International Airport.
19      Q   Sorry.
20      A   Sorry.
21      Q   I should know that one.
22          And before you were the supervisor of customer
23  service at DIA, what did you do at Frontier?
24      A   I was a customer service coordinator in Salt
25  Lake City, Utah, for Frontier.

---

27

1       Q   Okay.  And before that, what did you do?
2       A   I was a customer service agent in Bozeman,
3   Montana.
4       Q   Okay.  Did you have any other jobs at Frontier
5   besides that?
6       A   No.
7       Q   Okay.  So when did you start?  You said
8   20 years ago?
9       A   July of 1994.
10      Q   Okay.  And that was as a customer service
11  agent?
12      A   Correct.
13      Q   Okay.  Okay.  So it seems like you're -- you
14  have a really rich history in HR with the company.  Is
15  that fair?
16      A   Correct.
17      Q   Okay.  And with the -- and you -- you were in
18  the human resources or labor relations department for,
19  say, the entire time that Ed Quick was employed at
20  Frontier except for that three-year period that you were
21  gone and he was gone in the military, right?
22      A   I believe that's the case.  If it was 2004,
23  then I would have been, yes.
24      Q   Okay.  How many employees does Frontier
25  Airlines have?

---

28

1       A   Approximately 3500.  I'm -- I'm not sure
2   exactly.
3       Q   Okay.  Has that number grown in recent years or
4   shrinked -- shrinked?
5       A   Both.  In 2012-'13, we went through some
6   outsourcing of some of our functions, some of our
7   workforce, so it went down then.  Since then, there's been
8   some growth as well.
9       Q   Okay.  How about since 2014, has there been
10  growth in the workforce at Frontier Airlines?
11      A   Yes.
12      Q   Do you have a sense of how much growth there's
13  been in the workforce at Frontier Airlines since 2014?
14      A   Since towards the end of 2014 to the present,
15  there's been about, approximately, 400 positions that have
16  been filled.  But there may be multiple people filling
17  those -- those roles, so the number may be bigger.
18      Q   Okay.  Do you know how many of that -- how many
19  of those positions that have -- the growth -- do you know
20  what portion of the growth in employees since late 2014
21  has been in the pilot workforce?
22      A   No.  We have had growth in the pilot workforce.
23      Q   Okay.  Significant growth?
24      A   More significant than prior years.
25      Q   Okay.  What -- I think earlier Mr. Thibodeau

---

29

1   referenced a -- that there's 1,025 pilots at -- at
2   Frontier?
3       A   That sounds right.
4       Q   Is that accurate?
5       A   I -- I wouldn't know the exact number, but I
6   wouldn't disagree with it.
7       Q   Okay.  And the growth that he referenced, I
8   think it was about -- at least several hundred people --
9   pilots over the last five years, that's consistent with
10  your understanding of the growth in the pilot workforce?
11      A   That sounds about right.
12      Q   Okay.  Are you familiar with the -- the
13  revenues or the profitability of Frontier Airlines?
14      A   No.
15      Q   No?  Do you know if the company is losing money
16  every year, or is it --
17      A   I don't know what the big picture or -- or
18  detail is on Frontier's profitability.
19      Q   Okay.  It went through bankruptcy, right?
20      A   Correct.
21      Q   When did that bankruptcy happen?
22      A   I believe it was -- it was shortly after I left
23  Frontier, or right about that same time when I had the
24  break.  So 2010.  I'm not sure.
25      Q   Did the bankrupt -- do you know if the

---

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

---

**30**

1   bankruptcy made the airline more profitable going forward?
2       A   I don't know.
3       Q   Okay.  Okay.  Can you help me sketch out the
4   organization of the different departments?
5           There's human resources and labor relations.
6   Are those in the same, broad -- bigger department, or are
7   those separate divisions?
8       A   They're now separate.  The labor relations
9   department, as I said before, reports to the legal
10  department.  And the human resources department now
11  reports to -- I believe Cindy reports directly to Barry
12  Biffle, our CEO and president.  I believe that's accurate.
13      Q   Okay.  And for today, we're talking about
14  Mr. Quick and pilots.  For pilots, where do -- who were
15  the other -- what are the other departments that pilots
16  interact or interface with, besides HR and the labor
17  department -- and the labor relations departments?
18      A   In one way or another, probably most
19  departments in the company.
20      Q   Could you identify some of the major
21  departments?
22      A   The systems operations control department,
23  dispatch.  And the folks who are in management in those
24  groups probably interface more with other administrative
25  departments, such as accounting.

---

**31**

1       Q   Scheduling?
2       A   Scheduling.  Scheduling.
3       Q   Flight operations?
4       A   Well, we're talking about flight operations,
5   right.
6       Q   Is all a division of?
7       A   Can you restate the question?
8       Q   You've mentioned systems operations, control,
9   dispatch, accounting, scheduling.  Are there any other
10  departments within Frontier Airlines that are -- interface
11  with pilots?
12      A   I'm sure there are.  That's all I can think of
13  at the moment, though.
14      Q   Okay.  So I'd like to talk a little bit about
15  how the military leave works at Frontier Airlines.  You're
16  familiar with that?
17      A   Yes.
18      Q   Okay.  And in your capacity as the --
19  previously as the director of labor relations and human
20  resources, were you the point person for dealing with
21  military leave or reemployment issues?
22      A   In some occasions I had, as I mentioned,
23  employee relations managers who reported to me.  They
24  would sometimes be the initial point of contact.  If they
25  needed to consult me or if there was something out of the

---

**32**

1   ordinary, I would be involved -- more involved.
2       Q   So the harder cases would go to you,
3   essentially?
4       A   Yeah.  I would -- I would assist, either
5   partner with them or maybe take point.
6       Q   Okay.  How did you decide which were the harder
7   cases for you -- for you to partner with them or take
8   point?
9       A   Some military leave issues were
10  straightforward; some were more complex.  It would depend
11  on the -- on the circumstances.
12      Q   In terms of being "more complex," what do you
13  mean?
14      A   If there were any -- any questions that the
15  employee relations managers weren't able to answer for the
16  individual or if there were -- if there was further
17  assistance that was needed while the person was on leave
18  or returning.
19      Q   Okay.  Was it ordinary -- so you currently
20  don't handle re- -- military leave or reemployment issues,
21  right?
22      A   Correct.
23      Q   Okay.  When you did work on those issues, was
24  it common to -- to have lawyers or consultants involved in
25  working on reemployment issues?

---

**33**

1       A   Yes.  If -- if -- again, it would sort of
2   escalate.  If the employee relations managers couldn't
3   answer it or there was a question, they would consult me.
4   If I had a question or needed assistance, we would use
5   counsel for guidance.
6       Q   How -- how often would you involve counsel or
7   consultants in working on reemploying a service member?
8       A   I wouldn't say that it was often, but on
9   occasion there would be questions that we would need to
10  reach out and -- and make sure we were in compliance.
11      Q   Okay.  I'm going to hand you what will be
12  Exhibit 9 and ask if you recognize this document.
13          (Deposition Exhibit 9 was marked.)
14      A   This looks like Section 8.05 of Page 1 of the
15  leave of absence section out of our employee handbook.
16      Q   (By Mr. Romer-Friedman)  Okay.  And what --
17  what -- why do you have an employee handbook at Frontier
18  Airlines?
19      A   So that employees know what our policies are
20  and -- I guess that's a simple answer.
21      Q   In general, does Frontier follow its employee
22  handbook or --
23      A   Yes.
24      Q   -- is this something that is discretionary?
25      A   In general, we follow the employee handbook.

---

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

---

34

1     Q   Okay.  And here in the third paragraph of
2   Exhibit 9, it talks about that if you're on approved
3   leave, your group medical, dental, vision, life, and
4   disability insurance coverage continues under the same
5   terms as if you continued to work for the first 90 days of
6   the absence from work.  After 90 days, coverage will
7   continue if you elect; however, premiums will be at full
8   cost, paid by you.
9         So that -- that's the policy for all leave,
10   that if -- after 90 days, your benefits are cut off?
11     A   We have two -- at least two things to consider.
12   One is the employee handbook; second is the collective
13   bargaining agreement for various work groups who are
14   unionized.
15     Q   Okay.  Does the CBA say anything different than
16   that for the pilots?
17     A   I'd have to look, but for each type of wage, I
18   believe it goes through each of the benefits and what
19   happens and the timeline involved.
20     Q   Okay.  So essentially, if the -- if the CBA is
21   more specific than the employee handbook, the CBA would
22   govern?
23     A   Correct.
24     Q   Okay.  I will hand you what will be labeled
25   Exhibit 10 and ask if you can identify this document.

---

35

1         (Deposition Exhibit 10 was marked.)
2     A   This is also from the employee handbook.
3   8.05.6 is military leave.
4     Q   (By Mr. Romer-Friedman)  Okay.  So this -- is
5   this an accurate statement of Frontier Airlines' policy on
6   military leave?
7     A   As it's contained in the employee handbook.
8     Q   Okay.  So here at the -- end of the second
9   paragraph, it says, The period an individual has to make
10   application for reemployment or report back to work after
11   military service is based on the time spent on military
12   duty.  For service of more than 30 -- sorry -- for service
13   of more than 180 days, an application for reemployment
14   must be submitted within 90 days of release from service.
15         Did I read that right?
16     A   That's what it reads.
17     Q   And that's the policy at Frontier Airlines?
18     A   Yes, with the stipulation that we also have
19   language for pilots in the collective bargaining
20   agreement.
21     Q   Okay.
22     A   And that we would comply with USERRA
23   requirements.
24     Q   Is this the same requirement for USERRA -- that
25   USERRA contains, to your knowledge, that a service member

---

36

1   is gone on leave for -- for more than 180 days, that he or
2   she has 90 days after that service to report back and seek
3   reemployment?
4     MR. DABNEY:  Objection.  Calls for a legal
5   conclusion.
6     Q   (By Mr. Romer-Friedman)  You can answer if you
7   know.
8     A   I don't know for sure.  I -- I -- I imagine
9   this would be based on the USERRA requirements.
10     Q   Okay.  How many people -- how many workers at
11   Frontier Airlines would you say on an annual basis take
12   military leave?
13     A   I don't know.  It's varied over the years
14   depending on what's going on.  But we have several to many
15   people on military leave, one kind or another, through
16   various work groups.
17     Q   Okay.  I think Mr. Thibodeau earlier testified
18   that there are somewhere between 100 and 200 pilots who
19   are -- have on -- ongoing military obligations.
20         Would it be fair to say that there are hundreds
21   -- there are hundreds of individuals at the company
22   overall who have military obligations?
23     A   I don't know -- I wasn't aware of the number
24   that JP provided, but I think he would have knowledge of
25   that, those being his direct reports.  So I wouldn't, you

---

37

1   know, disagree with -- with his -- his numbers.
2     Q   Do you -- do you -- do you know if pilots are
3   more likely to be in the military than other types of
4   workers at Frontier Airlines?
5     A   I don't know.  We've had military leave in our
6   maintenance group quite a bit.  When we did have customer
7   service and ramp agents employed with us, I know there
8   were people from that group as well.
9     Q   Okay.  But it's -- it's not an uncommon thing
10   for Frontier Airlines workers to go on military leave; it
11   happens every year a fair amount?
12     A   Yes.
13     Q   Okay.  So walk me through the process of -- of
14   how military leave occurs.  Does a person have to give
15   written notice, or are there other ways that they can give
16   notice that they're taking military leave that are
17   acceptable to the company?
18     A   Their initial notice can be to their immediate
19   supervisor and/or human resources.  Sometimes initially
20   it's done verbally.  Our leave of absence department and
21   the human resources would then get the information, talk
22   with their supervisor, and make sure that administratively
23   they were coded as military leave.
24     Q   Okay.  Is there a specific form that you use at
25   Frontier Airlines for service members to notify the

---

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

38

1    company that they're taking military leave?
2        A   No.
3        Q   Does the -- the LOA department keep track of
4    all the military leave that occurs, or at least the -- the
5    leave that's reported to them?
6        A   For the leave that's reported to them, yes.
7        Q   Okay.  All right.  And -- and I take it service
8    members don't have to ask for permission to take military
9    leave, right?
10       A   Right.
11       Q   They just give notice of it?
12       A   Right.
13       Q   Because that's what the law requires?
14       A   Correct.
15       Q   Okay.
16           MR. ROMER-FRIEDMAN:  You want to object?
17           MR. DABNEY:  I have no objection.  No.
18           MR. ROMER-FRIEDMAN:  Okay.  All right.
19       Q   (By Mr. Romer-Friedman)  And what is it -- so I
20   think we talked about the front end:  The service member
21   gives notice, they go on military leave.
22           When the service member is ready to be
23   reemployed, could you walk me through that process?  How
24   -- how does that work at Frontier Airlines?
25       A   Sure.

39

1        The employee would notify us of their return.
2    Depending on the length of time that they had been out, we
3    would coordinate with their department management,
4    determine what was required from an HR perspective,
5    getting the person processed as well as any departmental
6    requirements.
7        Q   Okay.  Is there a form that is used for service
8    members to notify the company that they want to return to
9    work?
10       A   There may have been in the past over the years,
11   but currently the employee would notify verbally or
12   through e-mail, letter their department management and/or
13   human resources.
14       Q   Okay.  So for a pilot, it would be appropriate
15   for a service member to notify the chief pilot or the
16   assistant chief pilot of their intent to return to work?
17       A   Yes.
18       Q   That would be acceptable from the
19   company's perspective?
20       A   Yes.
21       Q   Okay.  And are you aware of the five basic
22   requirements for reemployment under USERRA?
23           MR. DABNEY:  Same objection as earlier.
24           Go ahead.
25       A   I'm aware that employees returning from

40

1    military leave are to be reemployed in their position
2    based on the escalator principle; If not, an -- an old
3    position or a similar position in status and pay, with
4    reasonable efforts by the company.  And that their
5    benefits, et cetera, are made whole, again based on the
6    escalator principle.
7        Q   (By Mr. Romer-Friedman)  Okay.  I think we got
8    -- I got ahead of ourselves and ahead of you.  But I guess
9    to take a step back, what do -- what does it actually mean
10   for the person to be back in the system.  We may not have
11   as you understand it?
12       A   To be, as I said, returned to their position,
13   if possible, or one of those other avenues that I
14   mentioned.
15       Q   Okay.  So to be returned to their old -- the
16   position that they would have had with the escalator
17   principle or --
18       A   If possible, or then there are other options
19   that USERRA provides for that we would explore.
20       Q   Okay.  And when they're reemployed, does that
21   mean that they're on payroll and have all their benefits
22   reinstated?
23       A   Reemployed would be, you know, through the
24   process that I just described, which includes assessing
25   whether they can be returned to their prior position or if

41

1    there's another position that we need to explore and to
2    also right -- catch up any benefits or make them whole in
3    that way.
4        Q   I guess what I'm asking is, more specifically:
5    When -- when you and the company consider someone to be
6    reemployed, does that mean they're actually in a position,
7    getting paid, receiving their benefits?  Or is it sometime
8    before that?
9        A   They could be -- they could be reemployed, and
10   we would put them back in the system.  We may not have
11   identified the right role for them based on their
12   circumstances.
13       Q   Okay.
14       A   It's a process we would go through.
15       Q   So in other words, in the view of -- your view
16   and the view of Frontier Airlines, if a pilot or -- in
17   your view, in the view of the company, if an employee has
18   returned from military service and hasn't actually been
19   put into a position where they're working and receiving a
20   salary, that person can still be considered reemployed?
21       A   Yes.  We would process them in the system so
22   that we could get benefits, et cetera, restored --
23       Q   Okay.
24       A   -- and -- and reemploy them.
25       Q   How often does that happen, that a worker

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

---

**42**

1    returns from military leave and is receiving benefits but
2    is not actually working in a position or receiving pay for
3    a number of months?
4        A   Typically, in my experience, they're able to
5    return to their -- their prior position.  So it would be
6    whatever time frame based on that job for training
7    purposes, et cetera.
8        Q   Within weeks or . . .
9        A   Our training programs by department, because
10   our workforce is so diverse, is pretty diverse.
11       Q   Okay.  Besides Mr. Quick, has anyone been in
12   this position where they're reemployed in the eyes of the
13   company but not receiving pay and not -- not working on a
14   regular basis for three, four, five, six, seven months?
15       A   I can't give you details on other cases.  I --
16   I don't know about time frames of other returning people
17   specifically.
18       Q   In the time that you were in the HR department,
19   are you aware of any situation like that besides
20   Mr. Quick?
21       A   I -- I can't recall any.  That doesn't mean
22   that there weren't.
23       Q   Okay.  Going back to those five requirements,
24   do you know what those are for -- to qualify for
25   reemployment?

---

**43**

1        A   I know that there are timelines involved and
2    the employee needs to give notice, the other requirements
3    that I explained previously about the protections and
4    rights under USERRA, that we comply with those.
5        Q   Are those -- just to --
6        A   Sure.
7        Q   -- help a little, that the employee left to
8    perform service in the uniform services, is that one of
9    the requirements?
10       A   Right.
11       Q   That they gave written notice or verbal notice
12   of service?
13       A   I believe so.
14       Q   That the cumulative length of service was no
15   more than five years, including time that would be
16   exempted, is that one of the requirements?
17       A   I know that there are probably several except
18   -- exceptions to that, but as a baseline, yes.
19       Q   Okay.  That the -- in the case of the -- as we
20   talked about, a service member who was out on leave for
21   more than 180 days, that he or she seeks reemployment
22   within 90 days after service, is that one of the
23   requirements?
24       A   I think those are the timelines.
25       Q   Okay.  And finally, that the -- that the

---

**44**

1    service member was separated under conditions that were
2    not dishonorable?
3        A   Correct.
4        Q   Okay.  Are you aware of any other requirements
5    besides those five for a service member to qualify for
6    reemployment?
7        A   I think that generally covers it.
8        Q   Okay.  There are no others?
9        A   That I can think of at the moment.
10       Q   Okay.  Let me know if you know of any.
11       A   Sure.
12       Q   And how promptly does Frontier Airlines
13   reinstate -- reemploy service members who come back from
14   military leave?
15       A   Everyone's circumstances are a little bit
16   different.  We do it as soon as we can.
17       Q   In the kind of ordinary case, how long does it
18   take to reemploy someone and get them actually working in
19   a position where they're being paid?
20       A   I don't know.  I have leave of absence
21   administrators who have worked for me who are closer to
22   the actual timelines.  I couldn't come up with a specific
23   -- specific range for you.
24       Q   Okay.  And I'm just trying to get a general
25   sense.  Do -- do most people who return from military

---

**45**

1    leave get reemployed and put into a position where they're
2    working within a month, or does it ordinarily, for most
3    people, take longer than that?
4        A   I suppose there are people who have been
5    returned within, you know, a month.  I think there's
6    probably others that, based on their department and
7    requirements, have taken longer, depending on how long
8    they've been out, et cetera.
9        Q   Okay.  So what are -- what are the different
10   factors that impact how long it takes to reemploy someone
11   at Frontier Airlines?
12           MR. DABNEY:  Object to form.
13       Q   (By Mr. Romer-Friedman)  You can answer.
14       A   Sure.
15           As I said, how long they've been out, the
16   department or job that they're returning to and their
17   requirements for return.  If there are clearances or
18   processing that needs to be done to get them back in the
19   system.  Any circumstances that the returning employee may
20   have themselves, if there are any things out of the
21   ordinary that need to be addressed that might affect the
22   timeline.
23       Q   Anything else that you can recall?
24       A   Not at this moment.
25       Q   Okay.  And in terms of the -- the actual

---

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

46

1  process of receiving someone back into the workplace, what
2  are the things that Frontier Airline requires the
3  employees to provide in order to get reemployed?
4          I think earlier today we were talking about a
5  drug -- a drug test and their military orders.  What are
6  the things that Frontier Airlines requires in order to
7  determine that a person -- you know, a person can be
8  reemployed?
9          MR. DABNEY:  Object to form.
10     A   Yes.  If they've been out longer than 180 days,
11  we do -- there are call clearances.  If they've been out
12  on long-term leave, we also ask them to attend
13  new-employee orientation to get a refresh for their own
14  benefit on maybe things that have changed as far as
15  benefits, policies, et cetera.
16          Anything that pertains to their job
17  specifically, such as, in Ed's case, the medical
18  certification.  For other departments, it may vary
19  depending on the -- any certifications or -- or standards
20  that they have to meet for that job.
21     Q   (By Mr. Romer-Friedman) And military orders as
22  well?
23     A   And military orders.
24     Q   Okay.  So when someone has been on leave for a
25  substantial period of time in the military, how does

47

1  Frontier determine that the person has satisfied the five
2  requirements we talked about to be reemployed?
3     A   If they're out for an extended period of time,
4  we would communicate directly with the employee as far as
5  their timeline, how long they've been out, you know, five
6  years.
7          If there are exceptions, then we process them
8  accordingly, to make sure that their -- their benefits and
9  pay and job, et cetera, are -- are taken care of.
10     Q   Do you have, like, a checklist in HR to make
11  sure that those five requirements are satisfied, to
12  confirm that notice was given and that they were actually
13  in the uniformed services, that there was no more than
14  five years of non-exempt time, they sought reemployment
15  within the prescribed period and the non-dishonorable
16  release?  Do you have a checklist?
17     A   I think we have a process manual that the leave
18  of absence department uses.  I can't tell you if there's a
19  checklist specifically for those items in that manual.
20     Q   How quickly does Frontier Airlines ordinarily
21  confirm that a service member has satisfied those five
22  basic requirements to be reemployed?
23     A   I think it's a matter of -- of course.
24     Q   What do you mean by that?
25     A   I think if somebody's been out for an extended

48

1  period of time, they're going to -- they're going to ask
2  for orders, they're going to check those things.  But the
3  leave periods vary quite a bit.
4     Q   I guess I'm not -- we'll talk about Mr. Quick
5  later.  But, you know, if I'm just John Doe, you know,
6  pilot or mechanic, and I come back and I say, I'd like to
7  be reemployed, what is the goal for the company to confirm
8  those five requirements that they can process the person
9  to be reemployed?
10     A   Yeah.  They're going -- the leave of absence
11  department, along with the department management, would
12  review that.  And if there was any questions, then
13  somebody like myself might be consulted, who might reach
14  out to counsel.
15     Q   Okay.  And in -- in the kind of ordinary -- I
16  realize that, you know, some of the other things you
17  mentioned, like the -- you know, obtaining the sort of
18  medical certifications or attending the new-employee
19  orientation, those might take a little bit longer.
20          But in terms of determining, in the first
21  instance, whether the person is entitled to be reemployed,
22  how long is that suppose to take?
23          I assume it's not suppose to take six months in
24  the ordinary course, right?
25     A   Right.  I mean, that usually can happen pretty

49

1  quickly unless there's some problem or oddity that needs
2  to be researched or we need to have some dialogue with the
3  returning employee.
4     Q   So is that a process that's supposed to take,
5  like, a week or two weeks or a month?
6          I mean, what is -- the company must have -- you
7  in HR must have some expectation as to, in the ordinary
8  course, how long it should take to confirm the five basic
9  requirements for reemployment, right?
10          MR. DABNEY:  Object to -- asked and answered.
11     Q   (By Mr. Romer-Friedman) You can answer.
12     A   I know there's some guidance that, you know, a
13  couple weeks' turnaround or as soon as, you know,
14  practicable, depending on the -- the circumstances.
15     Q   Okay.  So the goal is to get it done -- to
16  reemploy the person in a couple of weeks or as soon as
17  practicable?
18     A   I believe that's the case.
19     Q   Okay.  And to reemploy the person, you've got
20  to do more than just the five requirements, right?  It's
21  this other stuff of -- you said, of checking medical
22  certifications, and -- and that might be relevant, the new
23  employee orientation, right?
24          MR. DABNEY:  Object to form.
25     A   Can you repeat the question?

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

50

1    Q   (By Mr. Romer-Friedman) So the two weeks that
2  you're talking about is -- is the goal to reemploy people
3  in, right?
4    A   As soon as -- as soon as possible, depending --
5    Q   Right.  Or as soon as practicable, right?
6    A   -- depending on what the person's circumstances
7  are, and the department that they work in.
8    Q   All right.  Well -- and let me ask this a
9  different way:  So if -- if the person is working -- if
10  the person still has not yet been able to do or has not
11  been scheduled to get the -- to do the new-employee
12  orientation or -- or has not been able to get the medical
13  certification updated, will that person be reemployed if
14  the person otherwise meets the five requirements for
15  reemployment of USERRA?
16    MR. DABNEY:  Object to form.
17    A   So you're asking --
18    Q   (By Mr. Romer-Friedman) It's kind of which
19  comes first, you know, reemployment or this other
20  processing, right?
21    So, let's take, not Mr. Quick, but let's take
22  Jane -- Jane Doe pilot.  Straightforward case, right.  She
23  comes back; she gives you the information you need to see
24  that she's -- satisfies the five requirements of USERRA,
25  right.  You have that on -- on a Monday.

51

1    Do you put that person on the payroll
2  immediately, or do you say, Well, in three weeks we have a
3  new-employee orientation, and you need to wait for that
4  new-employee orientation before we can put -- you know,
5  put you on -- in an airplane and be working?
6    A   We do it as soon as possible, depending on --
7  yeah, the -- the availability of the clearances, the
8  availability of orientation, their training.  Also through
9  dialogue with the employee about when they want to return
10  or -- or can return.  Sometimes we'll get advanced notice,
11  so we'll set a date, you know, further out.
12    Q   How often does -- does Frontier hold the
13  new-employee orientations?
14    A   It's varied over time, but if we have a lot of
15  hiring going on at the time, it's -- it's typically every
16  Monday.
17    Q   Okay.  What's the outer limit of how often the
18  new employee trainings are?  Once a month?
19    MR. DABNEY:  Objection.  Asked and answered.
20    A   Our staffing levels are -- you know, they
21  fluctuate a lot.  So if we didn't have a lot of people
22  that we were hiring at the time, then those orientations
23  would be more infrequent.
24    Q   (By Mr. Romer-Friedman)  Okay.  So in the case
25  of, you know, the ordinary Jane Doe pilot, if there wasn't

52

1  rapid hiring at the time and she, let's say, has to wait
2  four weeks for the next employee training -- new-employee
3  training to occur, would she be back working and being
4  paid during that interim period, or would she have to wait
5  to do the new-employee orientation in order to -- to -- to
6  start work and get paid?
7    A   Depending on how many people were onboarding at
8  the time, we may even do a one-off, you know, orientation
9  for somebody so that they wouldn't have to wait a long
10  period of time.  So sometimes that gets customized.
11    Q   Okay.  And how about the medical certification?
12  If someone needs to update a medical certification or
13  update their training and say -- to get requalified to fly
14  or to do a particular task, what happens to that person
15  while they're working to get that certification, working
16  through that training?
17    Is that person paid a salary by Frontier
18  Airlines while they're waiting to start actually doing
19  their job, in the ordinary course?
20    A   Right.
21    Some of the collective bargaining agreements
22  cover, you know, the training periods, when they start,
23  when they start getting paid, et cetera.
24    If a person didn't have a medical or if another
25  employee wanted to return from military leave and had some

53

1  medical issue, then we would have them pursue the leave of
2  absence process in a different facet, and -- and, you
3  know, it would be approved for a medical leave, for
4  example.
5    Q   What if a person didn't have a medical
6  condition or a disability and they're just on, you know,
7  military leave for four years, they come back, they need
8  two months of training?  Would that pilot be paid while
9  he's waiting for his job to start during that training
10  process?
11    A   I believe the contract talks about, in the
12  normal course, when -- when the training starts, they
13  would start to be paid under the training program.
14    If they weren't performing functions prior to
15  that, I'd have to go back and check, but I don't know that
16  we've -- we've paid them, you know, prior to the training
17  starting, except for new-employee orientation, which we
18  usually pay about four hours for.
19    Q   Okay.  And I think we covered this this morning
20  with Mr. Thibodeau, but the -- when a -- when a worker --
21  when a pilot is hired at the outset and is training for a
22  couple of months or a few months, he's -- he's paid during
23  that interim period, right?
24    A   Paid while he's going through training.
25    Q   Right.

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

54

1          Even though he's not working a regular shift,
2    right?
3          A   Right.
4          Q   Okay.  And do you ever -- does the company ever
5    consider its obligations under federal law if it requires
6    the company to go beyond the collective bargaining
7    agreement?
8          A   Of course.  I mean, we're going to make sure
9    that we're -- if -- if there's something out of the
10   ordinary, we're going to check to make sure we're
11   compliant with federal requirements, and if we need to,
12   you know, reach out to counsel to make sure that all of
13   those things line up, our employee handbook policies,
14   policies in the collective bargaining agreement, legal
15   requirements.
16         Q   Do you know what USERRA says or what the courts
17   have said USERRA means as to whether a pilot or another
18   service member who comes back and is waiting to be
19   reinstated in their position, whether that person needs to
20   get paid -- reemployed and paid pending these things like
21   medical certification or the orientation or training?
22         MR. DABNEY:  Object to form.  Calls for a legal
23   conclusion.
24         Q   (By Mr. Romer-Friedman)  You can answer.
25         A   Restate it one more time.

55

1          Q   Well, going back, let's say, to 2014, 2015, did
2    you have any idea about what USERRA requires in terms of
3    whether a service member should be paid and -- and --
4    reemployed and paid if they meet the qualifications to be
5    reemployed, even if there are outstanding issues like a
6    medical certification or going through the new-employee
7    orientation or training?
8          MR. DABNEY:  Same objection.
9          Q   (By Mr. Romer-Friedman)  You can answer.
10         MR. DABNEY:  Sounds like a question on the
11   ultimate issue of the case.
12         Q   (By Mr. Romer-Friedman)  You can answer.
13         A   My understanding is that USERRA requires that
14   they -- a person be reemployed and that, as we talked
15   about before, that you have to try to place them in their
16   prior role, if they meet those qualifications with
17   reasonable efforts, or another similar role in pay and
18   status, that their benefits need to be restored and -- and
19   made up where applicable.  So I -- I know that those
20   things need to -- need to occur.
21         Q   Okay.  And when a per -- when a person is
22   reemployed at Frontier Airlines, how -- in the ordinary
23   course, how quickly is the person's benefits reinstated?
24         A   I think they're reinstated, you know, as -- as
25   soon as possible.  And sometimes there may be a subsequent

56

1    process that needs to happen to determine how the makeups
2    are done, depending on how long that person's been out,
3    et cetera.
4          Q   Like, for pension contributions?
5          A   Right.
6          Q   Okay.  But in terms of reinstating their health
7    care benefits, the -- the benefits they would get every
8    month as an employee, is it that, in the ordinary course
9    at Frontier, immediately restores that person's benefits
10   the months that they are reemployed, or is there a waiting
11   period?
12         Like, I know in some instances with a new
13   employee, you might have to wait three months or a month
14   to get on benefits.  How -- is that -- does that work
15   differently under -- on -- for a service member being
16   returned?
17         A   No.  It's my understanding that the benefits
18   are restored right away.
19         Q   Okay.
20         A   That there's not a waiting period.
21         Q   So you shouldn't wait three months or four
22   months to reinstate benefits if a person is actually being
23   reemployed?
24         A   Correct.
25         Q   Okay.  And let's -- let's talk about the

57

1    circumstance in which a person has a disability when
2    they're returning from military leave.
3          Okay?
4          Have you ever had that happen before, besides
5    Mr. Quick?
6          MR. DABNEY:  I'm sorry, Counsel, is there a
7    chance I could run to the bathroom?
8          MR. ROMER-FRIEDMAN:  Yeah.  Let's take -- do
9    you want to take a break?
10         THE VIDEOGRAPHER:  Going off the record.  The
11   time is 3:49.
12         (A recess was taken from 3:49 p.m. until
13   3:58 p.m.)
14         THE VIDEOGRAPHER:  We are back on the record at
15   3:58 in the deposition of Michelle -- Michelle Zeier.
16   This is Media Unit Number 2.
17         Q   (By Mr. Romer-Friedman)  Afternoon.
18         A   Afternoon.
19         Q   You understand you're still testifying under
20   oath?
21         A   I do.
22         Q   And that the same ground rules apply?
23         A   I do.
24         Q   Great.  Okay.
25         So I think we were just about to jump into how

Deposition of:   Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

58

1    the reemployment process is different at Frontier Airlines
2    when someone comes back with a service-related injury or
3    disability or just any injury that they've had during that
4    military service.
5        A   Right.
6        Q   Could you maybe sketch out briefly, you know,
7    basically how -- how the pro -- the reemployment process
8    is different in that instance?
9        A   You know, we're still going to reemploy them;
10   however, we need to understand what their disability is,
11   any restrictions in order to make reasonable efforts to
12   place them correctly.
13       Q   Okay.  Do you have a form or a process for how
14   to identify what people's injuries or disabilities or
15   capabilities are in that context?
16       A   Typically, they're used for disability
17   interactive process by the HR department, but they can
18   come through various forms if the employee provides
19   reports or information themselves.
20       Q   So if a -- you know, if a mechanic comes back
21   and says that they've lost an arm, let's say, walk me
22   through what you would do with that mechanic to -- or just
23   let's say the mechanic comes back and says, I have a
24   significant injury.  I don't think I'm going to be able to
25   do my job without accommodation.  What do you do?

