# EXHIBIT 8

# Transcript of the Testimony of:
## Joseph Thibodeau (Videotaped)

**Date:** August 4, 2016

Edward Quick v. Frontier Airlines and Michele (sic) Zeier

Civil No. 15-cv-00765-REB-KMT



14143 Denver West Parkway, Suite 100 • Golden, Colorado 80401
(303) 202-0210 • contact@milehighreporting.com
www.milehighreporting.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 15-cv-00765-REB-KMT

_____

VIDEOTAPED DEPOSITION OF JOSEPH THIBODEAU

August 4, 2016

_____

EDWARD K. QUICK,

Plaintiff,


vs.


FRONTIER AIRLINES, INC., and MICHELE (sic) ZEIER,

an individual,


Defendants.

_____



        PURSUANT TO NOTICE, the videotaped

deposition of JOSEPH THIBODEAU, called for an examination

by the Plaintiff herein, was taken at Holland & Hart, LLP,

555 17th Street, Suite 3200, Denver, Colorado 80202,

commencing at 9:15 a.m. on August 4, 2016, before

Shauna T. Dietel, a Registered Professional Reporter and

Notary Public within Colorado.

Deposition of:  Joseph Thibodeau (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

2

```
 1    APPEARANCES:

 2            PETER ROMER-FRIEDMAN, ESQ.
              Washington Lawyers' Committee for
 3            Civil Rights and Urban Affairs
              11 Dupont Circle, NW
 4            Suite 400
              Washington, DC  20036
 5            202-644-7080
              Peter_RomerFriedman@washlaw.org
 6            and
              JOSEPH A. WHITCOMB, ESQ.
 7            Whitcomb, Selinsky, McAuliffe, PC
              1391 Speer Boulevard
 8            Suite 705
              Denver, Colorado  80204
 9            303-534-1958
              joe@whitcomblawpc.com
10
                      For the Plaintiff
11

12            WILLIAM R. DABNEY, ESQ.
              Holland & Hart, LLP
13            555 17th Street
              Suite 3200
14            Denver, Colorado  80202
              303-295-8000
15            wrdabney@hollandhart.com

16                    For the Defendants

17

18
              Also Present:  Edward K. Quick
19                           Michelle Zeier
                             Kathy Myers, Videographer
20

21

22

23

24

25
```

Deposition of:  Joseph Thibodeau (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

3

1                         I N D E X

2    EXAMINATION:                                      PAGE

3    By Mr. Romer-Friedman                          5, 195

4    By Mr. Dabney                              189, 198

5

6    EXHIBITS:                                      MARKED

7      1    Notice of Deposition of Joseph Thibodeau        9

8      2    E-mail from ekquick@yahoo.com to Joseph      124
            Thibodeau dated Tuesday, September 23, 2014
9
       3    E-mail chain Bates labeled FA00900         132
10
       4    E-mail chain Bates labeled FA00902         138
11
       5    E-mail chain Bates labeled FA00906         142
12
       6    E-mail chain Bates labeled FA00921 and     154
13          FA00922

14     7    Frontier Airlines Position Description      163

15

16

17

18

19

20

21

22

23

24

25

Deposition of:  Joseph Thibodeau (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

---

**4**

1          PROCEEDINGS
2          THE VIDEOGRAPHER:  We are now on the record at
3    9:15 a.m. on August 4th, 2016, with Media No. 1 in the
4    deposition of Joseph Thibodeau in the case of Edward K.
5    Quick versus Frontier Airlines, Inc., et al., to be heard
6    in the U.S. District Court, District of Colorado, Case
7    Number 15-cv-00765-REB-KMT.
8          This deposition is being taken at 555
9    17th Street, Suite 3200, in Denver, Colorado, at the
10   request of plaintiff.
11         The videographer is Kathy Myers.  The court
12   reporter is Shauna Dietel from Mile High Court
13   Reporting & Video.
14         Will counsel please state their appearances at
15   this time, beginning with plaintiff's counsel.
16         MR. ROMER-FRIEDMAN:  Peter Romer-Friedman for
17   the plaintiff Edward Quick.
18         MR. WHITCOMB:  Joseph Whitcomb for the
19   plaintiff Edward Quick.
20         MR. DABNEY:  William Dabney, Holland & Hart,
21   for defendants.
22         THE VIDEOGRAPHER:  And others in the room,
23   counsel.
24         MR. ROMER-FRIEDMAN:  We have one of the
25   parties, Michelle Zeier, and we have the plaintiff, Edward

---

**5**

1    Quick.
2          THE VIDEOGRAPHER:  Thank you.
3          JOSEPH THIBODEAU,
4    having been first duly sworn, was examined and testified
5    as follows:
6          EXAMINATION
7    BY MR. ROMER-FRIEDMAN:
8      Q   Thank you.  Good morning.
9      A   Good morning.
10     Q   As I said, my name is Peter Romer-Friedman.  I
11   represent Mr. Quick in this case, Quick versus Frontier
12   Airlines.
13         Thanks for coming today.  We, hopefully, will
14   do our best to get through your deposition this morning so
15   that it won't carry on beyond lunch.
16         And I'll go over some ground rules that we'll
17   work under during the course of this deposition.  If you
18   ever have a question about any of this, let me know.
19     A   Okay.
20     Q   So for the record, please state your name.
21     A   Joseph Thibodeau.  I go by JP.
22     Q   Can I call you Mr. Thibodeau?
23     A   Sure.
24     Q   Okay.  And what's your address, sir?
25     A   Physical address, 16962 Parkside Drive South,

---

**6**

1    Commerce City, 80022.
2      Q   Okay.  And that's Commerce City, Colorado?
3      A   Colorado.  I'm sorry.
4      Q   That's okay.
5          And your current employer?
6      A   Frontier Airlines.
7      Q   And what's your title?
8      A   Chief pilot.
9      Q   Have you ever been deposed before?
10     A   No, sir.
11     Q   Have you ever given testimony in a trial or
12   courtroom before?
13     A   Not in a trial nor a courtroom.
14     Q   In any other kind of forum, have you given
15   testimony?
16     A   Arbitration.
17     Q   Okay.  We'll come back to that.
18         Okay.  So I'm going to ask you some questions
19   today, and when you answer, it would be helpful if you
20   could answer verbally.  Even though we're -- we're on
21   video today, the stenographer is going to take down
22   everything that you say, and so the video will get a head
23   nod, the -- the transcript won't reflect that.
24         Is that okay?
25     A   Understood.

---

**7**

1      Q   Great.  And let's do our best to not talk over
2    each other.  I'll try to make clear when I'm finishing my
3    question, and, you know, feel free to -- you know, if we
4    talk over each other, we'll try to figure out a way to
5    slow down and work together.
6          Okay?
7      A   Understood.
8      Q   Great.  And on occasion, I'm sure that I will
9    ask a poorly-worded question.  If you don't understand it,
10   please don't hesitate to say you don't understand, or you
11   can ask for clarification.
12         If you don't ask for clarification or you
13   don't -- you don't say that you don't understand, I'll
14   assume that you -- you understand the question.
15         Is that okay?
16     A   Okay.
17     Q   All right.  Now, your attorney, Mr. Dabney, may
18   make objections.  Unlike in a trial, in a courtroom, here
19   in a deposition, you should answer the question unless he
20   specifically tells you not to.
21     A   Okay.
22     Q   And so we want to make sure that there's time
23   for him to object, you answer, so we get a clean record.
24         Okay?
25     A   Understood.

---

Deposition of:   Joseph Thibodeau (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

8

```
 1        Q   Okay.  So we will try to take maybe one or two
 2   breaks this morning while your deposition is going on.  If
 3   you need more breaks than that or you need to go to the
 4   bathroom, just let -- let us know.
 5        The only -- the only thing is we shouldn't stop
 6   in the middle of a question.  But once we're sort of done
 7   with the -- the question, feel free to let me know if you
 8   need to use the restroom or get a drink, that kind thing.
 9        Okay?
10        A   Okay.
11        Q   And, you know, if at any point later on you
12   want to clarify what you've said earlier in the deposition
13   or you remember some further information, you can
14   volunteer that or come back to that and just let me know.
15   I'll be happy to revisit it.
16        Okay?
17        A   Okay.
18        Q   And, again, you understand you're under oath?
19        A   Yes, sir.
20        Q   Just as if you were in a court testifying
21   before a judge?
22        A   Yes, sir.
23        Q   Okay.  And you're here today in your individual
24   capacity, not -- not as a representative of the company;
25   is that right?
```

9

```
 1        A   Yes, sir.
 2        Q   Okay.  And you understand that you're not a
 3   party to this lawsuit?
 4        A   I understand that.
 5        Q   Okay.  We're just trying to get information
 6   from you because you're a potential witness in this case,
 7   right?
 8        A   Understood.
 9        Q   Okay.  Is there any reason why you can't tell
10   the truth today?
11        A   No, sir.
12        Q   You're not taking any medication or any drugs
13   that would prevent you from testifying --
14        A   No.
15        Q   -- truthfully and honestly?
16        A   No.
17        Q   Okay.  Okay.  And one quick ground rule:  When
18   I say "Frontier," do you understand we'll be referring to
19   Frontier Airlines?
20        A   Okay.
21        Q   Okay.  I'm going to hand you what will be
22   marked Exhibit 1 and ask you if you recognize this
23   document.
24        (Deposition Exhibit 1 was marked.)
25        A   I have never seen this document before.
```

10

```
 1        Q   (By Mr. Romer-Friedman)  Okay.  I will
 2   represent that this is a copy of the notice of deposition
 3   of Joseph Thibodeau that was served on defendants' counsel
 4   on July 21, 2016.
 5        Basically, this is a document that identifies
 6   and requests your presence to testify in the -- in the
 7   deposition in this case.
 8        A   Okay.
 9        Q   You haven't seen it, but you don't have any
10   objection, of course, to testifying today?
11        A   No, not at all.
12        Q   Okay.  Great.  Okay.
13        How did you prepare for today's deposition,
14   sir?
15        A   I met with our counsel.
16        Q   Mr. Dabney?
17        A   Mr. Dabney, yes, sir.
18        I reviewed personnel files, training records of
19   Mr. Quick and was able to review the transcript of his
20   deposition three weeks ago.
21        Q   Okay.  Okay.  So besides the personnel files
22   and the training files, did you review any other documents
23   besides that and the deposition transcript?
24        A   Ask that again.  I'm --
25        Q   Besides the personnel files, the training files
```

11

```
 1   of Mr. Quick, and the deposition, did you look at any
 2   other documents?
 3        A   Not documents, per se, no.  I -- I've got
 4   your -- some e-mails that had been a part of that
 5   transcript.  I went back and reviewed a couple of those.
 6        Q   Okay.  So some of the e-mails that were -- were
 7   exhibits in Mr. Quick's deposition?
 8        A   Right.  Right.
 9        Q   Okay.  Do you remember who those e-mails were
10   between or from?
11        A   No, not necessarily.
12        Q   Okay.  But they -- these were e-mails that
13   involved the issue of Mr. Quick's employment or
14   reemployment?
15        A   Correct.  And several of them were e-mails
16   directly between me and Mr. Quick.  And I just wanted to
17   validate what was in the transcript to see if it -- it
18   agreed with my memory of what had been stated in that
19   transcript.
20        Q   Okay.  Did you --
21        A   Specifically, the request for -- there was an
22   issue with the DD-214 orders.  That was really the only
23   one that I -- I looked at.
24        Q   Okay.  Have you looked at a copy of the -- the
25   complaint in this case?
```

Deposition of: Joseph Thibodeau (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

12

1    A  No, sir.
2    Q  Any other of the documents or pleadings that
3  are part of this case?
4    A  No, I have not.
5    Q  Okay.  How long did you meet with your counsel
6  to prepare for this deposition?
7    A  Several hours.
8    Q  When did that happen?
9    A  Yesterday.
10   Q  Okay.  Was anyone else present?
11   A  No.
12   Q  Ms. Zeier wasn't present?
13   A  No, not for -- not yesterday.
14   Q  Okay.  So just you and Mr. Dabney in the room
15  together?
16   A  Correct.
17   Q  Okay.  Leading up to your meeting with
18  Mr. Dabney yesterday, did you speak with anyone else at
19  Frontier about this case?
20   A  Specifically about the facts of the case, no.
21  I knew that Mr. Quick had filed a suit that had been, I
22  guess, internally discussed.  I wouldn't even say
23  "discussed."  It was just a matter of -- of knowledge
24  within our building that a suit had been brought.
25   Q  How did you find out about the lawsuit?

13

1    A  Through -- it would have been through HR, and I
2  can't say if it was specifically through Michelle Zeier or
3  through Jacalyn Peter, but it was one of our members of
4  our HR department, the flight operations.  I wanted to
5  call and say, This is what is going on currently with
6  Mr. Quick and with the airline.
7    Q  And Jacalyn Peter is the head of HR?
8    A  She is now the vice president of labor
9  relations.
10   Q  Okay.  Do you remember when you first heard
11  about this lawsuit being filed?
12   A  No, I don't.  It would have been sometime last
13  year, but I couldn't tell you --
14   Q  Okay.
15   A  -- with any degree of accuracy what day or what
16  month.
17   Q  Okay.  How common is it for there to be
18  lawsuits involving pilots?
19   A  Rephrase that.  Lawsuits with the company?
20  Pilots versus the company?
21   Q  Sure.
22   A  I can't think of any others that I know of, so
23  not very common.
24   Q  And we'll get into your employment history, but
25  you've been with Frontier for well over 15 years?

14

1    A  15 years, correct.
2    Q  And you're not -- other than Mr. Quick, you're
3  not familiar with any other lawsuits being filed by pilots
4  against Frontier Airlines?
5    A  In the history -- in that 15-year period?
6  There are a couple that come to mind.  I was a line pilot
7  at the time and not a party of the lawsuit, not a witness,
8  not involved in any way other than knowing that there had
9  been a couple of -- of lawsuits.
10   Q  Were those about veterans or military rights,
11  or about other things?
12   A  I can't say for -- for certain.
13   Q  Okay.  Okay.  So besides Ms. Peter and
14  Ms. Zeier, did you -- have you talked about Mr. Quick's
15  case or Mr. Quick's reemployment issues with anyone else
16  leading up to this deposition?
17   A  Per se, no.  Our director of operations was a
18  chief pilot.  He and I have discussed the training records
19  of Mr. Quick.
20   Q  Mr. Colburn?
21   A  Yes, Mr. Colburn.
22   Q  When did you discuss that with him?
23   A  Throughout the course of the last year.  I
24  couldn't tell you an exact day.
25   Q  Okay.  These were a number of discussions, or

15

1  just one or two?
2    A  There were several.
3    Q  Okay.  Okay.  Mr. Colburn was the chief pilot
4  when Mr. Quick went out on leave in 2007; is that right?
5    A  I would have to verify that.  I believe that's
6  correct, but I'd have to look at the -- the dates.
7    Q  All right.  Let's talk a little bit
8  about your -- your own professional background.  This
9  probably won't end up being important in the case, but
10  it's something that we kind of do in depositions, and
11  we'll try to get through it quickly.
12       Okay?
13   A  Certainly.
14   Q  Great.  Where did you go to college?
15   A  University of North Dakota.
16   Q  Okay.  You graduated from --
17   A  Yes, sir.
18   Q  Okay.  Have you had any professional school
19  beyond college?
20   A  Only that specific to the profession itself,
21  type ratings, CRM, engineers -- performance engineering
22  class with airbus, but no formal master's degree or
23  doctorate or anything beyond undergraduate.
24   Q  Okay.  Are you from North Dakota?
25   A  No, sir.

Deposition of:   Joseph Thibodeau (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

16

1    Q   Where are you from?
2    A   From here, Denver, Colorado.  Yes, sir.
3    Q   Great.
4        And you went to Regis Jesuit High School?
5    A   Correct.
6    Q   And you graduated in 1992?
7    A   Correct.
8    Q   And your -- you graduated in '95 from North
9    Dakota?
10   A   Yes, sir.
11   Q   Okay.  How long have you been flying as a
12   pilot?
13   A   I don't want to be evasive with the question.
14   How long have I been certified, or how long have I been
15   in --
16   Q   Sure.
17       When did you get certified to fly?
18   A   1992.  I soloed in 1990.  I grew up in an
19   aviation family.  I cannot remember the first time I was
20   in an airplane.
21   Q   Okay.
22   A   My first memory was at the age of four.
23   Q   All right.  But basically since -- since you
24   graduated from high school, you've been certified to fly
25   as a pilot?

17

1    A   Even before then.  As a junior, I was certified
2    to solo in 1990.
3    Q   Okay.  All right.  What was your -- what was
4    your first job out of college?
5    A   First job out of college was working, I
6    believe, at Jeppesen Sanderson.  It's Jeppesen now, but I
7    believe at that time it was Jeppesen Sanderson.  I was a
8    cartographer in the en route department.
9    Q   You were a cartographer?
10   A   Yes, sir.  Drafting aviation charts, en route
11   aviation charts.
12   Q   Okay.  When were you -- when did you have that
13   position?
14   A   It would have been 1995, and I can't remember
15   the months.  I went from Jeppesen to fly a cloud-seeding
16   contract in Kansas and then went back to Jeppesen.  So I
17   was employed by Jeppesen twice.
18   Q   Okay.
19   A   And the date range, I'm sorry, I -- I can't
20   remember with any degree of accuracy the months and the
21   exact years.
22   Q   Okay.  You started at Frontier in January of
23   2001, correct?
24   A   Correct.  Yes, sir.
25   Q   Okay.  So you would have left the job you just

18

1    mentioned at some point before then?
2    A   Yes, sir.
3    Q   Okay.  Would it have been in 2000 or 2001?
4    A   The job immediately preceding Frontiers'?
5    Q   Yes.
6    A   Yes.  I left seven days prior.  December 31,
7    19 -- December 31, 2000, was my last day of employment at
8    an airline named PSA.
9    Q   PSA.  What does that stand for?
10   A   At that time, it didn't stand for anything.
11   Prior, it had stood for -- I believe it was Pacific
12   Southwest.  A long chapter of aviation history, but it was
13   a certificate -- certificate that was purchased by
14   U.S. Airlines (sic).
15   Q   Okay.  So they were -- they were working --
16   basically flying U.S. Airways?
17   A   Correct.
18   Q   And you were at PSA?
19   A   Correct.  It's fair to say I flew U.S. Airways
20   Express.  It was PSA doing business as U.S. Airways
21   Express.  They were a wholly owned subsidiary of
22   U.S. Airways.
23   Q   Okay.  And why did you leave that job to go to
24   Frontier?
25   A   Career progression.

19

1    Q   Okay.  So you resigned that position?
2    A   Yes, sir.
3    Q   At PSA?
4    A   Yes, sir.
5    Q   Okay.  What was your position at PSA?
6    A   I was a first officer.
7    Q   Okay.  And you left to become a first officer
8    at Frontier Airlines?
9    A   Correct.
10   Q   So it's fair to say that was a -- you viewed
11   that as a better position or a better career opportunity
12   at Frontier than at --
13   A   Yes, sir.
14   Q   -- PSA?
15   A   Yes, sir.
16   Q   Okay.
17   A   And headquartered here in my hometown, so there
18   were -- there were several benefits to coming to work at
19   Frontier.
20   Q   That's fair.  Okay.  And you had -- at PSA, you
21   were there from -- is it -- is it May of '99 until
22   December of 2000?
23   A   That is correct.
24   Q   Okay.  So before May of 1999, where were --
25   what were -- where were you working?  What was your

Deposition of:  Joseph Thibodeau (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

---

20

1   position?
2       A   Riley Aviation --
3       Q   Okay.
4       A   -- which was a charter -- aviation charter
5   company, and I was a single pilot in Cessna 300 and 400
6   series aircraft.
7       Q   Okay.  So, that is, you were the only pilot
8   flying?
9       A   Correct.  A single-pilot operation.
10      Q   How many people -- passengers were -- were in
11  those -- in the charters that you flew?
12      A   It would depend on the aircraft, but up to -- I
13  believe we were configured to carry eight passengers in
14  our 400 series.
15      Q   Okay.  And how about when you were at PSA?
16  What -- what -- what kind of planes did you fly?  How many
17  people --
18      A   Dornier 328, and we carried 32 passengers and
19  one flight attendant.
20      Q   Before Riley Aviation, where were you working?
21      A   Immediately prior was Jeppesen.
22      Q   Okay.
23      A   And immediately prior to that was the weather
24  modification contract.
25      Q   Okay.  Have you ever been fired or --

---

21

1       A   No, sir.
2       Q   Okay.  So you left all of these positions --
3       A   Voluntarily --
4       Q   -- voluntarily?
5       A   Yes, sir.
6       Q   Okay.  Great.
7           Have you ever been disciplined?
8       A   No, sir.
9       Q   Okay.  Have you ever received criticism at work
10  for anything you've done?
11      A   Not directly.
12      Q   Okay.
13      A   And not by a supervisor.
14      Q   Okay.  You've been a member of the union?
15      A   Yes, sir.
16      Q   Okay.  Which unions?
17      A   When I was at PSA, they were members of the
18  Airline Pilots Association, or ALPA.
19      Q   Okay.
20      A   And then when I came to Frontier, it's been --
21  I don't know if we would say one union.  The same group of
22  pilots, but they have -- we, as the pilots at Frontier,
23  have been represented by the Frontier Airlines Pilots
24  Association, FAPA, the International Brotherhood of
25  Teamsters, or IBT, and now most recently ALPA, the Airline

---

22

1   Pilots Association.  So all continuous -- one continuous
2   union but different certified bargaining groups or
3   representatives.
4       Q   So over that period, the -- the work -- the
5   pilots at Frontier changed who they wanted to be
6   affiliated with?
7       A   Yes, sir.
8       Q   Okay.  First FAPA, then the IBT --
9       A   And then -- and then --
10      Q   -- FAPA --
11      A   And then --
12      Q   Okay.  And then FAPA and then ALPA?
13      A   Yes, sir.
14      Q   A lot of changing their minds.
15          What do -- what do you think is kind of
16  underlying that, or why do you think that that's happened?
17      A   I'd be speculating.  There are -- the first
18  change, from FAPA to the IBT, is a little bit more -- it
19  may take longer to explain, but probably easier to
20  explain.
21          At that time -- it would have been the summer
22  of 2011 -- Frontier Airlines was owned by Republic
23  Holdings.  Republic Holdings had four or five other air
24  carrier certificates that employed over 1400 pilots, at
25  least, maybe closer to 2,000 pilots, on those five

---

23

1   certificates.
2           So there was a membership vote with every pilot
3   employed under the umbrella of Republic Holdings.  That
4   vote, the Frontier pilots were -- were simply overwhelmed
5   by number.  I believe all 600, 700 Frontier pilots voted
6   to remain FAPA, but the majority of pilots on the other
7   certificates carried everybody into IBT.
8       Q   Oh, I see.  So they -- so they all became part
9   of the bigger unit --
10      A   Same class and craft.
11      Q   Okay.  So it was -- Republic was viewed as the
12  carrier?
13      A   Correct.
14      Q   As opposed to Frontier?
15      A   Correct.
16      Q   Okay.
17      A   And subsequent, when Frontier Airlines was sold
18  to Indigo Partners, Frontier became a wholly owned unit of
19  its own, and the Frontier pilots were again able to vote,
20  as a smaller group, which association they wanted to
21  represent them, and that's when the pilot group
22  transitioned from IBT back to Frontier Airlines Pilots
23  Association.
24      Q   Okay.  And then when did FAPA become -- when
25  did the -- the union go from FAPA to --

---

Deposition of:   Joseph Thibodeau (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

---

24

1    A   That vote occurred --
2    Q   -- to ALPA?
3    A   That vote occurred three or four months ago.
4  It was April or May, and it was, I believe, early June
5  when ALPA was certified as the bargaining agent.
6    Q   Okay.  Now, even though the union has changed
7  that you're affiliated with, the collective bargaining
8  agreement has always been between the same group of
9  workers and the company; is that right?
10   A   That is -- it's close.  There have been, I -- I
11 believe, three separate collective bargaining agreements
12 in that 15-year time frame, just through negotiations and
13 new collective bargaining agreements.
14   Q   Okay.  But those -- but those collective
15 bargaining agreements are between the -- the group of
16 pilots who work at Frontier and Frontier?
17   A   Yes, sir.  Yes, sir.
18   Q   They're not between the -- the -- the
19 bigger company and -- and all the workers who work for
20 those different --
21   A   As you have --
22   Q   -- sets of Republic?
23   A   As you have stated it, yes, sir, that's
24 correct.
25   Q   Okay.

---

25

1    A   The -- the -- the CBA is represented between
2  the working group of pilots and Frontier Airlines
3  management.
4    Q   Okay.  And so the -- is it fair to say the CBA
5  during that 15-year period would govern the wages, working
6  conditions, dispute mechanisms for pilots like Mr. Quick?
7    A   Yes, sir, that's -- that's accurate.
8    Q   Okay.  And you, to the extent that -- when you
9  were in management?
10   A   Correct.
11   Q   Okay.  And so you're in management now?
12   A   Yes, sir.
13   Q   So let's back up and -- and talk about your
14 progression at Frontier.  So you started as a first
15 officer in 2001?
16   A   Correct.
17   Q   Okay.  How long did you hold that position as
18 first officer?
19   A   25 months.
20   Q   Okay.  What happened after that 25 months?
21   A   I upgraded to captain.
22   Q   How did that happen?
23   A   Through the mechanism within the CBA, known as
24 a volunteering staffing adjustment.
25   Q   Okay.  Does someone have to pick you to upgrade

---

26

1  to captain, or is this something that you're allowed to
2  apply for?
3    A   Neither.  It's through the voluntary staffing
4  adjustment process, wherein it is a seniority-based
5  system.  There is a -- a vacancy to upgrade to captain.
6  Meeting certain conditions, you are eligible to go -- to
7  upgrade class to become a captain.  You're upgrading from
8  first officer to captain.
9    Q   Okay.  So you went through the training and
10 passed the tests to become a captain?
11   A   Yes, sir.
12   Q   How long did that process take?
13   A   Two months, roughly.  Seven weeks.
14   Q   Okay.  And why did you want to become a
15 captain?
16   A   Again, career progression.
17   Q   You make more money as a captain than as a
18 first officer?
19   A   Yes, you do.
20   Q   Considerably more?
21   A   Depending on longevity, yes.
22   Q   Okay.
23   A   And that -- you know, that -- that's an
24 interesting question, "considerably more."  Very senior
25 first officers are able to exercise the work roles within

---

27

1  the CBA to -- in some cases, our very senior first
2  officers make significantly more money than our junior
3  captains.
4    Q   That can happen at law firms too when they
5  first become equity partners.
6        So -- and is that because, based on your
7  seniority, they can choose either the route or the kind of
8  plane that they want to fly that allows them to make more
9  money?  Is that --
10   A   In part, certainly.
11   Q   But seniority, seems like, is very important to
12 pilots?
13   A   It can be.
14   Q   Okay.  All right.  And we'll get back to the
15 issue of seniority.
16       Okay.  So from -- so it was in 2003 when you
17 became a captain?
18   A   Yes, sir.
19   Q   Okay.  And how long did you hold that position
20 for?
21   A   I've held that continuously -- no.  February
22 2003, I was awarded captain, and that was in the
23 Boeing 737.  In August of that year, August 2003, I
24 received my type rating in the Airbus A-320 series.  It
25 was a busy summer.