59

1        A   Are you asking generally or a military return
2    specifically?
3        Q   When someone -- well, yeah.  When someone
4    returns from military leave.  If they have an injury, what
5    do you provide them?  What do you ask them?
6        A   Sure.
7        Q   What do you have them do?
8        A   We're going to talk with them and try to get
9    information, like I said, whether it be through reports
10   that they already have, medical documentation that they
11   already have, or ask them to complete some forms.
12       Q   Are those --
13       A   The forms we have are, like I said, typically
14   for ADA interactive process, but we would sort of mirror
15   that, for the most degree, if a similar situation occurred
16   with the military employee returning.
17       Q   Okay.  Well, let's -- let's talk about that.
18           How does -- so -- so you're saying that the
19   kind of same process for identifying what job a service
20   member would have after an injury --
21       A   I know that the exact same rules don't apply,
22   but generally the engagement that we have with the
23   employee and trying to ascertain what their abilities or
24   what their disability is or what their restrictions might
25   be.

60

1        Q   Okay.  So in the ADA context, when does that
2    interactive process happen?  Is it after a conditional
3    offer of employment or after the person's employed?
4        A   It would happen about the same time.  If it
5    were more straightforward and they were able to, you know,
6    go back to their job with some minor accommodation, that
7    would happen -- that would happen sooner.  If we had to
8    figure out a different job for them, it might take a
9    little longer.
10       Q   Okay.  I guess what I'm asking -- so, I mean,
11   under the ADA, you can't ask medical-related questions
12   before the person is given a conditional offer of
13   employment, right?
14       A   Right.  And I'm talking if somebody is, like,
15   returning from a medical leave or --
16       Q   Okay.
17       A   -- and they returned with some restrictions or
18   -- or informed us that they had -- they needed an
19   accommodation.
20       Q   Okay.  Right.  So, like, if a person, let's
21   say, has been employed, they take FMLA leave because of
22   their medical condition and they come back and they say --
23       A   And they say, I'm released with these
24   restrictions, then we evaluate those restrictions.
25       Q   Okay.  So you have a -- you have a -- you have

61

1    a -- you have a form where the person identifies their
2    medical condition or disability?
3        A   We have medical leave forms.  We have medical
4    release forms, FMLA, et cetera.
5        Q   That's so you can see their medical records?
6        A   So that we can obtain enough information from
7    their physician about what their restrictions might be.
8        Q   Okay.  Do you have any other forms that you use
9    to get information from a person who needs an
10   accommodation?
11       A   We do have ADA-related questionnaires.  If the
12   employee doesn't have documentation, then we will provide
13   them with these forms to give to their doctor to complete
14   and return.
15       Q   Okay.  And, of course, at this point the
16   person's already an employee, right?
17       A   Right.
18       Q   So we're talking that you have an employee --
19   the person's already employed?
20       A   Right.
21       Q   So there's an employment relationship.  You're
22   entitled to ask medical questions, right?
23       A   Right.
24       Q   To ensure that they can be returned to their
25   position?

Deposition of:   Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

62

1    A   Right.  They'll either get a -- a release, or
2   if they have a release but it has some restrictions, then
3   we would evaluate that based on the job they're returning
4   to.
5        Q   Okay.  How does the interactive process work --
6   could you describe that? -- under the ADA?
7        A   Sure.
8            We engage with the employee in person, over the
9   phone, sometimes, you know, e-mails or correspondence, any
10  number of -- of communication methods, and get their input
11  as far as what their restrictions might be, what kinds of
12  accommodations they think they might need.  And we do all
13  of this on a case-by-case basis because everybody's
14  situation is little different.
15       Q   Okay.  And in going through that interactive
16  process, and -- do you generally rely on -- on the advice
17  and information from medical professionals to understand
18  the full scope of someone's abilities or disabilities or
19  capabilities?
20       A   In part.  We take all of that into
21  consideration, information we receive through our dialogue
22  with the employee, information that we obtain from their
23  physician.
24       Q   Okay.  Now, you said that your approach to
25  USERRA reemployment when the person has a disability or

63

1   injury is similar to the interactive process under the
2   ADA, right?
3        A   Yes, in that -- in that we engage the employee
4   to try to ascertain how they may be accommodated under ADA
5   reasonable accommodations, under USERRA, you know, good
6   faith efforts.  So they're similar in concept.
7        Q   How are they different?  When you say -- how --
8   how -- how is the approach to identifying and
9   accommodating a disability different under Frontier
10  Airlines' approach to the ADA versus USERRA?
11           MR. DABNEY:  Objection to the extent it calls
12  for a legal conclusion.
13       Q   (By Mr. Romer-Friedman)  You can answer.  I --
14  I'm just asking what the -- how the practice is in terms
15  of how you approach the two different issues.
16           MR. DABNEY:  Same objection.
17       A   USERRA is a little more specific as far as the
18  requirements that need to be met for reemploying and --
19  and what types of positions; as we discussed an hour or so
20  ago, how a person would be placed either in their prior
21  role where the escalator principle applied or some similar
22  -- similar function.
23       Q   (By Mr. Romer-Friedman)  Is it your
24  understanding that under the ADA, Frontier Airlines has no
25  obligation to find the person who's disabled a different

64

1   job with the company?
2        A   I didn't say that.
3        Q   I'm saying, is that -- is that your
4   understanding?
5        A   That we have no obligation to find them another
6   job?  No, that's not the case.
7            We would do a similar process to try to
8   accommodate a person.  Or if they couldn't perform their,
9   you know, existing or prior job, look for other
10  opportunities to place them.
11       Q   Okay.  And regardless of whether that's
12  required by the ADA or not, how -- how would you go
13  about -- in the non-USERRA context, but in the ADA
14  context, how would you go about identifying what jobs are
15  compatible with a person's capabilities or disabilities?
16           MR. DABNEY:  I'll just object to the whole line
17  of questioning since it pertains to the ADA.  This is not
18  an ADA case.
19       Q   (By Mr. Romer-Friedman)  You can answer.
20       A   I think I already did answer, in that we would
21  have a dialogue with the employee, obtain whatever
22  information that we could.  If we determined through that
23  process that we needed to look at other positions, we
24  would evaluate that person's abilities and any
25  accommodations that would need to be made in order for

65

1   them to fulfil that role and meet the qualifications.
2        Q   Who would -- who would identify the types of
3   positions that the person could do?  Would that be the HR
4   department?  Would that be the worker?  Would that be
5   their union?  Again, in the ADA context.
6        A   It would be an evaluation done by the HR
7   department in conjunction with their -- their department
8   to see if there were other positions that their management
9   could give us feedback on that they may be able to do.
10           We may also reach out to leadership in other
11  departments, if we were considering whether the person
12  could do a job in another department.  So it would be a
13  collaboration.
14       Q   But in terms -- it seems like, though, in terms
15  of the -- the individual -- the -- the -- the kind of
16  point person for identifying the types of jobs that are
17  possible for the disabled worker, that it's -- someone in
18  HR is looking to discern which jobs could be poss --
19  possible, is that -- is that right?
20       A   We would take a general approach to that, based
21  on our level of knowledge for the various jobs.  Try to do
22  a first, you know, brush of, okay, these seem like
23  possibilities.  Then, because we don't have the in-depth
24  knowledge of some of the positions that are more
25  technical, we would have to get input and collaborate with

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

66

1   the leadership from that group.
2       Q   And when you -- when you say "leadership from
3   that group," you were saying the HR department would
4   consult with the leader of the -- at Frontier who is in
5   the department that the person working --
6       A   Right.  So the chief -- the chief pilot for the
7   pilots, the maintenance manager for the maintenance group,
8   et cetera.
9       Q   Okay.  Have you done that in the past?
10      A   Yes.
11      Q   How many times?
12      A   Quite a few.  I don't know if I could give you
13  a number, but . . .
14      Q   Like dozens of times?
15      A   It's a matter of course for us to consult and
16  partner with the various workgroups to explore
17  opportunities for placement.
18      Q   Okay.  Does that same process that you
19  described -- the process you just described for
20  identifying -- the HR department, identifying potential
21  positions that the worker could do in the ADA context, is
22  that how it works in the USERRA reemployment context, that
23  HR tries to figure out what positions the person could do
24  and talk to the department heads or managers about what
25  the appropriate positions might be?

67

1       A   Yes.  I -- I said, you know, it's a similar --
2   similar effort if it's determined that the person can't
3   return to their prior position.
4       Q   Okay.  So if -- if Jane Doe pilot comes back
5   from military leave for a year or two and says, you know,
6   she has a disability and you identify what that disability
7   is and it can be accommodated in -- before you offer a
8   different position than the one she had before, you'd go
9   and talk to the chief pilot or the assistant chief pilot
10  to figure out what are the potential positions that the
11  person could -- could do with or without a reasonable
12  accommodation?
13      A   Right.  With that information from the employee
14  and any other, you know, medical information received
15  during that process, we would have dialogue with the
16  employee about whether they could do their existing job
17  with or without accommodation, whether there are some --
18  if not, if there was some other department, you know, in the
19  department or in another -- another department that could
20  be -- they could be placed at.
21      Q   In the USERRA context of reemployment, have you
22  ever -- has -- are you aware of Frontier Airlines ever
23  asking a returning service member to go take a physical or
24  get a medical exam to identify the person's capabilities
25  or disabilities?

68

1       A   I can't recall, you know, the military return
2   process specifically.  I couldn't come up with another
3   example for you by name.
4       I know that we -- in other areas, that's --
5   that's one of the courses that we may take.  So if someone
6   was returning from another type of leave or reported that
7   they had a disability, that's been something that we've
8   done on occasion.  Maybe we -- if they're returning from
9   leave, if it's FMLA-related, we might get a second
10  opinion, those kind of things.
11      Q   Okay.  So if it's -- and would you send the
12  person, in either the -- the ADA or the USERRA context,
13  for a physical or medical exam in the case of,
14  you know, where it's not straightforward what the person's
15  abilities or disabilities are?
16      A   Typically we would rely on either the
17  information that the employee provided to us initially or,
18  as I said before, send them with the questionnaire that
19  they can bring to a doctor and have them return to us.
20      Q   Okay.  And you said, I think, before that that
21  same kind of ADA type of questionnaire would be the same
22  questionnaire that you would use in the USERRA or the ADA
23  context to identify --
24      A   I don't know that we've used it in that -- in
25  the military leave context before.  As I said, we would --

69

1   we would initially have a dialogue with the employee, see
2   what kind of documentation they already have.  And then,
3   based on that, decide if we needed to take other avenues,
4   whether it be, you know, a form or an exam, et cetera, to
5   get comfortable with knowing what their capabilities or
6   restrictions were.
7       Q   Okay.  And I might have asked you this before,
8   but are there other instances which you've dealt with of a
9   returning service member who had a disability?
10      A   Not that I can recall.
11      Q   Do you know if any -- anyone else at Frontier
12  in HR has dealt with that situation?
13      A   I don't.
14      Q   Okay.  Is it possible that Mr. Quick's was the
15  first such instance where a disabled service member came
16  back to be reemployed?
17      A   I don't know.
18      Q   It's possible?
19      A   It's possible.
20      Q   Okay.  Have you ever had a situation where a
21  service member came back and expressed that they couldn't
22  do their job, their -- their old position, for any reason,
23  maybe unrelated to a disability?
24      A   No, not that I can recall.
25      Q   Okay.  All right.  And, again, in that ADA

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

---

70

1    context, is it -- is it kind of commonplace to give the
2    worker a list of kind of job openings that are available
3    at the company, ask them to look at that?
4         Or is it -- or is it more nuanced, kind of as
5    you described it before, that HR works with the
6    departments to try to figure out an alternative position?
7         A  It's both.  We have, on many occasions, as a
8    starting point, asked the employee, or sometimes even sit
9    down with them, and together look at positions that are
10   currently open in the company.
11        After some dialogue, then we would start to,
12   you know, narrow things down and have more discussion with
13   department leadership.
14        Q  Does Frontier Airlines have any sort of policy
15   around training or trying to help a returning service
16   member to refresh their skills so they can get back to
17   work?
18        A  Usually it's pretty straightforward.  As I
19   mentioned, there are various departments that have had
20   people return from military leave.  And depending on how
21   long they're out, they would either get, you know, like, a
22   refresher, some sort of training period.  If they were out
23   longer, they may require longer periods of training.  Most
24   of the time, they're just returning to their prior
25   position.

---

71

1         Q  Okay.  Do you have any kind of clearinghouse or
2    database of people who have had disabilities accommodated
3    either in the ADA or the USERRA context?
4         A  We do track, keep a spreadsheet on our ADA
5    cases and interactive process.
6         Q  Do you keep a spreadsheet like that for the
7    USERRA context?
8         A  We've had -- we have a leave of absence, you
9    know, tracking of people who are on various types of
10   leave, to include military.
11        As I said, we haven't had many, if any, cases
12   that we've had to go through that similar process on the
13   military leave side.
14        Q  Okay.  So is it fair to say that when Mr. Quick
15   returned in September of 2014, that you were not familiar
16   with this kind of a situation of a service member
17   returning with a disability to be reemployed?
18        MR. DABNEY:  Object to form.
19        A  Most of the military leave returns that we had,
20   they were returning to their prior position.  And I -- I
21   can't think of any specific examples where they indicated
22   they were disabled and that we needed to apply
23   different --
24        Q  (By Mr. Romer-Friedman)  Had you ever --
25        A  -- a different dialogue.

---

72

1         Q  Sorry.
2         Have you ever -- have you ever -- have you ever
3    received training before September 2014 about how to
4    handle the situation of a service member who has been
5    injured during their service -- military service and how
6    they should be reemployed?
7         A  I have a, you know, undergraduate degree in --
8    in human resources, so that would have been at least
9    USERRA generally covered.  I have attended employment law
10   seminars over the years; typically, there's a component in
11   their seminars for USERRA.
12        Specific training as far as a returning
13   employee with a -- with a disability returning from
14   military leave, not specifically, but I know what the
15   requirements are and have experience in doing a similar
16   process.
17        Q  A similar process?
18        A  As we've just been discussing.
19        Q  Like the ADA process?
20        A  Right.
21        Q  Okay.  And you graduated in '92, you said?
22        A  Say that again?
23        Q  You graduated from college in '90 . . .
24        A  I can't remember what I said earlier.  It was
25   like 2000.

---

73

1         Q  Okay.  So you -- you don't recall whether in
2    those undergraduate courses or in those employment law
3    seminars whether they specifically addressed the issue of
4    a disabled veteran who needs to be reemployed, right?
5         MR. DABNEY:  Object.  Misstates the testimony.
6         Q  (By Mr. Romer-Friedman)  You can answer.
7         A  Generally, the topic of USERRA is covered in
8    those seminars and in the HR management program.  I can't
9    tell you if that particular facet was covered.
10        Q  Okay.  Same thing about these continuing
11   courses:  You don't recall specifically whether
12   reemploying a disabled veteran was specifically covered?
13        A  Correct.
14        Q  Okay.  And maybe this is way past us, but
15   when -- there are -- I assume there are lots of positions
16   at Frontier where the person needs to -- the employee, to
17   be hired and put on the job, requires some sort of medical
18   clearance or medical approval, right?
19        A  Right.
20        Q  Are there other positions besides pilots that
21   require similar kinds of medical screening?
22        A  The pilot group is unique in that they have to
23   hold the medical certificate to fly.  Through the normal
24   course of people returning from any kind of
25   medical-related leave, you know, they provide a clearance

---

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

74

1  from their physician that they're able to return to that
2  job.
3      Q   Okay.  How about -- besides pilots, what other
4  positions require a physical exam or some sort of medical
5  approval?
6      A   Anybody -- any employee returning from a
7  medical-type leave, whether it's FMLA or other, would
8  provide the leave of absence department with a clearance
9  to their job.  It would be specific to their job, if we
10  had a question.  If there are restrictions through FMLA,
11  for example, we would provide the physician with the job
12  description.
13      Q   I'm talking about at the outset of -- of
14  getting -- of getting employment at Frontier.  Are there
15  other jobs that require, like --
16      A   Sorry.  I misunderstood.
17      Q   That's okay.
18          Like, if you're going to be a flight attendant,
19  do you need to pass a physical, or if you're going to be a
20  mechanic or --
21      A   I don't believe, currently, there are any
22  positions that require that, other than the pilot group.
23  We have had, like I said, different workforce makeup in
24  the past.  But currently, I believe that's the only group.
25      Q   Okay.  What does it mean to provisionally

75

1  reemploy a service member?
2          MR. DABNEY:  Object to form.
3      A   People returning from military leave are
4  reemployed.  Do you have some other --
5      Q   (By Mr. Romer-Friedman)  Well, I think it's a
6  term that you've used in the past.  What is -- what is --
7  does it mean anything to you to say that somebody is
8  provisionally reemployed?
9          MR. DABNEY:  Objection.  Assumes facts.
10  Misstates the record in the case.
11      A   We --
12      Q   (By Mr. Romer-Friedman)  Let me ask it a
13  different way.
14      A   Yeah.
15      Q   Have you ever used the term "provisionally
16  reemployed"?
17      A   Yes.
18      Q   Okay.  When did you use that term?
19      A   In the context with Ed Quick, there may have
20  been times previously, but I can't, you know, be specific.
21          It is a -- there's a difference between
22  administrative processing and trying to return somebody in
23  a system, an HRIS system, in order to restore benefits and
24  give them a placeholder while we go through a process to
25  determine proper placement given that individual's

76

1  circumstances.
2      Q   Okay.  So have you -- is there any other
3  instance in which Frontier Airlines has provisionally
4  reemployed a service member?
5          MR. DABNEY:  Same objection.
6      A   It doesn't happen very often.  I -- I -- I
7  believe that -- not necessarily related to a service
8  member, but in other instances, if -- if we were -- if we
9  had somebody returning and we were in the interactive
10  process of some sort to try to figure out the proper
11  placement, we may give them the status in -- in our HRIS
12  system.
13      Q   (By Mr. Romer-Friedman)  I see.  So this
14  provisional reemploying concept -- and take a step back.
15          By provisionally reemploying, you mean the
16  person gets their benefits reinstated but isn't being paid
17  or working?
18      A   I mean, we're -- we're required to, and we do,
19  reemploy people and comply with USERRA.  If there are
20  questions about how to place or where to place the person,
21  we may need to, in our HR system, place them in some sort
22  of status in -- in order to make all those things happen
23  and process them while we go through the full process.
24      Q   Okay.  I guess maybe we jumped ahead by talking
25  about other people being provisionally reemployed.

77

1          But what -- does it -- your understanding of
2  this term of art that you've used, "provisionally
3  reemployed," does that mean that the person is -- had
4  their benefits reinstated but is not working and is not
5  receiving compensation?  Is that what you mean?
6          MR. DABNEY:  Same objection.
7      A   It -- it --
8      Q   (By Mr. Romer-Friedman)  Yes or no?
9      A   It doesn't have a lot to do with whether
10  they're reemployed or not.  It has more to do with how we
11  enter them in our system through the course of -- of
12  reemployment.
13      Q   I guess what I'm asking, what does it mean to
14  be provisionally employed or reemployed?
15      A   That you're reemployed and given a status in
16  the system while we interact with the employee to figure
17  out a final position to place them in.
18      Q   Okay.  In that context, when the person is
19  provisionally reemployed, are you saying their benefits
20  are -- are put back in place?  Or does it depend on the
21  circumstances?
22      A   Well, I think we talked about that before,
23  that -- that we reemploy them.  We start the process to
24  restore benefits, make up any contributions, and have the
25  interactive process with the employee or have dialogue

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

78

1  with the employee to determine placement in another
2  position if that's what's needed.
3      Q  I guess what I'm asking is, if a person is
4  provis -- and we can talk about this in his specific
5  context.
6      But in -- if this is an idea -- if this is a
7  concept that Frontier Airlines has, that a person can be
8  provisionally reemployed or provisionally employed, I'm
9  asking you, what -- how do you define that?
10     Does that mean it's someone who's getting
11 their benefits and not being paid compensation but waiting
12 to be placed into a position?  Is that an accurate
13 explanation of what you're saying provisionally employed
14 is?
15     MR. DABNEY:  Objection.  It's asked and
16 answered.  Misstates the testimony.
17     Q  (By Mr. Romer-Friedman)  You can answer.
18     A  It's a way to reemploy the employee in our
19 system in order to follow through with -- based on that
20 employee's position and required training, et cetera, to
21 make those things happen.
22     Q  Okay.  And I -- I realize that this is like the
23 sixth time I've asked the same question, but I'd like an
24 answer if possible.
25     In that instance in which the person is

79

1  provisionally reemployed, does it mean that the person is
2  not being paid compensation for working?  It's either a
3  yes or no, right?
4      MR. DABNEY:  Objection.  That misstates the
5  testimony.  It's asked and answered.  At this point it's
6  argumentative.
7      MR. ROMER-FRIEDMAN:  Not trying to argue with
8  you; I'm just trying to get yes or no.
9      A  Ask -- ask me one more time.
10     Q  (By Mr. Romer-Friedman)  When a person is
11 considered to be provisionally reemployed, does it mean
12 that that person is not being paid compensation for
13 working?
14     A  They are --
15     MR. DABNEY:  Same objection.
16     A  -- they are reemployed, and if the person
17 starts -- when they starts new-employee orientation or
18 they start training, then they will be paid.
19     Q  (By Mr. Romer-Friedman)  But that -- but at the
20 time that they're provisionally reemployed, other than
21 new-employee orientation or training, they're not
22 receiving compensation, right?
23     MR. DABNEY:  Same objections.
24     A  If they're not working at that time.
25     Q  (By Mr. Romer-Friedman)  Okay.  But -- okay.

80

1  But they're receiving benefits when they're provisionally
2  reemployed, under your definition, right?
3      A  Yes.
4      Q  Okay.  All right.
5      THE VIDEOGRAPHER:  Counsel, can I get you to
6  put your mic on --
7      MR. ROMER-FRIEDMAN:  Sorry.  On the top, yeah.
8      THE VIDEOGRAPHER:  Thanks.
9      Q  (By Mr. Romer-Friedman)  And, again, you're not
10 aware of anyone else who -- any other service member who
11 had been provisionally reemployed besides Mr. Quick,
12 right, by Frontier Airlines?
13     A  No.
14     Q  Okay.  Have you ever tried to find out if
15 anyone else was provisionally reemployed?
16     A  As I said, the many returns from military
17 leaves that we've had have been straightforward and they
18 returned to their prior position.
19     Q  Okay.  All right.  How does -- under the -- the
20 Frontier Airlines system for reemployment policies, how
21 do -- how do you deal with pension benefits that need to
22 be made up for the period of military leave?
23     A  Not all groups have a pension.
24     Q  Let's take the pilots.  How do you deal with
25 pilots?

81

1      A  They don't have a pension; they have a 401(k)
2  plan and a defined contribution plan.
3      Q  Okay.
4      A  And my involvement would be connecting that
5  person with our benefits department to evaluate the time
6  lapsed and make calculations to catch that employee up.
7      Q  Okay.  Do you -- are you aware of how that
8  calculation is made, what the formula is for the
9  calculation?
10     A  I do not.
11     Q  Okay.  And the defined contribution plan,
12 that's essentially -- could you describe what type of
13 benefits pilots receive under that?
14     A  So it's my understanding -- I don't know the
15 percentages off the top of my head -- but the defined
16 contribution plan, the employee doesn't have to make the
17 contribution on the 401(k) side.  There's a match or a
18 catchup on both sides.
19     Q  Okay.  So under your reemployment policy, the
20 company would make the ordinary defined contribution that
21 it would have made regardless of whether the employee
22 does -- puts -- puts money into their 401(k), right?
23     A  That's my understanding.
24     Q  Okay.
25     A  But my role is to connect them with the subject

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

82

1    matter experts, the benefits department, in order to do
2    those calculations and comply with USERRA as far as
3    benefits go.
4        **Q   Okay.  Does a service member have to request**
5    **the defined contribution in order to get the pension**
6    **contri -- in order to receive the makeup contribution?**
7        A   I don't believe so.  I think it's, you know,
8    something that I think they would typically have dialogue.
9    But I think that those -- those benefits are processed
10   when an employee returns.
11       **Q   Why is there dialogue needed to determine what**
12   **the person would have made in terms of their defined**
13   **contribution over a period of military leave?**
14           MR. DABNEY:  Objection.  You're misstating what
15   she said, again.
16       **Q   (By Mr. Romer-Friedman)  You can answer.**
17       A   Could you repeat the question?
18       **Q   Why would there need to be dialogue between the**
19   **company and the service member to determine if --**
20       A   It wouldn't necessarily need to be, but if
21   there were questions about, you know, the -- the period of
22   time, which sometimes it could be a long period of time,
23   to make sure that everybody is on the same page as far as
24   the calculations and what's to be restored at the end of
25   the day.

83

1        **Q   Okay.  How long does that -- does it ordinarily**
2    **take to make a pension contribution -- to make a defined**
3    **contribution or a 401(k) contribution as a makeup**
4    **contribution when a person is reemployed?**
5        A   I honestly don't know.  I imagine it varies
6    depending on how long the employee's been out and whether
7    they're just on the company 401(k) program or if they have
8    a collective bargaining agreement with different benefits.
9        **Q   Is there a goal that the company has in mind in**
10   **order to identify the appropriate calculation?**
11       A   As soon as possible.
12       **Q   Are you aware of any law or regulation that**
13   **limits the amount of time or identifies the amount of time**
14   **that should be -- in which the contribution should be**
15   **made?**
16           MR. DABNEY:  Objection.  Calls for a legal
17   conclusion.
18       **Q   (By Mr. Romer-Friedman)  You can answer if you**
19   **know.**
20       A   I don't know specifically.  I imagine it's as
21   soon as possible upon return.
22       **Q   Okay.  And if the -- if the service member**
23   **wants to make -- like a pilot who has a 401(k) wants to**
24   **match -- do his or her own match and have the company**
25   **match that amount, how does that process work at Frontier**

84

1    **Airlines?  Do you tell the service member they're allowed**
2    **to do that?  Do you leave it to them to -- to -- to speak**
3    **up about it?  How does that work?**
4        A   I don't know other than -- again, my role would
5    be to connect the service member with the benefits
6    department.  And we generally know that those things need
7    to occur.
8            So there would be, I imagine, some discussion
9    between the benefits folks and the service member as far
10   as either talking to them about the amount they wanted to
11   do or to go through a third party 401(k) administrator to
12   make that happen, but I don't know the details.
13       **Q   Okay.  I assume a service member -- is it fair**
14   **to say a service member wouldn't know what the maximum**
15   **amount they can -- they can put into the 401(k) as -- as a**
16   **makeup contribution, right?  The company would have to**
17   **tell them what --**
18       A   Right.  I guess that's one of the reasons I
19   said that there might need to be some dialogue to make
20   sure that the employee was aware of what was possible and
21   get feedback from them about what they wanted to do.
22       **Q   Is there a standard form or process for**
23   **informing the service member, the pilot about how much he**
24   **or she can deposit into a 401(k) as a makeup contribution?**
25       A   I imagine there is.  Whether it's a company

85

1    form or whether it's a form through our 401(k)
2    administrator, I'm not sure which it is.
3        **Q   Okay.  Someone at the company would know that?**
4        A   Yes.
5        **Q   Are you familiar with the 12-month look-back**
6    **rule under USERRA?**
7        A   No.
8        **Q   Okay.  So I'd like to talk a little bit about**
9    **-- with you about Mr. Quick's personnel history.**
10       A   Okay.
11       **Q   We said before, I think, you -- you've been in**
12   **the HR and/or labor department the entire time that he**
13   **was employed, right?**
14       A   In some capacity.
15       **Q   Okay.  In that capacity -- actually, let me ask**
16   **you, when -- when was the first time you became acquainted**
17   **or learned of Mr. Quick?**
18       A   I don't know.  We -- we haven't, that I recall,
19   have any -- had any dialogue or contact prior to his
20   return from this leave of absence.
21       **Q   In -- in September of 2014?**
22       A   Right.
23       **Q   Did you know who he was before then?**
24       A   Yes.  I -- I knew that he was a pilot on
25   military leave and had been a pilot for some time with

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

---

86

1  Frontier.
2      Q   How did you know that?
3      A   The only context I can give you for the prior
4  knowledge was a prior grievance that was filed related to
5  Ed's seniority, but I wasn't directly -- I don't recall
6  my level of -- my level of involvement wasn't that great.
7      Q   Who filed a grievance about Ed's seniority?
8      A   I believe Ed did.
9      Q   Ed did.  What was his complaint?
10     A   It had something to do with when he was hired
11  and being placed in a pool and a disagreement about what
12  his seniority date should be.
13     Q   Okay.  Was -- was he ultimately right about the
14  seniority date?  Was it changed?
15     A   Yes, the date was changed.
16     Q   From roughly 2004 to 2002?
17     A   I can't remember what the change was.
18     Q   Okay.  Did -- did the grievance about his
19  seniority relate to his military service?
20     A   I think he went out on military leave after
21  being placed in the pool, and that was the subject.
22     Q   Okay.  Were -- were -- was anybody at the
23  company concerned or dismayed by Mr. Quick having his
24  seniority moved back in time, that he was more senior?
25         MR. DABNEY:  Object to the form.

---

87

1      A   I don't know.  I can't speak for other people.
2      Q   (By Mr. Romer-Friedman)  Well, how did you
3  learn about the grievance?  In what context did you learn
4  about it?
5      A   I must have been -- I don't remember exactly
6  which role I was in at that time, but labor relations
7  related.  There's a good portion of my time in Frontier --
8  or in the HR department that I was involved, in one way or
9  another, with the grievance process for various
10  departments.
11     Q   Okay.  Would you have heard about the -- the
12  grievance or would you have read about it?  How -- how
13  would you have learned about that kind of a thing?
14         MR. DABNEY:  Asked and answered.
15     A   It's been a long time ago.  I don't -- I don't
16  recall if --
17     Q   (By Mr. Romer-Friedman)  Okay.
18     A   -- you know, I read the grievance specifically
19  or if I was made aware of it by someone else.
20     Q   Okay.  So prior to -- prior to being hired by
21  Frontier Airlines, Mr. Quick had to pass a medical
22  clearance, correct?
23         MR. DABNEY:  Object to form.
24     Q   (By Mr. Romer-Friedman)  Is that correct?
25     A   He would have --

---

88

1      Q   He -- prior to Mr. Quick being hired by
2  Frontier Airlines in 2004, he passed a medical clearance;
3  is that correct?
4      A   That's a medical certificate.  A medical
5  certificate, yes, he would have had to have that.
6      Q   Every pilot has to do that if they want to be a
7  first officer who's flying?
8      A   Correct.
9      Q   Okay.  I'm going to hand you what is labeled
10  Exhibit 11 and ask you if you recognize this document.
11         (Deposition Exhibit 11 was marked.)
12     A   This is a form that it looks like Ed completed
13  in 2004, identifying emergency contact.  There's a health
14  and safety portion.
15     Q   (By Mr. Romer-Friedman)  So this -- this is an
16  internal Frontier document; this is -- this is not an FAA
17  document; is that right?
18     A   That's what it appears to be, yes.
19     Q   Okay.  You're familiar with this document?
20     A   I know that we -- I've seen this document
21  before.  I know that we've used it in the past, but that's
22  about it.
23     Q   Okay.  So is it fair to say that this document,
24  particularly the bottom half of it, asks a pilot who is
25  starting work for Frontier Airline to disclose any injury

---

89

1  or injuries on the job that he's had?
2      A   Date of injury?  Yes, I see that.
3      Q   That's correct?  My -- my statement about what
4  this is, is correct?
5      A   There's a bullet point here, as you indicated,
6  date of injury.
7      Q   Okay.  Here it says, Have you had any injury or
8  injuries on the job?  Right?
9      A   It does read that.
10     Q   Okay.  And then it asks for the date of injury,
11  employer, body part affected, cause, and any permanent
12  disability percent, was workers' comp claim filed.  It
13  says all that, right?
14     A   Correct.
15     Q   Is this form optional, or is this required?
16     A   I don't think we use this form anymore.  I
17  don't know when it was discontinued.  And in 2004, I
18  wouldn't have been -- I don't know that I had familiarity
19  with how this was used in the process.
20     Q   Okay.  But this kind of a form -- we talked
21  before about the ADA process, right?  Is this the type of
22  form that would be -- would enable Frontier to identify
23  any injuries that might affect a person's ability to -- to
24  do a job, with or without a reasonable accommodation?
25         MR. DABNEY:  I reiterate my standing objection

---

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

---

90

1  to all the ADA questions as irrelevant.
2      Q  (By Mr. Romer-Friedman)  You can answer it.
3      A  We do not use this form for that purpose
4  currently.
5      Q  Well, when -- when Frontier used this form,
6  asking a prospective employee to identify any injury or
7  injuries on the job, would this form have been susceptible
8  of enabling Frontier Airlines to identify the injury or
9  disability that a person has who's going to be employed?
10         MR. DABNEY:  Object to foundation.
11      A  I don't know that they used it for that purpose
12  at that time.
13      Q  (By Mr. Romer-Friedman)  I'm asking, is it
14  capable of doing that?  I mean, it seems like here
15  Mr. Quick identified an injury he had.  Is it capable of
16  that?
17      A  I don't know that it's fully capable of that,
18  but certainly there's information on here about an injury
19  in '79 and another one in '97.
20      Q  But it's capable of at least starting the
21  process of identifying the person's disability or injury,
22  right?
23         MR. DABNEY:  Object to form.  It lacks
24  foundation.
25      Q  (By Mr. Romer-Friedman)  You can answer.