---

Deposition of:  Joseph Thibodeau (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

28

1    Q   Okay.  So since August of -- of 2003, you've
2    been a captain flying Airbus 320?
3    A   Correct.  The 320 series.
4    Q   Is that the largest plane that Frontier flies?
5    A   The series?  I don't want to be, again,
6    particular, but it's important to note that series covers
7    the Airbus A-318, A-319, A-320, and A-321.
8        So to answer your question directly, no, the
9    A-320 is not our largest aircraft today.  The A-321 is our
10   largest aircraft.
11   Q   Okay.  Do you fly the 321 now?
12   A   Yes, sir, I do.
13   Q   Okay.  When did you start flying the 321?
14   A   I took acceptance of our first aircraft in
15   August 2015 -- pardon me -- October 2015.
16   Q   Okay.  When did you become the chief pilot?
17   A   March of 2013.
18   Q   Okay.  How did you -- how -- how did it come to
19   be that you -- you became the chief pilot?
20   A   For the chief pilot, I was appointed.
21   Q   How were you appointed?
22   A   My predecessor returned from his management
23   position to a position flying the line.  I was asked to
24   report to the vice president's office.  The vice president
25   of flight operations, my predecessor, the director of

29

1    operations, and a representative from HR advised me that
2    my predecessor was going back to fly the line and that I
3    would be the next chief pilot.
4    Q   Was there an application process?
5    A   For the chief pilot position?  No, sir.
6    Q   Okay.  Between being chief pilot and being a
7    captain for those, I guess, 12 years, were -- did you have
8    any other positions at Frontier?
9    A   Yeah.  I don't want to, again, be nit-picky.
10   It would have been 10 years --
11   Q   Okay.
12   A   -- from captain --
13   Q   Let me -- let me restate the question.
14       Besides being a captain and a first officer and
15   the chief pilot, have you held any other positions at
16   Frontier?
17   A   Yes, sir.
18   Q   What were those positions?
19   A   I was the assistant chief pilot prior to
20   becoming the chief pilot.
21   Q   Okay.  When did you become the assistant chief
22   pilot?
23   A   August two -- very late August or the first
24   week of September 2012.  And I can't remember when my
25   official start date was, but it was, it's fair to say,

30

1    late August 2012.
2    Q   Okay.  How did you become the assistant chief
3    pilot?
4    A   That position had been posted as an open
5    position.  I applied for it, interviewed for it, and was
6    selected.
7    Q   Okay.  So besides the chief pilot position, are
8    there any other positions where -- in management where a
9    pilot does not have to apply for the position at Frontier?
10   A   I can't answer that.  It would be -- it would
11   be speculative for me to say one way or the other.  I can
12   certainly think that there are certain positions within
13   management that by FAR, Federal Aviation Regulations,
14   certain requirements have to be met before an individual
15   can be in that position.
16       I can't -- I can't honestly answer if they
17   would appoint anyone else or if there would be an
18   application for all flight operations management --
19   management positions.  Vice president of flight
20   operations, for example, comes to mind.  So too does the
21   director of operations.
22   Q   Where the -- where the person would just be
23   appointed --
24   A   Yes, sir.
25   Q   -- because they wouldn't apply?

31

1    A   Yes, sir.
2    Q   Okay.  Okay.  So besides assistant chief pilot,
3    chief pilot, captain, first officer, have you held any
4    other positions at Frontier?
5    A   Not by title, no, sir.
6    Q   So informally, are there other positions that
7    you -- you did, worked on?
8    A   Other projects that I've worked on.  I've been
9    a member of our emergency response team.  But, again, that
10   was in the capacity of a captain.  And so too with our
11   fuel conservation committee; I was a member of that.  But,
12   again, it was not a title change nor a change in function.
13   I was a captain that met as part of a committee.
14   Q   Okay.  Have you had to maintain your -- all of
15   your certifications --
16   A   Yes.
17   Q   -- in all these positions?
18   A   Yes, sir.
19   Q   Okay.  Including a medical clearance?
20   A   Yes, sir.
21   Q   You've never let that lapse?
22   A   I've maintained either a first- or second-class
23   medical for the entirety of my -- my duration at Frontier
24   Airlines.
25   Q   Okay.  All right.  Okay.  Let's talk a little

Deposition of:   Joseph Thibodeau (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

---

32

1  bit about kind of the -- the general operations of
2  Frontier Airlines.
3       Okay?
4    A  Uh-huh.
5    Q  How many pilots are there right now who work at
6  Frontier Airlines?
7    A  Approximately 1,025.
8    Q  1,025?
9    A  Yes, sir.
10   Q  Okay.  How does that compare to prior years?
11   A  We've grown.
12   Q  Okay.  So let's say back in -- in '01 -- 2001
13  when you started, how many pilots were there?  Do you have
14  a recollection?
15   A  I don't know.  I don't remember.
16   Q  Okay.  How about five years ago?
17   A  Five years ago, again, without -- I -- you
18  know, without looking at any other documentation, it
19  would, again, be a guess, at best, but in the neighborhood
20  of 550, perhaps 600 pilots.
21   Q  About -- about five years ago, you said?
22   A  Correct.
23   Q  Okay.  Why has the company grown so steadily
24  and so significantly between five years and now?
25   A  Utilizing our assets more efficiently.

---

33

1    Q  Could you explain what you mean by that?
2    A  Yes, sir.  Five years ago, we had the same --
3  roughly the same amount of airframes on property, in
4  between 50 and 60 aircraft, typically, at any given time.
5       Five years ago, we operated the aircraft at
6  about ten hours per aircraft per day.  Today, we operate
7  our aircraft in excess of 14 hours per day -- per -- per
8  aircraft per day.
9       So without growing the fleet size, necessarily,
10  we've grown the airline through network, connecting
11  different city pairs, opening new city pairs.  As a
12  result, we've added pilots to continue flying.
13       Of significant note, with pilot staffing, in
14  2000 -- January 2014, FAR 117 was implemented, which
15  governs pilot duty limitations, flight time limitations,
16  and rest requirements.
17       It was a paradigm shift in all three of those
18  -- those metrics, fight duty, flight time, and rest, from
19  the previous regulation.  That, in -- in part, drove our
20  need to hire more pilots.
21   Q  So duty time, rest, these were things that the
22  federal government was saying that you had to limit the
23  amount of time that a pilot could be working, effectively?
24   A  Yes, sir.  Prior to January 2014, those metrics
25  were governed by with FAR Part 121.  FAR 117 changed all

---

34

1  three metrics.
2    Q  Okay.  And so it sounds like you're saying that
3  because of these new -- the new FAR, the new regulations,
4  you couldn't employ the same number of people to do the
5  same amount of work; you had to hire more people?
6    A  In very limited part, but yes.
7    Q  Okay.
8    A  FAR 117 did drive our need to hire additional
9  pilots.
10   Q  Okay.  And then a second ago, you were talking
11  about how utilizing the equipment more efficiently, you
12  were able to do more flights per day or more -- more
13  flying per day, and, in essence, it seems like you would
14  need more pilots --
15   A  Correct --
16   Q  -- to do that?
17   A  Correct.
18   Q  Okay.
19   A  Those are both true statements.
20   Q  Okay.  Has there been some increase as well in
21  that five-year period in the -- the number of planes,
22  the -- you know, the -- the amount of the equipment that's
23  been utilized on a -- on a -- on -- at any one time?
24   A  If -- if there has been, it has been an order
25  of magnitude.  So small, nearly imperceptible.  I could

---

35

1  answer the question and say, yes, we had 53 airplanes; now
2  we have 55.
3       And we currently have 58 to 60 aircraft that we
4  are responsible for at any given time; however, we may
5  have several of those aircraft being returned to lessors.
6  So while they may appear on our operations specifications,
7  they are not actively flying in the network.
8       So to answer:  Over the last five years, no, we
9  have not had an appreciable gain of aircraft operating in
10  network.
11   Q  Okay.  Have these changes made Frontier a more
12  profitable airline?
13   A  I -- that would be wild speculation on my part.
14   Q  Okay.  Do you know if Frontier Airlines makes
15  profit on an annual basis?
16   A  No.  It being a privately held company, we can
17  look at Form 41 data and -- and perhaps try to interpret.
18  I'm certain, through some of the data that has been
19  shared, we are in a much better business position today
20  than we were two years ago.
21       But that, again, is not firsthand knowledge.
22  I'm not in -- you know, I'm not in -- I'm not a party of
23  any of the discussions with our finance team or revenue
24  teams.
25   Q  Okay.

---

Deposition of:  Joseph Thibodeau (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

---

36

1      MR. ROMER-FRIEDMAN:  And I should note, you
2  know, for the record, if there's information that would be
3  confidential or proprietary, we have no objection to
4  Mr. Dabney designating that after the fact as
5  confidential.
6      Q   (By Mr. Romer-Friedman)  So if there's
7  information that you know, you know --
8      A   Yeah.
9      Q   -- unless he instructs you not to answer, we'd
10  appreciate you to identify.
11      But do you have a sense, for example, in 2015
12  whether Frontier earned profit or -- or lost money in the
13  year?
14      MR. DABNEY:  Object that it lacks foundation.
15      MR. ROMER-FRIEDMAN:  Sure.
16      Q   (By Mr. Romer-Friedman)  You can answer.
17      A   Yeah.  I -- my -- my only inclination would be
18  that there was a newspaper article in The Denver Post last
19  September that said Frontier has launched into being -- I
20  believe it was the fifth most profitable airline in the
21  United States.
22      Again, that's not firsthand knowledge; it's
23  reading an article in the newspaper.  I'm not trying to be
24  evasive or dodge the question; I simply don't know how we
25  are doing financially.

---

37

1      Q   Okay.  Have there -- since mid- to late
2  September of 2014, do you know if the financial condition
3  of the airline has gotten worse or better or stayed the
4  same?
5      MR. DABNEY:  Same objection.
6      A   Yeah, and I'll answer, but, again, it's -- it's
7  a guess.  I'm sorry.
8      Q   (By Mr. Romer-Friedman)  Okay.  Okay.  So right
9  now there are -- you said there are 1,025 pilots --
10      A   Yes, sir.
11      Q   -- currently at Frontier Airlines?
12      A   Correct.
13      Q   Okay.  Do you know how many of those are
14  captains versus chief -- first officers?
15      A   I can get you the exact number, but it's fair
16  to say roughly half.
17      Q   Okay.
18      A   And it's probably fairer yet to say we have
19  several more first officers than captains.
20      Q   Okay.
21      A   That's the natural progression.  We hire many
22  first officers first.  Once they're trained, then we
23  will -- you know, again, based on that mechanism in the
24  CBA with the voluntary staffing adjustment, our first
25  officers then become captains.

---

38

1      So in order to maintain that equilibrium, we
2  have to have more first officers for a short period of
3  time before they transition to the captain seat.
4      Q   Okay.  And every plane that Frontier flies,
5  does it always have a first officer and a captain?
6      A   Yes, sir.
7      Q   So it's -- any more than that on any of the
8  bigger planes, or it's always one and one?
9      A   By type certificate, it's always two.  We do --
10  occasionally, we may have a third in the flight deck
11  conducting a -- what we call a recurrent line check, which
12  would be one of our certified check airmen observing
13  our -- our captain and first officer.  That would be the
14  only exception when we would have more than a captain and
15  first officer.
16      Q   Okay.  And the person doing the check is
17  observing, not flying the plane?
18      A   That is correct.
19      Q   Okay.  And so you -- you've -- you've had the
20  chief pilot position, the assistant chief pilot position.
21  We've talked about captains, first officers.
22      Are there any other pilot positions at Frontier
23  Airlines?
24      A   Pilot positions?  No.  From those positions, we
25  may have other -- it's not a position.  Within those

---

39

1  positions, you may have designations, but --
2      Q   I see.
3      A   -- those -- those are the positions.
4      Q   So, like, variations or sub --
5      A   And -- and I'm sorry to go back.  Ask that
6  again.  I want to make sure I'm answering it accurately.
7      Besides first officer -- I'll let you --
8      Q   Sure.  Besides -- besides captain, first
9  officer, assistant chief pilot, and pilot, are there any
10  other pilot positions at Frontier Airlines?
11      A   Not pilot, per se, but we do have an Airbus
12  program manager.  Currently, we have a captain in that
13  role.  And we have a flight standards manager, also a
14  captain.
15      Q   Okay.  What -- could you describe what those
16  two positions do, the Airbus --
17      A   Our Airbus program manager is responsible for
18  all technical aspects of our Airbus fleet, including, but
19  not limited to, meeting with our partners at Airbus, our
20  partners at GE to define different options that we will
21  take on our -- on our new aircraft.
22      They meet, converse, work integrally with each
23  other, not only on the new side, but as well as the
24  aircraft that are already on property.  Line fitting,
25  retrofitting different pieces of equipment, different

---

Deposition of:  Joseph Thibodeau (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

40

1   computers on board the aircraft.
2        Also responsible for implementing policy and
3   procedure with regard to our operating profiles,
4   limitations of the aircraft, implementing -- Airbus refers
5   to it as an operations engineer bulletin, or an OEB,
6   which, again, is a directive from the manufacturer to the
7   flight crews on how to operate the aircraft.
8        Airbus program managers are responsible for
9   taking care of those.  Editing, revising, maintaining what
10  we call our Quick Reference Handbook, or QRH, which is a
11  reference book for emergency procedures.  Same thing with
12  our abnormal, normal, and supplemental procedures with the
13  aircraft.
14       That's by no means an exhaustive list, but I
15  hope that gives a little bit of --
16       Q   That's helpful.
17       A   -- shape to what that individual does.
18       Q   So does -- does the -- the Airbus program
19  manager, does that person fly on a regular basis?
20       A   Yes.  They're currently qualified.
21       Q   Okay.  Does that per -- that -- that position,
22  that person has to be certified by the FAA with a medical
23  clearance to fly?
24       A   If they're going to fly, yes, they have to be
25  certified.

41

1        Q   Are they required to fly for that position?
2        A   That position is not an FAA position; that's a
3   Frontier position.
4        Q   Okay.  So in other words, to hold that position
5   of Airbus program manager, that person does not have to
6   have medical clearance from the FAA or any certification
7   to fly passengers?
8        A   I'll have to review the job description.  I
9   believe we have in the job description that it's -- a
10  pilot holds that position.
11       Q   Okay.
12       A   And if that is the case, then they are
13  required --
14       Q   Okay.
15       A   -- to maintain currency and proficiency with
16  the aircraft.
17       Q   And we can get into that.
18       How about the flight standards position?
19  What -- what are the basic duties of that position?  What
20  does that person do?
21       A   Same thing:  Quality assurance, quality control
22  with our standard operating procedures, how they're
23  implemented within Frontier flight operations, profiles,
24  limitations with the aircraft, standardization of our
25  check airmen cadre, whether they're simulated to airmen,

42

1   air crew program designees, line check airmen.  It is that
2   person -- that individual's responsibility to ensure a
3   uniform standard is met across the board with -- with
4   regard to all our captains, all our first officers.  And
5   make recommendations to the chief pilot, to the director
6   of operations, based on observation data from different
7   safety programs within the airline.
8        Q   How does a person get hired for the Airbus
9   program manager or the flight standards operations
10  position?
11       A   I believe those are both posted with openings,
12  an application, interview.
13       Q   Does seniority matter for obtaining those types
14  of positions?
15       A   No, sir.
16       Q   So someone very low on the seniority list could
17  obtain either of those positions?
18       A   With the requisite skill set and technical
19  background.
20       Q   Okay.  Let's talk for a second about who were
21  the different people in Frontier who have supervisory
22  responsibility or interaction with the pilots.
23       So it sounds like the chief pilot and the
24  assistant chief pilot are supervisors of all the pilots;
25  is that right?

43

1        A   That is correct.
2        Q   Okay.  Do the first officers and captains have
3   any other super -- direct supervisors besides those two
4   positions, assistant chief pilot and pilot?
5        A   Not currently on -- on property.  We have had
6   in the past flight operations duty managers, who, again,
7   are certified pilots.
8        Q   When was that?
9        A   Seven years ago.
10       Q   Okay.  So that would have been prior to 2008?
11       A   Correct.  Prior to bankruptcy.
12       Q   Okay.
13       A   And I want to clarify too:  We keep saying
14  assistant chief pilot.  We have -- it is a similar
15  capacity, but we have a chief pilot and base chief pilot
16  in our -- our Orlando domicile.  So they are -- they are
17  synonymous, base chief pilot and assistant chief pilot.  I
18  want to make sure that I'm -- I'm clearly answering.
19       Q   Oh, so the person who is called the "assistant
20  chief pilot" is the base pilot in Orlando?
21       A   Correct.  In Orlando, his title is base chief
22  pilot.
23       Q   Okay.
24       A   He carries the responsibilities and duties of
25  an assistant chief pilot.

Deposition of:  Joseph Thibodeau (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

44

1      Q   There's not a -- there's not a -- you're the
2  only chief pilot?
3      A   That is correct.
4      Q   Okay.  So the buck stops with you, so to speak?
5      A   Perhaps.  I have -- I have bosses too.
6      Q   Well, who are -- who are -- who are your
7  bosses?
8      A   I -- I -- I report on a -- through the FAR
9  side, I report to the director of operations.
10  Administratively, through the Frontier organization, I
11  report in part to the director of operations but also
12  report to the vice president of flight operations.
13      Q   Okay.
14      A   So I kind of have two bosses.
15      Q   And the -- so the director of operations is?
16      A   Mr. Jim Colburn.
17      Q   Okay.  And the director of flight operations is
18  who?
19      A   It's one and the same, director of operations
20  or director of flight operations.
21      Q   Okay.
22      A   I wouldn't quite say they're synonymous.  Jim
23  is our director of operations.  We have a vice president
24  of flight operations.
25      Q   Who is that?

45

1      A   James Nides.
2      Q   How do you spell that, for the record?
3      A   N-I-D-E-S.
4      Q   Okay.  Who else do you report to?
5      A   Directly?  Nobody.
6      Q   Indirectly, who else do you report to?
7      A   Indirectly, I would report to our chief
8  operations officer and our CEO.  I suppose you could say
9  they're all superior to me.
10      Q   Okay.  What role does the HR department have
11  with respect to pilots?
12      A   Can you be more specific?  "Their role" is
13  broad.
14      Q   Are they -- are the people in the human
15  resources department, are they considered supervisors of
16  the first officers or the captains?
17      A   No, sir.
18      Q   Okay.  So what is the role of the human
19  resources department with respect to pilots and first
20  officers?
21      A   Human resources department would aid and assist
22  the chief pilot's office and its personnel with any
23  questions that we may have regarding facets of employment
24  that are outside our scope of expertise, leaves of
25  absence, benefits.

46

1      Q   Who does the hiring of -- of pilots at -- at --
2      A   The chief pilot.
3      Q   So you?
4      A   Yes, sir.
5      Q   Okay.
6      A   With assistance from the assistant chief pilots
7  and an interview cadre.
8      Q   Do you work with the HR department in the
9  hiring process?
10      A   In a very, very limited degree.  To be very
11  specific, we make the selections of who we are going to
12  hire or not hire.  Once those decisions are made, our HR
13  department would aid and assist with the requisite
14  paperwork that needs to be completed to onboard an
15  employee.
16      Q   Okay.  And what -- what are those -- what are
17  those prerequisites or requisites that are necessary to --
18  to confirm that a pilot or -- is prepared to become a
19  first officer or captain?
20      A   I would have to look further to get you a -- a
21  complete list.  But, in short, we're going to need copies
22  of pilot's license; medical certificate; passport; radio
23  operator's permit; driver's license, if I didn't just say
24  that; record of employment; record of -- I believe they
25  look for record of residence.

47

1      Q   Okay.
2      A   To get all the specifics, I'm sorry, I'd -- I'd
3  really have to go --
4      Q   No, that's a pretty good list.  So that list
5  you just gave us, those are things the HR department would
6  follow up on to confirm?
7      A   Correct.
8      Q   Okay.  And that is after the chief pilot and
9  the assistant chief pilot have selected the candidate?
10      A   In addition to.  When we interview, we ask and
11  look at the same -- at those same documents.
12      Q   Okay.
13      A   But for the official employment record and
14  file, HR would assist us in that piece of collecting that
15  data.  We look at them, but HR would collect it.
16      Q   Okay.  Do -- where -- where does the -- the
17  government, like the FAA, fall into this chain of command
18  in terms of supervising or working with the airline?
19      A   That's a very, very broad question.  How -- how
20  does the FAA interface with flight operations or with the
21  airline?
22      Q   With flight operations.
23      A   With flight operations, we deal primarily,
24  although not exclusively, with our principal operations
25  inspector, assistant principal operations inspector, air

Deposition of:  Joseph Thibodeau (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

48

1    crew program manager.  Those are the three that we
2    primarily interface with.
3         But we have a lot of interaction with our
4    maintenance side of the house.  Obviously, pilots and
5    mechanics work very closely together.  It's no different
6    on our management side.  Our operations team works quite
7    closely with what we call our principal maintenance
8    inspector, or PMI, and the assistant, the APMI.  That is
9    on a nearly daily basis.
10        Not as often, we interface with their bosses as
11   well if -- they refer to it as a front line manager.  We
12   meet with them as well.
13        The basis of our interaction is very
14   widespread.  It can be anything from their guidance, our
15   -- our requests.  It -- it's a very integral piece of
16   those positions, whether it's director of operations,
17   chief pilot, assistant chief.  Even our base chief pilot
18   in Orlando interfaces with our assistant POI quite
19   frequently.
20        And the operations side of the house, they look
21   not only at the pilots and pilot training, pilot
22   qualifications, but they're looking at how our pilots
23   interface with ramp operations, maintenance operations,
24   crew scheduling, dispatch.  It -- it is a very
25   fundamental, very key part of those roles at Frontier.

49

1         Q   So with respect to the hiring process, how does
2    the FAA interface in terms of, you know, getting someone
3    hired when you're -- let me take that back.
4              When you've decided, as chief pilot, you want
5    to select a candidate, to hire them as a pilot, either as
6    a first officer or as a captain, what role does the FAA
7    play in qualifying that person?
8         A   On an individual basis?  None whatsoever.  They
9    do have requirements, obviously.  Through FAR, we can't
10   hire an individual with no certificates and bring them
11   onboard as an employee.  Through FAR, the FAA specifies
12   was ratings and certificates a pilot has to have before we
13   can employ them.
14        Q   Okay.  So the pilot goes to the FAA and gets
15   the -- whatever the relevant certificates are and brings
16   them --
17        A   In a matter of -- in a matter of speaking, a
18   pilot would go to a flight school and be trained, take --
19   take and pass check rides to obtain the certificate.  Once
20   those certificates are met, that's the minimum requisite
21   to come the Frontier, which is an ATP certificate, with
22   today's regulation.
23        Once a pilot or an applicant possesses an ATP,
24   as long as some of those other things that I just
25   discussed -- ability to work in the United States, radio

50

1    operator's permit, valid medical -- those -- those are --
2    the medical and the ATP certificate are regulated by the
3    FAA.
4         Outside of that, there is no interface with the
5    FAA with regard to pilot hiring at Frontier Airlines.
6         Q   Okay.  So is it fair to say that when Mr. Quick
7    was hired by Frontier in 2004 that he would have had to
8    have had all the relevant certifications?
9         A   I wasn't the chief pilot at the time.  I would
10   have to review the file.  The regulation has changed since
11   2004.  I would have to review that --
12        Q   Okay.
13        A   -- specifically.
14        Q   But it's -- it's not Frontier's practice to
15   hire pilots who lack FAA certifications?
16        A   No, sir.  That is a fair statement.
17        Q   Okay.  So when there's a dispute in the
18   workplace about the qualifications of a pilot or something
19   that might result in discipline, how -- how is that
20   resolved at Frontier?
21        A   It seems like that's two different questions.
22   A -- a simple dispute process is handled through Section
23   12, the mechanism in our CBA.
24        If there was a question as to the qualification
25   of a pilot, it would -- it would not fall within the

51

1    dispute vehicle or process within the -- the CBA.  That
2    would be a case-by-case review and analysis, if there were
3    ever a question of qualification.
4         Q   Okay.  And when you say "dispute," what -- what
5    do you mean?  When we -- when we're talking about disputes
6    versus qualifications, could you describe what --
7         A   Yes, sir.
8         Q   -- you mean by that --
9         A   Yes, sir.  Our -- our -- our collective
10   bargaining agreement -- and, again, I'm sorry for naming
11   the section.  Section 12 is the dispute and grievance
12   process.
13        In our collective bargaining agreement, a
14   dispute would be a contractual -- I don't even want to say
15   "disagreement."  It is a vehicle in the contract wherein
16   if a pilot feels that the contract or CBA has been
17   violated, the pilot has a mechanism for bringing that
18   forward to the company to be made whole.
19        Q   Okay.  And that's resolved through a grievance
20   and arbitration procedures?
21        A   Several different steps.  It can be resolved at
22   the dispute level, which is between the aggrieved pilot
23   and the chief pilot.  That's the dispute level.
24        And if there's no resolution -- pardon me -- it
25   goes to our grievance level.  We have first level, second

Deposition of:   Joseph Thibodeau (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

---

52

1    level grievance, then system board, then arbitration.
2    There are multiple steps, multiple places where these may
3    be resolved.
4        **Q   Okay.  And when we're talking about qual- -- a**
5    **dispute or -- or an issue about the qualifications of a**
6    **pilot, could you describe what that means, and -- and how**
7    **is that handled?**
8        A   It would be case by case, I can answer that.
9    But to explain what that might be, I cannot.  It would --
10   again, it would -- not to be flippant, but if you -- I
11   apologize for being direct, but you asked the question.
12       So what would -- what would be an issue with
13   qualifications?  Would it be an question with how they
14   obtained the certificate or -- or otherwise?  I'm not
15   clear with the question.
16       **Q   Well, what are -- what, in your experience, are**
17   **some of the ways or the reasons why a pilot who's**
18   **currently flying might be deemed unqualified or questioned**
19   **the qualifications of that person to fly?**
20       A   I've never had one.  In my time at -- at -- at
21   -- as the chief pilot, I've never had an opportunity to
22   call anyone's qualifications into question.
23       **Q   Okay.  If -- if you did, what would be the**
24   **process for addressing that?  I know you said on a**
25   **case-by-case basis.  What is the procedure for addressing**