---

91

1      A  So the question is?
2      Q  Is this type of form capable of identifying an
3  employee or a prospective employee's injury or disability?
4         MR. DABNEY:  Asked and answered.
5      A  I don't know that it would or not.  There's --
6  there are other forms that are used.  I don't know what
7  this was used for at the time.
8      Q  (By Mr. Romer-Friedman)  Okay.
9      A  An employee with a restriction or disability
10  would notify the company, and -- and we would go through
11  our process.
12      Q  Okay.  I know earlier you said that you had no
13  significant disagreement with Mr. Thibodeau about his
14  statements with respect to Mr. Quick and other testimony,
15  but I want to just cover a couple things that I talked
16  with Mr. Thibodeau about.
17         Okay?
18      A  Sure.
19      Q  All right.  So is it fair to say that when
20  Mr. Quick was hired by Frontier Airlines that he had more
21  experience than most pilots who are hired by Frontier
22  Airlines to be first officers?
23         MR. DABNEY:  Object to form.
24      A  I don't know.  Mr. Thibodeau testified to the
25  hours that he had.  That's how I know he had 11,000.  I

---

92

1  don't know what those hours consisted of --
2      Q  Okay.  But --
3      A  -- to be able to correctly answer that
4  question.
5      Q  Okay.  But, again, it's -- I think we --
6  earlier we talked about how there were -- the requirement
7  was to have 2500 hours is --
8      A  And 11,000 hours is --
9      Q  Is what Mr. Quick had?
10      A  Correct.
11      Q  And that's significantly more than what's
12  required for the position.
13      A  Correct.
14      Q  Okay.  And from the -- you reviewed Mr. Quick's
15  personnel file?
16      A  No.
17      Q  No?
18      A  Not -- not fully.  I -- when the lawsuit came
19  up, that was part of one of the things that was asked for,
20  so I helped to obtain and -- and provide that, but I
21  didn't go through his full -- his full file.
22      Q  Okay.  When -- and Mr. Quick took military
23  leave from June 18th, 2007, until the summer of 2014; is
24  that correct?
25      A  I believe those are the -- I know it was 2007.

---

93

1      Q  Okay.  And is it correct that he gave notice to
2  his supervisors, written notice, that he was going to take
3  military leave before he went on military leave?
4      A  Based on JP's testimony, I assume that's the
5  case.
6      Q  You don't know that independently?
7      A  No.
8      Q  All right.  Let me take a step back.
9         When did you determine that -- well, let me ask
10  -- a further step back.
11         Has Frontier Airlines ever determined that
12  Mr. Quick satisfied the five requirements to be reemployed
13  under USERRA?
14      A  I believe through the course of returning him
15  that, yes, we did have comfort that he had satisfied those
16  requirements.
17      Q  And when did you determine that?  When did
18  Frontier Airlines determine that he had --
19      A  I don't know the --
20      Q  -- satisfied those requirements?
21      A  I don't know the exact date, but there was
22  dialogue and -- and a course -- over a course of time when
23  we were obtaining those things from Ed.
24      Q  Do you know if that was in September or October
25  or November or December of 2014 or at a later time?

---

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

---

94

1　　　　A　It would have had to be sometime between
2　September when he made contact and, you know, December,
3　and he started new-employee orientation on January 5th,
4　so . . .
5　　　　Q　Okay.  So at some point between when he
6　contacted Mr. Thibodeau on September 23rd, 2014, and the
7　new-employee orientation on January 5th, 2015, Frontier
8　Airlines determined that he satisfied fully the five
9　requirements for reemployment under USERRA?
10　　　　MR. DABNEY:  Object.  It -- it calls for a
11　legal conclusion.
12　　　　Q　(By Mr. Romer-Friedman)  Is that correct?
13　　　　A　Sometime during that period, assuming, yes,
14　that that occurred, because we reemploying him.
15　　　　Q　Okay.  So you don't have any reason to doubt
16　that -- today that Mr. Quick has satisfied those five
17　requirements?
18　　　　A　No.
19　　　　MR. DABNEY:  Same objection.
20　　　　Q　(By Mr. Romer-Friedman)  No?
21　　　　A　No.
22　　　　Q　Okay.  Do you have a -- a ballpark sense of
23　when it was determined by Frontier Airlines, you, that he
24　satisfied those five requirements?
25　　　　MR. DABNEY:  Misstates the testimony.  Asked

---

95

1　and answered.
2　　　　Q　(By Mr. Romer-Friedman)  I know you said it was
3　sometime between September and January of 2014, 2015.
4　　　　A　I don't.  Sometime during that period.
5　　　　Q　Okay.  Is there any sort of formal process to
6　identify the date that a person has satisfied those five
7　requirements?
8　　　　A　Is there a specific date that we would identify
9　that they --
10　　　　Q　Is there a --
11　　　　A　-- were satisfied?
12　　　　Q　Is there a record or a process that says, on
13　this date we have determined that Mr. Quick has satisfied
14　the reemployment requirements of USERRA, such that we can
15　reemploy him?
16　　　　A　No.  We just, through the course of the process
17　of returning them, determine that that's been satisfied
18　and move forward with reemployment.
19　　　　Q　Okay.  All right.  Given the -- the timing that
20　you talked about, that it had to have been before you sent
21　him to have the new-employee orientation, is it -- is it
22　right that any time that a person's is -- a service member
23　is being sent for the new-employee orientation, that
24　Frontier Airlines has determined that the person satisfied
25　the five requirements to be reemployed?

---

96

1　　　　MR. DABNEY:  Object to form.
2　　　　Q　(By Mr. Romer-Friedman)  You can answer.
3　　　　A　That would typically be part of the process of
4　returning them.
5　　　　Q　You're not aware of a situation where someone
6　was sent for new-employee orientation but had not yet been
7　determined to have satisfied the five requirements, right?
8　　　　A　I'm not aware of any instance.
9　　　　Q　Okay.  Not just pilots, but of the whole
10　company?
11　　　　A　Right.
12　　　　Q　Okay.  Now, when Mr. Quick left in 2007 for
13　military leave, there was some -- well, how would you
14　characterize what was going on at the time when he left?
15　　　　A　I don't know when I became aware, maybe through
16　the course of even recent events, but that there were some
17　training issues in the department.  He went on military
18　leave.  That's about the extent of it.
19　　　　Q　Okay.  Are you familiar with -- that the TRB
20　was being convened around the time that he went on
21　military leave?
22　　　　A　I don't know that I was aware of it at that
23　time.
24　　　　Q　When did you become aware of that fact?
25　　　　A　I can't say for certain that I was aware of it

---

97

1　prior to Ed's notification recently that he was returning.
2　　　　Q　So prior -- you weren't aware of it prior to
3　September of 2014?
4　　　　A　I can't tell you that I was for sure.
5　　　　Q　Okay.  Do you recall how you learned about
6　that, the -- the fact that Mr. Quick had failed a check
7　ride and was being sent to have a TRB?
8　　　　A　Obviously it came up in the course of his
9　reemployment and my dialogue with him with regard to his
10　status as either a first officer, captain, and associated
11　rate of pay.
12　　　　Q　Right.  I understand that it came up.  Do have
13　-- do you know how you learned of that?  Did someone tell
14　you about that?
15　　　　A　There were discussions with the department.  I
16　can't remember exactly who, whether it was JP or somebody
17　else in the department that -- what his status was, as far
18　as FO or captain, and his training, his training status
19　and -- and failures.
20　　　　Q　Okay.  Would it be fair to say that there were
21　some people at Frontier Airlines who wanted Mr. Quick to
22　be terminated back in 2007?
23　　　　MR. DABNEY:  Object to the form.  It lacks
24　foundation.
25　　　　A　I can't answer that.

---

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

---

98

1    Q   (By Mr. Romer-Friedman)  How about in 2014 when
2    he returned from military leave?  Was there anyone in
3    management who didn't want to see him hired?
4        A   Not to my knowledge.
5        MR. DABNEY:  Same objection.
6        Q   (By Mr. Romer-Friedman)  Who did you talk --
7        MR. DABNEY:  Let me get an objection in before
8    you answer.
9        THE WITNESS:  Sorry.
10       Q   (By Mr. Romer-Friedman)  Who did you talk to in
11   the context of Mr. Quick seeking reemployment besides --
12   you talked to Mr. Thibodeau, right?
13       A   Correct.
14       Q   Who else did you interact with when trying to
15   reemploy Mr. Quick?
16       A   Mostly people within my own department
17   responsible for reemploying Mr. Quick and restoring his
18   benefits, et cetera.
19       Q   Okay.  And then Jacalyn Peter as well?
20       A   Yes.  I think I stated that before.
21       Q   Mr. Sabia?  Sabia?
22       A   I probably had conversations with Anthony, yes.
23       Q   Did you talk with anyone about Mr. Quick
24   outside of your department?
25       A   JP, as I said.

---

99

1        Q   Anyone else in the -- any other pilot
2    management people?
3        A   Not that I recall.
4        Q   Okay.  What did Mr. Thibodeau tell you about
5    Mr. Quick?
6        A   Generally, I remember that because Ed had
7    raised the question of his status as first officer or
8    captain and the rate of pay associated with those, that we
9    were determining what his status was when he left.
10       And through the course of that, you know, it
11   was discussed that there was a training review board that
12   had been discussed that needed to occur in accordance with
13   the CBA.  That that's sort of where he was in his upgrade
14   process when he -- when he went on military leave.
15       Q   Okay.  When you heard that from Mr. Thibodeau,
16   did you understand that to mean that there were some
17   people in -- in the pilot operations side who may want to
18   have him terminated via the TRB?
19       A   No, I don't think that's fair to say.  The
20   process is the process.  It's very specifically laid out
21   in our collective bargaining agreement for the pilots.
22   And each pilot, depending on their type of failure,
23   et cetera, go through, my general understanding, you know,
24   based on the number of failures, certain type of
25   retraining at some point.  A training review board can be

---

100

1    -- can be called, as outlined in that -- in that process.
2        Q   Okay.  And in order to upgrade from first
3    officer to captain, is -- is it your understanding that
4    there's -- it's not just that anyone can do that at any
5    time; you have to have certain qualifications, right?
6        A   I believe you have to have certain
7    qualifications, and it's done in accordance with the
8    placement section of the contract.
9        Q   Okay.  And at the time that Mr. Quick was
10   trying to upgrade, other than passing the -- the check
11   ride, he was qualified to be a captain, right?  Is that
12   correct?
13       A   I don't have a reason to believe that he wasn't
14   eligible to begin the process, as he did, from first
15   officer to a captain upgrade.
16       Q   In fact, he -- he actually received captain pay
17   for some time; is that correct?
18       A   He -- he was paid for a period of time as
19   captain, it's my understanding, yes --
20       Q   Okay.
21       A   -- during that period.
22       Q   And subsequent to being paid as a captain and
23   the whole TRB issue coming up, he was never terminated or
24   formally disciplined, correct?
25       A   No.  He was sort of at that level of process

---

101

1    when he left and at that level of process upon returning.
2        Q   Okay.  And no one at the time had made a
3    decision to remove Mr. Quick in June of 2007 or terminate
4    him, right?
5        A   No.  He was still in the middle of his training
6    and upgrade process.
7        Q   Okay.  You agree with Mr. Thibodeau when he
8    said earlier that it was possible that he, Mr. Quick,
9    could have gone through the TRB and continued to work as a
10   pilot and even become a captain at some -- some time in
11   the future?
12       MR. DABNEY:  Objection.  Lacks foundation.
13       A   Answer similarly to JP's testimony, which is
14   there are multiple scenarios through that process based on
15   the individual, and that could conceivably had ended.
16       Q   (By Mr. Romer-Friedman)  Okay.  I'll hand you
17   what will be Exhibit 12.
18       (Deposition Exhibit 12 was marked.)
19       Q   (By Mr. Romer-Friedman)  There you go.  Do you
20   recognize this document?
21       A   Yes.  It's a personal action form, a form that
22   we used before being more automated.
23       Q   This is a manual form, you're saying?
24       A   Right.
25       Q   Okay.  So now this would be done

---

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

---

**102**

1  electronically?
2      A   Correct.
3      Q   Okay.  What is -- this is a -- what does it
4  mean to be a personnel action form?
5      A   It initiates any kind of change associated with
6  the employee's --
7      Q   Okay.  And what's happening --
8      A   -- condition of employment.
9      Q   What is -- what's happening in this personnel
10  action form?
11         Mr. -- it appears that Mr. -- this is in
12  September of 2007, several months after Mr. Quick goes on
13  leave, correct, military leave?
14      A   Right.  It -- it appears, you know, the
15  military leave box was checked above and that -- my
16  understanding, he, during the course of his captain
17  upgrade process, during that training period -- this is in
18  2007, looks like.
19         Job title says captain.  The job code says FO
20  1011, which honestly confuses me a little bit, why it
21  would be FO, but maybe that's flight operations.  So
22  that's the code associated with captain.
23      Q   Okay.  And the grade or structure there says
24  "CPT."  Does that stand for captain?
25      A   Correct.

---

**103**

1      Q   Okay.  And the hourly rate of 135.53, is that a
2  captain's rate at the time?
3      A   It must have been.
4      Q   Okay.  And the $121,993 annual salary, is that
5  based on the hourly rate times what the -- the -- the line
6  guarantee?
7      A   I don't know about the line guarantee part, but
8  I -- I --
9      Q   Okay.  That would be his annual salary,
10  essentially?
11      A   Based on what I'm seeing on this form, yes.
12      Q   Okay.  All right.  In -- in effect, this is --
13  this form is saying that because Mr. Quick was on military
14  leave, you're turning off his payroll, right?  It says,
15  "Turn off in payroll," under effective --
16      A   Turn -- turn off --
17      Q   -- date of change --
18      A   Yes, I see that in the comment section.
19      Q   What does -- what does that mean?
20      A   It must have been associated with him going out
21  on military leave.  And as I said, I -- I know that he
22  hadn't successfully upgraded to captain, but I believe
23  during his training period, he was -- obviously, his
24  status was that --
25      Q   Okay.

---

**104**

1      A   -- on this form.
2      Q   All right.  Does that make sense, that his
3  payroll, his benefits would be turned off, because this is
4  about 90 days after he went on military leave, consistent
5  with what we looked at earlier, the employee handbook?
6      A   I don't know.  I don't know what --
7      Q   Okay.  I'd just like to verify
8  specifically the -- look at the five requirements and the
9  context of how that information was obtained by Frontier
10  Airlines.
11         So earlier we looked at an exhibit with
12  Mr. Thibodeau, I believe.  Maybe we didn't.  Oh, we
13  didn't.  I'm hallucinating.  It's been a long day.
14         I'm handing you what will be marked Exhibit 13.
15         (Deposition Exhibit 13 was marked.)
16      Q   (By Mr. Romer-Friedman)  And please tell me if
17  you recognize this exhibit, this document.
18      A   This appears to be an e-mail from Ed Quick to
19  Jim Colburn on June 18th of 2007.
20      Q   And what is Mr. Quick telling Mr. Colburn in
21  this e-mail?
22      A   He's saying, Please find attached my request
23  for military leave.
24      Q   Okay.  And attached to this is a memorandum
25  from the Department of the Army?

---

**105**

1      A   Correct.
2      Q   Is that correct?
3      A   Yes.
4      Q   And it requests the following soldier be
5  granted military leave starting the following day,
6  June 19th, 2007, through September 30, 2007; is that
7  correct?
8      A   Correct.
9      Q   And that soldier is Edward K. Quick, right?
10      A   Correct.
11      Q   Okay.  And then attached on the final page,
12  Bates labeled 1259, is "Reemployment Rights After Military
13  Training," a form that Mr. Quick filled out, correct?
14      A   It appears so, yes.
15      Q   Okay.  Is this the kind of written notice prior
16  to taking military leave that would be appropriate and
17  satisfactory to invoke his right to take military leave,
18  as far as Frontier Airlines is concerned?
19      A   Yes.
20      Q   Okay.
21         MR. ROMER-FRIEDMAN:  This is 13.  Okay.
22      Q   (By Mr. Romer-Friedman)  And Mr. Colburn, at
23  the time, was the chief pilot; is that correct?
24      A   He must have been.
25      Q   Okay.  All right.  And you agree that

---

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

---

106

1    Mr. Quick, when he was serving in the Army from 2007 to
2    2014, was performing service in the uniformed service; is
3    that correct?
4        A   That's my understanding.
5        Q   Okay.  There was never really a dispute about
6    that?
7        A   I don't believe so.
8        Q   Okay.  And when did you learn that Mr. Quick
9    satisfied the five-year requirement for -- the five-year
10   time limit under USERRA?  And how did you -- and how did
11   you learn that?
12       A   I don't know for sure, but there were
13   discussions, I believe even with Ed, about the length of
14   time and that, you know, he believed he had met that.
15           At some point, there were discussions about
16   exceptions to the five-year rule.  But at the end of the
17   day, I think we determined that he had satisfied that and
18   were proceeding with reemployment.
19       Q   Was he fairly helpful in -- in providing you
20   with the orders and information so that you could
21   determine that he had time that was exempt from the
22   five-year limit?
23       A   Along the way, yes, there were -- there was
24   some period of time where there were exchanges back and
25   forth to see if we could make sure we had orders that

---

107

1    covered the full period of -- of time.
2        Q   Okay.  So -- so the answer is, yes, he was
3    helpful --
4        A   Yes.
5        Q   -- to provide that information?
6            Provide -- did he provide it punctually?  When
7    you asked him for orders, he gave it to you?
8        A   Yes.  There was -- there was one period where
9    there was a gap that it -- it required some follow-up
10   between Ed and I.
11       Q   Okay.  Were you aware of exemptions at the time
12   that you -- when Mr. Quick first began interacting with
13   you?
14       A   I believe generally there were wartime
15   exemptions.
16       Q   Okay.  Do you know if -- if ordinarily it's the
17   policy for Frontier Airlines that if a service member has
18   gone beyond the five-year limit, even including exempt
19   time, that they're denied reemployment or given
20   reemployment?
21           In other words, even if the person doesn't
22   satisfy that five-year limit, does it matter to Frontier
23   Airlines?
24       A   I don't know that we've -- I don't know that
25   we've had that come up.  But we would look at the -- the

---

108

1    five years and any exceptions at the time for that person.
2        Q   Okay.  Were you aware at the time, though, in
3    September, October 2014 that if Mr. Quick was not eligible
4    because of the five-year limit that he could be denied
5    reemployment?
6        A   I think we were assuming that he met the
7    requirements, and we had dialogue about exemptions and
8    were trying to obtain all of the orders to cover the
9    period for the record so that we had it on file.
10       Q   All right.  I'm going to hand you an exhibit.
11           MR. ROMER-FRIEDMAN:  It will be marked
12   Exhibit 14; is that correct?
13           THE REPORTER:  Uh-huh.
14           (Deposition Exhibit 14 was marked.)
15       Q   (By Mr. Romer-Friedman)  And this is a document
16   produced by the defendant, FA-434.  Are you familiar with
17   this document?
18       A   No.
19       Q   This appears to be an e-mail from Mr. Colburn,
20   the -- the chief pilot?
21       A   Can I just take a minute to finish reading it?
22       Q   Sure.
23       A   Okay.  It seems to be from 2008, a
24   correspondence between Jim Colburn and Ed Quick.
25       Q   Okay.  So this is the chief pilot from Frontier

---

109

1    Airlines e-mailing Mr. Quick on April 30th, 2008; is that
2    right?
3        A   I believe Jim was the the chief pilot at
4    that time.
5        Q   Okay.  And he's talking about -- he's talking
6    to Mr. Quick here about returning to Frontier Airlines; is
7    that fair?
8        A   Yes.
9        Q   Okay.  And he's reminding him that -- he says,
10   In addition to the various administrative matters you
11   discussed with Ms. Powers above, the flight operations
12   administrative assistant at DIA, there are important
13   issues relating to flight training events that occurred
14   prior to your leave last June that remain to be resolved
15   in connection with your return.
16           Correct?
17       A   Yes.
18       Q   Do you -- do you -- do you know what
19   Mr. Colburn was referring to?  Is that referring to the
20   TRB?
21       A   I don't know if in this case it had to do with
22   a TRB.  This is from 2008, right?
23       Q   Well, the TRB was called in June of 2007,
24   right?  This is about nine months after that.
25       A   Right.  That's the case.  True.

---

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

---

110

1    Q   Okay.  Is it common for -- for the -- a manager
2  to e-mail a service member while they're on military leave
3  to reference potential disciplinary action?
4        MR. DABNEY:  Object to form.
5    A   I can't answer that.  It appears what prompted
6  it was Ed visiting the flight operations office out at the
7  airport.  Must have been about his ID.  I can't speak to
8  the rest of the context.
9    Q   (By Mr. Romer-Friedman) Okay.  Would you
10 expect a manager to contact a person who's on military
11 leave and talk to them about discipline in the ordinary
12 course of human relations at Frontier Airlines?
13       MR. DABNEY:  Same objection.
14   Q   (By Mr. Romer-Friedman) You can answer.
15       Have you ever seen that happen before?
16       MR. DABNEY:  Also think it misstates the
17 exhibit.
18   A   Yeah, that's what I -- I'm trying to determine,
19 if we're talking about training or -- I mean, you're
20 characterizing it as "discipline."
21   Q   (By Mr. Romer-Friedman) We can move on.
22       I'd like to back up to Exhibit 6 from earlier
23 today.  This is a two-page -- I'll let you take a look.
24   A   Yes.
25   Q   Okay.  This is an e-mail exchange between you

---

111

1  and Mr. Quick between October 1 and October 3rd; is that
2  correct?
3    A   Yes.
4    Q   Okay.  And this is -- this is -- other than
5  this -- the Elizabeth Marsiglia header, this otherwise
6  appears to be an e-mail exchange that -- as it would look
7  like on your systems at Frontier Airlines?
8    A   Yes.
9    Q   Okay.  And at the start of this e-mail
10 exchange, you are reaching out to Mr. Quick after
11 Mr. Thibodeau had informed you that Mr. Quick wanted to be
12 reemployed, correct?
13   A   Correct.
14   Q   Okay.  Is this the first communication that you
15 had with -- with Mr. Quick about his interest in being
16 reemployed by Frontier Airlines?
17   A   I believe so.
18   Q   Okay.  You don't have -- there were no
19 conversations before this that you can recall?
20   A   No.  I think this was my first reach-out to Ed
21 to --
22   Q   Okay.
23   A   -- talk to him.
24   Q   And so here you were asking Mr. Quick to
25 schedule a call or -- with you, correct?

---

112

1    A   Yeah.  Let me know when it would be convenient
2  to discuss.
3    Q   Okay.  Okay.  So then in his very first
4  response to you, on October 1, at 5:14 p.m., Mr. Quick
5  writes, Thank you for reaching out to me.  Any time is
6  fine with me for a phone call, or I can come by the office
7  and meet with you in person.  I informed CP Thibodeau that
8  my military service was over; my intention to return to
9  Frontier.  Yes, I cannot get a first class medical
10 currently, and I am on temporary disability retirement
11 from the Army.  When I left from Frontier, I was a captain
12 in training and being paid at a captain's pay, so we
13 probably need to discuss this issue.  I am open to all
14 options, so a sit-down or phone call to help us to explore
15 our way forward.  I look forward to hearing from you.
16       Mr. Quick wrote that?
17   A   Yes.
18   Q   And you received that e-mail?
19   A   Yes.
20   Q   Okay.  And when you -- when you read this, did
21 you take this to mean that Mr. Quick wanted to retire and
22 go on long-term disability leave?
23   A   At this point, he doesn't mention long-term
24 disability.
25   Q   Okay.  So here he's saying that he wants all

---

113

1  options open.  How did you perceive that request in
2  conjunction with him saying he wants to return to -- his
3  intention to return to Frontier?
4    A   He's just saying, I left Frontier.  I was a
5  captain in training.  We can discuss that issue.  I'm open
6  to all options.  So I take that for what it says.
7    Q   Okay.  And "all options" could include
8  returning to a position working full-time at --
9    A   Yeah.
10   Q   -- Frontier?
11       MR. DABNEY:  Object to form.
12   A   He says he's open to all options.  That's
13 pretty wide open.
14   Q   (By Mr. Romer-Friedman) Okay.  And I'm just
15 asking, you understood "all options" could certainly
16 include being reemployed in an appropriate position at
17 Frontier, correct?
18   A   Yes.  Yes.
19   Q   Okay.  So then you write back, on October 3rd,
20 I have any time between 1:00 p.m. and 5:00 p.m. on Tuesday
21 of next week available.  Will that work for you to come in
22 for an in-person meeting?
23       Correct?
24   A   Correct.
25   Q   Okay.  And then Mr. Quick responds, 1:00 p.m.

---

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

---

**114**

1   works for me, as I have a doctor appointment at 3:30.
2          Correct?
3       A   Correct.
4       Q   And then -- and then you respond, Okay.  I will
5   meet you at the general office at 1:00 p.m. on Tuesday.
6   Just let Jeannine at the front desk know you're here to
7   see me.
8          Correct?
9       A   Yes.
10      Q   Okay.  Did you have -- and then he writes, Will
11  do.  See you that.
12         Right?
13      A   Right.
14      Q   Okay.  So did you have that meeting the next
15  Tuesday?
16      A   I think it was probably still that -- that
17  date.  But, yes, we had the in-person meeting.
18      Q   And the next week, you had a meeting, right?
19      A   I can't remember the exact date, but I believe
20  so.
21      Q   Okay.  Tell me about that meeting.  What did
22  you guys discuss, you and Mr. Quick?
23      A   Sure.
24         Ed came in and explained, as his e-mail
25  indicated, that he wanted to return from military leave

---

**115**

1   and indicated that -- I remember him talking about the
2   rate of pay and indicating that he should be at a
3   captain's rate of pay.
4          I also remember, you know, him telling me that
5   typically the return should be within two weeks, but he
6   was willing to provide more time, based on his
7   circumstances and the fact that he also wanted to explore,
8   as a first option, long-term disability.  He told me that
9   he wanted my assistance in moving forward on that -- on
10  that process.
11      Q   Okay.  Did he mention any positions that he was
12  interested in being reemployed to besides first officer or
13  captain?
14      A   I don't think in that meeting that he talked
15  about other positions.  I believe, you know, the focus was
16  the long-term disability option.  He made it clear that
17  that was what he intended to pursue.  And the captain's
18  rate of pay, he wanted to make sure that I understood it
19  was his position that was what he believed to be
20  appropriate in his case.
21      Q   Why would he -- why would he care about
22  captain's rate of pay if he just wanted to retire on
23  long-term disability?
24      A   My understanding was that it had to do with the
25  level of benefits he would receive under the long-term

---

**116**

1   disability program.
2       Q   Okay.  Are -- are you familiar with the
3   long-term disability program?
4       A   That we have it and that our pilots use it when
5   they can't hold a medical or otherwise qualify for the
6   program.
7       Q   Did you know at the time that Mr. Quick
8   wouldn't have been eligible for long-term disability?
9       A   No, I did not.
10      Q   When did you learn that?  I should say, when
11  did you learn that he wouldn't qualify because he had a
12  war-related injury?
13      A   I don't know that I -- I didn't know that
14  through the process of dialoguing with Ed.  I think I may
15  have only become aware of that after the lawsuit was
16  filed.
17      Q   But you agree now that if he had applied for
18  long-term disability at that time when he was talking with
19  you, he wouldn't have qualified, right?
20         MR. DABNEY:  Object to form.  Calls for a legal
21  conclusion.
22      Q   (By Mr. Romer-Friedman)  You can answer.
23      A   Through the course of this lawsuit and
24  preparation, I have become aware that at some point in
25  time he learned that he -- I -- I presume that he learned

---

**117**

1   that he was not eligible under -- under the program.
2       Q   Okay.  And you're -- you're not disputing his
3   view that -- that he would not have been eligible, right?
4   That there is a war clause in long-term disability --
5       A   I'm just telling you what I did and didn't know
6   through the process.  I --
7       Q   I'm saying --
8       A   -- wasn't aware that he would not have been
9   qualified.
10      Q   Okay.  But today, you -- you now understand
11  that he wouldn't have qualified for long-term disability
12  because of the war clause?
13         MR. DABNEY:  Same objection.
14      A   I don't know the reasons or the war clause, but
15  I -- I become aware that he was not eligible.
16      Q   (By Mr. Romer-Friedman)  You don't know how you
17  became aware that he -- that he was not eligible for the
18  long-term disability?
19         MR. DABNEY:  If anything in your conversations
20  with counsel is called for in the answer to this question,
21  then you are not to answer that.
22      A   I can't answer that question.
23      Q   (By Mr. Romer-Friedman)  You can't answer that
24  because it would invade the attorney-client privilege?
25      A   Yes.

---

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

118

1    Q   Okay.  Would -- did Mr. Quick interact with
2  other people to explore the option of long-term disability
3  leave besides you?
4    A   He would have talked to our benefits
5  department.
6    Q   He did?
7    A   I remember him coming in the office, talking to
8  them about various things.  I presume it included
9  long-term disability.  We were trying to facilitate his
10 ability to apply and get that process going, as he
11 indicated he wanted to in our initial meeting.
12   Q   Did any -- did any of those individuals in the
13 benefits department investigate whether he would be
14 basically eligible for the program?
15   A   I don't know.  I think they typically have the
16 -- the application forms, et cetera, available online; the
17 employee completes that; it goes to the insurance company.
18   Q   Would you expect the benefits professionals in
19 your benefits department to -- to know that someone
20 wouldn't qualify for the program, like in the case of a
21 war-related injury?
22   A   I can't say or not.  I don't know if they do
23 that evaluation.
24   Q   If you had known at the time, back in
25 September -- October of 2014, that Mr. Quick would not be

119

1  eligible for long-term disability leave, would you have
2  still encouraged him to have sought that as an -- as an
3  option or even a primary option?
4    MR. DABNEY:  Objection.  Assumes facts.
5    Q   (By Mr. Romer-Friedman)  You can answer.
6    A   The fact is I didn't know that he wouldn't be
7  eligible.  He indicated that was his primary choice or
8  objective.  I was trying to help facilitate that process
9  by putting him in touch with the benefits department and
10 making sure he knew where to find the application.
11   I thought it would be left to the insurance
12 company to make the determination whether he was eligible
13 or not.
14   Q   Okay.  I guess I'm asking you -- maybe this is
15 a more general question, theoretical.  If you knew that
16 a -- an employee would not qualify for a benefit like
17 long-term disability, would you ever encourage them to
18 apply for it in lieu of trying to have a regular job at
19 Frontier Airlines?
20   MR. DABNEY:  Object to form.
21   A   It is hypothetical, but I certainly wouldn't --
22 I wouldn't want to discourage an employee from applying
23 and, you know, vetting that out or making sure that they
24 were or weren't eligible.  If I had an opinion that they
25 weren't eligible, we certainly would be spending our time

120

1  on other options.
2    Q   Okay.  So if this happened again and next week
3  a service member comes back and has an injury and says,
4  I'd like to talk about the options of you, know,
5  reemployment and any particular possible position,
6  long-term disability, other options, and that was a
7  war-related injury, you would tell that person, Let's not
8  focus on long-term disability, right?
9    MR. DABNEY:  Object to form.
10   Q   (By Mr. Romer-Friedman)  Knowing what you know
11 now?
12   MR. DABNEY:  Same objection.
13   A   I might inform them of my knowledge based on
14 prior experience.  I wouldn't want to -- I wouldn't want
15 for them to rely on that to determine whether they wanted
16 to pursue that avenue or not.  I would leave that to the
17 experts and the individual to determine if -- if they
18 wanted to pursue it.
19   Q   (By Mr. Romer-Friedman)  Okay.  I assume part
20 of your role is it's not just to -- I assume part of your
21 role is to try help workers get the benefits that they
22 would be entitled to, right?
23   A   Absolutely.  And I -- what I'm trying to say
24 and I think I've already said is, I wouldn't want to
25 discourage an employee from exploring all of the avenues

121

1  that were available to them or benefits that were
2  available to them.
3    Q   Okay.  I mean, knowing what you know now about
4  Mr. Quick's ineligibility for long-term disability, if you
5  could do it again, would you instead work with him more on
6  the other option of reemployment from the start?
7    MR. DABNEY:  Same objection.
8    A   I think I answered the question.
9    Q   (By Mr. Romer-Friedman)  You can answer.
10   A   I -- I would let them know what information I
11 had or experiences I had, but I would not want to
12 discourage them or block them from exploring benefits or
13 other options.
14   Q   Okay.
15   A   And in light of wanting to help people, I
16 wouldn't want to have that cause a problem where they --
17 they, maybe in their -- based on their circumstances,
18 would -- would be eligible.
19   Q   Right.  Okay.
20   Like, for example, if someone was entitled --
21 not entitled to FMLA leave and, you know, they asked you
22 whether they should go out on FMLA leave now or whether
23 they should wait a month until they can qualify for it,
24 you'd probably tell them, you know, Don't go on leave.
25 You know, I'd encourage you to, if you can, wait until you

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

122

1    can have your job protected, right?
2         Or you'd -- well, strike that.  That's fine?
3         (Deposition Exhibit 15 was marked.)
4    Q   (By Mr. Romer-Friedman)  I'm going to hand you
5    what will be Exhibit 15, these -- from Mr. -- Mr. Dabney
6    represented that these were your notes at Mr. Quick's
7    deposition.  And perhaps you can confirm whether this is
8    your handwriting, which is better than mine.
9    A   Yes, this is my handwriting.
10   Q   Okay.  You took these notes on October 7, 2014,
11   when you met with Mr. Quick, correct?
12   A   Correct.
13   Q   Okay.  The first thing you say here in your
14   notes is temporary disability, correct?
15   A   That's what Ed told me.
16   Q   Okay.  So does that suggest that he told --
17   does that mean he told you that he had a temporary
18   disability?
19   A   Based on what I wrote, that's what it appears
20   as though he told me, yes.
21   Q   Okay.  So is it fair to assume at the time, you
22   would have believed it was not necessarily a permanent
23   disability that he had?
24   A   That that was the status with the military, was
25   my understanding.