---

53

1    the qualifications of a pilot that are called into
2    question?
3        MR. DABNEY:  Note my objection that it's vague
4    and hypothetical.
5        **Q   (By Mr. Romer-Friedman)  Sure.  You can answer.**
6        A   Yeah.  Again, it would be speculating.  It
7    would have to -- you know, what was the basis of -- of the
8    question?  Did somebody obtain an airman's certificate
9    fraudulently?  That would take us down one path, which
10   would interface with the FAA.
11       Versus has somebody lied about their
12   qualifications in a different manner, whether that be with
13   a logbook or a false representation during an interview
14   process.  To me that would be two -- two separate things
15   that would require two separate -- at least two separate
16   paths to go gown.  But it would have to be case by case.
17       **Q   Let's say if someone fails a check ride and the**
18   **person's basic skills as a pilot are called into question**
19   **over that failure of a check ride.  How would that be**
20   **handled?**
21       A   Well, two different things:  If somebody has
22   not passed a check ride, our collective bargaining
23   agreement addresses that in Section 20, on what are the
24   steps to requalify, what needs to be done.
25       If it were called into question with basic

---

54

1    airmanship, ability and skill, again, it would be case by
2    case.  I've never had this happen, so it would be
3    speculative for me to say.
4        **Q   Okay.**
5        A   But we would very likely follow up.  We have,
6    through Pilot Records Improvement Act, or PRIA, we have a
7    pretty good idea of who we are hiring long before they're
8    employed.  We just haven't faced this.
9        **Q   Okay.  So is -- is it fair to say, then, if --**
10   **if a  person -- pilot files -- back up.**
11       **Is it fair to say, then, that if a pilot fails**
12   **a check ride that the person is not automatically**
13   **terminated?**
14       A   That's fair.  That is correct.
15       **Q   That there are steps for that pilot to either**
16   **get training or take actions that would result in that**
17   **pilot continuing to work at Frontier?**
18       A   Yes, sir.
19       **Q   Okay.  Have you ever had the occasion to see**
20   **that happen?**
21       A   Yes, sir.  When somebody has not passed a check
22   ride?  Yes, that happens.
23       **Q   How often is it the case that someone fails a**
24   **check ride?**
25       A   Not frequent.  Again, to get specific numbers,

---

55

1    I would have to go do a little bit more investigation.
2    But it does not happen frequently.
3        **Q   Do you have a -- I'm sorry, go ahead.**
4        A   When it does happen, I am notified.
5        **Q   Do you have a ballpark sense, on a kind of**
6    **annual basis, how many people, first officers or captains,**
7    **fail a check ride?**
8        MR. DABNEY:  Lacks foundation.
9        A   Yeah, I'm sorry, I can't.  Especially with our
10   growth.  To give a number would be a pure guess.  I know
11   it's a very low percentage.
12       **Q   (By Mr. Romer-Friedman)  Okay.**
13       MR. ROMER-FRIEDMAN:  Is that something that
14   defendants can produce?
15       MR. DABNEY:  You want a specific year or . . .
16       MR. ROMER-FRIDEMAN:  Number of people who fail
17   check rides each year.
18       MR. DABNEY:  For how many years?
19       MR. ROMER-FRIEDMAN:  Maybe over the past eight
20   years.
21       MR. DABNEY:  It's -- I'll talk with my client
22   at a break, and we'll get back with you.
23       MR. ROMER-FRIEDMAN:  Okay.
24       A   Yeah, I'd have -- I -- I don't know how -- how
25   far back --

---

Deposition of:  Joseph Thibodeau (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

56

1      Q   (By Mr. Romer-Friedman) Sure.  And -- and --
2  and to be clear, I don't think the precise number matters
3  that much, as opposed to, you know, if -- now, are we
4  talking about five a year, or are we talking about 50 a
5  year?
6      A   Right.
7      Q   I mean, do you have a sense of that?
8      A   Yeah, somewhere in between.  It wouldn't be
9  five, and it's not 50.  It's somewhere in between that
10 number.
11     Q   Okay.  And you've been chief pilot for a few
12 years now?
13     A   Three and a half.
14     Q   Okay.
15     A   Roughly three and a half.
16     Q   Okay.  And during that time, when there have
17 been failed check rides, what portion of those people have
18 been terminated versus the portion that were able to -- to
19 keep flying for Frontier?
20     A   Again, without -- I could -- that I could -- in
21 my tenure, I could go find a number.
22     Q   Sure.
23     A   I don't have it readily available.  There have
24 been several, but not many.
25     Q   Several who were terminated?

57

1      A   Correct.
2      Q   Okay.  And was that the minority of the -- of
3  the pilots who failed the check ride?
4      A   Correct.  And, typically, new hires that were
5  not able to pass a type rating.
6      Q   Okay.  So it's fair to say that most of the
7  people who are first officers or captains or applying to
8  be those positions and fail a check ride, most of those
9  people are able to ultimately continue their employment as
10 a -- as a first officer or -- or a captain?
11         MR. DABNEY:  Objection.  I think it misstates
12 the record.
13     A   Yeah, I mean, it happens so infrequently
14 that -- we could go back and look at the -- you know, to
15 get you a sense, a basis how many continue, how many don't
16 continue.  You know, I'd really need to dig in to get you
17 a direct answer.
18         But most of the time, if somebody -- you know,
19 I think we need more basis on what is a failure, what --
20 what -- what led to the failure.
21         In a two-and-a-half-hour check ride, it may be
22 one event, one maneuver.  That's significantly different
23 than an individual that goes into a check ride and has
24 multiple deficiencies.  So it's difficult to answer the
25 question directly.

58

1      Q   (By Mr. Romer-Friedman) Okay.  Have there ever
2  been situations where a person has multiple deficiencies
3  in a check ride and still continues his or her employment
4  at Frontier?
5          MR. DABNEY:  In his tenure or ever?
6      A   Yeah, ever, right?  That's exactly what I
7  was --
8      Q   (By Mr. Romer-Friedman) How about in your
9  tenure?
10     A   It just hasn't happened that often.  We don't
11 have people that have -- that -- I certainly don't have
12 concerns with -- when somebody does not pass a check ride
13 that is shared with me, I follow up with either our
14 director of training or the examiner and get a quick
15 briefing, what happened.
16         And I've never been led to have any concern
17 other than, okay, this sounds like a simple retrain, one
18 maneuver, retake the check ride and continue.
19     Q   Okay.  Is it possible before your tenure as
20 chief pilot that individuals who had several or multiple
21 items in a check ride that were failure that they
22 continued to work at Frontier Airlines?
23         MR. DABNEY:  I object to form.
24     A   Yeah, Frontier had been around for at least
25 seven years prior to my employment there.  I have no idea

59

1  what happened in the first seven years.  And what happened
2  prior to my time in the chief pilot's office would be to
3  provide you with a speculative answer.
4          Knowing our directors of training and the
5  flight operations department, my sense would be no.  If
6  there are multiple deficiencies, our -- our examiners and
7  our training department do not pass individuals that
8  cannot meet a standard.  It does not happen.
9          They're responsible for the traveling public
10 and the welfare and safety therein.  It's a responsibility
11 they take quite seriously.  So while speculative, I would
12 say that no, we -- we don't do business that way.
13     Q   (By Mr. Romer-Friedman) Okay.  But you're --
14 it sounds like you don't know either way whether there was
15 an instance in which a person had multiple check ride
16 failures and continued their employment?
17     A   I certainly couldn't know before my time in
18 management or before my time at the airline.
19     Q   Okay.
20     A   In my -- in my --
21     Q   You just don't know either way?
22     A   In my time, no, we do not.  If somebody has
23 multiple failures, multiple areas of deficiency, if they
24 cannot be retrained and they cannot pass a check ride,
25 their employment does not continue at Frontier.

Deposition of:   Joseph Thibodeau (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

---

60

1    Q   Okay.  So I -- I understand, I think, what
2  you're saying, which is that if someone had several items
3  in a check ride and they retrained them so that those were
4  addressed, that person could continue their employment?
5  Is that what you're saying?
6    A   As long as they passed the -- a following check
7  ride, yes, sir.
8    Q   Okay.
9    A   Retraining is the first step; rechecking is the
10 second step.
11   Q   Okay.  Are there any other steps besides
12 retraining and rechecking?
13   A   There can be, through our contract, depending
14 on how many.  You know, is there a type of pattern, is how
15 our contract calls it, or is it a pattern of failures.  If
16 a pattern of failures has been identified, the only other
17 step that we haven't discussed is the convention of a
18 training review board.
19   Q   I see.  So it's retraining, recheck, training
20 review board?
21   A   Not necessarily.
22   Q   But that could be a progression?
23   A   It would be training review board, based on
24 their recommendation, re -- retrained and rechecked.
25   Q   Okay.  Who's part of the training review board?

---

61

1    A   We haven't convened one in my time at Frontier.
2  So it would be a member we would have to select.
3    Q   Who selects?
4    A   It is joint between the company and the union,
5  and they get -- again, that would be case by case.  And we
6  would, as a company, convene and discuss with our union
7  leadership.
8    Q   So the training review board, is that made up
9  of kind of neutral people who are identified by the
10 company and the union to evaluate the situation?
11   A   It would have to be.
12   Q   It would have to be.
13   And both the company and the union, do they
14 have input on --
15   A   Yes.
16   Q   -- the consideration of the pilot at that
17 point?
18   A   Yes.
19   Q   Okay.  And so at -- at the point where a pilot
20 goes to a training review board, there's -- it's not
21 clear, I assume, that there's -- the person's going to be
22 terminated or the person's going to be retained --
23   A   Right, there's -- there's no preconception.
24   Q   Okay.
25   A   There's no preconception.

---

62

1    Q   It would be based on all the facts and
2  circumstances?
3    A   Correct.  And then that's why they would
4  review.
5    And, you know, to back up and get specifics, I
6  would myself have to refamiliarize myself with the
7  specifics of Section 20 on who was a member of that
8  training review board.
9    Q   Okay.  That's Section 20 of the CBA?
10   A   Correct.
11   Q   Okay.
12   A   And I -- I -- I can't remember how many
13 participate on that board, if it's -- I believe it's an
14 odd number.  I think it's three.  I -- I'd have to go
15 look --
16   Q   Okay.
17   A   -- but, again, in that we haven't convened one.
18   Q   Okay.  Let's talk a little bit about the
19 standard practices at Frontier with respect to the
20 military leave issue.
21   Okay?
22   A   Sure.
23   Q   Do you-all have a policy at Frontier on
24 military leave?
25   A   The company or flight operations?  My answer is

---

63

1  that yes, I believe -- I know that the company does, and I
2  know that flight operations does.
3    Q   Are they one and the same, the company and
4  flight operations, with respect to the personnel policies?
5    A   I would have to defer to HR with the personnel
6  question.  I can tell you that our collective bargaining
7  agreement has a military leave section, which further
8  breaks out and defines what our pilot can expect if
9  they're on military leave.  That's what I'm familiar with.
10   Q   Okay.  Well, so you can speak for flight
11 operations?
12   A   Sure.
13   Q   So what is the military leave policy for flight
14 operations?
15   A   It's defined in Section 9.  In broad terms, it
16 discusses our pilots, if they're on military leave, what
17 they can expect with regard to longevity, benefits,
18 seniority, pass privileges.  That those are the immediates
19 that come to mind.  I'd have to get into the section and
20 review it bullet by bullet.
21   Q   Okay.  And is it different in terms of the --
22 like, there's not a conflict between the --
23   A   No.
24   Q   -- flight operations policy with -- and under
25 the CBA and the -- for example, the company's handbook on

---

Deposition of:   Joseph Thibodeau (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

---

**64**

1  military leave?
2      A   No, there wouldn't be -- if there's -- if
3  there's a conflict, I'm not aware of it.  But, no, the CBA
4  would -- would be a place to go, above and beyond, to
5  further clarify for our pilot personnel versus another
6  employee of the company.
7      Q   Okay.  So if -- and how often would you say you
8  have pilots who go on military leave?  Is it pretty
9  common?
10     A   Oh, yes.  Very common.
11     Q   Do you have any idea of how many members of the
12  -- the -- 1,025 pilots are -- are in the armed forces?
13     A   Not specific numbers.  I can get that, but it
14  would take me a long time to figure out.  But we have --
15  we have a large percentage of our pilot group that is
16  engaged with the military in one fashion or another.
17     Q   Is it dozens or is it 500 or -- do you have a
18  ballpark sense of the number?
19     A   Yeah, it would not be 500.  That would be half.
20  Dozens, if we were into the -- ten or 15 dozen, may be
21  accurate.  I would guess we've got somewhere in the
22  neighborhood of at least 100 to 200 pilots that are active
23  with the military in one fashion or another, whether
24  that's reserve or guard unit or active duty, but in any of
25  the branches.

**65**

1      Q   Okay.  So about 10 to 20 percent, then, of
2  the -- could be about 10 to 20 percent of the overall --
3      A   That's speculative, but that would be my sense.
4      Q   Okay.  No one -- I assume there wouldn't be
5  anyone else at the company that would have a better sense
6  of that than you, right?
7      A   Not that I'm aware of.
8      Q   Okay.
9      A   Not, at least, with regard to flight ops.
10     Q   Okay.  So is -- is it fair to say that you, as
11  a chief pilot, and whoever works on the scheduling has to,
12  you know, work with -- with the pilots who go on military
13  leave so that you can get all the flight operations done
14  and accommodate the military leave?
15     A   Yeah, that's fair.
16     Q   Okay.  How do -- how do you guys do that?
17     A   Typically, our pilots notify myself, assistant
18  chief, anybody in our office.  It can be -- some of them
19  are very deliberate with, Here are my orders, I need to
20  leave.  Others are more verbal.
21         And I understand that.  It's a need -- you
22  know, based on the needs of -- whether it's, again, a
23  reserve unit, a guard unit -- how they are called up.
24         Sometimes it's a phone call.  Hey, I've got to
25  be on military leave.  It looks like it's going to be X

**66**

1  many days.  Call you when I get back.  Okay, no problem.
2         So it can be a very wide range of how that
3  is -- how we are notified.  Once we're notified, it is a
4  matter of chief pilot's office reaching out to our crew
5  scheduling team, first, to make sure that there are no
6  flying assignments that will be missed.
7         For -- in that example, if someone calls me
8  today and they've got to leave tomorrow, if there's a
9  flight assignment tomorrow, we need to remove our military
10  employee and replace that section of flying with someone
11  else.
12         We also will touch base with our leave
13  department so that we have an accurate accounting of who's
14  on leave.  Those are -- are the quick, basic steps from my
15  office.
16     Q   And so I take it, it doesn't matter if a person
17  gives verbal or written notice to you or the assistant
18  chief pilot, but what matters is that you -- under the --
19  under your kind of policies, what matters is that you
20  receive notice about the person going on military leave?
21     MR. DABNEY:  Objection.  Misstates the record.
22     Go ahead.
23     A   Yeah, for me, you know, I -- if someone says,
24  Hey, I've got to go on military leave, we take care of
25  that.

**67**

1      Q   (By Mr. Romer-Friedman) Okay.  And you -- you
2  and the assistant chief pilot would work to make sure that
3  their leave gets logged correctly with HR?
4      A   And -- and crew scheduling.
5      Q   And crew scheduling.
6      A   Right.  We have a software application that
7  crew scheduling would annotate with a three-letter code,
8  MIL, military leave.
9      Q   Okay.  Do you have a rule about how much notice
10  a pilot has to give?
11     A   It may be in the contract.  I'd have to look.
12  I do not have a rule.  I've got -- I have friends in the
13  Cheyenne unit that are in the MAPs force fighting.  They
14  can get called up on a moment's notice.  They call me up.
15  Hey, I just got deployed.  I've got to go do this.  We'll
16  take care of it.
17     Q   And -- and -- and that -- sometimes that
18  happens, right, that a person is called to duty or
19  volunteers to go on duty and they may only have a day or
20  two notice?  That -- that happens?
21     A   I'm sure it does.  I mean, I think it would be
22  disingenuous to answer otherwise.  More often than not, we
23  have orders a month out, six weeks out.  Most of our --
24  most of our pilots are now in reserve capacities, and they
25  know what their schedules are.  They -- they communicate

Deposition of:  Joseph Thibodeau (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

---

68

1    them with us --
2      Q   Okay.
3      A   -- fairly -- fairly freely.  Fairly -- you
4    know, with great regularity.  This is when I'll be out.
5      Q   Okay.  Do you have rules about bidding on a
6    schedule, in terms of how it relates to military leave?
7      A   There are rules within the schedule that
8    dictate when you can bid or not bid, but it is not germane
9    nor specific to military leave.
10      Q   Okay.  So, for example, a pilot could bid on a
11    -- on a monthly schedule and then drop days because
12    they're -- they're scheduled for military leave, or drop a
13    flight?
14      A   Right, that is correct.
15      Q   Okay.  And do you -- do you have -- a lot of
16    airlines, they have reserve pilots and line holders --
17      A   Correct.
18      Q   -- is that the structure you have?
19      A   Correct.
20      Q   What's the difference between reserve pilots
21    and line holders?
22      A   In broad strokes, a line holder has a defined
23    schedule, with defined sequences of flights.  A reserve
24    pilot will have defined days where they will be on
25    reserve, which is akin to being on call.  And they won't

---

69

1    have a set schedule for the sequence of flights; they'll
2    just have a schedule for which days they need to be
3    available to go fly.
4      Q   So if someone -- if a pilot who's in the
5    military gives only a day or two notice, ordinarily
6    Frontier would have a pilot on reserve duty who could come
7    and fill that spot?  It that fair to say?
8      A   Not necessarily fair to say it that way.  It
9    would depend on time of the month.  Transition is the end
10    of one month, beginning of another month, which is always
11    very tight for any airline, not just Frontier, with regard
12    to our reserve pilot staffing and coverage.
13      There are -- there are multiple reasons.  Any
14    kind of irregular operation can deplete our reserve
15    status.  So while the answer is yes, we do have reserve
16    pilots, it's not fair to say that we've always got a
17    reserve that's in place, ready to go fly, when someone
18    advises us they have to go on military leave.
19      Q   Okay.  Do you -- does -- does Frontier have a
20    minimum number of hours that pilots get paid for based on
21    whether they're a line holder or reserve pilot?
22      A   Yes -- yes, we do.
23      Q   What are those minimum number of hours that are
24    compensated in a month?
25      A   A -- it's Section 4, 75 hours.  75-hour

---

70

1    guarantee.
2      Q   For both?
3      A   Yes.
4      Q   Okay.
5      A   But our line values are typically built in
6    excess of 75.  So our line holders, we use what we call a
7    -- a bid divisor, which sets -- when we map out the
8    network for a month, we try to build most of our
9    line-holding lines to approximately 77, 78 hours.
10      And so most line holders get about 77 hours
11    minimum, and our reserve pilots are guaranteed a minimum
12    of 75.  If our reserves are greater than 75, they're paid
13    for the flying that they do in excess of that guarantee.
14      Q   Okay.  So on the military leave issue, once
15    service and the pilot has given leave -- given notice of
16    the leave and has gone on military duty, what happens when
17    that pilot returns?  How does -- how does the reemployment
18    process work from your perspective?  Or how is it supposed
19    to work?
20      A   Multiple questions.  Can --
21      Q   What is the policy of the company, as -- as you
22    understand it, in terms of returning a pilot to work?
23      A   It would depend on the length, obviously, of
24    the military leave.  We have -- for example, we may have a
25    pilot that will just leave to -- for the weekend.  They

---

71

1    may have a drill weekend.  So they may fly Monday through
2    Wednesday.  They'll be drilling Saturday, Sunday, but will
3    return to their flying the following Thursday.  There --
4    there -- there's no training event.  There's no
5    qualification event.  There's no -- there's nothing other
6    than the pilot resumes his schedule, as if -- as if he had
7    never left.
8      On the flight operations side, if the leave is
9    longer than that, there are other steps as required by
10    FAR, and our training requirements, before we can put
11    somebody back into the flight deck.
12      Q   Okay.  Well, let's talk about a longer period
13    of leave, like if someone's gone for a year or two --
14      A   Okay.
15      Q   -- and they come back.  What is the checklist
16    in your mind, that -- under the company's policy, that --
17    the things that need to get -- get done?
18      A   To put someone back into the flight deck?
19      Q   Yeah.
20      A   We would have to -- and, again, it's -- it's
21    defined.  Our manual is the flight operations training
22    manual, and there are different modules of training that
23    are required based on that duration of leave.
24      So if somebody was out for one year, they would
25    need one module.  For example, greater than 18 months,

---

Deposition of:   Joseph Thibodeau (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

---

72

1    it's a separate module.  Greater that 36 months, it's yet
2    again a different module of training that needs to be
3    completed.
4         So in my mind, the steps that we would take
5    would be to determine how long have you been gone.
6         Q   Right.
7         A   What training module will you fit into.  We
8    need your certificates, just as if we do with any other
9    pilot.  Every pilot is required to have a current medical
10   on file.  We will need those certificates, photocopies of
11   them.
12        And work with -- again, you asked year to two
13   years.  Greater than 180 days, we'll have to have a pilot
14   pass a reemployment or preemployment drug screening.
15        Once all of those requisites are met, then we
16   can begin to schedule the training to get the pilot back
17   into the flight deck.
18        Q   All right.  So just to make sure I got this
19   right, you said you would want to make sure that there are
20   certain trainings that would have to be done, and that
21   depends on the amount of time?
22        A   Correct.
23        Q   Okay.  FAA clearance -- medical clearance,
24   right?
25        A   Correct.  A -- a current medical.

---

73

1         Q   And then you said pass a reemployment or
2    preemployment drug screening?
3         A   Correct.
4         Q   Okay.  Anything else besides those three in
5    terms of the checklist or qualifications to return?
6         A   Not that come immediately to mind on the chief
7    pilot's side.
8         Q   Okay.  So the training, the FAA medical, the
9    reemployment/preemployment drug screening, those are
10   things for the chief pilot, kind of flight operations
11   side, would be important -- or necessary to return a pilot
12   to work?
13        A   Right.
14        Q   Okay.  How about on the HR side, in terms of,
15   you know -- well, do you know what the requirements are in
16   order for someone to actually return under USERRA, the
17   Uniformed Services Employment and Reemployment Rights
18   Act --
19        A   Do I know what --
20        Q   -- in terms of their job?
21        A   Do I know what the requirements are that HR has
22   to ask for?  No.  We -- I believe Section 9, again, allows
23   us to ask for orders.  We frequently do that on the
24   long-term leave.  But, again, I'm sorry.  I -- I don't
25   know what HR's checklist would look like or what they

---

74

1    would ask for.
2         Q   Okay.  Yeah.  So when the -- ordinarily, when a
3    person is going through the training, the FAA and medical,
4    the employment -- the drug screening, is that person on
5    payroll?  Or is that person kind of waiting on the
6    sidelines?
7         A   It would depend on what kind of leave they've
8    been on, and I would have to go review each case to tell
9    you what has been done.
10        Q   In terms of depending on what type of leave
11   they've been on, what do you mean by that?  Like, how long
12   leave was?
13        A   Right.  And so -- I would -- I would -- I would
14   have to go back and look at each of our individual cases
15   on, you know, if somebody was gone, what -- what was the
16   training requirements that was -- that was required, what
17   module we had to complete, when we could get that person
18   into training.
19        And I would -- I would coordinate and contact
20   our flight operations training department to ask them, in
21   concert with our payroll department, when did the person
22   notify us?  When was this person put on payroll.
23        Q   Notify you of -- of their intent to return?
24        A   Correct.
25        Q   Okay.  Okay.  Well, let's -- yeah, let -- let's

---

75

1    talk about that.  How does a pilot actually express, under
2    the rules that you have at Frontier, their intent to
3    return to their job from military leave?  What is an
4    acceptable way to do that?
5         A   Any of the conventional methods.  An e-mail
6    would be acceptable.  Verbal.  We've had --
7         Q   Like a call to you or the assistant chief
8    pilot?
9         A   Yeah, you know, a phone call.  That's typically
10   how our -- our returns have -- have gone.  If it's been a
11   longer duration, people typically call me up and are very
12   proactive with it.  They call early.  I'm retiring.  I
13   will be discharged in three months.  What do I need to do
14   to sign up?  What do I need to do to get back in?  What
15   will be required of me?
16        Okay.  And that gets the ball rolling.  Okay.
17   Well, what date?  Will you have all of these in your
18   possession?  "These" being your certificates.  And that
19   generally is sufficient for me.
20        And I ask the pilot to contact flight
21   operations training once we -- you know, pilot will
22   answer, yes, I've got a medical.  I'll send a copy to
23   flight operations training.  Excellent.  Coordinate with
24   them, and we'll get your training scheduled.  That is the
25   typical process.

---

Deposition of:  Joseph Thibodeau (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

---

76

1    Q   So under the typical process, you're the --
2  you're the point person for handling the reemployment of
3  the pilot?
4    A   You know, I can be, but there are others in
5  flight operations management.  I'm not the exclusive or
6  sole point of contact.
7    Q   Who would the other people be in flight
8  operations -- if you weren't the point person, who would
9  the other point people be in handling reemployment?
10    A   Well, a pilot could contact our director of
11  operations, who could contact flight operations training.
12  A pilot could contact our flight operations training
13  manager.  That typically -- you know, we communicate quite
14  well, sitting near each other.
15        It -- it does ultimately come back to the chief
16  pilot's office, but our pilots aren't necessarily --
17  typically, they are not required to contact me.  If I'm
18  flying, if I'm out of country, they couldn't contact me.
19  They would contact an assistant or anybody else in flight
20  ops management.
21    Q   Right.  So is there a kind of uniform set of
22  information that you ask the pilot to give you in order to
23  be reemployed?
24    A   Typically, and those are what I just -- what I
25  just stated.