123

1    Q   Okay.  And you wrote, Retired risk.  Could
2    change.  Right?
3    A   I did.
4    Q   What does that mean?
5    A   That he was on -- I -- I presume that he was on
6    a retired list with the military, and he was telling me
7    that that could change.
8    Q   All right.  So if -- in other words, if his
9    disability was only temporary and -- and didn't continue,
10   his military retirement can change, right?
11        Is that what you were --
12        MR. DABNEY:  Object to form.
13   Q   (By Mr. Romer-Friedman)  -- commemorating?
14   A   Retired list?  That was that he was on a
15   retired list and that that could change.  I'm not sure I
16   fully understood exactly at the time what that may have
17   meant.
18   Q   Okay.  What's the difference between a
19   temporary disability and a permanent disability in the
20   context that you know of as an HR professional?
21        MR. DABNEY:  Object to the form.
22   A   I wouldn't -- I wouldn't presume to know in the
23   military world what they -- maybe their classifications
24   are for temporary disability.  I don't know if they have
25   another classification for permanent disability.

124

1    Q   (By Mr. Romer-Friedman)  Well, in the general
2    sense -- I mean, it seems like in the ADA context, right,
3    or the -- the standard employment context, people -- even
4    the medical context, people refer to some disability as
5    temporary, some as permanent, right?
6         Like, a sprained ankle might be a temporary
7    one, whereas, you know, breaking your vertebrae in your
8    back is a permanent one, right?
9    A   That's fair.
10   Q   Okay.  So it's fair to say temporary disability
11   is something that could be recovered from or overcome in
12   the -- you know, at some point in the future, right?
13   A   That -- that could be the case, yes.
14   Q   Okay.  And at the time -- in going back to the
15   conversation, I think you kind of laid out what you all
16   talked about -- was one of the things that -- one of the
17   options that you talked about reemployment, with Mr. Quick
18   on October 7th?
19   A   I don't believe in this meeting that that was
20   talked about as -- except that, you know, he had notified
21   us that he wanted to return from leave and be reemployed.
22        This meeting, you know, had a lot to do with Ed
23   telling me what his status was with the military, that he
24   couldn't hold a first or second class medical, and that
25   his first option would be to explore the short-term and

125

1    long-term disability program.
2    Q   Okay.  You also wrote here that -- two weeks'
3    window to reinstate.  Realize he may need more time.
4    "Reinstate," doesn't that suggest that he wants to
5    actually go back to a job?
6    A   That he wants to reinstate with the company and
7    pursue long-term disability, was my understanding.
8    Q   Okay.
9    A   And he said, you know, Out of sight, out of
10   mind.  I want to pursue long-term disability.  He talked
11   to me about the 401(k) and DC plan.
12        Again, as I said, he talked about the pay rate
13   and it was his position that he was owed the captain's
14   rate of pay and -- and some of the reasons why.  And that
15   was --
16   Q   Okay.
17   A   -- the emphasis of the meeting and
18   conversation.
19   Q   So I think earlier when we were talking about
20   this October 7th meeting you said at some later point in
21   your conversations with Mr. Quick, he did -- he did, in
22   your recollection, start to talk about other positions,
23   right?
24   A   After this and sometime early in the process,
25   he made mention in passing that -- you know, he mentioned

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

126

1 a couple of the other positions in the flight ops
2 department but was focused on the long-term disability.
3 That's what I was still trying to help him with, at his
4 direction.
5        But it was in passing, and my understanding
6 was, you know, kind of a means to and end, that he wanted
7 to be returned to some kind of status, so that he felt
8 that that would enable him to process his long-term
9 disability application and receive benefits.
10    Q   Okay.  We'll -- we'll -- we'll -- we'll talk
11 about the -- the back and forth.  But did you ever
12 investigate those other flight ops positions, in terms of
13 whether he might be qualified to do them?
14    A   Not at that time because I was still trying to
15 help him with the long-term disability process.
16    Q   When did you start investigating the flight ops
17 positions that he had expressed interest in pursuing?
18    A   It wasn't --
19        MR. DABNEY:  Object to form.
20    Q   (By Mr. Romer-Friedman) You can answer.
21    A   It wasn't until later in dialogue with Ed that
22 he seemed to change somewhat his emphasis from the
23 long-term disability avenue to, you know, other positions.
24 And that's when, I think as you mentioned before, at some
25 point we asked him to look at other jobs.  And so we were

127

1 generally starting to think then about evaluating other
2 positions for him.
3    Q   Was that in the spring of 2015?  It was in
4 2015, right?
5    A   I can't remember when we -- when I asked him
6 to --
7    Q   Okay.
8    A   -- to do that.
9    Q   So the -- the first time that you would have
10 even -- the first time that you started to even look at
11 those flight ops positions that he expressed interest in
12 was around the time you sent him a list of job positions
13 for him to look at?  Is that what you're -- that's what
14 you're saying?
15    A   Right.  My -- my engagement with Ed through
16 this process, initially at his direction, had to do with
17 his applying for long-term disability, so that's where our
18 efforts were -- were focused.
19    Q   I'm just trying to get a sense of the timeline.
20 You said -- and I just want to clarify.  It seems like you
21 -- you were saying that around the time when you sent him
22 the -- the job openings at Frontier, that around that time
23 is when you might have first started looking at these
24 flight ops positions that he previously expressed interest
25 in.  Is that -- is that right, in terms of the timeline?

128

1    A   Right.  There might have been some internal,
2 you know, discussion about positions.  But, yes,
3 eventually we -- the correspondence, based on Ed's change
4 of tone or -- or, you know, that he was interested in
5 other positions, then we started to take those steps with
6 him.
7    Q   Okay.  I think Mr. Thibodeau testified earlier
8 today that he never spoke with you or anyone else in HR
9 about what flight ops positions Mr. Quick could be
10 qualified or trained to do after he sent the, kind of,
11 reemployment issue over to you in the end of September
12 2014.  Is that accurate?
13        You never spoke to him about particular
14 positions?
15    A   No.  I think, as I described earlier, we do,
16 you know, kind of our own internal, okay, what makes
17 sense, where can we start with a person to begin to have
18 that dialogue and obtain information about what their
19 disability is, what they can do.
20        So Ed had mentioned those things, some -- those
21 positions somewhere along in the process.  But my attempt
22 to engage with him about other positions was asking him to
23 look at other positions and -- and look on the website.
24    Q   Okay.  But what I asked you is if Mr. Thibodeau
25 is correct, that you never spoke with him or communicated

129

1 with him about flight ops pilot positions or flight ops
2 positions that Mr. Quick might be qualified or trained to
3 do, right?
4    A   I also recall that -- I don't recall that we
5 had any -- JP and I had any discussions about that --
6    Q   Okay.
7    A   -- prior to that.
8    Q   Did you have any discussions or communications
9 with anyone else in Chief Pilot Thibodeau's chain of
10 command?
11    A   Not that I recall.
12    Q   Okay.  All right.  Let me put . . .
13        (Deposition Exhibit 16 was marked.)
14    Q   (By Mr. Romer-Friedman)  This will be Exhibit
15 Number 16.  There you go.  Do you recognize Exhibit 16?
16    A   It looks like an e-mail from myself to Ed on
17 October 14th, 2014.
18    Q   Okay.  And you write, Thanks for meeting with
19 me last week.  That would be October 7th, the October 7th
20 meeting?
21    A   Right.
22    Q   Pursuant to our discussion, we are further
23 researching your questions and hope to respond by the end
24 of the week.  It's my understanding that you will be
25 sending me a copy of the orders that we discussed.  Let me

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

---

130

1  know if there's anything else we need to address at this
2  time.
3       Correct?
4       A  Correct.
5       Q  Okay.  So at this point, did you feel like
6  Mr. Quick was working with you to explore his options?
7       A  Yes.
8       Q  Okay.  Okay.
9       A  It was pretty early in the process, and as I --
10  as I said, he -- we talked about in the meeting what we
11  talked about, and, you know, this was a short follow-up.
12       Q  And was exploring -- researching your
13  questions, was -- was part of that ascertaining whether he
14  might be eligible for long-term disability or what his
15  options might have been under long-term disability?
16       A  I wouldn't phrase it that way.  It had to do
17  with getting him the appropriate information so that he
18  could apply.  I think I may have told him in the meeting
19  that that information was online and that, you know, he
20  should -- he should get the application and apply for
21  long-term disability if that's what he wanted to do.
22       I think he had other questions.  Obviously, the
23  question of his pay rate was at issue, so that was
24  something we were looking into.
25       Q  Okay.  All right.

---

131

1       THE WITNESS:  And, Peter, at your
2  convenience -- I don't want to mess up your flow, so
3  finish what you want to do but --
4       MR. ROMER-FRIEDMAN:  Can we do one document and
5  take a quick break?
6       THE WITNESS:  Yep.
7       MR. ROMER-FRIEDMAN:  Okay.  Great.  I could
8  probably use one myself.
9       (Deposition Exhibit 17 was marked.)
10       Q  (By Mr. Romer-Friedman)  This will be
11  Exhibit 17, and I will hand to you and ask if you
12  recognize this document.
13       A  Sure.
14       Yes.  It's an e-mail from Ed to myself on
15  October 15th of 2014.
16       Q  Okay.  So this is a day after October -- so on
17  October 14th, back on Exhibit 16, you asked him to send
18  you a copy of his orders, right?
19       A  Correct.
20       Q  And then the next day, with -- Mr. Quick
21  responds on October 15th, Here is my previous DD214 and
22  orders showing exempt from the five-year limit.  Please
23  let me know if you have anything more.
24       Correct?
25       A  Correct.

---

132

1       Q  And the attachment to this e-mail is his DD214,
2  correct?
3       A  Yes.
4       Q  And this is the type of information that a
5  service member provides to show the period of service,
6  that it was not dishonorably discharged; is that correct?
7       A  Correct.
8       Q  Okay.  So -- and it also would identify whether
9  the service was exempt from -- from the five-year limit,
10  correct?
11       A  Sorry.  Repeat that.
12       Q  So let me ask you to look at the first page of
13  the DD214, which is Quick 80, Bates number.  This is the
14  second page of Exhibit 17.
15       A  Yes.
16       Q  Under paragraph 18, do you see that?  It says,
17  "Remarks"?
18       A  Yes.
19       Q  And it says, Period is exempt from the
20  five-year cumulative service limit on employment rights
21  under Title 38 USC Section 4312(c)(4)(b).  See attached
22  continuation sheet.
23       A  Right.
24       Q  Okay.  So is it fair to say that this DD214 and
25  all the orders attached to it would be the kind of

---

133

1  information that would alert you and Frontier that his
2  service during the period in which he was on military
3  leave was exempt from the five-year USERRA limit?
4       A  I believe we received the -- the documents from
5  Ed and, with regard to exemptions, reached out to counsel
6  to check on what those exemptions were and if, you know,
7  things were covered.
8       Q  Have you ever done that before with a -- with
9  another service member, to check with counsel as to
10  whether the service time is exempt even when the DD214
11  says that it's exempt from the five-year limit?
12       A  I don't think we've had that come up before.
13       Q  Had what come up before?
14       A  Exemptions.  As I said, most of our returns
15  from military leave are pretty straightforward.
16       Q  So Frontier --
17       A  And I -- I don't know that we have had to look
18  into exemptions before.
19       Q  Okay.
20       A  I'm not sure.
21       Q  So -- but you're -- you're confident this is
22  the only time that Frontier Airlines reached out to
23  counsel to -- in your tenure, to check into the -- to
24  whether a service member satisfied the five-year limit?
25       MR. DABNEY:  Objection.  It misstates what she

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

---

134

1   just said.  If you're putting words in her mouth, we're
2   going to be here a long time because I have a lot of
3   objections to your style.
4       MR. ROMER-FRIEDMAN:  Okay.
5       Q  (By Mr. Romer-Friedman)  Okay.  I will --
6   sorry.  This will be the last one; then we will take a
7   break.  This is related to the prior one.  This will be
8   Exhibit 18.
9           (Deposition Exhibit 18 was marked.)
10      Q  (By Mr. Romer-Friedman)  And it appears that
11  this is an e-mail sent shortly after the -- the prior
12  e-mail we just looked at on October 15, from Mr. Quick to
13  you on October 15th, 2014, at 3:55 p.m.; is that correct?
14      A  Correct.
15      Q  Okay.  So this is about an hour after his prior
16  e-mail.  So here he's sending you his previous
17  DD214 and orders showing exempt from the five-year limit;
18  is that correct?
19      A  Right.  I think there were multiple exchanges
20  between Ed and myself with regard to forms that covered
21  the period and discussion about exemption, et cetera.
22      Q  Okay.  So it's fair to say you were -- when he
23  was -- you were asked -- you -- after he sent this initial
24  e-mail, you asked him for further information and he gave
25  it to you?  Or he's just sending additional --

---

135

1       A  I don't think I probably asked him for further
2   information within the hour --
3       Q  Okay.  In any event --
4       A  -- or a half an hour.
5       Q  -- he's providing you with an additional DD214
6   to cover more service period, correct?
7       A  Yeah.  I think I just took it as he was sending
8   me stuff as he could find it, to --
9       Q  Okay.
10      A  -- to provide a full record.
11      Q  Okay.  And on the second page here, again, it
12  says that this period is exempt from the five-year
13  cumulative service limit on reemployment rights, correct?
14      A  I think it's the same as the other, right?
15      Q  Okay.  And I meant to ask you --
16      A  Yes.
17      Q  -- why -- did you have any reason to question
18  the Department of Defense telling Frontier Airlines that
19  his service -- military service was exempt from the
20  five-year limit?
21      MR. DABNEY:  Object to form.
22      A  I don't know that I questioned it or not but
23  wanted to obtain records for the full period and make sure
24  that things were reviewed.
25      Q  (By Mr. Romer-Friedman)  Okay.  And here in the

---

136

1   e-mail he says, As I said during our meeting, I am open to
2   more time if needed by you to research our options,
3   plural, correct?
4       A  Correct.
5       Q  Okay.  And at this point, did -- did you still
6   think that he's only talking about long-term disability,
7   or did you understand options to mean something beyond
8   that, such as reinstatement?
9       A  Based on the whole context and my conversations
10  and e-mail correspondence with Ed, it was always my
11  understanding that that was his first choice.  He told me
12  that.
13          He would occasionally say "other options" or in
14  passing say "other positions," but from my perspective, he
15  made it quite clear that that was his first choice of
16  pursuit.
17      Q  Okay.  But at this point you're --
18      A  The e-mail says what it says.
19      Q  Okay.  But at this point, when -- when you are
20  receiving this e-mail and you are interacting with him in
21  mid-October, you -- you understand he's considering
22  long-term disability, right?
23      A  Right.
24      Q  But you're not assuming that he's closed the
25  door on reemployment or that he wants you to --

---

137

1       A  I didn't think he --
2       Q  -- disregard --
3       A  -- had closed the door on that.  I -- I just
4   understood that his -- his primary choice was to pursue
5   long-term disability.
6       Q  Okay.
7       MR. ROMER-FRIEDMAN:  All right.  Let's take a
8   break.
9       THE VIDEOGRAPHER:  Going off the record at
10  5:47.  This is the end of Media Unit 2.
11          (A recess was taken from 5:47 p.m. until
12  6:09 p.m.)
13      THE VIDEOGRAPHER:  Back on the record at 6:09
14  with Media Unit Number 3 in the deposition of Michelle
15  Zeier.
16      MR. ROMER-FRIEDMAN:  Zeier.
17      THE VIDEOGRAPHER:  Zeier.
18      MR. ROMER-FRIEDMAN:  Zeier.  I got it.
19      THE WITNESS:  Correct.
20      MR. ROMER-FRIEDMAN:  Right?
21      THE WITNESS:  Yes.
22      MR. ROMER-FRIEDMAN:  Good.  Never forget it.
23      Q  (By Mr. Romer-Friedman)  Okay.  Ms. Zeier,
24  we're still on the record.  Same ground rules apply,
25  correct?

---

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

---

138

```
 1      A  Understood.  Yes.
 2      Q  Okay.  Testifying under oath?
 3      A  Yes.
 4      Q  Great.  Okay.
 5          I think I missed the last two of the five
 6   requirements.  Just wanted to make sure that we -- we
 7   agree that by contacting Mr. Thibodeau on September 23rd
 8   to seek reemployment, Mr. Quick sought reemployment within
 9   90 days after his service ended.  Is that correct?
10      A  Yes, that's my understanding.
11      Q  Okay.  You don't recall when you determined
12   that he had met the 90-day --
13      A  No.
14      Q  -- requirement?
15          Okay.  And you agree, based on his DD214s, that
16   his service was not dishonorable; is that correct?
17      A  Correct.
18      Q  Okay.  So quick question:  When we talked about
19   the -- the -- long-term disability leave option
20   earlier and Mr. Quick talking to the benefits department
21   about that --
22      A  Yes.
23      Q  -- were those your supervised employees?  You
24   were their supervisor?
25      A  I was not.  Anthony Sabia was their manager,
```

---

139

```
 1   director.
 2      Q  Okay.  Do you know if -- if at some point he
 3   knew whether Mr. Quick would qualify for -- for the LT --
 4   for the long-term disability benefits?
 5      A  I don't know.
 6      Q  Okay.  You never talked with him about that?
 7      A  No.
 8      Q  Would you have expected him or someone else in
 9   employee benefits to have picked up on than point, about
10   the war clause?
11      A  I think we talked about that earlier, and I
12   don't know whether the benefits folks would evaluate for
13   that.  If it would be the insurance company after the
14   employee applied.
15      Q  Okay.  All right.  And Mr. -- going back to
16   your -- your initial discussion with Mr. Quick in early
17   October and your October 7th meeting, okay --
18      A  Yes.
19      Q  -- he identified what you wrote in your notes
20   as a tem -- that he had a temporary disability.  Right?
21      A  Correct.
22      Q  That prevented him from getting his first --
23   first class or second class medical clearance in the FAA;
24   is that right?
25      A  Correct.
```

---

140

```
 1      Q  Okay.  So at that point, did you specifically
 2   ask him what his disability was?
 3      A  No.  We -- we talked about his application for
 4   long-term disability, the other things that I mentioned
 5   earlier.  I took it for what he told me at the time, which
 6   was his status with the military, and that was it.
 7      Q  Okay.  Before the litigation ensued, before
 8   Mr. Quick filed his lawsuit, did you ever ask him
 9   specifically what his disability was?
10      A  We were -- I was focused on assisting him with
11   the long-term disability process, and through that, as
12   well as the correspondence about applying for a leave of
13   absence, I thought those avenues would start to provide
14   some information as to what his disabilities were, what
15   his restrictions were, but weren't focused on -- on that
16   at that time, as I mentioned before.  It was more about
17   helping him with what he said he wanted to have done.
18          (Deposition Exhibit 19 was marked.)
19      Q  (By Mr. Romer-Friedman)  Okay.  I'm going to
20   hand you what will be Exhibit 19, which I will represent
21   is a copy of the complaint and jury demand of Edward Quick
22   versus Frontier Airlines and Michelle Zeier.  And on the
23   last page, it is dated April 23rd, 2015.
24          Do you see that on Page 15?
25      A  Yes.
```

---

141

```
 1      Q  And you agree that that's the date that
 2   Mr. Quick filed his lawsuit?
 3      A  Dated April -- you said April 13th?
 4      Q  April 23rd, 2015.  See that on the last page,
 5   kind of up before the Law Office of Thomas Jarrard?  You
 6   see it says dated April 13 --
 7      A  Yeah, April 13 --
 8      Q  Okay.  I'm sorry, April 13th.  You're right.
 9   I'm sorry about that.
10      A  Yes.
11      Q  Okay.  So prior to this date, April 13th, 2015,
12   had you ever asked Mr. Quick specifically what his
13   disability -- his temporary disability was that prevented
14   him from getting a clearance?
15      A  As I said, through the course of his
16   application or -- or my assumption that he was going to
17   apply for long-term disability and medical leave of
18   absence, that that was the -- the avenue we expected to
19   obtain information.
20      Q  It sounds like the answer's no, you never
21   specifically asked him what his temporary disability was
22   prior to the time he file this lawsuit, right?
23          MR. DABNEY:  Object to form.
24      Q  (By Mr. Romer-Friedman)  I mean -- I mean, it's
25   a yes-or-no question --
```

---

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

142

1    A   Correct.
2    Q   -- right?
3    A   Correct.
4    Q   Correct, that you never asked him what his
5  disability was prior to the time that he filed the
6  lawsuit?
7    A   I did not.
8    Q   Okay.  Did anyone else at Frontier Airlines ask
9  him that question specifically?
10   A   I don't know.  I'm not aware of anybody else
11 who asked him that.
12   Q   Who else would have asked him?  You were the
13 point person, right, in his reemployment --
14   A   Correct.
15   Q   -- efforts?
16   A   Yes.
17   Q   Okay.  So -- and no one told you that they had
18 asked him for that information?
19   A   Correct.
20   Q   Okay.  So as far as you're concerned, it --
21 most of it is that no one asked him specifically what his
22 disability was?
23   A   Correct.
24   Q   Okay.  And Mr. Thibodeau testified earlier he
25 never asked Mr. Quick either what his disability was,

143

1  correct?
2    A   Correct.
3    Q   And, likewise, did -- it seems that the answer,
4  then, is, as well to the next question, that you -- you
5  never asked him to do a -- you know, for you -- to take a
6  physical exam or medical exam before he filed this
7  lawsuit; is that right?
8    A   I never asked him to take a physical exam, no.
9    Q   Or did you ever ask him to provide you medical
10 records about this temporary disability?
11   A   Outside of the medical leave application, no.
12   Q   Okay.  Did anyone else ask him to take a
13 physical or provide medical records with respect to his
14 reemployment?
15   A   I don't know.  I'm not aware that anybody else
16 did.
17   Q   Okay.  Would anyone have been more appropriate
18 than you to ask him for that information in the context of
19 him seeking reemployment?
20   A   No.
21   Q   Okay.  So all those forms that we talked about
22 earlier that you use for the ADA interactive process or to
23 identify disability, you didn't use any of those, you
24 didn't give those to Mr. Quick before he filed this
25 lawsuit in April 2015?

144

1    A   No.  As I have testified before, I had
2  conversations with Ed about the long-term disability
3  application and, congruently, the -- asked him to reach
4  out to the leave of absence department to complete leave
5  of absence forms which would have information pertaining
6  to his medical status.
7    Q   Okay.  But they never -- as you said before,
8  you're not aware that they asked him specifically what his
9  temporary disability was, right?
10   A   Correct.
11   Q   Okay.  Okay.  I'm going to hand you what will
12 be exhibit -- this will be Exhibit 20 that I'm going to
13 hand to you and ask you if you recognize this document.
14 It's two pages, Quick 92 to 93.
15       (Deposition Exhibit 20 was marked.)
16   A   Yes, an e-mail from Ed to myself on
17 November 12th, 2014.
18   Q   (By Mr. Romer-Friedman)  Okay.  And on October
19 30th, at the bottom here, Ed writes to you, Michelle --
20 that -- that's you?
21   A   Yes.
22   Q   -- here is the orders you requested.  Had to
23 run over to the Office Depot to scan it in for you.  I
24 will be sending you additional military orders.  Is that
25 right?

145

1    A   Yeah.  I -- that's what I take it as.
2    Q   And then you say, Thank you, Ed.  I will be in
3  touch with the next step -- for that next step.  Is that
4  correct?
5    A   Yes.
6    Q   Okay.  And then again later, on -- well, 12
7  days later -- 13 days later, on November 12th, you write,
8  Hi, Ed, you will be getting a phone call from Cassie
9  Micklich, HR specialist.  I wanted to begin your paperwork
10 processing for return to active status.  I will follow up
11 with you about the other return details.
12       You wrote that, right?
13   A   Yes.
14   Q   So why -- at this point, where you're talking
15 about processing his paperwork to return to active status,
16 is that when you and Mr. Quick start talking about him,
17 more seriously, in your view, wanting to be reemployed?
18       MR. DABNEY:  Object to form.
19   A   I can't remember when it was that we sent
20 him -- when I sent him the e-mail about looking at other
21 jobs, but I think there's some e-mail correspondence about
22 that . . .
23   Q   (By Mr. Romer-Friedman)  But is it fair to say
24 here that talking to him about "active status" would be
25 about going back to work?

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

146

1      A   Yeah.  Cassie is our compliance officer, so
2   that had to do with getting his clearances completed.
3      Q   Okay.  If he was just going to go to long-term
4   disability leave, he wouldn't be proceeding to get the
5   clearances and get back to active status, right?
6          MR. DABNEY:  Object to form.
7      A   We were still in the process of reemploying him
8   and processing him congruently with providing him
9   information so that he could apply for long-term
10   disability.
11      Q   (By Mr. Romer-Friedman)  Okay.  So at this
12   point, is it fair to say there's -- you're still operating
13   on a potential two track, one of getting -- returning him
14   to active status as a -- as -- in some position and
15   reemployment, and also considering long-term disability?
16          MR. DABNEY:  Object to form.
17      A   As we discussed before, Ed was insistent that
18   he needed to be, you know, returned to some status in
19   order to apply for long-term disability.  So it had to do
20   with -- with that as well.
21      Q   (By Mr. Romer-Friedman)  Okay.  So it was both
22   things, reemployment and LTD?
23      A   It was primarily --
24          MR. DABNEY:  Object to form.
25      A   It was primarily LTD, but all of the

147

1   possibilities were -- were still possibilities.
2      Q   (By Mr. Romer-Friedman)  Okay.  All options
3   were still possible at that time?
4      A   Right.
5      Q   Okay.  And that was as of November 12th, 2014?
6      A   Correct.
7      Q   Almost two months after Mr. Quick first
8   contacted JP Thibodeau about returning, correct?  About
9   seven weeks after?
10      A   You just want to know about the timeline?
11   Yeah.
12      Q   Okay.  All right.  And so Mr. Quick responds
13   that he looks forward to a call from Cassie next week and
14   a follow-up with you?
15      A   Correct.
16      Q   Okay.  Did you have a conversation with him
17   in -- following up on this November 12th e-mail?
18      A   I may have.
19      Q   Okay.  Do you recall what that conversation
20   involved, what was discussed?
21      A   During this time and based on this e-mail, I
22   think we were discussing when he would attend new-employee
23   orientation, et cetera.
24      Q   Okay.  And as you said before, he would have to
25   do that new orien -- new-employee orientation as a -- as a

148

1   prerequisite to actually working?
2      A   Not necessarily as a prerequisite, but it was
3   part of our process, as I testified to earlier, to provide
4   a refresh on information to the employee, for us to get --
5   you know, make sure we have good contact information, that
6   kind of thing.
7      Q   Okay.  And at this point, Mr. Quick, through
8   November 12th, hasn't been paid, right, for any -- at all?
9      A   Right.  The first pay he received was for his
10   attendance at the new-employee orientation.
11      Q   Okay.  And his benefits haven't been reinstated
12   at this point, in mid-November 2014; is that right?
13      A   I can't be sure.
14      Q   Do you recall when his benefits were
15   reinstated?
16      A   Medical, et cetera?
17      Q   Medical, vision, dental.
18      A   I think it would have been after that.
19      Q   Subsequent to November -- mid-November?
20      A   I believe so.
21      Q   Okay.  But you just don't recall when?
22      A   I don't know exactly.
23      Q   Okay.  We'll get to that.
24          (Deposition Exhibit 21 was marked.)
25      Q   (By Mr. Romer-Friedman)  Here is Exhibit 21.

149

1   This appears to be an e-mail on December 10th between --
2   from you and Mr. Quick; is that correct?
3      A   Yes.
4      Q   Okay.  And you write, I understand from Cassie
5   that your reentry drug alcohol test is clear.  Correct?
6      A   Yes.
7      Q   So that means at this point he's -- he's
8   checked that box of alcohol drug test?
9      A   Correct.
10      Q   Okay.  When we last met, you explained that you
11   would like to apply for LTD.  I have attached a claim
12   filing instruction through UNUM, if you'd like to initiate
13   this process as a next step.  Also, you will need to
14   contact Leave of Absence Administrator Brandi Aragon at
15   loa@flyfrontier.com to request a leave of absence.
16          We also talked about your status and
17   corresponding pay rate.  Based on the records, you were a
18   first officer, and your longevity places you at Step 12,
19   89.40 per hour.
20          And you write later, I also want to remind you
21   that the training review board, which was previously set
22   for June 7, 2007, will need to be rescheduled.  Please let
23   me know if you have any questions.
24          So why would you be discussing the training
25   review board at this point if you thought he was really

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

---

150

1  just going to take long-term disability and not be
2  reemployed?
3        A   Through our correspondence, and even from the
4  very beginning, Ed indicated that he believed he was -- or
5  should be placed at a captain's rate of pay.  So him
6  continuing to press that rate of pay as part of my -- is
7  part of my explanation of telling him that he's at
8  Step 12, 89.40 an hour, and a first officer, and also
9  reminding him of where he was in the process, which was
10  the TRB for upgrade to captain.
11       Q   Okay.  But at this point, right, the TRB was --
12  so what you're saying, then, is because he wanted to be
13  paid based on a captain rate, you in response were
14  emphasizing that he would still face this training review
15  board?
16       A   That he was not -- he had not successfully
17  upgraded to captain --
18       Q   Okay.
19       A   -- and that's why I was giving him the first
20  officer Step 12 rate of pay.
21       Q   Wasn't the training review board about whether
22  he was qualified to be a first officer, not about whether
23  he was -- should be a captain?
24           MR. DABNEY:  Object to form.  Foundation.
25       A   Will you ask the question again?

---

151

1        Q   (By Mr. Romer-Friedman)  When they convened the
2  training review board, or trying to, in June of 2007,
3  wasn't that a question about Mr. Quick's overall
4  qualifications at the time to be even a first officer, not
5  about whether he should be a captain or a first officer?
6           MR. DABNEY:  Same objection.
7        Q   (By Mr. Romer-Friedman)  You can answer.
8        A   It was in the process of him training to
9  upgrade to captain, which had to do, in these
10  correspondence, with his position that he should be paid
11  at captain's rate of pay --
12       Q   Okay.
13       A   -- in correlation with his first stated choice
14  of pursuing long-term disability.
15       Q   Okay.  Now, is this the first time that you
16  sent Mr. Quick a copy of the UNUM long -- disability --
17  long-term disability application or --
18       A   It -- it may have been, but I believe we had
19  prior correspondence through some avenue that he could be
20  in touch with our benefits folks, who could let him know
21  how to apply and that the information was also on UltiPro,
22  our employee HR website.
23       Q   Okay.  Does this say anything about the war
24  clause or whether a person would be exempt based on an
25  injury that was related to military service?