---

77

1    Q   Which is the FAA medical, the drug screening,
2  the training; is that right?
3    A   Correct.
4    Q   Is there anything you ask for them -- a copy of
5  their orders?
6    A   Typically.  It depends, again, on the duration
7  of the leave.
8    Q   Right.  Why do you ask them for a copy of their
9  orders?
10    A   Just for the personnel file.
11    Q   Okay.  Do you ordinarily do anything to confirm
12  that the pilot has cumulatively served no more than five
13  years of nonexempt time in the military?
14    A   Ask it again.
15       Do I normally?
16    Q   So one of the -- one of the requirements for
17  reemployment under USERRA is that the service member has
18  to have not served more than five years cumulatively in --
19  in the military, although some time can be deemed exempt
20  under the law.
21       Is -- is determining whether the pilot
22  satisfies that five-year rule something that you
23  ordinarily do as part of the reemployment process?
24    A   We can.  Again, in my role, my concerns are
25  more focused on getting somebody requalified to get back

---

78

1  into the cockpit.  If it's an HR issue with regard to a
2  cumulative time limit, that's something that, frankly, I'm
3  -- I'm more concern with the pilot side of the house,
4  which is getting somebody back into the flight deck.
5    Q   Okay.  So if there were -- on an -- on an --
6  ordinarily if there were a question about whether the
7  pilot had -- has been on military leave for more than five
8  years of nonexempt time, would that be referred to the HR
9  department, or is that something that your department
10  could handle?
11    A   Well, we would defer that to the HR department.
12  That's -- that's -- being familiar with every exemption
13  within USERRA is not something that the chief's pilot's
14  office is familiar with.
15    Q   Sure.
16    A   So --
17    Q   Is it part of your job to confirm, under the
18  ordinary processes for reemployment, whether the pilot was
19  separated honorably from the military?
20    A   We have not -- I've never asked that.
21    Q   Okay.  Do you know if Frontier asks that on a
22  regular basis of pilots who return?
23    A   I do not know, but with regard to airman
24  certification and the employee handbook, had there been
25  any egregious inappropriate behavior, it -- it's our

---

79

1  pilot's responsibility to notify the company.  There are
2  requirements -- for example, a felony charge disqualifies
3  our pilots from flying.  So if -- you know, I'm not
4  familiar with all the ins and outs of military law.
5    Q   Sure.
6    A   But had there been a charge such as that, that
7  would be akin or equivalent to a felony, then our pilots
8  responsible to share that information with the airline.
9       That, I suspect -- and, again, this is
10  speculation.  I don't -- I don't know, but I would suspect
11  that would be something that Frontier would want to ask
12  its -- it's military employees when they return.
13    Q   Okay.  You -- you just don't know how or who
14  asks that?
15    A   Correct.
16    Q   Okay.  How about the time -- the amount of time
17  between the military service and the request for
18  reemployment?
19       Do you confirm in your department how much time
20  has elapsed between the end of the military leave and the
21  request for reemployment?
22    A   Typically not, no.  Again, our concerns are --
23  the timing there, our concerns would be back to our flight
24  operations training manual.  How long have you been gone?
25  What module do we need to put you into?

---

Deposition of: Joseph Thibodeau (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

80

1    Q   Okay.
2    A   And there are different -- whether it's a, you
3    know, a module number 1, number 2, number 3.  The
4    requirements of Frontier to train that pilot by FAR vary.
5    So it -- it's important for us -- you know, that's my
6    focus, is, you know, the regulatory compliance.
7         If we bring somebody -- we reemploy somebody
8    and put them in the wrong class, we're in violation of the
9    FAR and exposed to certificate to a letter of
10   investigation.
11        So that's where we get concerned with any kind
12   of timing.  How long has this person been away from
13   Frontier?  What module do we need to put them in for their
14   retraining?
15        Q   Okay.  So is -- is that -- is the issue of the
16   time between the end of the leave and the time seeking
17   reemployment --
18        A   Correct.
19        Q   -- is that something that HR exclusively
20   handles at the company?
21        A   No.  We can -- it -- again, depending -- there
22   are limitations with our software.  So if -- with -- with
23   our crew-tracking software.  If we have to go back, for
24   example, greater than 36 months, I would have to
25   coordinate with HR to find out how long somebody's been

81

1    gone.  Inside 36 months, we, in our -- in the chief's
2    pilot's office have the ability to find out when somebody
3    went out on military leave.
4         Q   Okay.
5         A   And that -- again, to the degree that we're
6    concerned with timelines, that I can satisfy.  Jane Doe
7    flew this day.  It was 37 months ago.  She will go under
8    this class.  Or this was 23 months ago.  We will put Jane
9    in this class.
10        Q   Okay.  How often do -- do you end up working
11   with the HR department on a reemployment issue, when a
12   pilot's trying to get back to work?
13        A   We don't -- we simply don't have that many.  In
14   terms of numbers, not often.  In terms of percentages is
15   probably a lot higher because there is that interaction --
16   there can be that interaction, the timing interaction.
17        Q   Okay.  In -- in general, in your experience,
18   how -- you know, when someone's been gone for more than,
19   let's say, six months or a year on military leave, how
20   long does it take to get that pilot back into a job at
21   Frontier?
22        MR. DABNEY:  Objection.  Vague.
23        Q   (By Mr. Romer-Friedman)  You can answer.
24        A   The -- the timing there, again, to those
25   modules is -- is unique.  And, again, it will play to FAR,

82

1    in recency of experience requirements.  Somebody who's
2    been gone for six months may require one training event in
3    the simulator and one qualifying event in the simulator.
4    That's very easy, and that happens more quickly.
5         If somebody needs a protracted or extended
6    module of training, training in and of itself is going to
7    take longer to complete.
8         Q   So from that shorter period that you described
9    to the longer period, what -- what does that range look
10   like of the time it takes to get someone back to, say,
11   flying?
12        A   If someone's been gone six months, there's
13   not -- there's not a very voluminous -- the -- the amount
14   of training is very small.  That can occur -- in six
15   months it's interesting.
16        If we want to say 179 days, it can happen much
17   more quickly.  If we go to 180 days, 181 days, we have FAR
18   Part 120 compliance issues with drug and alcohol
19   screening.  That can delay it.
20        Book -- bookmarks -- their bookends would be as
21   fast as 10 days, as long as -- it could be several weeks,
22   based on the time it takes to get back the results of
23   urinalysis.
24        Q   What's the longest amount of time that you've
25   seen it take to reemploy a pilot at Frontier besides

83

1    Mr. Quick?  We'll talk about him later.
2         A   I'd have to go back and review.  I can think
3    of --
4         Q   How about during your tenure?
5         A   Yeah.
6         Q   What's the longest it's taken to get someone
7    back to work?
8         A   A couple of months, several month.  And, again,
9    to get you a specific day, and I'd be happy to, but I'd
10   have to go and review it.
11        Q   Okay.
12        A   But it can take two to three months.  Again, it
13   depends on the module that they need.  Those modules can
14   take up to, in some cases, over 100 -- 100, 110 days.
15        Q   Okay.  So -- and in those situations -- those
16   few situations during your tenure where it took someone
17   two to three months to -- to get back to their job after
18   military service, were those people on payroll at the
19   time?
20        A   I'd have to confirm with our payroll
21   department.  Again, the one I -- the one that comes
22   quickly to mind was an individual that advised several
23   months in advance, This is the day I will be leaving the
24   military.  And I believe it was, I don't know, two, three
25   weeks after that, I would like to be back at Frontier.

Deposition of:  Joseph Thibodeau (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

---

84

1 We were told that very early, very much in
2 advance of when he wanted to return.  We coordinated with
3 that individual on which class he wanted to be a part of
4 in order to complete his flight ops, that FOTM module.
5 That was rather seamless for him.
6 But to get you specific days when he was on
7 payroll, I'd have to verify that.
8 **Q   Who was this individual?**
9 A   Randall Russell.
10 **Q   Do you recall the other people?  You said there**
11 **were several people who took where two to three months to**
12 **get them back to their jobs.**
13 A   They weren't specifically military.  John
14 Stemler (phonetic) was not military but in a similar
15 position, with a long leave of absence that needed to be
16 -- he needed a very complete -- he needed to complete more
17 -- one of the more voluminous amounts of training.
18 **Q   Who's the -- any others that you can recall?**
19 A   I'd have to go look to get you -- to get you
20 specific names.
21 **Q   Is that something that you could identify in**
22 **the records, when -- when those individuals were put on**
23 **payroll, in terms -- relative to when they resumed their**
24 **duties?**
25 A   We -- we'd have to discuss -- I believe we

---

85

1 could figure that out.
2 **Q   Okay.**
3 A   But it would be going through several
4 departments.  We may be able to.
5 **Q   Okay.**
6 **MR. ROMER-FRIEDMAN:  We'd ask defendants to**
7 **consider producing that.**
8 MR. DABNEY:  We'll consider it.  I mean,
9 there's an issue with the expiration of the time to
10 serve -- to request production and what's -- what's fairly
11 encompassed by the topics in -- in the 30(b)(6) notice.
12 So I would have to consider it and let you know.
13 MR. ROMER-FRIEDMAN:  Okay.  And perhaps this is
14 something that tomorrow, at the 30(b)(6) could be
15 addressed, if this is information that can be retrieved
16 you.
17 MR. DABNEY:  You know, again, if it's something
18 that was in the topics, then we would make an attempt to
19 prepare to answer the question.  If it's something that
20 wasn't, then there's an issue there.
21 I mean, it's not an -- a 30(b)(6) is not a
22 license to ask for, whatever and whenever, stuff that
23 should have been asked for long before where we are in the
24 calendar.  So I would have to consider those issues before
25 I would answer.

---

86

1 **Q   (By Mr. Romer-Friedman) Okay.  It -- it's**
2 **possible, though, that those individuals, Mr. Russell and**
3 **Mr. Stemler, while they were waiting to be -- to resume**
4 **working, they would have been -- they could have been on**
5 **payroll?**
6 A   Speculative.  I'd have to ask our payroll
7 department if they were or if they were not.
8 **Q   Okay.  But you don't -- you don't know that**
9 **they were left off payroll --**
10 A   I don't.  I don't handle our payroll.  I don't
11 handle any part of payroll.
12 **Q   Okay.  HR handles payroll?**
13 A   Pilot payroll handles the pilot payroll.  They
14 have their own part within our payroll department.
15 **Q   Do you know how quickly benefits get reinstated**
16 **for pilots who return from military leave?**
17 A   I have no idea.
18 **Q   Have you ever had a complaint that benefits**
19 **were not reinstated promptly?**
20 A   Not to me directly, not that I'm aware of.
21 **Q   Indirectly?**
22 A   No.
23 **Q   So in terms of the -- actually -- so if a**
24 **person comes back from military leave and they have a**
25 **service-related or -connected injury or disability, how**

---

87

1 does that change the process in terms of reemployment at
2 Frontier Airlines from what we already talked about?
3 A   Yeah, I don't know how it would change the
4 process at Frontier.  If it was a matter within flight
5 operations, I would defer to our -- our -- our HR and
6 benefits department, what -- where do we go?  That's not
7 something I -- as a chief pilot, that's not something I
8 deal with.
9 **Q   So in general, though -- I mean, so to take a**
10 **step back.  If a pilot has a disability that needs to be**
11 **accommodated in order for them to do their job, who**
12 **handles that?  Do you handle that?**
13 A   No.  I would immediately refer that to HR.  I
14 wouldn't begin to know how to accommodate if I didn't know
15 what the disability was.
16 **Q   How -- ordinarily, how would you find out what**
17 **a disability is that a person has?**
18 A   I would refer the pilot to HR.  Our HR
19 specialists are specifically trained with dealing with
20 those types of issues.  They're certified with different
21 protections, with HIPAA.  I am not.  I deliberately refer
22 those types of questions to HR.
23 **Q   Okay.**
24 A   They are the ones that will -- we can work
25 together, but I don't ever want to intrude on a pilot's

Deposition of:  Joseph Thibodeau (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

88

1    medical issues.  That's not my business.  They can take
2    care of that with benefits, with our leave of absence
3    people.
4         Q    And when a -- when a pilot's initially getting
5    hired, do they have to take a medical, physical exam?
6         A    No, sir.  They provide their FAA medical
7    certificate.  That is a requisite to hire.
8         Q    Okay.  But to get that FAA certificate, the
9    pilot needs to take a physical; is that right?
10        A    They take an exam, yes, sir, with an aviation
11   medical examiner.
12        Q    Is that an FAA doctor, or is that -- who is the
13   doctor that --
14        A    It's an FAA doctor.
15        Q    Okay.  So it's a doctor for the government does
16   a medical examination of the pilot before -- in order to
17   get that medical certification?
18        A    Roundabout.  I wouldn't say a "doctor for the
19   government."  They are doctors that --
20        Q    Hired by the government?
21        A    Well, they are certified by the FAA to conduct
22   a specific examination.
23        Q    Okay.  And if a pilot was trying to get that
24   medical certification and had a disability that implicated
25   their ability to fly a plane, would that be identified and

89

1    discussed and analyzed by that doctor contracted or
2    certified by the FAA?
3         A    Speculative, in that I'm not an examiner.
4    There is a questionnaire when you take your medical exam.
5         Q    Okay.  Have you ever had a pilot tell you that
6    they have a disability that implicates their ability to
7    fly?
8         A    I have had pilots tell me that I -- I -- I have
9    an issue with my medical that will not allow me to fly for
10   a number of days.
11        Q    Okay.  How did you handle that?
12        A    Went -- had the -- had our pilot, in each
13   event, contact LOA, leave of absence, to, again, go
14   through the same steps that we discussed previous, which
15   is to coordinate with the LOA department on what the
16   medical condition is and to be put on a type of medical
17   leave, whether it's FMLA, intermittent FMLA, or medical.
18        Q    Okay.  So it's handled by a different
19   department or -- than you?
20        A    Correct.
21        Q    Okay.  So you would just refer the person to
22   talk to the LOA department?
23        A    That is correct.
24        Q    LOA would handle the specifics?
25        A    Correct.

90

1         Q    Okay.  And at what point would you begin
2    interfacing again with that pilot?  It would be after the
3    person is cleared by --
4         A    Correct.
5         Q    -- LOA or someone else in -- in the airline --
6         A    That is correct.
7         Q    -- to fly?
8         A    That is correct.
9         Q    Okay.  So it's just not really your bailiwick,
10   to kind of get involved with accommodating disabilities?
11        A    That's correct.  And I'm simply not trained in
12   all of the, you know, state and federal statutes and
13   regulations.
14        Q    Okay.  Is anyone else within flight operations
15   underneath you?
16        A    No.
17        Q    So they would have the same protocol,
18   that if someone came to them, they would refer it like
19   you --
20        A    Correct.  With specific regard to disability?
21   Correct.
22        Q    Okay.  So -- and I -- I apologize if I wasn't
23   listening to you clearly.  Have you ever had a -- a pilot
24   come back after being on military leave and have a -- a
25   disability or medical condition that had to be

91

1    accommodated?
2         A    No, sir.
3         Q    Okay.  Never in your tenure?
4         A    Never in my tenure.  And I don't want to speak
5    prior to that because I wasn't privy to what occurred with
6    management prior to my -- my involvement.
7         Q    Okay.
8              MR. ROMER-FRIEDMAN:  We'll take -- you want to
9    take a break in about five?
10             THE WITNESS:  Sure.
11             MR. ROMER-FRIEDMAN:  Is that okay?
12        Q    (By Mr. Romer-Friedman)  Okay.  Are there
13   different types of reemployment?
14             MR. DABNEY:  Objection.  Vague.
15        A    Right.  I -- I wouldn't know.
16        Q    (By Mr. Romer-Friedman)  Is there -- does
17   the -- does Frontier distinguish between someone who is
18   kind of completely reemployed versus someone who's
19   provisionally reemployed?
20        A    Asking on behalf of Frontier, I can't answer.
21   We'd have to defer that to HR.
22        Q    Have you ever heard anyone in -- in the company
23   talk about provisionally reemploying a pilot?
24        A    No, sir, not with me.
25        Q    Okay.  Not during your tenure?

Deposition of:  Joseph Thibodeau (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

92

1      A   Correct.
2      Q   Okay.  Which goes back three and a half years?
3      A   In the current role, that's correct.
4      Q   Okay.  And -- and this may be beyond you, but
5  in your experience, how -- how are pension benefits
6  handled for pilots who go on military leave when they
7  return?
8      A   I'm afraid that is beyond my bailiwick again.
9      Q   Okay.  That's handled by HR?
10     A   Yes, sir.
11     Q   Okay.  Have you ever heard any complaints by
12  pilots about how the pensions contributions for -- for
13  military leave are -- have been handled?
14     A   No, sir, not -- not specific to the military
15  leave.
16     Q   Okay.  There haven't been any disputes between
17  the union and the company?
18     A   I can't answer with -- with -- with great
19  definition.  We have defined contributions.
20     Q   And that's separate -- defined contributions
21  are separate from the 401(k), right?
22     A   Yeah, it's part of the -- a piece CBA.  The
23  only -- the only -- the only dispute, if you will, that I
24  know was the timing of the deposits, which our pilots,
25  including myself, believed that the contribution had to be

93

1  made on payday, but it actually, I believe, has to be made
2  within five days of payday.  So any perceived grievance
3  did not exist.
4      Q   Okay.
5      A   That's the only one I'm aware of.
6      Q   So there was a question about when Frontier had
7  to make the makeup contribution --
8      A   Correct.
9      Q   -- for the defined contribution --
10     A   Or the -- or the match, correct.
11     Q   -- or the -- or the 401(k) match.
12     A   Correct.  And that's -- that's the extent of my
13  knowledge.  And as I said when I dug a little deeper, I --
14  I found that I was, indeed, misunderstanding.  The company
15  was depositing it as they're required to.
16     Q   And I think, actually, that the -- you may not
17  be -- I think the Department of Labor regulations say that
18  deposits have to be made within 90 days of the -- the
19  leave.
20     A   I'm not aware.
21     Q   It sounds like maybe they were having a dispute
22  about something that wasn't a dispute.
23      MR. ROMER-FRIEDMAN:  Okay.  All right.  Let's
24  take a quick break.
25      THE VIDEOGRAPHER:  Going off the record at

94

1  11:01.  This is the end of Media Unit 1.
2      (A recess was taken from 11:01 a.m. until 11:23
3  a.m.)
4      THE VIDEOGRAPHER:  Back on the record at 11:23
5  with Media Unit 2 in the deposition of Joseph Thibodeau.
6      Q   (By Mr. Romer-Friedman) Great.  Mr. Thibodeau,
7  you understand you're still under oath?
8      A   Yes, sir.
9      Q   And all the same ground rules we talked about
10  before are acceptable?
11     A   Yes, sir.
12     Q   Great.
13      I just want to -- before we move on to some
14  other things, I just want to clean up a couple things we
15  talked about before.
16      So when we were talking about kind of your
17  experience with pilots who were coming back from leave or
18  had a disability, that, you know, grounded them from
19  flying, you know, have you ever had a situation where a
20  pilot, let's say, had a temporary grounding, like three or
21  six months, because of any -- any particular condition or
22  issue?
23     A   Yes.
24     Q   Okay.  Is that pretty common, or is -- how
25  often does that happen?

95

1      A   Not very often.
2      Q   Okay.  So when -- when that happened in your
3  tenure, what -- you know, what -- what did you do and what
4  was -- what happened with that pilot?  What were the
5  circumstances?
6      A   I -- I wouldn't want to divulge someone else's
7  medical information, but it was a medical condition.  I
8  referred that pilot to HR, our leave of absence
9  department.  That pilot was -- or pilots went on a medical
10  leave.  When they had taken care of their issue, they
11  returned to work.
12     Q   Okay.  So I'm not asking for the name of the
13  person, but what kind of a medical condition was it, if
14  you could describe in at least some specificity?
15     A   A medical condition that made their medical
16  certificate no longer valid, a typ -- a cardio issue.
17     Q   Like a heart condition?
18     A   In broad, general terms, yes.
19     Q   Okay.  Have you ever had a pilot who had
20  something like sleep apnea or something like that?
21     A   Yes, we have.
22     Q   More than once?
23     A   I'm sure, but I -- I can't tell you exactly.
24     Q   What -- in those circumstances where a pilot
25  had sleep apnea, what did -- what did -- what did the

Deposition of:  Joseph Thibodeau (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

96

1  airline do to -- to address that and get them flying
2  again?
3      A   The airline did not do anything to get the
4  pilot back to flying status.  That would be between the
5  airman and the airman's medical examiner.
6      Q   Okay.  So from the time that that -- these
7  pilots, either in the person with the heart condition or
8  the person with sleep apnea, from the time that that
9  person identified that issue to the company, to Frontier,
10 what -- you said the person with the heart condition went
11 on medical leave?
12     A   Correct.
13     Q   So they -- the person was paid for -- during
14 that period, or was it unpaid?
15     A   They -- the pilot has the option, and I don't
16 know specifically which each -- what each pilot has
17 elected.
18     Q   Okay.  Did the pilot have an opportunity to do
19 a different job at the company?
20     A   No, sir.
21     Q   Okay.  How about the person with sleep apnea?
22 What happened with those individuals while they were
23 waiting to get their certification again?
24     A   They were on a medical leave, again, directed
25 to the leave of absence department and placed on a medical

97

1  leave.
2      Q   Okay.  So going back to when we were talking
3  about the -- you were talking about how the -- the amount
4  of -- or the type or the amount of training that would be
5  required for a person coming back from a leave absence or
6  military leave would depend on how long they were gone?
7      A   Uh-huh.
8      Q   Do you recall that?
9      A   Yes, sir.
10     Q   Okay.  How would -- how would that be impacted
11 by whether the person who is coming back was flying during
12 that period?  Like, if the person had been flying, let's
13 say, in the military --
14     A   They're mutually exclusive.
15     Q   What do you mean by that?
16     A   Flying in the Military is -- does not qualify
17 for the flying on behalf of Frontier Airlines --
18     Q   Okay.
19     A   -- with regard to currency or recency of
20 experience.
21     Q   Okay.  So if a person was -- had an injury and
22 was sitting on his couch for six months and doing rehab
23 versus a person flying, you know, a plane that might be
24 comparable to what is flown at Frontier Airlines, it
25 wouldn't make a difference in terms of what kind of

98

1  training would be necessary upon returning?
2      A   That is correct.
3      Q   Okay.  Going back to the check rides you were
4  talking about, could you walk me through kind of how
5  does -- how does -- you know, from the point where the
6  pilot and the FAA inspector kind of go to the -- go to the
7  plane or start the check ride experience, could you just
8  walk me through what happens, how that -- you know, how it
9  unfolds?  Where they -- like, where do they meet?
10     A   They typically meet at -- at the simulator
11 building.  We conduct our -- our proficiency checks in a
12 simulator.  The pilot and instructor and -- and/or
13 examiner would meet at the simulator building.
14     Q   Okay.  And that's on -- on Frontier property?
15     A   No, sir.
16     Q   Oh, that's an FAA building?
17     A   An FAA-approved building.
18     Q   Okay.  It's controlled by the FAA?
19     A   Correct.
20     Q   Okay.  So they meet.  Does -- how -- how -- do
21 they interact on a regular basis throughout the process,
22 or is it essentially just observing?
23     A   Does who interact?
24     Q   Does the -- the -- the FAA inspector and the
25 pilot who is -- who's going through the check ride, do

99

1  they interact?
2      A   They can.  Every check ride, if it is a
3  proficiency check or a -- a check ride, we at Frontier
4  need to notify the FAA.  We have this check ride.  It is
5  scheduled for this day.  Will you complete the check?
6          If the FAA can, they -- it is within their
7  realm to conduct the check.  Typically, they will tell us,
8  we don't have the manpower.  We need your examiner to
9  conduct the check ride.  They may or may not observe.  If
10 they do observe, they can be involved as much or as little
11 as they desire.
12     Q   Okay.  So when the examiner is doing the --
13 this is an FAA person, right, employee who is the
14 examiner?  You're saying sometimes it could be the --
15 Frontier's examiner; sometimes it could be the FAA
16 examiner?
17     A   Correct.  And if it is a -- a person who is
18 employed by Frontier acting in the capacity of an
19 evaluator or examiner, they are acting on behalf of the
20 administrator --
21     Q   Okay.
22     A   -- the FAA administrator.
23     Q   Is the job of that examiner supposed to be the
24 same and be done the same regardless of whether they're
25 employed by Frontier or by the FAA?

Deposition of:   Joseph Thibodeau (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

100

1    A   Correct.  They are obligated to evaluate and
2   examine as if they were FAA examiners.
3        Q   They follow the same standards, protocols?
4    A   Yes.
5        Q   Okay.  So going back to kind of how the process
6   works, the -- the -- the pilot meets the examiner at the
7   simulator building, right?
8    A   Yes, sir.
9        Q   And what do they do from there?
10    A   They will typically go into a smaller room, a
11   briefing room.  And in that briefing room, they will
12   review, again, the same certificates that we've been
13   talking about this morning, the airman certificate, the
14   medical certificate, to make sure that everything is
15   current.  And then they will begin, typically, an
16   examination -- an oral examination of the aircraft and its
17   systems.
18        Q   And that oral examination, that -- it's
19   essentially the examiner asking questions about the
20   systems and the pilot answering the questions --
21    A   Correct.
22        Q   -- orally?
23    A   Correct.
24        Q   Okay.  And then where -- where do they proceed
25   from the oral examination?  What -- what happens?

101

1    A   If the oral is successful, upon completion of
2   the examination, they will proceed to the simulator.
3        Q   They both sit in the simulator?
4    A   Yes.
5        Q   Okay.  While they're -- while they're in the
6   simulator, is the examiner talking or just observing the
7   pilot?
8    A   It depends on the capacity, why the examiner is
9   there.  It can happen either way.
10        Q   And why would it happen that the examiner would
11   -- would talk to the pilot during that simulation?
12    A   And let me back up to clarify.  The pilot?  Who
13   do you mean as the pilot?  The --
14        Q   The pilot who is going through the check
15   ride --
16    A   Okay.
17        Q   -- who's being evaluated.
18    A   The applicant.
19        Q   The applicant.
20    A   Can we call them the applicant?
21        Q   We can call -- if that's the term of art, let's
22   use "applicant."
23    A   The examiner can speak with the applicant.  It
24   is a practical examination, so if the examiner has reason
25   to interface with the applicant -- What are you doing?

102

1   Why are you doing? -- they can.
2        Q   Okay.  Can they talk about things outside the
3   scope of the examination, like issues that are unrelated
4   to the examination?
5    A   I don't know what that would be.
6        Q   Like, would they talk about sports or politics
7   or --
8    A   No.  No, they wouldn't.
9        Q   So other than asking questions specifically
10   about the simulation --
11    A   Correct.
12        Q   -- the examiner would have no reason, and --
13   and it would break the custom to talk about things outside
14   of that scope?
15    A   With the applicant.
16        Q   With the applicant.
17    A   That is a true statement.
18        Q   Okay.  And is that -- that's true throughout
19   the process, from the time that they meet to start the
20   oral examination to the simulation to the end?
21    A   There may be a break in between the oral
22   examination period and when that crew can get into the
23   simulator.  There can be 20 minutes, five minutes.  It
24   depends on the schedules.  But in between the briefing
25   room and the simulator, it would be much -- just like the

103

1   break that we just took.
2        Q   Right.  So how -- is it -- how often have you
3   seen an examiner ask kind of questions or -- or --
4   unrelated to -- how often have you seen an examiner in a
5   check ride ask questions to an applicant outside the scope
6   of the examination itself?  Have you ever seen that?
7    A   Only in my own examinations.
8        Q   Has that ever happened in yours?
9    A   Yes.
10        Q   What kind of questions were they asking?
11    A   I would be going back well over 10 years, so I
12   couldn't give you specifics.
13        Q   Okay.  Were -- have you ever seen questions
14   asked that -- that could be viewed as kind of trying to
15   rile someone up or get them excited?
16    A   No, I have not.
17        Q   Okay.  That would be inappropriate to do that?
18    A   If that occurred.
19        Q   Okay.  All right.  So when -- what -- to go
20   back a little bit, a while ago we were talking when
21   individuals are -- are hired, right, they get their FAA
22   medical clearance from the FAA.
23    A   Correct.
24        Q   They get all the paperwork done with HR, and
25   they've been selected by you, right?