---

152

1        A   I don't know without reading through it, but it
2  was my understanding this -- these are the instructions
3  that are on our site for filing a claim.
4        Q   Okay.  Did -- did he ever ask you for -- did
5  Mr. Quick ever ask you for a full copy of an actual plan
6  as opposed to, like, this two-page summary?
7        A   At some point in the process he made it clear
8  that that was the document that he was -- that he wanted
9  in addition to this.
10       Q   Okay.  In retrospect now, doesn't it seem -- it
11  seems that it was probably a good thing to have looked at
12  the actual policy, right, because it includes information
13  that these summaries might not?
14           MR. DABNEY:  Object to form.
15       A   I was making effort to try to assist Ed in
16  connecting with the benefits department, filing a claim
17  for long-term disability, period.
18       Q   (By Mr. Romer-Friedman)  Okay.  I'm going to
19  hand you what will be Exhibit 22 and ask you if you
20  recognize this exhibit.
21           (Deposition Exhibit 22 was marked.)
22       A   Okay.
23       Q   (By Mr. Romer-Friedman)  Okay.  So the -- on
24  the second page, I think, is the e-mail that we just
25  looked at, is that correct --

---

153

1        A   Yeah.
2        Q   -- where you were saying that he passed the
3  drug test and the alcohol test and --
4        A   Yes.
5        Q   -- the thing about the training review board?
6  Okay.
7            And then -- let's see.  About six hours -- six
8  and a half hours later, Mr. Quick writes back to you,
9  Thanks for your e-mail.  Please let me know my report date
10  to return to work.  Correct?
11       A   Yes.
12       Q   Okay.  What did you think Mr. Quick meant when
13  he said that he wanted to know his -- his report date to
14  return to work?
15       A   As the further e-mail indicates, I guess I'm a
16  little confused by your response, given your prior meeting.
17  Do you want a meeting or call to discuss what you would
18  have -- or what you would like to do regarding position,
19  LTD, and leave of absence.
20           So in my mind, we were going down one course,
21  and he kind of throws this out.  And so I'm saying, okay,
22  we have -- you know, you're talking about return to work.
23  Do you want to talk about position, long-term disability,
24  leave of absence?  I'm trying to get some clarity.
25       Q   Okay.  So you're -- you're confused at this

---

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

---

154

1  point because you thought his priority was long-term
2  disability rather than reemployment, and now it seems like
3  he's saying pretty clearly on December 10th, no, I -- I'm
4  looking forward to returning to work, right?
5      MR. DABNEY: Object. Misstates the exhibit,
6  based on the date.
7      A  As I stated before, he made it quite clear
8  throughout this process that his priority was long-term
9  disability. Even though he says in this e-mail, Let me
10  know when I -- report date to return to work. Obviously,
11  I'm confused by that. And even thereafter, I recall he
12  continued to ask about or talk to me about long-term
13  disability.
14      Q  (By Mr. Romer-Friedman) Okay. Did you have a
15  conversation after this December 11th e-mail where you
16  asked him if he wanted to do a meeting or a call?
17      A  We may have. I can't recall --
18      Q  Okay.
19      A  -- if he wanted --
20      Q  So in response, on December 12th, at 9:03 a.m.,
21  Mr. Quick writes, Please give me your
22  earliest report date as I eagerly await my return to
23  Frontier. We can continue to discuss my pay rate upon my
24  return. I'm available as early as this Monday the 15th.
25      So did -- and he's responding -- he writes

---

155

1  that, correct?
2      A  Uh-huh.
3      Q  And this is in response to you saying you're a
4  little confused. Does this -- did this make it more clear
5  to you that he was really wanting to return to work?
6      A  I still had questions in my mind about, as he
7  indicated, him wanting to return to some status in order
8  to apply for and receive long-term disability benefits.
9      Q  Okay. All right. Okay. I'm going to hand you
10  what will be Exhibit 23, which I'll ask you if you
11  recognize this document.
12      (Deposition Exhibit 23 was marked.)
13      A  So this e-mail continues from what we just
14  looked at. It's from Ed to me on December 12th.
15      Q  (By Mr. Romer-Friedman) Okay. And then after
16  he sends this e-mail, the one we just looked at, at
17  10:03 a.m. on December 12th, he writes, also on
18  December 12th, Thanks for your call. I am willing to wait
19  if needed for Frontier to give me a start date due to the
20  logistics of my return and the holidays, if needed. The
21  15th was just to let you know I am ready when you are.
22      Did this make it more clear to you that he's --
23  a start date is what he's looking for? Isn't that
24  suggesting he wants a start date for work?
25      MR. DABNEY: Object to form.

---

156

1      A  It was -- it was still my understanding, as I
2  just indicated, and I think we did have a call, that he
3  was interested in returning to a status at Frontier so
4  that he could apply for long-term disability.
5      Q  (By Mr. Romer-Friedman) Okay. And -- but you
6  had a call that day, it seems like, from what he is
7  saying, "thanks for your call"?
8      A  That day or --
9      Q  On December 12th.
10      A  -- December 12th, since the e-mail's on the
11  same day.
12      Q  Okay. And you don't recall -- you said before
13  you don't recall the specifics of that discussion, right?
14      MR. DABNEY: Object to form. Misstates the
15  record. And counsel knows there's notes of that
16  conversation.
17      MR. ROMER-FRIEDMAN: I don't -- I'm not -- not
18  familiar with notes.
19      MR. DABNEY: Well, I'll give you the benefit of
20  the doubt, then.
21      MR. ROMER-FRIEDMAN: Okay.
22      MR. DABNEY: I don't want you to try --
23      MR. ROMER-FRIEDMAN: I'm not trying to set her
24  up.
25      MR. DABNEY: -- try to set her up by saying she

---

157

1  doesn't recall, when there are notes you could ask her
2  about --
3      MR. ROMER-FRIEDMAN: Oh, you know what, I'm
4  sorry. There are. There are notes. I
5  wasn't looking down the paper. Let's look at that.
6      Thanks for your assist.
7      MR. DABNEY: My pleasure. Always happy to
8  clarify the record.
9      MR. ROMER-FRIEDMAN: I expect good counsel to
10  do that, always.
11      Q  (By Mr. Romer-Friedman) All right. And this
12  will be Exhibit 24. And as I think your counsel has just
13  said -- I'm going to ask you if these are your notes from
14  a meeting with Mr. -- from a discussion with Mr. Quick on
15  12/12/14.
16      (Deposition Exhibit 24 was marked.)
17      A  Correct.
18      Q  (By Mr. Romer-Friedman) They are?
19      A  This is my handwriting and --
20      Q  Okay.
21      A  -- yeah, I -- I remember this was --
22      Q  Okay.
23      A  -- this was the phone call.
24      Q  And you write, Doesn't matter whether he has a
25  medical or not. Must bring me back in like position.

---

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

---

158

1    What are you --
2        A  This is what he stated to me.
3        Q  Okay.  And he's talking about bringing him back
4    to a position at Frontier, right?
5        A  Yes.
6        Q  Okay.  Pay issue --
7        A  Came out on master seniority list as captain.
8        Q  Okay.  And then union involvement.  Paycheck
9    says captain.  Training.  TRB is a threat.  Past timely
10   something.
11       So the bottom line here is on -- actually are
12   there two pages here?  Yeah.  All right.
13       LTD application, on the second page, putting
14   cart before the horse.  Do you see that?
15       A  Yes.  That's what he stated to me.
16       Q  Okay.  So is it fair to say here that he's --
17   he's making clear to you that he -- he does want a
18   position back at Frontier Airlines?
19       Now, whether he ultimately gets or applies for
20   LTD is a different question, right?  Is that what he's
21   stating here?
22       A  As I stated before, it was my understanding
23   that he was informing me that he needed to have a status
24   with Frontier in order to apply for long-term disability.
25   Must pass go to collect 200.  So again, that's, in my

---

159

1    mind, a focus on collecting long-term disability benefits.
2        Q  Okay.
3        A  And looks look I kind of stopped taking notes,
4    but intentions are the same from -- assuming so,
5    intentions are the same as before.
6        Q  Okay.  To take a step back, though.  Even if he
7    ultimately ends up applying for long-term disability
8    benefits, he has to come back to work, right, is what he
9    and you are understanding?  He has to get reemployed to
10   some position before he can go off and take LTD, right?
11       A  Right.
12       Q  So even if you understand that one of the goals
13   might be to get back to a reemployment position and then
14   later, even soon thereafter, take long-term disability,
15   he's still saying clearly in this correspondence, I want a
16   start date.  I want my position.  It should be a captain
17   rate.  I want to get back to my job -- to a job, right?
18       A  Not exactly.  He's -- he's saying, must bring
19   me back in like position.  We had previous discussions
20   about his captain rate of pay.  It was focused on the
21   captain rate of pay for the purpose of receiving --
22   maximizing his benefits under long-term disability, and
23   that that's still his primary wish.
24       Q  Okay.  At some point earlier, you said that in
25   these discussions that he had identified these flight ops

---

160

1    positions that didn't require a clearance that he could
2    do, right?
3        MR. DABNEY:  Object to form --
4        A  The flight ops positions that didn't require --
5        Q  (By Mr. Romer-Friedman)  The flight ops
6    positions that he thought he could do, like a flight
7    instructor position or --
8        A  With regard to his medical?
9        Q  Right.
10       A  Right.  He said -- he said something in passing
11   about those --
12       Q  Did he say --
13       A  -- through the process.
14       Q  Might he have said it at this point, or did
15   that come before or after this December 12th conversation?
16       A  I'm not sure.
17       Q  Okay.  Do you take notes of all your oral
18   discussions with people?
19       A  Not always.  But as a matter of course, yeah, I
20   -- I take a lot of notes.
21       Q  Okay.  Would you consider yourself to be an
22   expert on the LTD benefits?
23       A  No.
24       Q  Okay.  Did you have a good sense of his ability
25   to qualify for LTD benefits at the time?

---

161

1        A  No.  As I stated -- I'll just go back to what I
2    stated before, which was my intentions were to assist Ed
3    in what he indicated he wanted to do and to put him in
4    touch with the experts in his benefits department, and
5    through his application process, it would be determined
6    what benefits he would receive.
7        Q  Given this confusion that you were identifying,
8    wouldn't it have been helpful to bring in someone who has
9    expertise in the LTD benefits into this conversation so
10   that they could inform Ed about whether he could qualify
11   and, you know, whether he had to start with a job before
12   he could take the LTD benefits?
13       A  You've asked me that several -- several times,
14   and my answer, I believe, was something along the lines of
15   I was trying to connect Ed with our benefits department
16   and help him get the application so that he could submit
17   that and the insurance company would determine what he was
18   eligible for.
19       Q  Okay.  All right.  And at this point in
20   December, Mr. Quick's benefits haven't been reinstated,
21   correct?
22       A  I think that happened after his start date on
23   January 5th.
24       Q  Okay.  And he hasn't been paid for work or
25   waiting to work, right?

---

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

162

1    A   He and I agreed to the January 5th start date
2  through our correspondence.
3        Q   Through him saying he's willing to wait until
4  after the holidays for a position?
5    A   Correct.
6        Q   Okay.  Wasn't he, though, saying there that he
7  actually wants to come back to a position as opposed to
8  waiting to just come back to -- to not being paid?
9        MR. DABNEY:  Object to form --
10       Q   (By Mr. Romer-Friedman)  I guess I don't -- we
11 can do that.  Here's Exhibit 25.
12       (Deposition Exhibit 25 was marked.)
13       Q   (By Mr. Romer-Friedman)  This is an e-mail
14 exchange on December 23rd between you and Mr. Quick; is
15 that correct?
16   A   Yes.
17       Q   And that's December 23rd, 2014?
18   A   Yes.
19       Q   Okay.  And you write, at 1:43 p.m., Please plan
20 to attend a new/return from extended LOA employee
21 orientation on Monday, January 5th, at 8:30 a.m. at the
22 general offices.  Let me know if you have any questions.
23 I request a read receipt an this e-mail just to verify you
24 got the information.
25       You wrote that, right?

163

1    A   Yes.
2        Q   And he wrote, I'll plan on being there.  Thanks
3  for the update.  Correct?
4    A   Yes.
5        Q   Okay.  And he attended that orientation;
6  correct?
7    A   Yes.  I believe so.
8        Q   Okay.  What -- what took so long between
9  September --
10       MR. ROMER-FRIEDMAN:  You okay?
11       MR. DABNEY:  Just getting some air.
12       Q   (By Mr. Romer-Friedman)  What took so long
13 between September 23rd, when he identified his
14 interested -- his interest in being reemployed to
15 Mr. Thibodeau, and December 23rd, to schedule him for
16 new -- for employee orientation?
17       It's three --
18   A   It's simply --
19       Q   -- three months, right?
20   A   -- the mutually agreed-upon timeline between Ed
21 and myself --
22       Q   How did --
23   A   -- based on the prior conversations and e-mails
24 that you've seen.
25       Q   I -- could you identify what in the prior

164

1  e-mails said that Mr. Quick agreed to delay the
2  new-employee orientation for three months between his --
3    A   There were references to more time and the
4  holidays.
5        Q   The only e-mail that I can see that talks about
6  the holidays is the e-mail exchange on December 12th where
7  he talks about how he's available to return on Monday the
8  15th and then says if more time is needed after the
9  holidays, he can return and he'll -- he'll -- he'll
10 provide that.
11       That would be, what, about 12 days -- 15 days
12 between his e-mail on December 12th and the Christmas
13 holidays?
14       MR. DABNEY:  Object to form.  It speaks for
15 itself.
16       Q   (By Mr. Romer-Friedman)  Is that right?  You
17 can answer.
18       Is there anything besides that e-mail where
19 he's agreeing to delay anything with respect to the
20 new-employee orientation?
21   A   We could take time to go through them again.  I
22 remember, at least in our initial in-person meeting, there
23 were notes to that effect.  I believe there's one other
24 e-mail that refers to more time.
25       Q   Is there anything about the employee

165

1  orientation that needed to wait for him to do it, in terms
2  of processing, that happened before it?
3        I mean, is there something that -- you said
4  earlier that the new-employee orientation can happen,
5  often, every week, right, during busy periods?
6    A   Right.
7        Q   So why -- what about all this processing of
8  information would require him to wait three -- three
9  months just to go to a four-hour seminar --
10   A   Because --
11       Q   -- that's held every week?
12   A   -- we were talking previously about long-term
13 disability, his rate of pay, his benefits, and -- and --
14 and his status so that he could apply for long-term
15 disability.
16       Q   So if he had actually pursued long-term
17 disability, would he have not had to have gone through the
18 new-employee orientation?
19   A   He probably still would have -- would have done
20 that.  There were also, obviously, discussions about the
21 leave of absence and some time passing that we had asked
22 him to reach out to the leave of absence department, and I
23 had to circle back around.  I remember trying to find out
24 if he had done that or not.
25       So --

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

166

1  Q  Okay.
2  A  -- there were -- there were -- there was
3  dialogue and things that we had asked Ed to do, which was
4  my understanding that he wanted to do, apply for long-term
5  disability and a leave of absence, and he didn't do either
6  of those things.
7  Q  Okay.  Did you get a sense that there were
8  legal consequences to Mr. Quick's reemployment from the
9  beginning?
10  MR. DABNEY:  Object to form.
11  A  No.  Of course, our world is employment law
12  related and many things that we do, conceivably, would
13  have legal implications.
14  Q  (By Mr. Romer-Friedman)  So every -- do you
15  ordinarily tell people that every case has legal
16  implications?
17  A  No.  But we -- we deal with EEOC charges.  We
18  deal with the ADA.  We deal with USERRA.  We deal with any
19  number of things that are related to employment law.
20  Q  Okay.  Do you remember using that term to refer
21  to Mr. Quick's request for reemployment?
22  A  I don't recall.
23  MR. DABNEY:  I'm sorry.  What term?
24  MR. ROMER-FRIEDMAN:  "Legal implications."
25  Q  (By Mr. Romer-Friedman)  I'll hand you what

167

1  will be Exhibit 26.
2  (Deposition Exhibit 26 was marked.)
3  Q  (By Mr. Romer-Friedman)  And I'd like to direct
4  you to the -- the e-mail at the bottom of the e-mail
5  exchange.
6  A  Yes.
7  Q  Okay.  Here you write to Cassie Micklich --
8  she's the drug and alcohol coordinator, correct --
9  A  Yes.
10  Q  -- at the time?
11  You wrote, I have a pilot coming back from a
12  several-year-long military leave, by the name of Ed Quick.
13  It has legal implications that Jackie and I are managing.
14  Jackie, is that Jacalyn Peter?
15  A  Yes.
16  Q  She's your boss?
17  A  Yes.
18  Q  The next step with him is to get
19  clearances done, which in this case is limited to drug
20  screen, correct?  I can let him know that you will be in
21  touch regarding processing.  Can you just notify him over
22  the phone and have him go to a clinic?
23  You wrote that, right?
24  A  Yes.
25  Q  Okay.  So do you recall why you were telling

168

1  Ms. Micklich in November -- early November that
2  Mr. Quick's reemployment has legal implications?
3  A  That it was a return from military leave; there
4  were USERRA requirements that had legal implications that
5  we needed to make sure we were all managing correctly.
6  Q  Okay.  And I am going to hand you what will be
7  Exhibit 27.
8  MR. ROMER-FRIEDMAN:  Put this exhibit Post-it
9  on the bottom here.
10  (Deposition Exhibit 27 was marked.)
11  Q  (By Mr. Romer-Friedman)  Do you recognize this
12  document?
13  A  It's a document that is dated on the 5th,
14  signed by Ed, policy acknowledgement sign-off form.  So a
15  document that was -- he would have done in the
16  new-employee orientation.
17  Q  Okay.  That's -- and that's the first two pages
18  here?  I'm sorry.  The first page is to acknowledge
19  various policies?
20  A  Right.
21  Q  Okay.
22  A  Second page is a harassment/discrimination
23  policy acknowledgement.
24  Q  Okay.  He agrees not to discriminate, and
25  then -- is that right?

169

1  A  Yes.
2  Q  And on the third page, he's affirming his legal
3  work status; is that correct?
4  A  Yes.
5  Q  That's to affirm that he is a citizen or an
6  immigrant who has work status, correct?
7  A  Correct.
8  Q  Okay.  These are standard forms that every new
9  employee fills out; is that right?
10  A  I -- I believe so.
11  Q  Okay.  And returning service members will all
12  have to fill this out too?
13  A  I believe our new-employee orientation
14  coordinator, Jill Walkins, provides the same packet for --
15  for everybody in the -- in the orientation.
16  Q  Okay.  So whether you're a new employee or
17  returning service member, one has to fill out all these
18  forms as Mr. Quick did?
19  A  As I stated before, it was a -- a refresh since
20  he had been out a while, to hear all the presentations and
21  get the information that other employees were getting --
22  Q  I'm just asking --
23  A  -- and fill out -- and fill out the forms.
24  Q  I'm just asking, it was man -- whether it was
25  mandatory for him to fill out these forms for him to be

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

170

1    able to --
2        A   I don't know that it was mandatory, but these
3    are the forms that we have people complete in that
4    orientation, and -- and he did so as well.
5        Q   He was -- he was told over the course of
6    the fall he would have to do these new-employee
7    orientations -- the new-employee orientation and the
8    forms, right --
9        A   And attend, yes.
10       Q   Okay.  So he was following the instructions
11   that he was given to go to the orientation and fill out
12   the forms?
13       A   Yes.
14       Q   Okay.  All right.  And prior to this -- prior
15   to January 5th when he goes to the new-employee
16   orientation, is it right his benefits hadn't been
17   reinstated yet, hadn't received any pay?
18       A   I think I stated before that the benefits --
19   I'm not sure of the date that they were restored, but I
20   believe it was sometime after, and that the first pay he
21   received was for attending the new-employee orientation.
22       Q   Okay.  So he received, I think, three and a
23   half or four hours of pay for this new-employee
24   orientation; is that right?
25       A   I don't know whether it was three and a half or

171

1    four, but something like that.
2        Q   Okay.  So this date, January 5th, 2015, was the
3    first time he was paid anything by Frontier after he
4    returned from military leave?
5        A   Yes.
6        Q   Okay.  At -- at this time, on January 5th, is
7    that when Frontier considered him to be reemployed?
8        A   I believe so.  I believe that's the date that
9    we used in our HR system to -- to indicate that.
10       Q   Okay.  And is he provisionally employed --
11       MR. DABNEY:  Object to form.
12       A   Well --
13       Q   (By Mr. Romer-Friedman)  -- on that date?
14       A   -- to be reemployed.  And I would just go back
15   to the prior testimony about provisional.
16       Q   Okay.  But to be clear, to connect this to our
17   prior conversation, on this date and thereafter, he was --
18   Frontier considered Mr. Quick to be provisionally
19   employed?
20       A   He was reemployed, and I previously explained,
21   administratively, what "provisional" meant.
22       Q   Okay.  I'm going to hand you what will be
23   Exhibit 28.
24       (Deposition Exhibit 28 was marked.)
25       Q   (By Mr. Romer-Friedman)  Okay.  Exhibit 28 is

172

1    an e-mail, at the top, from Mr. Quick to you on
2    January 16th?
3        A   It is.
4        Q   Okay.  And the title is "reinstatement,"
5    right --
6        A   Yes.
7        Q   -- the subject?
8            And here Mr. Quick is talking about his concern
9    about his USERRA rights; is that correct?
10       A   Yes.
11       Q   Okay.  And he's referring to his conversations
12   with the Department of Labor, Veterans Employee Training
13   Services; is that correct?
14       A   Yes.
15       Q   Why do you think Mr. Quick was talking about
16   speaking with the Department of Labor at this point?
17       MR. DABNEY:  Object to form.
18       A   The e-mail says, To follow up with you on my
19   rate of pay issue.
20       Q   (By Mr. Romer-Friedman)  Okay.  Again, at this
21   point, in mid-January 2015, Mr. Quick is continuing to
22   talk to you about the -- whether -- whether he should come
23   back at a rate of pay of a captain or first officer,
24   right?
25       A   He wants to have -- has to do with

173

1    reinstatement so that he can secure long-term disability
2    benefits at captain's rate of pay.
3        Q   Here, he doesn't say anything in this e-mail
4    about long-term disability, right?  He's just talking
5    about reinstatement?
6        MR. DABNEY:  Object to form --
7        A   In the full context -- in the full context, as
8    I've testified before, it was my understanding from his
9    own statements in our meetings and correspondence that
10   captain's rate of pay was important relating to his
11   benefits under LTD.
12       Q   (By Mr. Romer-Friedman)  I'm going to hand
13   you --
14       A   And it was my -- my understanding throughout
15   that discussions about reinstatement or position was a
16   means to an end to receive benefits at captain's rate of
17   pay.
18       Q   Okay.  But, again, I think before when I asked
19   you, you weren't sure whether he actually had to formally
20   be reinstated to get the LTD benefits, right?  You thought
21   he could actually jut go straight to getting the LTD?
22       A   I thought he could get that ball rolling at any
23   time.  And he -- told me along the way that he felt
24   that he needed some sort of status to be reinstated.  As
25   my notes in the phone call indicate --

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

174

1    Q   Okay.
2    A   -- Don't pass go and collect $200.
3    Q   So that was his belief, then, not yours, that
4  he had to be reinstated to get the LTD benefits, or you
5  just didn't know?
6    A   Initially -- initially, I didn't -- I thought
7  that he could get the ball rolling and at least get the
8  application and begin filling it out.  I didn't know if he
9  needed a reinstatement status in order to submit the
10  application.
11    Q   When did you --
12    A   I wasn't aware of it being a prere --
13  prerequisite to -- to submit the application.
14    Q   Did your ever learn the answer to that
15  question, about whether he had to formally be reinstated
16  before he could go on LTD benefits?
17    A   No.  I -- I -- I thought that they could happen
18  congruently, that he'd at least get the -- get the process
19  going, as he indicated in the very first meeting, that he
20  wanted to get the ball rolling on the LTD application.
21        And, you know, then said he could -- he could
22  give more time for that process to occur.  Then, you know,
23  stated he wanted to -- we wanted to figure out what his
24  return date was and new-employee orientation, et cetera.
25    Q   Okay.  I'm going to hand you what's Exhibit 29.

175

1        (Deposition Exhibit 29 was marked.)
2    Q   (By Mr. Romer-Friedman)  Sorry.  Here you go.
3  And -- which looks like the prior e-mail that we -- we
4  just looked at on page -- on Exhibit 28 is on the second
5  page of Exhibit 29.
6        And then this is the first e-mail on the bottom
7  of -- first page of Exhibit 29 is an e-mail from Mr. Quick
8  to you on January 26, correct?
9    A   Yes.
10    Q   Okay.  Mr. -- Mr. Quick writes:  Have not heard
11  back from you.  I need to know what my status is.  I tried
12  using my medical for vision and dental but was told my doc
13  -- by my doctor's office I am not on Frontier insurance
14  plan.
15        As you know, when an employee returns from
16  military leave, your medical starts on that day.  Those
17  are -- those two are paid 100 percent by the company.  If
18  my return date was the 5th, they should be available to me
19  while you work out my pay rate issue.
20        He wrote that, right?
21    A   Yes.
22    Q   Okay.  So you agree at that time, on
23  January 26, Mr. Quick had not had his benefits reinstated?
24  Does that refresh your memory?
25    A   Yeah.  He was telling me that there was a

176

1  problem; that he went to -- that he tried using his
2  medical for vision and dental --
3    Q   Okay.  And then --
4    A   -- and he's telling me there was a problem when
5  he tried to do that.
6    Q   Okay.  And then above, you respond, I will
7  check on your benefits and seniority issue.  I thought we
8  had the date corrected.  This is the first time I've heard
9  about your benefit issue.
10        So this is the first time that you're hearing
11  that his benefits weren't -- were not, in fact, reinstated
12  on January 5th, right?
13    A   Right.  I didn't realize there was a problem
14  right away.
15    Q   Okay.  So then on the bottom e-mail, where
16  Mr. Quick writes to you on January 26th, he writes, Have
17  you been able to -- I'm sorry -- Have you been able to
18  reach out to the DOL in regard to my pay rate?  I'm ready
19  to meet with you and Jackie Peters [sic] in regard to my
20  return, but not hearing back from you is troubling.
21  Please respond.
22        He says "my return."  Does this make it any
23  clearer to you that he's looking to return to work?
24    A   We've talked about it before.  He didn't have a
25  medical to return to the pilot position.  We explained to

177

1  him where he was in that process.
2    Q   Okay.
3    A   The focus was on status of return so that --
4  according to Ed, so that he could apply for long-term
5  disability.
6    Q   Okay.  And you --
7    A   And he was still concerned about the pay rate,
8  and my understanding was because it related to his
9  long-term disability benefits.
10    Q   Okay.  But at this point -- and do you recall
11  whether you -- before, again, you had testified that you
12  talked with him about other positions besides the one --
13  the -- the first officer position, right?
14    A   Yeah.  He said something in passing.  And
15  again, throughout it was my understanding that was a
16  means to an end, to have a return to status so that he
17  could apply for long-term disability.
18    Q   But -- but I thought -- if I'm following what
19  you're saying, it sounded like you believed that he wanted
20  to return to a captain position so he could use that
21  captain rate for the purpose of his LTD benefits, right?
22    A   No.
23    Q   No?
24    A   No.
25    Q   Okay.  Okay.  And so at this point, is it fair

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

178

1    to say, when you responded to him on January 26th, his
2    benefits had not been reinstated?
3        A  It appears so.
4        Q  Okay.
5        A  At least some portions thereof.
6        Q  Okay.  I'm going to hand you what will be
7    Exhibit 30.
8            (Deposition Exhibit 30 was marked.)
9        Q  (By Mr. Romer-Friedman)  There you go.  Do you
10   recognize this top e-mail here?
11       A  Yes.
12       Q  Okay.  This is an e-mail from you to Mr. Quick
13   on January 27th at 3:47 p.m.?
14       A  Correct.
15       Q  Okay.  Now, here you write, I have spoke to our
16   benefits manager, Krista Shaff, and determined that you
17   are eligible to enroll in benefits.  There is a 30-day
18   waiting period after you return -- your return date before
19   benefits become effective.  Krista will be reaching out to
20   you to assist with enrollment.
21           You wrote that, right?
22       A  Yes.
23       Q  And that turned out to be incorrect, right,
24   that there -- there should not be a 30-day delay in
25   benefits for a returning service member?

179

1        A  Correct.  That was not correct, and we later
2    corrected that.
3        Q  When was that corrected?
4        A  Subsequent to this.
5        Q  Okay.  But at least for the -- at least between
6    September 23rd and January 27th, Mr. -- Mr. Quick's
7    benefits had not been reinstated, right?
8        A  Looks like I spoke to Krista and was under the
9    impression at that time that the -- based on that, that
10   there was a 30-day waiting period.  It was corrected
11   later.
12       Q  How were you corrected on that point?  How did
13   you learn that that was an erroneous position?
14       A  I don't know if Ed -- I don't know if Ed
15   questioned that or how I -- how I came to double-check.
16   I'm presuming he questioned it, and so I revisited it with
17   the department -- the benefits department and corrected
18   it.
19       Q  Okay.  Had they ever made another service
20   member wait 30 days to re-enroll in his benefits after
21   returning, another pilot?
22       A  I have no idea.
23       Q  You're just not aware that that had ever been
24   done before?
25       A  Right.

180

1        Q  Whose decision was it to make him wait 30 days
2    to -- after his new-employee orientation to reinstate his
3    benefits?
4        A  I think it was an oversight by the benefits
5    department.
6        Q  Okay.  Is that how they would have processed
7    someone from coming back from FMLA leave that that was
8    extended, or ADA leave, that went beyond 12 weeks of FMLA?
9        A  I think they were just -- had it in their mind
10   that new employees have to wait 30 days.  That's probably
11   the majority of the questions that they answer.
12       Q  Okay.
13       A  So as I said, it was likely an oversight.
14       Q  And at this point, in late January, it's about
15   four months after Mr. Quick first expresses interest in
16   being reemployed to Mr. Thibodeau, correct?
17       A  Yes.
18       Q  Okay.  At this point -- sorry -- you -- at this
19   point, you had not done anything specifically to identify
20   any positions that would be a reemployment position for
21   Mr. Quick, correct?
22       A  My energies were spent, at the direction of Ed,
23   to assist in his long-term disability application.
24           (Deposition Exhibit 31 was marked.)
25           MR. ROMER-FRIEDMAN:  This is Exhibit 31.

181

1        Q  (By Mr. Romer-Friedman)  But I'm just -- I'm
2    just asking you whether that's correct, that you hadn't
3    taken any actions specifically to identify other
4    reemployment positions at this point, in late January.
5    Yes or no?
6            MR. DABNEY:  Asked and answered.
7            MR. ROMER-FRIEDMAN:  I'm asking yes or no,
8    not -- not --
9        A  Didn't you already ask me questions about
10   the -- what was discussed in passing and the -- the
11   emphasis on long-term disability rather than a position at
12   that point?
13       Q  (By Mr. Romer-Friedman)  I'm just asking a
14   factual question.  On January 27th, at that point, had you
15   done anything specifically to identify other positions
16   that Mr. Quick would be qualified to be reemployed in?
17       A  No.
18       Q  Okay.  Thanks.
19           All right.  What is Exhibit 31?  Could you
20   please --
21       A  Let me -- can I clarify that last --
22       Q  Sure.
23       A  -- question?
24       Q  Yeah.
25       A  I also previously testified that we were trying

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

---

182

1  to engage with Ed about his disability and obtain
2  information through the leave of absence process,
3  et cetera.  So our intents were to engage him to ascertain
4  what his disabilities were, you know, in anticipation of
5  that being a potential option or path that we would go
6  down.
7     Q   LTD?
8     A   No, another position.
9         But that at that time, those were the efforts
10 that we had made.  But in -- in the -- that was done in
11 also the context and in parallel to trying to help Ed with
12 the long-term disability process.
13    Q   Before, you testified that you're not aware of
14 anyone specifically asking him what his disability was,
15 right?
16    A   Yes.
17    Q   Okay.  And that's still correct?
18    A   Yes.
19    Q   Okay.  No -- no form was given to him where
20 they specifically asked him to identify his disability,
21 correct?
22    A   I believe he was -- he was asked to contact the
23 leave of absence department, who would -- and there were
24 forms involved in that process.
25    Q   For the purpose of reemploying him, no -- no

---

183

1  one gave him a form to asking -- to ask him what his
2  disability was, right?
3         MR. DABNEY:  Asked and answered.
4     Q   (By Mr. Romer-Friedman)  We can move on.
5  That's fine.
6         Could you take a look at Exhibit 31?
7     A   Yes.
8     Q   Okay.  And the second -- the second and third
9  pages appears to be an e-mail from Nicole Zordani of the
10 Lockton Company; is that correct?
11    A   I'm looking at the last page.  It appears she's
12 the assistant vice president for Lockton.
13    Q   Okay.  And this is an e-mail to Chris -- to
14 Anthony Sabia, who is the head of the benefits department;
15 is that right?
16    A   It appears so.  I haven't seen this e-mail
17 before.
18    Q   Okay.  And in this e-mail, Nicole Zordani --
19 what is the Lockton Company?
20    A   One of our vendors.
21    Q   For benefits purposes?
22    A   Right.
23    Q   Okay.  So they advise the company on benefits?
24    A   Correct.
25    Q   Okay.  And they --

---

184

1     A   It's my understanding.
2     Q   So this is in January -- late January 2015, and
3  they're describing information to Mr. Sabia about USERRA
4  compliance, correct?
5     A   Yes.  That appears to be the case.
6     Q   Okay.  And one of the things that he says under
7  "Short Answer" is, Reemployment rights also include
8  coverage reinstatement rights.  The employee and
9  previously covered dependents have the right to immediate
10 reinstatement of group health insurance coverage upon
11 reemployment.  Health plan cannot impose a waiting period
12 and cannot impose exclusions based on preexisting
13 conditions.  This is -- this right is not contingent on
14 election to continue coverage during the period of
15 service.
16    A   That's what it says.
17    Q   That's what it says.
18        Does this refresh your memory about how you
19 came to learn that there was no 30-day waiting period?
20    A   This would have been, you know, correspondence
21 between our benefits department and Lockton.  I don't know
22 that I was aware that they were having dialogue.  I just,
23 as I testified before, came to find out or realize that
24 there wasn't a 30-day waiting period, so that's why we --
25 we corrected that.