Deposition of:   Joseph Thibodeau (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

---

104

1      A   (The witness nodded.)
2      Q   They're not -- they're not just put on an
3   airplane, right?
4          There -- there's still some training left; is
5   that right?
6      A   Correct.
7      Q   Okay.  What kind of training happens between
8   their hiring and them being actually, you know, put in
9   charge as first officer or captain of flying an aircraft
10  with passengers?  What happens in that time frame?
11     A   Modules, as defined by our FOTM, which would
12  include ground school, a simulator training period,
13  simulator qualification period, and then initial operating
14  experience, or IOE.  Upon completion of IOE, they are --
15  term of art, I guess, would be released to the line.
16     Q   And how long usually does that process take
17  from the time that they're informed they've been hired to
18  do all those things you just mentioned and be put in
19  charge as a first officer or captain?
20     A   It can be up to 180 days.
21     Q   Okay.  Commonly, how -- how -- how long does it
22  really take?
23     A   150.  It depends on how -- the interview date
24  and the date that they begin class.
25     Q   Okay.  And I assume they're paid for that time?

---

105

1      A   They're paid when they begin training.
2      Q   Okay.  So from the time that they -- so they're
3   -- they're told they -- they've been informed that they
4   have been hired, they're going to have to do all these
5   things to be trained, how soon after the kind of informing
6   them that they've been hired do they get on payroll?
7      A   Again, it would play to the date of the
8   interview versus the date of our ground school, when that
9   begins.  But that can be anywhere from 30 to 60 days
10  before we place somebody in class.
11     Q   Okay.  So when they're put in a class to start
12  the training, they're definitely on payroll?
13     A   At Frontier Airlines, they are.
14     Q   Okay.  How do they get paid?  Do they get paid
15  a kind of fixed salary or --
16     A   Correct, our guarantee.
17     Q   Okay.  So it's a line guarantee --
18     A   Correct.
19     Q   -- for this -- based on the seniority and
20  their -- I assume they're usually first officers, but
21  whatever their -- whatever their rank and their seniority
22  is?
23     A   Correct.
24     Q   Okay.  So earlier you said that in preparing
25  for this deposition, you reviewed Mr. Quick 's personnel

---

106

1   and training file; is that right?
2      A   Correct.
3      Q   You looked at the whole thing?
4      A   Most of it.  It's a -- it's a --
5      Q   Several --
6      A   -- very thick file.
7      Q   Several hundred pages?
8      A   Several hundred pages.
9      Q   Okay.  Is that usual?  Is that common?
10     A   Over that period -- you know, somebody that has
11  been with an airline over that period of time, certainly.
12     Q   Okay.
13     A   I have no idea thick mine is, but I'm sure it's
14  -- it's close.
15     Q   No one -- no one wants to look at their own
16  personnel file.
17         So in other words, the -- so the size of his
18  file is not kind of out of the ordinary?
19     A   I wouldn't think so.
20     Q   Okay.  And he was -- he was hired in 2004 -- or
21  he started -- he started flying for Frontier in 2004; is
22  that right?
23     A   He was hired in 2004.
24     Q   Okay.  And at the time, you -- you weren't a
25  manager, right?  You were just a fellow -- I guess you

---

107

1   were a captain by that point, 2004?
2      A   In 2004?  That is correct, I was a captain.
3      Q   Okay.  Did you know Mr. Quick back then?
4      A   No.  We never flew together.
5      Q   Did you know him outside of flying on an
6   aircraft together?
7      A   Not in 2004.
8      Q   When did you first become aware of or
9   acquainted with Mr. Quick?
10     A   I can't honestly answer.  I knew Mr. Quick was
11  an employee of Frontier, you know.  We have -- in our
12  employee break rooms, our crew rooms, I'm sure that we
13  have passed in that room.
14         But where I would say that I probably really
15  got to be acquainted with or know Ed would have gone back
16  to 2011, '12 time frame, outside of -- outside of any type
17  of airline connection.
18     Q   And why do you recall 2011?  What -- what comes
19  to mind about that time?
20     A   Nothing particular, just in the general time
21  within my life and spending more time here in Denver
22  versus less time out flying the line.
23         '11 may have been, maybe, premature.  It may
24  have been 2012.
25     Q   Okay.

---

Deposition of:  Joseph Thibodeau (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

---

108

1    A   But through different social affiliations and
2   knowing a lot of the same airmen not affiliated with the
3   airline.  I may have run into Ed at a picnic or --
4    **Q   Okay.  And by that time, 2011, 2012, you were**
5   **the assistant chief pilot?**
6    A   2012, I was.
7    **Q   2012.  Okay.  So you would have -- I guess at**
8   **the time, he wasn't working; he was on leave.**
9    A   Correct.
10   **Q   But if he had been here, he would have been**
11   **your -- you would have been his sup -- his supervisor?**
12   A   Not as an assistant.  We split our alphabet at
13  that time, and I was responsible for the seniority list
14  with last names beginning A through L.
15   **Q   Okay.  Who would have been his supervisor?**
16   A   At that time, I believe it was Rick Farrell.
17   **Q   Okay.  Farrell?**
18   A   Yes, sir.
19   **Q   Okay.  So having reviewed this -- Mr. Quick's**
20  **personnel file and -- and training, would you say that he**
21  **had a lot of experience before he started at Frontier**
22  **Airlines?**
23   A   He certainly flew for a lot of different
24  employers.
25   **Q   He had over, I think, 20 years of flying**

---

109

1   **experience, is that right, when he -- when he started at**
2   **Frontier?**
3    A   I don't know.  I know that he -- he reported
4   11,000 hours of flying time, but I don't know in terms of
5   years.
6    **Q   Okay.**
7    A   I don't recall.
8    **Q   In terms of 11,000 hours, how -- how does that**
9   **compare to other new hires at -- at Frontier?  Would that**
10  **be on the more senior side or the less senior side?**
11   A   It would be on the more senior, but not the
12  most.
13   **Q   Okay.  In -- in general, flying more hours**
14  **gives -- is a beneficial thing, I assume, in the airline**
15  **industry; is that right?**
16   A   It depends on the quality of the hours.
17   **Q   What do you mean by that?**
18   A   11,000 hours in a 121 airline, air carrier
19  operation, it would be much different than, say, 11,000
20  hours of flying traffic watch up and down I-25.
21      Although an hour is a unit of measuring time,
22  there are certainly different qualifiers of experience
23  with regard to type of operation, aircraft operation, the
24  environment.  So 11,000 hours, there's more to the story
25  than just hours.

---

110

1    **Q   Is there a minimum amount of flight hours that**
2   **is required to become a first officer at Frontier?**
3    A   Yes.
4    **Q   What's that number?**
5    A   2,500 hours.
6    **Q   So, then, Mr. Quick had more than four times**
7   **the minimum number of hours that are required?**
8    A   By today's minimums, yes, sir.
9    **Q   Okay.**
10   A   I'm not familiar -- I can't remember what the
11  minimums were in 2004.
12   **Q   Okay.  But he -- he definitely had the --**
13  **sufficient experience to be hired at the time as a first**
14  **officer?  I assume he -- he had it; otherwise, he wouldn't**
15  **have been hired, right?**
16   A   I'd be guessing.
17   **Q   Okay.  And is it true that Mr. Quick had**
18  **managerial experience as well as just experience as a**
19  **regular pilot?**
20   A   His resume and the transcript indicated that,
21  but I have no direct knowledge of that.
22   **Q   Okay.  You don't have any reason to question**
23  **that he had -- the positions on his resume were accurate**
24  **descriptions, do you?**
25   A   I have no reason.

---

111

1    **Q   Okay.  Having managerial experience, is that**
2   **something that's beneficial towards considering someone to**
3   **be a pilot?**
4    A   Again, it would be -- be similar to the hours.
5   It would depend on what type of managerial experience.
6    **Q   Okay.  Do most pilots who get hired at Frontier**
7   **Airlines have managerial experience as well as just the**
8   **minimum 2500 flight hours?  Or is it a minority?**
9    A   I -- I couldn't answer.  We have many that have
10  had managerial experience, and we have, as well, several
11  that have done nothing but fly.
12   **Q   Okay.  Why is managerial experience helpful**
13  **towards, you know, being part of a crew?**
14   A   Certainly, with -- with the way that the
15  question was asked, as part of a crew.  If you have the
16  aptitude and ability to have been placed in a position of
17  management, again, qualifying that position, it would
18  indicate to a hiring board that you will be able to lead
19  and direct a crew as a captain.
20   **Q   Okay.  And so when -- Mr. Quick began his --**
21  **his most recent period of medical leave on June 18, 2007;**
22  **is that correct?**
23   A   Medical or military?
24   **Q   I'm sorry.  I'm sorry.**
25      Mr. Quick began his most recent period of

---

Deposition of:   Joseph Thibodeau (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

---

**112**

1    military leave on June 18, 2007; is that correct?
2        A   That's what I reviewed.
3        Q   Okay.  And do you know when that continued
4    until?
5        A   He contacted me in September of 2013 -- 2013 or
6    2014.  It was 2014.
7        Q   Okay.  Do you know when he had ended his
8    military service prior to contacting you?
9        A   Only through review, and I cannot specify the
10   exact date.  I believe it was earlier that year.
11       Q   Was it within a 90-day period?
12       A   I believe it was.
13       Q   Okay.
14       A   I believe it was that summer.
15       Q   Okay.  The summer of 2014?
16       A   Correct.  And I apologize.  Again, to clarify,
17   it was 2014.
18       Q   Okay.  Thanks.
19           And are you aware of whether Mr. Quick gave
20   notice to the chief pilot or the assistant chief pilot
21   before he went on that seven-year period of military
22   leave?
23       A   Only through review.  That, again, would have
24   predated my tenure.  But through a review of the file.
25   And to directly answer, I don't know what -- the chief

---

**113**

1    pilot or -- or assistant chief, what I reviewed was a
2    notice to the director of flight operations training.
3    That's what I -- that's what I saw, was an e-mail to
4    Mr. Skid Roe, John Roe.
5        Q   Okay.  So you saw an e-mail in which Mr. Quick
6    contacted Mr. Roe, who was the director of flight
7    operations and training?
8        A   Correct.
9        Q   And told him that he was going on military
10   leave on June 18th, 2007?
11       A   Correct.
12       Q   Okay.  And going back to our conversation
13   before, is that the kind of notice that ordinarily service
14   members -- pilots give regarding their military leave to
15   the airline?
16       A   No, typically not.  It would have been to the
17   chief pilot.  But, again, to -- to be clear with my
18   answer, with several hundred pages, there may have been
19   notice to the chief pilot or assistant chief that I did
20   not happen to see.
21       Q   Okay.  Right.  And I think before, you
22   testified that in your view was that -- as the -- kind of
23   as the chief pilot, it wouldn't matter for the purpose of
24   giving notice to the flight operations and the airline
25   that the notice was given to the director of oper --

---

**114**

1    flight operation as opposed to the chief pilot, right?
2        A   That's correct.  I did testify to that.
3        Q   Okay.  So in terms of the -- the airline
4    policy, there wouldn't be -- they wouldn't view the fact
5    that he gave written to Mr. Roe differently than if he had
6    given it to Mr. Colburn, who at the time was chief pilot,
7    correct?
8        A   Well, again, to be fair, how Mr. Colburn ran
9    his chief pilot's office isn't identical to how I would
10   have mine.  I don't want to speak on Jim's behalf.
11           Had that occurred today, the director of flight
12   operations training, I'm sure, would had contacted me, and
13   that would have been acceptable had I been the chief pilot
14   at the time.
15       Q   Okay.  So you're not -- you're not aware of --
16   that Mr. Colburn had a different rule; you just don't know
17   what his --
18       A   I don't know.
19       Q   -- if he -- if he would have had a different
20   view of it?
21       A   I don't know how -- how Mr. Colburn ran his
22   office.
23       Q   Okay.
24       A   Not with that regard, not with military leave.
25       Q   Okay.  And, again, Mr. Quick could have given

---

**115**

1    that notice orally, in your -- in your understanding of
2    the growth company's policy, right?
3        A   Correct.
4        Q   It doesn't have to be written?
5        A   Correct.
6        Q   Okay.  And in -- in the ordinary course, if the
7    director of flight operations had received a request like
8    that, or a notice of military leave, he would have passed
9    it on to the chief pilot, right?
10       A   In an ordinary course, correct.
11       Q   Okay.  In the ordinary course, it would have
12   gotten passed along to the HR department?
13       A   That is correct.
14       Q   Okay.  Do you know what Mr. -- let -- let's
15   back up.
16           I mean, from your -- from your review of
17   Mr. Quick's personnel file, how -- how -- how would you
18   describe him as a -- as a pilot, in -- in the context of,
19   you know, his -- his experience and his work at Frontier
20   Airlines?
21       A   I'm not comfortable answering how I'd describe
22   him as a pilot because I've never flown with him.  Upon
23   review of the file, I can say that there have been several
24   questions.  Certainly, 2006, 2007, there were questions
25   with his specific knowledge of aircraft systems.  But,

---

Deposition of:  Joseph Thibodeau (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

---

116

1    again, that's reviewing a file.
2        Q   Right.  Okay.  And at the time that Mr. Quick
3    was going on military leave, in 2007, he was trying to
4    upgrade from first officer -- first officer to captain; is
5    that correct?
6        A   That is correct.
7        Q   Okay.  And he had failed a check ride in the
8    process of trying to upgrade to captain?
9        A   Correct.
10       Q   Okay.  And at that point, around the time that
11   he went on military leave, Frontier had assembled a TRB,
12   correct?  Or was in the process of commencing a TRB?
13       A   Yeah.  And, again, to be perfectly clear with
14   the answer, I was a line captain at the time.
15       Q   Okay.
16       A   A review of the file indicates that, yes, they
17   were in the process of convening a training review board.
18       Q   Okay.  And do you know why they were doing
19   that?
20       A   As the contract stipulates, if there's a
21   pattern of failures, a training review board will be
22   convened.
23       Q   Okay.  So you don't recall specifically why
24   they were convening a TRB?
25       A   I can't say that I recall.  I can tell you what

---

117

1    I reviewed, and the review was specific questions with
2    aircraft setup, aircraft systems.  I believe it was an
3    oral that was unsatisfactory, at least twice.  But, again,
4    I'm not the right person to ask about the specifics of
5    those examinations.
6        Q   Okay.  And since they never held -- they didn't
7    end up holding the TRB, right, for Mr. Quick?
8        A   They have yet to hold it, is my understanding.
9    It has not yet been held.
10       Q   Okay.  And so at the time that Mr. Quick went
11   on military leave, what was his status at the airline?
12       A   He was a first officer.  He had not passed his
13   captain upgrade training.
14       Q   Okay.  And he had not been terminated?
15       A   No, sir.
16       Q   There had been no decision to terminate him?
17       A   No, sir.
18       Q   The -- the TRB hadn't made a determination
19   about that --
20       A   That is correct.
21       Q   -- because it hadn't been convened?
22       A   That is correct.
23       Q   Okay.  So it's -- it's certainly possible that
24   if the TRB had, you know, run its course, there could have
25   been a range of different outcomes for Mr. Quick, correct?

---

118

1        A   That's correct.
2        Q   He could have retrained; he could have retaken
3    the check ride and passed and continued working as a first
4    officer?
5        A   That's correct.
6        Q   Is it possible that he could have even
7    eventually become a captain if he had resolved the issues
8    that had been raised in 2007 and, you know, gone on to --
9    to fly well?
10       A   Yes.  The -- contract does allow that.
11       Q   Okay.  So the fact that they convened the TRB
12   wouldn't have precluded him from later on upgrading to
13   captain at some point?
14       A   It would depend on the outcome of that TRB.
15       Q   Right.  And we just don't know what that would
16   have been?
17       A   That's correct.  It would be speculation.  The
18   TRB can recommend that an individual is never eligible to
19   upgrade again.  That's certainly an outcome.
20       Q   Okay.  If -- if a service member -- I'm sorry.
21           If a pilot were to kind of recognize and --
22   recognize failures and -- strike that.
23           If a pilot were to recognize areas of weakness
24   that had been identified through a failed check ride and
25   say that he wants to resolve those and get more training

---

119

1    and do a better job going forward, is that a positive
2    thing or -- you know, as opposed to somebody who said,
3    there's no problem, I'm great?  How would the company view
4    that?
5        A   We always -- we always expect our pilots to
6    attempt to resolve any deficiencies and -- and be masters
7    of their -- of their craft.
8        Q   Okay.  Do you -- I'm going to fast forward to
9    when Mr. Quick comes back from military leave.  Okay.
10       A   Okay.
11       Q   Okay.  So I think before, you said in September
12   of 2014, he contacted you?
13       A   (The witness nodded.)
14       Q   Were you the right person for him to contact to
15   -- to deal with reemployment?
16       A   Sure.  To come back from military leave, yes.
17       Q   Okay.  So ordinarily, that would be a -- you
18   would be the -- an appropriate person to contact?
19       A   Yeah.
20       Q   Okay.  And take us through -- it seems like
21   from the records, there was a call first, right, not an --
22   not an e-mail exchange?
23       A   Correct.  And in reading the transcript, I
24   think my recollection is the same as Mr. Quick's, as Ed's.
25   I can't remember if it was an initial call or a voice

---

Deposition of:  Joseph Thibodeau (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

---

120

1  mail. I think it was a voice mail. But there was an
2  initial contact made, and I was able to e-mail Ed in
3  response to that contact. And, again, I apologize. I
4  just can't recall if it was a call or a voice mail.
5      Q   Do you remember -- and I realize it's a long
6  time ago -- do you remember what -- what Mr. Quick said
7  about reemployment?
8      A   Just very basically. Very, very basically.
9      Q   Sure. Can you take us through what you recall?
10     A   Yeah. I only recall that Ed had said, I'm no
11 longer in the Army. I'm coming back to Frontier, and I'll
12 report on Monday.
13     Q   Okay.
14     A   And I can't even tell you what day of the week
15 it was when he said that. It would have been the week
16 prior.
17     Q   Right.
18     A   Midweek would be my best recollection.
19     Q   And when you say that he -- that -- that
20 Mr. Quick said that he wanted to report to Frontier on
21 Monday, did you assume he wanted to report to -- to return
22 as a first officer?
23     A   As a pilot. Absolutely.
24     Q   As a pilot? As a flying pilot?
25     A   Absolutely.

---

121

1      Q   Okay. So it sounds like whether this was a
2  voice mail or conversation, it was very brief because --
3      A   That's correct.
4      Q   -- it sounds like you didn't talk about his
5  military service specifically or his -- you know, any
6  medical disability that he had?
7      A   Oh, no, not at all. Not in the initial
8  contact.
9      Q   Okay. And he didn't -- in that initial
10 contact, he didn't mention wanting to go on long-term
11 disability leave or anything like that?
12     A   No. The very contact was very brief and to the
13 point. I'm done with the Army. I'm coming back. I'll be
14 there on Monday.
15     Q   Okay. And so is that -- is that a pretty kind
16 of normal exchange where a service member comes back and
17 says, Hey, I'm ready to come back to work?
18     A   That might be. But to say, I'm going to report
19 on Monday is abnormal.
20     Q   Okay. Well, normally, how would -- how would
21 you respond if someone said, I want to report on Monday?
22 What would you do?
23     A   Exactly what I did with -- with Ed. You know,
24 my assumption, you know, as the chief pilot, when a pilot
25 notifies you they're coming back, my assumption is that

---

122

1  this individual pilot, he or she, wants to be returned to
2  the flight deck. And as we've said earlier, we have got
3  to make sure we've complied with regulations before we put
4  somebody back into the airplane.
5          That was -- that was where I was with that
6  phone call. Oh, great, Ed's coming back. Here are the
7  steps we need to. These are the items that we'll need,
8  and then we'll put you into a class.
9      Q   Okay. We're going to look at some of this
10 correspondence, and this may be a little dry, and I
11 apologize.
12     A   That's okay.
13     Q   They're just documents.
14     A   No problem.
15     Q   But at the time, kind of, we're there other --
16 you know, were there -- it sounds like you're saying you
17 -- you had a positive attitude towards -- towards Ed at
18 the time?
19     A   Sure. I had no reason not to.
20     Q   Okay. Had you heard anything negative that
21 anyone else had said or -- or done with respect to Ed in
22 the past?
23     A   No. To be fair, I knew that -- I knew that Ed
24 was -- there were questions. We had to get him through
25 the TRB and then get him back into training.

---

123

1      Q   So at the time when he -- when he called you,
2  you already knew that he had to go back through the --
3  that the -- that the TRB would have to happen?
4      A   I knew that I was going to have to communicate
5  with the training department and the union. Where are we?
6  What do we need to do?
7      Q   Okay. How did you know that? Again, this is
8  before he called you, right?
9      A   When he called, this was turned over from
10 previous -- from predecessors -- from, you know, a
11 previous chief pilot.
12     Q   Rights. So when he called, at that point
13 you -- you were aware, even before he called you, that --
14 that when he did come back, he'd have to go through the
15 TRB?
16     A   I knew that it had not been convened.
17     Q   Okay.
18     A   So, yes, yes were files in the chief pilot's
19 office that -- that maintained -- the -- the -- the pilot
20 files.
21     Q   Right. Had you reviewed those files before Ed
22 called you?
23     A   Not Ed's exclusively or specifically. But,
24 yes, there was a file cabinet with -- with different
25 outstanding matters that were yet to be resolved. So any

---

Deposition of:   Joseph Thibodeau (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

124

1  time there was a transition from chief pilot to chief
2  pilot, these were the files that existed.
3     Q   Okay.  So would you, in the normal course of
4  that transition, have looked at those files?
5     A   Absolutely.  And they're not specific only to
6  pilots.  There were noise abatement issues --
7     Q   Sure.
8     A   -- various things that are -- are germane to
9  flight operations, including personnel issues.
10    Q   Did you talk to anyone prior to -- prior to Ed
11  calling you in September of 2014, had you talked with
12  anyone about the TRB or about the outstanding issues with
13  Ed?
14    A   I didn't have any reason to.  No, sir.
15    Q   So you didn't?
16    A   No.
17    Q   Okay.  I'm going to hand you what will be
18  marked as Exhibit 2.
19    A   Okay.
20       (Deposition Exhibit 2 was marked.)
21    Q   (By Mr. Romer-Friedman) Do you recognize this
22  document?
23    A   It's a -- yes, sir.  It's an e-mail.
24    Q   This is -- is this an e-mail, kind of ordinary
25  system of e-mail for Frontier Airlines?

125

1     A   It appears to be.  I mean, I don't see my
2  e-mail address on here, but it -- it looks like a
3  Microsoft Outlook e-mail.
4     Q   Right.  And this appears to be -- this -- this
5  appears to be an e-mail from ekquick@yahoo.com, correct?
6     A   Yes, sir.
7     Q   And that's -- is that Mr. Quick's e-mail
8  address, as far as you know?
9     A   As far as I know, yes, sir.
10    Q   Okay.  And this is addressed to Joseph
11  Thibodeau?
12    A   Yes, sir.
13    Q   And that's you?
14    A   Yes, sir.
15    Q   Okay.  And the date is September 23rd at 10:35
16  a.m.?
17    A   Agreed.
18    Q   Okay.  And Mr. Quick writes, JP, thanks for
19  your phone call this morning.  I have concluded my
20  military service and will be reporting back to Frontier on
21  Thursday the 25th.  Understand you have some stuff to send
22  to me via e-mail for my return.  Please let me know when
23  and where you would like me to report on Thursday.  I'll
24  follow up with a phone call today.
25    A   I agree that's what's written.

126

1     Q   Okay.  That's what Mr. Quick wrote to you?
2     A   Correct.
3     Q   Okay.  This -- you -- this document appears as
4  it would appear in your e-mail in the ordinary course of
5  business?
6     A   Yes, sir.
7        MR. DABNEY:  Probably without my name at the
8  top.
9        MR. ROMER-FRIEDMAN:  Okay.  Yes.
10       And for the record, it appears that much of
11  defendants' production has been produced with the name of
12  either counsel for the defendants or sometimes other HR
13  people at the top, and we'll -- we'll just disregard that
14  top --
15       THE WITNESS:  Understood.
16       MR. ROMER-FRIEDMAN:  -- name.
17       THE WITNESS:  And if I may back up?
18    Q   (By Mr. Romer-Friedman) Yeah.
19    A   When I said Ed wanted to report on Monday, it's
20  clear that this represents Thursday.  So I apologize for
21  the --
22    Q   Okay.
23    A   -- miscommunication with days of the week.
24    Q   All right.  So it appears here that Mr. Quick
25  is indicating that he called you on the morning of

127

1  September 23rd, and he's wanting to report back later that
2  week on Thursday?
3     A   Correct.
4     Q   Okay.
5     A   That's what I read.  When I read this e-mail,
6  that's what I understand.
7     Q   Okay.  And was this e-mail consistent with your
8  conversation with him, that he wanted to report back to
9  work and you were going to send him things via e-mail that
10  he needed to provide you for his return?
11    A   That piece is consistent.
12    Q   Okay.  And he says, I'll follow up with a phone
13  call today.
14       Do you recall whether he -- he did follow up
15  with a phone call after that?
16    A   I can't say with certainty if it occurred that
17  day.  I -- I'm sure that we spoke.  I just can't tell you
18  with honesty if it happened that day.
19    Q   That's fine.
20       Do you recall how many times you and Mr. Quick
21  spoke in -- in the September time frame or after that?
22    A   No.  I couldn't put a number on that.
23    Q   Okay.  Do you have a sense if it's three times
24  or 30 times or 10 times?
25    A   In between.

Deposition of:   Joseph Thibodeau (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

128

1    Q   In between --
2    A   15.
3    Q   15 times?
4    A   Several times.  Several.  It was not -- it had
5    to have been more than once or twice, but I wouldn't
6    suggest that it was 30 times a month.  I don't believe we
7    spoke every day.
8        Q   I mean, is it fair to say at some point --
9    we'll get to the dates, but at some point, you kind of let
10   Ms. Zeier take the lead on handling Mr. Quick's
11   reemployment?
12       A   That would be a fair statement.
13       Q   Okay.  And at that point, when it transitioned
14   over to Ms. Zeier handling the reemployment issues with
15   Mr. Quick, what was your role at that point?
16       A   If -- if there had been specific questions that
17   flight operations may be able to assist HR in answering,
18   that would have been my role.
19       Q   Like, about the training that needed to be
20   done --
21       A   Correct.
22       Q   -- or the drug screening?
23       A   Correct.  Training, absolutely.  Drug
24   screening, that would have been in concert with our
25   compliance department, not -- not solely HR.