---

185

1     Q   Okay.  But Krista Shaff was the person you had
2  been talking to in benefits about reinstating his -- his
3  benefits, right?
4     A   Correct.
5     Q   Okay.  Okay.  Going to hand you what will be
6  Exhibit 32.
7         (Deposition Exhibit 32 was marked.)
8     Q   (By Mr. Romer-Friedman)  And this -- does this
9  appear to be -- is this an e-mail exchange between you and
10 Mr. Quick on January 27th and 28th?
11    A   Yes.
12    Q   And here you write to Mr. Quick, I mistakenly
13 indicated that there -- indicated there was a waiting
14 period on your benefits reinstatement.  Krista -- is that
15 Krista Shaff?
16    A   Yes.
17    Q   Krista is aware that there is no waiting period
18 and will be contacting you to reinstate.
19        That's what you wrote?
20    A   Yes.
21    Q   Okay.  So this refreshes your memory that you
22 -- you found out in this time period, between January
23 26th, 28th, that there was no re -- no 30-day waiting
24 period, right?
25    A   Correct.

---

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

---

186

1  Q   Okay.  Okay.  Then you -- you write in the next
2  paragraph, We have been discussing these issues for some
3  time now.  We have followed all the employer requirements
4  under USERRA to complete your return.  You have not,
5  however, provided the paperwork that we have repeatedly
6  asked you to provide.  Please do so by February 2nd.  If
7  you need more time, please let me know.
8      You wrote that, correct?
9  A   Yes.
10  Q   Okay.  What paperwork are you talking about?
11  The LTD paperwork?
12  A   The leave of absence paperwork, primarily.
13  Q   That's to get LTD benefits?
14  A   Well, that was -- he said he wanted to pursue
15  long-term disability, and he didn't have a medical to
16  return to his prior position.  We would typically have
17  somebody complete leave of absence paperwork through that
18  process as well.
19  Q   If the person wanted to get reemployment, as
20  opposed to LTD, they would have done the leave of absence
21  paperwork?
22  A   It was my understanding that he was still
23  pursuing long-term disability, and -- and we had asked him
24  to contact the leave department to complete the leave of
25  absence paperwork.

---

187

1  Q   Okay.  So the paperwork that you're saying is
2  outstanding is the long-term disability paperwork and the
3  related L -- LOA paperwork related to the LTD?  Is that
4  what you're -- you're saying here?
5  A   I think it -- it would have more to do with the
6  leave of absence paperwork.  I mean, it -- he -- he
7  controls the timing on when he applies for long-term
8  disability and when he doesn't.
9  Q   Is it possible -- and, you know -- is it
10  possible at this point, a month and a half after he starts
11  talking about wanting to return to work, wanting to get
12  his position, wanting to get his start date, that perhaps
13  by this point he was not just focused on long-term
14  disability and he really wants to return to work?
15      MR. DABNEY:  Object to form.  Misstates the
16  record.
17      Go ahead.
18  A   I've consistently answered questions and will
19  say that it was -- it was my understanding
20  throughout the process that that was an end to a means,
21  that he wanted to return to a status in order to receive
22  long-term disability payments at captain's rate of pay.
23  Q   (By Mr. Romer-Friedman)  Okay.  Would -- would
24  -- would a pilot -- a pilot normally have to fill out the
25  LOA paperwork if they just wanted to be reinstated, under

---

188

1  USERRA?
2  A   No.  It had to do with the long-term disability
3  processing and his status if he were to receive long-term
4  disability.
5  Q   Okay.  So only if the pilot wanted to pursue
6  long-term disability would he have to fill out that LOA
7  paperwork you're -- you're talking about here; is that
8  right?
9  A   Because if he were to be on long-term
10  disability, he would also be on leave of absence.
11  Q   Okay.  So if he just wanted to be reinstated to
12  his job or to a similar position, he wouldn't have to fill
13  out the LOA paperwork, right?
14  A   Yes.
15  Q   That's correct?
16  A   Yes.
17  Q   Okay.  So the paperwork that you're talking
18  about not having received is the LTD and related LOA
19  paperwork, right?
20      MR. DABNEY:  Object to form.  She's testified
21  to what she meant --
22  Q   (By Mr. Romer-Friedman)  Okay.  At this point,
23  you're not asking him for additional paperwork, like --
24  related to reemployment, like military orders or his
25  giving notice --

---

189

1  A   When I read this --
2  Q   -- military leave?
3  A   Correct.  I -- I believe it was referring to
4  leave of absence.
5  Q   Okay.  So -- and maybe I -- I missed this, but
6  you said the date of his reemployment was January 5th,
7  2015, right, the date of his provision -- the date that he
8  became provisionally reemployed?
9  A   The date that he was reemployed and attended
10  new-employee orientation.
11  Q   Okay.  So at that point, certainly, by that
12  date, you had determined and Frontier determined that he
13  had satisfied the five requirements to be reemployed under
14  USERRA; is that right?
15  A   We were reemploying him and continuing to help
16  him pursue long-term disability.
17  Q   My question, though, is:  At that point, on
18  January 5th, you had already determined that he had met
19  the five requirements to be reemployed under USERRA,
20  correct?
21      MR. DABNEY:  Same objection.
22      MR. ROMER-FRIEDMAN:  You can answer.
23      MR. DABNEY:  That question was asked and
24  several other times.
25  Q   (By Mr. Romer-Friedman)  You can answer.

---

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

---

190

1     A   Repeat the question, please.

2     Q   On -- by January 5th, at the time that you say

3 he was provisionally reemployed, you and Frontier had

4 determined that he had met the five requirements to be

5 reemployed under USERRA, correct?

6     MR. DABNEY:  Same objection.  Object to form.

7 Object to form.  Foundation.

8     Q   (By Mr. Romer-Friedman)  You can answer.

9     A   I previously testified that he was reemployed

10 on the 5th and explained the status in the system with

11 regard to the work provision.

12     Q   Okay.  But on that --

13     A   My answer is the same.

14     Q   By that date, January 5th, 2015, you had

15 determined he had met the five requirements to be

16 reemployed, correct?

17     MR. DABNEY:  Same objections.

18     A   I believe so.

19     Q   (By Mr. Romer-Friedman)  Okay.  Thank you.

20     Okay.  I'm going to hand you what will be

21 Exhibit 33.

22     (Deposition Exhibit 33 was marked.)

23     Q   (By Mr. Romer-Friedman)  Do you recognize

24 Exhibit 33?

25     A   E-mail from Ed to myself on January 30th.

---

191

1     Q   Okay.  All right.  And this is following up on

2 the prior e-mail exchange where you said you had

3 mistakenly indicated there was a waiting period, right,

4 for his benefits?

5     A   Yes.

6     Q   Okay.  So you write on January 30th to

7 Mr. Quick, I would like -- oh, sorry.  He wrote.

8 Mr. Quick writes to you on January 30th, I would like to

9 get a copy of the short and long disability plans for my

10 review.  In the meantime, I am ready to return to work

11 with my disability and would like to know what position

12 you have for me.  I will call Krista back on my benefits

13 today.  I look forward to getting back to work.

14     So did this e-mail change anything about your

15 thinking with respect to whether Mr. Quick wanted to get

16 back to his actual job as opposed to just wanting to be

17 put on long-term disability?

18     A   Still in the full context, he says, Can I get a

19 copy of the short- and long-term disability plans for my

20 review?  So he's still, obviously, pursuing that, which

21 he's indicated was his priority, more consistently than

22 now saying, I'd like to know what position you have for

23 me.

24     Q   He says, I am ready to work -- to return to

25 work with my disability and would like to know what

---

192

1 position you have for me.

2     Is there any way to read this other than the

3 fact that he wants to return to work and have a

4 position --

5     MR. DABNEY:  Object to form.

6     Q   (By Mr. Romer-Friedman)  -- at the company and

7 make salary and work?

8     A   It says what it says, and I just explained why

9 I think there's still -- he's still asking about short-

10 and long-term disability and at the same time asking, I

11 want to know what position you have for me.

12     Q   So at the end, I look forward to getting back

13 to work, is what he says, you interpret that to mean he

14 wants to go on long-term disability, and he doesn't

15 want --

16     A   He says --

17     Q   -- to be reemployed?

18     A   He says, I look forward to getting back to

19 work.  He says that.

20     Q   Okay.

21     A   He's also -- you know, it says what it says.

22 It has long-term disability in it, and he also says, I

23 look forward to getting back to work.

24     Q   He doesn't say anything about him wanting to

25 actually file a long-term disability claim; just says he

---

193

1 wants to review the policy, right, in this e-mail?  I'm

2 asking what he's -- what he's telling you in this e-mail,

3 not -- not what context you are putting gloss on it.

4     MR. DABNEY:  Well, the objection is that it

5 speaks for itself.  The second objection is that it's

6 asked and answered.

7     MR. ROMER-FRIEDMAN:  Okay.

8     MR. DABNEY:  Third objection is it's

9 foundation, because what Ed was wanting is a different

10 question than what she understood.  I think she's

11 testified to what she understood about three times.

12     Q   (By Mr. Romer-Friedman)  Okay.  So you

13 understood when he said, I look forward to getting back to

14 work, that he had no interest in being reemployed in a

15 like position to the position he had before at Frontier?

16 Is that your testimony?

17     MR. DABNEY:  Testimony has already been stated.

18     Q   (By Mr. Romer-Friedman)  Is that your

19 testimony?

20     MR. DABNEY:  Again, you're misstating -- you're

21 misstating --

22     A   Can you ask me a question, and I'll answer it

23     Q   (By Mr. Romer-Friedman)  When he writes, I look

24 forward to getting back to work, and that he's ready to

25 return to work with my disability, like to know my -- what

---

Deposition of:   Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

194

1    position you have for me, you interpret that to mean he
2    has no intention of actually working in a reemployed
3    position, that instead he just wants to be on long-term
4    disability?  That's your testimony?
5        A    You know, it makes me scratch my head, as the
6    prior e-mail did, in trying to understand which direction
7    he's going, because consistently he's pursued long-term
8    disability, and then, you know, he'll throw something in
9    here and there.  And now, you know, this e-mail says what
10   it says, I look forward to getting back to work.
11       Q    Okay.  Had you spoken with him between
12   December 12th and this point, in late January 2015?
13       A    Had I spoken with him between December 12th --
14       Q    You -- the last time you had met with him
15   before this was December 12th, right, when we looked at
16   your notes?
17       A    Was that the phone call?
18       Q    The phone call.
19       A    The phone call notes?
20       Q    Yes.  You hadn't spoken with him between then
21   and January 30th?  You e-mailed, right, but not spoken?
22       A    I can't be certain but . . . .
23       Q    Okay.  Did you think about picking up -- if
24   there was any confusion at this point, when he's saying, I
25   look forward to getting back to work, was there any kind

195

1    of question mark in your head that said, maybe I should
2    pick up the phone and ask him, what does -- what does he
3    really want here, because it sounds like maybe he wants
4    something different than what you had perceived him
5    wanting before?
6        A    I certainly did that before.  And I don't know
7    what the e-mail correspondence is yet after this.  Maybe I
8    can speak to it better then.
9        Q    Okay.  This will be Exhibit 34 I'm handing you.
10           (Deposition Exhibit 34 was marked.)
11       Q    (By Mr. Romer-Friedman)  Please let me know if
12   you recognize this document.
13       A    (Witness reviews document.)
14       Q    This is an e-mail from Mr. Quick to you on
15   February 11th, 2015, correct?
16       A    Yes.
17       Q    And the subject is "return to work," right?
18       A    Yes.
19       Q    Okay.  And it looks like this is re -- he's
20   responding to a prior e-mail that you had summarized some
21   points, correct?
22       A    It appears so.
23       Q    Okay.  So here he says in the first paragraph,
24   I will simply clarify for you what has actually occurred
25   since I requested reemployment back on September 23rd,

196

1    2014, and what USERRA requires.  Correct?
2        A    Yes.
3        Q    Okay.  He writes, In September, I timely gave
4    Frontier notice of my intent to return to employment.  I
5    formed Frontier I am disabled and not able to fly, but I
6    am qualified to perform many, many other jobs at Frontier,
7    and I want to return to work; whether or not that takes a
8    little reasonable accommodation or training, that is
9    fine."
10           He wrote that, correct?
11       A    Yes.
12       Q    And his -- is that correct?
13       A    Yes, that's what it says.
14       Q    Is that a correct recollection of what he -- of
15   what happened?  He gave notice of his -- of his intent to
16   return to employment, he was disabled, he wanted --
17       A    He gave his notice of return.  He did tell us
18   he was disabled.  Told us he didn't have a medical.  And
19   now he says in this e-mail that, I am qualified to perform
20   many, many other jobs at Frontier, et cetera.
21       Q    Okay.  But I'm asking, prior to this
22   February 11th e-mail, you said he had identified there
23   were some flight ops position that he believed he was
24   qualified for, right?
25       A    In passing; and yes, we have talked about that

197

1    before.
2        Q    Okay.  So that's consistent with this -- with
3    him saying that he told Frontier that he was qualified to
4    perform other jobs, right?
5        MR. DABNEY:  Object to form.  Misstates the
6    testimony.
7        Q    (By Mr. Romer-Friedman)  Is that correct?
8        A    We talked before about a few positions he
9    mentioned in passing.  This says, many, many other jobs at
10   Frontier.  I don't know that those are the same thing.
11       Q    Okay.  And then he says, Frontier has made me
12   wait around for five months without pay.  And at this
13   point, it's February 11th, 2015, which is about five
14   months after September 2015, correct?
15       A    Yes.  The timeline has been established.  It is
16   what it is.
17       Q    And at this point, he hasn't received any pay
18   except for the four -- three and a half or four hours of
19   pay for the new-employee orientation, correct?
20       A    Correct.  And as I testified before, the
21   timeline was in mutual agreement with Ed.
22       Q    Okay.  Now, here he says that he has asked for
23   information on retirement benefits but hasn't been
24   provided those documents -- the plan documents.
25           Is that correct?  At this point, on

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

198

1    February 11th, he has not been provided any of the plan
2    documents for long-term disability, as opposed to the
3    summaries?
4        A   Yeah.  I have to take that for what it is.  I
5    -- I didn't know if he had made those requests previously
6    and received them through the benefits department or -- or
7    not.  So if he's saying he hadn't received them yet or
8    obtained them yet, then --
9        Q   Okay.
10       A   -- I believe him.
11       Q   And the next paragraph, it seems like Mr. Quick
12   is saying that he believes under USERRA he needs to be
13   reemployed first, and then Frontier should work with him
14   to determine what jobs he's qualified to do.  That's what
15   he's saying.  Is that --
16       A   Uh-huh.  Yes.
17       Q   That's correct that that's what he's saying?
18       A   You're in the fourth paragraph?
19       Q   Yeah, in the fourth paragraph, Exhibit 34.
20       A   Yes, that's what he says.
21       Q   Okay.  And do you have -- at the time, did you
22   know whether that was a correct statement of -- of what's
23   supposed to happen under USERRA, whether he was supposed
24   to be reemployed and then to identify -- to have Frontier
25   identify positions --

199

1        MR. DABNEY:  Objection --
2        Q   (By Mr. Romer-Friedman) -- that he was
3    qualified to do?
4        MR. DABNEY:  Objection.  Calls for a legal
5    conclusion and asks for an opinion on the issue.
6        Q   (By Mr. Romer-Friedman) You can answer if you
7    can.
8        A   Oh.
9        Q   I mean, is that -- is that how it's supposed to
10   work in the Frontier way, that you -- you --
11       A   My --
12       Q   -- don't reemploy the service member until
13   you've gone through a process to identify which position
14   the person can do with or without a reasonable
15   accommodation?
16       A   We did reemploy him, and were still pursuing
17   long-term disability benefits form him.  If, then, he
18   chose to pursue other positions, we would engage with him
19   to determine what the final placement would be.
20       Q   Okay.  So let me just make sure I understand
21   this timeline.  On January 30th, he said, I look forward
22   to getting back to work.  And then on February 11th, he
23   writes more specifically about how he has not been
24   reemployed, you haven't worked with him to identify a
25   position.

200

1        But between this January 30th and February 11th
2    e-mails, between Exhibits 33 and 34, did you anyone do
3    anything to identify positions that he could do at
4    Frontier?
5        MR. DABNEY:  I have to object at this point.  I
6    mean, counsel is well aware there is an e-mail on
7    February 9th that predates the one that he's trying to
8    supposedly establish a timeline on.
9        Q   (By Mr. Romer-Friedman) I'm asking, at this
10   point, February 11th, have you done anything to identify
11   any other positions he's qualified to do?
12       MR. DABNEY:  Same objection.
13       A   We talked before about there being a point in
14   time when we asked him to look at other jobs that were
15   open.  I can't remember when that occurred specifically,
16   but --
17       Q   (By Mr. Romer-Friedman) Okay.
18       A   -- this is February, and as we said before, he
19   was reemployed in -- in the system on January 5th.
20       (Deposition Exhibit 35 was marked.)
21       Q   (By Mr. Romer-Friedman) Okay.  I'm going to
22   hand you Exhibit 35, which is an e-mail exchange on
23   February 9th between you and Mr. Quick.  If you can verify
24   that that's correct, please do so.
25       A   It's from myself to Ed on February 9th, yes.

201

1        Q   Okay.  Okay.  All right.  So I want to work
2    through this with you.  I think this is an important
3    e-mail, which --
4        A   Do you mind if I take a minute?
5        Q   Sure.  Please read through.
6        A   (Witness reviews document.)
7        Q   Okay.  You sent this e-mail?
8        A   Yes.
9        Q   Did anyone help you prepare --
10       MR. DABNEY:  She's not quite done.
11       Are -- are you through reading the document?
12       THE WITNESS:  Not quite.
13       Q   (By Mr. Romer-Friedman) Sorry.
14       A   Okay.  Go ahead.
15       Q   Okay.  You sent this e-mail, right?
16       A   Yes.
17       Q   Did you work with anyone to draft this e-mail?
18       A   I was getting feedback, and as we said with
19   counsel at this point regarding the case, to have it
20   reviewed, make sure that we were compliant and covering
21   the bases.
22       Q   Okay.  So is everything, in your view, in this
23   e-mail true?
24       A   Yes.
25       Q   Okay.  So just to review a couple of these

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

### 202

1    things.  On the second paragraph, it says, When you
2    notified us of your intent to return from military leave
3    in September 2014, we began the process of returning you
4    to active status.
5             Is that correct?
6         A   Yes.
7         Q   And "active status" means actually returning to
8    work, to a job; is that correct?  Is that what you meant
9    there?
10        A   It means -- it means active status in our HRIS
11   system.
12        Q   Okay.  At the time you noted -- However, at the
13   time you notified us of your intent to return, you also
14   notified us that you were not able to hold an FAA first
15   class or second class medical certificate.
16            That was correct?
17        A   Yes.
18        Q   Okay.  Now, in the -- in the second paragraph,
19   you write, Under USERRA, an employee must be qualified for
20   any reemployment position.
21            Right?
22        A   Uh-huh.  Yes.
23        Q   I'd like you to help me understand that.  At
24   this time, in February -- February 9th, 2015, you had not
25   determined that he was qualified for any position at

### 203

1    Frontier Airlines, correct?
2         A   As I testified before, he didn't have a
3    medical.  We talked to him about not being qualified for
4    the pilot positions.  He mentioned some other positions in
5    passing.  But we hadn't yet gotten Ed to engage with us on
6    any meaningful conversations about other positions, no.
7         Q   Okay.  So you hadn't determined that he was
8    qualified for any particular position at Frontier at that
9    time, right?
10        A   That he was or wasn't, beyond the pilot
11   positions.
12        Q   You hadn't determined that he was qualified for
13   any particular position at that time, right, at Frontier
14   Airlines?
15            MR. DABNEY:  Asked and answered.
16        A   Other than the pilot positions, no.
17        Q   (By Mr. Romer-Friedman)  And you had -- you had
18   determined he wasn't qualified for positions either;
19   right?
20        A   Based on not being able to hold a medical.
21        Q   Correct?
22        A   Yes.
23        Q   Okay.  But here you write, Under USERRA, an
24   employee must be qualified for any reemployment position.
25            Right, that's what you wrote?

### 204

1         A   Yes.
2         Q   I guess I'm having a hard time understanding
3    how he was reemployed, yet, in your own view, he wasn't
4    qualified for any reemployment position.  How -- how do
5    you kind of --
6             MR. DABNEY:  Objection.
7         Q   (By Mr. Romer-Friedman)  -- find those to be
8    consistent --
9             MR. DABNEY:  Misstates --
10        Q   (By Mr. Romer-Friedman)  -- that he was
11   reemployed on January 5th, 2015, but yet here, you're
12   talking about how he must be qualified for any
13   reemployment position, but he hasn't, in your view, not
14   been determined to be qualified for any particular
15   position?
16            How are those things consistent?
17            MR. DABNEY:  Object to form.  Misstates the
18   record.
19        A   Ask me one more time.
20        Q   (By Mr. Romer-Friedman)  Okay.  In this
21   sentence, you're saying that under USERRA, an employee
22   must be qualified for any reemployment position, right?
23   That's what you said?
24        A   Yes.
25        Q   But to be reemployed at the company, the person

### 205

1    needs to be qualified, right?  Is that -- that's what
2    you're saying there?
3         A   With reasonable efforts and through the
4    processes that we've talked about previously --
5         Q   Okay.
6         A   -- about how we would accomplish that.
7         Q   All right.  But to that date, you had not
8    determined if he was qualified for any particular
9    position, right?
10        A   We had told him, as it states above, that the
11   medical certificate is a necessary requirement for pilots.
12        Q   Or any other position he had -- it's okay.  We
13   can move on.
14            Let's -- looking at the second-to-last
15   paragraph on Page 501 of Exhibit 35.
16        A   Okay.
17        Q   You say, Because you have indicated no interest
18   in becoming reemployed into a different position at
19   Frontier, i.e., other than a first officer or captain,
20   Frontier has provisionally reemployed you as a first
21   officer with all of your accrued seniority.
22            That's what you wrote, right?
23        A   Yes.
24        Q   But at the same time, you previously testified
25   that before this, before February of 2015, he had

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

---

**206**

1  mentioned that he thought he could do other flight
2  operations positions, like a flight instructor position,
3  right?
4      A   I testified that he said those things,
5  mentioned those positions in passing, as a means to an
6  end, and that we were still focused on his application for
7  long-term disability and that we had not engaged with him
8  about other positions to any real extent.
9      Q   Okay.  I think that's fair.  You -- you just
10  said -- it seems consistent with the record.  You hadn't
11  engaged with him in a meaningful way about those other
12  positions, right?
13      A   It was too soon in the process as -- for the
14  reasons that I've stated before, that at Ed's direction,
15  his priority was receiving long-term disability, and he
16  wanted to be returned with some status at captain's rate
17  in order to maximize those benefits.
18      Q   But no interest in becoming reemployed in a
19  different position?
20      I mean, how do you square that with your prior
21  testimony that he said, even in passing, that he wanted to
22  be reemployed to a non-flying pilot's position?
23      A   He didn't express or engage with us as far as
24  any real desire to pursue a different position.
25      Q   Okay.  Is that because it was up to him to

---

**207**

1  identify the positions that he was qualified to do, as
2  opposed to it being Frontier's obligation?
3      A   No.  I've already said that it was because we
4  were focused on other priorities, as stated by Ed.
5      Q   Okay.  So prior to this time, February 9th, you
6  hadn't asked him to identify other positions he could --
7  he qualified to do; is that right?
8      A   I believe at this point it was, as I was
9  referring to before, where we tried to get the process
10  going.  Now that we see the change in tone and emphasis on
11  the possibility other positions, that we asked him to look
12  at open positions on the website.
13      Q   Okay.  Well, let's -- let's look at that.
14      So -- and before we get to that, in the last
15  paragraph on this same page, the first page of Exhibit 35,
16  you write, I told you a number of times that if you wish
17  to apply for LTD benefits, you must complete the LTD
18  paperwork and submit it.  You have not responded to my
19  request for you to complete the LTD paperwork.  We cannot
20  do that for you.
21      Is it possible that the reason why he didn't
22  actually complete that paperwork was because he just
23  didn't want to file for LTD?
24      MR. DABNEY:  Object to the form.  Foundation.
25      A   I didn't know.  I -- I understood that -- from

---

**208**

1  his statements that that was what he wanted to do.  We
2  talked about leave of absence paperwork to go along with
3  that, tried to help him with the LTD information so that
4  he could apply.  And because it was such a priority for
5  him, I didn't know why he wasn't following through.
6      Q   (By Mr. Romer-Friedman)  Okay.  But, again,
7  since December 12th, when you had your last meeting, you
8  didn't pick up the phone to ask him: Hey, I'm confused.
9  You -- you now saying you want to return to work.  You
10  haven't given us the LTD paperwork.  Is it that you really
11  want to go back to the job as you said in your January
12  30th e-mail, or do you want --
13      A   I was communicating with Ed through the process
14  in a few different ways, in person, by phone, via e-mail,
15  I called him before.  In this case, we corresponded via
16  e-mail.
17      Q   Okay.  But to go back to Exhibit 34 now, this
18  is his e-mail that responds to your February 9th e-mail.
19  This is his February -- Exhibit 34 is his February 11th
20  e-mail, correct?
21      A   Yes.
22      Q   Okay.  Doesn't this e-mail from him make clear
23  he does really want to be reemployed in a position, or at
24  least be reemployed with pay and -- and work with Frontier
25  to identify the positions that he can do in the --

---

**209**

1      A   He says --
2      Q   I mean, isn't that what he's saying in
3  Paragraph 4 of Exhibit 34?
4      A   He says, Figure out what jobs I'm qualified to
5  do.  I'm happy to help you with that.  So that's why, in
6  part, we respond with -- starting to see if he'll engage
7  with us with regard to looking at other positions.
8      Q   Okay.  But back to Exhibit 35, on the second
9  page -- this is two days before he sent you that e-mail --
10  you write, If you do not wish to apply for LTD benefits
11  but would rather return to work for Frontier in a capacity
12  other than a pilot, you may also pursue open positions for
13  which you are qualified or for which you could become
14  qualified through reasonable efforts by Frontier.
15      Because a position of pilot in the airline
16  industry is unique, there are no jobs that are closely
17  comparable.  Without more information from you about your
18  interest and ability, it is impossible for us to know what
19  open positions you are either interested in or -- or
20  qualified with reasonable training to hold.
21      If you are sincere about pursuing other
22  options, please go to www.flyfrontier.com/careers and
23  review if there are openings that you would like to
24  discuss.  We are available to meet to discuss open
25  positions with you.  Please let me know if you would like

---

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

---

210

1   to do that.  We cannot guarantee how long any posted
2   position will be available, and the openings change
3   frequently.
4        You wrote that, right?
5        A   Yes.
6        Q   So, in essence, were you telling him here that
7   if he wants a different job besides the first officer job,
8   he can go to the website, look to see what he thinks he's
9   qualified for and tell you, and then you could discuss
10  that?  That's the process that you were outlining?
11       A   As I just said, it was an attempt to get Ed to
12  engage with us to start to talk about, at least as a first
13  step, what was open in the company that would be easier
14  than positions that were, you know, already occupied.  So
15  it was -- it was an attempt to start to dialogue more
16  deeply with Ed on that subject.
17       Q   And is this February 9th the first time that
18  you're trying to engage Ed in a dialogue about what
19  positions other than first officer he could do?
20       A   I think I've answered that a few times before.
21       Q   If it's still yes, I'd like you to answer yes.
22           MR. DABNEY:  Misstates her prior testimony.
23       A   Ask me again.
24       Q   (By Mr. Romer-Friedman)  Is this -- on
25  February 9th, this e-mail that you sent to Ed Quick

---

211

1   identifying jobs he could look at on frontier.com --
2   flyfrontier.com, is this the first time that you or
3   Frontier Airlines was engaging him about positions that he
4   could do other than the first officer job?
5        A   Yes, for the reasons stated before, which were
6   at the direction of Ed Quick and him wanting to pursue
7   long-term disability.  We talked about that before.
8        Q   When you sent this e-mail, were -- were you
9   under the impression that the only jobs that he could be
10  reemployed to were jobs that were open at the time?
11       A   No.  As I said, it was a starting point to
12  start to engage with him about, first, what was open; that
13  would be easiest.  But nothing was off the table.  He just
14  had to go through the process.
15       Q   Okay.  So if he had come to you and said, These
16  are 20 jobs on this list that I think I'm qualified for,
17  and you determined he was qualified for one of those jobs,
18  you would have fired someone else and put him in that
19  position?  Is that your testimony?
20       A   I'm saying that we would have -- you know, we
21  use this as a starting point, that were open jobs, but I
22  know that it's not just limited to open jobs as far as
23  possibilities for Ed.
24           We would have to look at what was similar in
25  status, pay, et cetera, as we've talked about before, find

---

212

1   out what his disability was, what he could and couldn't
2   do, and make efforts to train him, if necessary, et
3   cetera.
4        Q   So is the answer to my question yes, that if
5   one of these open jobs -- if one of the -- if a job that
6   was at the airline that he could do and he met the
7   qualifications for it was occupied by someone, that that
8   person would be displaced for him to be reemployed?
9            Is that how it would work or not?
10       A   I don't know that the person would be
11  displaced.  I mean, maybe it was a position that we could
12  place him in in addition to somebody else.  It would
13  depend.
14       Q   But if it was him or the person in that
15  position, what would you have done?  Would you have
16  reemployed him, or would you have made him wait until
17  there was an open position?
18       A   We would reemploy him.  We would go through
19  that process.  I'm -- I already told you that I know it's
20  not limited to what jobs are open.  That that was a
21  starting point.
22       Q   Okay.  Do you know what jobs were not -- do you
23  know what jobs were not listed on the website at this time
24  that he might have potentially been qualified for?
25       A   No.  I mean, I'm sure if we had gotten that far

---

213

1   and -- and we had been able to talk with Ed further about
2   what was open or what other jobs were maybe not
3   necessarily open but were similar in pay and status, we
4   would have evaluated those.
5        Q   And at this point, in addition to sending
6   Mr. Quick this public listing of jobs open -- that were
7   open at the time at Frontier Airlines, did you talk to any
8   department managers or supervisors about jobs that
9   Mr. Quick might have been qualified for at that time?
10       A   I'm not sure of the timing, if we had started
11  to talk to other people or look at other jobs when we sent
12  this, but certainly this was a, you know, a starting
13  point.
14       Q   You don't know?
15       A   I can't remember if we were concurrently
16  looking at other jobs or looking at what those postings
17  were at that time.
18       Q   But, again, earlier you testified you never
19  spoke with someone in the pilots division.  You never
20  spoke with JP Thibodeau or his assistants, about what
21  positions Mr. Quick might be qualified for.
22       A   Right.  But I also said that we would -- HR
23  would initially do a, okay, what's in the realm of
24  possibility, just based on what we know now.  We would try
25  to narrow that down before we would reach out to other

---

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

---

214

1    department leadership.
2        Q  Okay.  And narrow down in terms of what his
3    capabilities were, right?
4        A  Right.
5        Q  Okay.  But you never figured out what his
6    capabilities were?
7        A  Correct.
8        Q  At this point, did you ask him what his
9    disability was or ask him to see a doctor to identify his
10   capabilities or disabilities?
11       A  No.  But I think we're still referring to
12   paperwork, and as I stated before, we thought that the
13   leave of absence paperwork or long-term disability
14   paperwork would help us understand that.
15       Q  So, again, you just testified ten minutes ago,
16   right, that he would only need to do the LOA paperwork if
17   he was submitting an LTD application, right?
18       A  Correct.
19       Q  Okay.  So if -- as you laid out here, if he was
20   really seeking reemployment, he didn't need to do that --
21   you weren't asking him to do the LOA paperwork.  You would
22   presumably --
23       A  That's true.  We're now -- we're not trying to
24   flesh those things out, clear it up, and, you know, start
25   to engage with him by the starting point of asking him to

---

215

1    look at open positions.
2        Q  And at this point, you don't know if he has
3    migraines or sleep apnea or TBI or if he has terminal
4    cancer, right?  You don't -- you have no idea what his
5    disability is at this point?
6        A  No, and --
7        Q  All you know is that it was temporary, right?
8        A  -- he had --
9           Yes.  And he had, through the course of this
10   time as well, delayed the process of completing medical
11   leave paperwork.  He had, like, also not offered any
12   additional information or been helpful in those efforts.
13       Q  Okay.  So it's your testimony, then, that if a
14   service member doesn't volunteer voluminous information,
15   unsolicited about his disabilities, that the company
16   doesn't have to proceed to focus on reemployment?  Is that
17   your testimony?
18       A  That's not what I said.
19       Q  Okay.
20          MR. DABNEY:  Object to form.
21       A  Again, and as I've testified before, we were
22   trying to engage with Ed, first work on things that he
23   stated were his priority.  At this point, we are
24   attempting to engage with him as far as evaluating jobs
25   for placement.