129

1        Q   Okay.  Did you ever delete any e-mails that
2    involved Mr. Quick or --
3        A   I couldn't say for certain.  We do, of course,
4    maintain e-mail inbox maintenance.
5        Q   How -- how do you maintain your e-mail?  How
6    often do you delete things?
7        A   Daily.  There are e-mails that come across that
8    are deleted every day.  Just depends on the nature of what
9    the e-mail is about.  I -- I receive e-mails that will
10   discuss the status of a repair on an aircraft.  I don't
11   need to keep those types of e-mails.
12           If it's an e-mail from a pilot telling me about
13   a deficiency at a particular airport, I will take that --
14   that e-mail and forward it on to a particular station.
15   There is no, necessarily, process to my e-mail
16   maintenance.
17       Q   Okay.  So what about personnel matters, if
18   someone's --
19       A   Those are typically always kept.
20       Q   Okay.  And do you know if in this case -- let
21   me back up.
22           Do you have any sense of how many e-mails you
23   exchanged with either Mr. Quick or other people at
24   Frontier about Mr. Quick after September of 2014?
25       A   No more and no less than on any other

130

1    personnel-type matter.  I would guess anywhere from 50 to
2    100, perhaps, but that is a -- a very wild guess.
3        Q   Okay.  Do you know if all those e-mails were
4    produced?
5        A   Everything I had was produced.
6        Q   Everything you had at the time that you were
7    asked for it?
8        A   Correct.
9        Q   Do you know when you were asked by either the
10   airline or by your counsel to provide documents -- do you
11   know when that happened?
12       A   Earlier -- within the last year and a half, I
13   think.  I don't -- I don't have a sense of that.
14       Q   Was it after Mr. Quick filed his lawsuit?
15       A   It had to have been.
16       Q   Okay.  Did anyone internally at Frontier, when
17   Mr. Quick was seeking reemployment, ever kind of suggest
18   there could be legal implications to his reemployment?
19       A   No.
20       Q   No?  You never heard that phrase?
21       A   No, sir.
22       Q   Did anyone ever suggest that documents should
23   be retained and kept because there could be litigation?
24       A   That came, but I believe that was after suit
25   had been filed.

131

1        Q   Okay.
2        A   And that happens, not necessarily with just
3    flight operations.  If there's a passenger complaint, for
4    example, I may receive something from customer service.
5    If you have anything relevant to this flight number,
6    retain all documents.  That occurs.
7        Q   So there are what are called "litigation holds"
8    that are often placed on --
9        A   Yeah.  Yes, that's correct.
10       Q   Okay.  But there wasn't -- there wasn't a
11   litigation hold that you were aware of until after the
12   lawsuit was filed, you said?
13       A   As far as I know.  I -- I recall seeing a
14   litigation hold, but I can't tell you, without looking at
15   the timeline of when the suit was filed, when the
16   litigation hold was received.
17       Q   Okay.  Do you think that there's anyone at --
18   at Frontier who didn't want to see Ed reemployed?
19           MR. DABNEY:  Object to the form.
20       A   Yeah, I can't speculate.  There's 1,000 pilots.
21       Q   (By Mr. Romer-Friedman)  Anyone in management?
22   Was anyone of the view that he shouldn't be reemployed?
23           MR. DABNEY:  Same objection.
24       Q   (By Mr. Romer-Friedman)  You can answer.
25       A   And, again, same answer.  I can't -- I couldn't

Deposition of:   Joseph Thibodeau (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

---

132

1  speak on anyone else's behalf, but that's not the way that
2  -- that our management operates.  We've got to operate in
3  the blind and treat each individual as uniformly as we
4  can.
5       Q   Okay.  I'm going to hand you what will be
6  Exhibit 3 and ask you if you recognize this document.
7       (Deposition Exhibit 3 was marked.)
8       MR. DABNEY:  Let me ask, Counsel, before we go
9  too far in the exhibit numbering:  Did you want to make it
10 sequential with the previous deposition, or did you want
11 to start over each time?  I know we've marked a couple.
12 We can re-mark it if that's --
13      MR. ROMER-FRIEDMAN:  Let's start -- let's start
14 today and use -- these two days, go up from 1 to --
15      MR. DABNEY:  Okay.
16      MR. ROMER-FRIEDMAN:  Is that okay?
17      MR. DABNEY:  That's fine.  It's your
18 deposition.
19      MR. WHITCOMB:  Yeah.  I realize it's a little
20 bit bulky, but it may be easier in the context of what we
21 have here.
22      MR. DABNEY:  Fair enough.
23      Q   (By Mr. Romer-Friedman)  Okay.  Do you
24 recognize this document, sir?
25      A   Yes.  This is another e-mail.

---

133

1       Q   Okay.  Here it actually appears to be two
2  e-mails; is that right?  One from you --
3       A   Correct.
4       Q   -- to Ed Quick and then one from Mr. Quick to
5  you?
6       A   Yes, sir, that is correct.
7       Q   Okay.  So -- and the -- and the first e-mail is
8  from you.  You're -- and you're JP?
9       A   Correct.
10      Q   Okay.  To Ed Quick, right?
11      A   Correct.
12      Q   And that's at 3:53 on September 24th, 2014,
13 correct?
14      A   I agree that's what's on here.
15      Q   Okay.  And can you take a look at -- at what's
16 written here?
17      A   Sure.
18      Q   Okay.  All right.  And I'll just read for the
19 record what it says.  In response to your voice mail that
20 you intend to return to work at Frontier, I'm providing
21 you with the following information to begin that process.
22      You wrote that, right?
23      A   Correct.
24      Q   Okay.  And so it seems like here, at least on
25 September 24th, you continued to be under the impression

---

134

1  that Mr. Quick wants to be reemployed in his job, right?
2       A   Correct.
3       Q   Okay.  And the information in the second
4  paragraph here that starts with the letter -- with the
5  word "first," right?
6       A   Uh-huh.  Correct.
7       Q   Are these the basic things that you would
8  request of any pilot who's been out for more than 30 days?
9       There, I think you write that you need
10 documentation and related military orders establishing
11 that, one, your reemployment application is timely; two,
12 you have not exceeded the five-year application limit on
13 the duration of service, subject to those exceptions
14 permitted by law; and three, your separation or dismissal
15 from military service was not disqualifying.
16      Are those things that you would ordinarily require
17 of others?
18      A   Typically.  You asked about 30 days, and that
19 would -- that would be my only objection to the -- to the
20 question.  Yes, we would -- on a protracted or extended
21 duration, we would request those three -- three items.
22      Q   Okay.  Why would -- why would you request those
23 items?
24      A   As we discussed earlier this morning, and in
25 concert with HR, we need to make sure that reemployment is

---

135

1  timely.  And as we discussed earlier, the -- the
2  separation or dismissal being disqualifying, as discussed,
3  can -- if it was disqualifying for the military, it does
4  have a potential to disqualify with regard to the FAA and
5  airman certificate as well.
6       Q   Okay.  And then further down, in the last full
7  -- in the last full paragraph, you say that, We also
8  require documentation that you hold a current first class
9  FAA medical certificate, correct?
10      A   Correct.
11      Q   Okay.  This is something you would ordinarily
12 ask a pilot?
13      A   Correct.
14      Q   Okay.  And we will also need you -- it says,
15 Further, we will also need you to schedule and complete a
16 drug screen, and we need for you to attend a new-hire
17 orientation class.
18      A   Correct.
19      Q   Okay.  These are things that are required of
20 all returning pilots?
21      A   Based on duration, that's correct.
22      Q   And who -- based on pilots who have been gone
23 more than 30 days?
24      A   Greater than 180 for the drug screening.
25      Q   Okay.  And then you say, finally, please

---

Deposition of:  Joseph Thibodeau (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

---

136

1  contact me so that we can discuss these matters further
2  and answer any questions you might have -- you might have
3  and to set a date by which we can reasonably expect the
4  necessary information from you.
5      A  Correct.
6      Q  Okay.  So at the time, how long did you think
7  it would take to reemploy Mr. Quick?
8          MR. DABNEY:  Object to form.
9      A  Yeah, again, a little bit of --
10     Q  (By Mr. Romer-Friedman)  When you wrote this
11  e-mail, how long did -- you say, to talk about how much --
12  a date by which we can reasonably expect the necessary
13  information from you.
14         MR. DABNEY:  Same objection.
15     A  I wouldn't expect any undue delay if the
16  individual is expressing that they want to be -- come back
17  as a -- as a flight deck officer.  I've never experienced
18  any delay.  I would expect this would happen relatively
19  quickly.
20     Q  (By Mr. Romer-Friedman)  Okay.  So, again, if
21  he would have -- he would have needed the training that we
22  talked about earlier because he was gone more than 36
23  months?
24     A  Correct.
25     Q  So that might delay things a little bit, but

---

137

1  then once that was done, he would be reemployed, correct,
2  under the ordinary circumstances?
3      A  Correct.  Again, it's -- there are too many
4  qualifiers there.  All the pieces have to be in place to
5  start the training.
6      Q  Okay.  So in response -- in the same -- same
7  Exhibit 3, Mr. Quick writes back to you, JP, thanks for
8  your e-mail and update.  I will provide the documentation
9  needed tomorrow when I report back.  Unless you tell me
10  otherwise, I will report to your office tomorrow at 9:00
11  a.m.  Look forward to discussing with you my return and
12  the way forward for both of us.  Please let me know if you
13  want me report somewhere else and if a different time
14  works better for you.
15         So he wrote that, correct?
16     A  Correct.
17     Q  Okay.  So still at this point when he writes
18  this e-mail, your understanding was he wanted to be
19  reemployed, correct?
20     A  Correct.  As a pilot.
21     Q  As a pilot.
22         And that he was going to come in and talk to
23  you about the information that you asked him to provide --
24  or sorry.
25         He's telling you he's going to provide you with

---

138

1  the documentation, correct?
2      A  Correct.
3      Q  Okay.  Did you end up meeting with him in
4  person?  He says in this e-mail he would come and meet
5  with you.
6      A  No.  My recollection is that we did not.
7      Q  Okay.  Did you tell him you didn't need to meet
8  with him?
9      A  I believe that's correct.
10     Q  Okay.  Why was that?
11     A  Convenience.  There's no need to hand-deliver
12  the documents when they can be electronically submitted.
13     Q  Okay.  So in other words, you just -- you know,
14  you just needed to get the documentation and move forward
15  with the process?
16     A  Correct.
17     Q  That's what you were concerned about?
18     A  Correct.
19     Q  Okay.
20         MR. ROMER-FRIEDMAN:  This will be marked
21  Exhibit 4.
22         (Deposition Exhibit 4 was marked.)
23     Q  (By Mr. Romer-Friedman)  And I'll ask if you
24  can tell me if you recognize this document, after you've
25  had an opportunity to look at it.

---

139

1      A  (Witness reviews document.)
2         Again, I recognize this.  Although it does not
3  have the same headers up top, it appears to be a series of
4  exchange through e-mail.
5      Q  Okay.  And it looks like the -- the e-mail at
6  the very bottom of Exhibit 4 is the e-mail we just read --
7      A  I would agree.
8      Q  -- in Exhibit 3 where he -- Mr. Quick is saying
9  he'll provide you the documentation; he wants to get back
10  to work; he'll meet with you.
11         So then after that, you respond to him and you
12  say, No need to report to my office tomorrow.  Submitting
13  the requested documentation via e-mail and via USPS would
14  -- will be fine.  Once it is received, we can continue to
15  process the scheduling of your return to work.  Drug
16  screening and new-hire orientation, that can be most
17  easily accomplished over the phone.
18         You wrote that, correct?
19     A  Correct.
20     Q  Okay.  And so that's consistent with what you
21  just said, that you don't need to meet with people in
22  person.  If they want to be reemployed, they just provide
23  you the documentation and you move forward?
24     A  That's correct.
25     Q  Okay.  Okay.  And then in response, Mr. Quick

---

Deposition of:  Joseph Thibodeau (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

---

140

1   writes back, I will e-mail my DD Form 214 tomorrow and
2   follow up with a phone call.  Thanks, Ed.
3           He writes that, correct?
4       A   Correct.
5       Q   Okay.  And the DD -- what is a DD Form 214?
6       A   Those are just statements of what the military
7   orders were and duration.
8       Q   Okay.  And those are part of -- to go back to
9   Exhibit 3, those are part of the orders that you were
10  asking him to submit, right?
11      A   Correct.
12      Q   Okay.  And that's, in part, so you can figure
13  out that he's qualified for reemployment?
14      A   Correct.
15      Q   And -- And also to make sure that it was
16  honorable -- not dishonorable, service, correct?
17      A   Or better stated -- pardon me -- not
18  disqualifying.
19      Q   Not disqualifying.  Okay.
20          All right.  So at this point, was Mr. -- it
21  seems like Mr. Quick was being cooperative and trying to
22  help provide the information, is that -- is that fair?
23          MR. DABNEY:  Object to form.
24      A   You know, knowing what -- what I have
25  subsequently learned, I would say that the -- what we just

---

141

1   read on Exhibit 4, JP, I will e-mail my DD Form 214
2   tomorrow and follow up with a phone call, thanks, Ed, I
3   certainly feel that there is a -- a -- I'm not --
4   certainly not being provided with the full story by Ed
5   with that response.  I've requested a medical and other --
6   other items.
7       Q   Well, you -- right, you've asked him -- let's
8   see.  Back in Exhibit 3, you -- you said, While you were
9   in the process of providing the necessary documentation
10  described above to determine whether you meet the
11  eligibility requirements under USERRA, we also require
12  documentation that you hold a first class FAA medical
13  certificate, right?
14      A   Correct.  I think a more full answer would have
15  been -- early on, it certainly would have been helpful had
16  we know known that Mr. Quick was not able to hold a
17  medical at all.
18      Q   Okay.  Do you think it's possible that part of
19  the reason why he wanted to talk to you over the phone was
20  to tell you that?
21          MR. DABNEY:  Object to form.
22      A   I don't know what he would have wanted to talk
23  about.
24      Q   (By Mr. Romer-Friedman) Okay.  All right.  But
25  he -- he -- soon after that, he told you that he had a

---

142

1   disability that prevented him from flying, right?
2       A   No.  He told me he could not hold a medical.
3       Q   Okay.  But that's a piece of information that a
4   second ago you were saying he -- you know, you would have
5   like him to have told you on --
6       A   It would have accelerated the process.
7       Q   Okay.  But a day later, on the 25th, he -- he
8   tells you that -- and we'll look at a document -- but
9   within a day, he follows up to this e-mail telling you
10  that he had a medical condition --
11          MR. DABNEY:  Objection.  If you're going to ask
12  him about the next document, you should put it in front of
13  him.
14          MR. WHITCOMB:  I'll put it in front of him.
15  Objection taken.
16          I'm going to hand you what will be marked
17  Exhibit 5.
18          (Deposition Exhibit 5 was marked.)
19      Q   (By Mr. Romer-Friedman) Do you recognize this
20  document?
21      A   Yes, sir.
22      Q   Okay.  And is this an e-mail -- this is an
23  e-mail exchange, first on September 25th, 2014, and then
24  on September 26th, 2014, between you and Mr. Quick?
25      A   Correct.

---

143

1       Q   Okay.  So on the 25th, at 10:41, Mr. Quick
2   writes to you, JP, please find attached my temp disability
3   retirement orders and DD 214.  My last day was 28, June
4   2014.  I am on the temp disability retirement list due to
5   my medical condition.
6           My application to return to work is timely, as
7   it falls within the 90 days allowed for military service
8   over 90 days.  My period of service is exempt from the
9   five-year -- five-year limit under Title 38 U.S.C.
10  Section 4312(c)(4)(b).
11          Due to my medical condition, I cannot obtain a
12  first class FAA medical.  I will follow up today with a
13  phone call to discuss our options.
14          He wrote that, right?
15      A   That's what's on the paper, yes, sir.
16      Q   So it seems like he -- on the 25th, he's now --
17  you know, two days after your initial call, he's starting
18  to provide this information about his -- that he has a
19  medical condition, that he can't get an FAA medical
20  certificate, right?
21      A   No, I disagree.  It says he cannot obtain a
22  first class FAA medical, which is fundamentally different.
23  There are three separate classes of medical.
24      Q   Can -- could he fly without a -- with -- with
25  something other than a first class medical?

---

Deposition of:  Joseph Thibodeau (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

144

1    A  Yes, sir.
2    Q  Okay.  What would that be?
3    A  A second class medical.
4    Q  Okay.  Did you ever ask him about that?
5    A  I believe verbally, but I cannot -- I cannot
6  recall.  I believe I asked him, if you cannot obtain a
7  first class medical, would you be able to maintain a second class
8  medical?
9    Q  And do you know what he said?
10   A  He, I believe, would have said no.  But, again,
11  going back into the memory over nearly two years.
12   Q  Okay.  Okay.  So in your experience --
13   A  And -- and the reason that is relevant, the
14  chief pilot has the ability to -- our flight operations
15  manual requires a first class medical.  The chief pilot
16  will deviate and waive that requirement for a first
17  officers such that they may carry a second class
18  medical --
19   Q  Okay.
20   A  -- had that been the case.
21   Q  So ordinarily, a pilot would have to have a
22  first class medical?
23   A  Correct.
24   Q  Okay.  And Mr. Quick would know that; is that
25  right?

145

1       MR. DABNEY:  Object to form.
2    Q  (By Mr. Romer-Friedman)  Pilots would normally
3  know that the standard is they should have a first class
4  medical from the FAA, right?
5    A  Attached in which capacity?
6    Q  To -- to fly.
7    A  As a captain or first officer?
8    Q  Right.  They would know that?
9    A  Which is it?
10      As a captain, an airline transport-rated
11  pilot --
12   Q  Yep.
13   A  -- to act in the capacity of a captain, must --
14  must maintain a first class medical.
15   Q  But as a first officer, they can have a -- they
16  can deviate?
17   A  Correct.
18   Q  Okay.  But I guess what I'm asking is:
19  Ordinarily, would it be fair for a -- for a pilot who's a
20  first officer, as Mr. -- you know, as you said Mr. Quick
21  was when he left, would it be, you know, the ordinary
22  understanding of a -- of a first officer if they need to
23  have that first class medical clearance?
24   A  Or receive authorization from the chief pilot
25  to maintain a second class.  That is in our operations

146

1  manual, yes, sir.
2    Q  How often do people receive that exemption to
3  get a -- have a second class?
4    A  We haven't had an opportunity -- not many
5  opportunities, but every time I've been asked, I have
6  approved.
7    Q  So in your -- in your tenure as chief pilot for
8  three and a half years, how often has that happened that
9  you've allowed a deviation?
10   A  Only a handful of times.
11   Q  Like two or three?
12   A  Less than 10 but more than 3.
13   Q  Okay.  So in this Exhibit 5, you then respond.
14  My schedule is tied -- is a bit tied up right now.  How
15  about we speak next Wednesday at 11:00 -- at 11:00.  I
16  will call your cell number.  Right?
17   A  Uh-huh.  Yes, sir.
18   Q  Did you follow up and -- and call the following
19  Wednesday?
20   A  I can't recall specifically day and time.
21   Q  Okay.  And, again, on the next day, on
22  September 26th, which is a Friday, Mr. Quick responds, JP,
23  that works for me.  Thanks, Ed.
24   A  Correct.
25   Q  So, you know, in this exhibit, it's clear that

147

1  he's telling you that he has a medical condition, and he can't
2  get a first class FAA medical certificate, and he's happy
3  to follow up with you and talk, right?
4    A  Close.  I would -- I would state that he has
5  told me, not necessarily -- I can understand from this
6  there is a medical condition.  But in reading this by
7  itself, all I know is that the condition prevents him from
8  obtaining the first class --
9    Q  Okay.
10   A  And -- and to answer the question completely:
11  Yes, he does -- we have communicated we will discuss it at
12  greater length.
13   Q  Okay.  So as far as I can tell, after this last
14  e-mail on September 26th, what's been produced by Frontier
15  does not include any direct correspondence between you and
16  Mr. Quick.  And I don't know, of course, whether that
17  e-mail was deleted or whether it just never happened.
18      But is it -- you know, looking back at this
19  time period, Friday, September 26th, is that the time
20  period in which you kind of transferred the -- being the
21  point person on Mr. Quick's reemployment to Ms. Zeier?
22   A  It would have occurred -- I wouldn't say
23  September 26th.  It would have occurred after the phone
24  call, the one that's discussed in -- in Exhibit 5, How
25  about we speak next Wednesday.

Deposition of:   Joseph Thibodeau (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

148

1    Q    Okay.  So you had that phone call?
2    A    At some point.  And, again, what I testified is
3    I don't recall the dates or the time, but we had to have
4    spoken.
5    Q    Okay.
6    A    Because there was at some point where Ed shared
7    with me that he couldn't hold any type of medical.  That
8    was where I would have turned it over to HR.
9    Q    I see.
10    Okay.  So between the time in which Ms. Zeier
11    starts contacting Mr. Quick, you have a phone call or a
12    meeting with Mr. Quick, you talk further about his medical
13    condition -- you talk further about how he can't hold an
14    FAA clearance, right?
15    A    That would be a fair statement.
16    Q    Okay.
17    A    Can't told a FAA medical at all.
18    Q    Because I -- I would assume if he -- sorry.  If
19    he had told you that he had a medical condition but thinks
20    he can -- thinks that he can hold a second class
21    clearance, you would have followed up with him on that,
22    right?
23    A    I would have followed up with him regardless.
24    But the conversation went, I cannot -- if the conversation
25    were I cannot hold a first class, but I can hold a second

149

1    class, there would have been no need for me to have
2    contacted HR.
3    Q    Okay.  So in that respect, he wasn't being
4    evasive with you about the fact that he couldn't hold any
5    FAA clearance at the time, right?
6    MR. DABNEY:  Object to form.
7    Q    (By Mr. Romer-Friedman)  Because you -- you
8    referred it to Ms. Zeier, you didn't follow up on a second
9    class certificate, correct?
10    MR. DABNEY:  Same objection.
11    A    It -- I would argue it was evasive in that it
12    took greater than a week, when an airman that should have
13    known, and did know, I cannot hold a medical, all the
14    airman had to do was come to me and say, I want to return,
15    but I can't hold a medical.  What do I do next?
16    Q    (By Mr. Romer-Friedman)  Okay.  Sure.
17    I guess what I'm asking is, when you had this
18    conversation in -- the following Friday, September 26th,
19    in the following week, he was clear to you that he
20    couldn't hold any medical clearance from the FAA because
21    you -- as you forwarded this on to
22    Ms. Zeier as opposed to going down the other road of --
23    A    That's correct.
24    Q    -- of trying to see if he could qualify for a
25    second or third class certificate, right?

150

1    A    That's correct.
2    Q    Okay.
3    A    Well, to be clear, did you say second or third
4    class?
5    Q    Second class.
6    A    Okay.  Third class would be moot in our world.
7    Q    Okay.  A third class would be unacceptable in
8    all circumstances?
9    A    Correct, by FAR, not by Frontier.
10    Q    Okay.  So -- okay.  Do you recall anything
11    about that conversation with Mr. Quick?  Could you take us
12    through what you -- what you-all talked about the week of
13    -- I guess it would be the week of September 28th or 29th?
14    A    No, sir.  Other than -- nothing other than what
15    we just discussed.  It would have been brought to my
16    attention that -- Mr. Quick would have brought to my
17    attention that he cannot hold a medical at all.
18    At that point, it would have been, let's turn
19    to this over to benefits and find out -- to HR, pardon me,
20    to find out what we need to do.
21    Q    Okay.  Did -- did he tell you anything about
22    how he got injured?
23    A    No.
24    Q    Did you ask him anything about how he got
25    injured?