---

216

1        Q  (By Mr. Romer-Friedman)  Okay.  And at this
2    point, do you know if his benefits had been reinstated
3    February -- by February 9th, 2015?
4        A  In the last e-mail we looked at, I think he was
5    going to be in touch with Krista or Krista was going to
6    call him after she realized there wasn't a 30-day waiting
7    period to get that reinstated.  I don't know the exact
8    date of when that occurred.
9           THE VIDEOGRAPHER:  I'm sorry.  Can you not grab
10   your shirt?
11          THE WITNESS:  Sorry.
12          THE VIDEOGRAPHER:  Thank you.
13       Q  (By Mr. Romer-Friedman)  Okay.  I'm going to
14   hand you what will be Exhibit 36 and ask if you can
15   identify this document.
16          (Deposition Exhibit 36 was marked.)
17       A  This looks like an e-mail from Ed to myself on
18   February 12th.
19       Q  (By Mr. Romer-Friedman)  Okay.  And in this
20   e-mail he writes, Hi, Michelle, I'm ready, willing and
21   able to return to work first; then I'm ready for Frontier
22   to pay the delta into my retirement based on captain pay I
23   was at when I left and now at the Step 12 level of 144.50
24   per hour.  I would then apply for STD/LTD and a leave of
25   absence.

---

217

1        Right?
2        A  That's what's written, yes.
3        Q  Okay.  So it's clear here that before he would
4    apply for STD or LTD, he wants to return to work, even
5    though he's saying he wants to be at a captain rate,
6    right?
7           MR. DABNEY:  Object to form, foundation.
8    Exhibit speaks for itself.  And she can't say what she
9    think he's saying in -- in terms of his authorship of the
10   e-mail.
11       Q  (By Mr. Romer-Friedman)  What did you
12   understand him to be saying when he says, I'm ready,
13   willing and able to return to work first and then apply
14   for LTD?
15       A  As I said in prior testimony, my understanding
16   throughout, and in the context of Ed's wishes, that that
17   was a means to an end to facilitate the long-term
18   disability payment at the captain's rate, which was
19   critically important to him throughout, obviously.
20       Q  Okay.
21       A  And my notes, based on our phone call,
22   indicate, you know, don't pass go, collect $200.  I mean,
23   there were these comments all the way along the way that
24   this was the process that he saw as necessary to collect
25   benefits.

Deposition of:   Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

218

1      Q   Okay.  And we now know that if he had returned
2  to work first and then applied for LTD, his LTD
3  application would have been denied, right, because of the
4  war clause?  Is that correct?
5      MR. DABNEY:  Same objection as before.
6      A   We talked about that, I think, a couple
7  times --
8      Q   (By Mr. Romer-Friedman)  The answer's still
9  yes, right?
10     MR. DABNEY:  That misstates the testimony.
11     Q   (By Mr. Romer-Friedman)  You know as a fact
12  that if he had done what he's asked to do here, which was
13  to return to work and then apply for LTD, he would have
14  returned to work and he would have been denied the LTD
15  because of the war clause, correct?
16     A   I did not know that at the time.
17     Q   I'm saying now we know that if he had done
18  this, as he proposed to do, to return to work first and
19  then apply for LTD, he would have returned to work but
20  been denied the LTD benefit, right, because of the war
21  clause?
22     MR. DABNEY:  Same objections.
23     Q   (By Mr. Romer-Friedman)  Is that correct?
24     A   I think I testified before that through my
25  conversations with counsel that I became aware that that

219

1  was the case.
2      Q   That it would be the case that he could not
3  qualify for LTD?
4      A   That's my understanding.
5      Q   Okay.  All right.  I'm going to hand you what
6  will be Exhibit 37.
7      (Deposition Exhibit 37 was marked.)
8      MR. ROMER-FRIEDMAN:  In the future, everyone
9  should use bigger font.
10     Q   (By Mr. Romer-Friedman)  And I don't want to
11  talk -- I -- I only want to talk about a small part of
12  this, if that's okay.
13     I'd direct you down to the -- so this is an
14  e-mail on March 6th, 2015, between -- from you to
15  Mr. Quick, correct?
16     A   On March 6th, yes.
17     Q   And in the fourth paragraph, you write, Third,
18  with respect to employee benefits issue, Frontier is
19  currently working with Charles Schwab to determine how to
20  properly compensate your defined contribution and your
21  401(k) plan to account for your period of military leave.
22  Frontier intends to follow USERRA in all relevant
23  respects.
24     Given the complexity of the issues related, in
25  part, to multiple changes to Frontier's relevant plans

220

1  during your military leave, this may take some time.  We
2  will inform you when the process is completed.  In the
3  meantime, in light of your request, I will send plan
4  documents pertaining to Frontier's defined contribution
5  and 401(k) plans.
6      You wrote that, right?
7      A   Yes.
8      Q   Okay.  And that was correct at the time?
9      A   That's my understanding, yes.
10     Q   So on March 6th, which is five and a half
11  months after Mr. Quick seeks reemployment in late
12  September, the -- the company is still working with
13  Charles Schwab to determine how to compensate him for his
14  makeup contributions?
15     A   Yes.
16     Q   Okay.  And that's for his defined contribution
17  and 401(k), correct?
18     A   Yes.
19     Q   Have you ever seen it take more than five and a
20  half months to compensate a pilot or another service
21  member for their pension or 401(k)?
22     A   I don't know for sure.
23     Q   Okay.  This is -- do you know when they started
24  the process of trying to calculate that figure?
25     A   Not exactly.  I know when we notified the

221

1  benefits department and Ed was in touch with them.  I
2  don't know what they were working on, when, in what order,
3  et cetera.
4      Q   Would -- did that start only once he was
5  reemployed, in your view, on January 5th, 2015?
6      A   No.  I believe he was in touch with them and --
7  and stopped by probably even before the January 5th date
8  to talk about long-term disability for sure.  I'm not what
9  sure what else they discussed.
10     Q   Okay.  And also in this e-mail, in the last
11  paragraph that goes from the first to second page, As to
12  your long-term disability benefits, I have previously
13  given you a description of available benefits and forms
14  for applying for the same.  You have now requested to see
15  the actual plan documents.  Although these plan documents
16  are likely unnecessary for your purposes, are already
17  available to you and are likely redundant of the
18  information I have already provided you, copies of the
19  plan documents are nonetheless attached.
20     Is that right?
21     A   Yes.
22     Q   You wrote that, and you attached the plan
23  documents?
24     A   Yes.
25     Q   Do you know whether the war clause was in just

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

222

1    the plan documents or whether that was in the other
2    information that was -- you had previously provided to
3    him?
4        A   I don't know.
5        Q   Okay.  Could it have been very, very wrong in
6    the end for you to have told him that it was unnecessary
7    for him to look at the plan documents if the only thing
8    that he could have seen to determine that he's not
9    qualified was in the plan documents themselves?
10       MR. DABNEY:  Object to form.  Foundation.
11       Q   (By Mr. Romer-Friedman) You can answer.
12       A   I testified before and -- and still would say
13   that I thought that Ed could apply for long-term
14   disability with the prior instructions information that we
15   gave him and through his conversations with the benefits
16   department to do so.  Through that process and their
17   input, his eligibility or not would be determined.
18       I didn't know, prior or throughout the process,
19   why he was continuing to wait to apply.
20       Q   Okay.  Okay.  I'm going to hand you what will
21   be Exhibit 38.
22       (Deposition Exhibit 38 was marked.)
23       Q   (By Mr. Romer-Friedman) Here you go.  This is
24   plaintiff's production, Quick 192 through 202.
25       Do you know what UltiPro is?

223

1        A   Yes.
2        Q   What is that?
3        A   UltiPro is the current human resources
4    information system.
5        Q   Okay.  Are these pay stubs in Exhibit 38 for
6    Mr. Quick?
7        A   Yes.  Statement of earnings and deductions.
8        Q   Okay.  Are these -- do these appear to be
9    accurate statements of Mr. Quick's earnings?
10       A   I'm familiar that this is the format that these
11   forms come in.
12       Q   But you don't have any reason to disbelieve
13   that these are accurate statements of the earnings that he
14   made during these relevant pay periods?
15       A   Right.
16       Q   Okay.  Okay.
17       (Deposition Exhibit 39 was marked.)
18       Q   (By Mr. Romer-Friedman) By the way, do you
19   know what Mr. Quick's current status is at the airline?
20       A   He's reemployed, and his job title in the HRS
21   system is first officer, I believe.
22       Q   Okay.  Is he -- is all of his -- are -- do his
23   benefits -- have his benefits continued since they were
24   reinstated in 2015?
25       A   I imagine so.

224

1        Q   Do you know if they are?
2        A   I haven't gone in the system to verify.  I
3    haven't heard from Ed that there's a problem, so . . .
4        Q   Okay.  But his status is active -- well, we'll
5    talk about this.  Here's the exhibit.  Sorry.  39.  And
6    I'd ask you to turn to the third page of this exhibit.
7        Is this -- this lists the job history for
8    Edward Kevin Quick; is that correct?
9        A   Yes.
10       Q   Okay.  And that's at Frontier Airlines?
11       A   Yes.
12       Q   So his status is -- if the status says he's
13   active on 4/1/2015 through 4/20/15, 12/16/2014, 3/4/2014,
14   3/4/2014, is that right, that his status was active, March
15   of 2014, or is that erroneous?  Right?  Because he was
16   on --
17       A   There is a -- I don't know that I can explain
18   why some of these are -- indicate leave of absence, but
19   there are a couple different systems that track leave of
20   absence status.
21       And for reasons in the collective bargaining
22   agreement for pilots and how the system works and the
23   requirements for how their accruals, et cetera, are done,
24   they're left as active status when, in fact, with the
25   leave of absence department, they could be on -- on some

225

1    type of leave.
2        Q   Okay.  Is there anyone else in Mr. Quick's
3    situation in the entire company, a pilot, who is -- has
4    active status but has -- has not earned any compensation
5    over the last year and a half?
6        A   If I don't answer your question correctly, let
7    me know.  But as I mentioned, the -- this particular
8    system could show somebody as active for the reasons I
9    just explained, but if they were on a -- whatever type of
10   leave of absence -- that would be tracked through the LOA
11   department, another spreadsheet, also, as JP mentioned, in
12   Crew Track software.  And if they were -- if they had
13   exhausted sick, vacation, et cetera, then they could be in
14   unpaid status.
15       Q   Okay.  Do you know, at this time, is Mr. Quick
16   able to use his accrued sick leave or accrued vacation to
17   be paid for sick time or vacation time that he might
18   choose to use?
19       A   I don't know what he has on the books for sick
20   and vacation, and I haven't really talked to him about
21   that or -- or looked at it.
22       Q   Would he be able to use it at this point, if he
23   had any at that time?
24       A   I believe so.
25       Q   Okay.  You don't know if he's asked to -- to

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

226

1    use that time?
2        A  I don't -- I don't know.
3        Q  Okay.  Okay.  Do you know, as a matter of
4    ordinary policy, is a pilot required to use all of his
5    sick leave if it's accrued before he goes on medical leave
6    -- long-term disability or medical leave?
7        A  We have a company policy, and then those things
8    vary a little bit per contract.  I would have to look at
9    the CBA, because I sometimes get it confused with what's
10   required for another workgroup or what that says.
11       Q  Okay.  And besides the three and a half or four
12   hours of pay that Mr. Quick received for his new --
13   new-employee orientation on January 5th, 2015, to this day
14   he hasn't received any other compensation for work at
15   Frontier; is that correct?
16       A  Not that I'm aware of.
17       Q  Okay.  So how did it come that Mr. Quick was
18   offered two different positions at some point in 2015?
19          Could you walk me through that, who was
20   involved in that, how the decision was made.
21       A  Without any information to go on, we were
22   looking at positions that could be somewhat related to the
23   operations since Ed was from that side of the business.
24          And simply to get the ball rolling him and get
25   him to respond to us and engage, we -- we identified a

227

1    couple of jobs and made those offers to him.  That was,
2    you know, above -- above and beyond.  But, again, we did
3    it to try to engage with Ed.
4        Q  What were those two positions that you offered
5    him?
6        A  I believe they were crew scheduler and AOG
7    buyer/planner.
8        Q  Okay.  And how did you determine that those two
9    positions were appropriate for him to -- that -- for him
10   to do?
11       A  Without any information, as I said, we didn't
12   have much to go on, so we tried to identify a couple of
13   jobs that were operational related that we could talk to
14   him about.
15       Q  Okay.  Who was involved in that decision?
16       A  Myself.  I can't remember who else in the
17   department I talked to at the time about it.
18       Q  Just you?  You're -- you're not familiar with
19   anyone else who played a role in deciding that those were
20   the two jobs that he could do at the airline?
21          MR. DABNEY:  Objection.  It misstates the
22   testimony.
23       A  I can't recall who else I talked to at the time
24   about it --
25       Q  (By Mr. Romer-Friedman)  Okay.

228

1        A  -- about those jobs.
2        Q  Did you -- to get to those two positions, how
3    did you drill down to those, from all the positions?
4        A  Crew scheduling, for example, they schedule
5    pilots and flight attendants, with Ed's background, he
6    would have a knowledge of some of the rules that -- that
7    pertained to that role.
8        Q  Okay.  And the other position was the buyer
9    position?
10       A  Right.
11       Q  How did you determine that he would be able to
12   do that position?
13       A  I believe at the time, I looked at the
14   qualifications.  Based on what I knew, I thought it was a
15   possibility.  It was operationally related.  At least it
16   would give us something to talk about and start to get
17   more information and assistance from Ed.
18       Q  Did you -- how did you get to those two as
19   opposed -- I mean, there -- I mean --
20       A  It was a shot in the dark.  I just explained
21   sort of some of the logic behind it.  It was -- it was a
22   starting point.
23       Q  So you were just guessing about what positions
24   he might be able to do?
25       A  Because we hadn't gotten information from Ed or

229

1    engaged with him to find out what, if any, his
2    restrictions were, or what he might be best placed in.
3        Q  Did it occur to you that asking him to do a
4    medical physical or asking him for his medical records
5    might help you to identify his qualifications before
6    coming up with this list of two positions?
7        A  We didn't get to that point.  As I said, we
8    spent our time on the things we spent our time on, at the
9    direction of Ed, and this was kind of a last-ditch effort
10   to engage him on that front.
11       Q  Do you know when the crew schedule and buyer
12   position were offered to Ed?
13       A  I believe that was in an e-mail that I sent.  I
14   can't recall the exact date.
15       Q  Was it before or after the lawsuit was filed?
16       A  Right about the same time.
17       Q  You don't recall if it was before or after?
18   It's okay if you don't know.
19       A  I can't recall, Peter.
20       Q  To come up with those two positions, did you
21   talk to any of the managers or leaders of those
22   departments that those positions were in, or did you just
23   do that on your own?
24       A  Sort of both, in that at that time, for those
25   positions with regard to Ed, I did not; however, I had

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

230

1  previously spoken to the -- the manager of crew scheduling
2  for other placement processes, so I was familiar with and
3  had prior discussions with them about placing people in
4  that role.
5      Q.  Okay.  So as you testified before, in trying to
6  come up with positions that Mr. Quick was qualified for,
7  you didn't reach out to the managers of other
8  departments to try to figure out what scope of the work in
9  their -- in their departments he could do?
10     A.  No.  I -- I -- I based it on my prior knowledge
11  of at least the crew scheduling position and -- and my
12  knowledge of AOG buyer/planner and looking at the job
13  description.
14     (Deposition Exhibit 40 was marked.)
15     Q.  (By Mr. Romer-Friedman)  Okay.  I'm going to
16  give you Exhibit 40, which is Frontier Airlines' response
17  to Interrogatory Number 6, which asked about what
18  positions were open at Frontier Airline from September
19  2014 until the point of this request.
20     Sorry, here you go.
21     This is a long list, and I'm not going to ask
22  you to look at all these positions, but it goes from Bates
23  Number 741 to 745.  It's five pages of dozens of jobs on
24  each page of open positions.
25     Did you look through this list or a similar

231

1  list like this to try to come up with what potential
2  positions Mr. Quick would be offered after he filed his
3  lawsuit?
4      A.  Is this all -- all positions, or is this -- are
5  these what was on the website?  I think I would have, at
6  the time, looked at what was on the website.
7      Q.  Okay.
8      A.  Because it would be easy to look at what was
9  open at the time and at least put something out there that
10  may make sense in order to engage Ed.
11     Q.  Did you look at positions beyond the ones that
12  are on the website, perhaps ones that were not open at the
13  time?
14     A.  We would have, as I testified before,
15  considered positions that were open or not --
16     Q.  But I'm asking, at this point, when you came up
17  with these two jobs, the crew scheduling job, the buyer
18  job, you said you looked at the website for opening --
19  open jobs.  Did you go beyond that, to look at all the
20  other jobs that might -- might be --
21     A.  I didn't review every single position in the
22  company at that point.
23     Q.  Did you review any others besides the job --
24  jobs that are were on the -- the website that were open at
25  the time?

232

1      A.  I can't remember the full list that I looked
2  at, but there were, you know, probably a number open at
3  the time, and those were a couple that I thought would be
4  a good starting place to start talking with Ed about.
5      Q.  Okay.  So it's possible at that time, when you
6  were coming up with the two jobs that you -- came up with
7  the list of two jobs that he jobs he was qualified for,
8  there could have been other jobs that you weren't looking
9  at specifically that he might have been qualified for?  Is
10  that -- is that possible?
11     A.  Yes.
12     Q.  Okay.  Did -- and you were the only person
13  doing that evaluation of what jobs might be -- he might be
14  qualified for, right?  You didn't have any assistance --
15     A.  I don't -- I don't recall talking with the --
16  as you said, anybody else outside the department.
17     Q.  Okay.
18     A.  I may have had a discussion with the employee
19  relations managers.  We typically talk about those things
20  together.
21     Q.  Okay.  Okay.  To go through the process of
22  qualifying -- you know, figuring out Mr. -- Mr. Quick's
23  capabilities or disabilities and figuring out what job he
24  would -- he could be qualified for, would that be an
25  expensive process for Frontier Airlines?

233

1      A.  An expensive process for us to review?
2      Q.  To figure out what his capabilities were and
3  what job he was qualified for?  Would that be an onerous
4  or an expensive process for Frontier to engage in?
5      A.  No.  And we were making reasonable efforts to
6  engage with Ed to do just that.
7      Q.  Okay.  I think earlier you said you go through
8  interactive processes pretty frequently under the ADA,
9  right?
10     A.  Correct.
11     Q.  Okay.  So -- and you -- I think we talked
12  earlier about how there were more than a thousand pilots,
13  right?
14     A.  Yes.
15     Q.  So this -- dealing with the -- the reemployment
16  with Mr. Quick, even if it might have been more
17  complicated than the ordinary reemployment of a pilot who
18  didn't have a disability, it wouldn't add kind of a -- an
19  onerous or an impossible cost for the airline to bear,
20  right?
21     A.  Not to go through that process.  To place him
22  in a job without having gone through that process and --
23  and having a comfort level of where he was placed, both
24  for Ed and us, would not be good.
25     I mean, we would need to -- based on the fact

234

1  that we're an airline and it's an operation responsible
2  for passenger safety, it's important for us to engage with
3  Ed and -- and -- and do that.
4      Q   Okay.  Hand you what will be Exhibit 41 and ask
5  you to identify it.
6          (Deposition Exhibit 41 was marked.)
7          THE WITNESS:  Peter, at another point in
8  time --
9          MR. ROMER-FRIEDMAN:  Yeah.  Why don't we take a
10  break after this one, and then we'll try to finish up in
11  the next 45 minutes.
12         THE WITNESS:  I'm just wondering if these are
13  all labels for me.
14         MR. ROMER-FRIEDMAN:  I hope not.
15     Q   (By Mr. Romer-Friedman)  Do you recognize this
16  e-mail exchange between you and Jacalyn Peter?
17     A   This is from Jackie to Brian Mumaugh, Jim
18  Colburn, CC myself, on January 12th.
19     Q   Okay.  Who -- at this point, who -- who -- who
20  are Brian Mumaugh and Jim Colburn, and why are you
21  involving them in Mr. Quick's reemployment discussions?
22     A   So this starts with an e-mail from Tracy, the
23  payroll manager.  She's asking about his rate of pay.  And
24  then I sent -- I sent an e-mail to Tracy.  Jackie's on
25  here talking about disagreement in his pay.

235

1      Q   Seems like in -- as -- at least as of
2  January 6, 2015, the payroll manager -- Ms. Vialpando?
3      A   Yes.
4      Q   -- doesn't know what Mr. Quick's rate of pay
5  should be, whether it should be captain or first officer,
6  different variations of that.  Is that -- is that fair to
7  say, that she doesn't understand what his pay rate should
8  be?
9      A   Yeah.  She's -- she's providing some
10  information and trying to ascertain.
11     Q   Okay.  And she's questioning, in this last
12  sentence, Should he have retained seniority in pay while
13  on mil -- I assume that's military leave -- per the CBA.
14  In this e-mail she's questioning whether he retained his
15  seniority and pay -- and -- and pay rate while he was on
16  military leave?  That's what she's questioning?
17     A   Yes.
18     Q   Why would the payroll manager have -- have no
19  idea that a service member who's been honorably discharged
20  would continue his seniority?  Why would that be a foreign
21  concept for her?
22         MR. DABNEY:  Object to form.  Foundation.
23     A   I can't say to her background or understanding
24  or reason behind.  She's obviously asking about it and not
25  only USERRA, but the collective bargaining agreement,

236

1  which sometimes they have to look at multiple -- multiple
2  things to determine.
3      Q   Okay.
4      A   So she might have been asking for
5  clarification, with those things in mind.
6          MR. ROMER-FRIEDMAN:  All right.  Let's take a
7  quick break.
8          THE WITNESS:  Thanks.
9          THE VIDEOGRAPHER:  Going off the record.  This
10  is the end of Media Unit 3.  The time is 8:22.
11         (A recess was taken from 8:22 p.m. until
12  8:35 p.m.)
13         THE VIDEOGRAPHER:  Back on record with Media
14  Unit 4.  The time is 8:35.  This is the deposition of
15  Michelle Zeier.
16     Q   (By Mr. Romer-Friedman)  All right.  Ms. Zeier,
17  we're going to try to wrap this up soon.  You understand
18  we're (sic) still under oath?
19     A   I do.
20     Q   Same ground rules apply?
21     A   Yes, sir.
22     Q   Great.  Okay.
23         I'm going to hand you what will be Exhibit 42.
24         (Deposition Exhibit 42 was marked.)
25     Q   (By Mr. Romer-Friedman)  Here you go.

237

1      A   Thank you.
2      Q   And if you could identify what this exhibit is,
3  I'd appreciate it.
4      A   This looks like originally e and-mail from
5  Cassie, the drug and alcohol coordinator, to Dave Welt on
6  February 11th and then a response on the same day.
7      Q   Okay.  And who -- who -- who is Dave Welt?
8      A   The director of flight operations training.
9      Q   Okay.  So he responds to Ms. Micklich who --
10  Ms. Micklich asks, Ed Quick, is he doing any training here
11  at the GO?  What would "the GO" be?
12     A   Our general offices.
13     Q   Okay.  And Dave Welt responds, Nope.  Talked to
14  Jackie and Michelle -- Michelle is you?
15     A   Yes.
16     Q   -- about that one.
17         And Jackie is Jacalyn Peter?
18     A   Correct.
19     Q   Okay.  Why -- why do you think he would respond
20  this way?
21         MR. DABNEY:  Objection.  Form.  Foundation.
22     A   I don't know, other than he maybe knew I was
23  the point of contact for Ed or that we were involved with
24  Ed in his return proces.
25     Q   (By Mr. Romer-Friedman)  Okay.  How -- how

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

238

1    would Mr. Welt know that?
2        A    I don't know.
3        Q    Okay.  I guess Mr. Thibodeau could have -- but
4    did he report to Mr. Thibodeau?
5        A    No.
6        Q    He was in a separate department?
7        A    Under the flight ops umbrella, but as JP
8    explained, the training department doesn't report to him.
9        Q    Okay.  But at least at this point, in February
10   of 2015, Mr. Welt knew, in this exchange, that Mr. Quick
11   -- that Quick -- Mr. Quick was not going to be doing any
12   training?
13           MR. DABNEY:  Objection.  Form.  Foundation.
14       A    At that point, he's saying that he isn't aware
15   of him doing training at the general offices.
16       Q    (By Mr. Romer-Friedman)  Okay.  Would Mr. Welt
17   ordinarily be part of any -- determining any training that
18   a returning service member, returning employee, pilot,
19   needs to undertake?
20       A    My understanding is he would generally be
21   involved with and have knowledge of pilot training
22   schedules, et cetera.
23       Q    Okay.  I'm going to hand you what will be
24   Exhibit 43.
25           (Deposition Exhibit 43 was marked.)

239

1        Q    (By Mr. Romer-Friedman)  Do you recognize this
2    document, particularly the first two pages?  This is -- is
3    this an e-mail exchange between Brian Mumaugh and you and
4    Mr. -- and Ms. Peter?
5        A    I see Jackie on here.
6        Q    Okay.
7        A    I don't know.
8        Q    So on -- on -- on January 22nd -- on January
9    26, 2015, Mr. Mumaugh writes to Ms. Peter and you a draft
10   response to Quick, correct?
11       A    On January 26th, yes, it looks like I was --
12           MR. DABNEY:  Hold on a second.  We need to take
13   a break.
14           MR. ROMER-FRIEDMAN:  Can we go off the record.
15           THE VIDEOGRAPHER:  Going off the record.  The
16   time is 8:40.
17           (A discussion was held off the record.)
18           THE VIDEOGRAPHER:  Back on the record.  The
19   time is 8:41.
20           MR. ROMER-FRIEDMAN:  Okay.  Counsel has
21   discussed Bates Number 1862 and 1863 that's potentially
22   including attorney-client privileged information.  At
23   least for the purposes of this deposition, I'm going to
24   withdraw Exhibit 43, and we're not going to make this part
25   of the record.

240

1        Is that acceptable, Counsel?
2            MR. DABNEY:  Well, I appreciate you're doing
3    that for purposes of the deposition.  Of course, our
4    position's going to be it's not going -- it's not going to
5    have -- it should not -- it should be part of the
6    litigation under -- in any context, the deposition and
7    otherwise.
8            MR. ROMER-FRIEDMAN:  Okay.  Can we discuss your
9    request to claw back after we're off the record today?
10           MR. DABNEY:  Sure.
11           MR. ROMER-FRIEDMAN:  Okay.  And I think that we
12   will likely be able to -- to do that.
13           Okay?
14           Okay.  Hand that to him -- or how do you want
15   to handle it?  I'm just going to -- we'll move on.
16       Q    (By Mr. Romer-Friedman)  All right.  Ms. Zeier,
17   it just -- it seems to me, going -- looking at kind of the
18   back and forth over the five-, six-month period that
19   Mr. Quick was kind of in a weird -- in a limbo process or
20   limbo in terms of not knowing where he stood.
21       Is that a fair way to describe what happened to
22   him or how the process resulted in -- in him being put in
23   limbo for months on end?
24       A    I don't know that that's a fair
25   characterization.  As I've said before, Ed and I had

241

1    dialogue from the time that he -- or after he contacted
2    JP.  I engaged with him and attempted to assist him on the
3    things that he said were a priority, which were the
4    long-term disability.  We agreed that the -- on the time
5    frame.  And, yes, he eventually attended new-employee
6    orientation on January 5th.
7        Q    And on the time frame, that -- that goes back
8    to your contention earlier that you -- you think he agreed
9    to delay the new-employee orientation for some period of
10   time, right?
11       A    It was mutually agreed to, is my understanding.
12       Q    He didn't -- he didn't agree to be -- to wait
13   for reemployment until halfway through 2015, right?
14           MR. DABNEY:  Object to form.  Foundation.
15       Q    (By Mr. Romer-Friedman)  He didn't -- he didn't
16   waive his reemployment rights at any point or say that you
17   could wait six or seven months to actually offer him a
18   position, correct?
19           MR. DABNEY:  Object to form.  Foundation.
20       A    As I said, we mutually agreed upon his
21   January 5th start date.
22       Q    (By Mr. Romer-Friedman)  Did you sign --
23       A    And there was -- and there was -- there was
24   dialogue up until that point and efforts to assist Ed in
25   answering the questions that he had along the way.

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

242

1      Q   Okay.  I'm going to hand you Exhibit 44 and ask
2   you if you'd identify this document.
3          (Deposition Exhibit 44 was marked.)
4      A   Yes.  It's from me to Shelly Leyner.
5      Q   (By Mr. Romer-Friedman)  Who was Shelly Leyner?
6      A   She was the supervisor of disability management
7   at the time.
8      Q   Did she -- you supervise her?
9      A   I did at the time.
10     Q   At the time?  Okay.
11         How come -- is there any reason why she doesn't
12  appear in any more -- any of this correspondence, if she
13  -- she was the -- you said the director of disability
14  management?
15     A   She was the supervisor of disability
16  management.  And you can see on the e-mail that Brandi
17  Aragon is also there.  Brandi reported to Shelly at the
18  time, and I think Brandi is maybe involved in some of the
19  prior correspondence.
20     Q   Okay.  All right.  So in this e-mail on January
21  8th, 2015, you write to Ms. Leyner and Ms. Aragon, Oh, I
22  -- I must have been thinking about Malia Keck.  You can
23  send coding.  He went to NEO 1/5.
24         What are you talking about there?
25     A   Coding has to do with their process for

243

1   administering dates and coding for various leaves and
2   duration of time.
3      Q   Malia Keck, is she another employee?
4      A   I -- I believe she was another employee, yes.
5      Q   Okay.  And the subject of this exchange is
6   Edward Quick, RTW, right?
7      A   Yes.
8      Q   What does "RTW" stand for?
9      A   Return to work.
10     Q   Okay.  So you're -- the discussion is about Ed
11  Quick returning to work?  That's the subject of these
12  e-mail exchanges?
13     A   Yes.
14     Q   Okay.  And Ms. Leyner is asking you about Ed
15  Quick returning to work, and she says, Not that I can see
16  in the notes.  Brandi, can you respond to verify that the
17  coding is not done yet?
18         What -- what is she talking about there?
19     A   I think they're just trying to ascertain if
20  they've done the coding yet or not with regard to Ed's
21  return.
22     Q   And what is -- what is the code -- what --
23  could you describe what coding is?
24     A   Sure.
25         So the leave of absence department, as I said,

244

1   they have different codes for different types of leave and
2   when a person is going out versus when they're coming
3   back.  And with regard to crew, pilots and flight
4   attendants, they communicate or send this coding to crew
5   scheduling so that the crew scheduling department knows
6   the status also of the availability of crew members as a
7   -- as a general protocol.
8      Q   Okay.  So then you write -- with respect to Ed
9   Quick, RTW, you write, You can send coding.  He -- he is
10  talking about -- "he" is Ed Quick in this?
11     A   "He" meaning Ed Quick, yes.
12     Q   -- Ed Quick went to NEO 1/5, that means he went
13  to the new-employee orientation on 1/5/15?
14     A   Correct.  Correct.
15     Q   Okay.  And then you say, We are still in weird
16  limbo land with him anyway . . . Thanks.
17     A   I did write that, yes.
18     Q   Okay.  So when you said you were in weird limbo
19  land with Ed Quick, what did you -- what did you mean by
20  that?
21     A   Meaning that we were still trying to figure out
22  his long-term disability, possible placement, et cetera,
23  but that he was -- that we were sending him to
24  new-employee orientation on the 5th and that they had the
25  green light to do the coding accordingly.