151

1    A    No.
2    Q    Did you ask him anything about his disability?
3    A    No.  I'm not trained.
4    Q    Okay.  How -- how long did this conversation
5    last?
6    A    I have no idea.  Brief.
7    Q    Could it have been, like, two minutes or 15
8    minutes?
9    A    I would say five minutes or less.
10    Q    Okay.  And in that conversation, did Mr. Quick
11    express interest in being reemployed?
12    A    He would have expressed exploring options.
13    What that meant, I'm not sure.  During that conversation.
14    Q    Okay.  So in terms of exploring options, he
15    wasn't saying to you, I only want one particular option,
16    as opposed to he's -- he's looking to see what is
17    possible?
18    A    I can't speak for what -- what he meant by
19    that.
20    Q    Well, what did you understand him to mean when
21    he was talking to you about his options?
22    A    Where -- what were his options available to
23    him.  I did not necessarily receive that as, how am I
24    going to be reemployed?  What are my options?  Am I
25    eligible for any type of benefit?  Am I eligible for a

Deposition of:  Joseph Thibodeau (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

152

1  leave?  That's exactly why I turned it over to HR.
2      Q    Okay.  And at the time, were you aware that it
3  -- it could be possible under USERRA or any other company
4  policy to put Mr. Quick into a -- a nonflying position?
5      A    Vaguely familiar with that, yes, that USERRA
6  allowed.
7      Q    Okay.  What -- what did you know at all about
8  the time about what kinds of positions he could be
9  reemployed into?
10     A    I was not a subject matter expert on that.  I
11  knew that our -- our obligation was to reemploy.
12     Q    Okay.  So you knew at the -- at the end of the
13  day, the company had to find him a job.  That was not your
14  issue; that was something for HR to determine?
15     A    Correct.
16     Q    Okay.  Did -- so let's talk about how kind of
17  you -- you transitioned from being the point person with
18  Mr. Quick on his reemployment to Ms. Zeier.
19          Okay?
20     A    Okay.
21     Q    All right.  What -- how -- how did that happen?
22  Did -- was it a phone call?  Was it an e-mail?  What --
23  what happened in terms of transitioning that?
24     A    I can't recall if it would have been an e-mail,
25  a phone call, face to face.  But the message would have

153

1  been, I have a pilot that wants to return but is not
2  medically qualified.  I don't know what to do.  Can you
3  help me out here?
4      Q    Okay.  And you expected, when you did that,
5  that Ms. Zeier would help Mr. Quick to find a job at the
6  airline?
7      A    I understood that my -- my expectation and
8  understanding was that our HR department, not necessarily
9  Ms. Zeier specifically, but our HR department, would work
10  through the process defined by USERRA and by company
11  policy.
12     Q    Okay.  And I guess -- you know, you -- you
13  earlier said in your tenure and just your knowledge of the
14  company, you -- there hadn't been a situation in which
15  someone came back with a disability from military leave
16  that needed to be accommodated, so it was just something
17  new for you?
18     A    From military leave?  That is correct.
19     Q    All right.  Okay.  And that's why, and
20  consistent with the protocol that you -- you talked about
21  earlier, that those issues get moved from operations to
22  HR.  That's what you did?
23     A    Correct.
24     Q    Okay.  Did you tell anyone else about the need
25  to make someone else the point person on Mr. Quick's

154

1  reemployment besides Mr. Zeier?
2      A    I don't remember if we had a flight operations
3  employee relations person on point or not.  I -- I can't
4  recall.
5      Q    Okay.
6          (Deposition Exhibit 6 was marked.)
7      Q    (By Mr. Romer-Friedman)  I'm going to hand you
8  what will be marked Exhibit 6 and ask you to turn to the
9  second page of Exhibit 6, the -- the e-mail at the very
10  bottom of the page.
11          Does this appear to be an e-mail from
12  Michelle Zeier to Mr. Quick on October 1, at 2:00 p.m.?
13     A    Yes, sir.
14     Q    Okay.  And this -- this appears to be a
15  document -- an e-mail that would ordinarily be kept in the
16  regular course of Frontier's business?
17     A    Correct.
18     Q    Okay.  All right.  Now, Ms. Zeier writes to
19  Mr. Quick, Chief Pilot Thibodeau -- that's you, right?
20     A    Correct.
21     Q    -- informed me that you have contacted him
22  about reemployment at Frontier Airlines.  I further
23  understand that you have informed CP Thibodeau that you
24  cannot hold a first class medical and that you would
25  therefore be unable to resume any duties as a Frontier

155

1  first officer.  CP Thibodeau stated that you had some
2  questions that he was unable to answer.  Can we schedule a
3  call so that we can review those questions?
4          In addition, CP Thibodeau provided me the
5  paperwork that you sent him at his request, and I have
6  some follow-up questions for you as well.  Please let me
7  know when it would be convenient to discuss.
8          She appears to have written that, right?
9      A    I agree that's what's written here.
10     Q    Okay.  And is everything that she wrote
11  consistent with what you told her?
12     A    I have no reason -- yeah.
13     Q    Okay.  Do you recall what questions that
14  Mr. Quick had that you were unable to answer?
15     A    Not specifically.  Again, to the point of -- of
16  what we discussed earlier, that would his options be.
17     Q    Okay.  And -- and, you know, as I think you
18  just said, you -- you would not -- because this was not
19  something that you handled previously and you weren't
20  trained, you wouldn't be familiar with what his options
21  were for finding a different position or getting medically
22  cleared?
23     A    That's correct.
24     Q    Okay.  All right.  Was Ms. Zeier familiar with
25  the -- the same personnel file and -- and information that

Deposition of:  Joseph Thibodeau (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

156

1  you had reviewed prior to --
2       MR. DABNEY:  Object to form.
3       A  I can't answer what she's familiar with or not.
4       Q  (By Mr. Romer-Friedman)  Okay.  Take us through
5  the conversation you had with Ms. Zeier when you -- you
6  know, when you talked to her about having her take over
7  this issue.
8       A  Again, without any, you know, record of it, I
9  can only speak to the -- to the basics, and it would have
10  been a basic conversation.  Ms. Zeier, I've been
11  approached by Ed Quick, who would like to return from the
12  military.  He's unable to hold medical certification.  I
13  don't know what to do next.  On behalf of Frontier and HR,
14  can you reach out to him and see what our next steps need
15  to be?
16       Q  Okay.  And at this point, you -- you -- as it
17  says in the e-mail, you provided her with the
18  documentation that Mr. Quick had sent you?
19       A  Correct.
20       Q  Okay.  And this e-mail is dated October 1,
21  correct?
22       A  The one that we just read is dated October 1st.
23       Q  Right.  So certainly by that time, Mr. Quick
24  had provided you with the documentation that you had
25  requested?

157

1       A  I believe he only provided the DD214.
2       Q  Okay.  So what was outstanding at that point?
3       A  Medical.  Medical, but we had already discussed
4  it was not in his possession.
5       Q  Right.  Is there anything else that you had
6  requested of him that he hadn't provided besides the
7  medical that, as you said, he couldn't provide because he
8  couldn't get it?
9       A  Let's review Exhibit 3.  It would appear that,
10  in terms of paper documentation, the DD214 would have been
11  provided in the absence of possession of the medical.  We
12  just discussed he couldn't provide that.  But I don't have
13  any record -- I don't know if there is any record of
14  Mr. Quick attempting to schedule any pre-reemployment drug
15  screening or attempts to attend new-hire orientation.  I
16  wouldn't have that information.  That's our compliance
17  department.
18       Q  Okay.  Ordinarily, though, is that -- who
19  schedules the -- the employee for that kind of a screening
20  process?  Is that something that --
21       A  The employee and -- and a compliance officer.
22       Q  Okay.  In your e-mail, though, back in
23  Exhibit 3, you had talked with him about needing to -- you
24  know, that you need to schedule a drug screen and do
25  orientation.  But you say, Please contact me so that we

158

1  can discuss these matters further.  Right?
2       A  Right.
3       Q  So in that conversation that you had with him,
4  did you talk with him about how he could get the drug
5  screen and the -- and the -- a new orientation done?
6       A  I can't recall.
7       Q  Okay.
8       A  And I don't know if we got there.
9       Q  Okay.  It seems like if -- your understanding
10  was he couldn't get a medical license, so you didn't need
11  to move forward with this other stuff because Ms. Zeier
12  was going to work with him?
13       A  Yeah.  And I would say that that's fair.  We're
14  speculating, we're guessing; however, there are many
15  positions that aren't safety sensitive that don't require
16  the drug screening.  That's why, at the point I knew he
17  wasn't coming immediately back into the flight deck --
18       Q  Right.
19       A  -- it would not have been a -- a focus of mine.
20       Q  Okay.  Well, let's actually talk about that.
21  Let's talk about what positions don't require screenings
22  or certificates.
23       So what pilot -- pilot-related positions or
24  pilot positions don't require an FAA medical clearance?
25       A  A pilot position, by definition, requires a

159

1  medical certificate.
2       Q  What about an operations instructor or ground
3  school?
4       A  Those aren't pilots.
5       Q  Those are -- okay.  How about director of
6  flight operations training?  Does that require a medical
7  -- FAA medical clearance?
8       A  I'd have to look at the job description.  That
9  reports to the director of operations, not me.
10       Q  Okay.  How about the assistant chief pilot?
11       A  They do report to me.
12       Q  Does that require a medical -- an FAA medical
13  clearance?
14       A  To operate the aircraft, yes.
15       Q  Do they need to operate the aircraft in order
16  to be the assistant chief pilot?
17       A  At times.
18       Q  Okay.  Could someone ever get hired as the
19  assistant chief pilot if they didn't have medical
20  clearance?
21       A  They would have to first be a pilot, which by
22  definition, as we discussed, to be a pilot, you've got
23  have a medical to be hired.  But our assistant chief
24  pilots are hired from within our seniority list.
25       Q  They're -- like, the person who has the most

Deposition of:  Joseph Thibodeau (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

160

1  seniority can just become the assistant chief pilot?
2      A   No.  It's an application process, posted
3  opening, application, interviews, selection.
4      Q   So it's somewhat discretionary as to who gets
5  selected?
6      A   Correct.  It's through an interview process.
7      Q   Okay.  Did you discuss with Mr. Quick in that
8  week, week and a half period in which you were engaged
9  with him talking about reemployment, did you discuss any
10  positions besides first officer or captain?
11      A   Ed had -- and I can't say it was
12  specifically that week.  There was a phone call where Ed
13  stated, hey, you can make me your assistant chief pilot.
14  I'll do it for a day, and then I'll go out on long-term
15  disability.
16          I didn't know how to receive that.  I didn't
17  know if he was speaking in jest, if he was serious.  I
18  didn't know if he wanted to become an assistant chief
19  pilot or wanted to go out on to a longer- or shorter-term
20  disability.  In that I had no idea what he wanted to do or
21  how to accommodate, I referred it to -- HR, referred
22  his particular case to HR.
23      Q   Okay.  So you didn't have any opportunity to --
24  at the time in September of 2014, you didn't talk with --
25  you didn't walk through or look at the positions that

161

1  Mr. Quick might be able to do in the absence of a medical
2  clearance?
3      A   I had no idea what his disability was at that
4  time.  It wasn't shared with me.  Absent -- I -- in my
5  role, I did not know what Mr. -- one, I didn't know what
6  he wanted.  Two, I didn't know what his disability was.
7  In the absence of those two, I couldn't possibly have
8  reviewed what he may want to do, what he is able to
9  perform, and that is exactly why I turned it over to HR.
10      Q   Okay.  Do you know if Frontier ever asked --
11  after September of 2014 ever asked Mr. Quick to sit with
12  for medical exam or meet with a doctor to figure out what
13  his capabilities or disabilities were?
14      A   I don't know.  I don't know --
15      Q   You didn't ask him?
16      A   I did not ask him.
17      Q   Okay.  And you don't know if anyone else asked
18  him?
19      A   I do not know.  I do not have knowledge of
20  that.
21      Q   Okay.  Just from your experience as a -- as a
22  manager at an airline, do you think -- is it fair to say
23  that having a medical exam or having a physical is a
24  proper way to determine what someone's disabilities or
25  capabilities are?

162

1          MR. DABNEY:  Object to form.
2      A   Yeah, I don't -- I'm not -- I'm not in that
3  world, not in the medical profession.  I don't know how
4  you would evaluate.
5      Q   (By Mr. Romer-Friedman)  Okay.  So you think
6  having a medical exam would have no value to discern what
7  someone's disabilities or capabilities are?
8          MR. DABNEY:  Object to the form.  Misstates the
9  testimony.
10      A   Again, I don't know how -- a medical exam?  A
11  physical, a cognitive exam, a cardio exam?  I wouldn't
12  begin to know.  That's why I would refer to medical
13  professionals.  I would let them decide.
14      Q   (By Mr. Romer-Friedman)  Okay.  Because medical
15  professionals are the ones who can determine what
16  someone's abilities are?
17      A   Well, you asked first what -- how to determine
18  the level of disability.  I wouldn't ask a pilot to
19  evaluate somebody's disability.  I would ask a
20  professional in that field.
21      Q   Right.  No, I think -- I think --
22      A   I don't know how to --
23      Q   Right.  I mean, you wouldn't ask a magician to
24  determine whether someone has a disability that prevents
25  them from flying, right?

163

1      A   I agree.
2      Q   You would ask a doctor?
3      A   Correct.
4      Q   Okay.  I'm going to hand you what will be
5  marked as Exhibit 7.
6          (Deposition Exhibit 7 was marked.)
7      Q   (By Mr. Romer-Friedman)  And I will represent
8  to you that this is the document that was produced in
9  response to plaintiff's request for production number 1 as
10  pilot positions that did not require all certifications to
11  be maintained.
12          Do you recognize what these position
13  descriptions are?
14      A   Stand by.  I'll review them.
15      Q   Yep.
16      A   (Witness reviews document.)
17          I recognize these.
18      Q   Okay.  Do you -- did you ever look at these
19  types of positions to see whether Mr. Quick could qualify
20  for them after he -- after he attempted to return to
21  Frontier in 2014?
22      A   Again, I had not been made aware, until
23  sometime after, what Mr. Quick wanted to do.  When he
24  says, I could be your assistant chief pilot for a day and
25  then go out on long term, I was not certain if he was

Deposition of:  Joseph Thibodeau (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

164

1    genuinely sincere and wanted to be an assistant chief
2    pilot.  That's why I turned it over to HR.  If there had
3    been a genuine discussion of I really wanted to be your
4    assistant chief pilot, I would have reviewed this.
5        **Q   Okay.  So if Mr. Quick had told Ms. Zeier that**
6    **he wanted any of these positions, would you have expected**
7    **her to tell you that so that you could look through these**
8    **positions to determine if he was qualified or could be**
9    **trained or brought up to speed to do those positions?**
10       A   Could you ask that again?  Would Ms. Zeier
11   have --
12       **Q   If Mr. Quick had told -- in this September,**
13   **October time frame, that Mr. Quick had told Ms. Zeier that**
14   **these types of positions were positions he would be**
15   **interested in working on at Frontier, would you have**
16   **expected her to communicate that to you so that you could**
17   **look to determine whether Mr. Quick could do those**
18   **positions?**
19       A   Certainly --
20           MR. DABNEY:  Objection.  Assumes facts.
21       A   -- I can't speak for Ms. Zeier, but in a
22   wholistic, global view, we would review everything.  What
23   does Mr. Quick want to do?  What do we have that fits?
24   What is he capable of doing?
25       **Q   (By Mr. Romer-Friedman)  Okay.  So as the chief**

165

1    **pilot, though, the person who ultimately has to decide**
2    **whether someone can be put in -- selected for one of these**
3    **positions, you would expect to have the information about**
4    **the pilot so that you could determine whether he's**
5    **qualified for that, correct?**
6           MR. DABNEY:  Object to the form.
7       A   Yeah, again, it would -- I would have to defer
8    the HR, where -- as an organization, we would all -- we
9    would all review.  It wouldn't be my review alone.
10      **Q   (By Mr. Romer-Friedman)  Okay.  But, again, you**
11   **-- take a step back.**
12          **You never heard from Ms. Zeier or anyone else,**
13   **after September 2014, that Mr. Quick wanted to be**
14   **reinstated into one of these positions, correct?**
15      A   I cannot recall.  When you're asking about
16   specific positions, and I cannot say with certainty what
17   was discussed and what wasn't.  We've got four or five
18   different positions here.
19      **Q   Okay.  Well, let's talk about these positions.**
20   **And if you -- if you recall that Ms. Zeier or anyone else**
21   **told you that Mr. Quick wanted one of those positions,**
22   **please let us know.  Okay?**
23      A   Certainly.
24      **Q   All right.  So the first position in -- which**
25   **is Bates number -- in Exhibit 7, which is Bates number**

166

1    **747, beginning of the document, this is for instructor,**
2    **flight ops.  That's flight operations instructor position?**
3       A   That is -- would be correct.  Correct.
4       **Q   Okay.  And this is in the department of flight**
5    **operations training, correct?**
6       A   Correct.
7       **Q   Okay.  And the summary is to -- of the position**
8    **is to instruct in classroom ground simulator FTD training**
9    **of initial transition upgrade and recurrent flight**
10   **training, correct?**
11      A   Correct.  That's what the position summary is.
12      **Q   Okay.  So in terms of qualifications under**
13   **Section V, it says, Bachelor's degree preferred.  Previous**
14   **instruction experience.  Part 121 aircraft training**
15   **experience preferred.  A-320 type rating preferred.**
16   **Assist with ongoing courseware development during light**
17   **training periods.  Right?**
18      A   Correct.
19      **Q   These are things that would qualify someone for**
20   **this position?**
21      A   That's what's listed as the qualifications,
22   yes, sir.
23      **Q   Okay.  Do you know if Mr. Quick had the**
24   **qualifications that are listed here?**
25      A   Only through review.

167

1       **Q   Based on your review --**
2       A   I don't know if has a bachelor's degree or not.
3       **Q   Well, it says, Bachelor's degree preferred,**
4    **correct?**
5       A   Yeah, but it's a preference, and that is a
6    qualification.  I can't say if we would prefer Ed Quick
7    over another candidate.  I don't know if he has a
8    bachelor's degree.
9       **Q   Okay.  But in terms of the base qualifications**
10   **for him to do that position, it says "preferred," not**
11   **required, correct?**
12      A   Sure.
13      **Q   So if he didn't have a bachelor's degree, he**
14   **still would be qualified.**
15      A   Correct.
16      **Q   It might be that -- if you were going to look**
17   **at someone compared to him, someone else might be better**
18   **in your view, correct?**
19      A   I would agree.
20      **Q   Okay.  Other that the bachelor' degree that you**
21   **think he may not have, do you know, based on the record,**
22   **whether he satisfies the rest of these qualifications?**
23      A   The only one that I can affirmatively state,
24   because it's not preferred, is the previous instruction
25   experience.  And until I reviewed the transcript from his

Deposition of:  Joseph Thibodeau (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

168

1    deposition, I did not know if he had been an instructor.
2         Q   But now you know he has been an instructor,
3    correct?
4         A   Correct.
5         Q   Okay.  And that he currently --
6         A   There was some level of questioning as to why
7    he was no longer an instructor, but it was my
8    understanding that he instructed for American Eagle.
9         Q   Okay.  So other than that, then, you -- you
10   would have no reason to believe that he's unqualified for
11   this position, correct?
12        MR. DABNEY:  Object to form.
13        A   You're asking me specifically on Roman numeral
14   V, which is qualifications, but there are other qualifiers
15   to this description.  If we go to Roman numeral VI,
16   Knowledge, skills and abilities.  Demonstrate in-depth
17   knowledge of aircraft systems as well as Frontier policies
18   and procedures, we had question with that -- I would have
19   question with that.  I would have concern with that.  An
20   individual that has had unsatisfactory performance on two
21   oral examinations of the aircraft, I don't think it's fair
22   to say that that individual has a, quote, in-depth
23   knowledge of the aircraft systems.
24        Q   (By Mr. Romer-Friedman)  Let me ask the
25   question.  What you just said, is that based on your

169

1    review of the litigation and information that you obtained
2    recently, or is that based on what you knew at the time,
3    in September of 2014?
4         A   September 2014, you know, that's -- the level
5    of detail is due to my review of litigation.  Having
6    reviewed the chief pilot turnover folders, I knew that a
7    training review board was in need of being convened.
8         Q   Okay.
9         A   So I did not know the specifics of the oral
10   examinations, but I knew from the chief pilot office
11   turnover file that there were questions with the aircraft
12   systems knowledge.
13        Q   Okay.  And that information that you would have
14   been generally aware of, right, in September 2014, that
15   was information that was seven years old, correct, because
16   it dated back to June --
17        A   At the time it would have been, yes, sir.
18        Q   Okay.  So if there was other information that
19   could have been obtained subsequent to 2007, you wouldn't
20   -- you weren't operating under that information, correct,
21   about Mr. Quick's abilities?
22        MR. DABNEY:  Objection.
23        A   Well, to be clear, I wouldn't have been a part
24   of this discussion in any event.  This position reports to
25   the director of flight operations training.  The questions

170

1    you're asking me would have been discussion between HR and
2    the director of flight operations training.
3         Q   (By Mr. Romer-Friedman)  Okay.  But flight
4    operations training is underneath you as the chief pilot,
5    correct?
6         A   No, sir.  They report to the director of
7    operations.
8         Q   But you're familiar with these positions?
9         A   Yes, sir.
10        Q   Okay.  I guess what I'm trying to get at is
11   that in 2014, you looked back and saw what the record had
12   been in 2007, right?  But in terms of -- of evaluating
13   these abilities, you had no idea whether Mr. Quick was
14   proficient in Microsoft Office Suite, correct?
15        MR. DABNEY:  Object to form.  Unclear as to
16   time frame and --
17        MR. ROMER-FRIEDMAN:  That's my point.
18        MR. DABNEY:  -- evaluation or --
19        Q   (By Mr. Romer-Friedman)  That's my point,
20   right, is you didn't have information to know, at the time
21   when Mr. Quick was seeking reemployment, whether he had
22   demonstrated those particular things, as opposed to the
23   things in the Section 5, right, are about his prior
24   experience, which said he said.  6 is about skills,
25   abilities.  And at that time in 2014, there was a

171

1    seven-year gap in knowledge, right?
2         A   Sure.
3         Q   Okay.  Let's look at the next position --
4         A   Okay.
5         Q   -- which is on Bates number 749, assistant
6    chief pilot.  And it says -- the summary is, The assistant
7    chief pilot reports directly to the chief pilot and is
8    responsible for supporting the chief pilot in all
9    administrative, supervisory functions with the domicile.
10   Correct?
11        A   Correct.
12        Q   Okay.  And on qualifications it says, Two
13   years' experience as qualified PIC at Frontier Airlines
14   preferred.  Excellent working knowledge of Frontier, FAPA,
15   CBA, FOM Volume 1 and 2, MEL employee handbook.  Prior
16   aviation-related supervisory experience preferred.  Check
17   airman preferred.  Ability to become check airman
18   required.
19        So let's talk about that last one.  Check
20   airman preferred, what does that mean?
21        A   An individual that has an FAA letter of
22   authorization to act in the capacity of a line check
23   airman on the Airbus A-320 sere aircraft is a preferred
24   requirement.
25        Q   Okay.  And so ability to become a check airman

Deposition of: Joseph Thibodeau (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

---

172

1    means, like, the person would become the examiner, right,
2    to do the check?
3        A    Recurrent line check --
4        Q    Right.
5        A    -- and to -- yes.
6        Q    Okay.  Is that the -- is that the kind of thing
7    that somebody could be trained to do?
8        A    Yes.  We have a training module, but you have
9    to, in order to hold the line check airman letter, also be
10   able to provide what we discussed earlier, initial
11   operating experience or upgrade operating experience.
12   It's a position wherein a check airman will need to be a
13   crew member onboard the aircraft, whether it's a captain
14   or first officer, depending on the requirement of the
15   training.
16       Q    So to be a check airman, they would need to
17   have an FAA medical clearance?
18       A    To act in the capacity of a check airman at
19   that time, yes.
20       Q    All right.  But, again, here it's check airman
21   preferred, right --
22       A    Correct.
23       Q    -- for when you're hired?
24       A    Correct.
25       Q    Okay.  And so if it were -- if it had been

---

173

1    possible for Mr. Quick in the future to have become
2    medically -- to get a medical clearance in the FAA, it's
3    possible over time he could have gotten the -- become a
4    check airman, correct?
5            MR. DABNEY:  Objection.  Assumes facts.
6        A    Yeah, I would -- I would agree.  We're assuming
7    several things there.
8        Q    (By Mr. Romer-Friedman)  Okay.  But it's not
9    impossible?
10       A    You have to have a medical and you have to be
11   type rated in the aircraft.
12       Q    Okay.  Did Mr. Quick have prior
13   aviation-related supervisory experience?
14       A    He has so listed on his resume.
15       Q    Okay.  And we talked earlier.  You said you
16   didn't have any reason to question that that was accurate,
17   correct?
18       A    That is correct.
19       Q    Okay.  And do you have any -- do you know
20   whether Mr. Quick had knowledge of the CBA or the employee
21   handbook, those kinds of things?
22       A    Respectfully, I -- I've never administered any
23   tests or quizzes.  I don't know what his level -- and we
24   had not interviewed him.
25       Q    And he had two years' experience as a qualified

---

174

1    PIC, right?
2        A    No, sir.
3        Q    Experience as a qualified PIC at Frontier?  No?
4        A    No.
5        Q    Okay.  But that's preferred, right, not
6    required?
7        A    Correct.
8        Q    Okay.  So it's possible that at the time he
9    met -- he could have met the base qualifications --
10           MR. DABNEY:  Objection.  Assumes facts.
11       Q    (By Mr. Romer-Friedman)  -- in September 2014
12   for assistant chief pilot, correct?
13           MR. DABNEY:  Same objection.
14       A    With the absence -- in September 2014, the
15   absence is the ability to become a check airman being
16   required.  If an individual cannot possess a medical at
17   all ever, there's no possible way they could become a
18   check airman.
19       Q    (By Mr. Romer-Friedman)  Yeah, I mean, at that
20   point when you heard that Mr. Quick couldn't get a medical
21   -- medical clearance -- first class medical clearance in
22   2014, did you know that that was permanent, or did you
23   have any reason to know whether that might be a temporary
24   thing that might prevent him from getting a clearance for,
25   let's say, six months?

---

175

1        A    No.  And, again, that's why I handed it off to
2    HR.  I had no idea if he was serious about being an
3    assistant chief pilot or if it was in jest because he
4    wanted to be on long-term disability.
5        Q    Okay.  But if a person at the time couldn't get
6    a medical clearance for -- but potentially could, let's
7    say, in three or six months, they would have the ability
8    in the future to become a check airman, right?
9        A    It would -- the catch that we haven't discussed
10   is the requirement that is currently in our collective
11   bargaining agreement, which requires a requisite amount of
12   pilot command hours flown in a Frontier aircraft.  So that
13   is another requirement that is not listed on this page,
14   but in order to be in compliance with the contract, we
15   have to have a minimum prescribed time in the aircraft.
16       Q    And do you know if Mr. Quick had sufficient
17   hours in command?
18       A    He did not.
19       Q    And when you say "command," is that as a
20   captain or as a first officer?
21       A    500 hours pilot in command on the Airbus A-320
22   series aircraft.
23       Q    Where is that requirement?
24       A    In our collective bargaining agreement.
25       Q    Okay.  Let's look at the next job, director of

---

Deposition of:   Joseph Thibodeau (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

---

176

1    flight operations training.
2         And actually, just to back up, the first two
3    job positions, neither of those, assistant chief pilot or
4    instructor of flight operations, neither of those
5    requires, at the time the person is hired, to have an FAA
6    clearance, correct, for medical?
7    A   It is not listed on these job descriptions.
8    Q   Okay.  How about this one for the -- the
9    director of flight operations training at FAA 751 of
10   Exhibit 7?  Under qualifications, it lists five years'
11   experience in Part 121 training; airline training
12   programs; five years experience in Part 121 pilot
13   operations; airline flight training and ground training
14   experience; previous leadership experience in Part 121
15   airline training programs; A-320 type rating preferred.
16        Does this require an active medical clearance
17   in the FAA?
18   A   I don't see that on this list.
19   Q   Okay.  And again here, the A-320 rating is
20   preferred but not required, correct?
21   A   That's what it states.
22   Q   Okay.  Do you have any reason to believe that
23   Mr. Quick would not meet these basic qualifications?
24   A   I have no idea what operating certificate
25   American Eagle was operating under at the time that

---

177

1    Mr. Quick was instructing, so I can't answer if he has at
2    least five years experience in 121 airline training
3    programs.  If he does not -- I have no idea on how to
4    answer if he has five years' experience in 121 pilot
5    operations.
6         So to answer your question, there would be
7    reason for me to have concern and question and follow up.
8    Q   Okay.  But you wouldn't -- based on what you've
9    seen in the record, you don't know that he was -- would be
10   disqualified based on those qualifications?
11        MR. DABNEY:  Objection.  Misstates the
12   testimony.
13   A   I would have to review operating certificates,
14   cross-checking with Mr. Quick's resume.
15   Q   (By Mr. Romer-Friedman)  Okay.
16   A   FAR Part 135 and Part 121 are -- are different.
17   Q   Okay.  Let's look at the last position, and
18   then we'll be done with this boring document.  The final
19   position, on Bates number FAA 753 of Exhibit 7, is
20   instructor, ground school.  Summary says, Facilitates all
21   ground school instruction for pilots.  Responsible for all
22   phases of ground training for initial upgrade
23   requalification recurrent.  And it lists the
24   qualifications as two to three years of experience in
25   training instruction required.  Must receive a

---

178

1    satisfactory review on mandatory FAA observation.  One
2    year of previous experience teaching the A-320 aircraft.
3         And FAR 121 or 142, says, FAA certification,
4    ground school instructor or commercial pilot preferred.
5    Previous FAR 121 fix-based full flight simulator
6    experience preferred.  Some college preferred.
7         So it looks like here, the bottom four bullets
8    of Section 5 are all preferred.  So do you know whether --
9    the two things that appeared to be mandatory, do you know
10   if Mr. Quick would be disqualified based on these?
11   A   I don't -- the top bullet, I don't know --
12   again, without reviewing and cross-checking Ed's resume, I
13   don't know if he has to two three years of experience in
14   training or instruction.  Five-plus years of experience --
15   of experience piloting A-320 aircraft may be considered in
16   lieu of.  My knowledge, the cumulative total of
17   Mr. Quick's experience with A-320 does not equal five-plus
18   years.
19   Q   Okay.
20   A   So I would have -- we would have --
21   Q   We would have to look at the two to three
22   years' experience and training?
23   A   Correct.
24   Q   Okay.
25   A   We would have to look at that.