245

1      Q   Okay.  So in the context of this e-mail, Ed
2   Quick, return to work on January 8, 2015, you -- part
3   of -- one of the options that you were working on or
4   considering was placing him in a -- in a position?
5          That's what you were talking about in terms of
6   placement?
7      A   That those were still all the things that we
8   were trying to figure out with Ed.
9      Q   Okay.  Thanks.
10         Who is Girardo Ariano -- Ariano?
11     A   Yeah, he goes by Jerry Ariano.  He was an
12  employee relations manager, I believe, at the time.  He
13  still is in the HR department.
14     Q   What does he do there?
15     A   The job scope is pretty wide, but they assist
16  employees and -- and management on employment-related
17  matters.
18     Q   Okay.  Okay.  This will be Exhibit 45.
19         (Deposition Exhibit 45 was marked.)
20     Q   (By Mr. Romer-Friedman)  I think we talked
21  about this -- part of this exchange earlier.  Do you
22  recognize this document, Exhibit 45?
23     A   Not yet.  Give me a second.
24     Q   Sure.
25     A   So the first e-mail is from Anthony to Krista

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

246

1    and myself on January 27th.
2        Q   Okay.  And he writes, Krista will call Ed Quick
3    to get him enrolled tomorrow.
4            Does this refresh your memory of when
5    Mr. Quick's benefits were reinstated?
6        A   Yeah.  This must have been during that time
7    when we were, you know, figuring out the 30-day waiting
8    period and correcting that.
9        Q   Okay.  So it -- it -- this refreshes your
10   memory that his benefits would have been reinstated in --
11   in late January, after this January 27th e-mail?
12       A   That's what I'm taking from this e-mail.  I
13   don't recall this one specifically.
14       Q   Okay.  And he -- Mr. Sabia writes, What I
15   learned from a conversation with Jackie just now is that
16   he has a government exception in his orders that has to do
17   with serving in wartime.  That exception waives the
18   five-year limit period for reemployment benefits, below.
19   And says, Must not have exceeded the five-year cumulative
20   limit on period of services.
21           Because of these orders and the time/reason he
22   served, his benefits will be effective immediately.  I
23   hope this clears up any confusion, as -- as the exception
24   per the government and in his orders overrules any waiting
25   limit?

247

1            So he wrote that, correct?
2        A   Yes.
3        Q   And you received that e-mail?
4        A   Yes.
5        Q   Okay.  Was this the first time that you learned
6    that there were exceptions to the five-year limit on
7    service?
8        A   I know, as I testified before, generally that
9    there are exceptions to the five years.  I don't remember
10   at what point in time through receiving his orders and
11   looking at them that we paid attention to that.
12           And in the prior exhibits about the 30-day
13   waiting period and the correction on that, I don't know
14   what the date on that is relevant to this date,
15   January 27th, but there may have been, you know, some
16   initial discussion about that, and this could be some
17   follow-up also related to it.
18       Q   So even after you allegedly provisionally
19   employed -- reemployed Mr. Quick on January 5th, 2015, was
20   there still confusion within the HR department about
21   whether you-all believed that he satisfied the
22   reemployment requirements under USERRA?
23       A   I don't know.  A lot of times there -- we -- we
24   go forward based on our understanding, and if somebody in
25   the group has a follow-up question or -- or clarification

248

1    or verification that they want to make, it's conceivable
2    that they would -- they would still do that.
3        Q   Okay.  So is it -- it's possible that you
4    didn't communicate to these other people in HR that
5    Mr. Quick had qualified to be reemployed and that's why
6    they didn't understand that these benefits should be --
7        A   I don't know.
8        Q   (By Mr. Romer-Friedman)  -- effective
9    immediately?
10           MR. DABNEY:  Object to form.  Foundation.  I
11   don't think it -- I think it misstates the prior
12   testimony.
13       A   The prior exhibit between Krista and myself,
14   where I have the understanding and communicate to Ed that
15   there's a waiting period, then later I said, Oh, I stand
16   corrected, there's not -- I mean, that was what it was --
17       Q   (By Mr. Romer-Friedman)  Okay.
18       A   -- as far as timeline.
19       Q   Okay.  I'll hand you what will be Exhibit 46.
20           (Deposition Exhibit 46 was marked.)
21       Q   (By Mr. Romer-Friedman)  Earlier I had asked
22   you if you knew when Frontier, the HR department, began to
23   calculate Mr. Quick's makeup or catchup defined
24   contributions.
25       A   Correct.

249

1        Q   Does this appear to be an e-mail between Krista
2    Shaff and Anthony Sabia --
3        A   Yes.
4        Q   -- on March 6th, 2015?
5        A   Yes.
6        Q   And it says, Okay.  I have started the
7    spreadsheet for Ed Quick.  I've looked through the CBA to
8    try to find the match amounts and deferred comp amounts.
9    What I cannot determine is 401(k) contributions prior to
10   his leave, as Oracle only goes back to 12/7, and he was
11   already at zero hours.  And then what he should have been
12   paid hourly rate wise, but I think he was going to have
13   Hillary do that piece.  Let me know what changes need to
14   be made or if this was correct.
15           That's what it says, right?
16       A   Yes.
17       Q   Okay.  And does this refresh your memory about
18   when the company began to calculate Mr. Quick's defined
19   contributions?
20       A   This still doesn't make it clear to me exactly
21   when they started looking into it, because it appears as
22   though he's already done some evaluation.
23       Q   But clearly in March of 2015, they were still
24   working on it, right?
25       A   Yes.

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

250

1    Q   Correct?
2    A   Correct.
3    Q   Okay.  Have you -- and are you aware of any --
4  any defined contribution makeup taking that long to be
5  performed?
6    A   I don't know.
7    Q   Okay.  Could part of why it took so long to get
8  going in making this contribution or making this
9  calculation is that there was this limbo situation with Ed
10  for a number of months?
11    A   I don't know that that's the case.  I think we
12  were addressing multiple issues with Ed, and looks like
13  they had started work on it but were still working on it
14  in March.
15    Q   Okay.
16    A   I know that they had, because of the period of
17  time, and we had changed HRIS systems.
18    Q   Say that again.
19    A   We had changed HRIS systems over that period.
20  We were using ADP; then we used Oracle; then we used
21  UltiPro.  So I know they had to try to go back and access
22  those systems and look at if there were any benefit
23  changes over time.
24    Q   Okay.  And if -- if Mr. Quick had not actually
25  been reemployed, Frontier would not have owed him any

251

1  makeup contributions; is that correct?
2    Let me take a step back.
3    Do you understand how the -- the makeup
4  contributions work under USERRA, under --
5    A   That there's an escalator provision and that
6  he's -- I think I testified before that there's a defined
7  contribution plan for pilots that wouldn't require him to
8  contribute.  It's a little bit different for 401(k), but
9  that he would have opportunities to be made whole with
10  regard to those benefits.
11    Q   I guess what I'm asking is to -- more
12  fundamentally is if a pilot never returns to a reemployed
13  position, do you know if Frontier would have to make --
14  make up a contribution for any sort of pension?
15    A   I'm most familiar with that process happening
16  when they do return.  I -- I'm not sure beyond that, to be
17  honest.
18    Q   Have you ever made a pension contribution for a
19  service member who went on leave for a year or any period
20  of time and never returned to the company?
21    A   That's not my area of responsibility, and I'm
22  not sure.
23    Q   So you've never seen it done, right?
24    A   I wouldn't even know about it.
25    Q   You -- you've -- you've never actually heard or

252

1  seen of a service member leave the company, not return and
2  get pension contribution for their military service,
3  right?
4    A   I'm not aware of any specific examples of that.
5    Q   Okay.  So if Mr. Quick had not actually been
6  reemployed into a reemployed position, it's foreseeable
7  that the company would have never made that makeup
8  contribution, correct?
9    A   I think you're mischaracterizing it.  I just
10  said I don't know.
11    Q   Okay.  And he was ultimately paid about $32,000
12  for the defined contribution makeup, correct?  I don't
13  know if that's on the paper.
14    A   I don't know the exact amount.  Is that in this
15  document?
16    Q   It's not in that document.
17    Do you -- do you know how much he was provided
18  in makeup contributions?
19    A   Was that for the DC?
20    Q   For the DC.
21    A   That sounds about right.  I'm not sure of
22  the --
23    Q   Okay.  Do you know if he was ever given any
24  sort of 401(k) match contribution -- makeup contribution?
25    A   I didn't know at this time, when this was going

253

1  on, what the calculations were or what had been -- it's
2  only later through this process that I know that there was
3  a DC plan makeup.  I don't know that there's been a
4  401(k).  Not to my knowledge.
5    Q   If -- if -- if he -- if Mr. Quick has not been
6  informed of what he needs to pay to have the company match
7  for the makeup contribution, is that -- to -- to this day,
8  is that -- would that be consistent with Frontier's policy
9  under USERRA?
10    A   That if he --
11    Q   If he hasn't been informed what he's allowed to
12  match so that Frontier can match it.
13    A   I don't know that -- I don't know if he's been
14  informed or not.  Those would have been discussions
15  between he and the benefits department.
16    Q   Okay.  But if -- if he hasn't been informed
17  now, almost two years after he sought reemployment, that
18  wouldn't be consistent with Frontier's policy, right?
19    MR. DABNEY:  Objection.  Assumes facts.
20    A   I don't know.
21    Q   (By Mr. Romer-Friedman)  Have you ever heard of
22  a pilot or another employee waiting two years to be
23  informed what they need to pay in order to get a makeup
24  matching contribution under a 401(k)?
25    A   I'm not aware of the timelines with other

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

254

1    people, and I'm not sure what's been communicated about
2    that to Ed.
3        Q   I'm going to hand you what will be Exhibit 47.
4            (Deposition Exhibit 47 was marked.)
5        A   Okay.
6        Q   (By Mr. Romer-Friedman)  Okay.  Is this an
7    exchange between you and -- e-mail exchange between you and
8    Cassandra Micklich?
9        A   Yes.
10       Q   Okay.  And on November 18th, on this first page
11   of Exhibit 47 --
12       A   Yes.
13       Q   -- you state here, Hi, Cassie, please hold off
14   calling Ed Quick today until I have a chance to connect
15   with you.
16       A   Yes.
17       Q   Okay.  And Cassie is the drug and alcohol
18   coordinator?
19       A   Yes.
20       Q   Why did you tell her to hold off?
21           Were -- were you telling her to hold off on --
22   on calling Quick to schedule a drug and alcohol test?
23       A   Yes.
24       Q   Okay.  Why did you tell her to hold off?
25       A   I can't remember exactly, but it may have had

255

1    to do with my communications with Ed about the timing of
2    his return.
3        Q   Okay.  Have you ever told the drug and alcohol
4    coordinator to hold off on scheduling this kind of testing
5    for someone who's being returned?
6        A   Yes, if it had to do with corresponding with
7    their attendance at the employee orientation.
8        Q   Say that again?
9        A   Or when they would start the -- and when they
10   were scheduled for new-employee orientation --
11       Q   Okay.
12       A   -- if there was a change in schedule.
13       Q   Well, at this point, you hadn't scheduled
14   Mr. Quick for new-employee orientation, right, because he
15   -- he did the new-employee orientation on January 5th,
16   2015, which is about a month and a half after this e-mail,
17   right?
18       A   I can't recall if there were some prior
19   discussions with him about a possible start date sooner
20   than that and then we ended up waiting until the 5th.
21       Q   Okay.
22       A   But I would have been in communication with Ed
23   about all of that pertaining to scheduling and when he
24   would start.
25       Q   Okay.  But then on the second page of

256

1    Exhibit 47, you write on November 25th to Ms. Micklich and
2    Jacalyn Peter, Hi, Cassie, can you please go forward with
3    the notification to Ed Quick?  Right?
4        A   Yeah.
5        Q   Okay.  What -- what changed between November
6    18th and November 25th?
7        A   I don't know.  There must have been
8    back-and-forth discussions, you know, with Ed about when
9    we were actually going to have him come in and start.
10           I think there was a prior exhibit about, you
11   know, getting into the holidays and if you want to wait
12   until after the holidays, go ahead, and -- and I think we
13   decided to do that.
14       Q   How long does it take to usually schedule
15   someone who's trying to return to their job for a drug and
16   alcohol testing, routinely?
17       A   It doesn't take very long.
18       Q   Less than a week?
19       A   But it -- it coincides with when they're going
20   to return, when they're scheduled to return.
21       Q   So, then, what you just said a second --
22   a minute ago, you're holding off on doing the drug
23   testing, but the going forward on November 25th, does that
24   signal that you were trying to proceed with actually
25   returning him to a job or -- or --

257

1        A   It appears that there were different
2    anticipated start dates back and forth, but we didn't
3    actually end up starting him until the 5th, and I believe
4    there was a prior exhibit about yet another time frame
5    closer to that date that we did have Cassie contact him.
6        Q   Okay.  I know a lot of ink has been spilled on
7    what Mr. Quick's capabilities or disabilities have been
8    over various periods of times, particularly in the expert
9    reports.
10           Have you looked at any of those expert reports?
11       A   Which expert reports are you referring to?
12       Q   That have been -- that have been part of this
13   case.
14       A   No.
15       Q   So you've not looked at any expert reports?
16       A   I sat -- I sat in on Ed's deposition, heard his
17   testimony, but I haven't reviewed the documents associated
18   with that testimony.
19       Q   Okay.  Have you -- did you -- did your -- did
20   you talk to anyone prior -- are you aware that the
21   defendants in this case have served expert reports on the
22   plaintiff?
23       A   I'm aware that as a part of this process, there
24   were reports from maybe his hearings related to the Social
25   Security and the military benefits were -- were provided.

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

258

1    I have not reviewed them.
2        Q    Okay.  And you didn't -- you didn't look at
3    them or you weren't consulted prior to the serving of
4    those reports, right?
5        A    Right.
6        Q    You didn't hire the experts?
7        A    No.
8        Q    You didn't pay the experts?
9        A    You're talking about the experts in regard to
10   what?  Who?
11       Q    The experts that are -- that are working for
12   the defendants in this case, including you.
13           MR. DABNEY:  You're asking her who paid the
14   experts?
15       A    I don't understand the question, who paid the
16   experts.
17       Q    (By Mr. Romer-Friedman)  Are you -- are you
18   aware who the experts are who are working for the
19   defendants in this case?
20       A    With regard to documents provided through the
21   Social Security Administration and -- who are the experts
22   we're referring to?
23       Q    I'm asking, are you aware of any experts that
24   are working for the defendants to provide expert opinions
25   in this case?

259

1        A    No.
2        Q    And you didn't speak to anyone at Frontier or
3    your counsel before those were produced -- before any
4    expert reports were produced to the plaintiff?
5            MR. DABNEY:  Don't answer about any
6    conversation you did or did not have with counsel.
7        A    I can't recall what you're -- what you're
8    referring to.
9        Q    (By Mr. Romer-Friedman)  Okay.  So you don't
10   have any reason to know whether you agree with the
11   defendants' expert reports or not?
12           MR. DABNEY:  Form.  Foundation.
13       A    I don't recall --
14       Q    (By Mr. Romer-Friedman)  Let me rephrase.
15           If expert reports have been provided to the
16   plaintiff on behalf of the defendants in this case, you
17   have no idea whether you agree with them or disagree with
18   them, correct?
19           MR. DABNEY:  Form.  Foundation.
20       Q    (By Mr. Romer-Friedman)  You can answer.
21       A    I don't know.
22       Q    You have no way of knowing, right, because you
23   haven't read them or seen them?
24       A    I don't believe so.  I'm -- I'm having a hard
25   time understanding exactly what you're talking about.

260

1    That's why I keep asking you to clarify.
2        Q    Okay.  Did you -- did you respond to
3    interrogatories that were asked -- that you were asked to
4    answer by the plaintiff --
5        A    Yes --
6        Q    -- in this case?
7        A    -- as I recall.
8        Q    Okay.
9        A    Interrogatories, yes.
10       Q    What did you do to respond to the
11   interrogatories?
12       A    Reviewed correspondence based on the questions,
13   tried to do whatever research was necessary to answer.
14       Q    Okay.  I'm going to hand you what is Exhibit 47
15   [sic].
16           (Deposition Exhibit 47 was marked.)
17       Q    (By Mr. Romer-Friedman)  Do you recognize this
18   document?
19       A    Yes.
20       Q    What is it?
21           MR. DABNEY:  Is this 47?
22           MR. ROMER-FRIEDMAN:  I'm sorry.  This is --
23           (A discussion was held off the record.)
24           MR. ROMER-FRIEDMAN:  We will call this 48.
25   Here, I'll take that one.  We can figure out how we

261

1    screwed up the exhibits afterwards, maybe.
2            (Deposition Exhibit 48 was marked.)
3        Q    (By Mr. Romer-Friedman)  Do you recognize
4    Exhibit 48?
5        A    This is Defendant Michelle Zeier's Responses to
6    Plaintiff's First Set of Interrogatories and Request for
7    Production.
8        Q    Okay.  And on the last page, Page 17, after
9    what -- Page 16, there's a sheet that has a signature
10   above Michelle Zeier?
11       A    Yes.
12       Q    Is that your signature?
13       A    Yes.
14       Q    Okay.  And you state here that you read the
15   foregoing answers.  The foregoing interrogatories and the
16   answers are true and correct to the best of my knowledge
17   and information, belief, based on records of defendant?
18       A    Yes.
19       Q    Okay.  And is that still correct?
20       A    Yes.
21       Q    And is -- do you have any reason to believe
22   that this information is not still correct?
23       A    I have no reason to believe that they were --
24   that there was anything incorrect at the time, certainly.
25       Q    Okay.  Have you been promised to be indemnified

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

262

1   by Frontier Airlines for any liability that you have in
2   this case?
3        A   I believe so.  That's -- that was -- I don't
4   know if that was exactly the verbiage discussed, but it's
5   my understanding that I'm being represented by counsel
6   personally, as well as them representing Frontier.
7        Q   I think that might be a different question.
8            So it sounds like you're saying that Frontier
9   Airlines is paying for your counsel to represent you and
10  Frontier Airlines; is that correct?
11       A   Yes.
12       Q   So you're not paying Mr. Dabney or his law
13  firm?
14       A   Correct.
15       Q   Okay.  In addition to that, the question that I
16  have is, is there an agreement, like a contract or some
17  sort of employment agreement between you and Frontier,
18  where Frontier Airlines has agreed to indemnify you and
19  pay whatever damages you -- you might have to pay in this
20  case?
21       A   I didn't sign a contract, but it's my
22  understanding that that -- that that is the case.
23       Q   What is your understanding based on that you
24  have been indemnified -- or promised indemnification by
25  Frontier Airlines?

263

1        A   Yes.
2        Q   How -- how -- how did you come to understand
3   that?
4        A   Through the course of the process that -- that
5   that would be the case and that it wasn't necessary for me
6   to secure separate counsel.
7        Q   Okay.  So there's no written document; it's
8   just an oral promise that Frontier has made to you that if
9   you end up having to pay a million dollars of damages in
10  this case that Frontier Airlines will pay?
11       A   There's no document that I'm aware of.
12       Q   But you have an agreement to that -- to that
13  effect?
14       A   That's my understanding.
15       Q   Okay.  Do you know if that's binding?
16           MR. DABNEY:  Object to form.  Foundation.
17           MR. ROMER-FRIEDMAN:  Legal conclusion as well.
18       Q   (By Mr. Romer-Friedman)  Do you -- do you -- I
19  mean, do you know if -- if you can actually enforce that
20  against Frontier Airlines?
21           Did you get --
22           MR. DABNEY:  Same objection to the same
23  question.
24       A   I don't know.
25       Q   (By Mr. Romer-Friedman)  Did you give Frontier

264

1   Airlines any consideration or anything in return for that
2   promise?
3        A   No.
4        Q   Okay.  Who told you that you --
5            MR. DABNEY:  I'll object to the last question
6   on the same basis.  It calls for a legal conclusion --
7            MR. ROMER-FRIEDMAN:  Okay.
8            MR. DABNEY:  -- and lacks foundation.
9        Q   (By Mr. Romer-Friedman)  Who -- who told you
10  that you were indemnified in this -- for -- for any
11  actions that you took with respect to this case?
12       A   Counsel, whether it be Jackie Peter or
13  Holland & Hart.
14       Q   Is that standard operating procedure, for
15  HR/labor relations officials at the Frontier Airlines to
16  be indemnified for violations of the law if they are named
17  in an individual capacity?
18           MR. DABNEY:  Same -- same objections.  The
19  witness has no foundation to answer about the nature of
20  indemnification or for what actions it might -- that might
21  apply.  She has no idea about the standard operating
22  procedure in those matters.  She's already testified she
23  lacks the foundation.
24       Q   (By Mr. Romer-Friedman)  You just testified
25  that you have an understanding that you have an agreement

265

1   with Frontier Airlines that the airline will indemnify you
2   if you end up having to pay damages in this case, correct?
3        A   That's my understanding.
4        Q   Okay.  And my question is, is that the standard
5   way in which indemnification works at the company for HR
6   or labor relations officials?
7            MR. DABNEY:  Same objections.
8        A   I believe it's happened in other cases.  I
9   don't know what the particulars were of those agreements
10  with other people.
11       Q   (By Mr. Romer-Friedman)  Does it matter whether
12  your violations are found to be willful under the law in
13  terms of your indemnification agreement, or is it that no
14  matter what the standard of -- of -- of violations are
15  that you'll -- you'll be indemnified?
16           MR. DABNEY:  Same objections.  She has no
17  foundation to answer questions about --
18           MR. ROMER-FRIEDMAN:  You can --
19           MR. DABNEY:  -- with respect to any of these
20  legal concepts.
21       Q   (By Mr. Romer-Friedman)  What's your
22  understanding?
23       A   I don't know.
24       Q   Okay.  Do you have any sort of direct insurance
25  policy for you in an individual capacity that would allow

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

266

1  you to pay a judgment in a case like this?
2       A  No.
3       Q  Do you know if the directors and officers of
4  the company have such a policy?
5       A  I'm not sure.
6       Q  Okay.  Okay.
7       MR. ROMER-FRIEDMAN:  I think we're -- we're
8  done for this evening, unless you have anything.
9       MR. DABNEY:  I do.  I have literally very few
10  follow-up questions.
11       EXAMINATION
12  BY MR. DABNEY:
13       Q  Ms. Zeier, do you recall testifying earlier at
14  some point today on the issue of whether or not you had
15  ever asked Mr. Quick about any specific disability that he
16  may have at any point in time?
17       A  I'm sorry, Bill.  Can you say that again,
18  please?
19       Q  Sure.
20       Do you remember testifying at some point today
21  about whether you had ever asked Mr. Quick at any point in
22  time what specific disability he may have?
23       A  Yes, that came up.
24       Q  Okay.  And when you were asked that question,
25  were you asked it in -- in conjunction with reviewing your

267

1  February 9th or March 6th e-mails to Mr. Quick?
2       A  Yes.
3       Q  Okay.  If you'd take a look back at Exhibit 37.
4       A  Okay.
5       Q  If you look at the last paragraph on the second
6  page.
7       A  Yes.
8       Q  You notice there's a sentence that begins,
9  towards the right-hand side in the middle, You have also
10  and just recently suggested that you may be seriously
11  interested in returning to a non-pilot position at
12  Frontier.
13       A  Right.
14       Q  Ms. Zeier, it says, If you're interested, then
15  please engage with us in a meaningful dialogue and the
16  manner indicated above to help us identify another
17  position which you will accept and which you're qualified
18  to perform, including with reasonable accommodation and/or
19  training by Frontier.
20       A  Yes.  That's what it said on the March 6th.
21       Q  Now, is -- is that -- that information conveyed
22  to Mr. Quick, is that an -- an attempt by you to determine
23  information regarding his specific disability?
24       A  Yes.
25       MR. ROMER-FRIEDMAN:  Objection.  Leading.

268

1       Q  (By Mr. Dabney)  Take a look at Exhibit 35.
2       A  Okay.
3       Q  Again, in respect to Mr. Romer-Friedman's
4  questions on whether you ever asked Mr. Quick about what
5  specific disability he may have had at any point in time,
6  I want to direct your attention to the second page of
7  Exhibit 35, second paragraph there.
8       A  Okay.
9       Q  There's a sentence that begins toward the
10  middle of the paragraph, Without more information from you
11  about your interests and abilities, it is impossible for
12  us to know what open positions you are either interested
13  in or qualified with reasonable retraining to hold.
14       And is that -- conveying that statement to
15  Mr. Quick, is that an attempt by you to determine what
16  specific abilities or disabilities he may have?
17       MR. ROMER-FRIEDMAN:  Objection.  Asked and
18  answered.
19       A  Um --
20       MR. ROMER-FRIEDMAN:  Leading.
21       A  May I answer the question?
22       MR. ROMER-FRIEDMAN:  Answer.
23       A  As I stated before, we had made attempts and
24  engaged -- engaged with Ed, primarily through long-term
25  disability leave of absence processes, and had not

269

1  obtained information through that period of time as to
2  what his disabilities were.  These were attempts to try to
3  make it clear that we were asking for that information.
4       Q  Do you recall testimony earlier today in regard
5  to the issue of Mr. Quick's emphasis on a captain's rate
6  of pay being appropriate for him in his return to work
7  efforts?
8       A  Yes.  On many occasions, I testified to Ed's
9  questions about his rate of pay, his position that it
10  should be a captain's rate of pay, and that he expected
11  that in relation to his long-term disability benefits.
12       MR. DABNEY:  Those are my questions.
13       MR. ROMER-FRIEDMAN:  Okay.
14       EXAMINATION
15  BY MR. ROMER-FRIEDMAN:
16       Q  Before and after your February and March 6th
17  e-mails, you testified earlier that you did not ask
18  Mr. Quick to undergo any sort of medical exam or physical;
19  is that correct?
20       A  Yes.
21       Q  Okay.  If you had done that simple thing and he
22  had undergone that process, you would have known all of
23  Mr. Quick's capabilities and disabilities; is that
24  correct?
25       MR. DABNEY:  Object to form and foundation.

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

270

1      A   As I said before, there were other avenues that
2   we were focusing on with Ed, and through the long -- leave
3   of absence request process, we expected to obtain some
4   information, but we never did.
5      Q   (By Mr. Romer-Friedman)  And, again, the -- the
6   LTD/LOA, that was the -- the LOA form request, that was in
7   conjunction with asking him if he wanted, and he chose to,
8   pursue long-term disability leave, right?
9      A   Right.
10     Q   Okay.  And in terms of Mr. Quick's dispute or
11  disagreement with you about whether he should get captain
12  pay or first officer pay, that dispute did not prevent
13  Frontier from reemploying him, correct?
14     A   Correct.  It had to do with answering his
15  questions and -- related to long-term disability.
16     Q   Okay.  And in -- in the whole process between
17  September 20 -- 2014 and the -- and the point in, I guess,
18  mid-2015 when you had identified the two positions that
19  were offered to Mr. Quick, you didn't analyze or look at
20  or review any medical information or disability-related
21  information with respect to Mr. Quick, right?
22     A   I don't think we had any at that time,
23  information to review.
24     Q   Okay.  So if Ed had told you back in the fall
25  of 2014 that he had a mild case of TBI, PTSD, sleep apnea,

271

1   how would that have informed your decisions at that point?
2      Would you have just kind of decided with your
3   gut about what should be done, or would you consult a
4   medical professional?  Who would make that determination
5   about his abilities and capabilities?
6      A   There would be several, as we discussed before,
7   we would consider any documentation that's provided to the
8   employee, what they're telling us, ask them questions,
9   we'll evaluate the job description.  And based on that, we
10  have, in other instances, if we had questions, sent people
11  to medical professionals.
12     Q   Okay.  But despite knowing on October 7th, in
13  those notes we looked at, that Mr. Quick had a temporary
14  disability, from that point into the -- between that point
15  and the point that he was offered those two positions, you
16  never specifically asked him, what is that temporary
17  disability, correct?
18     MR. DABNEY:  Object.  Misstates the testimony.
19     (By Mr. Romer-Friedman)  You can answer.
20     A   He informed us he had a temporary disability,
21  or me in our first meeting, and we took other the avenues,
22  as I discussed, as far as obtaining information, and then
23  in the February and March e-mails, we -- we asked.
24     Q   You asked him to engage in a process, right?
25     A   Right.

272

1      Q   But you never --
2      A   To let us know --
3      Q   But, again, in -- your testimony before was
4   under oath, correct?
5      Previously, you testified today that you never
6   specifically asked him, What is that temporary disability?
7   And no one else, you said, to your knowledge, asked that
8   either of him; is that correct?  That's still correct?
9      Those e-mails don't specifically ask him, What
10  is that temporary disability, right?
11     A   That's what I was checking.  I think we asked
12  what his -- what his capabilities are, asked questions to
13  try to get information to engage him in that process.
14     Q   But those e-mails, and you're -- as you've
15  testified before, those -- that doesn't change your --
16  your testimony under oath earlier that you -- neither you
17  nor anyone else at the company -- Mr. Thibodeau,
18  Ms. Peter, none of you -- asked Mr. Quick, What is the
19  temporary disability you have; is that right?
20     MR. DABNEY:  That misstates her earlier
21  testimony.
22     Q   (By Mr. Romer-Friedman)  Is that correct?
23     A   Um --
24     Q   You never asked him that specific question,
25  correct?

273

1      A   I believe I testified that we had talked to Ed
2   about the leave of absence paperwork and that that was an
3   avenue we were working on to obtain information, and I
4   believe I testified that he didn't provide us medical
5   information.  And we didn't ask at that time what the
6   temporary disability was.
7      Q   Okay.
8      MR. ROMER-FRIEDMAN:  And I think -- yeah, I
9   think we're done.  Thank you.
10     THE WITNESS:  Okay.
11     THE VIDEOGRAPHER:  This concludes the
12  deposition of Michelle Zeier with Media Unit 4 of 4.
13     We are going off the record.  The time is 9:28.
14     (The deposition concluded at 9:28 p.m. on the
15  4th day of August, 2016.)
16
17
18
19
20
21
22
23
24
25

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

274

```
 1              AFFIDAVIT
 2    I have read my deposition, and it is true and accurate,
 3    except for changes or corrections now indicated by me on
 4              the Amendment sheet.
 5
 6        Amendment sheet attached  ( )
 7        No changes to testimony   ( )
 8
 9        _____
10        MICHELLE ZEIER
11
12    Subscribed and sworn to before me this
      date, _____ 2016.
13
          _____
14        My Commission expires:
15
          _____
16        NOTARY PUBLIC
17
          _____
18        STREET ADDRESS
19        _____
20        CITY, STATE, ZIP
21    Return to:  MILE HIGH COURT REPORTING & VIDEO, INC.
          14143 Denver West Parkway
          Suite 100
22        Golden, Colorado  80401
23
24
25
```

275

```
 1              CERTIFICATE
 2
      STATE OF COLORADO        )
 3                             ) ss.
      COUNTY OF ADAMS          )
 4
 5        I, SHAUNA T. DIETEL, Registered
      Professional Reporter, and Notary Public of the State of
 6    Colorado, certify that before the deposition the witness
      sworn by me to testify to the truth, and that the
 7    foregoing is a true transcript of the questions asked,
      testimony given, and proceedings had.
 8
 9        I further certify that I am not related to,
      any party herein, nor their counsel, and have no interest
10    in the result of this litigation.
11
12
13
          _____
14        Shauna T. Dietel, RPR
          My commission expires 8/6/2017
15
16
17
18
19
20
21
22
23
24
25
```

Mile High Court Reporting and Video, Inc.  303-202-0210
contact@milehighreporting.com

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

August 17, 2016


WILLIAM R. DABNEY  ESQ.
Holland & Hart, LLP
555 17th Street
Suite 3200
Denver, Colorado  80202


RE:  Quick v. Frontier Airlines, et al.
     Civil Action No. 15-cv-00765-REB-KMT
     Deposition of:  MICHELLE ZEIER
     Taken:  August 4, 2016


Dear Mr. Dabney:

Enclosed with your copy of the above-referenced
deposition is the signature page from the Court's
original transcript.

In accordance with the Rule, please have the witness
read and sign his or her testimony, then return the
executed signature page and any amendment sheets used
to us within 35 days of the date of this letter.


Sincerely,

MILE HIGH COURT REPORTING & VIDEO, INC.


Encl.


cc: Original transcript

    Peter Romer-Friedman, Esq.

    Joseph A. Whitcomb, Esq.

Deposition of:  Michelle Zeier (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

PETER ROMER-FRIEDMAN, ESQ.
Washington Lawyers' Committee for
Civil Rights and Urban Affairs
11 Dupont Circle, NW
Suite 400
Washington, DC  20036


Re:  Quick v. Frontier Airlines, et al.
     Civil Action No. 15-cv-00765-REB-KMT
     Deposition of:  MICHELLE ZEIER
     Taken:  August 4, 2016


Dear Mr. Romer-Friedman:

The above-referenced original deposition is being filed
with you on this date:_____.
Pursuant to the governing Rules of Civil Procedure, the
above-mentioned deposition is being filed:


_____ signed, with no changes

_____ signed, with changes, a copy of which is attached

_____ unsigned, no changes

_____ unsigned, with changes, a copy of which is
      attached

_____ unsigned, pursuant to agreement of counsel that
      the deposition may be reviewed and signed at or
      before the time of trial

_____ unsigned, our office having received notice that
      the case has settled

_____ signature waived at the time of deposition

_____ signature not required


MILE HIGH COURT REPORTING & VIDEO, INC.

cc: Original transcript
    William R. Dabney, Esq.