---

179

1         And must receive a satisfactory review on
2    mandatory FAA observations, I can't give you an answer on
3    that.  That would be up to Mr. Quick that day and the
4    examiner, whoever the examiner was, on how does he
5    perform, how was he evaluated.
6    Q   Okay.  So it would be at the time, like in 2014
7    or 2015, whenever he went for that observation by the FAA,
8    whether it was satisfactory?
9    A   Correct.
10   Q   You wouldn't look back to 2007 and say seven
11   years ago, this guy failed a check?
12   A   Again, this -- you know, this is not my
13   bailiwick, reporting to the ground school program manager.
14   But looking at this on the surface, they're apples and
15   oranges.
16   Q   Okay.  And, again, just to close this out, you
17   never went through these positions to see if Mr. Quick was
18   qualified?
19   A   Again, the only one that --
20   Q   Until today?
21   A   The only one that I would have been qualified
22   to have reviewed would have been the assistant chief pilot
23   position.  And to reiterate, the only time that Mr. Quick
24   ever brought that up with me, I didn't know if he was
25   serious or in jest, which is why when he mentioned LTD,

---

Deposition of:  Joseph Thibodeau (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

180

```
1   meaning long-term disability, I referred it to HR.
2       Q   Okay.  Now, eventually, Frontier, it's their
3   position that they offered him two positions in 2015.  Are
4   you aware of that?
5       A   Only through discussion.
6       Q   Discussion with?
7       A   With counsel.
8       Q   Okay.  Do you know what those positions were?
9       A   AOG buyer and the crew scheduler, I believe.
10      Q   And were those -- did you play any role
11  in determining that he could do those positions?
12      A   No.
13      Q   Okay.  Are --
14      A   Those positions don't report to the chief
15  pilot.
16      Q   Who do they report to?
17      A   I don't know.  Crew scheduler reports to the
18  manager of crew scheduling.  I have no idea who an AOG
19  buyer reports to.
20      Q   Okay.  In the context of Frontier determining
21  that he was qualified for those two positions --
22      MR. DABNEY:  Objection.  Assumes facts.
23      MR. ROMER-FRIEDMAN:  Do you think I could
24  finish my question and then you can object?
25      MR. DABNEY:  My apologies.  I thought you were
```

181

```
1   finished.
2       MR. ROMER-FRIEDMAN:  No problem.
3       Q   (By Mr. Romer-Friedman)  Insofar as Frontier
4   ultimately offered him these two positions, did you play
5   any role in trying to identify any position within your
6   chain of command that he could do?
7       A   So if I understand, you're asking two separate
8   things, about the crew scheduling and AOG buyer positions,
9   and anything under my chain of command?
10      Q   Sure.  Let's separate those out.  That's fair.
11  That's a compound question.
12          After September 2014, did you play any role or
13  take any action to determine whether Mr. Quick could do
14  any job at Frontier Airlines?
15      A   No, sir.
16      Q   Okay.  Did anyone ask you to help them with
17  that?
18      A   No, sir.
19      Q   Did anyone ask you whether in your view there
20  was a position within your chain of command that could be
21  done by someone who lacked an FAA medical clearance?
22      A   It had to have been discussed, but I can't -- I
23  can't recall specifics --
24      Q   Okay.
25      A   -- you know, what would have been discussed.
```

182

```
1   And, again, as we just went through and reviewed, my chain
2   of command is rather limited with regard to all the
3   positions in flight operations.
4       Q   Okay.  In your experience, is it pretty common
5   for lawyers or consultants to be involved in determining
6   reemployment opportunities for service members coming
7   back?
8       A   I don't have any basis or experience to answer
9   that question.
10      Q   Have you ever seen Frontier deal with -- use
11  lawyers or benefits consultants to try to figure out
12  whether someone can or should be reemployed?
13      A   Yes, we have engaged legal counsel, but I can't
14  recall specifics with regard to reemployment.
15      MR. ROMER-FRIEDMAN:  Can we take a five-minute
16  break, and then I may have five, ten minutes of questions
17  and then we can break for lunch.
18      THE VIDEOGRAPHER:  Going off the record, the
19  time is 1:06.
20      (A recess was taken from 1:06 p.m. until
21  1:21 p.m.)
22      THE VIDEOGRAPHER:  We are back on the record,
23  and the time is 1:21 with Media Unit 3 in the deposition
24  of Joseph Thibodeau.
25      Q   (By Mr. Romer-Friedman)  All right.  We've come
```

183

```
1   back from our break, Mr. Thibodeau.  Do you understand
2   you're still under oath?
3       A   Yes, sir.
4       Q   Same ground rules apply?
5       A   Yes, sir.
6       Q   Great.
7           I want you to look back quickly at Exhibit 7
8   again and just these positions.  Can you tell me how many
9   positions at Frontier there are for instructor, flight
10  operations?  Do you know?
11      A   I don't know.
12      Q   Do you have a ballpark sense?  Five?  15?
13      A   Ten.
14      Q   Ten.  Okay.  How about the assistant chief
15  pilot, which is on page 749?
16      A   By definition, that job description is two.
17      Q   Two?
18      A   Yes, sir.
19      Q   There two assistant chief pilots?
20      A   Correct.
21      Q   How about the director of flight operations
22  training?
23      A   There is only one.
24      Q   Okay.  And how about instructor, ground school?
25  How many positions are there?
```

Deposition of:  Joseph Thibodeau (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

---

184

1      A   I believe -- instructor, I believe there are
2   only two.
3      Q   Okay.  Great.  And among the -- the assistant
4   pilots, do you know if among the people who have been
5   employed as assistant pilots since September 2014 whether
6   any of them have less seniority than Mr. Quick?
7      A   One, two -- yes.  Two of them, yes.
8      Q   Two of them have less seniority than Mr. Quick?
9      A   Yes.
10     Q   Do you know how many -- how many have more?
11     A   Since September 2014, only one.
12     Q   Okay.  How about the other positions here?  How
13  about --
14     A   I have no idea.
15     Q   You don't know the other people?
16     A   No.
17     Q   Okay.  And in -- in the context of reviewing
18  these files and your work as chief pilot, have you had an
19  opportunity to review Mr. Quick's military experience from
20  2007 to 2014, in terms of what he did?
21     A   Only through transcripts, through his
22  deposition.  Very brief.
23     Q   Okay.  So you're aware that he was a captain --
24  he flew as a captain in the army for a number of years,
25  between 2007 and when he was ultimately grounded later?

---

185

1      A   Correct.
2      Q   Okay.  Do you have any reason to believe that
3   the quality of his work as a captain was not satisfactory?
4      A   Satisfactory to whom?
5      Q   To the army.
6          MR. DABNEY:  Object to foundation.
7      A   I don't know.
8      Q   (By Mr. Romer-Friedman)  Have you seen anything
9   in the record that --
10     A   No.
11     Q   -- suggests the army believed his service as a
12  captain was not adequate?
13     A   I have not seen anything.
14     Q   Okay.  Do you know much about military pilots
15  or the standards for them?
16         MR. DABNEY:  Objection.  Vague.
17     A   Yeah, I couldn't answer that.  Do I know much
18  with regard to -- to what?
19     Q   (By Mr. Romer-Friedman)  Do you think the army
20  would employ someone who had inadequate skills as a
21  captain in the army?
22         MR. DABNEY:  Objection to form.  Lacks
23  foundation.
24     A   I haven't been in the Army, so I can't speak to
25  their practical test standards.  I don't know what their

---

186

1   basis of evaluation is compared to 121 world.
2      Q   (By Mr. Romer-Friedman)  Okay.  If you were --
3   if you had the opportunity to determine whether Mr. Quick
4   could have done any of these positions in Exhibit 7, would
5   you have considered his military pilot experience in
6   determining what his qualifications were?
7      A   We would have to go case by case, again,
8   through each of these job descriptions.
9      Q   But in doing that, you would necessarily look
10  at his experience from 2007 to 2014 as a military pilot?
11     A   Case by case, I don't know that that experience
12  directly correlates to a 121 world.
13     Q   Okay.  But I guess my point is:  To determine
14  case by case whether he -- whether he had the
15  qualifications for these positions in Exhibit 7, it would
16  have been relevant to consider his military pilot
17  experience from '07 through 14?
18         MR. DABNEY:  Asked and answered.
19     A   Where relevant.
20     Q   (By Mr. Romer-Friedman)  Where relevant.
21     A   Where relevant.  But we have many
22  qualifications in FAR Part 121.  FAR Part 121 experience
23  has nothing whatsoever to do with military experience.
24     Q   Okay.  What is Mr. Quick's current status at
25  Frontier?

---

187

1      A   I don't know.  Within the -- within his -- we
2   would have to ask HR to look in his -- his file to find
3   out where they have him -- how they have him classified.
4   I don't know.
5      Q   Do you think it would be appropriate for him to
6   be listed as being a current pilot at Frontier Airlines?
7      A   Well, we classify as first officer or captain.
8      Q   Do you think it would be appropriate to list
9   him as a first officer in HR files and records at this
10  point?
11         MR. DABNEY:  Object to form.
12     A   I'm not familiar with how they list -- how they
13  do that.  I don't know.
14     Q   (By Mr. Romer-Friedman)  Okay.  Is there anyone
15  else who's listed as a pilot -- or is there anyone else in
16  -- under your command who you're not -- you don't know
17  what their status is at the company?
18     A   No.  Within my command?  No, I know what our
19  classifications are.
20     Q   Okay.  But you don't know with respect to
21  Mr. Quick?
22     A   No, not with respect to Mr. Quick because the
23  question is where is he now, today.  I don't know.  I know
24  where he was when he left and was in contact with me in
25  September, but where we are today, I don't know how HR has

---

Deposition of:  Joseph Thibodeau (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

188

1    classified him as a pilot.  He left as -- he went on
2    military leave as a pilot.  He wanted to be reemployed as
3    a pilot.  I would suspect he is classified as a pilot, but
4    I don't know.
5        Q   Okay.  Last question is I know that there was a
6    dispute when Mr. Quick was coming back from military leave
7    about whether his pay rate should be a first officer or a
8    captain, right?
9        A   Correct.
10       Q   Do you recall that that was a dispute?
11       A   A formal dispute as defined by collective
12   bargaining agreement?
13       Q   I mean more kind of a layperson dispute.  A
14   disagreement between --
15       A   I would agree.
16       Q   -- HR and Mr. Quick, right?
17       A   I would agree.  I was aware of that.
18       Q   Okay.  In your experience as the chief pilot,
19   is a disagreement over what the appropriate rate is for
20   someone when they return from military leave a reason to
21   delay their reinstatement into a job that they can do?
22       MR. DABNEY:  Object to form.
23       A   Yeah, I don't know how he -- I couldn't speak
24   on behalf of HR.
25       Q   (By Mr. Romer-Friedman) Have you ever seen a

189

1    disagreement over a pay rate result in a service member
2    not be returned to a job at Frontier?
3        A   No, I have not.
4        Q   Okay.
5        MR. ROMER-FRIEDMAN:  That's all.  Do you have
6    anything?
7        MR. DABNEY:  Yes.
8            EXAMINATION
9    BY MR. DABNEY:
10       Q   JP, do you recall a series of questions about
11   the e-mails that were exchanged between you and Mr. Quick
12   when he first contacted you in September 2014?
13       A   Yes, sir.
14       Q   And in at least one of the e-mails that came
15   subsequent to the first one, he indicated that he had a
16   medical condition; is that right?
17       A   Yes, sir.
18       Q   And then in a subsequent phone call, he stated
19   to you that -- or he made a statement to the effect that
20   he could come back to work at Frontier as an assistant
21   chief pilot for one day and then go out on long-term
22   disability?  He made that statement?
23       A   That's my recollection.
24       Q   Did you know what he meant by long-term
25   disability in terms of his own personal situation?

190

1        MR. ROMER-FRIEDMAN:  Objection.
2        A   No, I did not know.
3        Q   (By Mr. Dabney) okay.
4        A   I did not know the state of his disability.
5        Q   Did he -- did he at any point ever offer to
6    enlighten you about that?
7        A   No.
8        Q   Okay.  You were asked a series of questions
9    about what you would have done, had you been consulted by
10   HR, in terms of returning Mr. Quick to a position in
11   flight operations, and we talked about several positions.
12   Do you remember that?
13       A   Yes, sir.
14       Q   Okay.  And you reviewed the job descriptions
15   and qualifications listed on those documents, correct?
16       A   I did.
17       Q   In terms of analyzing reemployment of Mr. Quick
18   into one of those flight operations positions where you
19   would have input, would the reference Mr. Quick had made
20   to a medical condition and the reference Mr. Quick made to
21   long-term disability have had any impact on your analysis?
22       MR. ROMER-FRIEDMAN:  Objection.  Compound.
23       A   Yes, it would have.  With the knowledge
24   supplied and what we know how now --
25       Q   (By Mr. Dabney) Well, just sticking with what

191

1    Mr. Quick told you at the time.  The medical condition
2    that he had that was unspecified and a references to
3    long-term disability, would those things, in and of
4    themselves, have played any role in any analysis that you
5    subsequently did if you had been asked regarding returning
6    him to work in one of these flight operations positions?
7        MR. ROMER-FRIEDMAN:  Objection.
8        A   Yes.  We needed more follow-up.
9        Q   (By Mr. Dabney) In what way?
10       A   I'd need to know what is the disability.  How
11   would it affect performance in any one of these roles.
12   There are several elements, particularly the assistant
13   chief pilot that reports to the chief pilot, what a
14   disability may impact the performance in that position.
15   We would need to collaborate with HR and the chief pilot
16   on what is the disability, how will it affect the
17   performance in this -- this position.
18       Q   And I understand that since that time, you have
19   reviewed Mr. Quick's deposition transcript?
20       A   Yes, I have.
21       Q   And you reviewed the information contained in
22   there that discusses various disabilities and medical
23   issues that pertain to Mr. Quick?
24       A   I have.
25       Q   Having reviewed that now, would any of those

Deposition of:  Joseph Thibodeau (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

192

1  have been -- would any of those be relevant to
2  consideration for him as assistant chief pilot or one of
3  the other operations positions under your purview?
4       MR. ROMER-FRIEDMAN:  Objection.
5       A   I can speak to the assistant chief pilot piece
6  and answer yes.  What was read in the transcript would
7  concern me with performance in the assistant chief pilot
8  position.
9       Q   (By Mr. Dabney)  Any particular functions?
10      A   Yes.  If we go to knowledge, skills, abilities
11  in the assistant chief pilot, page 2, ability to
12  communicate verbally and in writing in a professional and
13  positive manner with all company personnel as well as
14  outside agency representatives.  Second bullet, ability to
15  perform -- pardon me -- ability to problem solve and react
16  positively to all types of difficult situations.  And the
17  third, ability to manage, implement and maintain a project
18  from beginning to end.
19      What I read in the transcript with regard to
20  ability to complete simple tasks, emotional outbursts,
21  issues arising from being withdrawn, not communicating
22  with others, go directly counter to what we need our
23  assistant chief pilots to be able to do.  That would cause
24  concern.
25      Q   Did you review any information in the

193

1  transcript concerning problems with cognitive processing?
2       A   Yes.
3       Q   Did you review any information in the
4  transcript with regard to difficulty with memory?
5       A   Yes.
6       Q   Would those types of difficulties raise any
7  concern with respect to the position of chief pilot --
8       MR. ROMER-FRIEDMAN:  Objection.
9       Q   (By Mr. Dabney)  -- assistant chief pilot?
10      A   Yes, it would raise concerns.
11      Q   In what way?
12      A   Our assistant chief pilots are tasked daily
13  with a need to carry out many complex operations
14  simultaneously, whether it's with operational control of
15  our fleet, our aircraft, our airline; communicating with
16  our pilots; communicating with our flight attendants;
17  communicating interdepartmentally.  That is what our --
18  what our assistant chief pilots do every day.  Emotional
19  outbursts, carrying out and completing simple tasks or
20  complex tasks need to be done every day.
21      So what I read absolutely would concern me with
22  an ability to fill this role.
23      Q   And does an assistant chief pilot have any
24  responsibilities that are different from the day-to-day
25  when you are absent?

194

1       A   Absolutely.
2       Q   What are those?
3       A   When I am absent, one of the assistant chief
4  pilots acts in my capacity, directly reporting to the FAA
5  and maintaining what is defined in FAR Part 119 a concept
6  of operational control.  Responsibility for the safety and
7  regulatory compliance of the airline at all times.
8       Q   If there were an emergency with respect to
9  airlines operations flight-wise and you were absent, what
10  would the assistant chief pilot's role be?
11      A   To coordinate the flight operations emergency
12  response, the chief pilot's office portion of the flight
13  operations emergency response.
14      Q   And what could that include in terms of
15  significant actions?
16      A   Contacting crew members, contacting family
17  members, contacting the NTSB, contacting the local FAA,
18  contacting the union, carrying out -- securing our crew
19  room, securing what we call V files, which are employee
20  files.
21      There's a checklist that needs to be followed
22  and gone through that is specific to each department.
23  Chief pilots -- I've named several of the tasks that are
24  in the chief pilot's --
25      Q   Well, would the person acting in your absence

195

1  have authority to shut down the airline?
2       A   Yes, absolutely.  Yes.  By definition, in that
3  119 role, that person who maintains operational control
4  can shut down the airline.
5       MR. DABNEY:  Those are all my questions.
6       MR. ROMER-FRIEDMAN:  Just a couple follow-ups
7  on that.
8       EXAMINATION
9  BY MR. ROMER-FRIEDMAN:
10      Q   When you refer to the information that -- the
11  transcript, that you read the transcript and the exhibits?
12      A   The transcript, yes, sir.
13      Q   From Mr. Quick's deposition?
14      A   Yes, sir.
15      Q   Did you look at the exhibits?
16      A   Not entirely.
17      Q   Okay.  What do you mean, "not entirely"?
18      A   I haven't looked at every single exhibit.
19      Q   Did you look at most of them?
20      A   I looked at a couple.
21      Q   A couple of them.  That were e-mails, you said?
22      A   Yeah.
23      Q   Okay.  When you were talking about emotional
24  outbursts and cognitive difficulties, what information are
25  you relying on?  Is that what Mr. Dabney was asking

Deposition of:  Joseph Thibodeau (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

196

1  Mr. Quick about, or were those things that Mr. Quick said
2  specifically about himself?
3      A   They were specific questions from -- I can't
4  remember if it was an administrative law judge or Social
5  Security. I can't recall.  But they were specific
6  exchange regarding ability to be a cashier or a clerk at
7  711 and the -- and difficult -- it would be difficult to
8  complete those tasks as a clerk or a cashier at 711 due to
9  what we had mentioned.
10     Q   Okay.  And the -- the time in which those
11 statements were made, is that when you were -- when you
12 were thinking about that, I guess in the past week or two,
13 are you relying on information -- sorry.
14         In what you just told Mr. Dabney about your
15 concern about whether Mr. Quick could fulfill the various
16 duties and qualifications of these positions, you're
17 relying on information that was said back in 2012 or 2013,
18 not current information, correct?
19         MR. DABNEY:  Object to form.
20     A   The way that Mr. Dabney framed the question was
21 knowing what I know now, would that impact the performance
22 of this position.  That's how I was answering Mr. Dabney's
23 question.
24     Q   (By Mr. Romer-Friedman)  And I guess what I'm
25 asking is:  What you know now is not based on current

197

1  evaluations of Mr. Quick but, rather, historical
2  information, correct?
3      A   It was based on what was in the transcript.
4      Q   Okay.  But in the fall of September -- the fall
5  of 2014 or 2015, if you had at the time tried to ascertain
6  whether Mr. Quick was qualified for these positions, the
7  best way to do that would have been figure out at that
8  time what were his capabilities, what were his
9  disabilities, right?
10     A   I wasn't allowed that opportunity.
11     Q   Okay.
12     A   I --
13     Q   Right.  And I think before, when you were asked
14 by me about how does the airline -- how would you assess
15 someone's capabilities, you said that's not my decision;
16 that's for the doctor or the doctor in conjunction with HR
17 to determine what the person can do, right?
18     A   Correct.
19     Q   So right now in trying to assess what someone
20 said in a transcript about what was said to an
21 administrative law judge, you're not the person in the
22 airline to determine or evaluate the medical condition to
23 determine what the person could do, right?
24     A   The transcript had come from notes and
25 evaluations from doctors.  That's how I read it.  And,

198

1  again, the question from Mr. Dabney right now was knowing
2  what I know now, how would I apply that.
3      Q   Okay.
4      A   So...
5      Q   How long did it take you to review that
6  transcript?
7      A   Several hours.
8      Q   Like three hours or?
9      A   Three, four hours.
10     Q   Okay.
11     A   I was very deliberate with reading it.
12     Q   You read it cover to cover?
13     A   I didn't read all of the table of -- not the
14 table of contents but the index at the back.
15     Q   Yeah, I didn't --
16     A   I did not read all that.
17         MR. ROMER-FRIEDMAN:  I think that's it.  Thank
18 you.
19         MR. DABNEY:  I have a couple follow-ups.
20             EXAMINATION
21 BY MR. DABNEY:
22     Q   In respect to the questions you were asked
23 about a doctor's role in evaluating whether Mr. Quick or
24 anyone else could perform particular positions given any
25 issues they may have, disabilities, et cetera, is your

199

1  testimony that Frontier would turn that decision over to a
2  physician or other medical provider entirely?  Or is it
3  your testimony that you would seek the input of those
4  positions, but a decision whether a particular person was
5  able or not able to perform up to the necessary standards
6  be Frontier's at the end of the day?
7          MR. ROMER-FRIEDMAN:  Objection.  Compound.
8  Asked and answered.
9      A   We would have to take a holistic and global
10 view, seeking input from all.
11     Q   (By Mr. Dabney)  So the answer about as far as
12 who has the final say, is it your understanding that that
13 would be done by a third-party medical professional, or is
14 it your understanding that it would be done by someone at
15 Frontier taking that into account?
16     A   We would have to take it into account.
17     Q   You also indicated that you answered my
18 questions just earlier in the context of knowing what you
19 know now.
20     A   Correct.
21     Q   You also answered several questions in the
22 context of what you knew in 2014 from your communications
23 with Mr. Quick, correct?
24     A   Correct.
25         MR. DABNEY:  That's all I have.

Deposition of:  Joseph Thibodeau (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

---

200

1          MR. ROMER-FRIEDMAN: Okay.  Thanks.
2          THE VIDEOGRAPHER:  This concludes the
3    deposition of Joseph Thibodeau with Media Unit 3 of 3.
4    Going off the record, the time is 1:42.
5          MR. DABNEY:  We'll read and sign.
6          (The deposition concluded at 1:42 p.m. on the
7    4th day of August, 2016.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

201

1                    AFFIDAVIT
2      I have read my deposition, and it is true and accurate,
3      except for changes or corrections now indicated by me on
4                the Amendment sheet.
5
6          Amendment sheet attached  ( )
7          No changes to testimony   ( )
8
9          _____
10              JOSEPH THIBODEAU
11
12      Subscribed and sworn to before me this
     date, _____ 2016.
13
           My Commission expires:
14              _____
15          _____
16          NOTARY PUBLIC
17          _____
           STREET ADDRESS
18          _____
           CITY, STATE, ZIP
19
20
21    Return to:  MILE HIGH COURT Reporting & Video, INC.
              14143 Denver West Parkway
22            Suite 100
              Golden, Colorado  80401
23
24
25

---

202

1                   CERTIFICATE
2
     STATE OF COLORADO        )
3                            ) ss.
     COUNTY OF ADAMS          )
4
5          I, Shauna T. DIETEL, Registered
     Professional Reporter, and Notary Public of the State of
6    Colorado, certify that before the deposition the witness
     sworn by me to testify to the truth, and that the
7    foregoing is a true transcript of the questions asked,
     testimony given, and proceedings had.
8
9          I further certify that I am not related to,
     any party herein, nor their counsel, and have no interest
10   in the result of this litigation.
11
12
13          _____
           Shauna T. Dietel, RPR
14         My commission expires 8/6/2017
15
16
17
18
19
20
21
22
23
24
25

---

Deposition of:  Joseph Thibodeau (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

August 17, 2016

WILLIAM R. DABNEY  ESQ.
Holland & Hart, LLP
555 17th Street
Suite 3200
Denver, Colorado  80202

RE:  Quick v. Frontier Airlines, et al.
     Civil Action No. 15-cv-00765-REB-KMT
     Deposition of:  JOSEPH THIBODEAU
     Taken:  August 4, 2016

Dear Mr. Dabney:

Enclose with your copy of the above-referenced
deposition is the signature page from the Court's
Original transcript.

In accordance with the Rule, please have the witness
read and sign his or her testimony, then return the
executed signature page and any amendment sheets used
to us within 35 days of the date of this letter.

Sincerely,

MILE HIGH COURT Reporting & Video, INC.

Encl.

cc: Original transcript

    Peter Romer-Friedman, Esq.

    Joseph A. Whitcomb, Esq.

Deposition of:  Joseph Thibodeau (Videotaped) - August 4, 2016
Edward Quick v. Frontier Airlines and Michele (sic) Zeier

PETER ROMER-FRIEDMAN, ESQ.
Washington Lawyers' Committee for
Civil Rights and Urban Affairs
11 Dupont Circle, NW
Suite 400
Washington, DC  20036

Re:  Quick v. Frontier Airlines, et al.
     Civil Action No. 15-cv-00765-REB-KMT
     Deposition of:  JOSEPH THIBODEAU
     Taken:  August 4, 2016

Dear Mr. Romer-Friedman:
The above-referenced original deposition is being filed
with you on this date:_____.

Pursuant to the governing Rules of Civil Procedure, the
above-mentioned deposition is being filed:

_____ signed, with no changes

_____ signed, with changes, a copy of which is attached

_____ unsigned, no changes

_____ unsigned, with changes, a copy of which is
      attached

_____ unsigned, pursuant to agreement of counsel that
      the deposition may be reviewed and signed at or
      before the time of trial

_____ unsigned, our office having received notice that
      the case has settled

_____ signature waived at the time of deposition

_____ signature not required

MILE HIGH COURT Reporting & Video, INC.
cc: Original transcript
    William R. Dabney, Esq.